Ashley M. McDow (245114)
Michael T. Delaney (261714)
**BAKER & HOSTETLER LLP**
11601 Wilshire Boulevard, Suite 1400
Los Angeles, CA 90025-0509
Telephone:   310.820.8800
Facsimile:    310.820.8859
Email:        amcdow@bakerlaw.com
              mdelaney@bakerlaw.com

Attorneys for Debtor,
SOUTHERN INYO HEALTHCARE DISTRICT

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

### FRESNO DIVISION

| | |
|---|---|
| In re<br><br>SOUTHERN INYO HEALTHCARE DISTRICT,<br><br>              Debtor. | Case No.: 2016-10015 FEC<br><br>Chapter 9<br><br>Doc. No. BH-19<br><br>**FIRST AMENDED DISCLOSURE STATEMENT WITH RESPECT TO THE PLAN FOR THE ADJUSTMENT OF DEBTS OF SOUTHERN INYO HEALTHCARE DISTRICT**<br><br><u>Hearing:</u><br>Date:    August 30, 2017<br>Time:    1:30 p.m.<br>Place:   Dept A, Ctrm 11<br>          U.S. Bankruptcy Court<br>          2500 Tulare Street<br>          Fresno, CA 93721 |

611073534.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1  **CAVEAT: The Bankruptcy Court has not yet approved the within disclosure statement**

2  **pursuant to section 1125(b) of the Bankruptcy Code for use in the solicitation of vote with**

3  **respect to the plan of adjustment of debts for Southern Inyo Healthcare District described**

4  **herein.  Accordingly, the filing and distribution of the within disclosure statement is not**

5  **intended and should not be construed as a solicitation of acceptance or rejection of the plan**

6  **of adjustment of debts described herein.**

7  [This caveat shall be removed prior to solicitation]

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

**Page**

I.    SUMMARY ............................................................................................... 6

II.   INTRODUCTION .................................................................................... 11

      A.    Purpose of the Disclosure Statement ............................................ 11

      B.    Summary of Entities Entitled to Vote to Accept or Reject the Plan and Certain Prerequisites to Confirming the Plan ......................... 12

      C.    Summary of Voting Procedures, Balloting Deadline, Confirmation Hearing, and Other Dates, Deadlines, and Procedures ....................... 13

            1.    Voting Procedures and Deadlines ....................................... 13

            2.    Date of Confirmation Hearing and Deadline for Objecting to Confirmation of the Plan ................................................ 13

      D.    General Notices and Disclaimers .................................................. 14

      E.    Additional Information .................................................................. 15

III.  BACKGROUND INFORMATION .......................................................... 15

      A.    The District ................................................................................... 15

      B.    Events Precipitating Bankruptcy .................................................. 16

            1.    Historical Financial Issues ................................................. 16

            2.    Breakdown of Operations Due to Cash Shortage ............... 17

            3.    Appointment and Actions of New Board of Directors.......... 18

IV.   COMMENCEMENT AND ADMINISTRATION OF CHAPTER 9 CASE .................. 20

      A.    Commencement of the Chapter 9 Case .......................................... 20

      B.    Immediate Actions to Stabilize Operations and Revenue Deficits ..................... 20

      C.    Eligibility Litigation ..................................................................... 21

      D.    Appointment of Patient Care Ombudsman .................................... 21

      E.    Disputes Pertaining to Claims Against the District........................ 22

      F.    Pending Litigation ........................................................................ 23

      G.    Post-Petition Financing ................................................................. 24

V.    THE DISTRICT'S LIABILITIES AND ASSETS ......................................... 25

      A.    Liabilities ...................................................................................... 25

            1.    Summary of Scheduled Claims ........................................... 25

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

611073534.1

2. Proofs of Claim ................................................................... 25

3. Alterations to Liability under the Plan ................................. 26

    a. Alteration of Claims .................................................. 26

    b. Disputed Claims ........................................................ 27

4. Summary of Current Liabilities ........................................... 29

5. Statement Regarding Liabilities .......................................... 29

B. Assets ........................................................................................ 30

    1. Additional Medical Services and Treatment ........................ 30

    2. The Bond Measure .............................................................. 31

    3. Parcel Tax Increase ............................................................ 32

    4. Transient Occupancy Tax ................................................... 33

    5. ViHF LOC ......................................................................... 34

    6. Claims and Causes of Action Against Third Parties ........... 34

VI. SUMMARY OF THE PLAN OF ADJUSTMENT ................................. 35

A. Classification and Treatment of Claims ................................... 36

    1. Unclassified Claims ............................................................ 36

        a. Administrative Expense Claims ................................. 36

        b. Professional Claims .................................................... 36

        c. Deadline for the Filing and Assertion of Postpetition Claims, Administrative Claims (Other Than Ordinary Course Administrative Claims), and Professional Claims ...................... 37

    2. Class 1 – Secured Claims .................................................... 38

        a. Class 1A – Action Capital Corporation ..................... 38

        b. Class 1B – Bank of the West/Thermo Fisher Financial Services, Inc. ............................................... 38

        c. Class 1C – Canon Financial Services, Inc. ................ 39

        d. Class 1D – Cardinal Health 110, LLC ....................... 39

        e. Class 1E – Healthcare Resource Group ..................... 40

        f. Class 1F – Optum Bank, Inc. ..................................... 41

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

- ii -

g.     Class 1G – Vi Healthcare Finance, Inc. ....................................... 41

3.   Class 2 – Post-Petition Claims ..................................................... 42

a.     Impairment and Voting ...................................................... 42

b.     Treatment ........................................................................... 42

4.   Class 3 – General Unsecured Claims ............................................ 42

a.     Impairment and Voting ...................................................... 42

b.     Treatment ........................................................................... 42

c.     Class 4 Election .................................................................. 43

5.   Class 4 – Convenience Claims ...................................................... 43

a.     Impairment and Voting ...................................................... 43

b.     Treatment ........................................................................... 43

B.   Treatment of Executory Contracts and Unexpired Leases ...................... 43

1.   Generally ....................................................................................... 43

2.   Assumption of Executory Contracts and Unexpired Leases .................... 44

a.     Cure Payments ................................................................... 44

b.     Adequate Assurance of Prompt Cure and Future Performance .... 45

3.   Rejection of Executory Contracts and Unexpired Leases ....................... 45

a.     Claims Arising from Rejection ................................................... 47

C.   Means for Execution and Implementation of Plan.................................. 47

D.   Distributions .................................................................................... 48

1.   Disbursing Agent ........................................................................... 48

2.   Delivery of Distributions................................................................ 49

3.   Undeliverable Distributions ........................................................... 49

4.   Distribution of Cash ...................................................................... 49

5.   Timeliness of Payments ................................................................. 50

6.   Default and Cure ........................................................................... 50

7.   Compliance with Tax Requirements ............................................... 50

8.   Time Bar to Cash Payments........................................................... 51

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

- iii -

| | | | |
|---|---|---|---|
| 9. | | No De Minimis Distributions | 51 |
| 10. | | No Distributions on Account of Disputed Claims | 51 |
| 11. | | No Post-Petition Date Accrual | 52 |
| E. | Disputed Claims; Objections to Claims; Prosecution of Objections to Disputed Claims | | 52 |
| | 1. | Claim Objection Deadline; Prosecution of Objections | 52 |
| | 2. | Reserves, Payments, and Distributions with Respect to Disputed Claims | 52 |
| F. | Continuing Jurisdiction of the Bankruptcy Court | | 53 |
| VII. | CONFIRMATION AND EFFECTIVE DATE OF THE PLAN | | 53 |
| | A. | Voting and Right to be Heard at Confirmation | 53 |
| | | 1. Who May Support or Object to Confirmation of the Plan? | 53 |
| | | 2. Who May Vote to Accept or Reject the Plan? | 53 |
| | | 3. Votes Required to Confirm Plan | 54 |
| | B. | The "Best Interests" Test | 54 |
| | C. | Feasibility | 56 |
| | D. | "Cramdown" | 56 |
| | E. | Conditions Precedent | 57 |
| | | 1. Condition Precedent to Confirmation | 57 |
| | | 2. Conditions Precedent to Effective Date | 57 |
| | | 3. Non-Occurrence of Effective Date | 58 |
| | | 4. Conditions Precedent to Effective Date Payments | 58 |
| | | 5. Waiver of Conditions Precedent to Effective Date | 58 |
| | F. | Effect of Confirmation | 58 |
| | | 1. Dissolution of the Committee | 59 |
| | | 2. Discharge of the District | 59 |
| | | 3. Injunction | 59 |
| | | 4. Term of Existing Injunctions and Stays | 60 |
| | | 5. Exculpation | 60 |

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

- iv -

**TABLE OF CONTENTS CONTINUED**

                                                                                  **Page**

1          6.      Good Faith Compromise ............................................................. 60

2    VIII.   RESERVATION OF RIGHTS OF ACTION ........................................ 61

3    IX.     RISK FACTORS ................................................................................... 61

4    X.      FEDERAL INCOME TAX CONSEQUENCES ................................. 63

5    XI.     RECOMMENDATION AND CONCLUSION .................................... 65

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS

611073534.1

**I.      SUMMARY**

      **The following section summarizes certain important aspects of the First Amended Plan for the Adjustment of Debts for Southern Inyo Healthcare District. These matters are discussed further elsewhere in the within First Amended Disclosure Statement with Respect to the Plan for the Adjustment of Debts for Southern Inyo Healthcare District. Capitalized terms are defined in the text of this Disclosure Statement as well as the Plan, and any capitalized term used but not defined in the Disclosure Statement shall have the meaning ascribed to such term in the Plan. Unless otherwise noted, all references to "section ____" refer to the specified section of the Bankruptcy Code.**

      **<u>Please be aware</u> that the Disclosure Statement contains information that may be important to certain creditors or classes of creditors that is not set forth in this Summary and that such information may influence your decision regarding whether to accept or reject the Plan. Accordingly, please review the Disclosure Statement and Plan as well as the supporting documents in their entirety.**

* * * *

      The Southern Inyo Healthcare District filed a petition for relief under chapter 9 of the Bankruptcy Code on January 4, 2016, which was designated Case Number 2016-10015. The United States Bankruptcy Court for the Eastern District of California, Fresno Division, the Honorable Fredrick E. Clement presiding, entered an order for relief in the Chapter 9 Case on July 12, 2016, as docket entry 195. The Chapter 9 Case currently is pending before the Bankruptcy Court.

      The *First Amended Plan for the Adjustment of Debts for Southern Inyo Healthcare District Dated March 31, 2017* proposed by the District involves the adjustment of the District's operations and the repayment of its obligations under the Plan with operational revenues as well as additional revenues in the form of a bond issuance and increases to parcel and transient occupancy taxes. With the additional funds and revenues generated from the bond and tax increases, the District will be able to maintain operations and repay its obligations pursuant to the

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

Plan by December 2025. While approval of the bond and tax measures is required and the District has yet to obtain such approval, the District has commenced the process for obtaining the approvals and believes it will obtain the necessary approvals prior to the end of 2017. If approved, the District projects that it will receive the funds generated by the bond issuance in or about February or March 2018, which will result in an Effective Date for the Plan in or about March 2018.

In the event the District is unable to adjust its debts pursuant to the Plan, or any amended or revised version thereof, the District will likely be unable to maintain operations and, as a result, will be forced to close the hospital, medical clinic, and skilled nursing facility, which would not only render the District unable to pay its obligations, it would leave the community without necessary medical services.

The following chart summarizes key information, including the proposed treatment of the various classes of claims:

| | |
|---|---|
| **Debtor** | Southern Inyo Healthcare District, a California Local Health Care District |
| **Bankruptcy Court** | United States Bankruptcy Court for the Eastern District of California, Fresno Division |
| | The Honorable Fredrick E. Clement presiding |
| **Plan** | First Amended Plan for the Adjustment of Debts of Southern Inyo Healthcare District dated July 19, 2017 |
| **Purpose of Disclosure Statement** | To provide information of a kind, and in sufficient detail, that would enable a typical holder of Claims in a class Impaired under the Plan to make an informed judgment with respect to voting on the Plan. |
| **Balloting Information** | Ballots have been provided with this Disclosure Statement to creditors known to have Claims that are Impaired under the Plan. *See* Exhibit 1.[1] |
| | Ballots must be <u>received by</u> the Ballot Tabulator no later than ____ a.m./p.m., Pacific Time, on _____ , |

---

[1] All exhibits referenced herein are attached to the contemporaneously-filed Exhibits to First Amended Plan for the Adjustment of Debts of Southern Inyo Healthcare District, Disclosure Statement Relating Thereto, and the Declaration of Brian Weiss in Support Thereof (the "**Plan Exhibits**"). Unless otherwise stated, "Exhibit __ " refers to the specified exhibit appended to the Plan Exhibits.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

- 7 -

2017.[2]

**Ballot Tabulator**                Sonia Gaeta, Baker & Hostetler LLP, 11601 Wilshire
                                     Blvd., Ste. 1400, Los Angeles, California 90025
                                     (facsimile 310.820.8859; email sgaeta@bakerlaw.com)

**Confirmation Hearing**            The Court shall hold a hearing regarding the confirmation
                                     of the Plan on _____ , 2017, commencing at _____
                                     a.m./p.m. Pacific Time.

**Confirmation Objections**         Any objections to confirmation of the Plan must be set
                                     forth in writing and filed and served no later than
                                     _____ , 2017.

**Treatment of Claims**             If the Court confirms the Plan and the Plan becomes
                                     effective, Claims will be treated as follows:

Administrative Claims               Administrative Claims shall receive Cash on the Effective
                                     Date, or as soon thereafter as practicable, in an amount
                                     equal to their approved Administrative Claim.

Professional Claims                 Holders of Professional Claims shall be treated as follows:
                                     (i) Baker & Hostetler LLP shall receive payment on
                                     account of the portion of its Allowed Professional Claim
                                     relating to attorneys' fees in monthly installments over a
                                     term of 36 months commencing on the Effective Date;
                                     and (ii) HCCA, Nave Cortell LLP, and Province as well
                                     as the portion of the Allowed Professional Claim of Baker
                                     & Hostetler LLP relating to costs incurred in the course of
                                     the Chapter 9 Case shall receive Cash on the Effective
                                     Date, or as soon thereafter as practicable, in an amount
                                     equal to their respective Allowed Professional Claims.

                                     Payment of Professional Claims is subject to a finding of
                                     the Bankruptcy Court that the amounts of the Professional
                                     Claims are reasonable.

Class 1                             Claims in Class 1 are separated in to subclasses, which, in
Secured Claims                      each instance, are treated as separate classes under the
                                     Plan.

Class 1A                            **Impaired.** Action Capital Corporation shall receive an
Action Capital                      allowed General Unsecured Claim in the amount of
Corporation                         $185,600.35.

Class 1B                            **Impaired.** The District shall surrender to Bank of the
Bank of the West/Thermo             West or Thermo Fisher Financial Services, Inc. the
Fisher Financial Services,          collateral for the underlying agreement.
Inc.

Class 1C                            **Impaired.** The District shall surrender to Canon
Canon Financial Services,           Financial Services, Inc. the collateral for the underlying

---

[2] The District shall fill-in all missing information and incorporate all bracketed language contained herein prior to circulation of the final disclosure statement for solicitation.

611073534.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

| | | |
|---|---|---|
| 1 | Inc. | agreement. |
| 2 | Class 1D | **Unimpaired.** Cardinal Health 110, LLC shall be entitled |
| | Cardinal Health 110, LLC | to retain the funds presently in its possession, which total |
| 3 | | $838.28. The remainder of this Claim shall be allowed as |
| | | a General Unsecured Claim. |
| 4 | | |
| 5 | Class 1E | **Impaired.** The District shall make periodic payments to |
| | Healthcare Resource | Healthcare Resource Group until the Class 1E Claim is |
| 6 | Group | paid in full with interest. |
| 7 | Class 1F | **Impaired**. Class 1F is comprised of the Disputed Claim |
| | Optum Bank, Inc. | of Optum. Class 1F shall not receive any distributions |
| 8 | | under the Plan unless and until a court of competent |
| | | jurisdiction enters a Final Order allowing the Optum |
| 9 | | Claim. If the Optum Claim is adjudged valid, enforceable |
| | | and secured in whole or in part, the District shall pay |
| 10 | | Optum Cash in an amount equal to the portion of the |
| | | Optum Claim allowed as a Secured Claim no later than |
| 11 | | one hundred and twenty (120) days following the entry of |
| | | a Final Order allowing the Optum Claim. If the Optum |
| 12 | | Claim is adjudge valid and enforceable but not wholly |
| | | secured, the portion of the Optum Claim adjudged to be a |
| 13 | | Secured Claim shall be treated pursuant to the preceding |
| | | sentence and any order(s) entered in the Optum Adversary |
| 14 | | and the remaining Allowed Claim shall be treated as a |
| | | General Unsecured Claim in Class 3. If the Optum Claim |
| 15 | | is adjudged invalid and unenforceable, Class 1F shall not |
| | | receive any distributions under the Plan. |
| 16 | Class 1G | **Impaired.** Vi Healthcare Finance Inc. shall receive |
| | Vi Healthcare Finance Inc. | payment in an amount equal to its then-existing Secured |
| 17 | | Claim on the Effective Date. |
| 18 | Class 2 | **Impaired.** Holders of Class 2 Claims shall receive Cash |
| | Post-Petition Claims | on the Effective Date, or as soon thereafter as practicable, |
| 19 | | in an amount equal to the amount listed for each |
| | | respective claimant in Exhibit 6 |
| 20 | | |
| 21 | Class 3 | **Impaired.** Holders of Class 3 Claims shall receive a *pro* |
| | General Unsecured Claims | *rata* portion of $100,000.00, which shall be paid as |
| 22 | | follows: (a) $50,000 on the Effective Date, or as soon |
| | | thereafter as practicable; and (b) $50,000 on the last |
| 23 | | Business Day of 2018, assuming the Effective Date has |
| | | already occurred. |
| 24 | | Holders of Class 3 Claims shall have the ability to waive |
| | | their entitlement to Class 3 treatment and, instead, elect to |
| 25 | | have their Claims treated as Class 4 Claims. *See* Section |
| | | VI.A.5.c. |
| 26 | Class 4 | **Impaired.** Holders of Class 4 Claims shall receive Cash |
| 27 | Convenience Class Claims | on the Effective Date, or as soon thereafter as practicable, |
| | | in an amount equal to the lesser of (a) the amount of their |
| 28 | | Allowed Class 4 Claims or (b) $100.00. |

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

- 9 -

| | |
|---|---|
| **<u>Background Information</u>** | See pages 13 to 22 |
| **<u>Questions</u>** | Please contact the District's counsel, Ashley M. McDow, Baker & Hostetler LLP, 11601 Wilshire Blvd., Ste. 1400, Los Angeles, California 90025 (telephone 310.820.8800; facsimile 310.820.8859) |

**<u>PLEASE NOTE</u>: To the extent there is any inconsistency between the Plan (including the Exhibits and any supplements to the Plan) and the description of the Plan in the Disclosure Statement, the terms of the Plan (including the Exhibits and any supplements to the Plan) will govern.**

Baker & Hostetler LLP
Attorneys at Law
Los Angeles

FIRST AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS

611073534.1

## II.    INTRODUCTION

The District filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of California—thereby commencing the above-captioned bankruptcy case. On or about July 12, 2016, the Court entered an Order for Relief under chapter 9 of the Bankruptcy Code.

The District is the proponent of the Plan. During a hearing held on _____ , 2017, the Court found that the Disclosure Statement contains "adequate information" within the meaning of section 1125 of the Bankruptcy Code and authorized the District to transmit the Disclosure Statement and Plan to holders of Impaired claims in connection with the solicitation of votes on the Plan.

As discussed below, the District believes that adjusting its obligations pursuant to the Plan provides the best result for creditors and that any alternative would result in delay and/or reduced distributions to creditors, if any at all. Accordingly, the District encourages creditors to vote to accept the Plan.

### A.    Purpose of the Disclosure Statement

The Bankruptcy Code generally requires that the proponent of a plan of adjustment prepare and file with the Bankruptcy Court a "disclosure statement" that provides information of a kind and in sufficient detail that would enable a typical holder of claims in a Class Impaired under the proposed plan to make an informed decision regarding whether to accept or reject the plan. In accordance with this requirement, the within Disclosure Statement provides information regarding the Plan and the treatment of Claims thereunder. ***Parties in interest should read the Plan and Disclosure Statement as well as all associated documents carefully and in their entirety in order to (a) determine how the Plan will affect their Claims against the District, (b) understand their rights (if any) as they pertain to voting on the Plan, (c) understand their rights (if any) as they pertain to objecting to confirmation of the Plan, and (d) determine how and when creditors may vote to accept or reject the Plan.***

The Disclosure Statement cannot and, therefore, does not provide creditors with advice or inform creditors regarding all aspects of their rights. Holders of any Claims against the District

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

are advised to consult with independent counsel and/or a financial advisor to obtain advice regarding how the Plan will affect them and their Claims against the District and the best course of action to take with respect to the Plan.

This Disclosure Statement has been prepared in good faith and in compliance with applicable provisions of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure. Based upon currently available information, the District believes that the information contained in this Disclosure Statement is true and correct as of the date of its filing. The Disclosure Statement cannot and does not reflect events that may occur after July 19, 2017.

**B.     Summary of Entities Entitled to Vote to Accept or Reject the Plan and Certain Prerequisites to Confirming the Plan**

Each holder of an Allowed Claim classified into Classes 1A, 1B, 1C, 1E, 1G, 2, 3, and 4 of the Plan (collectively, the "**Voting Classes**") shall be entitled to vote each such Claim to accept or reject the Plan.[3]

The Bankruptcy Court may only confirm the Plan if at least one Class of Impaired Claims has voted to accept the Plan (without counting the votes of any Insiders[4] whose Claims are classified within that Class) and if certain statutory requirements are met as to both non-consenting members within a consenting Class and as to any dissenting Classes. A Class of Claims shall be deemed to have accepted the Plan if at least one-half in number and at least two-thirds in amount of the Allowed Claims actually voting in that Class vote in favor of the Plan.

In the event of a rejection of the Plan by any of the Voting Classes, the District will request that the Bankruptcy Court confirm the Plan in accordance with those portions of section 1129(b) applicable to cases filed under chapter 9 of the Bankruptcy Code, which provisions permit confirmation of the Plan notwithstanding the rejection thereof by an Impaired Class through a process commonly known as "cramdown". In order to confirm the Plan through

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

---

[3] If the Optum Claim is estimated pursuant to Bankruptcy Rule 3018(a) for voting purposes, Class 1F shall be entitled to vote on the Plan and shall be deemed included within the definition of "Voting Classes" for purposes of this Disclosure Statement and the Plan.

[4] As used in this Disclosure Statement, "**Insider**" shall have the meaning ascribed to such term in section 101(31)(D), as applicable to municipalities.

FIRST AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS

611073534.1

"cramdown", the Court must find, among other things, that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each rejecting Class.

### C.    Summary of Voting Procedures, Balloting Deadline, Confirmation Hearing, and Other Dates, Deadlines, and Procedures

#### 1.    Voting Procedures and Deadlines

The District has provided copies of this Disclosure Statement, the Plan, and the Ballot to all known holders of Impaired Claims in the Voting Classes.  Holders of an Allowed Claim in one or more of the Voting Classes may vote to accept or reject the Plan by completing, executing, and returning the Ballot by the Balloting Deadline (defined below) to the Ballot Tabulator—Sonia Gaeta, Baker & Hostetler LLP, 11601 Wilshire Blvd., Ste. 1400, Los Angeles, California 90025 (facsimile 310.820.8859; email sgaeta@bakerlaw.com).

*All Ballots, including Ballots transmitted by facsimile or email, must be completed, signed, returned to, and __actually received__ by the Ballot Tabulator by not later than _____ , \_\_\_\_, at 4:00 p.m. Pacific Time (the "__Balloting Deadline__").  Unless expressly waived by the District in its sole and absolute discretion, Ballots received after the Balloting Deadline, Ballots submitted directly to the Bankruptcy Court, and incomplete or illegible Ballots shall not be counted in connection with the confirmation of the Plan.*

#### 2.    Date of Confirmation Hearing and Deadline for Objecting to Confirmation of the Plan

The Bankruptcy Court shall hold a hearing to determine whether to confirm the Plan on _____ , \_\_\_\_, at \_\_:\_\_ a.m./p.m. Pacific Time, in Department A, Courtroom 11 of the United States Bankruptcy Court located at 2500 Tulare Street, Fresno, CA 93721, the Honorable Fredrick E. Clement presiding.  The Confirmation Hearing may be continued from time to time by pronouncement or order of the Bankruptcy Court with or without further notice.

Any objections to confirmation of the Plan along with copies of any and all supporting documents must be filed with the Bankruptcy Court and served on the following entities or their counsel of record no later than _____ , \_\_\_\_: (a) the Bankruptcy Court, 2500 Tulare Street, Suite 2501, Fresno, California 93721; (b) the Office of the United States Trustee, 2500

Baker & Hostetler LLP
Attorneys at Law
Los Angeles

Tulare Street, Suite 1401, Fresno, California 93721; and (c) Baker & Hostetler LLP, 11601

Wilshire Boulevard, Suite 1400, Los Angeles, California 90025, Attention: Ashley M. McDow,

Esq.  Please be aware that the Bankruptcy Court may not consider any objections that are not

timely filed and served.

### D.     General Notices and Disclaimers

The historical financial data relied upon in preparing the Plan and this Disclosure

Statement is based upon the District's books and records.  Although certain professional advisors

of the District assisted in the preparation of this Disclosure Statement and the documents filed in

support thereof, in doing so such professionals relied upon factual information and assumptions

regarding financial, business, and accounting data provided by the District and third parties, much

of which has not been audited.  The District's most recent audited financial statements, which

cover the fiscal years ending June 30, 2013, June 30, 2014, and June 30, 2015, are included in the

Plan Exhibits as Exhibits 2, 3, and 4, respectively, and incorporated herein by reference.

***The District's professional advisors have not independently verified all financial***

***information provided in this Disclosure Statement, and, accordingly, make no representations***

***or warranties as to its accuracy.***  Moreover, although reasonable efforts have been made to

provide accurate information, the District does not warrant or represent that the information in

this Disclosure Statement, including any and all financial information and projections, is without

inaccuracy or omissions, or that actual values or distributions will comport with the estimates and

projections contained herein or submitted in support of the Plan and Disclosure Statement.

***No individual or entity may rely upon the Plan or Disclosure Statement or any of the***

***supporting documentation for any purpose other than to determine whether to vote to accept or***

***reject the Plan***.  Nothing contained in such documents constitutes an admission of any fact or

liability by any party, nor shall such information or documentation be admissible in any

proceeding involving the District or any other party, nor will this Disclosure Statement be deemed

evidence of the tax or other legal effects of the Plan on holders of Claims in the Chapter 9 Case.

This Disclosure Statement is not intended to be a disclosure communication to the public capital

markets and should not be relied upon by investors.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

611073534.1

Certain information included in this Disclosure Statement and its exhibits contains forward-looking statements. The words "believe," "expect," "anticipate," and similar expressions identify such forward-looking statements. The forward-looking statements were based upon information and documentation available when such statements were made and are subject to risks and uncertainties that could cause actual results to differ materially from those expressed in the statements. A number of those risks and uncertainties are described below. Therefore, readers are cautioned not to place undue reliance on the forward-looking statements in this Disclosure Statement. The District undertakes no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events, or otherwise.

No regulatory agency has approved or disapproved this Disclosure Statement, nor has any such agency determined whether this Disclosure Statement is accurate, truthful, or complete.

**E.      Additional Information**

If you have any questions about the procedures for voting on the Plan, desire an additional copy of the Ballot, or seek further information about the dates and deadlines applicable to the confirmation of the Plan, please contact counsel for the District via email at the following addresses: Ashley M. McDow at amcdow@bakerlaw.com, Michael T. Delaney at mdelaney@bakerlaw.com, and Sonia Gaeta at sgaeta@bakerlaw.com. Any party represented by counsel is directed to submit any questions through counsel. Counsel for the District cannot and will not communicate directly with any individual or entity represented by counsel in relation to the Chapter 9 Case. Please note that counsel for the District cannot and will not provide creditors with any legal advice, including, without limitation, advice regarding how to vote on the Plan or the effect that confirmation of the Plan will have upon any Claims that may exist against the District.

**III.      BACKGROUND INFORMATION**

**A.      The District**

The District is a special district formed under the California Local Healthcare District Law, Cal. Health and Safety Code § 32000, *et seq*., located in Lone Pine, California. As of the commencement of the Chapter 9 Case, the District owned and operated three facilities—namely,

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

611073534.1

an emergency and acute care facility with four (4) beds (the "**Hospital**"), a skilled nursing facility with thirty-three (33) beds (the "**SNF**"), and an out-patient medical clinic (the "**Clinic**").

### B.    Events Precipitating Bankruptcy

#### 1.    Historical Financial Issues

As a rural healthcare district, the District has historically operated on a narrow margin; however, beginning in 2008, the District started experiencing substantial financial difficulties as patient demands and revenues declined while operational expenses remained high due to the cost of new hospital equipment and increasing salaries resulting from the limited availability of qualified doctors and medical personnel.  Indeed, between 2008 and 2015, the District only earned net revenues in two years—namely, 2013 and 2014.

In or about 2012, the financial condition of the District began to worsen.  The cause of the financial downturn is attributable to numerous sources, including a decrease in patient volume. More precisely, in or about 2012, the patient services and hospital occupancy rates began to rapidly decline—falling from an occupancy rate of 87.08% in 2012 to 67.20% in 2015.  In addition to unforeseen decreases in patient volume, increases in the discounts applied by governmental healthcare programs, such as Medicare and Medi-Cal, and insurance providers further diminished revenues.  As a result of the increased discounts, the District received less in reimbursements from these providers—exacerbating the effects caused by the reduction in patient volume and patient revenues.

Unfortunately, the declining financial condition of the District was further exacerbated by the failure of its former management to respond to the reduction in patient demands with corresponding decreases in staffing and other related overhead expenses.  Indeed, between 2013 and 2015, full time equivalents ("**FTEs**")[5] for staff members increased from 85.48 in 2013 to 103.23 in 2015—an increase of more than 20% at a time when occupancy was sharply declining.

---

[5] A full time equivalent is a unit of measurement essentially equal to a single full time employee.  The use of FTEs ensures consistency in financial reporting by providing a basis for calculating working hours or labor expenses of a business regardless of the number of employees providing the services—such as in the case of a business that employs full time and part time employees.

FIRST AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS

611073534.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1    Essentially, the District was employing more staff to serve fewer patients. As a result, operating

2    expenses increased from $8,376,655 in 2012 to $9,075,609 in 2015.

3          The District experienced its greatest financial decline during fiscal year 2015. As with

4    2013 and 2014, occupancy rates in 2015 continued to decline to 67.20%, which was the lowest

5    point in the past decade. As a result, operating income dropped to $6,105,816—a decrease of

6    approximately $1,800,000 from the 2014 fiscal year operating income. Notwithstanding the

7    reduced demand for services, the District continued to increase staffing, which resulted in an

8    increase in total operating expenses. As a result of the increased expenditures and decreased

9    revenues, the District experienced net losses in 2015 totaling $2,242,722. The substantial losses

10    in 2015 also resulted in a year-end cash balance of negative $626,583.

11        **2.**        **Breakdown of Operations Due to Cash Shortage**

12          The District continued to experience losses during the 2016 fiscal year, which resulted in

13    an inability to pay ordinary operating expenses, including payroll and vendor obligations. Indeed,

14    by October 2015, the District was unable to continue paying for employee health insurance—

15    ultimately resulting in the termination of this benefit—and, by November 2015, the District was

16    three to five weeks behind in its payroll obligations despite applying nearly all revenues to payroll

17    in an effort to keep the hospital running. Due to the inability to consistently meet its payroll

18    obligations, employees started to resign, which further reduced services at the hospital.

19          In an effort to keep the hospital and its related facilities open, the District was forced to

20    turn to the community for donations and loans to pay for essential items, including insurance,

21    licensing fees and payroll. While the District was able to obtain approximately $75,000 in

22    donations and an $80,000 loan from members of the community, the funds were quickly depleted

23    and, by the end of November 2015, the District lacked sufficient funds to pay payroll as well as

24    the amounts owing under the contracts with the emergency room doctors. As a result, the board

25    was forced to decide between paying hospital staff and paying the doctors. Ultimately, the board

26    voted to pay staff payroll—a decision that resulted in the District defaulting under the

27    employment agreements with the emergency room doctors and the loss of their services.

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

In addition to the inability to continue paying hospital staff, the severe economic conditions prevented the District from paying obligations owing to its vendors. As a result, the District's accounts payable continued to grow—ultimately reaching a balance of approximately $2,550,000 in December 2016. Despite large arrears and the District's inability to pay, vendors continued to work with the District in an effort to preserve the hospital for the community.

Regrettably, the concerted efforts of the community and the District ultimately proved too little as the staggering budget deficit and inability to generate sufficient operational revenues to meet its obligations stifled the District. With the loss of the doctors, the District was forced to begin winding down operations. Accordingly, on or about November 30, 2015, the board voted to issue 60- and 90-day notices that the District intended to terminate services at the Hospital and SNF. Thereafter, the District closed the Hospital and emergency room and began making arrangements to transfer SNF patients to surrounding medical facilities. Without patients, the District was unable to generate new revenues and earnings completely stagnated. Thereafter, on or about December 14, 2015, Lee Barron, the former Chief Executive Officer and Chief Financial Officer for the District, tendered her resignation. Three days later, the former board members resigned. As a result, the District was left without any management or governing body, and, thus, was unable to effectively operate or redress any of the financial issues facing the Hospital and its associated operations.

### 3. Appointment and Actions of New Board of Directors

The community, however, took efforts to save the District and prevent the closure of its facilities, which are vital to the remote area they serve. Accordingly, following the resignation of the prior board of directors, on or about December 29, 2015, the Inyo County Board of Supervisors appointed three new board members for the District. Immediately following its appointment, the new board of directors started making strides toward reopening the facility and restructuring its obligations.

On or about December 30, 2015, the board held a meeting to evaluate the financial condition of the District and other issues affecting operations. The principal issue facing the District was insufficient cash to continue to finance operations; indeed, by the end of December

- 18 -

611073534.1

2015, the District had virtually no cash on hand to fund operations. Additionally, the board learned that by the end of December 2015, the District's debt had grown to approximately $4,500,000, which was comprised in part of more than $2,550,000 in debt obligations to vendors and service providers previously utilized by the District in the course of its operations. The District, however, had few (if any) sources to generate new revenues due to the closure of the Hospital, the SNF, and the Clinic and only approximately $1,600,000 in accounts receivable, which included bad debt carried on the District's books. Furthermore, as the District lacked the ability to pay staff, the District was unable to effectively collect any accounts receivable presently owing.

Due to the dire financial condition of the District, the board immediately consulted with Healthcare Conglomerate Associates (HCCA), a restructuring and advisory firm focused on the reorganization and operation of medical practices and hospitals, and insolvency counsel to explore and evaluate potential reorganizational strategies to preserve District's operations, including bankruptcy and potential partnership with nearby hospitals or hospital associations. After evaluating potential partnership options, the board concluded that the options were no longer viable as Northern Inyo Hospital and Ridgecrest Hospital withdrew from discussions after learning of the District's financial condition. The board also concluded that obtaining a loan as a means of consolidating and adjusting its current obligations was not a viable option as the District had insufficient funds to cover its existing obligations, let alone service new debt. As the District could not debt finance its operations or enter into a partnership to help defray operating expenses, the board determined that bankruptcy provided the best option for the District, its patients and creditors, and the community at large.

Following a December 30, 2015 meeting of the District's board, the board noticed a public meeting for January 2, 2016, to elicit comments on the financial state of the District and potential options for the readjustment of its obligations as well as the retention of HCCA as chief restructuring officer. Approximately 80 members of the community attended the meeting, including individuals that had donated and loaned money to the District in an effort to support the Hospital's operations in late 2015. During the meeting, the board discussed the proposed

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

- 19 -

1    employment of HCCA as chief restructuring officer and the commencement of a voluntary

2    chapter 9 bankruptcy case as a means to restructure the operations and adjust the District's

3    present obligations.  The majority of the community members in attendance supported the

4    employment of HCCA and the commencement of the bankruptcy case.

5            With the support of the community, the board voted to approve the employment of

6    HCCA, to declare a fiscal emergency, and to authorize the commencement of the Chapter 9 Case.

7    The board of directors declared a fiscal emergency for numerous reasons, including, primarily,

8    the District's inability to operate due to the lack of sufficient funds, generate any revenues due to

9    the closing of the Hospital and related facilities, and pay the obligations then due and owing.  The

10   board also found that the inability to operate the Hospital and, thereby, provide medical services

11   to the community constituted a threat to the health and welfare of the residents of Southern Inyo

12   County.  On or about January 3, 2016, the board adopted Resolution No. 16-01, which effected

13   the board's prior decision.

## IV.    COMMENCEMENT AND ADMINISTRATION OF CHAPTER 9 CASE

### A.    Commencement of the Chapter 9 Case

16           Due to the District's dire financial condition and the inability to remedy the same outside

17   of bankruptcy, the District proceeded with filing a voluntary petition for relief under chapter 9 of

18   the Bankruptcy Code on January 4, 2016.

### B.    Immediate Actions to Stabilize Operations and Revenue Deficits

20           Following the Petition Date, the District and HCCA took action to establish a foundation

21   for the Plan.  The primary concerns immediately following the commencement of the Chapter 9

22   Case were the preservation of the Hospital, the SNF, and the Clinic operations and the

23   implementation of practices designed to decrease expenditures and, thereby, increase revenues.

24   For example, the District immediately began reevaluating the billing practices in an effort to

25   reduce the number of insurer discounts, thereby increasing net revenues.  The District also began

26   utilizing governmental programs that provide revenues to hospital and nursing facilities that

27   maintain high levels of service, including the California Quality Assurance Fee program.  In

28   additional to taking advantage of available programs and streamlining the overall operations, the

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1   District also began exploring opportunities for additional governmental subsidies to increase non-

2   operational revenues and permit the District to repay its obligations more quickly without

3   affecting its operational capabilities.

4       **C.     Eligibility Litigation**

5       On or about March 31, 2016, the District filed its brief regarding the District's

6   qualification as a debtor under chapter 9 of the Bankruptcy Code (the "**Eligibility Motion**").  The

7   Eligibility Motion came on for hearing on or about June 29, 2016.  On or about June 29, 2016, the

8   Bankruptcy Court issued a minute order finding that the District qualified as a debtor under

9   chapter 9 of the Bankruptcy Code.  Thereafter, on or about July 12, 2016, the Bankruptcy Court

10  entered an order for relief in the Chapter 9 Case.

11      **D.     Appointment of Patient Care Ombudsman**

12      On or about January 6, 2016, the Court issued the *Order to Appear and Show Cause Why*

13  *a Patient Care Ombudsman Should Not Be Appointed*.  On or about January 25, 2016, the District

14  filed the *Debtor's Motion to Excuse the Appointment of a Patient Care Ombudsman*.  On or about

15  February 3, 2016, the Debtor filed the *Declaration of Colleen Wilson, Chief Nursing Officer, in*

16  *Support of the Motion to Excuse the Appointment of a Patient Care Ombudsman*.  A hearing to

17  consider the appointment of a patient care ombudsman was held on February 10, 2016.  On or

18  about February 16, 2016, the Court entered an order denying the *Debtor's Motion to Excuse the*

19  *Appointment of a Patient Care Ombudsman* and, on or about February 17, 2016, entered an order

20  directing the appointment of a patient care ombudsman.  On or about March 4, 2016, the Office

21  of the United States Trustee filed a notice regarding the appointment of Joseph Rodrigues (the

22  "**Ombudsman**") as patient care ombudsman.

23      Since his appointment, the Ombudsman has filed numerous reports pertaining to the

24  operation of the District's facilities.  The reports are not attached hereto; however, copies of the

25  reports are available on the Chapter 9 Case docket or may be obtained from the District by

26  submitting a written request via email addressed to mdelaney@bakerlaw.com and

27  sgaeta@bakerlaw.com.  Over the last sixteen (16) months, the Ombudsman's reports have noted a

28  few minor issues; however, in each instance, these issues were promptly resolved to the

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1    Ombudsman's satisfaction.  In his reports, the Ombudsman also noted that the District's facilities

2    are clean and fully operational, and the District's patients are well cared-for by the staff.  In short,

3    the Ombudsman reports demonstrate that the District has corrected the operational issues it faced

4    in the past.

5         **E.      Disputes Pertaining to Claims Against the District**

6         Following the Petition Date, the District continued evaluating its existing obligations and

7    the Claims asserted against the District.  Notwithstanding the ongoing nature of this inquiry, the

8    District identified several disputed and/or objectionable Claims (whether in whole or in part)—

9    namely, the Claims asserted by the following claimants: (i) Action Capital Corporation (also

10   known as Coast to Coast Healthcare); (ii) Covidien; (iii) Dean Vander Wall; (iv) the California

11   Employment Development Department; (v) GE HFS LLC; (vi) Lee Barron; and (vii) MJL &

12   Associates.

13        Accordingly, on or about January 26, 2017, the District filed two omnibus objections to

14   proofs of Claim.  The first omnibus objection sought to characterize Claims asserted by the

15   California Employment Development Department, Lee Barron, and MJL & Associates, each of

16   which asserted an entitlement to priority treatment of all or part of their respective Claims under

17   the Bankruptcy Code, as General Unsecured Claims (the "**Priority Claim Objection**").  The

18   second omnibus objection sought to disallow Claims asserted by Action Capital Corporation,

19   Covidien, Dean Vander Wall, and GE HFS LLC based on the claimants' failure to adequately

20   substantiate the Claim through the submission of competent evidence (the "**Adequacy Claim**

21   **Objection**").

22        Prior to the hearing on the Adequacy Claim Objection, the District resolved the Adequacy

23   Claim Objection as it pertained to Dean Vander Wall and GE HFS LLC and, at the hearing,

24   withdrew the objection as it pertained to Covidien.  During the hearing on the Adequacy Claim

25   Objection, the Court denied without prejudice the objection as it pertained to Action Capital

26   Corporation.  On or about March 30, 2017, the Court entered an order adopting its rulings during

27   the hearing on the Adequacy Claim Objection.

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS

611073534.1

During the hearing on the Priority Claim Objection, the Bankruptcy Court sustained the objection and ordered that the affected Claims be reclassified as General Unsecured Claims. Accordingly, under the Plan, these Claims are treated as General Unsecured Claims in Class 3.

**F.      Pending Litigation**

As of the commencement of the Chapter 9 Case, the District was party to certain pending lawsuits, including the following: *Perez v. Kibler, et al.*, case no. SICV CV 1457395, pending in the California Superior Court for the County of Inyo (the "**Perez Litigation**"); *Anderson v. Southern Inyo Healthcare District*, case no. 30-2015-00817277-CL-CL-CJC (the "**Anderson Litigation**"); *Craneware, Inc. v. Southern Inyo Healthcare District*, 15CV04309, pending in the District Court of Johnson County, Kansas (the "**Craneware Litigation**"); and *J.MH, IL et al. v. Marilyn S Devries, MD., et al.*, Case Number: SI- CV-1659008; Superior Court of the State of California, County of Inyo (the "**Huerta Litigation**").

On or about February 1, 2016, the Anderson Litigation was dismissed.

On or about March 30, 2016, the District removed the Craneware Litigation to this Court and, on or about August 29, 2016, the Court dismissed the Craneware Litigation for failure to prosecute. On or about January 27, 2017, the underlying state court action was dismissed without prejudice.

On or about April 15, 2016, the Bankruptcy Court approved a stipulation by and between the District and the plaintiff in the Huerta Litigation. Pursuant to the stipulation, the District agreed to allow the plaintiff to prosecute the Huerta Litigation; *provided, however,* that he only seek to recover from any applicable insurance policies. The Huerta Litigation is currently pending.

Based on the nature of the Perez Litigation, the District did not remove the action.

In addition to the actions pending on the Petition Date, on or about January 13, 2016, the District filed a complaint against the California Department of Public Health ("**CDPH**")—thereby commencing the adversary proceeding styled *Southern Inyo Healthcare District v. California Department of Public Health, et al.*, adv. no. 2016-01008 (the "**CDPH Adversary**"). By and through the CDPH Adversary, the District sought a determination that the suspension or

611073534.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1   revocation of the District's hospital licensure violated the automatic stay. Following the

2   reinstatement of the District's licenses, the District and the defendants in the CDPH Adversary

3   reached an agreement to dismiss the CDPH Adversary without prejudice. On or about March 9,

4   2016, the District filed a stipulation to dismiss the CDPH Adversary without prejudice, which the

5   Court approved by order entered on or about March 10, 2016.

6       **G.      Post-Petition Financing**

7       During the pendency of the Chapter 9 Case, the District utilized a line of credit extended

8   by HCCA (the HCCA Loan) to cover temporary cash shortfalls arising in the course of

9   operations. HCCA is no longer willing and/or able to extend a line of credit to the District. As

10  the District requires funding to continue to operate pending both confirmation of the Plan and the

11  Effective Date, and finance certain pre-confirmation activities, the District explored various

12  financing options. Unable to procure financing from an institutional lender, on or about July 19,

13  2017, the District entered into an agreement with Vi Healthcare Finance Inc. ("**ViHF**") for the

14  provision of a line of credit in the amount of Two Million Dollars ($2,000,000) (the "**ViHF**

15  **LOC**"), which is secured by the District's tax revenues, to the extent permitted under California

16  law. Prior to the Effective Date, the District intends to draw $1,029,184 on the ViHF LOC to

17  repay the outstanding balance of the HCCA Loan (the "**HCCA Draw**"). The District also intends

18  to draw $408,316 on the ViHF LOC to make certain payments related to the District's operation

19  (the "**Operations Draw**").

20      Under the ViHF LOC, the HCCA Draw shall accrue interest at a rate of ten percent (10%)

21  until repaid. The Operations Draw and all other draws on the ViHF LOC shall accrue simple

22  interest at a rate of twenty percent (20%) until the amount is repaid in full. To ensure payment of

23  the ViHF LOC, the District has agreed to assign all future tax revenues permitted to be pledged

24  under applicable law to ViHF. The assigned tax revenues shall be applied to the balance owing

25  under the ViHF LOC until paid in full. Any tax revenues received by ViHF that are not necessary

26  to pay any outstanding balance under the ViHF LOC shall be returned to the District within one

27  (1) business day of receipt. The ViHF LOC shall remain open following the Effective Date of the

28  Plan, which shall provide the District with a $2,000,000 line of credit to fund its operations.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS

611073534.1

## V.    THE DISTRICT'S LIABILITIES AND ASSETS

The schedules filed in the Chapter 9 Case, as amended (collectively, the "**Schedules**"), provide a detailed list of the assets and liabilities of the District as of the Petition Date.[6] The audited financial statements provide detailed information regarding the performance of the District in the three (3) fiscal years immediately preceding the Petition Date. *See* Exhibits 2, 3, 4. The following is a summary of the liabilities and assets that are relevant to the Plan.

### A.    Liabilities

#### 1.    Summary of Scheduled Claims

The District filed its Schedules on or about January 19, 2016.  In sum, the Schedules identified the following obligations: (a) a total of 11 Secured Claims totaling $1,998,535.65; and (b) a total of 254 General Unsecured Claims totaling $2,503,239.60.  With the exception of the Administrative Claims and Professional Claims, the District does not have any unsecured Claims entitled to priority treatment under the Bankruptcy Code.  Accordingly, the District did not list any creditors in Schedule E.

#### 2.    Proofs of Claim

The Bankruptcy Court established September 30, 2016, as the deadline for the filing of non-administrative proofs of Claim against the District.  A total of 45 proofs of Claim were filed against the District prior to the Claims Bar Date.  These Claims represent a total debt of $3,662,136.08.  Of this amount, approximately eight (8) Claims, totaling $2,339,011.21, asserted security interests in certain assets of the District.  The majority of the proofs of Claim filed overlap with the Claims scheduled by the District.  Unless otherwise provided in the Plan, if a purported creditor filed a proof of Claim relating to a Claim listed in the Schedules, the Claim shall be Allowed in the amount stated in the proof of Claim and the amount listed for the Claim in the Schedules shall be disregarded for the purposes of calculating the total indebtedness provided for under the Plan or determining the treatment of the related creditor under the Plan.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

---

[6] Copies of the Schedules are available on the Chapter 9 Case docket or may be obtained from the District by submitting a written request via email addressed to mdelaney@bakerlaw.com and sgaeta@bakerlaw.com.

611073534.1

As previously noted, the District filed objections to eight (8) proofs of Claim. The Bankruptcy Court sustained the objections to the proofs of Claim filed by Employment Development Department, Lee Barron, and MJL & Associates. The District resolved or withdrew the objections to the proofs of Claim filed by Covidien, Dean Vander Wall, and GE HFS, LLC. The Bankruptcy Court overruled the objection to the proof of Claim filed by Action Capital Corporation. In total, the objections to the proofs of Claim resulted in the reclassification of $224,151.22 in purported priority unsecured Claims as General Unsecured Claims.

### 3. Alterations to Liability under the Plan

#### a. Alteration of Claims

Under the Plan, the District intends to alter the treatment or classification set forth in the Schedules for the following Claims:

- General Electric Capital Corporation ("**GE**"). In the Schedules, the District listed GE as holding two Secured Claims totaling $65,129.11. Following the Petition Date, GE filed three (3) proofs of Claim (nos. 5, 29, and 33) asserting three unsecured Claims relating to the same obligations. Accordingly, under the Plan, GE shall be treated as holding three (3) General Unsecured Claims in the amounts stated in the GE proofs of Claim.

- HCCA. In the Schedules, the District listed HCCA as holding a Secured Claim in an unknown amount relating to the HCCA Loan. Under the Plan, the District proposes treating the HCCA Loan as an Administrative Claim and, as such, paying any and all amounts owing under the HCCA Loan in full on the Effective Date, or as soon thereafter as practicable (subject to approval of such treatment in accordance with the Plan). As the HCCA Loan will be paid on the Effective Date, the Plan does not provide any treatment for the HCCA Loan in Class 1.

- Leasing Associates of Barrington, Inc. ("**LAB**"). In the Schedules, the District listed LAB as holding a Secured Claim in an unknown amount. LAB did not file a proof of Claim in the Chapter 9 Case. Accordingly, under the Plan, the Claim listed in the Schedules for LAB shall be treated as a Disallowed Claim.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

- Marlin Leasing Corporation ("**MLC**"). In the Schedules, the District listed MLC as holding a Secured Claim the in the amount of $0.00. MLC did not file a proof of Claim in the Chapter 9 Case. Accordingly, under the Plan, the Claim listed in the Schedules for MLC shall be treated as a Disallowed Claim.

- Siemens Healthcare Diagnostic, Inc. (aka Siemens Financial Services, Inc.) ("**Siemens**"). In the Schedules, the District listed two Secured Claims held by Siemens—one in the amount of $0.00 and the other in an unknown amount. Following the Petition Date, Siemens filed a proof of Claim (no. 36) asserting a General Unsecured Claim against the District relating to the same obligation. Accordingly, under the Plan, Siemens shall be treated as holding a General Unsecured Claim in the amount stated in proof of Claim no. 36.

- U.S. Foods ("**US Foods**"). In the Schedules, the District listed a purported Secured Claim held by US Foods in the amount of $35,539.19. Following the Petition Date, US Foods filed a proof of Claim (no. 44) asserting a General Unsecured Claim against the District relating to the same obligation(s). Accordingly, under the Plan, US Foods shall be treated as holding a General Unsecured Claim in the amount stated in proof of Claim no. 44.

In addition to the foregoing, pursuant to the terms of the Plan, any Claim qualifying as a Disallowed Claim shall not receive any distributions under the Plan, regardless of whether and in what manner the District listed such Claim in the Schedules.

### b. Disputed Claims

By and through proof of Claim no. 25 (the Optum Claim), Optum Bank has asserted a Secured Claim in the amount of $1,717,320.24 relating to a loan extended to the District in or about February 2015, which it contends is secured by the real property in which the SNF and the Hospital are located (the "**Property**"), as well as various personal property assets in which the District has an ownership interest. The District disputes the enforceability of the Secured Claim asserted by Optum Bank, especially with respect to the Property, and the validity of the underlying loan (i.e., the Optum Loan).

611073534.1

1    As a California healthcare district, the District's ability to borrow funds is strictly

2  regulated.  One of the many restrictions placed on the District's ability to borrow funding is set

3  forth at Cal. Health & Safety Code § 32130, which provides:

> A district may borrow money and incur indebtedness in an amount not to exceed
> 85 percent of all estimated income and revenue for the current fiscal year,
> including, but not limited to, tax revenues, operating income, and any other
> miscellaneous income received by the district, from whatever source derived. *The
> money borrowed and indebtedness incurred under this section shall be repaid
> within the same fiscal year.*

8  (emphasis added).  Additionally, Cal. Health & Safety Code § 32130.2(b) limits the issuance of

9  negotiable promissory notes to finance a "capital outlay"—in other words, the initial acquisition

10  of property, equipment and supplies utilized by a healthcare district—and to a term of no more

11  than ten (10) years.  "Restrictions on the borrowing of public entities are common in California

12  and other states. ... They are intended to prohibit the accumulation of public debt without the

13  consent of the taxpayers, and require governmental agencies to carry on their operations on a cash

14  basis."  *In re S. Humboldt Cmty. Healthcare Dist.*, 254 B.R. 758, 760 (Bankr. N.D. Cal. 2000).

15  Claims made on account of loans extended in violation of such limitations are unenforceable.

16  *Ibid.*

17    Based on its review of the salient documents and applicable law, the District believes that

18  the Optum Loan violates, among other provisions, Cal. Health & Safety Code §§ 32130 and

19  32130.2.  More precisely, the Optum Loan does not require repayment within the same fiscal year

20  nor was such repayment possible at the time the Optum Loan was extended.[7]  Additionally, the

21  Optum Loan provided for a repayment term in excess of ten (10) years and was not related to a

22  "capital outlay;" rather, the Optum Loan related to the refinancing of an existing debt.

23  Accordingly, the Optum Loan violates the restrictions on lending to healthcare districts under Cal.

24  Health & Safety Code §§ 32130 and 32130.2 and, thus, the Optum Claim is unenforceable.  As

25  such, the District is left with no choice but to treat the Optum Claim as a Disputed Claim under

26  the Plan.  *See In re S. Humboldt Cmty. Healthcare Dist.*, 254 B.R. at 760-761.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

---

[7] It also appears that the Optum Loan violates Cal. Health & Safety Code § 32130.2 by virtue of the fact that it matures more than ten (10) years after its issuance.

FIRST AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS

611073534.1

Furthermore, under California law, creditors are not able to encumber or assert security interests in municipal property unless expressly authorized by statute. *See Mayrhofer v. Board of Education of the City of San Diego, et al.*, 89 Cal. 110 (Cal. 1891). As relevant here, the Cal. Health & Safety Code contains no authorization for creditors to encumber the real property assets of a California health care district, such as the District. As Optum was not authorized to encumber the Property, the security interest asserted by Optum in the Property is void and unenforceable.

Based on the foregoing, the District has commenced the Optum Adversary, though which the District seeks to invalidate the Optum Loan and associated security interest, in whole or in part, and disallow the Optum Claim. Thus, under the Plan, the Optum Claim is treated as a Disputed Claim and shall not receive any distributions unless and until a court of competent jurisdiction enters a Final Order allowing the Optum Claim, and then, only to the extent allowed.

### 4. Summary of Current Liabilities

On the Effective Date, the District estimates that it will have the following liabilities:

- Administrative Claims totaling approximately $34,321.00;
- Professional Claims totaling approximately $2,440,471.75;
- Secured Claims totaling approximately $3,315,988.97;[8]
- Priority Unsecured Claims totaling $0.00;
- Post-Petition Unsecured Claims totaling $585,206.00; and
- General Unsecured Claims totaling approximately $3,146,486.11.[9]

### 5. Statement Regarding Liabilities

As previously noted, the District disputes a number of Claims that have been asserted against it, and the District's review and analysis of Claims is ongoing. Given that fact, as well as the inherent uncertainties in any litigation regarding Claims, no assurances can be given regarding

---

[8] This amount does not account for Secured Claims satisfied under the Plan through the surrender of collateral. This amount includes the Disputed Claim of Optum. If the Disputed Claim of Optum is excluded, the Secured Claims total $1,598,665.73.

[9] This amount is comprised of all General Unsecured Claims, including those classified in Class 4 under the Plan, the Unsecured portion of the Secured Claim asserted by Action Capital Corporation, and the projected cure payments due and owing in relation to the assumption of executory contracts and unexpired leases. The inclusion of any Claim in this calculation shall not alter the proposed treatment of such Claim under the Plan.

611073534.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

the successful outcome of any litigation that has or may be initiated in objecting to such Claims or regarding the ultimate amount of Claims that will be Allowed against the District.

As described below, the Plan enables the District to file objections to Claims at any time within one hundred and eighty (180) days after the Effective Date. The Plan also provides for the District to retain any and all defenses, offset and recoupment rights, and counterclaims that may exist with respect to any Disputed Claim, whether under section 502, 552, or 558 of the Bankruptcy Code or other applicable law. The District reserves all rights with respect to the allowance and disallowance of any and all Claims. **In voting on the Plan, creditors may not rely on the absence of a reference in this Disclosure Statement or the Plan or the absence of an objection to their proofs of Claim as any indication that the District ultimately will not object to the amount, priority, nature, or allowance of their Claim(s).**

**B.     Assets**

The District's assets include, among other things, the real property on which the Hospital and the SFN are located, medical equipment and supplies, accounts receivables, healthcare receivables, potential claims and causes of action, and other various personal property assets. The District's assets are more fully described in the Schedules and associated statement of financial affairs. Under the Plan, the District estimates that it will supplement its current revenue through offering additional medical services and treatments, the issuance of general obligation bonds in the amount of $5,000,000, which will net the District an estimated $4,500,000, and an increase in parcel and transient occupancy taxes. Each potential revenue source is discussed below:

**1.     Additional Medical Services and Treatment**

The District intends to partially fund the Plan with anticipated revenues to be generated from expanding certain services. More precisely, the District intends to expand its services in two respects: first, providing a facility for psychiatric holds pursuant to California Welfare & Institutions Code § 5150; and second, offering medical infusion services.

With respect to the former, California Welfare & Institutions Code § 5150 permits an individual to be held due to apparent psychiatric or mental health issues for up to 72 hours. At present, there are no facilities in Inyo County to provide these services. The District shall enter

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

- 30 -

into a contract with Inyo County to provide a secured facility and treatment to individuals held

under California Welfare & Institutions Code § 5150. The District estimates that the provision of

such services shall cost approximately $10,000 to ready a room designated for the holding of such

individuals, which cost is a one-time expenditure, and approximately $20,000 per year to

maintain the facility and appropriate staffing. The District estimates that readying the room and

entering into a contract with Inyo County will take approximately six (6) months and, thus, the

District will begin receiving revenues from this service prior to the Effective Date. The District

estimates that this service will generate approximately $90,000 in additional gross revenues in

2018, which assumes a daily charge of $500 and an occupancy rate of approximately fifty percent

(50%). The District projects that occupancy rates will increase over time—thereby increasing

revenues from this service in each successive year following the Effective Date.

With respect to the former, the District has designated a room in its hospital facility for

conversion into a treatment center for individuals requiring regular infusions of intravenous

medications, including, without limitation, medications for the treatment of cancer, arthritis, and

other chronic and severe illnesses and conditions. The designated space is sufficient to house

four (4) infusion chairs and related equipment—thereby permitting the District to treat up to four

(4) patients at any one time. Establishing the treatment facility will cost approximately

$6,350.00, which expense shall be a one-time cost. The District estimates that the annual

operating cost would be approximately $240,000 or $60,000 per chair, including the additional

staffing required to operate the facility and to administer the treatments. The District estimates

that the infusion services will result in additional net revenues of approximately $200,000 in

2018. The District anticipates that demand for this service will increase between 2018 and

2025—thereby increasing revenues derived from this service. The District believes it will be able

to establish and begin providing infusion services prior to the Effective Date.

## 2. The Bond Measure

The District intends to partially fund the Plan (and, particularly, Effective Date payments)

through the issuance of approximately $5,000,000 in general obligation bonds, which will provide

approximately $4,500,000 in revenues for the District to be used in accordance with the terms of

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

any bond indenture approved by the voters. The District has engaged in discussions with a number of brokerage firms regarding the underwriting for, and issuance of, the bonds, including Hilltop Securities, which underwrote and issued nearly $12,000,000 in revenue bonds for the Northern Inyo County Local Hospital District in or about 2013. In addition to its discussions with Hilltop Securities, the District issued requests for proposals to numerous financial advisors and bond counsel to assist the District obtain approval of the bond measure as well as the underwriting and issuance of the bonds. After receiving the responses, this District has decided to issue a second series of requests for proposals to additional financial advisors and bond counsel. The District has also discussed the Bond Measure with prominent members of the community to gauge the receptiveness of community members to the Bond Measure (as well as the tax initiatives discussed below). Based on these discussions, as well as the need for the funds to maintain operations of a critical medical care provider for the community, the District is confident that voters will approve the Bond Measure.

Voter Approval Required. Issuance of the Bond Measure will require approval by two-thirds of the voters in Inyo County, California, who vote on the measure.

Timing for Approval/Issuance. The District intends to seek approval of the Bond Measure as part of the general election in November 2017. If the requisite number of votes is received, the election results will thereafter be certified. Following certification, the District will move forward with underwriting for the Bond Measure and, once underwriting is completed, the bonds will be issued and marketed for sale. The District anticipates that the bonds will be issued and the funds related thereto will be received by the District no later than March 2018.

**3.      Parcel Tax Increase**

The District intends to fund the Plan (in part) with revenues from an increased parcel tax.[10] A parcel tax is a tax assessed against the owner of real property, be it commercial or residential. At present, the parcel tax in Southern Inyo is approximately $150.00 per parcel,

---

[10] Per the agreement with ViHF, the revenues from the parcel tax increase and transient occupancy tax have been assigned to ViHF; however, as the ViHF LOC shall be paid in full on the Effective Date, the District shall receive these revenues during the term of the Plan. If the District draws on the ViHF LOC, ViHF shall retain the proceeds from the parcel tax increase and transient occupancy tax until the balance due on the ViHF LOC is paid in full—at which point, the revenues will revert to the District.

which generates an average of $350,000 per year in revenues for the District. The District proposes increasing the parcel tax from $150.00 to $300.00 per parcel, per year, which will increase receipts from the parcel tax from approximately $350,000 to $700,000 per year.

As with the Bond Measure, the District has taken certain actions to gauge whether the community is likely to support an increase to parcel taxes in order to preserve the Hospital, the SNF, and the Clinic. Based thereon, the District believes that voters will support the increase in parcel taxes in order to ensure the continued operations of the District and availability of the essential services the District provides to the community.

<u>Voter Approval Required</u>. Similar to the Bond Measure, increasing the parcel tax will require approval by two-thirds of the voters in Inyo County, California, who vote on the tax measure.

<u>Timing for Approval</u>. The District intends to seek approval of the parcel tax initiative as part of the general election in November 2017. If the requisite number of votes is received, the election results will thereafter be certified. If approved, the District anticipates that its will begin receiving the additional revenues on account of the parcel tax increase in April 2018. The parcel tax revenues will be paid bi-annually—with the first payment in April of each year and the second payment in December of each year.

### 4. Transient Occupancy Tax

The District intends to partially fund the Plan with additional tax revenues from an increase in the Transient Occupancy Tax (the "**TOT**") for the County of Inyo, California. The TOT is a tax levied against consumers of tourist related goods and services, principally through taxes on hotel and motel rooms. At present, the TOT in Inyo County is twelve percent (12%), which is lower than some of the surrounding counties. The District intends to propose two one percent (1%) increases—the first in 2018 from twelve percent (12%) to thirteen percent (13%), and the second in 2021 from thirteen (13%) to fourteen percent (14%). The District has conferred with authorities from the County of Inyo and obtained historical collection data relating to the TOT. Based on its discussions with county officials and historical data, the District estimates that the allocation of additional revenues generated by the one percent (1%) increase proposed for

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

611073534.1

2018 would result in $268,000 per year in additional revenues for the District, which would increase to $536,000 per year in 2021 if and when the second one percent (1%) increase goes into effect. The District would receive the TOT revenues as a single payment at the end of each calendar year.

Voter Approval **Not** Required. Voter approval of the TOT increase is not required; rather, any increase to the TOT requires approval from the County Board of Supervisors, which ordinarily makes its decision in concert with the merchants affected by the assessment. Based on its discussion with the County Board of Supervisors, the District believes that the TOT increase will be approved and allocated to the District.

Timing for Approval. As voter approval is not required, the timeline for approval is slightly more flexible. Regardless, the District expects the TOT increase to be approved before the projected Effective Date in March 2018.

### 5.     ViHF LOC

As discussed *supra*, the ViHF LOC shall remain open following the Effective Date. As the balance owing on the ViHF LOC on the Effective Date shall be paid in full, the District shall have an open line of credit in the amount of $2,000,000 to fund District operations, if necessary. Per the agreement with ViHF, the ViHF LOC shall remain open unless and until terminated upon the provision of thirty (30) days' notice by ViHF or the District.

### 6.     Claims and Causes of Action Against Third Parties

The District may have claims and causes of action against certain individuals or entities, and is continuing its investigation of any and all potential claims and causes of action that may exist. By and through the Plan, the District retains the right to commence and prosecute any action(s) based upon any claim or cause of action possessed by the District prior to the Effective Date. Any recovery by the District arising from a claim or cause of action commenced on or after the Effective Date shall be treated as additional revenues and used by the District to fund operations and/or plan payments. **Parties in interest may not rely on the absence of a reference in this Disclosure Statement or the Plan as any indication that the District ultimately will not pursue any and all available claims and causes of action against them.**

## VI.　SUMMARY OF THE PLAN OF ADJUSTMENT

　　**The discussion of the Plan set forth herein is qualified in its entirety by reference to the more detailed provisions set forth in the Plan and its exhibits, the terms of which are controlling.　Holders of Claims and other interested parties are urged to read the Plan and its exhibits, copies of which are served herewith, in their entirety so that they may make an informed decision regarding the Plan.**

　　The Plan proposes paying the Allowed Claims against the District over a term of several years.　The Allowed Claims are separated into four (4) Classes—namely, Secured Claims (Class 1), Post-Petition Claims (Class 2), General Unsecured Claims (Class 3), and Convenience Class Claims (Class 4).

　　As set forth in the financial projections (Exhibit 5 to the Plan Exhibits), the Allowed Claims will be paid over a term of years depending on their specific classification and treatment relating thereto.　Administrative Claims and Professional Claims are not classified and shall receive payment in full on the Effective Date, unless the holders of such claims agree to alternate treatment.　Secured Claims are separately categorized into subclasses (Classes 1A-1G) based upon the collateral purportedly securing each of the Claims.　Post-Petition Claims (Class 2) consist of general unsecured Claims held by creditors that provide goods or services the District essential to the operation of the District and its facilities.　General Unsecured Claims (Class 3) consist of general unsecured Claims in excess of $250.00 held by claimants not classified as Post-Petition Claims.　Convenience Class Claims (Class 4) consist of general unsecured Claims in an amount less than or equal to $250.00 held by claimants not classified as Post-Petition Claims, which are separately classified from General Unsecured Claims in order to avoid the administrative burden and expense associated with remitting payments on account of Claims of this size over a term of years, and Claims classified in Class 3 that opt to be treated as Class 4 Claims.　The District shall make the payments provided for in the Plan over a term of approximately seven (7) years (the Effective Date through and including December 2025).

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

**A.      Classification and Treatment of Claims**

**1.      Unclassified Claims**

Section II of the Plan governs the treatment of certain Claims that are not classified into Classes under the Plan.

**a.      Administrative Expense Claims**

Except to the extent that the holder of an Allowed Administrative Claim agrees to a different treatment, the District or its agent shall pay to each holder of an Allowed Administrative Claim, in full satisfaction, release, and discharge of such Allowed Administrative Claim, Cash in an amount equal to such Allowed Administrative Claim on the later of (i) the Effective Date or (ii) the date on which such Claim becomes an Allowed Administrative Claim, or as soon thereafter as is practicable. Under the Plan, the Allowed Administrative Claims consist of the following: SourceMedia, Inc. ($34,321.00); and Up-to-Date ($0.00).[11]

**b.      Professional Claims**

Pursuant to section 943(b)(3), all amounts paid or to be paid following the Effective Date for services or expenses in the Chapter 9 Case or incident to the Plan must be disclosed to the Bankruptcy Court and must be reasonable. There shall be paid to each holder of a Professional Claim, in full satisfaction, release and discharge of the Professional Claims existing on the Effective Date, Cash in an amount equal to that portion of such Claim that the District consents to pay and the Bankruptcy Court deems reasonable.[12]

The portion of the Allowed Professional Claim of Baker & Hostetler LLP ("**Baker**") relating to attorneys' fees shall be paid in equal monthly payments over a term of thirty-six (36) months following the Effective Date. The District estimates that the attorneys' fees incurred by Baker for services rendered to the District prior to the Effective Date shall total approximately $800,000. The Allowed Professional Claims of Nave Cortell LLP, HCCA, and Province as well

---

[11] The amounts listed herein are estimates of amount owing on account of the Allowed Administrative Claims on the Effective Date.

[12] The treatment of Professional Claims provided herein shall not in any way limit the rights of any professional employed by the District seeking compensation for services provided following the Effective Date. The amounts listed in this Section are estimates of the Professional Claims and shall not in any way be interpreted as a limitation on the amount of the Professional Claims.

611073534.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

as the portion of the Allowed Professional Claim of Baker & Hostetler LLP relating to costs incurred in the course of the Chapter 9 Case shall be paid in full upon, or as soon as reasonably practicable following, the Effective Date. The District estimates that Nave Cortell LLP, HCCA, and Province shall have Professional Claims in the amount of approximately $30,593.00, $1,439,117.00, and $20,761.75, respectively, as of the Effective Date. The District estimates that the portion of the Allowed Professional Claim of Baker & Hostetler LLP relating to costs incurred in the course of the Chapter 9 Case shall total approximately $150,000 as of the Effective Date.[13]

The District does not consent to the Bankruptcy Court adjudicating whether any other individual or entity constitutes a Professional or may assert a Professional Claim. The District solely consents to the Bankruptcy Court adjudicating the reasonableness of the services rendered and costs incurred by the Professionals for which compensation and/or reimbursement is sought.

The District, in the ordinary course of its business, and without the requirement for Bankruptcy Court approval, may pay for professional services rendered and costs incurred following the Effective Date.

        **c.**      **Deadline for the Filing and Assertion of Postpetition Claims, Administrative Claims (Other Than Ordinary Course Administrative Claims), and Professional Claims**

**All proofs of Claim for Claims arising on or after the Petition Date, and requests for payment or any other means of preserving and obtaining payment of Administrative Claims that have not been paid, released, or otherwise settled, and all requests for a determination regarding the reasonableness of Professional Claims, must be filed with the Bankruptcy Court and served upon the District no later than thirty (30) days <u>before</u> the date set for the Confirmation Hearing.** Any proof of Claim for Claims arising on or after the Petition Date, or request for payment of an Administrative Claim or a Professional Claim that is not timely filed

Baker & Hostetler LLP
Attorneys at Law
Los Angeles

---

[13] This figure includes projected costs for Force 10 Partners, the financial advisory firm retained by Baker & Hostetler LLP to assist with the preparation of the Plan and associated documents.

FIRST AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS

611073534.1

will be forever barred and holders of such Claims shall be barred from asserting such Claims in any manner against the District.

### 2. Class 1 – Secured Claims

#### a. Class 1A – Action Capital Corporation

Class 1A consists of the Claim asserted by Action Capital Corporation (also known as Coast to Coast Healthcare) ("**ACC**") in the amount of $185,600.35, which is purportedly secured by all accounts receivable of the District arising on or before January 31, 2015.

##### i. Impairment and Voting

Class 1A is Impaired by the Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of ACC. Accordingly, this Class is entitled to vote to accept or reject the Plan in accordance with the Plan Solicitation Order.

##### ii. Treatment

ACC's Class 1A Claim is purportedly secured solely by accounts receivable generated on or before January 31, 2015, which the District estimates to be worth $0.00. Accordingly, in full satisfaction, release and discharge of the Class 1A Claim, ACC shall receive an allowed General Unsecured Claim in the amount of $185,600.35, which shall be included in and treated in accordance with the treatment provided for Class 3 Claims.

#### b. Class 1B – Bank of the West/Thermo Fisher Financial Services, Inc.

Class 1B consists of the Claims asserted by Bank of the West ("**BOW**") in the amount of $7,189.61 and Thermo Fisher Financial Services, Inc. ("**Thermo**") in the amount of $12,443.46,[14] which are purportedly secured by an Abbott iSTAT 1 Upgrade from 200 Series and the related equipment and documentation.

---

[14] Bank of the West and Thermo Fisher Financial Services, Inc. each filed proofs of Claim asserting Secured Claims in the subject collateral. Per the documentation provided in support of the proofs of Claim, it appears that Thermo Fisher Financial Services, Inc. assigned its rights under the agreement with the District to Bank of the West in or about June 2013. Accordingly, under the Plan, the Claims asserted by Bank of the West and Thermo Fisher Financial Services, Inc. are treated as one and the same.

611073534.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

###### i.        Impairment and Voting

Class 1B is Impaired by the Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of BOW and/or Thermo.  Accordingly, this Class is entitled to vote to accept or reject the Plan in accordance with the Plan Solicitation Order.

###### ii.        Treatment

In full satisfaction, release and discharge of the Class 1B Claims, the District shall surrender to BOW or Thermo the collateral for the underlying agreements—namely, one Abbott iSTAT 1 Upgrade from 200 Series and the related equipment and documentation.  The District shall surrender the subject equipment and documentation on or as soon as practicable following the Effective Date.

###### c.        Class 1C – Canon Financial Services, Inc.

Class 1C consists of the Claim asserted by Canon Financial Services, Inc. ("**Canon**") in the amount of $84,275.90, which is purportedly secured by certain office equipment subject to the agreements by and between the District and Canon or its affiliates.

###### i.        Impairment and Voting

Class 1C is Impaired by the Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of Canon.  Accordingly, this Class is entitled to vote to accept or reject the Plan in accordance with the Plan Solicitation Order.

###### ii.        Treatment

In full satisfaction, release and discharge of the Class 1C Claim, the District shall surrender to Canon the collateral for the underlying agreement.  The District shall surrender the subject equipment and documentation on or as soon as practicable following the Effective Date.

###### d.        Class 1D – Cardinal Health 110, LLC

Class 1D consists of the Claim asserted by Cardinal Health 110, LLC ("**Cardinal**") in the amount of $838.28, which is purportedly secured by certain funds presently held by Cardinal.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

611073534.1

### i.      Impairment and Voting

Class 1D is Unimpaired by the Plan since the treatment of this Class will not affect the legal, equitable, or contractual rights of Cardinal. Accordingly, this Class is **not** entitled to vote to accept or reject the Plan in accordance with the Plan Solicitation Order.[15]

### ii.      Treatment

In full satisfaction, release and discharge of the Class 1D Claim, Cardinal shall be entitled to retain the funds presently in its possession, which total $838.28. The remainder of the Claim asserted by Cardinal shall be allowed as a General Unsecured Claim in Class 3 in accordance with the proof of Claim filed by Cardinal.

### e.      Class 1E – Healthcare Resource Group

Class 1E consists of the Claim asserted by Healthcare Resource Group ("**HRG**") in the amount of $151,562.73, which is purportedly secured by various personal property and general intangible assets of the District or in which the District has an ownership interest.

### i.      Impairment and Voting

Class 1E is Impaired by the Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of HRG. Accordingly, this Class is entitled to vote to accept or reject the Plan in accordance with the Plan Solicitation Order.

### ii.      Treatment

In full satisfaction, release and discharge of the Class 1E Claim, the District shall make periodic payments to HRG until the Class 1E Claim is paid in full with interest. Under the Plan, the payments on account of the Class 1E Claim shall begin in the first full month following the Effective Date and shall be made monthly and in the amount of $1,481.00 per month over the life of the Plan, which equates to the full amount of the Claim plus interest at a rate of 3.25% *per annum*.

---

[15] The Unimpaired status of the Class 1D Claim held by Cardinal shall not affect the right of Cardinal, if any, to cast a vote for or against the Plan on account of the portion of its Claim categorized as a General Unsecured Claim in Class 3.

FIRST AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS
611073534.1

1      **f.      Class 1F – Optum Bank, Inc.**

2      Class 1F is comprised of the Disputed Claim asserted by Optum in the amount of

3   $1,717,320.24, which is purportedly secured by the District's real property as well as personal

4   property and general intangible assets.  The validity and enforceability of the Optum Claim is the

5   subject of the Optum Adversary.

6      **i.      Impairment and Voting**

7      Class 1F is Impaired by this Plan since the treatment of this Class will affect the legal,

8   equitable, or contractual rights of Optum.  However, as Class 1F is comprised solely of the

9   Disputed Claim of Optum, Class 1F is not entitled to vote on the Plan unless the Optum Claim is

10  estimated for voting purposes pursuant to Bankruptcy Rule 3018(a).

11     **ii.      Treatment**

12     As a Disputed Claim, the Optum Claim shall not receive any distributions under the Plan

13  unless and until a court of competent jurisdiction enters a Final Order allowing the Optum Claim.

14  If the Optum Claim is adjudged valid, enforceable and secured in whole or in part, the District

15  shall pay Optum Cash in an amount equal to the portion of the Optum Claim allowed as a

16  Secured Claim no later than one hundred and twenty (120) days following the entry of a Final

17  Order allowing the Optum Claim.  If the Optum Claim is adjudge valid and enforceable but not

18  wholly secured, the portion of the Optum Claim adjudged to be a Secured Claim shall be treated

19  pursuant to the preceding sentence and any order(s) entered in the Optum Adversary and the

20  remaining Allowed Claim shall be treated as a General Unsecured Claim in Class 3.  If the Optum

21  Claim is adjudged invalid and unenforceable, Class 1F shall not receive any distributions under

22  the Plan.

23     **g.      Class 1G – Vi Healthcare Finance, Inc.**

24     Class 1G is comprised of any and all funds advanced to the District by ViHF pursuant to

25  the ViHF LOC.  The anticipated balance of the ViHF LOC on the Effective Date is $1,447,106,

26  which shall be secured in accordance with the terms of the ViHF LOC to the extent permitted

27  under California law.

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS

611073534.1

### i.       Impairment and Voting

Class 1G is Impaired by the Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of ViHF.  Accordingly, this Class is entitled to vote to accept or reject the Plan in accordance with the Plan Solicitation Order.

### ii.      Treatment

The District shall pay any balance owing under the ViHF LOC as of the Effective Date in full on or as soon as practicable following the Effective Date.

### 3.       Class 2 – Post-Petition Claims

Class 2 consists of the Claims listed in Exhibit 6 of the Plan Exhibits.

### a.       Impairment and Voting

Class 2 is Impaired by the Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of the holders of Class 2 Claims.  Accordingly, this Class is entitled to vote to accept or reject the Plan in accordance with the Plan Solicitation Order.

### b.       Treatment

In full satisfaction, release and discharge of the Class 2 Claims, holders of Class 2 Claims shall receive Cash on the Effective Date, or as soon thereafter as practicable, in an amount equal to the amount listed for each respective claimant in Exhibit 6 of the Plan Exhibits.

### 4.       Class 3 – General Unsecured Claims

Class 3 consists of the Claims listed in Exhibit 7 of the Plan Exhibits.[16]

### a.       Impairment and Voting

Class 3 is Impaired by the Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of the holders of Class 3 Claims.  Accordingly, this Class is entitled to vote to accept or reject the Plan in accordance with the Plan Solicitation Order.

### b.       Treatment

In full satisfaction, release and discharge of the Class 3 Claims, holders of Class 3 Claims shall receive a *pro rata* portion of $100,000.00, which shall be paid as follows: (a) $50,000.00 on

---

[16] Exhibit 7 does not include any estimate(s) on account of the potential General Unsecured Claim of Optum, if any. If the Bankruptcy Court rules that Optum is entitled to an allowed General Unsecured Claim, such Claim shall be entitled to a *pro rata* portion of any distributions to Class 3.

611073534.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

the Effective Date or as soon thereafter as practicable; and (b) $50,000.00 on the last Business Day of 2018, assuming the Effective Date has already occurred.

### c.     Class 4 Election

Holders of General Unsecured Claims in Class 3 may elect to have their Claim(s) treated as Class 4 Claim(s) by so noting on the Ballot. Any Class 3 Claim electing treatment under Class 4 shall irrevocably forfeit its status as a Class 3 General Unsecured Claim and the holder of such Claim shall be deemed to have accepted payment as a holder of a Claim in Class 4 in full satisfaction, release and discharge of their Claim.

### 5.     Class 4 – Convenience Claims

Class 4 consists of the Claims in an amount of $250.00 or less. A list of all Class 4 Claims is set forth in Exhibit 8 of the Plan Exhibits.

### a.     Impairment and Voting

Class 4 is Impaired by the Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of the holders of Class 4 Claims. Accordingly, this Class is entitled to vote to accept or reject the Plan in accordance with the Plan Solicitation Order.

### b.     Treatment

In full satisfaction, release and discharge of the Class 4 Claims, holders of Class 4 Claims shall receive Cash on the Effective Date, or as soon thereafter as practicable, in an amount equal to the lesser of (a) the amount of their Allowed Class 4 Claims or (b) $100.00.

### B.     Treatment of Executory Contracts and Unexpired Leases

### 1.     Generally

The Bankruptcy Code grants debtors, subject to court approval, the power to assume or reject executory contracts and unexpired leases. An "executory contract" generally means a contract under which the obligations of both the District and the other party thereto are so far unperformed that the failure of either party to complete performance would constitute a material breach of the subject agreement, thereby excusing the performance of the other party.

If a debtor rejects an executory contract or unexpired lease, the rejection operates as a prepetition breach of the subject agreement. If an executory contract or unexpired lease is

611073534.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

assumed by the debtor, the assumption obligates the debtor to perform under the agreement, and damages arising from any subsequent breach of the agreement are treated as administrative expenses.

### 2. Assumption of Executory Contracts and Unexpired Leases

Without the need to file any further motions, the District intends to assume and will assume as of the Effective Date all executory contracts and unexpired leases to which it is a party and which was entered into prior to the Petition Date, except (i) for those unexpired leases and executory contracts specifically identified in subsection 3 below or (ii) as otherwise provided in the Plan.

### a. Cure Payments

To cure any purported default or arrears under the executory contracts and unexpired leases the District plans to assume through the Plan, the District shall make the cure payments identified on Exhibit 9 to the Plan Exhibits.[17]  The Bankruptcy Court shall resolve all disputes regarding: (i) the amount of any cure payment to be made in connection with the assumption of any contract or lease; (ii) the ability of the District to provide "adequate assurance of future performance" within the meaning of section 365 under the contract or lease to be assumed; and (iii) any other matter pertaining to such assumption and assignment.  If any party to an executory contract or unexpired lease that is to be assumed by the District asserts that the proposed cure payment is insufficient or some other performance is required to assume the subject contract or lease, such party shall file with the Bankruptcy Court and serve upon the District a written statement and accompanying declaration in support thereof specifying the basis for its position and accounting for the purported amount owing under the subject contract or lease not later than thirty (30) days after the Confirmation Date.  The failure to timely file and serve such a statement shall be deemed to be a waiver of any and all objections to the proposed assumption, including,

---

[17] If an executory contract or unexpired lease is not identified on Exhibit 9, the District shall not make any cure payment to any party or parties to such agreement as the District does not have any record of any outstanding amount owing under the subject agreement.  The omission of the subject contract or lease, however, shall not in any way affect the assumption of the subject agreement by and through the Plan.

611073534.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1  without limitation, any objection pertaining to the adequacy of the proposed cure payment or the

2  adequate of the assurance of prompt cure and/or of future performance.

3          **b.**        **Adequate Assurance of Prompt Cure and Future Performance**

4         What constitutes "adequate assurance" is a factual question to be determined on a case-by-

5  case basis with due regard to the nature and identify of the parties, their past dealings, and present

6  commercial realities.  The District need only show that performance is likely (i.e. more probable

7  than not) in order to assume an executory contract or unexpired lease pursuant to section 365.  As

8  reflected in Section VI.C. herein, the District submits that the means for implementation of the

9  Plan constitute adequate assurance of both its ability to "promptly" cure the payments set forth in

10  Exhibit 9, and for future performance. Moreover, as the total amount of the cure payments is only

11  $100,775.00, which the District intends to pay over a period of eighteen (18) months following

12  the Effective Date, even if one or more of the anticipated sources that will be used to fund the

13  Plan does not materialize, the District will be able to meet the cure obligations set forth in Exhibit

14  9.

15          **3.**        **Rejection of Executory Contracts and Unexpired Leases**

16         Without the need to file any further motions, the District elects to reject and shall be

17  deemed to have rejected as of the Effective Date the following executory contracts and unexpired

18  leases:[18]

19       •   Master Lease Agreement dated as of November 13, 2012 between the District, as

20          lessee, and General Electric Capital Corporation, as lessor, and all other leases

21          based thereon, pertaining to, among other things, a Proteus X Ray XR/a 65W

22          Radiographic System;

23       •   Lease dated March 7, 2013 between the District, as lessee, and Thermo Fisher

24          Financial Services, Inc., as lessor, and/or Bank of the West, as assignee of Thermo

25          Fisher Financial Services, Inc., pertaining to an Abbott iSTAT 1 Upgrade from

26          200 Series and related equipment and documentation;

27

28  _____

[18] Any reference contained herein to an agreement as a "lease" shall not constitute an admission regarding whether the subject agreement constitutes "true lease" under applicable law.

FIRST AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1     • Agreement dated October 9, 2014, between the District and Thermo Fisher

2       Financial Services, Inc., pertaining to a VITROS 350 Chemistry System;

3     • Lease between the District, as lessee, and Healthland, Inc., as lessor, pertaining to

4       certain medical billing hardware and software;

5     • Lease No. x005 between the District, as lessee, and Canon Financial Services, as

6       lessor, pertaining to Canon ImageRunner 1730iF (serial number x4453);

7     • Lease No. x006 between the District, as lessee, and Canon Financial Services, as

8       lessor, pertaining to Canon ImageRunner Advance 6255 (serial number x1950);

9     • Lease No. x007 between the District, as lessee, and Canon Financial Services, as

10     lessor, pertaining to Canon ImageRunner 1730iF (serial number x4451);

11    • Lease No. x008 between the District, as lessee, and Canon Financial Services, as

12    lessor, pertaining to IRA 4235 (serial number x1785), IRA 1025iF (serial number

13    x5469), IRA 400iF (serial number x2533), IRA 400iF (serial number x1857), IRA

14    400iF (serial number x1862), and IR 1730iF (service only) (serial number x5155);

15    • Agreement between the District and Celleration Inc.;

16    • Employment Agreement between the District, as employer, and Dr. Kenneth L.

17    Saeger, as employee;

18    • Employment Agreement between the District, as employer, and Dr. Milton R.

19    Jones, as employee;

20    • Employment Agreement between the District, as employer, and Dr. Steve Chong

21    Luo, as employee;

22    • Service Agreement between the District and Laboratory Specialists International,

23    as service provider;

24    • Lease between the District, as lessee, and Marlin Leasing Corporation, as lessor,

25    pertaining to certain medical equipment, including a Horiba Medial Pentra 60 C+,

26    two Unimac Natural Gas Dryers, and one Ultrascan table;

27    • Agreement between the District and T System, Inc.; and

28    • Agreement between the District and Tosoh Bioscience, Inc.

611073534.1

#### a. Claims Arising from Rejection

Proofs of Claim arising from the rejection of executory contracts or unexpired leases must be filed with the Bankruptcy Court and served on the District no later than thirty (30) days after the Effective Date. The failure to properly and timely assert a rejection damages Claim shall result in such Claim being forever barred and rendered unenforceable against the District or its assets, properties, or interests in property. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be classified into Class 3 (General Unsecured Claims) and treated accordingly.

#### C. Means for Execution and Implementation of Plan

Under the Plan, the District shall be required to make Cash disbursements totaling approximately $6,732,730[19] to the holders of Allowed Claims over a term of approximately seven (7) years while paying an estimated $10,534,350 per year for the costs and expenses associated with maintaining the operations of the District's facilities and services, including, without limitation, costs associated with staffing, supplies and equipment, and capital expenditures for the acquisition of new property and maintenance of current property, which total.

The Plan will be funded utilizing primarily the following sources:

- <u>Cash on Hand</u>. The District estimates that it will have approximately $2,817,400 in cash on hand on the Effective Date.

- <u>Operations</u>. The District estimates that it will generate approximately $8,930,410 per year from the operations.[20]

- <u>Bond Revenues</u>. As set forth in greater detail, *supra*, at Section V.B.1., the District anticipates receiving approximately $4,500,000 from the issuance of $5,000,000 in general obligation bonds. Unless waived by the District, in its sole and absolute discretion, the issuance of such bonds and receipt of the revenues

---

[19] This figure assumes payment of the Optum Claim in full. If the Optum Claim is disallowed, the distributions under the Plan will total approximately $2,734,000.

[20] The estimated operational revenues includes the estimated revenues from the facility for psychiatric holds pursuant to California Welfare & Institutions Code § 5150 and medical infusion services.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

therefrom shall be an express condition to the Effective Date, which is projected to occur in or about March 2018.

- Tax Revenues. The District anticipates receiving approximately $900,000 per year on account on approved tax assessments.

- Parcel Tax Revenues. As set forth in greater detail, *supra*, at Section V.B.2., the District anticipates receiving additional parcel tax revenues of $350,000 per year beginning in April 2018.

- Transient Occupancy Tax. As set forth in greater detail, *supra*, at Section V.B.2., the District anticipates receiving revenues from the Transient Occupancy Tax (TOT) of $268,000 per year for 2018 through 2020 and $536,000 per year for 2021 through 2025.

- ViHF LOC. In addition to its revenue sources, the District shall have access to a $2,000,000 line of credit with ViHF.

In sum, the District anticipates having approximately $7,317,400 in readily available funds ($2,817,400 from cash on hand and $4,500,000 from the bond issuance) on the Effective Date and approximately $10,678,000 in revenues per year. As a result, and as the financial projections (Exhibit 5) reflect, the District is confident it will be able to maintain its operations so that it can continue providing desperately needed medical treatment to the community at large while making the payments required under the Plan.

### D. Distributions

#### 1. Disbursing Agent

On and after the Effective Date, the District shall serve as disbursing agent for payments to be made under the Plan and in accordance with section 944. However, the District may elect to retain one or more agents to perform or assist it in making distributions pursuant to the Plan and may provide reasonable compensation to any such agent(s) without further notice or Bankruptcy Court approval.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

### 2. Delivery of Distributions

All distributions to any holder of an Allowed Claim shall be made at the address of such holder as set forth in the books and records of the District or its agents unless (i) the holder has designated an alternate address for payment in a proof of Claim filed with the Bankruptcy Court or (ii) specifies an alternate address on its Ballot. Any and all notifications of address changes should be addressed to Sonia Gaeta at Baker & Hostetler LLP, 11601 Wilshire Boulevard, Suite 1400, Los Angeles, California 90024, or sgaeta@bakerlaw.com.

### 3. Undeliverable Distributions

*Holding of Undeliverable Distributions*. If any distribution to a holder of an Allowed Claim is returned to the District or its agent as undeliverable, no further distributions shall be made to such holder unless and until the District is notified in writing of such holder's correct address. Unless and until the District is so notified, such distribution shall be deemed to be "Unclaimed Property" and shall be set aside and held in a segregated account.

*Notification and Forfeiture of Unclaimed Property.* On the first anniversary of the Effective Date, the District will file with the Bankruptcy Court a list of Unclaimed Property, together with a schedule that identifies the name and last-known address of the individuals and entities entitled to the Unclaimed Property. The District shall not otherwise be required to attempt to locate any such individual or entity. On the second anniversary of the Effective Date, all remaining Unclaimed Property and accrued interest or dividends earned thereon will be remitted to and vest in the District. Additionally, such individuals and entities shall be deemed to have waived and forfeited their right to any future payments under the Plan and such funds shall be retained by the District. Notwithstanding the non-payment of any forfeited Claims, such Claims shall be deemed satisfied and discharged as if paid pursuant to the terms of the Plan.

### 4. Distribution of Cash

Any payment of Cash to be made by the District or its agent pursuant to the Plan shall be made by check drawn on a domestic bank or by wire transfer, at the sole option of the District.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS

611073534.1

### 5.      Timeliness of Payments

Any payments or distributions to be made pursuant to the Plan shall be deemed to be timely made if made within fourteen (14) Business Days after the date(s) specified in the Plan. Whenever any distribution to be made under the Plan is due on a day that is not a Business Day, such distribution instead shall be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due.

### 6.      Default and Cure

In the event the District fails to make any payment required under the Plan in a timely manner, the affected creditor(s) shall serve the District with a notice of default not later than thirty (30) days after the purported default along with any documentation supporting the alleged default. Not later than sixty (60) days after receipt of the notice of the purported default, the District shall either (i) cure the default or (ii) serve the affected creditor(s) with a statement and supporting documentation contesting the allegation of default. In the event the District contests an alleged default, not later than five (5) Business Days after serving a response to a purported default, the District shall file a motion with the Bankruptcy Court requesting a resolution of the dispute relating to the alleged default and set the motion for hearing on the first available hearing date not sooner than fourteen (14) days after filing the motion. If the Bankruptcy Court rules that the non-payment constitutes an event of default under the Plan, the District shall cure the purported default not later than five (5) Business Days following the entry of a Final Order of the Bankruptcy Court adopting the finding with respect to the purported default.

### 7.      Compliance with Tax Requirements

Any and all distributions pursuant to the Plan shall be subject to any applicable tax withholding and reporting requirements imposed on it by any governmental unit. In connection with each distribution which requires the filing of an information return (such as Internal Revenue Service Form 1099 or 1042) or withholding, the District shall file such information return with the Internal Revenue Service and provide any required statements in connection therewith to the recipients of such distribution, or effect any such withholding and deposit all moneys so withheld to the extent required by law. With respect to any entity from whom a tax identification number,

611073534.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1　certified tax identification number, or other tax information is required by law to avoid

2　withholding has not been received by the District at the time the district is to be made, the

3　District, at its sole option, may withhold the amount required and distribute the balance to such

4　entity or the District may decline to make such distribution(s) until the information is received.

### 8.　Time Bar to Cash Payments

6　Checks issued by the District on account of Allowed Claims will be null and void if not

7　negotiated within ninety (90) days from and after the date of issuance thereof.  Requests for

8　reissuance of any check shall be submitted in writing to Sonia Gaeta via first-class mail addressed

9　to Sonia Gaeta, Baker & Hostetler LLP, 11601 Wilshire Boulevard, Suite 1400, Los Angeles,

10　California 90024, or via email addressed to sgaeta@bakerlaw.com.  Any request for reissuance of

11　an expired check must be not later than 180 calendar days following the initial issuance of the

12　subject check.  After such date, the amounts stated in the voided check(s) shall be deemed

13　forfeited and the District shall retain such funds.  Any amounts forfeited pursuant to the preceding

14　sentence shall be deemed paid to and received by the subject claimant for purposes of calculating

15　the amounts owing to such creditor under the Plan.

### 9.　No *De Minimis* Distributions

17　With the exception of Class 4 Claims (Convenience Class Claims), no payment of less

18　than ten dollars (US$10.00) will be made by the District on account of any Allowed Claim.

### 10.　No Distributions on Account of Disputed Claims

20　Notwithstanding anything to the contrary in the Plan, no distributions shall be made on

21　account of any part of any Disputed Claim or Disallowed Claim unless and until such Claim

22　becomes an Allowed Claim and only to the extent such Claim constitutes an Allowed Claim.

23　Distributions made after the Effective Date with respect to Claims that were not Allowed Claims

24　as of the Effective Date, but are later determined to be Allowed Claims, shall be deemed to have

25　been made on time and in accordance with the terms of the Plan.

26　If any distributions are made prior to the resolution of a dispute pertaining to a Claim, the

27　portion that would be payable on account of such Claim if such Claim was an Allowed Claim,

28　shall be held in a segregated bank account.  If the Claim is subsequently adjudicated to be an

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

611073534.1

Allowed Claim, the segregated funds shall be distributed to the holder of such Claim. Any

interest accrued on account of the segregated funds shall be paid to and retained by the District.

### 11.    No Post-Petition Date Accrual

Unless otherwise specifically provided in the Plan, specifically agreed to by the District in

writing, or allowed by Final Order of the Bankruptcy Court, the District will not be required to

pay to any holder of a Claim any interest, penalty or late charge accruing with respect to such

Claim on or after the Petition Date.

### E.    Disputed Claims; Objections to Claims; Prosecution of Objections to Disputed Claims

#### 1.    Claim Objection Deadline; Prosecution of Objections

The District shall have the right to object to the allowance of Claims with respect to which

liability or allowance is disputed in whole or in part. Unless otherwise ordered by the Bankruptcy

Court, the District shall file and serve any such objections to Claims (whether by motion or

commencement of an adversary proceeding) by not later than one hundred and eighty (180) days

after the Effective Date or, in the case of Claims properly filed after the Effective Date, by not

later than one hundred and eighty (180) days after the date of filing of such Claims.

#### 2.    Reserves, Payments, and Distributions with Respect to Disputed Claims

At such time as a Disputed Claim becomes an Allowed Claim, in whole or in part, the

District or its agent shall distribute to the holder thereof the distributions, if any, to which such

holder is then entitled under the Plan in the manner set forth in the Plan. Such distributions, if

any, shall be made as soon as practicable after the date that the order or judgment of the

Bankruptcy Court allowing such Claim becomes a Final Order, but in no event more than sixty

(60) days thereafter. Unless otherwise specifically provided in the Plan or allowed by Final Order

of the Bankruptcy Court, no interest will be paid on Disputed Claims that later become Allowed

Claims.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

**F.     Continuing Jurisdiction of the Bankruptcy Court**

The Plan provides for the Bankruptcy Court to retain jurisdiction over various matters relating to the Chapter 9 Case, the Plan, and other related items.  Readers are encouraged to review the Plan carefully to ascertain the nature of the Bankruptcy Court's continuing jurisdiction following the Effective Date.

**VII.    CONFIRMATION AND EFFECTIVE DATE OF THE PLAN**

**Because the law with respect to confirmation of a plan of adjustment is complex, creditors concerned with issues regarding confirmation of the Plan should consult with independent counsel and/or a financial advisor.**  The following discussion is intended solely for the purpose of providing basic information concerning certain confirmation issues.  The District cannot and does not represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Bankruptcy Court can confirm the Plan.  Some of the requirements discussed in this Disclosure Statement include acceptance of the Plan by the requisite number of creditors and whether the Plan is in the "best interests" of creditors.  These requirements, however, are not the only requirements for confirmation and the Bankruptcy Court will not confirm the Plan unless and until it determines that the Plan satisfies all applicable requirements, including requirements which may not be discussed or referenced in this Disclosure Statement

**A.     Voting and Right to be Heard at Confirmation**

**1.     Who May Support or Object to Confirmation of the Plan?**

Any party in interest may support or object to the confirmation of the Plan.  Even parties in interest that may not have a right to vote on the Plan (e.g., individuals and entities in Unimpaired Classes) may still have a right to support or object to confirmation of the Plan by filing pleadings supporting or objecting to confirmation of the Plan.

**2.     Who May Vote to Accept or Reject the Plan?**

A creditor generally has the right to vote for or against the Plan if its Claim is both (i) an Allowed Claim for purposes of voting and (ii) classified in an Impaired Class.  Generally, a Claim

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

- 53 -

is deemed allowed if a proof of Claim was timely filed or the Claim is scheduled as undisputed, non-contingent and liquidated; *provided, however*, that if an objection to the Claim has been filed or raised in the Plan or otherwise, or a Claim is otherwise disputed or contested, the claimant cannot vote unless and until the Bankruptcy Court, after notice and a hearing, either overrules the objection or allows the Claim for voting purposes.

The holders of the following types of Claims <u>are not</u> entitled to vote on the Plan: (a) Disallowed Claims; (b) Claims that are subject to a pending objection (whether by way of the Plan or independent motion or adversary proceeding) and that have not been allowed for voting purposes; (c) Claims that are not Impaired under the Plan; (d) Administrative Claims, since such Claims are not placed in Classes and are required to receive specific treatment; and (e) Professional Claims, since such Claims are not placed in Classes.

Each holder of an Allowed Claim classified into one or more of the Voting Classes shall be entitled to vote each such Claim to accept or reject the Plan.[21]

### 3. Votes Required to Confirm Plan

The Bankruptcy Court cannot confirm the Plan unless, among other things, (a) at least one Impaired Class has accepted the Plan without counting the votes of any Insiders within that Class and (b) either all Impaired Classes have voted to accept the Plan, or the Plan can be "crammed-down" with respect to each and every dissenting Impaired Class.

A Class of Claims is considered to have accepted the Plan when more than one-half in number **and** at least two-thirds in dollar amount of the Claims that actually voted in that Class have voted in favor of the Plan.

### B. The "Best Interests" Test

The Bankruptcy Court also must determine pursuant to section 943(b)(7) that the Plan is in the "best interests of creditors", which in the chapter 9 context means that the treatment of Claims under the Plan must be better than the only meaningful alternative available, which is

---

[21] As the Optum Claim is a Disputed Claim by virtue of the Optum Adversary, Class 1F is not entitled to vote on the Plan. If the Optum Claim is estimated pursuant to Bankruptcy Rule 3018(a) for voting purposes, Class 1F shall be entitled to vote on the Plan and shall be deemed included within the definition of "Voting Classes" for purposes of the Disclosure Statement and Plan.

611073534.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

dismissal of the Chapter 9 Case. The District submits that the Plan is in the best interests of all creditors because significant payments will be made to all Impaired Classes, and holders of Allowed Claims in all Impaired Classes will receive greater distributions under the Plan than those creditors would receive were the Chapter 9 Case dismissed. *See* Exhibit 5 to Plan Exhibits.

In contrast, in the absence of the Plan, the District's creditors would be left to "fend for themselves." Individual creditor collection actions would likely aggregate, through suits and attachments, to make continued operation of the District's facilities untenable (if not impossible), thus eliminating the ability to pay the obligations of the District. More precisely, but for the adjustment to its obligations proposed through the Plan, the District will not be unable to alter the treatment of certain Claims, including General Unsecured Claims. The District will also lose the benefits afforded to debtors under the Bankruptcy Code, which, in essence, would result in substantial interference in the operations of the Hospital, the SNF, and/or the Clinic as creditors sought to recover collateral and levy against the District's assets to satisfy their Claims, which would prevent the District from utilizing those assets to maintain operations and pay its obligations in an orderly and equitable fashion over a term of years. Furthermore, the District would likely be unable to resolve disputes regarding certain purported Claims (including, without limitation, the Claim asserted by Optum Bank) without the need for costly and protracted litigation—expenses that would further diminish, if not decimate, operational capabilities. As a result of the foregoing, the proposed ballot initiatives underpinning the Plan would likely fail as the District be unable to maintain its operations or establish a long-term work-out plan for the payment of its obligations in the face of operational difficulties causes by the debt collection efforts of its creditors and the costs of litigation. In short, the District cannot afford to pay its creditors absent the debt relief afforded by the Plan, and dismissal of the Chapter 9 Case would likely result in chaos, the closure of the District's facilities and cessation of its services, and, thus, an inability to not only pay most (if not all) of its creditors, but an inability to continue providing essential services to the community at large.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

611073534.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

### C. Feasibility

To satisfy the requirement set forth in section 943(b)(7) that the Plan be feasible, the District must demonstrate the ability to make the payments required under the Plan while maintaining its operations at the level necessary to the continued viability of the health care district. Based on the District's analysis of operational revenues, anticipated bond revenues, and supplemental tax revenues, as well as the projected Plan distributions, the District is confident it possesses the financial ability to maintain its current operations, which is necessary to continue providing services to the community, while simultaneously meeting its obligations under the Plan. Indeed, based on the financial projections (*see* Exhibit 5), the District will be able to maintain a positive cash position while servicing operational and Plan debts and simultaneously maintaining a reserve for future expenditures, including capital expenditures. Accordingly, the District submits that the Plan is feasible.

### D. "Cramdown"

The Bankruptcy Code provides that the Bankruptcy Court may confirm a plan of adjustment that is not accepted by all Impaired Classes if at least one Impaired Class of Claims accepts the Plan and the so-called "cramdown" provisions set forth in sections 1129(b)(1), (b)(2)(A) and (b)(2)(B) are satisfied. The Plan may be confirmed under the cramdown provisions if, in addition to satisfying the other requirements of section 943(b), it (a) is "fair and equitable," and (b) does not discriminate unfairly with respect to each Class of Claims that is Impaired under and has not accepted the Plan.

The "fair and equitable" standard (which is commonly known as the "absolute priority rule") requires, among other things, that unless a dissenting unsecured Class of Claims receives payment in full for its Allowed Claims, no holder of Allowed Claims in any class junior to that class may receive or retain any property on account of such Claims. The "fair and equitable" standard also has been interpreted to prohibit any class senior to a dissenting class from receiving more than 100% of its Allowed Claims under a plan. The District believes that the Plan satisfies

611073534.1

the "fair and equitable" standard because, among other things, no Classes junior to the Classes of Unsecured Claims are receiving or retaining any property under the Plan.[22]

The requirement that the plan not "discriminate unfairly" means, among other things, that a dissenting Class must be treated substantially the same as to other Classes of equal rank. The District does not believe that the Plan unfairly discriminates against any Class that may not accept or otherwise consent to the Plan.

**As noted above, the District has reserved the right to request that the Bankruptcy Court confirm the Plan by "cramdown" in accordance with sections 1129(b)(1), (b)(2)(A) and (b)(2)(B).**

### E. Conditions Precedent

#### 1. Condition Precedent to Confirmation

The Plan shall not be confirmed unless and until the following conditions precedent have been satisfied or waived: (1) the Plan satisfies the requirements of section 943(b) of the Bankruptcy Code, as applicable; (2) the District has received any and all authorizations, consents, regulatory approvals, rulings, no-action letters, opinions, and documents that are necessary to implement the Plan and that are required by law, regulation or order, including, but not limited to, those required under section 943(b)(6) of the Bankruptcy Code; and (3) the Bankruptcy Court enters a Confirmation Order in a form and substance satisfactory to the District.

#### 2. Conditions Precedent to Effective Date

The Plan will not become effective and operative unless and until the Effective Date occurs. Section XIII of the Plan sets forth certain conditions to the occurrence of the Effective Date. The Effective Date will occur on the first Business Day after which the conditions set forth in Section XIII.B. of the Plan are satisfied or waived. Based on currently available information, the District anticipates that the Effective Date will occur in or about March 2018.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

---

[22] Under governing law, as a municipality, the District may retain its assets without the payment of all General Unsecured Creditors in full. *See In re Corcoran Hosp. Dist.*, 233 B.R. 449, 457-459 (Bankr. E.D. Cal. 1999); *see also* 6 COLLIER ON BANKRUPTCY ¶ 943.03[1][f][iii].

### 3. Non-Occurrence of Effective Date

The Plan provides that, if the Bankruptcy Court confirms the Plan but the conditions precedent to the Effective Date thereof are not satisfied, upon notification submitted by the District to the Bankruptcy Court: (i) the Confirmation Order shall be vacated, (ii) no distributions under the Plan shall be made, (iii) the District and all holders of Claims shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iv) all of the District's obligations with respect to the Claims shall remain unchanged and nothing contained herein or in the Plan shall be deemed to constitute a waiver or release of any Claims by or against the District or any other entity or to prejudice in any manner the rights, remedies, or claims of the District or any entity in any further proceeding involving the District.

### 4. Conditions Precedent to Effective Date Payments

As a condition precedent to the payment of any Allowed Claim for which payment is due under the Plan on the Effective Date ("**Effective Date Payments**"), the District shall have paid any and all Post-Petition Claims incurred or arising between July 14, 2017 and the date immediately preceding the Effective Date.

### 5. Waiver of Conditions Precedent to Effective Date

Under the Plan, the District may waive in whole or in part any condition to the Effective Date of the Plan or the payment of any Effective Date Payments. Any such waiver of a condition may be effected at any time, without notice or leave or order of the Bankruptcy Court and without any formal action, other than the filing of a notice of such waiver with the Bankruptcy Court.

### F. Effect of Confirmation

Confirmation of the Plan and the occurrence of the Effective Date will have a number of important and binding effects, some of which are summarized below. Readers are encouraged to review Section XI of the Plan carefully and in its entirety to assess the various consequences of confirmation of the Plan.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS

611073534.1

1    **1.     Dissolution of the Committee**

2        On the Effective Date, the Committee shall be released and discharged of and from all

3    further authority, duties, responsibilities, and obligations relating to and arising from and in

4    connection with the Chapter 9 Case and the Committee shall be deemed dissolved and its

5    appointment terminated.  Any professionals retained by the Committee and/or the members

6    thereof shall not be entitled to compensation or reimbursement of expenses for any services

7    rendered or expenses incurred.

8    **2.     Discharge of the District**

9        Pursuant to section 944, upon completion of all payments required under the Plan, the

10   District shall be discharged from all debts (as defined in the Bankruptcy Code) of the District and

11   Claims against the District other than (i) any debt specifically and expressly excepted from

12   discharge by the Plan or the Confirmation Order and (ii) any debt owed to an entity that, before

13   the confirmation of the Plan, had neither notice nor actual knowledge of the Chapter 9 Case.

14       The rights afforded in the Plan and the treatment of all holders of Claims, whether

15   Impaired or Unimpaired, shall be in exchange for and in complete satisfaction, discharge and

16   release of all Claims of any nature whatsoever arising on or before the Effective Date, known or

17   unknown, including any interest accrued or expenses incurred thereon from and after the Petition

18   Date, whether against the District or any of its properties, assets or interests in property.

19   **3.     Injunction**

20       Except as otherwise expressly provided in the Plan, all entities who have held, hold or

21   may hold Pre-Confirmation Date Claims shall be permanently enjoined from and after the

22   Confirmation Date from: (i) commencing or continuing in any manner any action or other

23   proceeding of any kind with respect to any such Pre-Confirmation Date Claims against the

24   District or its property; (ii) enforcing, attaching, collecting, or recovering by any manner or means

25   any judgment, award, decree or order against the District or its property with respect to such Pre-

26   Confirmation Date Claims; (iii) creating, perfecting, or enforcing any lien or encumbrance of any

27   kind against the District or its property; and (iv) asserting any right of setoff, subrogation or

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

recoupment of any kind against any obligation due to the District with respect to any such Pre-Confirmation Date Claims.

**4.      Term of Existing Injunctions and Stays**

Unless otherwise provided in the Plan, all injunctions or stays provided for in the Chapter 9 Case pursuant to sections 105, 362, or 922, or otherwise, and in existence immediately prior to the Confirmation Date, shall remain in full force and effect unless and until the District receives a discharge in accordance with Section XI.A. of the Plan.

**5.      Exculpation**

Except with respect to obligations specifically arising pursuant to or preserved in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Claim, obligation, cause of action or liability for any Claim in connection with or arising prior to or on the Effective Date for any act taken in connection with, or related to, (i) the administration of the Chapter 9 Case, (ii) the negotiations, pursuit, confirmation, solicitation of votes for, consummation or implementation of the Plan, (iii) the administration of the Plan or property to be distributed under the Plan, (iv) the Cal. Gov't Code § 53760 process or compliance therewith, (v) any document, release, contract, or other instrument entered into in connection with, or related to, the Plan, and/or (vi) any other transaction contemplated by or entered into in connection with the Plan or entered into during the administration of the Chapter 9 Case; *provided*, *however*, that nothing  shall be deemed to release or exculpate any Exculpated Party for its willful misconduct or gross negligence.  In all respects, each Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities pursuant to the Plan.

**6.      Good Faith Compromise**

In consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan, including, without limitation, the exculpation provisions, constitute a good faith compromise and settlement of all Claims, causes of action and/or controversies relating to any and all rights that a holder of a Claim may have against the District, any distributions to be made pursuant to the Plan on account of any such Claim, and any and all Claims and causes of

611073534.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

action of any party. The entry of the Confirmation Order constitutes the Bankruptcy Court's approval, effective as of the Effective Date, of the compromise or settlement of all such Claims and/or controversies and the Bankruptcy Court's finding that all such compromises or settlements are in the best interests of the District and the holders of Claims, and are fair, equitable, and reasonable.

## VIII.    RESERVATION OF RIGHTS OF ACTION

Any and all claims, causes of action, rights of recovery, rights of offset, rights of recoupment, rights to refunds, and similar rights held by the District shall be retained by the District, including, without limitation, the claims and causes of action alleged in the Optum Adversary. The failure to identify any potential or existing Right of Action retained by the District is not intended to and shall not limit the rights of the District to pursue any such action(s). Unless a Right of Action is expressly waived, relinquished, released, compromised, or settled (in the Plan or otherwise), the District expressly reserves all Rights of Action for later adjudication and, as a result, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Rights of Action upon or after the Confirmation Date. In addition, the District expressly reserves the right to pursue or adopt against any other entity any claims alleged in any lawsuit in which the District is a defendant or an interested party.

## IX.    RISK FACTORS

Holders of Claims against the District should read and consider carefully the factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered with this Disclosure Statement and/or incorporated by reference, prior to voting to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.

As discussed herein, the Plan is premised on revenues from four principal sources—namely, (i) operational revenues, (ii) funds derived from the bond issuance, (iii) revenues derived from the increased parcel tax, and (iv) revenues derived from the TOT.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1.    With respect to the provision of services pursuant to California Welfare & Institutions Code § 5150, the District has yet to enter into a contract with Inyo County or convert the designated space to an acceptable holding facility; accordingly, there is a risk that the District will be unable to negotiate a contract with Inyo County or the negotiations of the agreement will not be completed within six (6) months, as estimated by the District, that the District will not earn revenues of $500 per day for the holding and treatment services, that the occupancy rate will be less than fifty percent (50%) *per annum*, and/or the operational costs will exceed the District's estimates—thereby reducing or eliminating the anticipated revenues.

2.    With respect to the provision of medical infusion treatments, the District has yet to establish the facility or provide the services; accordingly, there is a risk that the costs of acquiring the necessary equipment and establishing the treatment facility may exceed the cost estimates, that the facility may take longer than nine (9) months to establish, that the operational expenses may exceed the estimated costs, and/or that the demand for such services may be less than the projected demand— thereby reducing the anticipated revenues.

3.    With respect to the bond measure, the District requires voter approval for the bond issuance; accordingly, there is a risk that the bond measure will not be approved. Notwithstanding, as the Effective Date is expressly conditioned upon the receipt of the funds from the bond issuance, the receipt of the bond proceeds is not a risk factor in considering the District's ability to perform under the Plan; however, the approval of the bond measure is a risk factor in considering whether the Effective Date will occur.

4.    With respect to the parcel tax revenues, the District requires voter approval for the parcel tax initiative; accordingly, there is a risk that voters will not approve the parcel tax increase.  Notwithstanding, as the Effective Date is expressly conditioned upon the approval of the parcel tax initiative, such approval is not a

- 62 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

611073534.1

risk factor in considering the District's ability to perform under the Plan; however, the approval of the parcel tax initiative is a risk factor in considering whether the Effective Date will occur.

5.    With respect to the TOT revenues, the District requires approval from the Inyo County Board of Supervisors to receive a portion of the TOT; accordingly, there is a risk that Board will not approve the TOT increase. Notwithstanding, as the Effective Date is expressly conditioned upon the approval of the TOT initiative, such approval is not a risk factor in considering the District's ability to perform under the Plan; however, the approval of the TOT initiative is a risk factor in considering whether the Effective Date will occur.

6.    The Plan also relies upon operational revenues from the Hospital, the SNF, and the Clinic to fund operations and pay Allowed Claims under the Plan. As such, there are several risks related to the District's operations that may affect the Plan, including the following:

a.    The demand for medical services in Inyo County may decline and, thus, decrease revenues;

b.    Reimbursement from insurance companies and governmental programs (e.g., Medicare and MediCal) may decrease and, thus, decrease revenues; and

c.    Costs associated with operating the business (e.g., payroll, medicine, equipment, medical supplies, utilities, etc.) may increase and, thereby, decrease net revenues.

There is also a risk that the amount of the Allowed Claims may be greater than currently estimated, in which case distributions to creditors may be reduced.

## X.    FEDERAL INCOME TAX CONSEQUENCES

The implementation of the Plan may have federal, state, local and foreign tax consequences to the District and its creditors. No tax opinion has been sought or will be obtained with respect to any tax consequences of the Plan. This Disclosure Statement does not constitute

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS

611073534.1

and is not intended to constitute either a tax opinion or tax advice to any person, and the summary contained herein is provided for informational purposes only.  However, because the District is a municipality and, thus, is treated as a political subdivision of the State of California for federal income tax purposes, the District believes that it will not be subject to any federal income tax liability from the implementation of the Plan.

As individual circumstances may differ, and the income tax consequences of a chapter 9 case are complex and uncertain, this summary does not address the federal income tax consequences that may be relevant to the creditors of the District as a result of the Plan. Accordingly, creditors should consult with their own tax advisors regarding the potential income tax consequences of the Plan as it pertains to them.

**To ensure compliance with requirements imposed by the Internal Revenue Service, you are hereby notified that any discussion of tax matters contained herein (including any attachments) is not intended or written to be used by any taxpayer, and cannot be used by any taxpayer, for the purpose of avoiding tax-related penalties that otherwise may be imposed under the Internal Revenue Code on the taxpayer.  Such discussion of tax matters was written in connection with the solicitation of votes in favor of the Plan.  The District and its creditors should seek tax advice regarding the tax consequences to them of the Plan based on their particular circumstances from an independent tax advisor.**

Baker & Hostetler llp
Attorneys at Law
Los Angeles

FIRST AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS

611073534.1

## XI.     RECOMMENDATION AND CONCLUSION

The District believes that confirmation and implementation of the Plan represents the best option for the District and its creditors. Accordingly, **the District urges holders of Impaired Claims to vote to accept the Plan by so indicating on their Ballots and returning them as specified in this Disclosure Statement and on their Ballots.**

Dated:     July 19, 2017         SOUTHERN INYO HEALTHCARE DISTRICT

                      By:     /s/ Jaque Hickman [signature to follow]
                             Jaque Hickman

                      Secretary of the Board of Directors for Southern Inyo
                      Healthcare District

Submitted by:

**BAKER & HOSTETLER LLP**

By:     /s/ Michael T. Delaney
        Ashley M. McDow
        Michael T. Delaney

Attorneys for Debtor,
SOUTHERN INYO HEALTHCARE DISTRICT

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

611073534.1