1  Ashley M. McDow (245114)
   Michael T. Delaney (261714)
2  **BAKER & HOSTETLER LLP**
   11601 Wilshire Boulevard, Suite 1400
3  Los Angeles, CA 90025-0509
   Telephone: 310.820.8800
4  Facsimile: 310.820.8859
   Email: amcdow@bakerlaw.com
5        mdelaney@bakerlaw.com

6  Attorneys for Debtor,
   SOUTHERN INYO HEALTHCARE DISTRICT

7

8              **UNITED STATES BANKRUPTCY COURT**

9              **EASTERN DISTRICT OF CALIFORNIA**

10                     **FRESNO DIVISION**

11
   In re                                    Case No.: 2016-10015 FEC
12
   SOUTHERN INYO HEALTHCARE           Chapter 9
13 DISTRICT,
                                             Doc. No. BH-20
14           Debtor.
                                             **SECOND AMENDED DISCLOSURE**
15                                           **STATEMENT WITH RESPECT TO THE**
                                             **PLAN FOR THE ADJUSTMENT OF**
16                                           **DEBTS OF SOUTHERN INYO**
                                             **HEALTHCARE DISTRICT**
17
                                             Hearing:
18                                           Date:    February 28, 2018
                                             Time:    1:30 p.m.
19                                           Place:   Dept A, Ctrm 11
                                                      U.S. Bankruptcy Court
20                                                    2500 Tulare Street
                                                      Fresno, CA 93721
21

22

23

24

25

26

27

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

611923772.1

1   **CAVEAT: The Bankruptcy Court has not yet approved the within disclosure statement**

2   **pursuant to section 1125(b) of the Bankruptcy Code for use in the solicitation of vote with**

3   **respect to the plan of adjustment of debts for Southern Inyo Healthcare District described**

4   **herein.  Accordingly, the filing and distribution of the within disclosure statement is not**

5   **intended and should not be construed as a solicitation of acceptance or rejection of the plan**

6   **of adjustment of debts described herein.**

7                          [This caveat shall be removed prior to solicitation]

# TABLE OF CONTENTS

**Page**

I.     SUMMARY ................................................................................. 1

II.    INTRODUCTION ...................................................................... 7

    A.    Purpose of the Disclosure Statement .................................. 7

    B.    Summary of Entities Entitled to Vote to Accept or Reject the Plan and Certain Prerequisites to Confirming the Plan .......................................... 8

    C.    Summary of Voting Procedures, Balloting Deadline, Confirmation Hearing, and Other Dates, Deadlines, and Procedures ......................... 9

        1.    Voting Procedures and Deadlines ................................. 9

        2.    Date of Confirmation Hearing and Deadline for Objecting to Confirmation of the Plan .................................. 9

    D.    General Notices and Disclaimers ...................................... 10

    E.    Additional Information .................................................... 11

III.   BACKGROUND INFORMATION ........................................... 11

    A.    The District .................................................................... 11

    B.    Events Precipitating Bankruptcy ...................................... 12

        1.    Historical Financial Issues ........................................... 12

        2.    Breakdown of Operations Due to Cash Shortage ................... 13

        3.    Appointment and Actions of New Board of Directors ............... 14

IV.   COMMENCEMENT AND ADMINISTRATION OF CHAPTER 9 CASE ................. 16

    A.    Commencement of the Chapter 9 Case ............................... 16

    B.    Immediate Actions to Stabilize Operations and Revenue Deficits ............ 16

    C.    Eligibility Litigation ........................................................ 17

    D.    Appointment of Patient Care Ombudsman .......................... 17

    E.    Disputes Pertaining to Claims Against the District ............... 18

    F.    Pending Litigation .......................................................... 19

    G.    Post-Petition Financing ................................................... 20

V.    THE DISTRICT'S LIABILITIES AND ASSETS ......................... 21

    A.    Liabilities ...................................................................... 21

        1.    Summary of Scheduled Claims .................................... 21

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

- i -

| | | | | |
|---|---|---|---|---|
| 2. | Proofs of Claim | | | 21 |
| 3. | Alterations to Liability under the Plan | | | 22 |
| | a. | Alteration of Claims | | 22 |
| | b. | Disputed Claims | | 23 |
| 4. | Summary of Current Liabilities | | | 26 |
| 5. | Statement Regarding Liabilities | | | 26 |

B. Assets ... 27

1. Additional Medical Services and Treatment ... 27
2. Parcel Tax Increase ... 28
3. Transient Occupancy Tax ... 29
4. Claims and Causes of Action Against Third Parties ... 29
   a. Potential Claims and Causes of Action ... 30

VI. SUMMARY OF THE PLAN OF ADJUSTMENT ... 31

A. Classification and Treatment of Claims ... 32

1. Unclassified Claims ... 32
   a. Administrative Expense Claims ... 32
   b. Professional Claims ... 32
   c. Deadline for the Filing and Assertion of Postpetition Claims, Administrative Claims, and Professional Claims ... 33
2. Class 1 – Secured Claims ... 34
   a. Class 1A – Action Capital Corporation ... 34
   b. Class 1B – Bank of the West/Thermo Fisher Financial Services, Inc. ... 34
   c. Class 1C – Canon Financial Services, Inc. ... 35
   d. Class 1D – Cardinal Health 110, LLC ... 35
   e. Class 1E – Healthcare Resource Group ... 36
   f. Class 1F – Optum Bank, Inc. ... 37
   g. Class 1G – Vi Healthcare Finance, Inc. ... 38
3. Class 2 – Post-Petition Claims ... 38

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

a.    Impairment and Voting ..................................................... 38

b.    Treatment ......................................................................... 39

4.    Class 3 – General Unsecured Claims ..................................... 39

a.    Impairment and Voting ..................................................... 39

b.    Treatment ......................................................................... 39

c.    Class 4 Election ............................................................... 39

5.    Class 4 – Convenience Claims ............................................... 40

a.    Impairment and Voting ..................................................... 40

b.    Treatment ......................................................................... 40

B.    Treatment of Executory Contracts and Unexpired Leases ................................. 40

1.    Generally ................................................................................ 40

2.    Assumption of Executory Contracts and Unexpired Leases ................... 40

a.    Cure Payments ................................................................. 41

b.    Adequate Assurance of Prompt Cure and Future Performance .... 41

3.    Rejection of Executory Contracts and Unexpired Leases ..................... 42

a.    Claims Arising from Rejection ........................................ 43

C.    Means for Execution and Implementation of Plan ............................................. 44

D.    Distributions ....................................................................................................... 45

1.    Disbursing Agent .................................................................. 45

2.    Delivery of Distributions ...................................................... 45

3.    Undeliverable Distributions .................................................. 46

4.    Distribution of Cash .............................................................. 46

5.    Timeliness of Payments ........................................................ 46

6.    Default and Cure ................................................................... 46

7.    Compliance with Tax Requirements ..................................... 47

8.    Time Bar to Cash Payments ................................................. 47

9.    No De Minimis Distributions ................................................ 48

10.    No Distributions on Account of Disputed Claims .............. 48

- iii -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

11.    No Post-Petition Date Accrual ................................................. 48

E.    Disputed Claims; Objections to Claims; Prosecution of Objections to Disputed Claims .......................................................................................... 49

1.    Claim Objection Deadline; Prosecution of Objections ........................... 49

2.    Reserves, Payments, and Distributions with Respect to Disputed Claims ................................................................................................. 49

F.    Continuing Jurisdiction of the Bankruptcy Court ................................................. 49

VII.    CONFIRMATION AND EFFECTIVE DATE OF THE PLAN ...................................... 49

A.    Voting and Right to be Heard at Confirmation ...................................................... 50

1.    Who May Support or Object to Confirmation of the Plan? ..................... 50

2.    Who May Vote to Accept or Reject the Plan? ........................................ 50

3.    Votes Required to Confirm Plan .............................................................. 51

B.    The "Best Interests" Test .................................................................................... 51

C.    Feasibility ............................................................................................................ 52

D.    "Cramdown" ....................................................................................................... 53

E.    Conditions Precedent .......................................................................................... 53

1.    Condition Precedent to Confirmation ...................................................... 53

2.    Conditions Precedent to Effective Date .................................................. 53

3.    Non-Occurrence of Effective Date .......................................................... 54

4.    Waiver of Conditions Precedent to Effective Date .................................. 54

F.    Effect of Confirmation ........................................................................................ 54

1.    Dissolution of the Committee ................................................................... 54

2.    Discharge of the District .......................................................................... 55

3.    Injunction ................................................................................................ 55

4.    Term of Existing Injunctions and Stays ................................................... 55

5.    Exculpation ............................................................................................. 56

6.    Good Faith Compromise ......................................................................... 56

VIII.    RESERVATION OF RIGHTS OF ACTION ................................................................ 57

IX.    RISK FACTORS ......................................................................................................... 57

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

- iv -

**TABLE OF CONTENTS CONTINUED**

Page

X. FEDERAL INCOME TAX CONSEQUENCES ............................................................... 59

XI. RECOMMENDATION AND CONCLUSION ............................................................... 60

SECOND AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS

611923772.1

**I.      SUMMARY**

      **The following section summarizes certain important aspects of the Second Amended Plan for the Adjustment of Debts for Southern Inyo Healthcare District (the "Plan").  These matters are discussed further elsewhere in the within Second Amended Disclosure Statement with Respect to the Plan for the Adjustment of Debts for Southern Inyo Healthcare District (the "Disclosure Statement").  Capitalized terms are defined in the text of this Disclosure Statement as well as the Plan, and any capitalized term used but not defined in the Disclosure Statement shall have the meaning ascribed to such term in the Plan.  Unless otherwise noted, all references to "section ____ " refer to the specified section of the Bankruptcy Code.**

      **Please be aware that the Disclosure Statement contains information that may be important to certain creditors or classes of creditors that is not set forth in this Summary and that such information may influence your decision regarding whether to accept or reject the Plan.  Accordingly, please review the Disclosure Statement and Plan as well as the supporting documents in their entirety.**

* * * *

      The Southern Inyo Healthcare District is a California Healthcare District.  The District operates a hospital, skilled nursing facility, and medical clinic in Inyo County, California.  The District filed a petition for relief under chapter 9 of the Bankruptcy Code on January 4, 2016, which was designated Case Number 2016-10015.  The United States Bankruptcy Court for the Eastern District of California, Fresno Division, the Honorable Fredrick E. Clement presiding, entered an order for relief in the Chapter 9 Case on July 12, 2016, as docket entry 195.  The Chapter 9 Case currently is pending before the Bankruptcy Court.

      The *Second Amended Plan for the Adjustment of Debts for Southern Inyo Healthcare District* proposed by the District involves the adjustment of the District's operations and the repayment of its obligations under the Plan with operational revenues as well as additional revenues derived from expanded operations, potential litigation recoveries, and increases to parcel

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

and transient occupancy taxes. With the additional funds and revenues, the District will be able to maintain operations and repay its obligations pursuant to the Plan by December 2025. While approval of the tax measure is required, and the District has yet to obtain such approval, the District has commenced the process for obtaining the necessary approvals and believes these measures will be approved prior to the Effective Date. The District anticipates that measures will be voted upon in April 2018, which will result in an Effective Date for the Plan in or about January 2019.

In the event the District is unable to adjust its debts pursuant to the Plan, or any amended or revised version thereof, the District will likely be unable to maintain operations and, as a result, will be forced to close the hospital, medical clinic, and skilled nursing facility, which would not only render the District unable to pay its obligations, it would leave the community without necessary medical services.

The following chart summarizes key information, including the proposed treatment of the various classes of claims:

| | |
|---|---|
| **Debtor** | Southern Inyo Healthcare District, a California Local Health Care District |
| **Bankruptcy Court** | United States Bankruptcy Court for the Eastern District of California, Fresno Division |
| | The Honorable Fredrick E. Clement presiding |
| **Plan** | Second Amended Plan for the Adjustment of Debts of Southern Inyo Healthcare District |
| **Purpose of Disclosure Statement** | To provide information of a kind, and in sufficient detail, that would enable a typical holder of Claims in a class Impaired under the Plan to make an informed judgment with respect to voting on the Plan. |
| **Balloting Information** | Ballots have been provided with this Disclosure Statement to creditors known to have Claims that are Impaired under the Plan. *See* Exhibit 1.[1] |
| | Ballots must be <u>received by</u> the Ballot Tabulator no later than _____ a.m./p.m., Pacific Time, on _____ , |

---

[1] All exhibits referenced herein are attached to the contemporaneously-filed Exhibits to Second Amended Plan for the Adjustment of Debts of Southern Inyo Healthcare District, Disclosure Statement Relating Thereto, and the Declaration of Brian Weiss in Support Thereof (the "**Plan Exhibits**"). Unless otherwise stated, "Exhibit __ " refers to the specified exhibit appended to the Plan Exhibits.

611923772.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

2018.[2]

| | |
|---|---|
| **Ballot Tabulator** | Karla Hernandez, Baker & Hostetler LLP, 11601 Wilshire Blvd., Ste. 1400, Los Angeles, California 90025 (facsimile 310.820.8859; email khernandez@bakerlaw.com) |
| **Confirmation Hearing** | The Court shall hold a hearing regarding the confirmation of the Plan on _____ , 2018, commencing at ____ a.m./p.m. Pacific Time. |
| **Confirmation Objections** | Any objections to confirmation of the Plan must be set forth in writing and filed and served no later than _____ , 2018. |
| **Treatment of Claims** | If the Court confirms the Plan and the Plan becomes effective, Claims will be treated as follows: |
|    Administrative Claims | Administrative Claims shall receive Cash on the Effective Date, or as soon thereafter as practicable, in an amount equal to their approved Administrative Claim. |
|    Professional Claims | Holders of Professional Claims shall be treated as follows: (i) Baker & Hostetler LLP shall receive payment on account of the portion of its Allowed Professional Claim relating to attorneys' fees in monthly installments over a term of 36 months commencing on the Effective Date; and (ii) Nave Cortell LLP and Province as well as the portion of the Allowed Professional Claim of Baker & Hostetler LLP relating to costs incurred in the course of the Chapter 9 Case shall receive Cash on the Effective Date, or as soon thereafter as practicable, in an amount equal to their respective Allowed Professional Claims. |
| | Payment of Professional Claims is subject to a finding of the Bankruptcy Court that the amounts of the Professional Claims are reasonable. |
|    Class 1<br>   Secured Claims | Claims in Class 1 are separated in to subclasses, which, in each instance, are treated as separate classes under the Plan. |
|       Class 1A<br>      Action Capital Corporation | **Impaired.** Action Capital Corporation shall receive an allowed General Unsecured Claim in the amount of $185,600.35. |
|       Class 1B<br>      Bank of the West/Thermo Fisher Financial Services, Inc. | **Impaired.** The District shall surrender to Bank of the West or Thermo Fisher Financial Services, Inc. the collateral for the underlying agreement. |

---

[2] The District shall fill-in all missing information and incorporate all bracketed language contained herein prior to circulation of the final disclosure statement for solicitation.

SECOND AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS

611923772.1

BAKER & HOSTETLER LLP<br>ATTORNEYS AT LAW<br>LOS ANGELES

| | |
|---|---|
| Class 1C<br>Canon Financial Services, Inc. | **Impaired.** The District shall surrender to Canon Financial Services, Inc. the collateral for the underlying agreement. |
| Class 1D<br>Cardinal Health 110, LLC | **Unimpaired.** Cardinal Health 110, LLC shall be entitled to retain the funds presently in its possession, which total $838.28. The remainder of this Claim shall be allowed as a General Unsecured Claim. |
| Class 1E<br>Healthcare Resource Group | **Impaired.** Class 1E is comprised of the Disputed Claim of HRG. Class 1E shall not receive any distributions under the Plan unless and until a court of competent jurisdiction enters a Final Order allowing the HRG Claim or HRG returns any and all avoidable transfers. If the HRG Claim is adjudged valid, enforceable and secured in whole or in part and/or HRG returns any and all avoidable transfers, the District shall make periodic payments to HRG until the Class 1E Claim is paid in full with interest. Under the Plan, the payments on account of the Class 1E Claim shall begin in the first full month following the allowance of the HRG Claim and/or the return of any and all avoidable transfers. If deemed an Allowed Claim, HRG shall receive monthly payments in the approximate amount of $2,020.00 per month over the life of the Plan, which equates to the full amount of the Claim plus interest at a rate of 3.25% *per annum*. |
| Class 1F<br>Optum Bank, Inc. | **Impaired.** Class 1F is comprised of the Disputed Claim of Optum. Class 1F shall not receive any distributions under the Plan unless and until a court of competent jurisdiction enters a Final Order allowing the Optum Claim. If the Optum Claim is adjudged valid, enforceable and secured in whole or in part, the District shall pay Optum Cash in an amount equal to the portion of the Optum Claim allowed as a Secured Claim, which may include interest and costs and expenses incurred by Optum in association with the underlying loan, to the extent permitted under the Optum loan agreement and allowed by the Court, no later than one hundred and twenty (120) days following the entry of a Final Order allowing the Optum Claim. If the Optum Claim is adjudged valid and enforceable but not wholly secured, the portion of the Optum Claim adjudged to be a Secured Claim, which may include interest and costs and expenses incurred by Optum in association with the underlying loan, to the extent permitted under the Optum loan agreement and allowed by the Court, shall be treated pursuant to the preceding sentence and any order(s) entered in the Optum Adversary and the remaining Allowed Claim shall be treated as a General Unsecured Claim in Class 3. If the Optum Claim is adjudged invalid and unenforceable, Class 1F shall not receive any distributions under the Plan. |

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

SECOND AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS

611923772.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

| | |
|---|---|
| Class 1G<br>Vi Healthcare Finance Inc. | **Impaired.** The treatment of Class 1G shall depend on the outcome of the ViHF Adversary. If the District succeeds in disallowing the ViHF Claim in its entirety, Class 1G shall not receive any distributions under the Plan. If the Bankruptcy Court allows the ViHF Claim as a subordinated claim and transfers any security interest(s) associated therewith to the District, the ViHF Claim shall be treated in a separate class of subordinated Claims—Class 5. Class 5 shall receive a distribution equal to three percent (3%) of the total claims in the Class, which shall be paid in a lump sum within one hundred and twenty (120) days after entry of an order subordinating the ViHF Claim. If the Bankruptcy Court allows the ViHF Claim as a Class 1G Claim, the District shall pay the Allowed Secured Claim of ViHF in full within one hundred and twenty (120) days after entry of an order allowing the Class 1G Claim |
| Class 2<br>Post-Petition Claims | **Impaired.** Holders of Class 2 Claims shall receive Cash on the Effective Date, or as soon thereafter as practicable, in an amount equal to the amount listed for each respective claimant in Exhibit 6. |
| Class 3<br>General Unsecured Claims | **Impaired.** Holders of Class 3 Claims shall receive a *pro rata* portion of $100,000.00, which shall be paid as follows: (a) $25,000.00 on December 31, 2019, or as soon thereafter as practicable; (b) $25,000.00 on April 30, 2020; (c) $25,000 on December 31, 2020, or as soon thereafter as practicable; and (d) $25,000 on April 30, 2021, or as soon thereafter as practicable. In addition to the foregoing distributions, holders of Class 3 Claims shall receive a *pro rata* portion of 25% of any recovery, net of fees, costs, and other administrative expenses associated therewith, from the proposed litigation against HCCA, which shall be paid no later than 120 calendar days following recovery thereof.<br><br>Holders of Class 3 Claims shall have the ability to waive their entitlement to Class 3 treatment and, instead, elect to have their Claims treated as Class 4 Claims. *See* Section VI.A.5.c. |
| Class 4<br>Convenience Class Claims | **Impaired.** Holders of Class 4 Claims shall receive Cash on the Effective Date, or as soon thereafter as practicable, in an amount equal to the lesser of (a) the amount of their Allowed Class 4 Claims or (b) $100.00. |
| **Background Information** | See pages 16 to 25 |
| **Questions** | Please contact the District's counsel, Ashley M. McDow, Baker & Hostetler LLP, 11601 Wilshire Blvd., Ste. 1400, Los Angeles, California 90025<br>(telephone 310.820.8800; facsimile 310.820.8859) |

- 5 -

**PLEASE NOTE**: To the extent there is any inconsistency between the Plan (including the Exhibits and any supplements to the Plan) and the description of the Plan in the Disclosure Statement, the terms of the Plan (including the Exhibits and any supplements to the Plan) will govern.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

SECOND AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS

611923772.1

## II. INTRODUCTION

The District filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of California—thereby commencing the above-captioned bankruptcy case. On or about July 12, 2016, the Court entered an Order for Relief under chapter 9 of the Bankruptcy Code.

The District is the proponent of the Plan. During a hearing held on _____ , 2018, the Court found that the Disclosure Statement contains "adequate information" within the meaning of section 1125 of the Bankruptcy Code and authorized the District to transmit the Disclosure Statement and Plan to holders of Impaired claims in connection with the solicitation of votes on the Plan.

As discussed below, the District believes that adjusting its obligations pursuant to the Plan provides the best result for creditors and that any alternative would result in delay and/or reduced distributions to creditors, if any at all. Accordingly, the District encourages creditors to vote to accept the Plan.

### A. Purpose of the Disclosure Statement

The Bankruptcy Code generally requires that the proponent of a plan of adjustment prepare and file with the Bankruptcy Court a "disclosure statement" that provides information of a kind and in sufficient detail that would enable a typical holder of claims in a Class Impaired under the proposed plan to make an informed decision regarding whether to accept or reject the plan. In accordance with this requirement, the within Disclosure Statement provides information regarding the Plan and the treatment of Claims thereunder. *Parties in interest should read the Plan and Disclosure Statement as well as all associated documents carefully and in their entirety in order to (a) determine how the Plan will affect their Claims against the District, (b) understand their rights (if any) as they pertain to voting on the Plan, (c) understand their rights (if any) as they pertain to objecting to confirmation of the Plan, and (d) determine how and when creditors may vote to accept or reject the Plan.*

The Disclosure Statement cannot and, therefore, does not provide creditors with advice or inform creditors regarding all aspects of their rights. Holders of any Claims against the District

Baker & Hostetler llp
Attorneys at Law
Los Angeles

1  are advised to consult with independent counsel and/or a financial advisor to obtain advice

2  regarding how the Plan will affect them and their Claims against the District and the best course

3  of action to take with respect to the Plan.

4      This Disclosure Statement has been prepared in good faith and in compliance with

5  applicable provisions of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure.

6  Based upon currently available information, the District believes that the information contained in

7  this Disclosure Statement is true and correct as of the date of its filing.  The Disclosure Statement

8  cannot and does not reflect events that may occur after January 17, 2018.

9  **B.**  **Summary of Entities Entitled to Vote to Accept or Reject the Plan and**

10        **Certain Prerequisites to Confirming the Plan**

11      Each holder of an Allowed Claim classified into Classes 1A, 1B, 1C, 1F, 2, 3, and 4 of the

12  Plan (collectively, the "**Voting Classes**") shall be entitled to vote each such Claim to accept or

13  reject the Plan.[3]

14      The Bankruptcy Court may only confirm the Plan if at least one Class of Impaired Claims

15  has voted to accept the Plan (without counting the votes of any Insiders[4] whose Claims are

16  classified within that Class) and if certain statutory requirements are met as to both non-

17  consenting members within a consenting Class and as to any dissenting Classes.  A Class of

18  Claims shall be deemed to have accepted the Plan if at least one-half in number and at least two-

19  thirds in amount of the Allowed Claims actually voting in that Class vote in favor of the Plan.

20      In the event of a rejection of the Plan by any of the Voting Classes, the District will

21  request that the Bankruptcy Court confirm the Plan in accordance with those portions of section

22  1129(b) applicable to cases filed under chapter 9 of the Bankruptcy Code, which provisions

23  permit confirmation of the Plan notwithstanding the rejection thereof by an Impaired Class

24  through a process commonly known as "cramdown".  In order to confirm the Plan through

---

[3] While Class 1F is comprised of the Disputed Optum Claim and, as such, Class 1F would not be entitled to vote on the Plan ordinarily, the District and Optum entered into a stipulation to permit Optum to vote its Class 1F Claim notwithstanding the pending dispute and without affecting the parties' respective rights.  *See* D.E. 316.
[4] As used in this Disclosure Statement, "**Insider**" shall have the meaning ascribed to such term in section 101(31)(D), as applicable to municipalities.

SECOND AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS
611923772.1

"cramdown", the Court must find, among other things, that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each rejecting Class.

**C.      Summary of Voting Procedures, Balloting Deadline, Confirmation Hearing, and Other Dates, Deadlines, and Procedures**

     **1.      Voting Procedures and Deadlines**

The District has provided copies of this Disclosure Statement, the Plan, and the Ballot to all known holders of Impaired Claims in the Voting Classes. Holders of an Allowed Claim in one or more of the Voting Classes may vote to accept or reject the Plan by completing, executing, and returning the Ballot by the Balloting Deadline (defined below) to the Ballot Tabulator—Karla Hernandez, Baker & Hostetler LLP, 11601 Wilshire Blvd., Ste. 1400, Los Angeles, California 90025 (facsimile 310.820.8859; email sgaeta@bakerlaw.com).

*All Ballots, including Ballots transmitted by facsimile or email, must be completed, signed, returned to, and **actually received** by the Ballot Tabulator by not later than _____ , ____, at 4:00 p.m. Pacific Time (the "**Balloting Deadline**"). Unless expressly waived by the District in its sole and absolute discretion, Ballots received after the Balloting Deadline, Ballots submitted directly to the Bankruptcy Court, and incomplete or illegible Ballots shall not be counted in connection with the confirmation of the Plan.*

     **2.      Date of Confirmation Hearing and Deadline for Objecting to Confirmation of the Plan**

The Bankruptcy Court shall hold a hearing to determine whether to confirm the Plan on _____ , ____, at __:__ a.m./p.m. Pacific Time, in Department A, Courtroom 11 of the United States Bankruptcy Court located at 2500 Tulare Street, Fresno, CA 93721, the Honorable Fredrick E. Clement presiding. The Confirmation Hearing may be continued from time to time by pronouncement or order of the Bankruptcy Court with or without further notice.

Any objections to confirmation of the Plan along with copies of any and all supporting documents must be filed with the Bankruptcy Court and served on the following entities or their counsel of record no later than _____ , ____: (a) the Bankruptcy Court, 2500 Tulare Street, Suite 2501, Fresno, California 93721; (b) the Office of the United States Trustee, 2500

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1  Tulare Street, Suite 1401, Fresno, California 93721; and (c) Baker & Hostetler LLP, 11601

2  Wilshire Boulevard, Suite 1400, Los Angeles, California 90025, Attention: Ashley M. McDow,

3  Esq.  Please be aware that the Bankruptcy Court may not consider any objections that are not

4  timely filed and served.

5  　　　**D.　　　General Notices and Disclaimers**

6  　　　The historical financial data relied upon in preparing the Plan and this Disclosure

7  Statement is based upon the District's books and records.  Although certain professional advisors

8  of the District assisted in the preparation of this Disclosure Statement and the documents filed in

9  support thereof, in doing so such professionals relied upon factual information and assumptions

10  regarding financial, business, and accounting data provided by the District and third parties, much

11  of which has not been audited.  The District's most recent audited financial statements, which

12  cover the fiscal years ending June 30, 2013, June 30, 2014, and June 30, 2015, are included in the

13  Plan Exhibits as Exhibits 2, 3, and 4, respectively, and incorporated herein by reference.

14  　　　***The District's professional advisors have not independently verified all financial***

15  ***information provided in this Disclosure Statement, and, accordingly, make no representations***

16  ***or warranties as to its accuracy.***  Moreover, although reasonable efforts have been made to

17  provide accurate information, the District does not warrant or represent that the information in

18  this Disclosure Statement, including any and all financial information and projections, is without

19  inaccuracy or omissions, or that actual values or distributions will comport with the estimates and

20  projections contained herein or submitted in support of the Plan and Disclosure Statement.

21  　　　***No individual or entity may rely upon the Plan or Disclosure Statement or any of the***

22  ***supporting documentation for any purpose other than to determine whether to vote to accept or***

23  ***reject the Plan***.  Nothing contained in such documents constitutes an admission of any fact or

24  liability by any party, nor shall such information or documentation be admissible in any

25  proceeding involving the District or any other party, nor will this Disclosure Statement be deemed

26  evidence of the tax or other legal effects of the Plan on holders of Claims in the Chapter 9 Case.

27  This Disclosure Statement is not intended to be a disclosure communication to the public capital

28  markets and should not be relied upon by investors.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

- 10 -

611923772.1

Certain information included in this Disclosure Statement and its exhibits contains forward-looking statements. The words "believe," "expect," "anticipate," and similar expressions identify such forward-looking statements. The forward-looking statements were based upon information and documentation available when such statements were made and are subject to risks and uncertainties that could cause actual results to differ materially from those expressed in the statements. A number of those risks and uncertainties are described below. Therefore, readers are cautioned not to place undue reliance on the forward-looking statements in this Disclosure Statement. The District undertakes no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events, or otherwise.

No regulatory agency has approved or disapproved this Disclosure Statement, nor has any such agency determined whether this Disclosure Statement is accurate, truthful, or complete.

**E.     Additional Information**

If you have any questions about the procedures for voting on the Plan, desire an additional copy of the Ballot, or seek further information about the dates and deadlines applicable to the confirmation of the Plan, please contact counsel for the District via email at the following addresses: Ashley M. McDow at amcdow@bakerlaw.com, Michael T. Delaney at mdelaney@bakerlaw.com, and Karla Hernandez at khernandez@bakerlaw.com. Any party represented by counsel is directed to submit any questions through counsel. Counsel for the District cannot and will not communicate directly with any individual or entity represented by counsel in relation to the Chapter 9 Case. <u>Please note</u> that counsel for the District cannot and will not provide creditors with any legal advice, including, without limitation, advice regarding how to vote on the Plan or the effect that confirmation of the Plan will have upon any Claims that may exist against the District.

**III.     BACKGROUND INFORMATION**

**A.     The District**

The District is a special district formed under the California Local Healthcare District Law, Cal. Health and Safety Code § 32000, *et seq*., located in Lone Pine, California. As of the commencement of the Chapter 9 Case, the District owned and operated three facilities—namely,

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

611923772.1

an emergency and acute care facility with four (4) beds (the "**Hospital**"), a skilled nursing facility with thirty-three (33) beds (the "**SNF**"), and an out-patient medical clinic (the "**Clinic**").

### B.    Events Precipitating Bankruptcy

#### 1.    Historical Financial Issues

As a rural healthcare district, the District has historically operated on a narrow margin; however, beginning in 2008, the District started experiencing substantial financial difficulties as patient demands and revenues declined while operational expenses remained high due to the cost of new hospital equipment and increasing salaries resulting from the limited availability of qualified doctors and medical personnel.  Indeed, between 2008 and 2015, the District only earned net revenues in two years—namely, 2013 and 2014.

In or about 2012, the financial condition of the District began to worsen.  The cause of the financial downturn is attributable to numerous sources, including a decrease in patient volume.  More precisely, in or about 2012, the patient services and hospital occupancy rates began to rapidly decline—falling from an occupancy rate of 87.08% in 2012 to 67.20% in 2015.  In addition to unforeseen decreases in patient volume, increases in the discounts applied by governmental healthcare programs, such as Medicare and Medi-Cal, and insurance providers further diminished revenues.  As a result of the increased discounts, the District received less in reimbursements from these providers—exacerbating the effects caused by the reduction in patient volume and patient revenues.

Unfortunately, the declining financial condition of the District was further exacerbated by the failure of its former management to respond to the reduction in patient demands with corresponding decreases in staffing and other related overhead expenses.  Indeed, between 2013 and 2015, full time equivalents ("**FTEs**")[5] for staff members increased from 85.48 in 2013 to 103.23 in 2015—an increase of more than 20% at a time when occupancy was sharply declining.

---

[5] A full time equivalent is a unit of measurement essentially equal to a single full time employee.  The use of FTEs ensures consistency in financial reporting by providing a basis for calculating working hours or labor expenses of a business regardless of the number of employees providing the services—such as in the case of a business that employs full time and part time employees.

SECOND AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS

611923772.1

Essentially, the District was employing more staff to serve fewer patients. As a result, operating expenses increased from $8,376,655 in 2012 to $9,075,609 in 2015.

The District experienced its greatest financial decline during fiscal year 2015. As with 2013 and 2014, occupancy rates in 2015 continued to decline to 67.20%, which was the lowest point in the preceding decade. As a result, operating income dropped to $6,105,816—a decrease of approximately $1,800,000 from the 2014 fiscal year operating income. Notwithstanding the reduced demand for services, the District continued to increase staffing, which resulted in an increase in total operating expenses. As a result of the increased expenditures and decreased revenues, the District experienced net losses in 2015 totaling $2,242,722. The substantial losses in 2015 also resulted in a year-end cash balance of negative $626,583.

## 2.　　Breakdown of Operations Due to Cash Shortage

The District continued to experience losses during the 2016 fiscal year, which resulted in an inability to pay ordinary operating expenses, including payroll and vendor obligations. Indeed, by October 2015, the District was unable to continue paying for employee health insurance— ultimately resulting in the termination of this benefit—and, by November 2015, the District was three to five weeks behind in its payroll obligations despite applying nearly all revenues to payroll in an effort to keep the hospital running. Due to the inability to consistently meet its payroll obligations, employees started to resign, which further reduced services at the hospital.

In an effort to keep the hospital and its related facilities open, the District was forced to turn to the community for donations and loans to pay for essential items, including insurance, licensing fees and payroll. While the District was able to obtain approximately $75,000 in donations and an $80,000 loan from members of the community, the funds were quickly depleted and, by the end of November 2015, the District lacked sufficient funds to pay payroll as well as the amounts owing under the contracts with the emergency room doctors. As a result, the board was forced to decide between paying hospital staff and paying the doctors. Ultimately, the board voted to pay staff payroll—a decision that resulted in the District defaulting under the employment agreements with the emergency room doctors and the loss of their services.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

- 13 -

611923772.1

In addition to the inability to continue paying hospital staff, the severe economic conditions prevented the District from paying obligations owing to its vendors. As a result, the District's accounts payable continued to grow—ultimately reaching a balance of approximately $2,550,000 in December 2016. Despite large arrears and the District's inability to pay, vendors continued to work with the District in an effort to preserve the hospital for the community.

Regrettably, the concerted efforts of the community and the District ultimately proved too little as the staggering budget deficit and inability to generate sufficient operational revenues to meet its obligations stifled the District. With the loss of the doctors, the District was forced to begin winding down operations. Accordingly, on or about November 30, 2015, the board voted to issue 60- and 90-day notices that the District intended to terminate services at the Hospital and SNF. Thereafter, the District closed the Hospital and emergency room and began making arrangements to transfer SNF patients to surrounding medical facilities. Without patients, the District was unable to generate new revenues and earnings completely stagnated. Thereafter, on or about December 14, 2015, Lee Barron, the former Chief Executive Officer and Chief Financial Officer for the District, tendered her resignation. Three days later, the former board members resigned. As a result, the District was left without any management or governing body, and, thus, was unable to effectively operate or redress any of the financial issues facing the Hospital and its associated operations.

### 3.     Appointment and Actions of New Board of Directors

The community, however, took efforts to save the District and prevent the closure of its facilities, which are vital to the remote area they serve. More precisely, following the resignation of the prior board of directors, on or about December 29, 2015, the Inyo County Board of Supervisors appointed three new board members for the District. Immediately following its appointment, the new board of directors started making strides toward reopening the facility and restructuring its obligations.

On or about December 30, 2015, the board held a meeting to evaluate the financial condition of the District and other issues affecting operations. The principal issue facing the District was insufficient cash to continue to finance operations; indeed, by the end of December

611923772.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

2015, the District had virtually no cash on hand to fund operations. Additionally, the board learned that by the end of December 2015, the District's debt had grown to approximately $4,500,000, which was comprised in part of more than $2,550,000 in debt obligations to vendors and service providers previously utilized by the District in the course of its operations. The District, however, had few (if any) sources to generate new revenues due to the closure of the Hospital, the SNF, and the Clinic and only approximately $1,600,000 in accounts receivable, which included bad debt carried on the District's books. Furthermore, as the District lacked the ability to pay staff, the District was unable to effectively collect any accounts receivable presently owing.

Due to the dire financial condition of the District, the board immediately consulted with Healthcare Conglomerate Associates (HCCA), a restructuring and advisory firm focused on the reorganization and operation of medical practices and hospitals, and insolvency counsel to explore and evaluate potential reorganizational strategies to preserve District's operations, including bankruptcy and potential partnerships with nearby hospitals or hospital associations. After evaluating potential partnership options, the board concluded that the options were no longer viable as Northern Inyo Hospital and Ridgecrest Hospital withdrew from discussions after learning of the District's financial condition. The board also concluded that obtaining a loan as a means of consolidating and adjusting its current obligations was not a viable option as the District had insufficient funds to cover its existing obligations, let alone service new debt. As the District could not debt finance its operations or enter into a partnership to help defray operating expenses, the board determined that bankruptcy provided the best option for the District, its patients and creditors, and the community at large.

Following a December 30, 2015 meeting of the District's board, the board noticed a public meeting for January 2, 2016, to elicit comments on the financial state of the District and potential options for the readjustment of its obligations as well as the retention of HCCA as chief restructuring officer. Approximately 80 members of the community attended the meeting, including individuals that had donated and loaned money to the District in an effort to support the Hospital's operations in late 2015. During the meeting, the board discussed the proposed

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

611923772.1

1    employment of HCCA as chief restructuring officer and the commencement of a voluntary

2    chapter 9 bankruptcy case as a means to restructure the operations and adjust the District's

3    present obligations.  The majority of the community members in attendance supported the

4    employment of HCCA and the commencement of the bankruptcy case.

5          With the support of the community, the board voted to approve the employment of

6    HCCA, to declare a fiscal emergency, and to authorize the commencement of the Chapter 9 Case.

7    The board of directors declared a fiscal emergency for numerous reasons, including, primarily,

8    the District's inability to operate due to the lack of sufficient funds, generate any revenues due to

9    the closing of the Hospital and related facilities, and pay the obligations then due and owing.  The

10   board also found that the inability to operate the Hospital and, thereby, provide medical services

11   to the community constituted a threat to the health and welfare of the residents of Southern Inyo

12   County.  On or about January 3, 2016, the board adopted Resolution No. 16-01, which effected

13   the board's prior decision.

14   **IV.    COMMENCEMENT AND ADMINISTRATION OF CHAPTER 9 CASE**

15         **A.    Commencement of the Chapter 9 Case**

16         Due to the District's dire financial condition and the inability to remedy the same outside

17   of bankruptcy, the District proceeded with filing a voluntary petition for relief under chapter 9 of

18   the Bankruptcy Code on January 4, 2016.

19         **B.    Immediate Actions to Stabilize Operations and Revenue Deficits**

20         Following the Petition Date, the District and HCCA took action to establish a foundation

21   for the Plan.  The primary concerns immediately following the commencement of the Chapter 9

22   Case were the preservation of the Hospital, the SNF, and the Clinic operations and the

23   implementation of practices designed to decrease expenditures and, thereby, increase revenues.

24   For example, the District immediately began reevaluating the billing practices in an effort to

25   reduce the number of insurer discounts, thereby increasing net revenues.  The District also began

26   utilizing governmental programs that provide revenues to hospital and nursing facilities that

27   maintain high levels of service, including the California Quality Assurance Fee program.  In

28   additional to taking advantage of available programs and streamlining the overall operations, the

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

- 16 -

611923772.1

1   District also began exploring opportunities for additional governmental subsidies to increase non-

2   operational revenues and permit the District to repay its obligations more quickly without

3   affecting its operational capabilities.

4       **C.      Eligibility Litigation**

5       On or about March 31, 2016, the District filed its brief regarding the District's

6   qualification as a debtor under chapter 9 of the Bankruptcy Code (the "**Eligibility Motion**").  The

7   Eligibility Motion came on for hearing on or about June 29, 2016.  On or about June 29, 2016, the

8   Bankruptcy Court issued a minute order finding that the District qualified as a debtor under

9   chapter 9 of the Bankruptcy Code.  Thereafter, on or about July 12, 2016, the Bankruptcy Court

10  entered an order for relief in the Chapter 9 Case.

11      **D.      Appointment of Patient Care Ombudsman**

12      On or about January 6, 2016, the Court issued the *Order to Appear and Show Cause Why*

13  *a Patient Care Ombudsman Should Not Be Appointed*.  On or about January 25, 2016, the District

14  filed the *Debtor's Motion to Excuse the Appointment of a Patient Care Ombudsman*.  On or about

15  February 3, 2016, the Debtor filed the *Declaration of Colleen Wilson, Chief Nursing Officer, in*

16  *Support of the Motion to Excuse the Appointment of a Patient Care Ombudsman*.  A hearing to

17  consider the appointment of a patient care ombudsman was held on February 10, 2016.  On or

18  about February 16, 2016, the Court entered an order denying the *Debtor's Motion to Excuse the*

19  *Appointment of a Patient Care Ombudsman* and, on or about February 17, 2016, entered an order

20  directing the appointment of a patient care ombudsman.  On or about March 4, 2016, the Office

21  of the United States Trustee filed a notice regarding the appointment of Joseph Rodrigues (the

22  "**Ombudsman**") as patient care ombudsman.

23      Since his appointment, the Ombudsman has filed numerous reports pertaining to the

24  operation of the District's facilities.  The reports are not attached hereto; however, copies of the

25  reports are available on the Chapter 9 Case docket or may be obtained from the District by

26  submitting a written request via email addressed to mdelaney@bakerlaw.com and

27  sgaeta@bakerlaw.com.  Since his appointment, the Ombudsman's reports have noted a few minor

28  issues; however, in each instance, these issues were promptly resolved to the Ombudsman's

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

SECOND AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS
611923772.1

satisfaction.  In his reports, the Ombudsman also noted that the District's facilities are clean and fully operational, and the District's patients are well cared-for by the staff.  In short, the Ombudsman reports demonstrate that the District has corrected the operational issues it faced in the past.

### E.     Disputes Pertaining to Claims Against the District

Following the Petition Date, the District continued evaluating its existing obligations and the Claims asserted against the District.  Notwithstanding the ongoing nature of this inquiry, the District identified several disputed and/or objectionable Claims (whether in whole or in part)—namely, the Claims asserted by the following claimants: (i) Action Capital Corporation (also known as Coast to Coast Healthcare); (ii) Covidien; (iii) Dean Vander Wall; (iv) the California Employment Development Department; (v) GE HFS LLC; (vi) Lee Barron; and (vii) MJL & Associates.

Accordingly, on or about January 26, 2017, the District filed two omnibus objections to proofs of Claim.  The first omnibus objection sought to characterize Claims asserted by the California Employment Development Department, Lee Barron, and MJL & Associates, each of which asserted an entitlement to priority treatment of all or part of their respective Claims under the Bankruptcy Code, as General Unsecured Claims (the "**Priority Claim Objection**").  The second omnibus objection sought to disallow Claims asserted by Action Capital Corporation, Covidien, Dean Vander Wall, and GE HFS LLC based on the claimants' failure to adequately substantiate the Claim through the submission of competent evidence (the "**Adequacy Claim Objection**").

Prior to the hearing on the Adequacy Claim Objection, the District resolved the Adequacy Claim Objection as it pertained to Dean Vander Wall and GE HFS LLC and, at the hearing, withdrew the objection as it pertained to Covidien.  During the hearing on the Adequacy Claim Objection, the Court denied without prejudice the objection as it pertained to Action Capital Corporation.  On or about March 30, 2017, the Court entered an order adopting its rulings during the hearing on the Adequacy Claim Objection.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

611923772.1

During the hearing on the Priority Claim Objection, the Bankruptcy Court sustained the objection and ordered that the affected Claims be reclassified as General Unsecured Claims. Accordingly, under the Plan, these Claims are treated as General Unsecured Claims in Class 3.

**F.     Pending Litigation**

As of the commencement of the Chapter 9 Case, the District was party to certain pending lawsuits, including the following: *Perez v. Kibler, et al.*, case no. SICV CV 1457395, pending in the California Superior Court for the County of Inyo (the "**Perez Litigation**"); *Anderson v. Southern Inyo Healthcare District*, case no. 30-2015-00817277-CL-CL-CJC (the "**Anderson Litigation**"); *Craneware, Inc. v. Southern Inyo Healthcare District*, 15CV04309, pending in the District Court of Johnson County, Kansas (the "**Craneware Litigation**"); and *J.MH, IL et al. v. Marilyn S Devries, MD., et al.*, Case Number: SI- CV-1659008; Superior Court of the State of California, County of Inyo (the "**Huerta Litigation**").

On or about February 1, 2016, the Anderson Litigation was dismissed.

On or about March 30, 2016, the District removed the Craneware Litigation to this Court and, on or about August 29, 2016, the Court dismissed the Craneware Litigation for failure to prosecute. On or about January 27, 2017, the underlying state court action was dismissed without prejudice.

On or about April 15, 2016, the Bankruptcy Court approved a stipulation by and between the District and the plaintiff in the Huerta Litigation. Pursuant to the stipulation, the District agreed to allow the plaintiff to prosecute the Huerta Litigation; *provided, however,* that he only seek to recover from any applicable insurance policies. The Huerta Litigation is currently pending.

Based on the nature of the Perez Litigation, the District did not remove the action.

In addition to the actions pending on the Petition Date, on or about January 13, 2016, the District filed a complaint against the California Department of Public Health ("**CDPH**")—thereby commencing the adversary proceeding styled *Southern Inyo Healthcare District v. California Department of Public Health, et al.*, adv. no. 2016-01008 (the "**CDPH Adversary**"). By and through the CDPH Adversary, the District sought a determination that the suspension or

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

611923772.1

revocation of the District's hospital licensure violated the automatic stay. Following the reinstatement of the District's licenses, the District and the defendants in the CDPH Adversary reached an agreement to dismiss the CDPH Adversary without prejudice. On or about March 9, 2016, the District filed a stipulation to dismiss the CDPH Adversary without prejudice, which the Court approved by order entered on or about March 10, 2016.

### G.    Post-Petition Financing

During the pendency of the Chapter 9 Case, the District utilized a line of credit extended by HCCA (the HCCA Loan) to cover temporary cash shortfalls arising in the course of operations. HCCA was no longer willing and/or able to extend a line of credit to the District. As the District required funding to continue to operate pending both confirmation of the Plan and the Effective Date, and finance certain pre-confirmation activities, the District explored various financing options. Unable to procure financing from an institutional lender, on or about July 19, 2017, the District entered into an agreement with Vi Healthcare Finance Inc. ("**ViHF**") for the provision of a line of credit in the amount of Two Million Dollars ($2,000,000) (the "**ViHF LOC**"), which is secured by the District's current tax revenues, to the extent permitted under California law. The District has drawn funds on the ViHF LOC to repay the outstanding balance of the HCCA Loan (the "**HCCA Draw**").

Under the ViHF LOC, the HCCA Draw shall accrue interest at a rate of ten percent (10%) until repaid. Any additional draws on the ViHF LOC shall accrue simple interest at a rate of twenty percent (20%) until the amount is repaid in full. To ensure payment of the ViHF LOC, the District agreed to assign certain tax revenues permitted to be pledged under applicable law to ViHF. The assigned tax revenues shall be applied to the balance owing under the ViHF LOC until paid in full. Any tax revenues received by ViHF that are not necessary to pay any outstanding balance under the ViHF LOC shall be returned to the District within one (1) business day of receipt.[6]

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

---

[6] The District intends to file an action to disallow and/or subordinate the ViHF Claim and transfer any security interest related thereto to the District pursuant to section 510(c). If the ViHF Claim is disallowed or the related security interest transferred to the District, ViHF will no long be entitled to any tax revenues payable to the District.

611923772.1

## V.     THE DISTRICT'S LIABILITIES AND ASSETS

The schedules filed in the Chapter 9 Case, as amended (collectively, the "**Schedules**"), provide a detailed list of the assets and liabilities of the District as of the Petition Date.[7] The audited financial statements provide detailed information regarding the performance of the District in the three (3) fiscal years immediately preceding the Petition Date. *See* Exhibits 2, 3, 4. The following is a summary of the liabilities and assets that are relevant to the Plan.

### A.     Liabilities

#### 1.     Summary of Scheduled Claims

The District filed its Schedules on or about January 19, 2016. In sum, the Schedules identified the following obligations: (a) 11 Secured Claims totaling $1,998,535.65; and (b) 254 General Unsecured Claims totaling $2,503,239.60. With the exception of the Administrative Claims and Professional Claims, the District does not have any unsecured Claims entitled to priority treatment under the Bankruptcy Code. Accordingly, the District did not list any creditors in Schedule E.

#### 2.     Proofs of Claim

The Bankruptcy Court established September 30, 2016, as the deadline for the filing of non-administrative proofs of Claim against the District. Forty-eight (48) proofs of Claim were filed against the District prior to the Claims Bar Date. These Claims represent a total debt of $6,371,984.78. Of this amount, approximately eight (8) Claims, totaling $2,339,011.21, asserted security interests in certain assets of the District. The majority of the proofs of Claim filed overlap with the Claims scheduled by the District. Unless otherwise provided in the Plan, if a purported creditor filed a proof of Claim relating to a Claim listed in the Schedules, the Claim shall be Allowed in the amount stated in the proof of Claim and the amount listed for the Claim in the Schedules shall be disregarded for the purposes of calculating the total indebtedness provided for under the Plan or determining the treatment of the related creditor under the Plan.

---

[7] Copies of the Schedules are available on the Chapter 9 Case docket or may be obtained from the District by submitting a written request via email addressed to mdelaney@bakerlaw.com and sgaeta@bakerlaw.com.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1    As previously noted, the District filed objections to eight (8) proofs of Claim.  The

2  Bankruptcy Court sustained the objections to the proofs of Claim filed by Employment

3  Development Department, Lee Barron, and MJL & Associates.  The District resolved or

4  withdrew the objections to the proofs of Claim filed by Covidien, Dean Vander Wall, and GE

5  HFS, LLC.  The Bankruptcy Court overruled the objection to the proof of Claim filed by Action

6  Capital Corporation.  In total, the objections to the proofs of Claim resulted in the reclassification

7  of $224,151.22 in purported priority unsecured Claims as General Unsecured Claims.

8           **3.     Alterations to Liability under the Plan**

9                **a.     Alteration of Claims**

10    Under the Plan, the District intends to alter the treatment or classification set forth in the

11  Schedules for the following Claims:

12  - General Electric Capital Corporation ("**GE**").  In the Schedules, the District listed

13     GE as holding two Secured Claims totaling $65,129.11.  Following the Petition

14     Date, GE filed three (3) proofs of Claim (nos. 5, 29, and 33) asserting three

15     unsecured Claims relating to the same obligations.  Accordingly, under the Plan,

16     GE shall be treated as holding three (3) General Unsecured Claims in the amounts

17     stated in the GE proofs of Claim.

18  - HCCA.  In the Schedules, the District listed HCCA as holding a Secured Claim in

19     an unknown amount relating to the HCCA Loan.  As the HCCA Loan will be paid

20     on the Effective Date, the Plan does not provide any treatment for the HCCA Loan

21     in Class 1.  Any other amounts owing to HCCA shall be treated as a General

22     Unsecured Claim in Class 3.

23  - Leasing Associates of Barrington, Inc. ("**LAB**").  In the Schedules, the District

24     listed LAB as holding a Secured Claim in an unknown amount.  LAB did not file a

25     proof of Claim in the Chapter 9 Case.  Accordingly, under the Plan, the Claim

26     listed in the Schedules for LAB shall be treated as a Disallowed Claim.

27  - Marlin Leasing Corporation ("**MLC**").  In the Schedules, the District listed MLC

28     as holding a Secured Claim the in the amount of $0.00.  MLC did not file a proof

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1  of Claim in the Chapter 9 Case.  Accordingly, under the Plan, the Claim listed in

2  the Schedules for MLC shall be treated as a Disallowed Claim.

3      • Siemens Healthcare Diagnostic, Inc. (aka Siemens Financial Services, Inc.)

4  (“**Siemens**”).  In the Schedules, the District listed two Secured Claims held by

5  Siemens—one in the amount of $0.00 and the other in an unknown amount.

6  Following the Petition Date, Siemens filed a proof of Claim (no. 36) asserting a

7  General Unsecured Claim against the District relating to the same obligation.

8  Accordingly, under the Plan, Siemens shall be treated as holding a General

9  Unsecured Claim in the amount stated in proof of Claim no. 36.

10      • U.S. Foods (“**US Foods**”).  In the Schedules, the District listed a purported

11  Secured Claim held by US Foods in the amount of $35,539.19.  Following the

12  Petition Date, US Foods filed a proof of Claim (no. 44) asserting a General

13  Unsecured Claim against the District relating to the same obligation(s).

14  Accordingly, under the Plan, US Foods shall be treated as holding a General

15  Unsecured Claim in the amount stated in proof of Claim no. 44.

16      In addition to the foregoing, pursuant to the terms of the Plan, any Claim qualifying as a

17  Disallowed Claim shall not receive any distributions under the Plan, regardless of whether and in

18  what manner the District listed such Claim in the Schedules.

19                 **b.**      **Disputed Claims**

20      The District disputes the validity and/or enforceability of several claims, including,

21  without limitation, the Claims discussed below.  The omission of any Claim from the discussion

22  in this section shall not constitute a waiver or otherwise affect the rights of the District to object

23  or otherwise exercise any and all with respect to any Claim against the District.

24                 **i.**      **Optum Claim**

25      By and through proof of Claim no. 25 (the Optum Claim), Optum Bank has asserted a

26  Secured Claim in the amount of $1,717,320.24 relating to a loan extended to the District in or

27  about February 2015, which it contends is secured by the real property in which the SNF and the

28  Hospital are located (the “**Property**”), as well as various personal property assets in which the

611923772.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

District has an ownership interest. The District disputes the enforceability of the Secured Claim asserted by Optum Bank, especially with respect to the Property, and the validity of the underlying loan (i.e., the Optum Loan).

As a California healthcare district, the District's ability to borrow funds is strictly regulated. One of the many restrictions placed on the District's ability to borrow funding is set forth at Cal. Health & Safety Code § 32130, which provides:

> A district may borrow money and incur indebtedness in an amount not to exceed 85 percent of all estimated income and revenue for the current fiscal year, including, but not limited to, tax revenues, operating income, and any other miscellaneous income received by the district, from whatever source derived. *The money borrowed and indebtedness incurred under this section shall be repaid within the same fiscal year.*

(emphasis added). Additionally, Cal. Health & Safety Code § 32130.2(b) limits the issuance of negotiable promissory notes to finance a "capital outlay"—in other words, the initial acquisition of property, equipment and supplies utilized by a healthcare district—and to a term of no more than ten (10) years. "Restrictions on the borrowing of public entities are common in California and other states. ... They are intended to prohibit the accumulation of public debt without the consent of the taxpayers, and require governmental agencies to carry on their operations on a cash basis." *In re S. Humboldt Cmty. Healthcare Dist.*, 254 B.R. 758, 760 (Bankr. N.D. Cal. 2000). Claims made on account of loans extended in violation of such limitations are unenforceable. *Ibid*.

Based on its review of the salient documents and applicable law, the District believes that the Optum Loan violates, among other provisions, Cal. Health & Safety Code §§ 32130 and 32130.2. More precisely, the Optum Loan does not require repayment within the same fiscal year nor was such repayment possible at the time the Optum Loan was extended.[8] Additionally, the Optum Loan provided for a repayment term in excess of ten (10) years and was not related to a "capital outlay;" rather, the Optum Loan related to the refinancing of an existing debt. Accordingly, the Optum Loan violates the restrictions on lending to healthcare districts under Cal.

---

[8] It also appears that the Optum Loan violates Cal. Health & Safety Code § 32130.2 by virtue of the fact that it matures more than ten (10) years after its issuance.

1  Health & Safety Code §§ 32130 and 32130.2 and, thus, the Optum Claim is unenforceable.  As

2  such, the District is left with no choice but to treat the Optum Claim as a Disputed Claim under

3  the Plan.  *See In re S. Humboldt Cmty. Healthcare Dist.*, 254 B.R. at 760-761.

4        Furthermore, under California law, creditors are not able to encumber or assert security

5  interests in municipal property unless expressly authorized by statute.  *See Mayrhofer v. Board of*

6  *Education of the City of San Diego, et al.*, 89 Cal. 110 (Cal. 1891).  As relevant here, the Cal.

7  Health & Safety Code contains no authorization for creditors to encumber the real property assets

8  of a California health care district, such as the District.  As Optum was not authorized to

9  encumber the Property, the security interest asserted by Optum in the Property is void and

10  unenforceable.

11        Based on the foregoing, the District has commenced the Optum Adversary, though which

12  the District seeks to invalidate the Optum Loan and associated security interest, in whole or in

13  part, and disallow the Optum Claim.  Thus, under the Plan, the Optum Claim is treated as a

14  Disputed Claim and shall not receive any distributions unless and until a court of competent

15  jurisdiction enters a Final Order allowing the Optum Claim, and then, only to the extent allowed.

16                    **ii.      ViHF Claim**

17        ViHF asserts an entitlement to a Secured Claim in an amount equal to any draw on the

18  ViHF LOC.  The District contends that the ViHF Claim is not enforceable and/or may be

19  subordinated to all other Claims under section 510(c) and/or the Bankruptcy Court's general

20  equitable authority due to certain misconduct and improper actions taken by ViHF and/or its

21  affiliates.  The District intends to retain special litigation counsel to commence an adversary

22  proceeding against ViHF ("**ViHF Adversary**") prior to the Confirmation Hearing.  By and

23  through the ViHF Adversary, the District intends to seek an order disallowing or subordinating

24  the ViHF Claim and transferring any securing interest associated with the ViHF LOC to the

25  District.[9]

26

27  _____

28  [9] Due to allegations of conflicts of interest between HCCA and its affiliates, including ViHF, and general insolvency counsel for the District, the District shall provide further detail regarding the bases for the ViHF Adversary by and through the forthcoming complaint.

611923772.1

Baker & Hostetler LLP
Attorneys at Law
Los Angeles

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

### 4.     Summary of Current Liabilities

On the Effective Date, the District estimates that it will have the following liabilities:

- Administrative Claims totaling approximately $34,321.00;
- Professional Claims totaling approximately $1,094,910.97;
- Secured Claims totaling approximately $3,281,362.61;[10]
- Priority Unsecured Claims totaling $0.00;
- Post-Petition Unsecured Claims totaling $460,880.00; and
- General Unsecured Claims totaling approximately $7,153,051.98.[11]

### 5.     Statement Regarding Liabilities

As previously noted, the District disputes a number of Claims that have been asserted against it, and the District's review and analysis of Claims is ongoing. Given that fact, as well as the inherent uncertainties in any litigation regarding Claims, no assurances can be given regarding the successful outcome of any litigation that has or may be initiated in objecting to such Claims or regarding the ultimate amount of Claims that will be Allowed against the District.

As described below, the Plan enables the District to file objections to Claims at any time within one hundred and eighty (180) days after the Effective Date. The Plan also provides for the District to retain any and all defenses, offset and recoupment rights, and counterclaims that may exist with respect to any Disputed Claim, whether under section 502, 552, or 558 of the Bankruptcy Code or other applicable law. The District reserves all rights with respect to the allowance and disallowance of any and all Claims. **In voting on the Plan, creditors may not rely on the absence of a reference in this Disclosure Statement or the Plan or the absence of an objection to their proofs of Claim as any indication that the District ultimately will not object to the amount, priority, nature, or allowance of their Claim(s).**

---

[10] This amount does not account for Secured Claims satisfied under the Plan through the surrender of collateral. This amount includes the Disputed Claims of Optum and ViHF.

[11] This amount is comprised of all General Unsecured Claims, including those classified in Class 4 under the Plan, the Unsecured portion of the Secured Claim asserted by Action Capital Corporation, and the projected cure payments due and owing in relation to the assumption of executory contracts and unexpired leases. The inclusion of any Claim in this calculation shall not alter the proposed treatment of such Claim under the Plan.

611923772.1

**B.** **Assets**

The District's assets include, among other things, the real property on which the Hospital and the SFN are located, medical equipment and supplies, accounts receivables, healthcare receivables, potential claims and causes of action, and other various personal property assets. The District's assets are more fully described in the Schedules and associated statement of financial affairs. Under the Plan, the District estimates that it will supplement its current revenue through offering additional medical services and treatments, potential proceeds from litigation, and an increase in parcel and transient occupancy taxes. Each potential revenue source is discussed below:

**1.** **Additional Medical Services and Treatment**

The District intends to partially fund the Plan with anticipated revenues to be generated from expanding certain services. More precisely, the District intends to expand its services by offering medical infusion services.

The District has designated a room in its hospital facility for conversion into a treatment center for individuals requiring regular infusions of intravenous medications, including, without limitation, medications for the treatment of cancer, arthritis, and other chronic and severe illnesses and conditions. The designated space is sufficient to house four (4) infusion chairs and related equipment—thereby permitting the District to treat up to four (4) patients at any one time. Establishing the treatment facility will cost approximately $6,350.00, which expense shall be a one-time cost. The District estimates that the annual operating cost would be approximately $240,000 or $60,000 per chair, including the additional staffing required to operate the facility and to administer the treatments. The District estimates that the infusion services will result in additional net revenues of approximately $200,000 in 2018. The District anticipates that demand for this service will increase between 2018 and 2025—thereby increasing revenues derived from this service. The District believes it will be able to establish and begin providing infusion services prior to the Effective Date.

- 27 -

### 2. Parcel Tax Increase

The District intends to fund the Plan (in part) with revenues from an increased parcel tax. A parcel tax is a tax assessed against the owner of real property. At present, the parcel tax in Southern Inyo is approximately $150.00 per parcel, which generates an average of $350,000 per year in revenues for the District. The District proposes increasing the parcel tax from $150.00 to $365.00 per parcel, per year, which will increase receipts from the parcel tax from approximately $350,000 to $950,000 per year.

The District has taken certain actions to gauge whether the community is likely to support an increase to parcel taxes in order to preserve the Hospital, the SNF, and the Clinic. Based thereon, the District believes that voters will support the increase in parcel taxes in order to ensure the continued operations of the District and availability of the essential services the District provides to the community.

<u>Voter Approval Required</u>. Increasing the parcel tax will require approval by two-thirds of the voters in Inyo County, California, who vote on the tax measure.

<u>Timing for Approval</u>. The District intends to seek approval of the parcel tax initiative as part of the general election in April 2018. If the requisite number of votes is received, the election results will thereafter be certified. If approved, the District anticipates that its will begin receiving the additional revenues on account of the parcel tax increase in December 2018. The parcel tax revenues will be paid bi-annually—with the first payment in April of each year and the second payment in December of each year.

<u>Certificates of Participation</u>. In the event the District is required to make any lump-sum payments to Optum or ViHF, or otherwise remedy a cash shortfall, the District may issue certificates of participation ("**COP**") in association with the increased parcel tax revenues (to extent necessary to fund such payment(s)). The COP issuance will essentially securitize all or a portion of the future revenues from the increased parcel taxes and result in a lump-sum payment to the District. Thereafter, the District shall utilize the revenues from the parcel tax initiative to repay the COP obligations. Based on the District's calculations, the COP repayment obligations will be less than the revenues from the increased parcel taxes and, as the COP revenues will repay

611923772.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1    a substantial portion of the District's obligations, will not affect the District's ability to perform

2    under the Plan.

3                              **3.        Transient Occupancy Tax**

4           The District intends to partially fund the Plan with additional tax revenues from the

5    Transient Occupancy Tax (the "**TOT**") for the County of Inyo, California.  The TOT is a tax

6    levied against consumers of tourist related goods and services, principally through taxes on hotel

7    and motel rooms.  The District intends to propose an allocation of one percent (1%) of the TOT to

8    the District.  The District has conferred with authorities from the County of Inyo and obtained

9    historical collection data relating to the TOT.  Based on its discussions with county officials and

10   historical data, the District estimates that the allocation of additional revenues generated by the

11   one percent (1%) allocation would result in approximately $34,600 per year in additional

12   revenues for the District.  The District would receive the TOT revenues as a single payment at the

13   end of each calendar year.

14          <u>Voter Approval **Not** Required</u>.  Voter approval of the TOT increase is not required; rather,

15   any increase to the TOT requires approval from the County Board of Supervisors, which

16   ordinarily makes its decision in concert with the merchants affected by the assessment.  The

17   District believes that the TOT increase will be approved and allocated to the District.

18          <u>Timing for Approval</u>.  As voter approval is not required, the timeline for approval is

19   slightly more flexible.  Regardless, the District expects the TOT increase to be approved before

20   the projected Effective Date.

21                      **4.        Claims and Causes of Action Against Third Parties**

22          The District may have claims and causes of action against certain individuals or entities,

23   and is continuing its investigation of any and all potential claims and causes of action that may

24   exist.  By and through the Plan, the District retains the right to commence and prosecute any

25   action(s) based upon any claim or cause of action possessed by the District prior to the Effective

26   Date.  Any recovery by the District arising from a claim or cause of action commenced on or after

27   the Effective Date shall be treated as additional revenues and used by the District to fund

28   operations and/or plan payments.  **Parties in interest may not rely on the absence of a**

611923772.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

**reference in this Disclosure Statement or the Plan as any indication that the District ultimately will not pursue any and all available claims and causes of action against them.**

### a.     Potential Claims and Causes of Action

The District is presently aware of the claims and causes of action discussed *infra*. The following discussion of claims and causes of action does not in any way limit or affect the reservation of rights set forth in the preceding paragraph, nor the District's right to assert any and all claims and causes of action following the Effective Date.

### i.     HCCA Claim

The principal claim(s) of which the District is aware pertain to HCCA. More precisely, HCCA was retained as chief restructuring officers for the District. In this role, HCCA was responsible for, among other things, the management of the District's operations. Among other things, HCCA failed to collect approximately $4,000,000 in accounts receivable. To ameliorate this cash shortage (to the extent possible), the District was required to expend additional funds, including, without limitation, incurring additional debt from an HCCA affiliate at an interest rate of 20% and retaining additional professionals and service providers to fulfill HCCA's responsibilities. In sum, the District estimates that HCCA's failure to carry-out its duties resulted in more than $6,000,000 in damages to the District. The District intends to file an adversary proceeding against HCCA to recover damages arising from or relating to the foregoing.

### ii.     ViHF Adversary

As discussed *supra*, the District intends to commence an adversary proceeding challenging the validity and enforceability and/or seeking to subordinate the Claim asserted by ViHF and transferring any security interest associated with the ViHF Claim to the District.[12]

### iii.     Avoidance Actions

The District also intends to pursue claims to recover fraudulent and/or preferential transfers to or for the benefit of certain creditors, including, without limitation, HRG, under the

---

[12] Due to allegations of conflicts of interest between HCCA and its affiliates, including ViHF, and general insolvency counsel for the District, the District shall provide further detail regarding the bases for the ViHF Adversary by and through the forthcoming complaint.

SECOND AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS

611923772.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

Bankruptcy Code and applicable California law. The District intends to commence these avoidance actions prior to the Effective Date of the Plan, but in no event later than July 11, 2018.

## VI. SUMMARY OF THE PLAN OF ADJUSTMENT

**The discussion of the Plan set forth herein is qualified in its entirety by reference to the more detailed provisions set forth in the Plan and its exhibits, the terms of which are controlling. Holders of Claims and other interested parties are urged to read the Plan and its exhibits, copies of which are served herewith, in their entirety so that they may make an informed decision regarding the Plan.**

The Plan proposes paying the Allowed Claims against the District over a term of several years. The Allowed Claims are separated into four (4) Classes—namely, Secured Claims (Class 1), Post-Petition Claims (Class 2), General Unsecured Claims (Class 3), and Convenience Class Claims (Class 4).

As set forth in the financial projections (Exhibit 5 to the Plan Exhibits), the Allowed Claims will be paid over a term of years depending on their specific classification and treatment relating thereto. Administrative Claims and Professional Claims are not classified and shall receive payment in full on the Effective Date, unless the holders of such claims agree to alternate treatment. Secured Claims are separately categorized into subclasses (Classes 1A-1G) based upon the collateral purportedly securing each of the Claims. Post-Petition Claims (Class 2) consist of certain general unsecured Claims held by creditors that provide goods or services to the District essential to the operation of the District and its facilities. General Unsecured Claims (Class 3) consist of general unsecured Claims in excess of $250.00 held by claimants not classified as Post-Petition Claims. Convenience Class Claims (Class 4) consist of general unsecured Claims in an amount less than or equal to $250.00 held by claimants not classified as Post-Petition Claims, which are separately classified from General Unsecured Claims in order to avoid the administrative burden and expense associated with remitting payments on account of Claims of this size over a term of years, and Claims classified in Class 3 that opt to be treated as Class 4 Claims. The District shall make the payments provided for in the Plan over a term of approximately seven (7) years (the Effective Date through and including December 2025).

611923772.1

**A.     Classification and Treatment of Claims**

**1.     Unclassified Claims**

Section II of the Plan governs the treatment of certain Claims that are not classified into Classes under the Plan.

**a.     Administrative Expense Claims**

Except to the extent that the holder of an Allowed Administrative Claim agrees to a different treatment, the District or its agent shall pay to each holder of an Allowed Administrative Claim, in full satisfaction, release, and discharge of such Allowed Administrative Claim, Cash in an amount equal to such Allowed Administrative Claim on the later of (i) the Effective Date or (ii) the date on which such Claim becomes an Allowed Administrative Claim, or as soon thereafter as is practicable.  Under the Plan, the Allowed Administrative Claims consist of the following: SourceMedia, Inc. ($34,321.00) and Up-to-Date ($0.00).[13]

**b.     Professional Claims**

Pursuant to section 943(b)(3), all amounts paid or to be paid following the Effective Date for services or expenses in the Chapter 9 Case or incident to the Plan must be disclosed to the Bankruptcy Court and must be reasonable.  There shall be paid to each holder of a Professional Claim, in full satisfaction, release and discharge of the Professional Claims existing on the Effective Date, Cash in an amount equal to that portion of such Claim that the District consents to pay and the Bankruptcy Court deems reasonable.[14]

The portion of the Allowed Professional Claim of Baker & Hostetler LLP ("**Baker**") relating to attorneys' fees shall be paid in equal monthly payments over a term of thirty-six (36) months following the Effective Date.  The District estimates that the attorneys' fees incurred by Baker for services rendered to the District prior to the Effective Date shall total approximately $850,000.  The Allowed Professional Claims of Nave Cortell LLP and Province as well as the

---

[13] The amounts listed herein are estimates of amount owing on account of the Allowed Administrative Claims as of the anticipated Effective Date.

[14] The treatment of Professional Claims provided herein shall not in any way limit the rights of any professional employed by the District seeking compensation for services provided following the Effective Date.  The amounts listed in this Section are estimates of the Professional Claims and shall not in any way be interpreted as a limitation on the amount of the Professional Claims.

611923772.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

portion of the Allowed Professional Claim of Baker & Hostetler LLP relating to costs incurred in the course of the Chapter 9 Case shall be paid in full upon, or as soon as reasonably practicable following, the Effective Date. The District estimates that Nave Cortell LLP and Province shall have Professional Claims in the amount of approximately $24,149.22 and $20,761.75, respectively, as of the Effective Date. The District estimates that the portion of the Allowed Professional Claim of Baker & Hostetler LLP relating to costs incurred in the course of the Chapter 9 Case shall total approximately $200,000 as of the Effective Date.[15]

The District does not consent to the Bankruptcy Court adjudicating whether any other individual or entity constitutes a Professional or may assert a Professional Claim. The District solely consents to the Bankruptcy Court adjudicating the reasonableness of the services rendered and costs incurred by the Professionals for which compensation and/or reimbursement is sought.

The District, in the ordinary course of its business, and without the requirement for Bankruptcy Court approval, may pay for professional services rendered and costs incurred following the Effective Date.

**c.     Deadline for the Filing and Assertion of Postpetition Claims, Administrative Claims, and Professional Claims**

**All proofs of Claim for Claims arising on or after the Petition Date, and requests for payment or any other means of preserving and obtaining payment of Administrative Claims that have not been paid, released, or otherwise settled, and all requests for a determination regarding the reasonableness of Professional Claims, must be filed with the Bankruptcy Court and served upon the District no later than thirty (30) days <u>before</u> the date set for the Confirmation Hearing.** Any proof of Claim for Claims arising on or after the Petition Date, or request for payment of an Administrative Claim or a Professional Claim that is not timely filed will be forever barred and holders of such Claims shall be barred from asserting such Claims in any manner against the District.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

---

[15] This figure includes projected costs for Force 10 Partners, the financial advisory firm retained by Baker & Hostetler LLP to assist with the preparation of the Plan and associated documents.

611923772.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

**2.**      **Class 1 – Secured Claims**

     **a.**      **Class 1A – Action Capital Corporation**

Class 1A consists of the Claim asserted by Action Capital Corporation (also known as Coast to Coast Healthcare) ("**ACC**") in the amount of $185,600.35, which is purportedly secured by all accounts receivable of the District arising on or before January 31, 2015.

     **i.**      **Impairment and Voting**

Class 1A is Impaired by the Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of ACC. Accordingly, this Class is entitled to vote to accept or reject the Plan in accordance with the Plan Solicitation Order.

     **ii.**      **Treatment**

ACC's Class 1A Claim is purportedly secured solely by accounts receivable generated on or before January 31, 2015, which the District estimates to be worth $0.00. Accordingly, in full satisfaction, release and discharge of the Class 1A Claim, ACC shall receive an allowed General Unsecured Claim in the amount of $185,600.35, which shall be included in and treated in accordance with the treatment provided for Class 3 Claims.

     **b.**      **Class 1B – Bank of the West/Thermo Fisher Financial Services, Inc.**

Class 1B consists of the Claims asserted by Bank of the West ("**BOW**") in the amount of $7,189.61 and Thermo Fisher Financial Services, Inc. ("**Thermo**") in the amount of $12,443.46,[16] which are purportedly secured by an Abbott iSTAT 1 Upgrade from 200 Series and the related equipment and documentation.

     **i.**      **Impairment and Voting**

Class 1B is Impaired by the Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of BOW and/or Thermo. Accordingly, this Class is entitled to vote to accept or reject the Plan in accordance with the Plan Solicitation Order.

---

[16] Bank of the West and Thermo Fisher Financial Services, Inc. each filed proofs of Claim asserting Secured Claims in the subject collateral. Per the documentation provided in support of the proofs of Claim, it appears that Thermo Fisher Financial Services, Inc. assigned its rights under the agreement with the District to Bank of the West in or about June 2013. Accordingly, under the Plan, the Claims asserted by Bank of the West and Thermo Fisher Financial Services, Inc. are treated as the same Claim.

### ii.        Treatment

In full satisfaction, release and discharge of the Class 1B Claims, the District shall surrender to BOW or Thermo the collateral for the underlying agreements—namely, one Abbott iSTAT 1 Upgrade from 200 Series and the related equipment and documentation.  The District shall surrender the subject equipment and documentation on or as soon as practicable following the Effective Date.

### c.        Class 1C – Canon Financial Services, Inc.

Class 1C consists of the Claim asserted by Canon Financial Services, Inc. ("**Canon**") in the amount of $84,275.90, which is purportedly secured by certain office equipment subject to the agreements by and between the District and Canon or its affiliates.

### i.        Impairment and Voting

Class 1C is Impaired by the Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of Canon.  Accordingly, this Class is entitled to vote to accept or reject the Plan in accordance with the Plan Solicitation Order.

### ii.        Treatment

In full satisfaction, release and discharge of the Class 1C Claim, the District shall surrender to Canon the collateral for the underlying agreement.  The District shall surrender the subject equipment and documentation on or as soon as practicable following the Effective Date.

### d.        Class 1D – Cardinal Health 110, LLC

Class 1D consists of the Claim asserted by Cardinal Health 110, LLC ("**Cardinal**") in the amount of $838.28, which is purportedly secured by certain funds presently held by Cardinal.

### i.        Impairment and Voting

Class 1D is Unimpaired by the Plan since the treatment of this Class will not affect the legal, equitable, or contractual rights of Cardinal.  Accordingly, this Class is **not** entitled to vote to accept or reject the Plan in accordance with the Plan Solicitation Order.[17]

### ii.        Treatment

---

[17] The Unimpaired status of the Class 1D Claim held by Cardinal shall not affect the right of Cardinal, if any, to cast a vote for or against the Plan on account of the portion of its Claim categorized as a General Unsecured Claim in Class 3.

611923772.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

In full satisfaction, release and discharge of the Class 1D Claim, Cardinal shall be entitled to retain the funds presently in its possession, which total $838.28. The remainder of the Claim asserted by Cardinal shall be allowed as a General Unsecured Claim in Class 3 in accordance with the proof of Claim filed by Cardinal.

### e. Class 1E – Healthcare Resource Group

Class 1E consists of the Disputed Claim asserted by Healthcare Resource Group ("**HRG**") in the amount of $151,562.73, which is purportedly secured by various personal property and general intangible assets of the District or in which the District has an ownership interest. Based on the District's books and records, HRG received preferential and/or fraudulent transfers avoidable under the Bankruptcy Code and/or California law and, as such, the HRG Claim is unenforceable under section 502(d).

### i. Impairment and Voting

Class 1E is Impaired by the Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of HRG; however, as comprised of a Disputed Claim, this Class is **not** entitled to vote to accept or reject the Plan in accordance with the Plan Solicitation Order.

### ii. Treatment

As a Disputed Claim, the HRG Claim shall not receive any distributions under the Plan unless and until a court of competent jurisdiction enters a Final Order allowing the HRG Claim or HRG returns any and all avoidable transfers. If the HRG Claim is adjudged valid, enforceable and secured in whole or in part and/or HRG returns any and all avoidable transfers, the District shall make periodic payments to HRG until the Class 1E Claim is paid in full with interest. Under the Plan, the payments on account of the Class 1E Claim shall begin in the first full month following the allowance of the HRG Claim and/or the return of any and all avoidable transfers. If deemed an Allowed Claim, HRG shall receive monthly payments in the approximate amount of $2,020.00 per month over the life of the Plan, which equates to the full amount of the Claim plus interest at a rate of 3.25% *per annum*.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1

###### f.    Class 1F – Optum Bank, Inc.

2    Class 1F is comprised of the Disputed Claim asserted by Optum in the amount of

3    $1,717,320.24, which is purportedly secured by the District's real property as well as personal

4    property and general intangible assets.  The validity and enforceability of the Optum Claim is the

5    subject of the Optum Adversary.

6
###### i.    Impairment and Voting

7    Class 1F is Impaired by this Plan since the treatment of this Class will affect the legal,

8    equitable, or contractual rights of Optum.  As Class 1F is comprised solely of the Disputed Claim

9    of Optum, Class 1F is not entitled to vote on the Plan; however, the District and Optum entered

10    into a stipulation permitting Optum to vote in Class 1F.  As such, Class 1F is entitled to vote to

11    accept or reject the Plan in accordance with the Plan Solicitation Order.

12
###### ii.    Treatment

13    As a Disputed Claim, the Optum Claim shall not receive any distributions under the Plan

14    unless and until a court of competent jurisdiction enters a Final Order allowing the Optum Claim.

15    If the Optum Claim is adjudged valid, enforceable and secured in whole or in part, the District

16    shall pay Optum Cash in an amount equal to the portion of the Optum Claim allowed as a

17    Secured Claim, which may include interest and costs and expenses incurred by Optum in

18    association with the underlying loan, to the extent permitted under the Optum loan agreement and

19    allowed by the Court, no later than one hundred and twenty (120) days following the entry of a

20    Final Order allowing the Optum Claim.  If the Optum Claim is adjudged valid and enforceable

21    but not wholly secured, the portion of the Optum Claim adjudged to be a Secured Claim, which

22    may include interest and costs and expenses incurred by Optum in association with the underlying

23    loan, to the extent permitted under the Optum loan agreement and allowed by the Court, shall be

24    treated pursuant to the preceding sentence and any order(s) entered in the Optum Adversary and

25    the remaining Allowed Claim shall be treated as a General Unsecured Claim in Class 3.  If the

26    Optum Claim is adjudged invalid and unenforceable, Class 1F shall not receive any distributions

27    under the Plan.

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

611923772.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

### g.     Class 1G – Vi Healthcare Finance, Inc.

Class 1G is comprised of any and all funds advanced to the District by ViHF pursuant to the ViHF LOC.  The anticipated balance of the ViHF LOC on the Effective Date is $1,314,922.  The Class 1G Claim is purportedly secured in accordance with the terms of the ViHF LOC to the extent permitted under California law.  The Class 1G Claim constitutes a Disputed Claim under the Plan.

#### i.     Impairment and Voting

Class 1G is Impaired by the Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of ViHF; however, as comprised of a Disputed Claim, this Class is **not** entitled to vote to accept or reject the Plan in accordance with the Plan Solicitation Order.

#### ii.     Treatment

The treatment of Class 1G shall depend on the outcome of the ViHF Adversary.  If the District succeeds in disallowing the ViHF Claim in its entirety, Class 1G shall not receive any distributions under the Plan.  If the Bankruptcy Court allows the ViHF Claim as a subordinated claim and transfers any security interest(s) associated therewith to the District, the ViHF Claim shall be treated in a separate class of subordinated Claims—Class 5.  Class 5 shall receive a distribution equal to three percent (3%) of the total claims in the Class, which shall be paid in a lump sum within one hundred and twenty (120) days after entry of an order subordinating the ViHF Claim.  If the Bankruptcy Court allows the ViHF Claim as a Class 1G Claim, the District shall pay the Allowed Secured Claim of ViHF in full within one hundred and twenty (120) days after entry of an order allowing the Class 1G Claim.

### 3.     Class 2 – Post-Petition Claims

Class 2 consists of the Claims listed in Exhibit 6 of the Plan Exhibits.

#### a.     Impairment and Voting

Class 2 is Impaired by the Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of the holders of Class 2 Claims.  Accordingly, this Class is entitled to vote to accept or reject the Plan in accordance with the Plan Solicitation Order.

611923772.1

**b.      Treatment**

In full satisfaction, release and discharge of the Class 2 Claims, holders of Class 2 Claims shall receive Cash on the Effective Date, or as soon thereafter as practicable, in an amount equal to the amount listed for each respective claimant in Exhibit 6 of the Plan Exhibits.

**4.      Class 3 – General Unsecured Claims**

Class 3 consists of the Claims listed in Exhibit 7 of the Plan Exhibits.[18]

**a.      Impairment and Voting**

Class 3 is Impaired by the Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of the holders of Class 3 Claims. Accordingly, this Class is entitled to vote to accept or reject the Plan in accordance with the Plan Solicitation Order.

**b.      Treatment**

In full satisfaction, release and discharge of the Class 3 Claims, holders of Class 3 Claims shall receive a *pro rata* portion of $100,000.00, which shall be paid as follows: (a) $25,000.00 on December 31, 2019, or as soon thereafter as practicable; (b) $25,000.00 on April 30, 2020; (c) $25,000 on December 31, 2020, or as soon thereafter as practicable; and (d) $25,000 on April 30, 2021, or as soon thereafter as practicable. In addition to the foregoing distributions, holders of Class 3 Claims shall receive a *pro rata* portion of 25% of any recovery, net of fees, costs, and other administrative expenses associated therewith, from the proposed litigation against HCCA, which shall be paid no later than 120 calendar days following recovery thereof.

**c.      Class 4 Election**

Holders of General Unsecured Claims in Class 3 may elect to have their Claim(s) treated as Class 4 Claim(s) by so noting on the Ballot. Any Class 3 Claim electing treatment under Class 4 shall irrevocably forfeit its status as a Class 3 General Unsecured Claim and the holder of such Claim shall be deemed to have accepted payment as a holder of a Claim in Class 4 in full satisfaction, release and discharge of their Claim.

---

[18] Exhibit 7 does not include any estimate(s) on account of the potential General Unsecured Claim of Optum, if any. If the Bankruptcy Court rules that Optum is entitled to an allowed General Unsecured Claim, such Claim shall be entitled to a *pro rata* portion of any distributions to Class 3.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

### 5. Class 4 – Convenience Claims

Class 4 consists of the Claims in an amount of $250.00 or less. A list of all Class 4 Claims is set forth in Exhibit 8 of the Plan Exhibits.

#### a. Impairment and Voting

Class 4 is Impaired by the Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of the holders of Class 4 Claims. Accordingly, this Class is entitled to vote to accept or reject the Plan in accordance with the Plan Solicitation Order.

#### b. Treatment

In full satisfaction, release and discharge of the Class 4 Claims, holders of Class 4 Claims shall receive Cash on the Effective Date, or as soon thereafter as practicable, in an amount equal to the lesser of (a) the amount of their Allowed Class 4 Claims or (b) $100.00.

### B. Treatment of Executory Contracts and Unexpired Leases

#### 1. Generally

The Bankruptcy Code grants debtors, subject to court approval, the power to assume or reject executory contracts and unexpired leases. An "executory contract" generally means a contract under which the obligations of both the District and the other party thereto are so far unperformed that the failure of either party to complete performance would constitute a material breach of the subject agreement, thereby excusing the performance of the other party.

If a debtor rejects an executory contract or unexpired lease, the rejection operates as a prepetition breach of the subject agreement. If an executory contract or unexpired lease is assumed by the debtor, the assumption obligates the debtor to perform under the agreement, and damages arising from any subsequent breach of the agreement are treated as administrative expenses.

#### 2. Assumption of Executory Contracts and Unexpired Leases

Without the need to file any further motions, the District intends to assume and will assume as of the Effective Date all executory contracts and unexpired leases to which it is a party and which was entered into prior to the Petition Date, except (i) for those unexpired leases and

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

- 40 -

611923772.1

1   executory contracts specifically identified in subsection 3 below or (ii) as otherwise provided in

2   the Plan.

3                                   **a.      Cure Payments**

4            To cure any purported default or arrears under the executory contracts and unexpired

5   leases the District plans to assume through the Plan, the District shall make the cure payments

6   identified on Exhibit 9 to the Plan Exhibits.[19]  The Bankruptcy Court shall resolve all disputes

7   regarding: (i) the amount of any cure payment to be made in connection with the assumption of

8   any contract or lease; (ii) the ability of the District to provide "adequate assurance of future

9   performance" within the meaning of section 365 under the contract or lease to be assumed; and

10  (iii) any other matter pertaining to such assumption and assignment.  If any party to an executory

11  contract or unexpired lease that is to be assumed by the District asserts that the proposed cure

12  payment is insufficient or some other performance is required to assume the subject contract or

13  lease, such party shall file with the Bankruptcy Court and serve upon the District a written

14  statement and accompanying declaration in support thereof specifying the basis for its position

15  and accounting for the purported amount owing under the subject contract or lease not later than

16  thirty (30) days **before** the Confirmation Hearing.  The failure to timely file and serve such a

17  statement shall be deemed to be a waiver of any and all objections to the proposed assumption,

18  including, without limitation, any objection pertaining to the adequacy of the proposed cure

19  payment or the adequate of the assurance of prompt cure and/or of future performance.

20                          **b.      Adequate Assurance of Prompt Cure and Future Performance**

21           What constitutes "adequate assurance" is a factual question to be determined on a case-by-

22  case basis with due regard to the nature and identify of the parties, their past dealings, and present

23  commercial realities.  The District need only show that performance is likely (i.e. more probable

24  than not) in order to assume an executory contract or unexpired lease pursuant to section 365.  As

25  reflected in Section VI.C. herein, the District submits that the means for implementation of the

26

27  _____
    [19] If an executory contract or unexpired lease is not identified on Exhibit 9, the District shall not make any cure payment to any party or parties to such agreement as the District does not have any record of any outstanding amount owing under the subject agreement.  The omission of the subject contract or lease, however, shall not in any way affect the assumption of the subject agreement by and through the Plan.

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

- 41 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1　Plan constitute adequate assurance of both its ability to "promptly" cure the payments set forth in

2　Exhibit 9, and for future performance. Moreover, as the total amount of the cure payments is only

3　$99,899.18, which the District intends to pay over a period of eighteen (18) months following the

4　Effective Date, even if one or more of the anticipated sources that will be used to fund the Plan

5　does not materialize, the District will be able to meet the cure obligations set forth in Exhibit 9.

6　　　　　**3.　　　Rejection of Executory Contracts and Unexpired Leases[20]**

7　　　　　Without the need to file any further motions, the District elects to reject and shall be

8　deemed to have rejected as of the Effective Date the following executory contracts and unexpired

9　leases:[21]

10　　　• Master Lease Agreement dated as of November 13, 2012 between the District, as

11　　　　　lessee, and General Electric Capital Corporation, as lessor, and all other leases

12　　　　　based thereon, pertaining to, among other things, a Proteus X Ray XR/a 65W

13　　　　　Radiographic System;

14　　　• Lease dated March 7, 2013 between the District, as lessee, and Thermo Fisher

15　　　　　Financial Services, Inc., as lessor, and/or Bank of the West, as assignee of Thermo

16　　　　　Fisher Financial Services, Inc., pertaining to an Abbott iSTAT 1 Upgrade from

17　　　　　200 Series and related equipment and documentation;

18　　　• Agreement dated October 9, 2014, between the District and Thermo Fisher

19　　　　　Financial Services, Inc., pertaining to a VITROS 350 Chemistry System;

20　　　• Lease between the District, as lessee, and Healthland, Inc., as lessor, pertaining to

21　　　　　certain medical billing hardware and software;

22　　　• Lease No. x005 between the District, as lessee, and Canon Financial Services, as

23　　　　　lessor, pertaining to Canon ImageRunner 1730iF (serial number x4453);

24

25

26　[20] The Management Services Agreement ("**MSA**") by and between the District and HCCA was rejected via
stipulation prior to the preparation and submission of the Plan. *See* D.E. 377. As such, the MSA is not listed in this

27　section. The exclusion of the MSA shall not in any way alter the prior rejection of the MSA or the agreement(s) of
the District and HCCA relation to such rejection.

28　[21] Any reference contained herein to an agreement as a "lease" shall not constitute an admission regarding whether
the subject agreement constitutes "true lease" under applicable law.

611923772.1

1. - Lease No. x006 between the District, as lessee, and Canon Financial Services, as
2. lessor, pertaining to Canon ImageRunner Advance 6255 (serial number x1950);
3. - Lease No. x007 between the District, as lessee, and Canon Financial Services, as
4. lessor, pertaining to Canon ImageRunner 1730iF (serial number x4451);
5. - Lease No. x008 between the District, as lessee, and Canon Financial Services, as
6. lessor, pertaining to IRA 4235 (serial number x1785), IRA 1025iF (serial number
7. x5469), IRA 400iF (serial number x2533), IRA 400iF (serial number x1857), IRA
8. 400iF (serial number x1862), and IR 1730iF (service only) (serial number x5155);
9. - Agreement between the District and Celleration Inc.;
10. - Employment Agreement between the District, as employer, and Dr. Kenneth L.
11. Saeger, as employee;
12. - Employment Agreement between the District, as employer, and Dr. Milton R.
13. Jones, as employee;
14. - Employment Agreement between the District, as employer, and Dr. Steve Chong
15. Luo, as employee;
16. - Service Agreement between the District and Laboratory Specialists International,
17. as service provider;
18. - Lease between the District, as lessee, and Marlin Leasing Corporation, as lessor,
19. pertaining to certain medical equipment, including a Horiba Medial Pentra 60 C+,
20. two Unimac Natural Gas Dryers, and one Ultrascan table;
21. - Agreement between the District and T System, Inc.; and
22. - Agreement between the District and Tosoh Bioscience, Inc.

### a.　Claims Arising from Rejection

Unless otherwise agreed by the District and the counterparty or counterparties to the subject contract or lease, proofs of Claim arising from the rejection of executory contracts or unexpired leases must be filed with the Bankruptcy Court and served on the District no later than thirty (30) days after the Effective Date. The failure to properly and timely assert a rejection damages Claim shall result in such Claim being forever barred and rendered unenforceable

- 43 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

against the District or its assets, properties, or interests in property. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be classified into Class 3 (General Unsecured Claims) and treated accordingly.

**C.    Means for Execution and Implementation of Plan**

Under the Plan, the District shall be required to make Cash disbursements totaling approximately $1,33,071 to the holders of Allowed Claims over a term of approximately seven (7) years while paying an estimated $9,476,530 per year for the costs and expenses associated with maintaining the operations of the District's facilities and services, including, without limitation, costs associated with staffing, supplies and equipment, and capital expenditures for the acquisition of new property and maintenance of current property, which total.

The Plan will be funded utilizing primarily the following sources:

- <u>Cash on Hand</u>. The District estimates that it will have approximately $311,131 in cash on hand on the Effective Date.

- <u>Operations</u>. The District estimates that it will generate approximately $9,754,532 per year from the operations.[22]

- <u>Tax Revenues</u>. The District anticipates receiving approximately $900,000 per year on account on approved tax assessments.

- <u>Parcel Tax Revenues</u>. As set forth in greater detail, *supra*, at Section V.B.2., the District anticipates receiving additional parcel tax revenues of $602,000 per year beginning in December 2018.

- <u>Transient Occupancy Tax</u>. As set forth in greater detail, *supra*, at Section V.B.2., the District anticipates receiving revenues from the Transient Occupancy Tax (TOT) of $34,600 per year.

- <u>Inyo County Treasury Loan</u>. In accordance with its prior practices, the District intends to borrow funds from Inyo County to the extent necessary to cover any cash shortage during the term of the Plan. The District would repay any such loan(s) with interest upon receipt of funds from the Intergovernmental Transfer

---

[22] The estimated operational revenues includes the estimated revenues from the facility for medical infusion services.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

program (described in Exhibit 5 as "Supplemental Funds") or upon the availability of funds. Interest on such loans accrues at the rate of the current Local Agency Investment Fund at the time of financing plus 100 basis points.

- Litigation Proceeds. As discussed *supra*, the District intends to commence litigation against certain individuals and entities. If successfully, the District may obtain damages in excess of $6,000,000 and avoid certain fraudulent and/or preferential payments to creditors. Such funds will be available for the payment of Claims under the Plan and the maintenance of the District's operations.

In sum, the District anticipates having approximately $311,131 in cash on hand on the Effective Date and approximately $10,391,150 in revenues per year. As a result, and as the financial projections (Exhibit 5) reflect, the District is confident it will be able to maintain its operations so that it can continue providing desperately needed medical treatment to the community at large while making the payments required under the Plan.

**D.    Distributions**

**1.    Disbursing Agent**

On and after the Effective Date, the District shall serve as disbursing agent for payments to be made under the Plan and in accordance with section 944. However, the District may elect to retain one or more agents to perform or assist it in making distributions pursuant to the Plan and may provide reasonable compensation to any such agent(s) without further notice or Bankruptcy Court approval.

**2.    Delivery of Distributions**

All distributions to any holder of an Allowed Claim shall be made at the address of such holder as set forth in the books and records of the District or its agents unless (i) the holder has designated an alternate address for payment in a proof of Claim filed with the Bankruptcy Court or (ii) specifies an alternate address on its Ballot. Any and all notifications of address changes should be addressed to Karla Hernandez at Baker & Hostetler LLP, 11601 Wilshire Boulevard, Suite 1400, Los Angeles, California 90024, or khernandez@bakerlaw.com.

611923772.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

### 3. Undeliverable Distributions

*Holding of Undeliverable Distributions.*  If any distribution to a holder of an Allowed Claim is returned to the District or its agent as undeliverable, no further distributions shall be made to such holder unless and until the District is notified in writing of such holder's correct address.  Unless and until the District is so notified, such distribution shall be deemed to be "Unclaimed Property" and shall be set aside and held in a segregated account.

*Notification and Forfeiture of Unclaimed Property.*  On the first anniversary of the Effective Date, the District will file with the Bankruptcy Court a list of Unclaimed Property, together with a schedule that identifies the name and last-known address of the individuals and entities entitled to the Unclaimed Property.  The District shall not otherwise be required to attempt to locate any such individual or entity.  On the second anniversary of the Effective Date, all remaining Unclaimed Property and accrued interest or dividends earned thereon will be remitted to and vest in the District.  Additionally, such individuals and entities shall be deemed to have waived and forfeited their right to any future payments under the Plan and such funds shall be retained by the District.  Notwithstanding the non-payment of any forfeited Claims, such Claims shall be deemed satisfied and discharged as if paid pursuant to the terms of the Plan.

### 4. Distribution of Cash

Any payment of Cash to be made by the District or its agent pursuant to the Plan shall be made by check drawn on a domestic bank or by wire transfer, at the sole option of the District.

### 5. Timeliness of Payments

Any payments or distributions to be made pursuant to the Plan shall be deemed to be timely made if made within fourteen (14) Business Days after the date(s) specified in the Plan. Whenever any distribution to be made under the Plan is due on a day that is not a Business Day, such distribution instead shall be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due.

### 6. Default and Cure

In the event the District fails to make any payment required under the Plan in a timely manner, the affected creditor(s) shall serve the District with a notice of default not later than thirty

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

(30) days after the purported default along with any documentation supporting the alleged default. Not later than sixty (60) days after receipt of the notice of the purported default, the District shall either (i) cure the default or (ii) serve the affected creditor(s) with a statement and supporting documentation contesting the allegation of default. In the event the District contests an alleged default, not later than five (5) Business Days after serving a response to a purported default, the District shall file a motion with the Bankruptcy Court requesting a resolution of the dispute relating to the alleged default and set the motion for hearing on the first available hearing date not sooner than fourteen (14) days after filing the motion. If the Bankruptcy Court rules that the non-payment constitutes an event of default under the Plan, the District shall cure the purported default not later than five (5) Business Days following the entry of a Final Order of the Bankruptcy Court adopting the finding with respect to the purported default.

### 7.    Compliance with Tax Requirements

Any and all distributions pursuant to the Plan shall be subject to any applicable tax withholding and reporting requirements imposed on it by any governmental unit. In connection with each distribution which requires the filing of an information return (such as Internal Revenue Service Form 1099 or 1042) or withholding, the District shall file such information return with the Internal Revenue Service and provide any required statements in connection therewith to the recipients of such distribution, or effect any such withholding and deposit all moneys so withheld to the extent required by law. With respect to any entity from whom a tax identification number, certified tax identification number, or other tax information is required by law to avoid withholding has not been received by the District at the time the district is to be made, the District, at its sole option, may withhold the amount required and distribute the balance to such entity or the District may decline to make such distribution(s) until the information is received.

### 8.    Time Bar to Cash Payments

Checks issued by the District on account of Allowed Claims will be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof. Requests for reissuance of any check shall be submitted in writing to Karla Hernandez via first-class mail addressed to Karla Hernandez, Baker & Hostetler LLP, 11601 Wilshire Boulevard, Suite 1400,

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

Los Angeles, California 90024, or via email addressed to khernandez@bakerlaw.com.  Any request for reissuance of an expired check must be not later than 180 calendar days following the initial issuance of the subject check.  After such date, the amounts stated in the voided check(s) shall be deemed forfeited and the District shall retain such funds.  Any amounts forfeited pursuant to the preceding sentence shall be deemed paid to and received by the subject claimant for purposes of calculating the amounts owing to such creditor under the Plan.

### 9.    No *De Minimis* Distributions

With the exception of Class 4 Claims (Convenience Class Claims), no payment of less than ten dollars (US$10.00) will be made by the District on account of any Allowed Claim.

### 10.    No Distributions on Account of Disputed Claims

Notwithstanding anything to the contrary in the Plan, no distributions shall be made on account of any part of any Disputed Claim or Disallowed Claim unless and until such Claim becomes an Allowed Claim and only to the extent such Claim constitutes an Allowed Claim. Distributions made after the Effective Date with respect to Claims that were not Allowed Claims as of the Effective Date, but are later determined to be Allowed Claims, shall be deemed to have been made on time and in accordance with the terms of the Plan.

If any distributions are made prior to the resolution of a dispute pertaining to a Claim, the portion that would be payable on account of such Claim if such Claim was an Allowed Claim, shall be held in a segregated bank account.  If the Claim is subsequently adjudicated to be an Allowed Claim, the segregated funds shall be distributed to the holder of such Claim.  Any interest accrued on account of the segregated funds shall be paid to and retained by the District.

### 11.    No Post-Petition Date Accrual

Unless otherwise specifically provided in the Plan, specifically agreed to by the District in writing, or allowed by Final Order of the Bankruptcy Court, the District will not be required to pay to any holder of a Claim any interest, penalty or late charge accruing with respect to such Claim on or after the Petition Date.

**E.**     **Disputed Claims; Objections to Claims; Prosecution of Objections to Disputed Claims**

       **1.**     **Claim Objection Deadline; Prosecution of Objections**

The District shall have the right to object to the allowance of Claims with respect to which liability or allowance is disputed in whole or in part.  Unless otherwise ordered by the Bankruptcy Court, the District shall file and serve any such objections to Claims (whether by motion or commencement of an adversary proceeding) by not later than one hundred and eighty (180) days after the Effective Date or, in the case of Claims properly filed after the Effective Date, by not later than one hundred and eighty (180) days after the date of filing of such Claims.

       **2.**     **Reserves, Payments, and Distributions with Respect to Disputed Claims**

At such time as a Disputed Claim becomes an Allowed Claim, in whole or in part, the District or its agent shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan in the manner set forth in the Plan.  Such distributions, if any, shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Claim becomes a Final Order, but in no event more than sixty (60) days thereafter, unless otherwise provided in the Plan, order of the Bankruptcy Court, or agreement between the District and the subject Claim holder.  Unless otherwise specifically provided in the Plan or allowed by Final Order of the Bankruptcy Court, no interest will be paid on Disputed Claims that later become Allowed Claims.

**F.**     **Continuing Jurisdiction of the Bankruptcy Court**

The Plan provides for the Bankruptcy Court to retain jurisdiction over various matters relating to the Chapter 9 Case, the Plan, and other related items.  Readers are encouraged to review the Plan carefully to ascertain the nature of the Bankruptcy Court's continuing jurisdiction following the Effective Date.

**VII.     CONFIRMATION AND EFFECTIVE DATE OF THE PLAN**

**Because the law with respect to confirmation of a plan of adjustment is complex, creditors concerned with issues regarding confirmation of the Plan should consult with**

- 49 -

**independent counsel and/or a financial advisor.** The following discussion is intended solely for the purpose of providing basic information concerning certain confirmation issues. The District cannot and does not represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Bankruptcy Court can confirm the Plan. Some of the requirements discussed in this Disclosure Statement include acceptance of the Plan by the requisite number of creditors and whether the Plan is in the "best interests" of creditors. These requirements, however, are not the only requirements for confirmation and the Bankruptcy Court will not confirm the Plan unless and until it determines that the Plan satisfies all applicable requirements, including requirements which may not be discussed or referenced in this Disclosure Statement

### A. Voting and Right to be Heard at Confirmation

#### 1. Who May Support or Object to Confirmation of the Plan?

Any party in interest may support or object to the confirmation of the Plan. Even parties in interest that may not have a right to vote on the Plan (e.g., individuals and entities in Unimpaired Classes) may still have a right to support or object to confirmation of the Plan by filing pleadings supporting or objecting to confirmation of the Plan.

#### 2. Who May Vote to Accept or Reject the Plan?

A creditor generally has the right to vote for or against the Plan if its Claim is both (i) an Allowed Claim for purposes of voting and (ii) classified in an Impaired Class. Generally, a Claim is deemed allowed if a proof of Claim was timely filed or the Claim is scheduled as undisputed, non-contingent and liquidated; *provided, however*, that if an objection to the Claim has been filed or raised in the Plan or otherwise, or a Claim is otherwise disputed or contested, the claimant cannot vote unless and until the Bankruptcy Court, after notice and a hearing, either overrules the objection or allows the Claim for voting purposes.

The holders of the following types of Claims are not entitled to vote on the Plan: (a) Disallowed Claims; (b) Claims that are subject to a pending objection (whether by way of the Plan or independent motion or adversary proceeding) and that have not been allowed for voting

SECOND AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS

611923772.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

purposes; (c) Claims that are not Impaired under the Plan; (d) Administrative Claims, since such Claims are not placed in Classes and are required to receive specific treatment; and (e) Professional Claims, since such Claims are not placed in Classes.

Each holder of an Allowed Claim classified into one or more of the Voting Classes shall be entitled to vote each such Claim to accept or reject the Plan.

### 3.     Votes Required to Confirm Plan

The Bankruptcy Court cannot confirm the Plan unless, among other things, (a) at least one Impaired Class has accepted the Plan without counting the votes of any Insiders within that Class and (b) either all Impaired Classes have voted to accept the Plan, or the Plan can be "crammed-down" with respect to each and every dissenting Impaired Class.

A Class of Claims is considered to have accepted the Plan when more than one-half in number **and** at least two-thirds in dollar amount of the Claims that actually voted in that Class have voted in favor of the Plan.

### B.     The "Best Interests" Test

The Bankruptcy Court also must determine pursuant to section 943(b)(7) that the Plan is in the "best interests of creditors", which in the chapter 9 context means that the treatment of Claims under the Plan must be better than the only meaningful alternative available, which is dismissal of the Chapter 9 Case. The District submits that the Plan is in the best interests of all creditors because significant payments will be made to all Impaired Classes, and holders of Allowed Claims in all Impaired Classes will receive greater distributions under the Plan than those creditors would receive were the Chapter 9 Case dismissed. *See* Exhibit 5 to Plan Exhibits.

In contrast, in the absence of the Plan, the District's creditors would be left to "fend for themselves." Individual creditor collection actions would likely aggregate, through suits and attachments, to make continued operation of the District's facilities untenable (if not impossible), thus eliminating the ability to pay the obligations of the District. More precisely, but for the adjustment to its obligations proposed through the Plan, the District will not be unable to alter the treatment of certain Claims, including General Unsecured Claims. The District will also lose the benefits afforded to debtors under the Bankruptcy Code, which, in essence, would result in

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

substantial interference in the operations of the Hospital, the SNF, and/or the Clinic as creditors sought to recover collateral and levy against the District's assets to satisfy their Claims, which would prevent the District from utilizing those assets to maintain operations and pay its obligations in an orderly and equitable fashion over a term of years. Furthermore, the District would likely be unable to resolve disputes regarding certain purported Claims (including, without limitation, the Claim asserted by Optum Bank) without the need for costly and protracted litigation—expenses that would further diminish, if not decimate, operational capabilities. As a result of the foregoing, the proposed ballot initiatives underpinning the Plan would likely fail as the District would be unable to maintain its operations or establish a long-term work-out plan for the payment of its obligations in the face of operational difficulties causes by the debt collection efforts of its creditors and the costs of litigation. In short, the District cannot afford to pay its creditors absent the debt relief afforded by the Plan, and dismissal of the Chapter 9 Case would likely result in chaos, the closure of the District's facilities and cessation of its services, and, thus, an inability to not only pay most (if not all) of its creditors, but an inability to continue providing essential services to the community at large.

## C.    Feasibility

To satisfy the requirement set forth in section 943(b)(7) that the Plan be feasible, the District must demonstrate the ability to make the payments required under the Plan while maintaining its operations at the level necessary to the continued viability of the health care district. Based on the District's analysis of operational revenues, anticipated bond revenues, and supplemental tax revenues, as well as the projected Plan distributions, the District is confident it possesses the financial ability to maintain its current operations, which is necessary to continue providing services to the community, while simultaneously meeting its obligations under the Plan. Indeed, based on the financial projections (*see* Exhibit 5), the District will be able to maintain a positive cash position while servicing operational and Plan debts and simultaneously maintaining a reserve for future expenditures, including capital expenditures. Accordingly, the District submits that the Plan is feasible.

SECOND AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS

611923772.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

### D. "Cramdown"

The Bankruptcy Code provides that the Bankruptcy Court may confirm a plan of adjustment that is not accepted by all Impaired Classes if at least one Impaired Class of Claims accepts the Plan and the so-called "cramdown" provisions set forth in sections 1129(b)(1), (b)(2)(A) and (b)(2)(B) are satisfied. The Plan may be confirmed under the cramdown provisions if, in addition to satisfying the other requirements of section 943(b), it (a) is "fair and equitable," and (b) does not discriminate unfairly with respect to each Class of Claims that is Impaired under and has not accepted the Plan. The District believes that the Plan satisfies the foregoing requirements and, as such, may be confirmed over the objection of any dissenting Class of Claims.

**As noted above, the District has reserved the right to request that the Bankruptcy Court confirm the Plan by "cramdown" in accordance with sections 1129(b)(1), (b)(2)(A) and (b)(2)(B).**

### E. Conditions Precedent

#### 1. Condition Precedent to Confirmation

The Plan shall not be confirmed unless and until the following conditions precedent have been satisfied or waived: (1) the Plan satisfies the requirements of section 943(b) of the Bankruptcy Code, as applicable; (2) the District has received any and all authorizations, consents, regulatory approvals, rulings, no-action letters, opinions, and documents that are necessary to implement the Plan and that are required by law, regulation or order, including, but not limited to, those required under section 943(b)(6) of the Bankruptcy Code; and (3) the Bankruptcy Court enters a Confirmation Order in a form and substance satisfactory to the District.

#### 2. Conditions Precedent to Effective Date

The Plan will not become effective and operative unless and until the Effective Date occurs. Section XIII of the Plan sets forth certain conditions to the occurrence of the Effective Date. The Effective Date will occur on the first Business Day after which the conditions set forth in Section XIII.B. of the Plan are satisfied or waived. Based on currently available information, the District anticipates that the Effective Date will occur in or about March 2018.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

611923772.1

### 3. Non-Occurrence of Effective Date

The Plan provides that, if the Bankruptcy Court confirms the Plan but the conditions precedent to the Effective Date thereof are not satisfied, upon notification submitted by the District to the Bankruptcy Court: (i) the Confirmation Order shall be vacated, (ii) no distributions under the Plan shall be made, (iii) the District and all holders of Claims shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iv) all of the District's obligations with respect to the Claims shall remain unchanged and nothing contained herein or in the Plan shall be deemed to constitute a waiver or release of any Claims by or against the District or any other entity or to prejudice in any manner the rights, remedies, or claims of the District or any entity in any further proceeding involving the District.

### 4. Waiver of Conditions Precedent to Effective Date

Under the Plan, the District may waive in whole or in part any condition to the Effective Date of the Plan or the payment of any Effective Date Payments. Any such waiver of a condition may be effected at any time, without notice or leave or order of the Bankruptcy Court and without any formal action, other than the filing of a notice of such waiver with the Bankruptcy Court.

### F. Effect of Confirmation

Confirmation of the Plan and the occurrence of the Effective Date will have a number of important and binding effects, some of which are summarized below. Readers are encouraged to review Section XI of the Plan carefully and in its entirety to assess the various consequences of confirmation of the Plan.

### 1. Dissolution of the Committee

On the Effective Date, the Committee shall be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to and arising from and in connection with the Chapter 9 Case and the Committee shall be deemed dissolved and its appointment terminated. Any professionals retained by the Committee and/or the members thereof shall not be entitled to compensation or reimbursement of expenses for any services rendered or expenses incurred.

611923772.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

## 2. Discharge of the District

Pursuant to section 944, upon completion of all payments required under the Plan, the District shall be discharged from all debts (as defined in the Bankruptcy Code) of the District and Claims against the District other than (i) any debt specifically and expressly excepted from discharge by the Plan or the Confirmation Order and (ii) any debt owed to an entity that, before the confirmation of the Plan, had neither notice nor actual knowledge of the Chapter 9 Case.

The rights afforded in the Plan and the treatment of all holders of Claims, whether Impaired or Unimpaired, shall be in exchange for and in complete satisfaction, discharge and release of all Claims of any nature whatsoever arising on or before the Effective Date, known or unknown, including any interest accrued or expenses incurred thereon from and after the Petition Date, whether against the District or any of its properties, assets or interests in property.

## 3. Injunction

Except as otherwise expressly provided in the Plan, all entities who have held, hold or may hold Pre-Confirmation Date Claims shall be permanently enjoined from and after the Confirmation Date from: (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Pre-Confirmation Date Claims against the District or its property; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree or order against the District or its property with respect to such Pre-Confirmation Date Claims; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against the District or its property; and (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due to the District with respect to any such Pre-Confirmation Date Claims.

## 4. Term of Existing Injunctions and Stays

Unless otherwise provided in the Plan, all injunctions or stays provided for in the Chapter 9 Case pursuant to sections 105, 362, or 922, or otherwise, and in existence immediately prior to the Confirmation Date, shall remain in full force and effect unless and until the District receives a discharge in accordance with Section XI.A. of the Plan.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

611923772.1

1

## 5.    Exculpation

Except with respect to obligations specifically arising pursuant to or preserved in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Claim, obligation, cause of action or liability for any Claim in connection with or arising prior to or on the Effective Date for any act taken in connection with, or related to, (i) the administration of the Chapter 9 Case, (ii) the negotiations, pursuit, confirmation, solicitation of votes for, consummation or implementation of the Plan, (iii) the administration of the Plan or property to be distributed under the Plan, (iv) the Cal. Gov't Code § 53760 process or compliance therewith, (v) any document, release, contract, or other instrument entered into in connection with, or related to, the Plan, and/or (vi) any other transaction contemplated by or entered into in connection with the Plan or entered into during the administration of the Chapter 9 Case; *provided*, *however*, that nothing shall be deemed to release or exculpate any Exculpated Party for its willful misconduct or gross negligence. In all respects, each Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities pursuant to the Plan.

## 6.    Good Faith Compromise

In consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan, including, without limitation, the exculpation provisions, constitute a good faith compromise and settlement of all Claims, causes of action and/or controversies relating to any and all rights that a holder of a Claim may have against the District, any distributions to be made pursuant to the Plan on account of any such Claim, and any and all Claims and causes of action of any party. The entry of the Confirmation Order constitutes the Bankruptcy Court's approval, effective as of the Effective Date, of the compromise or settlement of all such Claims and/or controversies and the Bankruptcy Court's finding that all such compromises or settlements are in the best interests of the District and the holders of Claims, and are fair, equitable, and reasonable.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

611923772.1

## VIII.    RESERVATION OF RIGHTS OF ACTION

Any and all claims, causes of action, rights of recovery, rights of offset, rights of recoupment, rights to refunds, and similar rights held by the District shall be retained by the District, including, without limitation, the claims and causes of action alleged in the Optum Adversary.  The failure to identify any potential or existing Right of Action retained by the District is not intended to and shall not limit the rights of the District to pursue any such action(s).  Unless a Right of Action is expressly waived, relinquished, released, compromised, or settled (in the Plan or otherwise), the District expressly reserves all Rights of Action for later adjudication and, as a result, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Rights of Action upon or after the Confirmation Date.  In addition, the District expressly reserves the right to pursue or adopt against any other entity any claims alleged in any lawsuit in which the District is a defendant or an interested party.

## IX.    RISK FACTORS

Holders of Claims against the District should read and consider carefully the factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered with this Disclosure Statement and/or incorporated by reference, prior to voting to accept or reject the Plan.  These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.

As discussed herein, the Plan is premised on revenues from four principal sources—namely, (i) operational revenues, (ii) revenues derived from the increased parcel tax, and (iii) revenues derived from the TOT.

1.    With respect to the provision of medical infusion treatments, the District has yet to establish the facility or provide the services; accordingly, there is a risk that the costs of acquiring the necessary equipment and establishing the treatment facility may exceed the cost estimates, that the facility may take longer than nine (9) months to establish, that the operational expenses may exceed the estimated costs,

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

and/or that the demand for such services may be less than the projected demand—thereby reducing the anticipated revenues.

2. With respect to the parcel tax revenues, the District requires voter approval for the parcel tax initiative; accordingly, there is a risk that voters will not approve the parcel tax increase. Notwithstanding, as the Effective Date is expressly conditioned upon the approval of the parcel tax initiative, such approval is not a risk factor in considering the District's ability to perform under the Plan; however, the approval of the parcel tax initiative is a risk factor in considering whether the Effective Date will occur.

3. With respect to the TOT revenues, the District requires approval from the Inyo County Board of Supervisors to receive a portion of the TOT; accordingly, there is a risk that Board will not approve the TOT increase. Notwithstanding, as the Effective Date is expressly conditioned upon the approval of the TOT initiative, such approval is not a risk factor in considering the District's ability to perform under the Plan; however, the approval of the TOT initiative is a risk factor in considering whether the Effective Date will occur.

4. With respect to potential litigation revenues, the District may not prevail in the potential litigation described herein. If the District is unsuccessful, the District may not receive the potential damages awards or may be required to pay certain sums to creditors, including, without limitation, Optum and ViHF. The District, however, does not require the potential damages awards to perform under the Plan and, moreover, has provided for the contingency that the Claims of Optum and/or ViHF are adjudged to be Allowed Secured Claims.

5. The Plan also relies upon operational revenues from the Hospital, the SNF, and the Clinic to fund operations and pay Allowed Claims under the Plan. As such, there are several risks related to the District's operations that may affect the Plan, including the following:

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

611923772.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

a.   The demand for medical services in Inyo County may decline and, thus, decrease revenues;

b.   Reimbursement from insurance companies and governmental programs (e.g., Medicare and MediCal) may decrease and, thus, decrease revenues; and

c.   Costs associated with operating the business (e.g., payroll, medicine, equipment, medical supplies, utilities, etc.) may increase and, thereby, decrease net revenues.

There is also a risk that the amount of the Allowed Claims may be greater than currently estimated, in which case distributions to creditors may be reduced.

## X.    FEDERAL INCOME TAX CONSEQUENCES

The implementation of the Plan may have federal, state, local and foreign tax consequences to the District and its creditors. No tax opinion has been sought or will be obtained with respect to any tax consequences of the Plan. This Disclosure Statement does not constitute and is not intended to constitute either a tax opinion or tax advice to any person, and the summary contained herein is provided for informational purposes only. However, because the District is a municipality and, thus, is treated as a political subdivision of the State of California for federal income tax purposes, the District believes that it will not be subject to any federal income tax liability from the implementation of the Plan.

As individual circumstances may differ, and the income tax consequences of a chapter 9 case are complex and uncertain, this summary does not address the federal income tax consequences that may be relevant to the creditors of the District as a result of the Plan. Accordingly, creditors should consult with their own tax advisors regarding the potential income tax consequences of the Plan as it pertains to them.

**To ensure compliance with requirements imposed by the Internal Revenue Service, you are hereby notified that any discussion of tax matters contained herein (including any attachments) is not intended or written to be used by any taxpayer, and cannot be used by any taxpayer, for the purpose of avoiding tax-related penalties that otherwise may be**

611923772.1

imposed under the Internal Revenue Code on the taxpayer. Such discussion of tax matters was written in connection with the solicitation of votes in favor of the Plan. The District and its creditors should seek tax advice regarding the tax consequences to them of the Plan based on their particular circumstances from an independent tax advisor.

## XI.    RECOMMENDATION AND CONCLUSION

The District believes that confirmation and implementation of the Plan represents the best option for the District and its creditors. Accordingly, **the District urges holders of Impaired Claims to vote to accept the Plan by so indicating on their Ballots and returning them as specified in this Disclosure Statement and on their Ballots.**

Dated:     January 17, 2018            SOUTHERN INYO HEALTHCARE DISTRICT

By:     /s/ Mark Lacey [signature to follow]
        Mark Lacey

Vice President of the Board of Directors for Southern Inyo Healthcare District

Submitted by:

**BAKER & HOSTETLER LLP**

By:     /s/ Michael T. Delaney
        Ashley M. McDow
        Michael T. Delaney

Attorneys for Debtor,
SOUTHERN INYO HEALTHCARE DISTRICT

SECOND AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS

611923772.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES