**#8**

SAMUEL R. MAIZEL (Bar. No. 189301)
samuel.maizel@dentons.com
DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, CA 90017-5704
Telephone:    (213) 623 9300
Facsimile:    (213) 623 9924

GARY W. MARSH
gary.marsh@dentons.com
DENTONS US LLP
303 Peachtree St., NE, Suite 5300
Atlanta, GA 30308
Telephone:  (404) 527-4000
Facsimile:  (404) 527-4198

Special Counsel to the Debtor

## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

## FRESNO DIVISION

| | |
|---|---|
| In re: | Case No.: 2016-10015 |
| SOUTHERN INYO HEALTHCARE DISTRICT, | Chapter 9 |
| | DC No.: KDG-1 |
| Debtor. | **DECLARATION OF JAQUE HICKMAN IN SUPPORT OF DEBTOR'S OPPOSITION TO REQUEST FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM OF HEALTHCARE CONGLOMERATE ASSOCIATES, LLC ARISING OUT OF REJECTION OF EXECUTORY CONTRACT (11 U.S.C. §§ 503(b) AND 507(a)(2))** |
| | <u>Hearing:</u><br>Date:  TBD<br>Time:  TBD<br>Place:  TBD |

106520249\V-4

I, Jaque Hickman, hereby declare:

1.      I am at least 18 years of age. I am the President of the board of directors of the Southern Inyo Healthcare District. I submit this declaration in support of the contemporaneously filed *Debtor's Opposition to Request for Payment of Administrative Expense Claim of Healthcare Conglomerate Associates, LLC Arising out of Rejection of Executory Contract (11 U.S.C. §§ 503(b) and 507(a)(2))* (the "Opposition"). Unless otherwise defined herein, all capitalized terms and phrases have the same meaning ascribed to them in the Opposition.

2.      Unless otherwise stated, I have personal knowledge of the matters set forth herein and if called as a witness, could and would competently testify to the same.

3.      The District is a special district formed under the California Local Healthcare District Law, Cal. Health and Safety Code § 32000, *et seq.*, located in Lone Pine, California. As of the commencement of the Chapter 9 Case, the District owned and operated an emergency room, an acute care inpatient facility with four (4) beds, a skilled nursing facility with thirty-three (33) beds, and an out-patient medical clinic (collectively, the "Facilities").

4.      On or about January 2, 2016, the Debtor and HCCA entered into the Management Agreement. Pursuant to the Management Agreement, HCCA's contractual duties included, but were not limited to: (a) financial and operating system management; (b) preparation of proposed annual budgets; (c) purchasing; (d) contracting support and relationship management; (e) recruitment of personnel; and (f) supervision of the day-to-day operations of the Facilities.

5.      Throughout the entire term of the Management Agreement, HCCA failed to adequately perform its duties as discussed in detail below. In general, HCCA provided grossly deficient on-site management, failed to manage and collect the accounts receivable, entered into non-beneficial contracts on behalf of the District, hired improper personnel for various employee vacancies, and caused non-compliance with a number of state regulatory requirements.

- 2 -

106520249\V-4

6.    As a result of HCCA's failure to adequately perform under the Management Agreement, on or about October 11, 2017, the District held a special board meeting, where the District Board determined that it had no choice but to reject and terminate the Management Agreement and remove HCCA from the operations of the Facilities to protect the interests of the District and its creditors, as well as the health, safety and welfare of the community served by the District.

7.    HCCA's ineffective management services did not benefit the District as contemplated by the Management Agreement because HCCA failed to perform or ineffectively performed numerous duties under the Management Agreement.

8.    HCCA provided grossly deficient on-site management. Despite contractual obligation for on-site management, HCCA personnel were almost never on site, and the Administrator's office was empty 90% of the time. HCCA brought over personnel from HCCA headquarters, whose services were sporadic and ineffective. The HCCA personnel did not stay on site and would drop off suggestions at the Facilities then leave. In addition, HCCA did not provide any team building, training, or follow-up for employees.

9.    HCCA hired ineffective and inappropriate personnel that were very costly to the District. Instead of providing administration personnel included as part of the HCCA monthly management fee pursuant to the Management Agreement, HCCA contracted administration personnel and included them on the District's payroll. In addition, Employee vacancies were primarily filled by travelers or temporary assignments by HCCA employees, which included the requirement of providing housing. As a result, housing costs for employees increased, and in most cases, housing bills were not paid. In contrast, HCCA did not invest any money in providing job opportunities for local employees, as HCCA deemed it too expensive to advertise in the local papers, or on radio.

106520249\V-4

10.     HCCA was highly unresponsive to vendors, the District Board, and the District's attorneys and financial consultants. HCCA personnel often failed to take or return calls to vendors. The lack of response from HCCA to vendors demanding payment for services led to potential and actual disruption of hospital services. In addition, HCCA failed to timely respond to requests for a disclosure statement and cash flow projections made by Baker & Hostetler and Force 10 (the Chapter 9 financial consultant), despite numerous emails being sent outlining the District's frustration in information not being provided.

11.     HCCA mismanaged important financial information of the District. HCCA never completed accounts receivable statements, financial statements, cost reports, audits, or budgets. HCCA also never presented this financial information to the Board or public despite the Board's repeated requests. HCCA did not produce the required audited financials for the 2015–2016 and 2016–2017 years. HCCA did not manage or oversee billing software conversion from Healthland to Medworx; and as a result, accurate accounts receivable information was not available, leading to an overstated and inaccurate accounts receivable in the millions of dollars.

12.     HCCA also mismanaged assets of the District. HCCA illegally transferred monies from the skilled nursing facility resident fund on April 11, 2017. HCCA transferred $11,000 from a patient trust account to the general account, then transferred $11,000 to the payroll account. HCCA did not return the funds to the patient trust account until August 31, 2017.

13.     HCCA did not make a necessary intergovernmental transfer to the State of California. A portion of the funding for the District's operations is derived from state and federal supplemental programs. To receive the maximum amount of funding, the District is required to provide an intergovernmental transfer of ("IGT") funds to the State of California. The District generates in excess of $1,000,000.00 per year from these IGT payments. HCCA failed to make an

- 4 -

106520249\V-4

IGT payment on behalf of the District in or about September 2017, costing the District more than $300,000 in additional funds.

14.     HCCA failed to provide necessary financial information to the District Board. HCCA made several unauthorized transfers between the District and the Tulare Local Healthcare District ("Tulare"), another California healthcare district managed by HCCA. The Board did not know monies flowed back and forth between the District and Tulare except to be told that the IGT money came from Tulare because it had to come from a government agency. Supplies came into the District from Tulare, but there was supposed to be an accounting entry that would reflect them as a vendor. This does not seem to be the case since no financials were ever presented. The Board did not know any checks were ever written to Tulare or HCCA, with the exception of the IGT reimbursement.

15.     Instead of working the accounts receivable, HCCA extended the District's line of credit beyond the agreed to amount without the District Board's consent or knowledge. The District Board agreed to a $500,000.00 line of credit with HCCA. However, HCCA extended the line of credit to $800,000.00 before the Board was aware of the sum. After learning of the extended line of credit, the Board sent a letter of complaint to HCCA in August 2017 regarding the extended line of credit. Upon receipt of the letter, HCCA immediately demanded collateralizing the line of credit. Also after receiving the letter, HCCA missed an IGT payment and paid a payroll late. The Board believes that these actions by HCCA were to coerce the District to collateralize the line of credit, which the Board agreed to do under duress.

16.     HCCA failed to make necessary payments to vendors and servicers. For example, HCCA did not pay a contracted education vendor (Relias Learning), which led to the Facilities not meeting requirements for initial staff education and annual re-training. In addition, HCCA did not pay or communicate with Petrak and Associates. Petrak and Associates were hired to oversee

- 5 -

Medicare and Medi-Cal cost report preparation. As a result of HCCA's failure to communicate and pay Petrak and Associates, cost reports necessary to receive Medicare and Medi-Cal reimbursements were not completed in a timely manner, which led to financial withholds. When the District contacted Petrak and Associates, Derek Petrak stated that he had essentially dismissed the District as a client and was not going to do any further work for it due to lack of payment and communication.

17.    HCCA entered into multiple contracts on behalf of the District that contained unsuitable contract terms, were not beneficial to the District, and were not properly or thoroughly explained to the District Board prior to their execution. Examples of such non-beneficial contracts include: (a) the HealthTalent Solutions contract for revenue cycle management and business office management services; (b) the Medsphere contract for IT management services; and (c) the Sharonda Brown contract hiring Sharonda Brown as Interim Chief Nursing Officer and Associate Administrator. For many of the contracts entered into by HCCA on behalf of the District, the terms were onerous and not reflective of best business practices. In addition, HCCA committed the District to subcontractors, who were brought in without notice and were usually not paid. Such subcontractors were usually presented as part of the HCCA team as if the management fee would cover the cost but they were billed to the District instead. When the subcontractors were not paid, they became part of a growing list of accounts payable vendors.

18.    HCCA entered into contracts for needed services in haste without any due diligence and only in response to repeated statements of need by the Board or other personnel. For example, HCCA contracted HealthTalent Solutions to provide revenue cycle management and business office management services only after a fierce expression of dissatisfaction by the Board regarding lack of accounts receivable collections, and ultimately, HealthTalent Solutions did not provide adequate services to the District.

- 6 -

106520249\V-4

19.     As another example of an onerous contract, the Medsphere contract ($28,800 per month) has never worked to produce revenue. HCCA contracted Medsphere to provide IT management services, including electronic medical records oversight, help desk support, and training. HCCA did not provide the personnel, financial information, or training to make the Medsphere contract worthwhile. From August 2016 to date, the payments on the Medsphere contract have provided no benefit to the District. The total cost of the Medsphere contract to the District is undetermined at this time.

20.     HCCA's mismanagement led to failures to comply with numerous regulatory requirements. HCCA's management failures that resulted in regulatory non-compliance include, but are not limited to, the following: (a) HCCA failed to insure the necessary medical committees were formed and functioned; (b) HCCA failed to respond to the California Department of Public Health ("CDPH") and did not follow through on corrections after state inspections; (c) HCCA did not form a psychotropic team as required by the DP SNF Survey of April 6, 2017; (d) HCCA did not provide an Infection Control Coordinator (ICC) to complete quarterly Quality Assurance (QA) on infection control, and there was no ICC identified or quarterly QA meeting or reporting; (e) HCCA failed to respond and provide a signature to complete the hospital drug room certification pursuant to state regulations, which led to the drug room permit expiring and a citation from the State Board of Pharmacy and CDPH Licensure; (f) HCCA did not create a Pharmacy and Therapeutics Committee for one and a half years as required by state regulation and District policy, leading to an unsafe medication environment and citations from the CDPH Licensure; (g) HCCA failed to insure there was an organized medical staff as outlined in state regulations, leading to even more state citations; and (h) HCCA did not have a defined admission criteria pursuant to state regulations, leading to numerous citations form the CDPH Licensure.

106520249\V-4

21.     As a result of HCCA's mismanagement, the District was forced to hire a CFO to replace the CRO hired by HCCA. The current CFO is still struggling to figure out the accurate financial condition of District. The CFO had to go back to the beginning of the Management Agreement term to validate financial information and create financial statements to meet federal, state, cost report, and other requirements. HCCA's mismanagement of revenue cycle operations led to missing approximately $1.5 million in net revenue for FYE 2017.

22.     The Travel Expenses claimed by HCCA are unreasonable and did not benefit the District. Because HCCA management was not on site at the Facilities, HCCA incurred significant expenses travelling to the Facilities. The Travel Expenses are even more unreasonable given the fact that HCCA always travelled to the Facilities using an expensive, private jet.

23.     In sum, the District believes that the damages caused by HCCA's mismanagement exceed the amount that HCCA claims as an administrative expense claim.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22 day of February, 2018, at Lone Pine, California.

Jaque Hickman

106520249\V-4