Ashley M. McDow (245114)
Fahim Farivar (252153)
**FOLEY & LARDNER LLP**
555 S. Flower St. #3500
Los Angeles, CA 90071
Telephone: 213.972.4500
Facsimile: 213.486.0065
Email: amcdow@foley.com
ffarivar@foley.com

Attorneys for Debtor,
SOUTHERN INYO HEALTHCARE DISTRICT

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

### FRESNO DIVISION

| | |
|---|---|
| In re<br><br>SOUTHERN INYO HEALTHCARE DISTRICT,<br><br>Debtor. | Case No.: 2016-10015<br><br>Chapter 9<br><br>FL-2<br><br>**CHAPTER 9 STATUS REPORT**<br><br>Status Conference:<br>Date: May 30, 2018<br>Time: 1:30 p.m.<br>Place: Dept. A, Ctrm 11<br>U.S. Bankruptcy Court<br>2500 Tulare Street<br>Fresno, CA 93721 |

| | | | |
|---|---|---|---|
| I. | BANKRUPTCY CASE | | 2 |
| | A. | Petition and Schedules | 2 |
| | B. | Appointment of Patient Care Ombudsman | 2 |
| | C. | Adequate Assurance Stipulations And Orders Thereon | 5 |
| | D. | Executory Contracts/Unexpired Leases | 6 |
| | | 1. BETA Risk Management Authority | 6 |
| | | 2. Everbank Commercial Finance, Inc. | 6 |
| | | 3. Healthcare Conglomerate Associates, LLC | 6 |
| | E. | Relief from Stay | 7 |
| | F. | Case Administration | 8 |
| | | 1. Licensure | 8 |
| | | 2. Termination of HCCA/Imposition of New Management | 8 |
| | | 3. Financial Advisory Firm | 9 |
| | G. | Claims Administration | 9 |
| | | 1. Tulare Regional Medical Center | 9 |
| | | 2. Healthcare Conglomerate Associates, LLC | 9 |
| | H. | Pending and Prior Litigation | 10 |
| | | 1. The Anderson, Craneware and Perez Litigation | 10 |
| | | 2. The California Department of Public Health Litigation | 11 |
| | | 3. The Optum Bank Litigation | 11 |
| | | 4. The HCCA/VI Healthcare Litigation | 12 |
| II. | MEDIATION | | 12 |
| III. | SECTION 923 NOTICE | | 12 |
| IV. | PLAN OF READJUSTMENT | | 12 |
| | A. | Potential Funding Sources For Third Amended Plan and Third Amended Disclosure Statement | 14 |
| | | 1. Measure J | 14 |
| | | 2. Contract For Outpatient Lab Services. | 15 |

| | 3. | Settlement With Los Angeles Department of Water and Power: ............. 15 |
|---|---|---|
| | 4. | Citizens' Initiative ................................................................................... 15 |
| | 5. | Real And Personal Property Assessment Pursuant to California Health and Safety Code 32200 ............................................................................ 16 |
| | 6. | Sales Tax Increase. ..................................................................................... 16 |
| | 7. | Accounts Receivable Financing and/or Factoring ................................... 16 |
| V. | CONCLUSION ...................................................................................................... 17 |

SOUTHERN INYO HEALTHCARE DISTRICT ("SIHD" or the "Debtor"), the debtor in the above-captioned bankruptcy case (the "Bankruptcy Case"), respectfully submits the within *Chapter 9 Status Report*.

## I. BANKRUPTCY CASE

### A. Petition and Schedules

On January 4, 2016, SIHD commenced the instant Bankruptcy Case by filing a voluntary petition for relief (the "Petition") under chapter 9 of title 11 of the United States Code (the "Bankruptcy Code").

On or about January 19, 2016, the Debtor filed its schedules and statement of financial affairs. On or about February 5, 2016, the Debtor filed an amended summary of schedules as well as amended versions of Schedule D, Schedule E and Schedule F. On or about February 9, 2016, the Debtor filed an amended version of Schedule G. On or about March 3, 2016, the Debtor filed a second amended version of Schedule G.

On or about July 12, 2016, the Court entered an *Order for Relief under Chapter 9* in the Bankruptcy Case.

### B. Appointment of Patient Care Ombudsman

On or about January 6, 2016, the Court issued the *Order to Appear and Show Cause Why a Patient Care Ombudsman Should Not Be Appointed*. On or about January 25, 2016, SIHD filed the *Debtor's Motion to Excuse the Appointment of a Patient Care Ombudsman*. On or about February 3, 2016, the Debtor filed the *Declaration of Colleen Wilson, Chief Nursing Officer, in Support of the Motion to Excuse the Appointment of a Patient Care Ombudsman*. A hearing to consider the appointment of a patient care ombudsman was held on February 10, 2016, at 1:30 p.m. On or about February 16, 2016, the Court entered an order denying the *Debtor's Motion to Excuse the Appointment of a Patient Care Ombudsman*. On or about February 17, 2016, the Court entered an order directing the appointment of a patient care ombudsman. On or about March 4, 2016, the Office of the United States Trustee filed a notice regarding the appointment of Joseph Rodriquez as patient care ombudsman (the "Ombudsman").

On or about April 8, 2016, the Ombudsman filed the *First Report of the Patient Care Ombudsman*, which indicated, among other things, that no complaints had been made regarding the services provided by the Debtor. Accordingly, the Ombudsman had no recommendations for the Court.

On or about June 7, 2016, the Ombudsman filed the *Second Report of the Patient Care Ombudsman*, which indicated, among other things, that patients were comfortable and receiving adequate care. Accordingly, the Ombudsman had no recommendations for the Court.

On or about August 5, 2016, the Ombudsman filed the *Third Report of the Patient Care Ombudsman*, which indicated, among other things, that patients were comfortable and presented no complaints regarding the facility or the treatment they were receiving. Accordingly, the Ombudsman had no recommendations for the Court.

On or about October 4, 2016, the Ombudsman filed the *Fourth Report of the Patient Care Ombudsman*, which indicated, among other things, that patients were comfortable and presented no complaints regarding the facility or the treatment they were receiving. Additionally, the Ombudsman did not note any issues with the operations of the facility and, thus, had no recommendations for the Court.

On or about December 2, 2016, the Ombudsman filed the *Fifth Report of the Patient Care Ombudsman*, which indicated, among other things, that the patients were comfortable and that SIHD expeditiously addressed the few minor issues that had arisen. Accordingly, the Ombudsman had no recommendations for the Court.

On or about January 31, 2017, the Ombudsman filed the *Sixth Report of the Patient Care Ombudsman*, which indicated, among other things, that the facility appeared to be clean, patients were comfortable and that SIHD had expeditiously addressed and/or was working to resolve the few minor issues that had arisen. Accordingly, the Ombudsman had no recommendations for the Court.

On or about March 28, 2017, the Ombudsman filed the *Seventh Report of the Patient Care Ombudsman*, which indicated, among other things, that the patients were comfortable and satisfied with the services, the facility staff assisted residents routinely with daily activities, and

1  that SIHD had expeditiously addressed a minor complaint that had arisen. Accordingly, the
2  Ombudsman had no recommendations for the Court.
3      On or about May 19, 2017, the Ombudsman filed the *Eighth Report of the Patient Care*
4  *Ombudsman*, which indicated, among other things, that the facility appeared to be clean, patients
5  were comfortable and that SIHD had expeditiously addressed and/or was working to resolve the
6  minor issues that had arisen. Accordingly, the Ombudsman had no recommendations for the
7  Court.
8      On or about July 12, 2017, the Ombudsman filed the *Ninth Report of the Patient Care*
9  *Ombudsman*, which indicated, among other things, that the facility appeared to be clean, and
10  patients were comfortable. The report also noted that SIHD had expeditiously addressed the
11  minor issues that had arisen. Accordingly, the Ombudsman had no recommendations for the
12  Court.
13      On or about September 8, 2017, the Ombudsman filed the *Tenth Report of the Patient*
14  *Care Ombudsman*, which indicated, among other things, that the facility appeared to be clean,
15  residents appeared clean and were appropriately dressed for the time of year and day, and menus
16  were posted and residents reported being satisfied with their choices. The Ombudsman had no
17  recommendations for the Court.
18      On or about November 3, 2017, the Ombudsman filed the *Eleventh Report of the Patient*
19  *Care Ombudsman*, which indicated, among other things, that the local ombudsman program had
20  not received any concerns involving vendors, utilities, or external support factors that might
21  impact resident care. With respect to the one minor complaint that was received during the
22  relevant period, the Ombudsman noted that the resident reported that the matter had been resolved
23  when he met with him. The Ombudsman had no recommendations for the Court.
24      On or about January 2, 2018, the Ombudsman filed the *Twelfth Report of the Patient Care*
25  *Ombudsman*, which indicated, among other things, that the local ombudsman program had not
26  received any concerns involving vendors, utilities, or external support factors that might impact
27  resident care and several of the residents had indicated that they were comfortable and had no
28

1 complaints. The report also noted that the minor issues that had arisen during the relevant period
2 had been addressed. Accordingly, the Ombudsman had no recommendations for the Court.

On or about March 2, 2018, the Ombudsman filed the *Thirteenth Report of the Patient Care Ombudsman*, which indicated, among other things, that the local ombudsman program had not received any concerns involving vendors, utilities, or external support factors that might impact resident care. the facility appeared to be clean, and patients were comfortable. The report also noted that SIHD had addressed the issues that had arisen, and with respect to the one matter that the Ombudsman had reported to the California Department of Public Health ("CDPH"), the CDPH notified the Ombudsman that the allegations were unsubstantiated. Accordingly, the Ombudsman had no recommendations for the Court.

On or about May 1, 2018, the Ombudsman filed the *Fourteenth Report of the Patient Care Ombudsman*, which indicated, among other things, that the local ombudsman program had not received any concerns involving vendors, utilities, or external support factors that might impact resident care, and the Ombudsman noted that the facility appeared to be clean, residents appeared clean and were appropriately dressed for the time of year and day, and menus were posted and residents reported being satisfied with their choices  The report also noted that SIHD had addressed the two issues that had arisen, and that the parent of one of the residents who had lodged a complaint with SIHD advised that she was comfortable with the steps the facility had taken to ensure the safety of her parent.

### C. Adequate Assurance Stipulations And Orders Thereon

SIHD negotiated stipulations regarding the provision of adequate assurances pursuant to 11 U.S.C. §366 with the following utility providers: (a) the Los Angeles Department of Water and Power ("LADWP"); (b) Preferred Septic and Disposal; (c) Eastern Sierra Propane; (d) Thomas Petroleum; (e) California Broadband; (f) ATI Medical Waste Management; (g) the County of Inyo Town and Water Systems; and (h) Bishop Welding. The Court subsequently entered orders approving the foregoing stipulations.

4821-1796-7195.1

### D. Executory Contracts/Unexpired Leases

#### 1. BETA Risk Management Authority

On or about March 17, 2016, SIHD and BETA Risk Management Authority ("BETA") entered into a stipulation to assume certain insurance agreements by and between SIHD and BETA. On or about March 22, 2016, the Court entered an order approving the stipulation between SIHD and BETA and the assumption of the subject agreements.

#### 2. Everbank Commercial Finance, Inc.

SIHD rejected an unexpired lease/executory contract with Everbank Commercial Finance, Inc. ("Everbank") for certain medical equipment (the "Everbank Agreement"). Following the rejection of the Everbank Agreement, SIHD agreed to purchase the equipment subject thereto. On or about March 7, 2017, SIHD filed a motion seeking approval of the settlement and mutual release agreement (the "Settlement Agreement") by and between SIHD and Everbank pursuant to Rule 9019 of Federal Rule of Bankruptcy Procedure, which the Court approved by entry of an order on or about March 22, 2017. In sum, SIHD agreed to pay Everbank the sum of One Hundred Fifty Thousand Dollars ($150,000.00) in exchange for the withdrawal of proof of claim no. 43-1 filed by Everbank in the Bankruptcy Case (the "Everbank POC"), and a release and/or transfer, as applicable, from Everbank to SIHD of any and all right(s), title and interest in various medical equipment that was the subject of the Everbank Agreement. The Settlement Agreement also provided for mutual and general releases by and between SIHD and Everbank. SIHD has paid the amounts due under the Settlement Agreement, and title to the medical equipment has been transferred to SIHD. In addition, on or about June 14, 2017, Everbank withdrew the Everbank POC.

#### 3. Healthcare Conglomerate Associates, LLC

On or about January 2, 2016, SIHD entered into a management agreement with Healthcare Conglomerate Associates, LLC ("HCCA") (the "HCCA Management Agreement"). On or about October 17, 2017, SIHD filed an *Emergency Motion (1) For Authority to Immediately Terminate the HCCA Management Agreement Or, In The Alternative, For Authority*

- 6 -

Filed 05/17/18    Case 16-10015    Doc 431

*To Modify The Terms Of The HCCA Management Agreement In Order To Designate The Board As The Sole Signatory On All District Bank Accounts And (2) To Continue Hearing On Second Amended Disclosure Statement And Associated Filing Deadlines* (the "HCCA Termination Motion"). On or about October 23, 2017, the Court entered an order granting the HCCA Termination Motion in part (the "HCCA Termination Order"). More specifically, the HCCA Termination Order authorized SIHD to remove HCCA as the signatory from any and all bank accounts containing SIHD funds, and instructed SIHD to file a supplemental brief addressing, among other issues, whether the HCCA Management Agreement constituted an executory contract within the meaning of 11 U.S.C. §365. On or about November 15, 2017, SIHD filed[1] a supplemental brief in support of the HCCA Termination Motion. On or about November 22, 2017, SIHD filed a Notice of Settlement resolving the issues raised by and through the HCCA Termination Motion ("HCCA Termination Settlement"). Among other things, the HCCA Termination Settlement provided for the rejection of the HCCA Management Agreement, and set the deadline for HCCA to file a claim as January 31, 2018 (the "HCCA Bar Date").

### E. Relief from Stay

On or about March 29, 2016, J.M.H., II, a minor, moved for relief from stay to proceed with pending litigation relating to alleged medical malpractice and recover any judgment resulting from such litigation from any insurance coverage. Thereafter, SIHD entered into a stipulation to grant J.M.H., II, relief from the automatic stay to proceed with the pending litigation and seek to recover any judgment from any insurance coverage. The Court entered an order approving the stipulation on or about April 15, 2016.

On or about June 7, 2016, Everbank filed a motion for relief from the automatic stay in order to record a UCC-3 financing statement indicating the assignment of a security interest in certain medical equipment utilized by the hospital. The motion also requested that the Court set a deadline by which SIHD had to either assume or reject the Everbank Agreement. SIHD opposed the motion and, more specifically, the characterization of the agreement as an unexpired lease or

---

[1] In response to allegations of purported conflict of interest asserted by HCCA against Baker Hostetler, SIHD has retained Dentons LLP as special counsel to handle, amongst other things, the HCCA Termination Motion.

- 7 -

executory contract. The Court ultimately granted in part and denied in part Everbank's motion and set a deadline for SIHD to assume or reject the Everbank Agreement. As noted above, the Debtor rejected the Everbank Agreement and, thereafter, Everbank and the Debtor entered into the Settlement Agreement.

**F.     Case Administration**

    1.    **Licensure**

On or about March 1, 2016, the California Department of Public Health (the "CDPH") reinstated SIHD's license to operate the hospital. Following the reinstatement of the license, SIHD commenced operations at the hospital and the associated clinic and skilled nursing facility.

    2.    **Termination of HCCA/Imposition of New Management**

Immediately prior to the filing of the Petition, SIHD entered into the HCCA Management Agreement pursuant to which HCCA, among other things, was charged with managing the operations of the Debtor. Following the termination of the HCCA Management Agreement (*as further detailed below*), the Debtor hired Jerrel Tucker ("Mr. Tucker") as the new Chief Financial Officer and Brian Cotter ("Mr. Cotter") as the new Chief Executive Officer. In addition to having significant experience with hospitals of similar size and type as SIHD, including Big Bear, Mr. Tucker was a member of J.W.T. & Associates, LLP, which prepared the most recent audited financials for SIHD. Mr. Cotter has been noted as a transformational executive leader that has led multiple seven figure hospital turn-arounds and excelled in quality metrics and operational efficiencies by implementing LEAN tactics, strategic planning & execution, and leadership accountability. Mr. Cotter has also led operational teams in successful CMS, CDPH surveys that include DNV, Medication Error Reduction Plan (MERP), Life Safety, Sub-Acute, SNF, Dietary, Psych, Paramedic Receiving, and Out Patient Services, and has extensive experience with, among other things, both general acute care and critical access hospitals.

- 8 -

### 3. Financial Advisory Firm

The Debtor has also engaged a financial advisory firm, Force10 Partners, LLC, which has assisted and continues to assist with the analysis of the data and creation of financial projections in furtherance of the plan(s) and disclosure statement(s) which have been filed and are to be filed.

### G. Claims Administration

Pursuant to the *Order Granting Motion to Set Claims Bar Date Pursuant to Fed. R. Bankr. P. 3003(c)(3)* entered by the Court on or about August 16, 2016, the Court set September 30, 2016 as the deadline by which to file claims.

The Debtor continues to negotiate with several individuals and entities to whom and to which avoidance action demand letters were sent. To the extent the Debtor is unable to reach agreement(s) with the recipients of what the Debtor believes to be avoidable transfers, the Debtor will timely commence avoidance actions as necessary and appropriate.

#### 1. Tulare Regional Medical Center

On or about November 6, 2017, Tulare Regional Medical Center ("TRMC") filed an *Administrative Expense Claim* in which it asserted it was entitled to an administrative claim in an amount exceeding $2,500,000 (the "TRMC Claim") (the "TRMC Claim Request"). On or about April 2, 2018, SIHD (through special counsel[2]) filed an opposition to the TRMC Claim Request. Since that time, SIHD and Tulare have been negotiating the issues underlying the TRMC Claim Request, and have agreed in principle to treat the entirety of the TRMC Claim as a general unsecured claim, with the amount subject to negotiation between the parties and, if that fails, mediation. The parties are working diligently towards finalizing and filing a stipulation reflecting the treatment of the TRMC Claim prior to the date of the status conference.

#### 2. Healthcare Conglomerate Associates, LLC

On or about January 30, 2018, HCCA filed a *Request For Payment Of Administrative Expense Claim of Healthcare Conglomerate Associates, LLC Arising Out Of*

---

[2] In an abundance of caution, special counsel for SIHD is also handling issues relating to the TRMC Claim.

*Rejection Of Executory Contract (11 U.S.C. §§503(b) and 507(a)(2))* (the "HCCA Administrative Claim Request"), in which HCCA asserted a claim with purported administrative priority in the amount of $2,524,054.00 for damages arising from the rejection of the HCCA Management Agreement (the "HCCA Claim"). On or about February 23, 2018, SIHD filed an opposition to the HCCA Administrative Claim Request. On or about February 26, 2018, the Court issued a memorandum informing HCCA that it would not take any action with respect to the HCCA Administrative Claim Request unless and until HCCA complied with the notice and hearing requirement set forth in 11 USC §503(b). To date, HCCA has not yet complied with 11 USC §503(b), and has made no effort otherwise to have the matter brought for hearing before the Court, and thus the matter remains unresolved. As there is no mechanism (of which the Debtor is aware) to compel a hearing on the HCCA Administrative Claim Request, the Debtor respectfully requests that the Court set a hearing thereon in order to advance this matter towards resolution.

### H. **Pending and Prior Litigation**

#### 1. **The Anderson, Craneware and Perez Litigation**

As of the commencement of the Bankruptcy Case, the Debtor was party to certain lawsuits, including the following: *Perez v. Kibler, et al.*, case no. SICV CV 1457395, pending in the California Superior Court for the County of Inyo (the "Perez Litigation"); *Anderson v. Southern Inyo Healthcare District*, case no. 30-2015-00817277-CL-CL-CJC (the "Anderson Litigation"); and *Craneware, Inc. v. Southern Inyo Healthcare District*, 15CV04309, pending in the District Court of Johnson County, Kansas (the "Craneware Litigation").

On or about February 1, 2016, the Anderson Litigation was dismissed.

On or about March 30, 2016, the Debtor removed the Craneware Litigation to this Court. On or about August 29, 2016, the Court dismissed the Craneware Litigation for failure to prosecute. On or about January 27, 2017, the underlying state court action was dismissed without prejudice.

Based on the nature of the Perez Litigation, the Debtor did not remove that action.

### 2. The California Department of Public Health Litigation

In addition to the actions pending on the petition date, on or about January 13, 2016, the Debtor filed a complaint against the CDPH and Karen Smith—thereby commencing the adversary proceeding styled *Southern Inyo Healthcare District v. California Department of Public Health, et al.*, adv. no. 2016-01008 (the "CDPH Adversary"). By and through the CDPH Adversary, the Debtor sought a determination that the suspension or revocation of the Debtor's hospital licensure violated the automatic stay. Following the reinstatement of SIHD's licenses, the Debtor and the defendants in the CDPH Adversary reached an agreement to dismiss the CDPH Adversary without prejudice. On or about March 9, 2016, SIHD filed a stipulation to dismiss the CDPH Adversary without prejudice, which the Court approved by order entered on or about March 10, 2016.

### 3. The Optum Bank Litigation

On or about August 15, 2017, the Debtor filed a complaint seeking to disallow the purported secured claim (the "Optum Claim") asserted by Optum Bank, Inc. ("Optum") and invalidate any and all security interest(s) and set aside any and all liens associated therewith (the "Optum Complaint"). The resulting adversary proceeding is styled *Southern Inyo Healthcare District v. Optum Bank, Inc.*, adv. no. 2017-01077 FEC (the "Optum Adversary").

On or about October 27, 2017, Optum filed an answer and counterclaim to the Optum Complaint (the "Counterclaim"). On or about March 20, 2018, the Debtor filed an answer to the Counterclaim (the "Optum Answer"). On or about April 5, 2018, the Court entered an order setting various dates and deadlines related to the Optum Adversary.

On or about April 10, 2018, Optum filed the *Motion to Strike Southern Inyo Healthcare District's Affirmative Defenses to Optum Bank's Counterclaim* (the "Motion to Strike"). The Motion to Strike sought to dismiss certain of the Debtor's certain affirmative defenses raised in the Optum Answer (the "Optum Affirmative Defenses").

On or about May 8, 2018, the Motion to Strike came on for hearing (the "Motion to Strike Hearing") before the Court and was granted with fourteen (14) days leave to amend. The Debtor

4821-1796-7195.1

1 is proceeding to prepare and file an amended answer to the Counterclaim, which will address the
2 concerns raised by the Court during the Motion to Strike Hearing.

### 4. The HCCA/VI Healthcare Litigation

SIHD has recently retained Jeffrey S. Shinbrot, APLC in connection with the preparation and filing of an complaint against HCCA and related entities. Mr. Shinbrot has reviewed evidence, conducted witness interviews and drafted a complaint containing numerous claims for relief against HCCA and related entities, including but not limited to VI Healthcare. The claims for relief include, but are not limited to, those relating to violations of California's False Claims Act, violation of California's Government Code, Breach of Fiduciary Duty and other business torts. Mr. Shinbrot is also investigating claims for violation of the automatic stay by HCCA and related parties. Mr. Shinbrot is confident that he will have the foregoing complaint filed prior to the status conference, and has committed to working expeditiously to bring the resulting adversary proceeding to trial in this Court thereafter.

## II. MEDIATION

The Debtor believes that mediation may be beneficial in helping to resolve the issues underlying the HCCA Administrative Claim Request. Additionally, the Debtor and Optum may elect to mediate the issues underlying the Optum Adversary once the parties have engaged in substantive settlement discussions (which they intend to do shortly), if the Debtor believes mediation will meaningfully assist in a resolution of the dispute.

## III. SECTION 923 NOTICE

On or about February 12, 2016, SIHD filed the *Debtor's Motion for Entry of an Order (1) Approving Form of Notice, and (2) Setting Deadline for Filing Objections to Petition*. On or about March 15, 2016, the Court entered an order approving the motion and proposed manner in which to provide notice via publication in accordance with 11 U.S.C. §923. The Debtor timely completed all publications required under the order.

## IV. PLAN OF READJUSTMENT

On or about January 27, 2017, the Court entered the *Order Granting Ex Parte Motion to Continue Deadline to File Plan of Adjustment*. Through that order, the Court extended the

- 12 -

deadline to file a plan for the adjustment of debts from January 31, 2017 through and including March 31, 2017.

On or about March 31, 2017, the Debtor filed the Plan for the Adjustment of Debts of Southern Inyo Healthcare District (the "Initial Plan"), the Disclosure Statement with Respect to the Plan for the Adjustment of Debts of Southern Inyo Healthcare District (the "Initial Disclosure Statement"), and other related and supporting documents.

Following the hearing on the adequacy of the Initial Disclosure Statement, the Court disapproved the Initial Disclosure Statement in order to enable the Debtor to make certain modifications thereto, including modifications relating to Optum and the Optum Claim. The Court also set the hearing on the adequacy of the amended disclosure statement for August 30, 2017, and directed the Debtor to file its amended plan and disclosure statement.

On or about July 20, 2017, the Debtor filed the First Amended Plan for the Adjustment of Debts of Southern Inyo Healthcare District (the "First Amended Plan"), the First Amended Disclosure Statement with Respect to the Plan for the Adjustment of Debts of Southern Inyo Healthcare District (the "First Amended Disclosure Statement"), and other related and supporting documents.

After filing the First Amended Plan and the First Amended Disclosure Statement, the Debtor engaged in discussions with several creditors, including Optum, regarding the First Amended Plan and the treatment of certain claims and contracts thereunder. As a result of these discussions, the Debtor was able to resolve certain disputes pertaining to the First Amended Plan and/or the First Amended Disclosure Statement. Among these, the Debtor and Optum reached an agreement in principle through which the Debtor agreed to allow Optum to vote on the Plan despite the disputed status of the Optum Claim.

On or about January 17, 2018, the Debtor filed the Second Amended Plan (the "Second Amended Plan") and the Second Amended Disclosure Statement with Respect to the Plan for the Adjustment of Debts of Southern Inyo Healthcare District (the "Second Amended Disclosure Statement"), and other related and supporting documents. Similar to the previous iterations of the plan and disclosure statement, the Second Amended Plan and the Second Amended

Disclosure Statement provided for the adjustment of the Debtor's operations and the repayment of its obligations with operational revenues. The Second Amended Disclosure Statement also included additional detail regarding the treatment of the Optum Claim in order to address the objections raised by Optum and comments expressed by the Court with respect to the previous versions of the plan and disclosure statement. On or about February 28, 2018, at the hearing to approve the adequacy of the Second Amended Disclosure Statement, the Debtor withdrew the Second Amended Disclosure Statement given, among other things, the significant change in circumstances that had occurred since the filing thereof.

The Debtor anticipates that it will be in a position to file a third amended plan and disclosure statement in the next sixty (60) to ninety (90) days.

**A.      Potential Funding Sources For Third Amended Plan and Third Amended Disclosure Statement**

1.      **Measure J:** In or about the end of February 2018 and/or the beginning of March 2018, the Debtor held a special mail election in which it asked voters to approve a parcel tax in the amount of $215 per parcel per year for a period of fifteen (15) years. The parcel tax was estimated to generate approximately $602,000 per year, for a total of $9,030,000 over the term of the tax. The proceeds from the tax were to be paid to SIHD as part of its biannual tax disbursement. On or about April 10, 2018, the ballots were tabulated, and of the 976 voters who cast a ballot, fifty-seven percent (57%) voted in favor of Measure J and forty-three percent (43%) voted against Measure J. Unfortunately, Measure J needed 2/3 voter approval to pass, and thus did not pass. Immediately upon learning that Measure J did not pass, both SIHD and the community-at-large began working diligently together to try to identify viable alternatives for the future of the Debtor, focusing primarily on sources of alternative funding for not only the plan of readjustment, but the operations of the Debtor on a moving forward basis. To this end, SIHD has held a number of board meetings - the majority of which have been well attended by the public. At one of the most recent board meetings, the board of directors took a poll to assess the options the community was most interested in having SIHD pursue, many of which are included below:

2. **Contract For Outpatient Lab Services:** Under this option, the Debtor would enter into a "Services Agreement" with an entity which would provide and implement certain administrative, software and management services in furtherance of an exclusive laboratory outreach program at the hospital. The CEO of SIHD has done a significant amount of research into this option, and is confident that pursuing this alternative would generate more than sufficient revenue to enable the Debtor to not only satisfy its obligations under the amended plan and maintain operations on a moving forward basis, but also to enable SIHD to make capital improvements to the facilities if and when such capital improvements are necessary. To this end, SIHD is in the process of negotiating an agreement with CuroMD for the provision of such services. However, given the fact that this is a relatively new concept, both the board of directors and counsel are conducting further research to confirm the propriety and legality of the proposed arrangement before moving forward in this regard.

3. **Settlement With Los Angeles Department of Water and Power:** With the support of a large number of LADWP employees (both individually and through their union) who reside in Southern Inyo, the Debtor has written a demand letter to LADWP requesting, among other things, that LADWP contribute funds sufficient to not only satisfy the obligations of SIHD under a plan of readjustment, but also to ensure the continuation of healthcare services for SIHD and the community it serves (including countless employees of LADWP) for years to come.[3] In response thereto, LADWP has agreed to meet with the board of directors on May 25, 2018 at 9:00 a.m., and the board of directors is very optimistic about what will transpire there at.

4. **Citizens' Initiative:** Pursuant to the recent decision of the California Supreme Court in *California Cannabis vs. Upland*,[4] any tax initiative which is introduced by the citizens only requires a majority of voter approval to pass (as opposed to 2/3 voter approval which is required if the board includes proposes such an initiative – i.e. Measure J – on the

---

[3] To the extent that it would be more palatable for LADWP to remit funds as a "donation" to SIHD rather than as a "payment" to SIHD, the Debtor is exploring the possibility of setting up a non-profit healthcare foundation in order to facilitate any such agreement.

[4] *California Cannabis Coalition, et. al. v. City of Upland, et. al.*, 3 Cal. 5th 924, 401 P.3d 49 (2017), <u>as modified on denial of reh'g</u> (Nov. 1, 2017).

- 15 -

CHAPTER 9 STATUS REPORT

4821-1796-7195.1

1  ballot). Although the *Upland* decision is controversial, it is currently good law, and a significant
2  number of citizens have expressed an intention to ensure that Measure J (or a measure
3  substantially similar if not identical to Measure J) is put (back) on the ballot in November of this
4  year. Based upon the results of the Measure J election, if a similar initiative is included on the
5  ballot for the upcoming election by the citizens, it will likely garner the requisite number of votes
6  to pass.

7  **5.  Real And Personal Property Assessment Pursuant to California Health
8  and Safety Code 32200:** SIHD is exploring whether and the extent to which Measure J can be
9  rewritten and reintroduced on the ballot as an assessment based on value rather than a flat per
10 parcel tax. While there is definitely support from the community for this option, counsel for the
11 Debtor is exploring the potential limitations of such an assessment, including but not limited to
12 potential limitations imposed by Proposition 13, before moving forward in this regard.

13 **6.  Sales Tax Increase:** The Debtor has asked the Inyo County Board of
14 Supervisors to increase the sales tax in Inyo County by one percent (1%), with the proceeds
15 thereof to be reserved solely and expressly for SIHD. Although SIHD has not yet received a
16 formal response from the County, and cannot independently opine on the legality of such an
17 arrangement from the County's perspective, it intends to follow-up with the County regularly as
18 this option was also of significant interest to the community.

19 **7.  Accounts Receivable Financing and/or Factoring:** Prior to the
20 termination of the HCCA Management Agreement, HCCA maintained the data and information
21 needed to complete the Debtor's cost report(s), including the cost report that was due on
22 November 30, 2017 for the fiscal year ending June 30, 2017 (the "November Cost
23 Report"). Unfortunately, HCCA did not file the November Cost Report, and the Debtor was
24 forced to recreate the information necessary to prepare it following the termination of the HCCA
25 Management Agreement. Unfortunately, due to the delinquent filing(s) and the delinquent cost
26 report, the Centers for Medicare and Medicaid Services ("CMS") began withholding payment at a
27 rate of fifty percent (50%) beginning in November of 2017 (the "Holdback"). This Holdback has
28 caused significant harm to the Debtor and severely impacted the Debtor's cash flow.

The November Cost Report was filed on March 22, 2018, and accepted by CMS on March 23, 2018. In addition, the financial statement data and quarterly credit balance reports (which had previously been unavailable to the Debtor) that was due with the cost report was submitted to CMS on May 16, 2018. As result of the acceptance of the cost report and the submission of the financial data, the Debtor anticipates that the Holdback will be remitted to the Debtor in an estimated amount of $225,000.00, and that the corresponding adjustments under the cost report(s) will be approximately $337,000.00. Moreover, since the termination of the HCCA Management Agreement, the Debtor has also regained control of the billing system(s), which has resulted in a <u>fifty percent (50%) increase</u> in billings for the period between January 2018 and April 2018. Given these significant improvements in the Debtor's financial situation, the Debtor believes that it will be able to obtain financing of its accounts receivable sufficient to enable it to confirm a plan of readjustment. To this end, the Debtor has submitted financial information to a number of potential financiers, including but not limited to CNH Financial, ASM Capital, Legalist, Inc., and Bay Point Advisors, and is in varying stages of discussion regarding potential "DIP" and/or exit financing options with these lenders. In addition, the Debtor has provided Optum with certain financial information relevant to the Debtor's finances in furtherance of not only the potential for financing but for a global resolution of any and all claims between the parties, including but not limited to the Optum Claim and the Optum Adversary. The Debtor intends to continue these discussions, and anticipates that it will have a meaningful and substantive update regarding this option at the upcoming status conference.

**V.　　CONCLUSION**

Despite the fact that Measure J did not pass, it is clear that the community-at-large (a number of which are creditors of the Debtor) believes that the healthcare services currently provided by the Debtor are vital and must continue uninterrupted in some form or another. Not only is it the only hospital in a 135 mile stretch of Highway 395, it also provides exceptional skilled nursing care for as many as 33 residents. There are many residents who can testify to the care that they or a loved one have received at SIHD that, in many cases, has saved lives. In addition to the invaluable health and safety benefits provided by the Debtor, the Debtor also

1 employs over ninety (90) people who would be unemployed if SIHD was forced to close its
2 doors. The significant impact that such a closure would have on the entire community would be
3 devastating, as it would represent a loss of almost two million dollars ($2,000,000) in annual
4 payroll, much of which is spent in the Eastern Sierra.
5     Given the significant improvement in the financial condition of the Debtor that has
6 occurred since the termination of the HCCA Management Agreement, and the myriad of options
7 being diligently explored, the Debtor is confident that it will not only be able to satisfy its
8 obligations under the second amended plan of readjustment to be filed, but that it will be able to
9 continue to provide and improve the level of healthcare so desperately needed by Southern Inyo
10 and the surrounding communities.

Dated: May 17, 2018        Respectfully submitted,

**FOLEY & LARDNER LLP**

By:   /s/ Ashley M. McDow
       Ashley M. McDow
       Fahim Farivar

Attorneys for Debtor,
SOUTHERN INYO HEALTHCARE DISTRICT