**27**

1   HAGOP T. BEDOYAN, CSB NO. 131285
    **KLEIN, DENATALE, GOLDNER,**
2     **COOPER, ROSENLIEB & KIMBALL, LLP**
    5260 N. Palm Avenue, Suite 205
3   Fresno, California 93704
    Telephone: (559) 438-4374
4   Facsimile: (661) 326-0418
    Email: hbedoyan@kleinlaw.com;
5
6   Attorneys for VI Healthcare Finance, Inc.
7
8                 **UNITED STATES BANKRUPTCY COURT**
9        **EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION**

10  In re:                              Case No.: 16-10015-A-9

11  SOUTHERN INYO HEALTHCARE           Chapter    9
    DISTRICT,
12                                      DC No.:    KDG-2

13              Debtor.                 Date:      TO BE SCHEDULED
                                        Time:      TO BE SCHEDULED
14                                      Place:     United States Bankruptcy Court
                                                   2500 Tulare Street, Fifth Floor
15                                                 Department A, Courtroom 11
                                                   Fresno, California
16                                      Judge:     Honorable Fredrick E. Clement

17       **EXHIBITS IN SUPPORT OF ADMINISTRATIVE EXPENSE CLAIM OF**
         **VI HEALTHCARE FINANCE, INC. (11 U.S.C. §§ 503(b) and 507(a)(2)**
18
19

| EXHIBIT | DESCRIPTION | PAGE(S) |
|---------|-------------|---------|
| A | Revolving Line of Credit, Note, (Secured) | 2 - 9 |
| B | Requests for Funding | 11 - 14 |
| C | Assignment, Security Agreement and Pledge Agreement | 16 - 23 |
| D | Notice of Assignment of Anticipated Tax Revenues | 25 - 26 |

25  Dated: June 7, 2018              KLEIN, DENATALE, GOLDNER,
                                     COOPER, ROSENLIEB & KIMBALL, LLP
26
27                        By: _____
                              HAGOP T. BEDOYAN, Attorneys for
28                            VI Healthcare Finance, Inc.

# EXHIBIT A

# REVOLVING LINE OF CREDIT NOTE
## (SECURED)

$2,000,000.00                                                July 19, 2017

FOR VALUE RECEIVED, SOUTHERN INYO HEALTHCARE DISTRICT, a healthcare district formed under California Health and Safety Code § 32000 et seq. ("Borrower"), with an address at 501 E. Locust Street, Lone Pine, California 93545, promises to pay to the order of Vi Healthcare Finance, Inc., a California corporation ("Lender"), in lawful money of the United States of America in immediately available funds at 4924 West Lakewood Drive, Visalia, California 93291, or at such location as Lender may designate from time to time, the principal sum of Two Million Dollars ($2,000,000), or such lesser amount as may be advanced to or for the benefit of the Borrower hereunder, together with interest accruing on the outstanding principal balance from the date of each advance, all as provided below.

1.    <u>Lending Procedures</u>.  During the period from the date of this Note until the Termination Date (as defined herein), Borrower may borrow and re-borrow amounts hereunder, subject to the terms and conditions of this Note. In no event shall the aggregate unpaid principal amount of advances under this Note exceed the face amount of this Note.

Requests for advances shall be made in writing to Lender.  Lender may accept electronic (facsimile or email) requests for advances only from the President or Secretary of Borrower's Board of Directors, and Lender shall be entitled to rely upon the authority of such person providing such requests.  Lender will enter in its books and records, which entry when made will be presumed correct, the date and amount of each advance, as well as the date and amount of each payment made by Borrower.

Advances shall be deposited in a bank account designated by Borrower.

Lender may, at any time, whether or not an Event of Default (as defined herein) exists, terminate its obligation to make further advances under this Note by giving notice to Borrower, whereupon Lender's obligation to make further advances under this Note will terminate as of the date set forth in such notice (the "<u>Termination Date</u>").

2.    <u>Rate of Interest</u>.  The first $1,038,789.56 of advances, which shall be used only for the purposes of paying off loans held by Healthcare Conglomerate Associates, LLC in that amount, shall bear interest at the lesser of the rate of ten percent (10%) per annum, or the Highest Lawful Rate (as defined herein).  All subsequent advances shall bear interest at the lesser of the rate of twenty percent (20%) per annum, or the Highest Lawful Rate.

3.    <u>Payment Terms</u>.  Prior to the Maturity Date (as defined herein), the entire unpaid principal balance of this Note, plus all accrued but unpaid interest thereon, shall be payable one hundred twenty (120) days after demand by Lender.  If no demand is made, this Note shall be

1

L7

Exhibit _A_
Page_ 3_

due and payable (unpaid principal and all accrued but unpaid interest) on a date which is four (4) years and 360-days after the date of this Note. The date that this Note is due and payable as provided in the prior two sentences is referred to herein as the "Maturity Date". For clarification, the Maturity Date may not be the Termination Date. Payments received will be applied to charges, fees and expenses (including attorneys' fees), accrued interest and principal in that order.

4.    Default Rate. Upon the occurrence of any Event of Default, all amounts outstanding under this Note shall bear interest at a rate equal to the applicable interest rate under Paragraph 2.

5.    Prepayment. Borrower shall have the right to prepay any advance hereunder at any time and from time to time, in whole or in part, without penalty or premium. Any amounts prepaid may be re-borrowed up until the Termination Date, and subject to the maximum amount of advances set forth in Paragraph 1 above.

6.    Security; Loan Documents. This Note is secured by a Security Agreement, Assignment and Pledge Agreement between Lender and Borrower of even date herewith, and certain other documents executed and delivered in connection therewith (as amended, modified or renewed from time to time, collectively the "Loan Documents").

7.    Remedies Following Event of Default. Upon the occurrence of an Event of Default: (a) Lender shall be under no further obligation to make advances hereunder; (b) this Note will bear interest at the Default Rate; and (c) Lender may exercise from time to time any of the rights and remedies available under the Loan Documents or at law.

8.    Anti-Money Laundering/International Trade Law Compliance. Borrower represents and warrants to Lender, as of the date of this Note, as of the date of each advance of proceeds, as of the date of any renewal, extension or modification of this Note, and at all times that any obligations exist hereunder that: (A) Borrower is not (i) is listed or otherwise recognized as a specially designated, prohibited, sanctioned or debarred person or entity, or subject to any limitations or prohibitions (including but not limited to the blocking of property or rejections of transactions) under any order or directive of any Compliance Authority; (ii) has any of its assets in a Sanctioned Country or in the possession, custody or control of a Sanctioned Person; or (iii) does business in or with, or derives any of its operating income from investments in or transactions with, any Sanctioned Person or Sanctioned Country in violation of any law or regulation enforced by any Compliance Authority; (B) the advances made hereunder will not be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Country; and (C) Borrower is in compliance with, and Borrower does not engage in any dealings or transactions prohibited by, any laws of the United States including the USA Patriot Act, the Trading with the Enemy Act, or the U.S. Foreign Corrupt Practices Act of 1977, all as amended, supplemented or replaced from time to time. As used herein: "Compliance Authority" means each and all of the (a) U.S. Department of the Treasury's Office of Foreign Asset Control; (b) U.S. Treasury Department/Financial Crimes Enforcement Network; (c) U.S. State Department/Directorate of Defense Trade Controls; (d) U.S. Commerce Department/Bureau of Industry and Security; (e) U.S. Internal Revenue Service; (f) U.S. Justice Department; and (g) U.S. Securities and Exchange Commission; "Sanctioned

2

Exhibit _A_

Page _4_

Country" means a country subject to a sanctions program maintained by any Compliance Authority; and "Sanctioned Person" means any individual person, a group, regime, entity or thing subject to, or specially designated under, any sanctions program maintained by any Compliance Authority.

9.     <u>Indemnity</u>. Borrower agrees to indemnify each of Lender, each legal entity, if any, who controls, is controlled by or is under common control with Lender, and each of their respective shareholders, directors, officers and employees (the "<u>Indemnified Parties</u>"), and to defend and hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all fees and charges of internal or external counsel with whom any Indemnified Party may consult and all expenses of litigation and preparation therefor) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority (including any person or entity claiming derivatively on behalf of Borrower), in connection with or arising out of or relating to the matters referred to in this Note or in the other Loan Documents, or the use of any advance hereunder, whether (a) arising from or incurred in connection with any breach of a representation, warranty or covenant by Borrower, or (b) arising out of or resulting from any suit, action, claim, proceeding or governmental investigation, pending or threatened, whether based on statute, regulation or order, or tort, or contract or otherwise, before any court or governmental authority; provided, however, that the foregoing indemnity agreement shall not apply to any claims, damages, losses, liabilities and expenses solely attributable to an Indemnified Party's gross negligence or willful misconduct. The indemnity agreement contained in this Paragraph shall survive the termination of this Note, payment of any advance hereunder and the assignment of any rights hereunder. Borrower may participate at its expense in the defense of any such action or claim.

10.     <u>Miscellaneous</u>. All notices, demands, requests and other communications required or permitted hereunder ("<u>Notices</u>") must be in writing and will be effective upon receipt. First-class mail (return receipt requested), facsimile or email transmission and overnight courier service are hereby agreed to as acceptable methods for giving Notices. Regardless of the manner in which provided, Notices may be sent to a party's address as set forth above, or to such other address as any party may give to the other for such purpose in accordance with this Paragraph. No delay or omission on Lender's part to exercise any right or power arising hereunder will impair any such right or power or be considered a waiver of any such right or power, nor will Lender's action or inaction impair any such right or power. Lender's rights and remedies hereunder are cumulative and not exclusive of any other rights or remedies which Lender may have under other agreements, at law or in equity. No modification, amendment or waiver of, or consent to any departure by Borrower from, any provision of this Note will be effective unless made in a writing signed by Lender, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Borrower agrees to pay on demand, to the extent permitted by law, all costs and expenses incurred by Lender in the enforcement of its rights in this Note and in any security therefor, including without limitation reasonable fees and expenses of Lender's counsel (including attorney's fees incurred in any proceeding under the Bankruptcy Code, including stay litigation, and on appeal). If any provision of this Note is found to be invalid, illegal or unenforceable in any respect by a court, all the other provisions of this Note will remain in full force and effect. Borrower and all other makers and endorsers of this Note hereby forever waive presentment, protest, notice of dishonor

Exhibit   _A_

Page   _5_

and notice of non-payment.  This Note shall bind Borrower and its successors and assigns, and the benefits hereof shall inure to the benefit of Lender and its successors and assigns; provided, however, that Borrower may not assign or delegate its obligations under this Note in whole or in part without Lender's written consent, and Lender at any time may assign this Note in whole or in part.

This Note has been delivered to and accepted by Lender and will be deemed to be made in the State of California.  THIS NOTE WILL BE INTERPRETED AND THE RIGHTS AND LIABILITIES OF LENDER AND BORROWER DETERMINED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA, EXCLUDING ITS CONFLICT OF LAWS RULES.  Borrower hereby irrevocably consents to the exclusive jurisdiction of any state or federal court in the County of Inyo in the State of California.  Borrower acknowledges and agrees that the venue provided above is the most convenient forum for both Lender and Borrower.  Borrower waives any objection to venue and any objection based on a more convenient forum in any action instituted under this Note.

11.      Commercial Purpose.  Borrower represents that the indebtedness evidenced by this Note is being incurred by Borrower solely for commercial purposes (i.e., providing financing for the hospital which is owned and operated by Borrower), and not for personal, family or household purposes.  The line of credit offered hereunder is made pursuant to California Health and Safety Code § 32130.6.

12.      Authority.  Borrower acknowledges that entering into this Note and the other Loan Documents has been duly authorized by a duly adopted resolution of its Board of Directors, and that the person signing this Note and the other Loan Documents has full power and authority to do so, and by his signature Borrower shall be legally bound.

13.      Events of Default.

(a)      Upon the happening of any of the following events (each an "Event of Default"), Lender may, at its option, by notice to Borrower, declare immediately due and payable the entire unpaid principal balance of this Note, together with all accrued but unpaid interest thereon:

(i)      Borrower has defaulted under any of the terms or conditions of this Note.

(ii)      The occurrence of any of the following, other than the filing made prior to the date of this Note: (a) the filing by Borrower of a voluntary petition under Chapter 9 of the Bankruptcy Code, or (b) the filing of a petition for the appointment of a receiver for all or any of the property of Borrower; or (c) the taking of any voluntary or involuntary steps to dissolve or suspend the powers of Borrower (unless such steps to dissolve or suspend are removed) within thirty (30) days; or (d) the consent by Borrower to an order for relief under the Bankruptcy Code or the failure to vacate such an order for relief under the Bankruptcy Code or the failure to vacate such an order for relief within sixty (60) days from and after the date of entry thereof, or (e) the entry of any order, judgment or decree, by any court of competent jurisdiction, on the application of any creditor of Borrower or any other person, adjudicating

4

Exhibit ___A___

Page ___6___

Borrower as a bankrupt, or to be insolvent, or approving, a petition seeking reorganization or the appointment of a receiver, trustee or liquidator of all or a substantial part of Borrower's assets, if such order, judgment or decree shall continue unstayed and in effect for any period of sixty (60) days. In the event that Borrower files a petition under Chapter 9 of the Bankruptcy Code, Borrower agrees, to the extent permitted by law: (a) not to reject this Note; (b) to designate Lender as a vendor supplier that is critical to Borrower's business and obtain a critical vendor order that (x) waives or releases any preference liability; and (y) provides administrative priority or other preferred status, acceptable to Lender, with respect to Lender's pre-petition claims (if any), and any and all funds advanced by Lender post-filing.

         (iii)     If Lender, at any time and in good faith, shall deem itself insecure. Lender shall be entitled to deem itself insecure when some event occurs, fails to occur or is threatened or some objective condition exists or is threatened which significantly impairs the prospects that any of the obligations of Borrower hereunder will be paid when due, or which significantly affects the financial or business condition of Borrower.

         (iv)     An Event of Default has occurred under any of the other Loan Documents.

     14.     <u>Compliance with Law</u>. All agreements between Lender and Borrower, whether now existing or hereafter arising and whether written or oral, are hereby limited so that in no contingency, whether by reason of demand or acceleration of the Maturity Date or otherwise, shall the interest contracted for, charged, received, paid or agreed to be paid to Lender in regard to the loan evidenced by this Note exceed the maximum amount permissible under Applicable Law. If, from any circumstance whatsoever, interest would otherwise be payable to Lender in excess of the maximum amount permissible under Applicable Law, the interest payable to Lender shall be reduced to the maximum amount permissible under Applicable Law; and if from any circumstance Lender shall ever receive anything of value deemed interest by Applicable Law in excess of the maximum amount permissible under Applicable Law, an amount equal to the excessive interest shall be applied to the reduction of the principal hereof and not to the payment of interest, or if such excessive amount of interest exceeds the unpaid principal balance hereof, such excess shall be refunded to Borrower. All interest paid or agreed to be paid to Lender shall, to the extent permitted by Applicable Law, be amortized, prorated, allocated, and spread throughout the full period (including any renewal or extension) until payment in full of the principal so that the interest hereon for such full period shall not exceed the maximum amount permissible under Applicable Law. Lender expressly disavows any intent to contract for, charge or receive interest in an amount which exceeds the maximum amount permissible under Applicable Law. This provision shall control all agreements between Lender and Borrower.

     15.     <u>Borrower Representations</u>. Borrower represents to Lender as follows:

         (a)     Borrower has at least $2,000,000 in total assets according to its most recent financial statements (which financial statements are dated not earlier than ninety (90) days prior to the date of this Note and are prepared in accordance with generally accepted accounting principles).

(b)      The controlling person of Lender has a pre-existing business relationship with Borrower (as such term is defined in § 25102(f)(2) of the California Corporations Code).

(c)      Borrower intends that the loans evidenced by this Note be exempt from the usury provisions of the Constitution of the State of California pursuant to § 25118 of the California Corporations Code.

16.      <u>Certain Definitions</u>.  For the purposes of this Note, the terms set forth below shall have the following meanings:

(a)      "Applicable Law" shall mean (i) the laws of the United States of America applicable to contracts made or performed in the State of California, now or at any time hereafter prescribing or eliminating maximum rates of interest on loans and extensions of credit, (ii) the laws of the State of California now or at any time hereafter prescribing or eliminating maximum rates of interest on loans and extensions of credit, and (iii) any other laws at any time applicable to contracts made or performed in the State of California which permit a higher interest rate ceiling hereunder.

(b)      "Highest Lawful Rate" shall mean at the time in question the maximum rate of interest which, under Applicable Law, Lender is then permitted to charge Borrower in regard to the loan evidenced by this Note. If the maximum rate of interest which, under Applicable Law, Lender is permitted to charge Maker in regard to the loan evidenced by this Note shall change after the date hereof, the Highest Lawful Rate shall be automatically increased or decreased, as the case may be, from time to time as of the effective date of each change in the Highest Lawful Rate without notice to Borrower. For purposes of determining the Highest Lawful Rate under the Applicable Law, all fees and other charges contracted for, charged or received by Lender in connection with the loan evidenced by this Note which are either deemed interest under Applicable Law or required under Applicable Law to be deducted from the principal balance hereof to determine the rate of interest charged on this Note shall be taken into account.

**Borrower acknowledges that it has read and understood all the provisions of this Note, has had the opportunity to discuss the provisions of this Note with legal counsel of its own choosing, and has been advised by counsel as necessary or appropriate.**

6

IN WITNESS WHEREOF, Borrower has executed and delivered this Note as of the date and year first above written.

SOUTHERN INYO HEALTHCARE DISTRICT,
a healthcare district formed under California
Health and Safety Code § 32000 et seq.

By: _____

Richard P. Fedchenko, Chairman of the
Board of Directors

7

# EXHIBIT B



**Southern Inyo Hospital**
501 E. Locust Street     P.O. Box 1009     Lone Pine, California 93545

.07.25.2017

Vi Healthcare Finance

Attn: Dr. Benny Benzeevi (via e-mail)

RE: Advance from the line of credit

Dear Dr. Benzeevi,

This is a formal request for an advance from the line of credit established for Southern Inyo Healthcare District.

The amount requested is $1,038,789.56 and is to be used to pay off the HCCA loans made through 7.25.2017 to the Southern Inyo Healthcare District and has been agreed to by the signatories of this letter.

By signing below, Southern Inyo Healthcare District agrees that the principal balance of the Revolving Line of Credit Note dated July 19, 2017 executed by Southern Inyo Healthcare District in favor of Vi Healthcare Finance Inc. is increased by $1,038,789.56 as of this date, and that all loans made by HCCA to Southern Inyo Healthcare District as of this date will be deemed paid in full. This will be accomplished by an accounting entry and no funds are required to change hands.

Alan Germany, Chief Restructuring Administrator
Southern Inyo Healthcare District

9/18/17

Richard Fedchenko, President
Southern Inyo Healthcare District

Exhibit _B_
Page _11_



**Southern Inyo Healthcare District**
501 E. Locust Street    P.O. Box 1009    Lone Pine, California 93545

August 1, 2017

Vi Healthcare Finance
Attn: Dr. Benny Benzeevi (via email)

**RE**: Advance from the line of credit

Dear Dr. Benzeevi,

This is a formal request for an advance from the line of credit established for Southern Inyo Healthcare District.

Please wire the funds to El Dorado Savings Bank in Lone Pine, CA.

| | |
|---|---|
| Bank: | El Dorado |
| Bank Account No.: | 243 0538 65 |
| Routing: | 321170978 |

The amount requested is $350,000.00 and has been agreed to by the signatores of this letter.

_____    Date: 8/1/17

Alan Germany, Chief Restructuring Officer/ Adminstrator
Southern Inyo Healthcare District

_____    Date: 8/1/17

Richard Fedchenko, President
Southern Inyo Healthcare District

**Board of Directors:**

| Richard Fedchenko<br>President | Jaqueline Hickman<br>Secretary | Carma Roper<br>Treasurer | Mark Lacey<br>Director | Charles Carson<br>Director |
|---|---|---|---|---|

Exhibit_____ B

Page_____ 12



**Southern Inyo Hospital**

501 E. LOCUST STREET
P.O. BOX 1009
LONE PINE, CALIFORNIA 93545

Telephone
(760) 876-5501
FAX (760) 876-4388
Admin. FAX (760) 876-2

SOUTHERN INYO
HEALTHCARE DISTRICT

September 7, 2017

Via email

Dr. Benzeevi
Vi Healthcare Finance

Dear Dr. Benzeevi,

This is a formal request, agreed to and approved by the President of the Board and the Chief Restructuring Officer, for an advance against the line of credit for Southern Inyo Healthcare District in the amount of $100,000.00 (One hundred thousand dollars).

In order to make payroll on Friday, September 8 (tomorrow) the funds will have to be deposited to our credit as early in the day as possible.

Thank you for your support of this request.

Sincerely yours,

Richard Fedchenko 9/7/17
**Richard Fedchenko**
**President, Board of Directors, SIHD**

Alan Germany 9/7/17
**Alan Germany**
**Chief Restructuring Officer**

2

Exhibit _B_
Page _13_



Southern Inyo Hospital
501 E. Locust Street     P.O. Box 1009     Lone Pine, California 93545

09.18.2017

Vi Healthcare Finance

Attn: Dr. Benny Benzeevi (via e-mail)

RE: Advance from the line of credit

Dear Dr. Benzeevi,

This is a formal request for an advance from the line of credit established for Southern Inyo Healthcare District.

Please wire the funds to El Dorado Savings Bank in Lone Pine, CA.

| | |
|---|---|
| Bank: | El Dorado |
| Bank Account No.: | 243 0538 65 |
| Routing: | 321170978 |

The amount requested is $250,000.00 and has been agreed to by the signatories of this letter.

_____                    9/18/17
Alan Germany, Chief Restructuring/Administrator        Date
Southern Inyo Healthcare District


_____                    9/18/17
Richard Fedchenko, President                 Date
Southern Inyo Healthcare District

Exhibit _B_
Page _14_

# EXHIBIT C

# ASSIGNMENT, SECURITY AGREEMENT AND PLEDGE AGREEMENT

This ASSIGNMENT, SECURITY AGREEMENT AND PLEDGE AGREEMENT ("Security Agreement") dated as of July 19, 2017 is entered into by and between SOUTHERN INYO HEALTHCARE DISTRICT, a healthcare district formed under California Health and Safety Code § 32000 et seq. ("Borrower"), and Vi HEALTHCARE FINANCE, INC., a California corporation ("Lender").

## Recitals

A.     Pursuant to a certain Revolving Line of Credit Note of even date herewith (the "Note"), Lender is providing a line of credit to Borrower in the amount of up to $2,000,000.

B.     The parties intend that the indebtedness evidenced by the Note (the "Secured Indebtedness") is to be secured by certain anticipated tax revenues of the Borrower.

NOW, THEREFORE, the parties agree as follows:

## Agreement

Section 1.     Granting Clauses. For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, as security for the Secured Indebtedness, the Borrower hereby assigns to the Lender, and grants to the Lender a first priority security interest under the Uniform Commercial Code as adopted in the State of California (as amended from time to time, the "Uniform Commercial Code") in all of the Tax Revenues (as defined below) of the Borrower.

The Borrower shall execute and cause to be delivered to the Inyo County Auditor/Controller an assignment and a notice of the assignment and the security interest granted hereunder in the form attached hereto as Exhibit "A", and shall execute and deliver any other instruments or documents which may be necessary or requested reasonably by the Lender to perfect or maintain, to the extent permitted by law, that assignment and security interest or to give public notice thereof.

The foregoing provisions of this Security Agreement constitute an absolute and present assignment of the Tax Revenues.

"Tax Revenues" means:

(i)     all present and future revenues of the Borrower which Borrower is entitled to receive from Inyo County including but not limited to property taxes, parcel taxes (except for revenues from the 2005 Measure A "Save Southern Inyo Hospital Parcel Tax" as described by Board resolution 05-05), tobacco taxes, and any other taxes for which the Borrower may hereafter be entitled to collect revenues, excluding only those tax revenues which cannot

1

*R7*

lawfully be assigned and pledged by Borrower under applicable law for the purpose of the loan evidenced by the Note.

(ii)        Proceeds of the foregoing.

The property described in this Section 1 is hereinafter collectively referred to as the "Collateral".

Should Lender receive any Tax Revenues which are not permitted by applicable law to be assigned and pledged to Lender, Lender will immediately remit same to Borrower.

Section 2.        Lender Has Rights and Remedies of a Secured Party.  In addition to all rights and remedies given to the Lender by this Security Agreement, the Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code.

Section 3.        Provisions Applicable to the Collateral.  The parties agree that the following provisions shall be applicable to the Lender during the term of this Security Agreement:

(a)        Chief Executive Office; Books and Records; Name.

(i)        The Borrower shall keep accurate and complete books and records concerning the Collateral.

(ii)        The Borrower represents and warrants that its chief executive office is located at the address set forth below its signature hereto.  The Borrower shall not move its chief executive office, except to such new location as it may establish in accordance with subsection (iv) below.

(iii)        The only original books of account and records of the Borrower relating to the Tax Revenues of the Borrower are, and will continue to be, kept at the chief executive office of the Borrower.  The location where such books of account and records are kept will not be changed, except in accordance with subsection (iv) below.

(iv)        The Borrower shall not establish any new location for its chief executive office or for the place where such books of account and records are kept until (A) it shall have given to the Lender written notice of its intention so to do clearly describing such new location and providing such other information in connection therewith as the Lender may reasonably request and (B), with respect to such new location, it shall have taken such action, satisfactory to the Lender (including without limitation all action required by Section 4 hereof) as may be necessary to maintain the security interest of the Lender granted hereunder at all times fully perfected and in full force and effect.

(v)        The Borrower's exact legal name is set forth in the first paragraph of this Security Agreement and the Borrower will not change its legal name.  The Borrower has conducted business solely under such legal name during

2

Exhibit _____ C

Page _____ 17

the last five years. The Borrower's charter number or organizational identification number is N/A and its federal employer identification number is 95 - 6005450.

  (b) <u>Inspection</u>. The Lender and its authorized agents shall have the right to review the books and records of the Borrower concerning the Collateral and to copy the same and make excerpts therefrom and to inspect the books and records of the Borrower concerning the Collateral, at all times during regular business hours.

  (c) <u>Lender's Right to Collect Tax Revenues</u>. It is agreed that until the Secured Indebtedness has been paid in full, and Lender has no further obligation to fund advances under the Note, all Tax Revenues shall be paid directly to Lender, and Lender shall apply same against the Secured Indebtedness from time to time in the manner set forth in the Note. If, at any time after the Secured Indebtedness has been paid in full, but Lender remains obligated to make future advances under the Note, any Tax Revenues are received by Lender, they shall immediately be remitted to Borrower by the next business day. At such time that the Secured Indebtedness has been paid in full and Lender has no further obligation to make advances under the Note, this Security Agreement shall be deemed cancelled and Lender shall promptly give notice to the Inyo County Auditor/Controller that Tax Revenues are thereafter to be paid directly to Borrower and not to Lender.

  Section 4. <u>Preservation and Protection of Security Interests</u>. The Borrower will faithfully preserve and protect the Lender's security interest in the Collateral and will, at its own cost and expense, cause such security interest to be perfected and continue perfected so long as the Secured Indebtedness or any portion thereof are outstanding and unpaid, and for such purpose the Borrower will, from time to time, at the request of the Lender file or record, or cause to be filed or recorded, such instruments, documents and notices, including without limitation, financing statements and continuation statements, as the Lender may deem necessary or advisable from time to time in order to perfect and continue perfected said security interests. The Borrower will do all such other acts and things and will execute and deliver all such other instruments and documents, including without limitation, further security agreements, pledges, endorsements, assignments and notices, as the Lender may deem necessary or advisable from time to time in order to perfect and preserve the priority of said security interest as a perfected first priority security interest in the Collateral prior to the rights of any other secured party or lien creditor. The Lender, and its officers, employees and authorized agents, or any of them, are hereby irrevocably appointed the attorneys-in-fact of the Borrower to do all acts and things which the Lender may deem necessary or advisable to preserve, perfect and continue perfected the Lender's security interest in the Collateral, including without limitation the signing of financing, continuation or other similar statements and notices on behalf of the Borrower.

  Notwithstanding anything in the foregoing or this Security Agreement to the contrary, the Borrower hereby irrevocably authorizes the Lender at any time and from time to time to file (without Borrower's signature) in the appropriate filing office in the Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto that (a) describe the Collateral, and (b) provide any other information required by part 5 of Article 9 of the Uniform

3

Exhibit ___C___
Page ___18___

Commercial Code for the sufficiency or filing office acceptance of any financing statement or amendment.

           Section 5.       Application of Moneys. Except as otherwise provided herein, if an Event of Default shall have occurred and be continuing, all moneys which the Lender shall receive upon realization of the security or otherwise may be applied by or at the direction of the Lender in the following manner:

                (a)       First, to the payment or reimbursement of all reasonable advances, expenses and disbursements of the Lender (including, without limitation, the reasonable fees and disbursements of its counsel and agents) incurred in connection with the administration and enforcement of, or the preservation of any rights under, this Security Agreement; and

                (b)       Second, to be applied in any manner desired by the Lender to the satisfaction of the Secured Indebtedness.

           Section 6.       Certain Representations and Covenants. The Borrower represents and agrees, from and after the date of this Security Agreement and until payment in full of the Secured Indebtedness, as follows:

                (a)       Title and Liens. It has and will have good and marketable title to the Collateral from time to time owned or acquired by it, free and clear of all liens, encumbrances, pledges and security interests; and the security interests of the Lender in the Collateral are perfected lien security interests (to the extent they can be perfected by filing UCC financing statements), prior to the rights of any other secured party or lien creditor. The Borrower will defend its title to the Collateral against the claims and demands of all persons and will maintain and the priority of the security interest granted to the Lender in the Collateral.

                (b)       Negative Pledge. It will not, without the prior written consent of the Lender, (i) grant or create or permit to exist any lien, encumbrance, pledge or security interest on or in any of the Collateral, (ii) permit any levy or attachment to be made against any of the Collateral, (iii) file any financing statement with respect to any of the Collateral, except financing statements and mortgages and deeds of trust in favor of the Lender, or (iv) sell, convey, transfer or otherwise alienate all or any part of interests in the Collateral.

                (c)       If any Tax Revenues are received by Borrower, Borrower will immediately remit same to Lender, and Borrower will be deemed to hold such Tax Revenues in trust for Lender.

                (d)       Borrower will take no actions (or omit to take any actions) which would in any way stop, delay, restrict, hinder or otherwise interfere with the flow of Tax Revenues to the Borrower, it being understood that Tax Revenues will continue to be subject to this Security Agreement notwithstanding the closure or cessation of business of the hospital operated by the Borrower, the consolidation or merger of Borrower into any other healthcare district or other entity, the sale of all or substantially all of the assets of

R7

Borrower, the dissolution or liquidation of the Borrower, or the change in the Board of Directors of the Borrower.

Section 7.     Events of Default. If any one or more of the following events shall occur and be continuing or shall exist (each, an "Event of Default"):

(a)     Any representation or warranty herein made by the Borrower shall prove to have been false or misleading in any material respect as of the time made or furnished; or

(b)     The Borrower shall default in the due observation or performance of any of the covenants or agreements of the Borrower contained in this Security Agreement and such default shall not be remedied within a period of 30 days; or

(c)     An Event of Default occurs under the Note:

then in any such event, the Lender shall have such rights and remedies in respect of the Collateral or any part thereof as are provided by the Uniform Commercial Code and such other rights and remedies in respect thereof which it may have at law or in equity or under this Security Agreement, including without limitation the right to enter any premises where any Collateral is located and take possession of the same without demand or notice and without prior judicial hearing or legal proceedings, which the Borrower hereby expressly waives, and to sell all or any portion of the Collateral at public or private sale without prior notice to the Borrower except as otherwise required by law (and if notice is required by law, after 10 days' prior written notice) at such place or places and at such time or times and in such manner and upon such terms, whether for cash or on credit, as the Lender in its sole discretion may determine. Upon any such sale of any of the Collateral, the Lender may purchase all or any of the Collateral being sold, free from any equity or right of redemption. The Lender shall apply the proceeds of any such sale to the obligations of the Borrower as provided in Section 5 hereof. If such proceeds are insufficient to pay the amounts required by law, the Borrower shall be liable for any deficiency in the amount so realized from the Collateral.

In addition, in any such event, the Borrower shall promptly upon demand by the Lender assemble all books and records relating to the Collateral and make them available to the Lender at a place to be designated by the Lender which shall be reasonably convenient to the Lender and the Borrower. The right of the Lender under this Section to have the books and records relating to the Collateral assembled and made available to it is of the essence of this Security Agreement and the Lender may, at its election, enforce such right by an action in equity for specific performance.

The Borrower, to the extent that it has any right, title or interest in any of the Collateral, waive and release any right to require the Lender to collect any of the Secured Obligations from any other of the Collateral under any theory of marshalling of assets, or otherwise, and specifically authorizes the Lender to apply any of the Collateral against any of the Secured Obligations in any manner that the Lender may determine.

R7

Exhibit _____ C
Page _____ 20

Section 8.      Amendments, Waivers. The provisions of this Security Agreement may from time to time be waived, modified or amended only by an instrument in writing executed and delivered by the party against whom enforcement is sought.

Section 9.      Counterparts. This Security Agreement may be executed simultaneously in several counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 10.      Governing Law. Except where the application of another law is mandatory, this Security Agreement shall be construed to be a contract made under and pursuant to the laws of the State of California, and all of the terms, covenants, and conditions contained herein shall be governed by and construed in accordance with such laws.

Section 11.      Notices. Any notices to be given hereunder shall be given pursuant to the notice provisions in the Note.

(signatures on following page)

Exhibit___C___

Page___21___

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Security Agreement as of the day and year first above written.

BORROWER:

Southern Inyo Healthcare District, a healthcare district formed under California Health and Safety Code § 32000 et seq.

By: _____

Richard P. Fedchenko, Chairman of the Board of Directors

Address:

501 E. Locust Street
Lone Pine, CA 93545

LENDER:

Vi Healthcare Finance, Inc., a California corporation

By: _____

Benny Benzeevi, President

Address:

4524 West Lakewood Drive
Visalia, CA 93291

7

Exhibit ___C___
Page ___22___

## EXHIBIT "A"

## NOTICE OF ASSIGNMENT OF ANTICIPATED TAX REVENUES

To:　　Inyo County Auditor/Controller
　　　　P.O. Drawer R
　　　　Independence, CA 93526

　　　　Please be advised that pursuant to the terms of a certain Assignment, Security Agreement and Pledge Agreement of even date herewith, Southern Inyo Healthcare District ("Assignor") has assigned to Vi Healthcare Finance, Inc. ("Assignee") all of the Tax Revenues (as defined below) due and payable by Inyo County to Assignor.

　　　　Tax Revenues include but are not limited to all property tax revenues, parcel tax revenues (except for revenues from the 2005 Measure A "Save Southern Inyo Hospital Parcel Tax" as described by Board resolution 05-05), tobacco tax revenues and any other tax revenues which may hereafter be payable by Inyo County to Assignee (excluding any tax revenues which may not be assigned under applicable law).

　　　　Unless and until you receive written notice from Assignee, all Tax Revenues payable to Assignor shall be sent instead to Assignee at the following address:

　　　　　　　　Vi Healthcare Finance, Inc.
　　　　　　　　4924 West Lakewood Drive
　　　　　　　　Visalia, CA 93291

　　　　　　　　Very truly yours,

　　　　　　　　SOUTHERN INYO HEALTHCARE DISTRICT,
　　　　　　　　a healthcare district formed under California
　　　　　　　　Health and Safety Code § 32000 et seq.

　　　　　　　　By:　_____
　　　　　　　　　　　Richard P. Fedchenko, Chairman of the
　　　　　　　　　　　Board of Directors
　　　　　　　　Date: July 19, 2017

Receipt of the foregoing Notice of Assignment is hereby acknowledged by the Inyo County Auditor/Controller this _____ day of July, 2017.

_____
Name

_____
Title

Exhibit　C
Page　23

# EXHIBIT D

## NOTICE OF ASSIGNMENT OF ANTICIPATED TAX REVENUES

To:    Inyo County Auditor/Controller
        P.O. Drawer R
        Independence, CA 93526

Please be advised that pursuant to the terms of a certain Assignment, Security Agreement and Pledge Agreement of even date herewith, Southern Inyo Healthcare District ("Assignor") has assigned to Vi Healthcare Finance, Inc. ("Assignee") all of the Tax Revenues (as defined below) due and payable by Inyo County to Assignor.

Tax Revenues include all property tax revenues, parcel tax revenues, tobacco tax revenues (except for revenues from the 2005 Measure A "Save Southern Inyo Hospital Parcel Tax" as described by Board resolution 05-05) and any other tax revenues which may hereafter be payable by Inyo County to Assignee (excluding any tax revenues which may not be assigned under applicable law).

Unless and until you receive further written notice from Assignee, all Tax Revenues payable to Assignor shall be sent to Assignee by wire transfer as follows:

        Bank:                 Chase Bank
        Bank Account No.:    929365109
        Routing:          322271627

        Vi Healthcare Finance, Inc.
        4924 West Lakewood Drive
        Visalia, CA 93291

Unless and until you receive further written notice from Assignor, the revenues from the 2005 Measure A "Save Southern Inyo Hospital Panel Tax" as described by Board resolution 05-05 (which are excluded from the definition of Tax Revenues above), shall be sent to Assignor by wire transfer as follows:

        Bank:                 El Dorado
        Bank Account No.:    243 0538 65
        Routing:          321170978

        Southern Inyo Hospital
        501 E. Locust Street
        Lone Pine, CA 93545

Assignor hereby indemnifies and agrees to hold you free and harmless from any and all claims, demands, actions, causes of action, lawsuits, judgments, costs, expenses, and other liabilities of every nature (including reasonable attorney's fees and costs) which may be asserted against you for complying with the provisions of this Assignment.

096608.000010 611030291.2

Exhibit _D_
Page _25_

Very truly yours,

**SOUTHERN INYO HEALTHCARE DISTRICT,**
a healthcare district formed under California
Health and Safety Code § 32000 et seq.

By: _Richard P. Fedchenko_ _____
     Richard P. Fedchenko, Chairman of the
     Board of Directors

Dated: July 25, 2017

Receipt of the foregoing Notice of Assignment is hereby acknowledged by the Inyo County
Auditor/Controller this 26 day of July, 2017.

_Amy Shepherd_ _____
Name

_Auditor-Controller_ _____
Title

2

Exhibit D
Page 26