Ashley M. McDow (245114)
Fahim Farivar (252153)
**FOLEY & LARDNER LLP**
555 S. Flower St. #3500
Los Angeles, CA 90071
Telephone: 213.972.4500
Facsimile: 213.486.0065
Email: amcdow@foley.com
ffarivar@foley.com

Attorneys for Debtor,
SOUTHERN INYO HEALTHCARE DISTRICT

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

### FRESNO DIVISION

In re

SOUTHERN INYO HEALTHCARE DISTRICT,

        Debtor.

Case No.: 2016-10015

Chapter 9

**CHAPTER 9 STATUS REPORT**

Status Conference:
Date: August 29, 2018
Time: 1:30 p.m.
Place: Dept. A, Ctrm 11
U.S. Bankruptcy Court
2500 Tulare Street
Fresno, CA 93721

      SOUTHERN INYO HEALTHCARE DISTRICT ("SIHD" or the "Debtor"), the debtor in the above-captioned bankruptcy case (the "Bankruptcy Case"), respectfully submits the within *Chapter 9 Status Report*.

/ / /

/ / /

/ / /

/ / /

/ / /

## I. BANKRUPTCY CASE

### A. Petition and Schedules

On January 4, 2016, SIHD commenced the instant Bankruptcy Case by filing a voluntary petition for relief (the "Petition") under chapter 9 of title 11 of the United States Code (the "Bankruptcy Code").

On or about January 19, 2016, the Debtor filed its schedules and statement of financial affairs. On or about February 5, 2016, the Debtor filed an amended summary of schedules as well as amended versions of Schedule D, Schedule E and Schedule F. On or about February 9, 2016, the Debtor filed an amended version of Schedule G. On or about March 3, 2016, the Debtor filed a second amended version of Schedule G.

On or about July 12, 2016, the Court entered an *Order for Relief under Chapter 9* in the Bankruptcy Case.

### B. Appointment of Patient Care Ombudsman

On or about January 6, 2016, the Court issued the *Order to Appear and Show Cause Why a Patient Care Ombudsman Should Not Be Appointed*. On or about January 25, 2016, SIHD filed the *Debtor's Motion to Excuse the Appointment of a Patient Care Ombudsman*. On or about February 3, 2016, the Debtor filed the *Declaration of Colleen Wilson, Chief Nursing Officer, in Support of the Motion to Excuse the Appointment of a Patient Care Ombudsman*. A hearing to consider the appointment of a patient care ombudsman was held on February 10, 2016, at 1:30 p.m. On or about February 16, 2016, the Court entered an order denying the *Debtor's Motion to Excuse the Appointment of a Patient Care Ombudsman*. On or about February 17, 2016, the Court entered an order directing the appointment of a patient care ombudsman. On or about March 4, 2016, the Office of the United States Trustee filed a notice regarding the appointment of Joseph Rodriques as patient care ombudsman (the "Ombudsman").

On or about April 8, 2016, the Ombudsman filed the *First Report of the Patient Care Ombudsman*, which indicated, among other things, that no complaints had been made regarding the services provided by the Debtor. Accordingly, the Ombudsman had no recommendations for the Court.

1　　　　On or about June 7, 2016, the Ombudsman filed the *Second Report of the Patient Care
2　*Ombudsman*, which indicated, among other things, that patients were comfortable and receiving
3　adequate care. Accordingly, the Ombudsman had no recommendations for the Court.
4　　　　On or about August 5, 2016, the Ombudsman filed the *Third Report of the Patient Care
5　Ombudsman*, which indicated, among other things, that patients were comfortable and presented
6　no complaints regarding the facility or the treatment they were receiving. Accordingly, the
7　Ombudsman had no recommendations for the Court.
8　　　　On or about October 4, 2016, the Ombudsman filed the *Fourth Report of the Patient Care
9　Ombudsman*, which indicated, among other things, that patients were comfortable and presented
10　no complaints regarding the facility or the treatment they were receiving. Additionally, the
11　Ombudsman did not note any issues with the operations of the facility and, thus, had no
12　recommendations for the Court.
13　　　　On or about December 2, 2016, the Ombudsman filed the *Fifth Report of the Patient Care
14　Ombudsman*, which indicated, among other things, that the patients were comfortable and that
15　SIHD expeditiously addressed the few minor issues that had arisen. Accordingly, the
16　Ombudsman had no recommendations for the Court.
17　　　　On or about January 31, 2017, the Ombudsman filed the *Sixth Report of the Patient Care
18　Ombudsman*, which indicated, among other things, that the facility appeared to be clean, patients
19　were comfortable and that SIHD had expeditiously addressed and/or was working to resolve the
20　few minor issues that had arisen. Accordingly, the Ombudsman had no recommendations for the
21　Court.
22　　　　On or about March 28, 2017, the Ombudsman filed the *Seventh Report of the Patient Care
23　Ombudsman*, which indicated, among other things, that the patients were comfortable and
24　satisfied with the services, the facility staff assisted residents routinely with daily activities, and
25　that SIHD had expeditiously addressed a minor complaint that had arisen. Accordingly, the
26　Ombudsman had no recommendations for the Court.
27　　　　On or about May 19, 2017, the Ombudsman filed the *Eighth Report of the Patient Care
28　Ombudsman*, which indicated, among other things, that the facility appeared to be clean, patients

1 were comfortable and that SIHD had expeditiously addressed and/or was working to resolve the
2 minor issues that had arisen. Accordingly, the Ombudsman had no recommendations for the
3 Court.

4 On or about July 12, 2017, the Ombudsman filed the *Ninth Report of the Patient Care*
5 *Ombudsman*, which indicated, among other things, that the facility appeared to be clean, and
6 patients were comfortable. The report also noted that SIHD had expeditiously addressed the
7 minor issues that had arisen. Accordingly, the Ombudsman had no recommendations for the
8 Court.

9 On or about September 8, 2017, the Ombudsman filed the *Tenth Report of the Patient*
10 *Care Ombudsman*, which indicated, among other things, that the facility appeared to be clean,
11 residents appeared clean and were appropriately dressed for the time of year and day, and menus
12 were posted and residents reported being satisfied with their choices. The Ombudsman had no
13 recommendations for the Court.

14 On or about November 3, 2017, the Ombudsman filed the *Eleventh Report of the Patient*
15 *Care Ombudsman*, which indicated, among other things, that the local ombudsman program had
16 not received any concerns involving vendors, utilities, or external support factors that might
17 impact resident care. With respect to the one minor complaint that was received during the
18 relevant period, the Ombudsman noted that the resident reported that the matter had been resolved
19 when he met with him. The Ombudsman had no recommendations for the Court.

20 On or about January 2, 2018, the Ombudsman filed the *Twelfth Report of the Patient Care*
21 *Ombudsman*, which indicated, among other things, that the local ombudsman program had not
22 received any concerns involving vendors, utilities, or external support factors that might impact
23 resident care and several of the residents had indicated that they were comfortable and had no
24 complaints. The report also noted that the minor issues that had arisen during the relevant period
25 had been addressed. Accordingly, the Ombudsman had no recommendations for the Court.

26 On or about March 2, 2018, the Ombudsman filed the *Thirteenth Report of the Patient*
27 *Care Ombudsman*, which indicated, among other things, that the local ombudsman program had
28 not received any concerns involving vendors, utilities, or external support factors that might

1  impact resident care. the facility appeared to be clean, and patients were comfortable.  The report
2  also noted that SIHD had addressed the issues that had arisen, and with respect to the one matter
3  that the Ombudsman had reported to the California Department of Public Health ("CDPH"), the
4  CDPH notified the Ombudsman that the allegations were unsubstantiated.  Accordingly, the
5  Ombudsman had no recommendations for the Court.

6  On or about May 1, 2018, the Ombudsman filed the *Fourteenth Report of the Patient Care*
7  *Ombudsman*, which indicated, among other things, that the local ombudsman program had not
8  received any concerns involving vendors, utilities, or external support factors that might impact
9  resident care, and the Ombudsman noted that the facility appeared to be clean, residents appeared
10 clean and were appropriately dressed for the time of year and day, and menus were posted and
11 residents reported being satisfied with their choices  The report also noted that SIHD had
12 addressed the two issues that had arisen, and that the parent of one of the residents who had
13 lodged a complaint with SIHD advised that she was comfortable with the steps the facility had
14 taken to ensure the safety of her parent.

15 On or about June 29, 2018, the Ombudsman filed the *Fifteenth Report of the Patient Care*
16 *Ombudsman*, which indicated, among other things, that the local ombudsman program had not
17 received any concerns involving vendors, utilities, or external support factors that might impact
18 resident care, and the Ombudsman noted that the facility appeared to be clean, residents appeared
19 clean and were appropriately dressed for the time of year and day.  The report also noted that
20 SIHD had addressed the one issue that had arisen regarding the posting menu in the facility, and
21 the complaint of a resident regarding personal funds was satisfactorily resolved.

22 **C.    Adequate Assurance Stipulations And Orders Thereon**

23 SIHD negotiated stipulations regarding the provision of adequate assurances pursuant to
24 11 U.S.C. §366 with the following utility providers: (a) the Los Angeles Department of Water
25 and Power ("LADWP"); (b) Preferred Septic and Disposal; (c) Eastern Sierra Propane; (d)
26 Thomas Petroleum; (e) California Broadband; (f) ATI Medical Waste Management; (g) the
27 County of Inyo Town and Water Systems; and (h) Bishop Welding.  The Court subsequently
28 entered orders approving the foregoing stipulations.

- 5 -

**D.　Executory Contracts/Unexpired Leases**

　　1.　**BETA Risk Management Authority**

On or about March 17, 2016, SIHD and BETA Risk Management Authority ("BETA") entered into a stipulation to assume certain insurance agreements by and between SIHD and BETA. On or about March 22, 2016, the Court entered an order approving the stipulation between SIHD and BETA and the assumption of the subject agreements.

　　2.　**Everbank Commercial Finance, Inc.**

SIHD rejected an unexpired lease/executory contract with Everbank Commercial Finance, Inc. ("Everbank") for certain medical equipment (the "Everbank Agreement"). Following the rejection of the Everbank Agreement, SIHD agreed to purchase the equipment subject thereto. On or about March 7, 2017, SIHD filed a motion seeking approval of the settlement and mutual release agreement (the "Settlement Agreement") by and between SIHD and Everbank pursuant to Rule 9019 of Federal Rule of Bankruptcy Procedure, which the Court approved by entry of an order on or about March 22, 2017. In sum, SIHD agreed to pay Everbank the sum of One Hundred Fifty Thousand Dollars ($150,000.00) in exchange for the withdrawal of proof of claim no. 43-1 filed by Everbank in the Bankruptcy Case (the "Everbank POC"), and a release and/or transfer, as applicable, from Everbank to SIHD of any and all right(s), title and interest in various medical equipment that was the subject of the Everbank Agreement. The Settlement Agreement also provided for mutual and general releases by and between SIHD and Everbank. SIHD has paid the amounts due under the Settlement Agreement, and title to the medical equipment has been transferred to SIHD. In addition, on or about June 14, 2017, Everbank withdrew the Everbank POC.

　　3.　**Healthcare Conglomerate Associates, LLC**

On or about January 2, 2016, SIHD entered into a management agreement with Healthcare Conglomerate Associates, LLC ("HCCA") (the "HCCA Management Agreement"). On or about October 17, 2017, SIHD filed an *Emergency Motion (1) For Authority to Immediately Terminate the HCCA Management Agreement Or, In The Alternative, For Authority To Modify The Terms Of The HCCA Management Agreement In Order To Designate The Board*

1 *As The Sole Signatory On All District Bank Accounts And (2) To Continue Hearing On Second*
2 *Amended Disclosure Statement And Associated Filing Deadlines* (the "HCCA Termination
3 Motion"). On or about October 23, 2017, the Court entered an order granting the HCCA
4 Termination Motion in part (the "HCCA Termination Order"). More specifically, the HCCA
5 Termination Order authorized SIHD to remove HCCA as the signatory from any and all bank
6 accounts containing SIHD funds, and instructed SIHD to file a supplemental brief addressing,
7 among other issues, whether the HCCA Management Agreement constituted an executory
8 contract within the meaning of 11 U.S.C. §365. On or about November 15, 2017, SIHD filed[1] a
9 supplemental brief in support of the HCCA Termination Motion. On or about November 22,
10 2017, SIHD filed a Notice of Settlement resolving the issues raised by and through the HCCA
11 Termination Motion ("HCCA Termination Settlement"). Among other things, the HCCA
12 Termination Settlement provided for the rejection of the HCCA Management Agreement, and set
13 the deadline for HCCA to file a claim as January 31, 2018 (the "HCCA Bar Date").

### E. Relief from Stay

On or about March 29, 2016, J.M.H., II, a minor, moved for relief from stay to proceed with pending litigation relating to alleged medical malpractice and recover any judgment resulting from such litigation from any insurance coverage. Thereafter, SIHD entered into a stipulation to grant J.M.H., II, relief from the automatic stay to proceed with the pending litigation and seek to recover any judgment from any insurance coverage. The Court entered an order approving the stipulation on or about April 15, 2016.

On or about June 7, 2016, Everbank filed a motion for relief from the automatic stay in order to record a UCC-3 financing statement indicating the assignment of a security interest in certain medical equipment utilized by the hospital. The motion also requested that the Court set a deadline by which SIHD had to either assume or reject the Everbank Agreement. SIHD opposed the motion and, more specifically, the characterization of the agreement as an unexpired lease or executory contract. The Court ultimately granted in part and denied in part Everbank's motion

---

[1] In response to allegations of purported conflict of interest asserted by HCCA against Baker Hostetler, SIHD has retained Dentons LLP as special counsel to handle, amongst other things, the HCCA Termination Motion.

- 7 -

and set a deadline for SIHD to assume or reject the Everbank Agreement. As noted above, the Debtor rejected the Everbank Agreement and, thereafter, Everbank and the Debtor entered into the Settlement Agreement.

### F. Case Administration

#### 1. Licensure

On or about March 1, 2016, the California Department of Public Health (the "CDPH") reinstated SIHD's license to operate the hospital. Following the reinstatement of the license, SIHD commenced operations at the hospital and the associated clinic and skilled nursing facility.

#### 2. Termination of HCCA/Imposition of New Management

Immediately prior to the filing of the Petition, SIHD entered into the HCCA Management Agreement pursuant to which HCCA, among other things, was charged with managing the operations of the Debtor. Following the termination of the HCCA Management Agreement (*as further detailed below*), the Debtor hired Jerrel Tucker ("Mr. Tucker") as the new Chief Financial Officer and Brian Cotter ("Mr. Cotter") as the new Chief Executive Officer. In addition to having significant experience with hospitals of similar size and type as SIHD, including Big Bear, Mr. Tucker was a member of J.W.T. & Associates, LLP, which prepared the most recent audited financials for SIHD. Mr. Cotter has been noted as a transformational executive leader that has led multiple seven figure hospital turn-arounds and excelled in quality metrics and operational efficiencies by implementing LEAN tactics, strategic planning & execution, and leadership accountability. Mr. Cotter has also led operational teams in successful CMS, CDPH surveys that include DNV, Medication Error Reduction Plan (MERP), Life Safety, Sub-Acute, SNF, Dietary, Psych, Paramedic Receiving, and Out Patient Services, and has extensive experience with, among other things, both general acute care and critical access hospitals.

#### 3. Financial Advisory Firm

The Debtor has also engaged a financial advisory firm, Force10 Partners, LLC, which has assisted and continues to assist with the analysis of the data and creation of financial

1 projections in furtherance of the plan(s) and disclosure statement(s) which have been filed and are to be filed.

### G. Claims Administration

Pursuant to the *Order Granting Motion to Set Claims Bar Date Pursuant to Fed. R. Bankr. P. 3003(c)(3)* entered by the Court on or about August 16, 2016, the Court set September 30, 2016 as the deadline by which to file claims.

The Debtor continues to negotiate with several individuals and entities to whom and to which avoidance action demand letters were sent. To the extent the Debtor is unable to reach agreement(s) with the recipients of what the Debtor believes to be avoidable transfers, the Debtor will timely commence avoidance actions as necessary and appropriate.

#### 1. Tulare Regional Medical Center

On or about November 6, 2017, Tulare Regional Medical Center ("TRMC") filed an *Administrative Expense Claim* in which it asserted it was entitled to an administrative claim in an amount exceeding $2,500,000 (the "TRMC Claim") (the "TRMC Claim Request"). On or about April 2, 2018, SIHD (through special counsel[2]) filed an opposition to the TRMC Claim Request. Since that time, SIHD and Tulare have been negotiating the issues underlying the TRMC Claim Request, and have agreed in principle to treat the entirety of the TRMC Claim as a general unsecured claim, with the amount subject to negotiation between the parties and, if that fails, mediation. The parties are working diligently towards finalizing and filing a stipulation reflecting the treatment of the TRMC Claim prior to the date of the status conference.

#### 2. Healthcare Conglomerate Associates, LLC

On or about January 30, 2018, HCCA filed a *Request For Payment Of Administrative Expense Claim of Healthcare Conglomerate Associates, LLC Arising Out Of Rejection Of Executory Contract (11 U.S.C. §§503(b) and 507(a)(2))* (the "HCCA Administrative Claim Request"), in which HCCA asserted a claim with purported administrative priority in the amount of $2,524,054.00 for damages arising from the rejection of the HCCA Management Agreement (the "HCCA Claim"). On or about February 23, 2018, SIHD filed an opposition to the

---

[2] In an abundance of caution, special counsel for SIHD is also handling issues relating to the TRMC Claim.

- 9 -

1　HCCA Administrative Claim Request. On or about February 26, 2018, the Court issued a

2　memorandum informing HCCA that it would not take any action with respect to the HCCA

3　Administrative Claim Request unless and until HCCA complied with the notice and hearing

4　requirement set forth in 11 USC §503(b). To date, HCCA has not yet complied with 11 USC

5　§503(b), and has made no effort otherwise to have the matter brought for hearing before the

6　Court, and thus the matter remains unresolved. As there is no mechanism (of which the Debtor is

7　aware) to compel a hearing on the HCCA Administrative Claim Request, the Debtor respectfully

8　requests that the Court set a hearing thereon in order to advance this matter towards resolution.

### H. Pending and Prior Litigation

#### 1. The Anderson, Craneware and Perez Litigation

11　As of the commencement of the Bankruptcy Case, the Debtor was party to certain

12　lawsuits, including the following: *Perez v. Kibler, et al.*, case no. SICV CV 1457395, pending in

13　the California Superior Court for the County of Inyo (the "Perez Litigation"); *Anderson v.

14　Southern Inyo Healthcare District*, case no. 30-2015-00817277-CL-CL-CJC (the "Anderson

15　Litigation"); and *Craneware, Inc. v. Southern Inyo Healthcare District*, 15CV04309, pending in

16　the District Court of Johnson County, Kansas (the "Craneware Litigation").

17　On or about February 1, 2016, the Anderson Litigation was dismissed.

18　On or about March 30, 2016, the Debtor removed the Craneware Litigation to this Court.

19　On or about August 29, 2016, the Court dismissed the Craneware Litigation for failure to

20　prosecute. On or about January 27, 2017, the underlying state court action was dismissed without

21　prejudice.

22　Based on the nature of the Perez Litigation, the Debtor did not remove that action.

#### 2. The California Department of Public Health Litigation

24　In addition to the actions pending on the petition date, on or about January 13,

25　2016, the Debtor filed a complaint against the CDPH and Karen Smith—thereby commencing the

26　adversary proceeding styled *Southern Inyo Healthcare District v. California Department of

27　Public Health, et al.*, adv. no. 2016-01008 (the "CDPH Adversary"). By and through the CDPH

28　Adversary, the Debtor sought a determination that the suspension or revocation of the Debtor's

1 hospital licensure violated the automatic stay. Following the reinstatement of SIHD's licenses,
2 the Debtor and the defendants in the CDPH Adversary reached an agreement to dismiss the
3 CDPH Adversary without prejudice. On or about March 9, 2016, SIHD filed a stipulation to
4 dismiss the CDPH Adversary without prejudice, which the Court approved by order entered on or
5 about March 10, 2016.

### 3. The Optum Bank Litigation

On or about August 15, 2017, the Debtor filed a complaint seeking to disallow the purported secured claim (the "Optum Claim") asserted by Optum Bank, Inc. ("Optum") and invalidate any and all security interest(s) and set aside any and all liens associated therewith (the "Optum Complaint"). The resulting adversary proceeding is styled *Southern Inyo Healthcare District v. Optum Bank, Inc.*, adv. no. 2017-01077 FEC (the "Optum Adversary").

On or about October 27, 2017, Optum filed an answer and counterclaim to the Optum Complaint (the "Counterclaim"). On or about March 20, 2018, the Debtor filed an answer to the Counterclaim (the "Optum Answer"). On or about April 5, 2018, the Court entered an order setting various dates and deadlines related to the Optum Adversary.

On or about April 10, 2018, Optum filed the *Motion to Strike Southern Inyo Healthcare District's Affirmative Defenses to Optum Bank's Counterclaim* (the "Motion to Strike"). The Motion to Strike sought to dismiss certain of the Debtor's certain affirmative defenses raised in the Optum Answer (the "Optum Affirmative Defenses").

On or about May 8, 2018, the Motion to Strike came on for hearing (the "Motion to Strike Hearing") before the Court and was granted with fourteen (14) days leave to amend. On May 19, 2018, the Debtor filed the amended answer to the Counterclaim, which addressed the concerns raised by the Court during the Motion to Strike Hearing.

Over the past couple of months, the Debtor has been diligently responding to written discovery propounded by Optum and is in the process of propounding written discovery to be propounded on Optum.

### 4. The HCCA/VI Healthcare Litigation

- 11 -

SIHD has recently retained Jeffrey S. Shinbrot, APLC in connection with the preparation and filing of a complaint against HCCA and related entities. In this capacity, Mr. Shinbrot reviewed evidence, conducted witness interviews, and on or about May 30, 2018, filed a complaint containing numerous claims for relief against HCCA and a related entity, VI Healthcare Finance, Inc. ("Vi"), *styled as Southern Inyo Healthcare District v. Healthcare Conglomerate Associates, LLC, et. al.* adv. no. 2018-01031 FEC (the "HCCA Complaint") (the "HCCA Adversary"). As set forth in the HCCA Complaint, the Debtor has asserted claims for including, but not limited to, those relating to violations of California's False Claims Act, violation of California's Government Code, Breach of Fiduciary Duty and other business torts. On or about June 29, 2018, HCCA and Vi filed their answer to the HCCA Complaint. The conference and requisite disclosures pursuant to Federal Rule of Bankruptcy Procedure 7026 have been completed, and the parties are now commencing discovery. All parties to the HCCA Adversary have expressed a desire to mediate, and are discussing potential dates for a mediation that will include multiple parties and claimants - including but not limited to Tulare Regional Medical Center and Baker Hostetler LLP - the majority of which have expressed a willingness and an ability to mediate in early to mid-September. Given the number and amount of the claims at issue in the proposed mediation, the Debtor believes that conducting the mediation prior to proposing an amended plan and disclosure statement is the most efficient use of both community and judicial resources. Accordingly, the Debtor has been expending significant efforts to ensure that the proposed mediation is conducted as early as possible and with as many (potentially) affected parties as possible.

Notwithstanding the foregoing, Mr. Shinbrot also continues to investigate claims for violation of the automatic stay by HCCA and related parties, and if necessary, may leave the Court to amend the HCCA Complaint.

5. **Avoidance Action Litigations**

On or about July 12, 2018, the Debtor commenced five lawsuits against Coast To Coast Healthcare Services, Inc., Premier, Emergency Physicians of California Medical Group., Optum, Healthland, Inc., and Healthcare Resource Group, Inc., in which the Debtor sought the avoidance

- 12 -

1  and recovery of preferential transfers, preservation of avoided transfers, and disallowance of any
2  claims  (collectively, the "Avoidance Complaints") (collectively, the "Avoidance Adversaries").
3  The Avoidance Adversaries are more specifically styled as follows:

4  - *Southern Inyo Healthcare District v. Coast To Coast Healthcare Services, Inc.,* adv. no.
5    2018-01044 FEC;
6  - *Southern Inyo Healthcare District v. Premier, Emergency Physicians of California*
7    *Medical Group.,* adv. no. 2018-01047 FEC;
8  - *Southern Inyo Healthcare District v. Optum Bank,* adv. no. 2018-01046 FEC;
9  - *Southern Inyo Healthcare District v. Healthland, Inc.,* adv. no. 2018-01045 FEC; and
10 - *Southern Inyo Healthcare District v. Healthcare Resource Group, Inc.,* adv. no. 2018-
11   01043 FEC.

12  　　The Debtor has served the Avoidance Complaints, and the status conferences in the
13  Avoidance Adversaries are currently set for September 18, 2018.  The Debtor has already begun
14  discussions with a number of the defendants in the Avoidance Adversaries, and is hopeful that
15  most, if not all, of the Avoidance Adversaries can be resolved without further significant
16  expenditure of District resources.  Moreover, and any all funds that are obtained on account of the
17  Avoidance Adversaries will likely be used to fund the amended plan of readjustment to be
18  proposed, and thus, the more advanced the negotiations are, the more definitive the figures
19  contained in the plan of readjustment will be.

20  **II.　　MEDIATION**

21  　　The Debtor believes that mediation may be beneficial in helping to resolve the issues
22  underlying not only the HCCA Adversary, but also one or more of the Avoidance Adversaries
23  depending on whether and to what extent the Debtor is able to resolve the latter in the course of
24  the informal settlement negotiations that have begun.

25  **III.　　SECTION 923 NOTICE**

26  　　On or about February 12, 2016, SIHD filed the *Debtor's Motion for Entry of an Order (1)*
27  *Approving Form of Notice, and (2) Setting Deadline for Filing Objections to Petition*.  On or
28  about March 15, 2016, the Court entered an order approving the motion and proposed manner in

- 13 -

which to provide notice via publication in accordance with 11 U.S.C. §923. The Debtor timely completed all publications required under the order.

## IV. PLAN OF READJUSTMENT

On or about January 27, 2017, the Court entered the *Order Granting Ex Parte Motion to Continue Deadline to File Plan of Adjustment*. Through that order, the Court extended the deadline to file a plan for the adjustment of debts from January 31, 2017 through and including March 31, 2017.

On or about March 31, 2017, the Debtor filed the Plan for the Adjustment of Debts of Southern Inyo Healthcare District (the "Initial Plan"), the Disclosure Statement with Respect to the Plan for the Adjustment of Debts of Southern Inyo Healthcare District (the "Initial Disclosure Statement"), and other related and supporting documents.

Following the hearing on the adequacy of the Initial Disclosure Statement, the Court disapproved the Initial Disclosure Statement in order to enable the Debtor to make certain modifications thereto, including modifications relating to Optum and the Optum Claim. The Court also set the hearing on the adequacy of the amended disclosure statement for August 30, 2017, and directed the Debtor to file its amended plan and disclosure statement.

On or about July 20, 2017, the Debtor filed the First Amended Plan for the Adjustment of Debts of Southern Inyo Healthcare District (the "First Amended Plan"), the First Amended Disclosure Statement with Respect to the Plan for the Adjustment of Debts of Southern Inyo Healthcare District (the "First Amended Disclosure Statement"), and other related and supporting documents.

After filing the First Amended Plan and the First Amended Disclosure Statement, the Debtor engaged in discussions with several creditors, including Optum, regarding the First Amended Plan and the treatment of certain claims and contracts thereunder. As a result of these discussions, the Debtor was able to resolve certain disputes pertaining to the First Amended Plan and/or the First Amended Disclosure Statement. Among these, the Debtor and Optum reached an agreement in principle through which the Debtor agreed to allow Optum to vote on the Plan despite the disputed status of the Optum Claim.

On or about January 17, 2018, the Debtor filed the Second Amended Plan (the "Second Amended Plan") and the Second Amended Disclosure Statement with Respect to the Plan for the Adjustment of Debts of Southern Inyo Healthcare District (the "Second Amended Disclosure Statement"), and other related and supporting documents. Similar to the previous iterations of the plan and disclosure statement, the Second Amended Plan and the Second Amended Disclosure Statement provided for the adjustment of the Debtor's operations and the repayment of its obligations with operational revenues. The Second Amended Disclosure Statement also included additional detail regarding the treatment of the Optum Claim in order to address the objections raised by Optum and comments expressed by the Court with respect to the previous versions of the plan and disclosure statement. On or about February 28, 2018, at the hearing to approve the adequacy of the Second Amended Disclosure Statement, the Debtor withdrew the Second Amended Disclosure Statement given, among other things, the significant change in circumstances that had occurred since the filing thereof.

Since the last status conference (at which appearances were waived), the Debtor has worked diligently to resolve nearly ten million dollars in claims both by and against the Debtor, which, if successful, would pave the way for what would likely be a consensual plan of readjustment. These efforts have culminated in what the Debtor anticipates to be a multi-party mediation - in which the largest purported claim holders against the Debtor will be participating - to be held in the next thirty (30) to forty-five (45) days.

### A. **Potential Funding Sources For Third Amended Plan and Third Amended Disclosure Statement**

1. **Contract For Outpatient Lab Services:** The Debtor has continued to evaluate numerous proposals for outpatient lab services, whereby the Debtor would enter into a "Services Agreement" with an entity which would provide and implement certain administrative, software and management services in furtherance of an exclusive laboratory outreach program at the hospital. The CEO of SIHD has done a significant amount of research into this option, and is confident that pursuing this alternative would generate more than sufficient revenue to enable the Debtor to not only satisfy its obligations under the amended plan and maintain operations on a

moving forward basis, but also to enable SIHD to make capital improvements to the facilities if and when such capital improvements are necessary. However, given the fact that this is a relatively new concept, both the board of directors and counsel continue to conduct further research to confirm the propriety and legality of any and all proposed arrangements before moving forward in this regard.

2. **Settlement With Los Angeles Department of Water and Power:** The Debtor and the Los Angeles Department of Water and Power ("LADWP") have continued to engage in substantive discussions regarding a potential commitment of funds sufficient to ensure the continuation of healthcare services for the District and the community it serves (including countless employees of LADWP) for years to come.

**3.** **Sales Tax Increase:** The Debtor has asked the Inyo County Board of Supervisors to increase the sales tax in Inyo County by one percent (1%), with the proceeds thereof to be reserved solely and expressly for SIHD. Although SIHD has not yet received a formal response from the County, and cannot independently opine on the legality of such an arrangement from the County's perspective, it intends to (continue to) follow-up with the County regularly.

**4.** **Accounts Receivable Financing and/or Factoring:** Prior to the termination of the HCCA Management Agreement, HCCA maintained the data and information needed to complete the Debtor's cost report(s), including the cost report that was due on November 30, 2017 for the fiscal year ending June 30, 2017 (the "Fiscal Year 2017 Cost Report"). Unfortunately, HCCA did not file the November Cost Report, and the Debtor was forced to recreate the information necessary to prepare it following the termination of the HCCA Management Agreement. Unfortunately, due to the delinquent filing(s) and the delinquent cost report, the Centers for Medicare and Medicaid Services ("CMS") began withholding payment at a rate of fifty percent (50%) beginning in November of 2017 (the "Holdback"). This Holdback has caused significant harm to the Debtor and severely impacted the Debtor's cash flow.

Fortunately for the Debtor, the Fiscal Year 2017 Cost Report was filed on March 22, 2018, and accepted by CMS on March 23, 2018. In addition, the financial statement data and

quarterly credit balance reports (which had previously been unavailable to the Debtor) that were due with the cost report were submitted to CMS on May 16, 2018. As result of the acceptance of the Fiscal Year 2017 Cost Report, on or about August 10, 2018, the Debtor received $180,000.00 that had been previously withheld by Medicare, and expects to receive an additional $374,000.00 on or about August 22, 2018 for the corresponding adjustments under the Fiscal Year 2017 Cost Report. Moreover, since the termination of the HCCA Management Agreement, the Debtor has also regained control of the billing system(s), which has resulted in a <u>fifty percent (50%) increase</u> in billings for the period between January 2018 and July 2018.

In addition, on or about August 15, 2018, the Debtor was informed that it would be receiving $302,000.00 from Medicare (within fifteen (15) days of August 8, 2018) based upon a previous underpayment resulting from the failure of HCCA to timely submit the requisite cost-report(s).

In addition, the Debtor has reached an agreement in principle with Paladium M&S Capital Partners, LLC and/or an affiliate thereof to sell its outstanding accounts receivable for five hundred thousand dollars and zero cents ($500,000.00), to be paid within forty-eight (48) hours of execution of the related asset purchase agreement, which counsel for the Debtor is in the process of finalizing. In addition to the foregoing, the Debtor has also engaged in substantive discussions with Paladium M&S Capital Partners, LLC regarding the extension of "DIP" and/or exit financing, and the parties are in the process of evaluating the amount of financing, if any, that is necessary, and what the applicable terms of such financing would be.

Given these significant improvements in the Debtor's financial situation, the Debtor believes that it will be able to satisfy any and all allowed claims against the Debtor by and through the amended plan and disclosure statement to be filed.

4821-1796-7195.1

### 5. Significant Medicare Reimbursement Rate Increase

On or about August 15, 2018, the Debtor was advised that, effective July 18, 2018, the level of interim reimbursement to be paid on Medicare claims was increased from $7,436.00 per day to $9,999.00 per day for acute beds, and from $2,893.00 per day to $9,999.00 per day for swing beds – an unprecedented increase of over 300%! Moreover, the reimbursement rates for part B services provided to skilled nursing residents increased three percent (3%) from sixty nine percent (69%) to seventy two percent (72%). The Debtor anticipates that these rate increases will result in no less than an additional seventy five thousand dollars and zero cents ($75,000.00) of net revenues, which constitutes an additional twenty five percent increase in current net revenues.

## V. CONCLUSION

Given the significant improvement in the financial condition of the Debtor that has occurred since the termination of the HCCA Management Agreement, and the myriad of options continuing to be diligently explored by the Debtor, the Debtor is confident that it will not only be able to satisfy its obligations under the amended plan of readjustment to be filed, but that it will be able to continue to provide and improve the level of healthcare so desperately needed by Southern Inyo and the surrounding communities.

Dated:   August 15, 2018          Respectfully submitted,

**FOLEY & LARDNER LLP**

By:   /s/ Ashley M. McDow
          Ashley M. McDow
          Fahim Farivar

Attorneys for Debtor,
SOUTHERN INYO HEALTHCARE DISTRICT

- 18 -

CHAPTER 9 STATUS REPORT

4821-1796-7195.1