Ashley M. McDow (245114)
Fahim Farivar (252153)
**FOLEY & LARDNER LLP**
555 S. Flower St. #3500
Los Angeles, CA 90071
Telephone: 213.972.4500
Facsimile: 213.486.0065
Email: amcdow@foley.com
ffarivar@foley.com

Attorneys for Debtor,
SOUTHERN INYO HEALTHCARE DISTRICT

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

### FRESNO DIVISION

In re

SOUTHERN INYO HEALTHCARE DISTRICT,

    Debtor.

Case No.: 2016-10015

Chapter 9

FL-003

**CHAPTER 9 STATUS REPORT**

Status Conference:
Date: October 16, 2018
Time: 1:30 p.m.
Place: Dept. A, Ctrm 11
U.S. Bankruptcy Court
2500 Tulare Street
Fresno, CA 93721

SOUTHERN INYO HEALTHCARE DISTRICT ("SIHD" or the "Debtor"), the debtor in the above-captioned bankruptcy case (the "Bankruptcy Case"), respectfully submits the within *Chapter 9 Status Report*.

/ / /

/ / /

/ / /

/ / /

/ / /

CHAPTER 9 STATUS REPORT

4821-1796-7195.1

## I. BANKRUPTCY CASE

### A. Petition and Schedules

On January 4, 2016, SIHD commenced the instant Bankruptcy Case by filing a voluntary petition for relief (the "Petition") under chapter 9 of title 11 of the United States Code (the "Bankruptcy Code").

On or about January 19, 2016, the Debtor filed its schedules and statement of financial affairs. On or about February 5, 2016, the Debtor filed an amended summary of schedules as well as amended versions of Schedule D, Schedule E and Schedule F. On or about February 9, 2016, the Debtor filed an amended version of Schedule G. On or about March 3, 2016, the Debtor filed a second amended version of Schedule G.

On or about July 12, 2016, the Court entered an *Order for Relief under Chapter 9* in the Bankruptcy Case.

### B. Appointment of Patient Care Ombudsman

On or about January 6, 2016, the Court issued the *Order to Appear and Show Cause Why a Patient Care Ombudsman Should Not Be Appointed*. On or about January 25, 2016, SIHD filed the *Debtor's Motion to Excuse the Appointment of a Patient Care Ombudsman*. On or about February 3, 2016, the Debtor filed the *Declaration of Colleen Wilson, Chief Nursing Officer, in Support of the Motion to Excuse the Appointment of a Patient Care Ombudsman*. A hearing to consider the appointment of a patient care ombudsman was held on February 10, 2016, at 1:30 p.m. On or about February 16, 2016, the Court entered an order denying the *Debtor's Motion to Excuse the Appointment of a Patient Care Ombudsman*. On or about February 17, 2016, the Court entered an order directing the appointment of a patient care ombudsman. On or about March 4, 2016, the Office of the United States Trustee filed a notice regarding the appointment of Joseph Rodriques as patient care ombudsman (the "Ombudsman").

On or about April 8, 2016, the Ombudsman filed the *First Report of the Patient Care Ombudsman*, which indicated, among other things, that no complaints had been made regarding the services provided by the Debtor. Accordingly, the Ombudsman had no recommendations for the Court.

On or about June 7, 2016, the Ombudsman filed the *Second Report of the Patient Care Ombudsman*, which indicated, among other things, that patients were comfortable and receiving adequate care. Accordingly, the Ombudsman had no recommendations for the Court.

On or about August 5, 2016, the Ombudsman filed the *Third Report of the Patient Care Ombudsman*, which indicated, among other things, that patients were comfortable and presented no complaints regarding the facility or the treatment they were receiving. Accordingly, the Ombudsman had no recommendations for the Court.

On or about October 4, 2016, the Ombudsman filed the *Fourth Report of the Patient Care Ombudsman*, which indicated, among other things, that patients were comfortable and presented no complaints regarding the facility or the treatment they were receiving. Additionally, the Ombudsman did not note any issues with the operations of the facility and, thus, had no recommendations for the Court.

On or about December 2, 2016, the Ombudsman filed the *Fifth Report of the Patient Care Ombudsman*, which indicated, among other things, that the patients were comfortable and that SIHD expeditiously addressed the few minor issues that had arisen. Accordingly, the Ombudsman had no recommendations for the Court.

On or about January 31, 2017, the Ombudsman filed the *Sixth Report of the Patient Care Ombudsman*, which indicated, among other things, that the facility appeared to be clean, patients were comfortable and that SIHD had expeditiously addressed and/or was working to resolve the few minor issues that had arisen. Accordingly, the Ombudsman had no recommendations for the Court.

On or about March 28, 2017, the Ombudsman filed the *Seventh Report of the Patient Care Ombudsman*, which indicated, among other things, that the patients were comfortable and satisfied with the services, the facility staff assisted residents routinely with daily activities, and that SIHD had expeditiously addressed a minor complaint that had arisen. Accordingly, the Ombudsman had no recommendations for the Court.

On or about May 19, 2017, the Ombudsman filed the *Eighth Report of the Patient Care Ombudsman*, which indicated, among other things, that the facility appeared to be clean, patients

1    were comfortable and that SIHD had expeditiously addressed and/or was working to resolve the
2    minor issues that had arisen. Accordingly, the Ombudsman had no recommendations for the
3    Court.

4         On or about July 12, 2017, the Ombudsman filed the *Ninth Report of the Patient Care
5    Ombudsman*, which indicated, among other things, that the facility appeared to be clean, and
6    patients were comfortable. The report also noted that SIHD had expeditiously addressed the
7    minor issues that had arisen. Accordingly, the Ombudsman had no recommendations for the
8    Court.

9         On or about September 8, 2017, the Ombudsman filed the *Tenth Report of the Patient
10    Care Ombudsman*, which indicated, among other things, that the facility appeared to be clean,
11    residents appeared clean and were appropriately dressed for the time of year and day, and menus
12    were posted and residents reported being satisfied with their choices. The Ombudsman had no
13    recommendations for the Court.

14         On or about November 3, 2017, the Ombudsman filed the *Eleventh Report of the Patient
15    Care Ombudsman*, which indicated, among other things, that the local ombudsman program had
16    not received any concerns involving vendors, utilities, or external support factors that might
17    impact resident care. With respect to the one minor complaint that was received during the
18    relevant period, the Ombudsman noted that the resident reported that the matter had been resolved
19    when he met with him. The Ombudsman had no recommendations for the Court.

20         On or about January 2, 2018, the Ombudsman filed the *Twelfth Report of the Patient Care
21    Ombudsman*, which indicated, among other things, that the local ombudsman program had not
22    received any concerns involving vendors, utilities, or external support factors that might impact
23    resident care and several of the residents had indicated that they were comfortable and had no
24    complaints. The report also noted that the minor issues that had arisen during the relevant period
25    had been addressed. Accordingly, the Ombudsman had no recommendations for the Court.

26         On or about March 2, 2018, the Ombudsman filed the *Thirteenth Report of the Patient
27    Care Ombudsman*, which indicated, among other things, that the local ombudsman program had
28    not received any concerns involving vendors, utilities, or external support factors that might

1  impact resident care. the facility appeared to be clean, and patients were comfortable.  The report
2  also noted that SIHD had addressed the issues that had arisen, and with respect to the one matter
3  that the Ombudsman had reported to the California Department of Public Health ("CDPH"), the
4  CDPH notified the Ombudsman that the allegations were unsubstantiated.  Accordingly, the
5  Ombudsman had no recommendations for the Court.
6        On or about May 1, 2018, the Ombudsman filed the *Fourteenth Report of the Patient Care*
7  *Ombudsman*, which indicated, among other things, that the local ombudsman program had not
8  received any concerns involving vendors, utilities, or external support factors that might impact
9  resident care, and the Ombudsman noted that the facility appeared to be clean, residents appeared
10  clean and were appropriately dressed for the time of year and day, and menus were posted and
11  residents reported being satisfied with their choices  The report also noted that SIHD had
12  addressed the two issues that had arisen, and that the parent of one of the residents who had
13  lodged a complaint with SIHD advised that she was comfortable with the steps the facility had
14  taken to ensure the safety of her parent.
15        On or about June 29, 2018, the Ombudsman filed the *Fifteenth Report of the Patient Care*
16  *Ombudsman*, which indicated, among other things, that the local ombudsman program had not
17  received any concerns involving vendors, utilities, or external support factors that might impact
18  resident care, and the Ombudsman noted that the facility appeared to be clean, residents appeared
19  clean and were appropriately dressed for the time of year and day.  The report also noted that
20  SIHD had addressed the one issue that had arisen regarding the posting menu in the facility, and
21  the complaint of a resident regarding personal funds was satisfactorily resolved.
22        On or about August 28, 2018, the Ombudsman filed the *Sixteenth Report of the Patient*
23  *Care Ombudsman*, which indicated, among other things, that the local ombudsman program had
24  not received any concerns involving vendors, utilities, or external support factors that might
25  impact resident care, and the Ombudsman noted that the facility appeared to be clean, residents
26  appeared clean and were appropriately dressed for the time of year and day.  The report also
27  noted that SIHD had addressed through proper channels the three complaints that had arisen
28  regarding the readmission of a resident, alleged sexual abuse, and the discharge plan of a resident.

**C.　Adequate Assurance Stipulations And Orders Thereon**

SIHD negotiated stipulations regarding the provision of adequate assurances pursuant to 11 U.S.C. §366 with the following utility providers: (a) the Los Angeles Department of Water and Power ("LADWP"); (b) Preferred Septic and Disposal; (c) Eastern Sierra Propane; (d) Thomas Petroleum; (e) California Broadband; (f) ATI Medical Waste Management; (g) the County of Inyo Town and Water Systems; and (h) Bishop Welding.  The Court subsequently entered orders approving the foregoing stipulations.

**D.　Executory Contracts/Unexpired Leases**

　　1.　**BETA Risk Management Authority**

On or about March 17, 2016, SIHD and BETA Risk Management Authority ("BETA") entered into a stipulation to assume certain insurance agreements by and between SIHD and BETA.  On or about March 22, 2016, the Court entered an order approving the stipulation between SIHD and BETA and the assumption of the subject agreements.

　　2.　**Everbank Commercial Finance, Inc.**

SIHD rejected an unexpired lease/executory contract with Everbank Commercial Finance, Inc. ("Everbank") for certain medical equipment (the "Everbank Agreement").  Following the rejection of the Everbank Agreement, SIHD agreed to purchase the equipment subject thereto. On or about March 7, 2017, SIHD filed a motion seeking approval of the settlement and mutual release agreement (the "Settlement Agreement") by and between SIHD and Everbank pursuant to Rule 9019 of Federal Rule of Bankruptcy Procedure, which the Court approved by entry of an order on or about March 22, 2017.  In sum, SIHD agreed to pay Everbank the sum of One Hundred Fifty Thousand Dollars ($150,000.00) in exchange for the withdrawal of proof of claim no. 43-1 filed by Everbank in the Bankruptcy Case (the "Everbank POC"), and a release and/or transfer, as applicable, from Everbank to SIHD of any and all right(s), title and interest in various medical equipment that was the subject of the Everbank Agreement.  The Settlement Agreement also provided for mutual and general releases by and between SIHD and Everbank.  SIHD has paid the amounts due under the Settlement Agreement, and title to the medical equipment has

been transferred to SIHD.  In addition, on or about June 14, 2017, Everbank withdrew the Everbank POC.

### 3. **Healthcare Conglomerate Associates, LLC**

On or about January 2, 2016, SIHD entered into a management agreement with Healthcare Conglomerate Associates, LLC ("HCCA") (the "HCCA Management Agreement"). On or about October 17, 2017, SIHD filed an *Emergency Motion (1) For Authority to Immediately Terminate the HCCA Management Agreement Or, In The Alternative, For Authority To Modify The Terms Of The HCCA Management Agreement In Order To Designate The Board As The Sole Signatory On All District Bank Accounts And (2) To Continue Hearing On Second Amended Disclosure Statement And Associated Filing Deadlines* (the "HCCA Termination Motion").  On or about October 23, 2017, the Court entered an order granting the HCCA Termination Motion in part (the "HCCA Termination Order").  More specifically, the HCCA Termination Order authorized SIHD to remove HCCA as the signatory from any and all bank accounts containing SIHD funds, and instructed SIHD to file a supplemental brief addressing, among other issues, whether the HCCA Management Agreement constituted an executory contract within the meaning of 11 U.S.C. §365. On or about November 15, 2017, SIHD filed[1] a supplemental brief in support of the HCCA Termination Motion.  On or about November 22, 2017, SIHD filed a Notice of Settlement resolving the issues raised by and through the HCCA Termination Motion ("HCCA Termination Settlement").  Among other things, the HCCA Termination Settlement provided for the rejection of the HCCA Management Agreement, and set the deadline for HCCA to file a claim as January 31, 2018 (the "HCCA Bar Date").

**E.**     **Relief from Stay**

On or about March 29, 2016, J.M.H., II, a minor, moved for relief from stay to proceed with pending litigation relating to alleged medical malpractice and recover any judgment resulting from such litigation from any insurance coverage.  Thereafter, SIHD entered into a stipulation to grant J.M.H., II, relief from the automatic stay to proceed with the pending

---

[1] In response to allegations of purported conflict of interest asserted by HCCA against Baker Hostetler, SIHD retained Dentons LLP and The Shinbrot Firm as special counsel to handle, amongst other things, the HCCA Termination Motion.

- 7 -

litigation and seek to recover any judgment from any insurance coverage. The Court entered an order approving the stipulation on or about April 15, 2016.

On or about June 7, 2016, Everbank filed a motion for relief from the automatic stay in order to record a UCC-3 financing statement indicating the assignment of a security interest in certain medical equipment utilized by the hospital. The motion also requested that the Court set a deadline by which SIHD had to either assume or reject the Everbank Agreement. SIHD opposed the motion and, more specifically, the characterization of the agreement as an unexpired lease or executory contract. The Court ultimately granted in part and denied in part Everbank's motion and set a deadline for SIHD to assume or reject the Everbank Agreement. As noted above, the Debtor rejected the Everbank Agreement and, thereafter, Everbank and the Debtor entered into the Settlement Agreement.

### F.　Case Administration

#### 1.　Licensure

On or about March 1, 2016, the California Department of Public Health (the "CDPH") reinstated SIHD's license to operate the hospital. Following the reinstatement of the license, SIHD commenced operations at the hospital and the associated clinic and skilled nursing facility.

#### 2.　Termination of HCCA/Imposition of New Management

Immediately prior to the filing of the Petition, SIHD entered into the HCCA Management Agreement pursuant to which HCCA, among other things, was charged with managing the operations of the Debtor. Following the termination of the HCCA Management Agreement (*as further detailed below*), the Debtor hired Jerrel Tucker ("Mr. Tucker") as the new Chief Financial Officer ("CFO") and Brian Cotter ("Mr. Cotter") as the new Chief Executive Officer. Mr. Cotter has been noted as a transformational executive leader that has led multiple seven figure hospital turn-arounds and excelled in quality metrics and operational efficiencies by implementing LEAN tactics, strategic planning & execution, and leadership accountability. Mr. Cotter has also led operational teams in successful CMS, CDPH surveys that include DNV, Medication Error Reduction Plan (MERP), Life Safety, Sub-Acute, SNF, Dietary, Psych, Paramedic Receiving, and Out Patient Services, and has extensive experience with, among other things, both general acute

- 8 -

care and critical access hospitals. Due to health issues, Mr. Tucker was unable to continue in his capacity as CFO; however, the Debtors were incredibly fortunate that Chet Beedle ("Mr. Beedle"), the (former) CFO of both Kern Valley Healthcare District and Tehachapi Valley Healthcare District, recently agreed to serve as the CFO of the Debtor. As a seasoned healthcare executive, Mr. Beedle has significant experience in navigating the unique challenges presented by a rural healthcare facility, and has already proven to be a valuable addition to the management team.

### 3. Financial Advisory Firm

The Debtor has also engaged a financial advisory firm, Force10 Partners, LLC, which has assisted and continues to assist with the analysis of the data and creation of financial projections in furtherance of the plan(s) and disclosure statement(s) which have been filed and are to be filed.

## G. Claims Administration

Pursuant to the *Order Granting Motion to Set Claims Bar Date Pursuant to Fed. R. Bankr. P. 3003(c)(3)* entered by the Court on or about August 16, 2016, the Court set September 30, 2016 as the deadline by which to file claims.

The Debtor continues to negotiate with several individuals and entities to whom and to which avoidance action demand letters were sent. To the extent the Debtor is unable to reach agreement(s) with the recipients of what the Debtor believes to be avoidable transfers, the Debtor will timely commence avoidance actions as necessary and appropriate.

### 1. Tulare Regional Medical Center

On or about November 6, 2017, Tulare Regional Medical Center ("TRMC") filed an *Administrative Expense Claim* in which it asserted it was entitled to an administrative claim in an amount exceeding $2,500,000 (the "TRMC Claim") (the "TRMC Claim Request"). On or about April 2, 2018, SIHD (through special counsel) filed an opposition to the TRMC Claim Request. Since that time, SIHD and Tulare have been negotiating the issues underlying the TRMC Claim Request, and have agreed in principle to treat the entirety of the TRMC Claim as a general unsecured claim, with the amount subject to negotiation between the parties. To this end,

- 9 -

TRMC recently provided the Debtor with detailed documentation supporting the TRMC Claim, which the Debtor is in the process of investigating. The Debtor anticipates completing this investigation prior to the status conference such that a resolution of the TRMC Claim can be reached in short order.

### 2. Healthcare Conglomerate Associates, LLC

On or about January 30, 2018, HCCA filed a *Request For Payment Of Administrative Expense Claim of Healthcare Conglomerate Associates, LLC Arising Out Of Rejection Of Executory Contract (11 U.S.C. §§503(b) and 507(a)(2))* (the "HCCA Administrative Claim Request"), in which HCCA asserted a claim with purported administrative priority in the amount of $2,524,054.00 for damages arising from the rejection of the HCCA Management Agreement (the "HCCA Claim"). On or about February 23, 2018, SIHD filed an opposition to the HCCA Administrative Claim Request. On or about February 26, 2018, the Court issued a memorandum informing HCCA that it would not take any action with respect to the HCCA Administrative Claim Request unless and until HCCA complied with the notice and hearing requirement set forth in 11 USC §503(b). To date, HCCA has not yet complied with 11 USC §503(b), and has made no effort otherwise to have the matter brought for hearing before the Court, and thus the matter remains unresolved.

### H. Pending and Prior Litigation

#### 1. The Anderson, Craneware and Perez Litigation

As of the commencement of the Bankruptcy Case, the Debtor was party to certain lawsuits, including the following: *Perez v. Kibler, et al.*, case no. SICV CV 1457395, pending in the California Superior Court for the County of Inyo (the "Perez Litigation"); *Anderson v. Southern Inyo Healthcare District*, case no. 30-2015-00817277-CL-CL-CJC (the "Anderson Litigation"); and *Craneware, Inc. v. Southern Inyo Healthcare District*, 15CV04309, pending in the District Court of Johnson County, Kansas (the "Craneware Litigation").

On or about February 1, 2016, the Anderson Litigation was dismissed.

On or about March 30, 2016, the Debtor removed the Craneware Litigation to this Court. On or about August 29, 2016, the Court dismissed the Craneware Litigation for failure to

- 10 -

prosecute. On or about January 27, 2017, the underlying state court action was dismissed without prejudice.

Based on the nature of the Perez Litigation, the Debtor did not remove that action.

### 2. The California Department of Public Health Litigation

In addition to the actions pending on the petition date, on or about January 13, 2016, the Debtor filed a complaint against the CDPH and Karen Smith—thereby commencing the adversary proceeding styled *Southern Inyo Healthcare District v. California Department of Public Health, et al.*, adv. no. 2016-01008 (the "CDPH Adversary"). By and through the CDPH Adversary, the Debtor sought a determination that the suspension or revocation of the Debtor's hospital licensure violated the automatic stay. Following the reinstatement of SIHD's licenses, the Debtor and the defendants in the CDPH Adversary reached an agreement to dismiss the CDPH Adversary without prejudice. On or about March 9, 2016, SIHD filed a stipulation to dismiss the CDPH Adversary without prejudice, which the Court approved by order entered on or about March 10, 2016.

### 3. The Optum Bank Litigation

On or about August 15, 2017, the Debtor filed a complaint seeking to disallow the purported secured claim (the "Optum Claim") asserted by Optum Bank, Inc. ("Optum") and invalidate any and all security interest(s) and set aside any and all liens associated therewith (the "Optum Complaint"). The resulting adversary proceeding is styled *Southern Inyo Healthcare District v. Optum Bank, Inc.*, adv. no. 2017-01077 FEC (the "Optum Adversary").

On or about October 27, 2017, Optum filed an answer and counterclaim to the Optum Complaint (the "Counterclaim"). On or about March 20, 2018, the Debtor filed an answer to the Counterclaim (the "Optum Answer"). On or about April 5, 2018, the Court entered an order setting various dates and deadlines related to the Optum Adversary.

On or about April 10, 2018, Optum filed the *Motion to Strike Southern Inyo Healthcare District's Affirmative Defenses to Optum Bank's Counterclaim* (the "Motion to Strike"). The Motion to Strike sought to dismiss certain of the Debtor's certain affirmative defenses raised in the Optum Answer (the "Optum Affirmative Defenses").

- 11 -

1　　　On or about May 8, 2018, the Motion to Strike came on for hearing (the "Motion to Strike
2　Hearing") before the Court and was granted with fourteen (14) days leave to amend.  On May 19,
3　2018, the Debtor filed the amended answer to the Counterclaim, which addressed the concerns
4　raised by the Court during the Motion to Strike Hearing.
5　　　Pursuant to this Court's Amended Scheduling Order in the Optum Adversary, dated April
6　5, 2018, the deadlines in the Optum Adversary are currently as follows:
7　　　　　a.　Close of Fact Discovery - October 31, 2018;
8　　　　　b.　Deadline for Disclosure of Expert Witnesses and Retained Expert's Reports -
9　　　　　　　November 30, 2018;
10　　　　　c.　Deadline for Disclosure of Rebuttal Expert Witnesses - January 2, 2019;
11　　　　　d.　Close of Expert Discovery - January 31, 2019;
12　　　　　e.　Dispositive Motion Deadline - April 30, 2019; and
13　　　　　f.　Final Pretrial Conference - May 29, 2019.
14　　　The parties have each propounded written discovery, and are in the process of noticing
15　depositions of key witnesses.  Since the last status conference, Optum has made a settlement offer
16　to the Debtor, which the Debtor is presently considering.  However, now that a formal and
17　comprehensive settlement offer has been extended by Optum, the Debtor believes that mediation
18　would be beneficial in assisting the parties with reaching a global resolution in the most efficient
19　and effective manner.
20　　　　　　4.　**The HCCA/VI Healthcare Litigation**
21　　　SIHD has recently retained The Shinbrot Firm in connection with the preparation and
22　filing of a complaint against HCCA and related entities.  In this capacity, Mr. Shinbrot has
23　reviewed evidence, conducted witness interviews, and on or about May 30, 2018, he filed a
24　complaint containing numerous claims for relief against HCCA and a related entity, VI
25　Healthcare Finance, Inc. ("Vi"), *styled as Southern Inyo Healthcare District v. Healthcare*
26　*Conglomerate Associates, LLC, et. al.* adv. no. 2018-01031 FEC (the "HCCA Complaint") (the
27　"HCCA Adversary").  As set forth in the HCCA Complaint, the Debtor has asserted claims for
28　including, but not limited to, those relating to violations of California's False Claims Act,

violation of California's Government Code, Breach of Fiduciary Duty and other business torts. On or about June 29, 2018, HCCA and Vi filed their answer to the HCCA Complaint. On September 18, 2018, the Court held a continued status conference in the HCCA Adversary, and set a further status conference for October 16, 2018.

All parties have stated that mediation of the HCCA Adversary is appropriate and are discussing potential dates for a multi-party mediation that will resolve a host of issues necessary to pave the way for a consensual plan of readjustment. To this end, the parties have requested a continuance of the status conference in the HCCA Adversary to December 12, 2018 so that the mediation process may progress.

### 5. **Avoidance Action Litigation**

On or about July 12, 2018, the Debtor commenced five adversary proceedings by filing complaints seeking avoidance and recovery of preferential transfers, preservation of avoided transfers, and disallowance of any claims held by defendants against Coast To Coast Healthcare Services, Inc., Premier, Emergency Physicians of California Medical Group, Optum, Healthland, Inc., and Healthcare Resource Group, Inc. (collectively, the "Avoidance Complaints") (collectively, the "Avoidance Adversaries"), styled as follows:

- *Southern Inyo Healthcare District v. Coast To Coast Healthcare Services, Inc.,* adv. no. 2018-01044 FEC (the "Coast to Coast Adversary");
- *Southern Inyo Healthcare District v. Premier Emergency Physicians of California Medical Group.,* adv. no. 2018-01047 FEC (the "Premier Adversary");
- *Southern Inyo Healthcare District v. Optum Bank,* adv. no. 2018-01046 FEC (the "Optum Avoidance Adversary");
- *Southern Inyo Healthcare District v. Healthland, Inc.,* adv. no. 2018-01045 FEC (the "Healthland Adversary"); and
- *Southern Inyo Healthcare District v. Healthcare Resource Group, Inc.,* adv. no. 2018-01043 FEC (the "HRG Adversary").

The Debtor served the Avoidance Complaints, and since then, has worked diligently to resolve the Avoidance Adversaries without the need for protracted litigation. To this end, and

since the last status conference, the Debtor has resolved three of the five Avoidance Adversaries (with the Coast-to-Coast Adversary being dismissed).

By and through the Healthland Adversary, the Debtor sought to avoid $12,835.88 in preferential transfers (the "Healthland Transfers"). Healthland contended that it had legitimate defenses to the Healthland Transfers, and following good-faith negotiations between the parties, the parties reached a settlement whereby Healthland will, among other things, waive its alleged claim against the Debtor for a total of $90,921.83, as follows: (1) claim one in the amount of $17,757.58 for services provided prior to the Petition Date, and claim two in the amount of $73,164.25 for services provided after the Petition Date.

By and through the HRG Adversary, the Debtor sought to avoid $22,500 in preferential transfers (the "HRG Transfers"). HRG contended that it had legitimate defenses to the HRG Transfers, and following extensive negotiations between the parties, the parties reached a settlement whereby HRG agreed to withdraw and/or not assert its claims against the Debtor, which HRG contends total no less than $5,625.00.

Premier Emergency Physicians of California has yet to file any responsive pleading or make an appearance in the Premier Adversary.

On or about September 26, 2018, the Court entered an order approving a stipulation by and between the Debtor and Optum in the Optum Avoidance Adversary, to, among other things, stay any and all discovery dates and deadlines and hearings until the Court enters a final non-appealable order fully deciding the Optum Adversary, whether in the form of a final judgment or dismissal of the Optum Adversary. The status conference in the Optum Avoidance Adversary has been continued to May 29, 2019.

The status conferences for the remaining Avoidance Adversaries have been scheduled for November 14, 2018.

**II.　MEDIATION**

Except as identified above with respect to the HCCA Adversary and the Optum Avoidance Adversary, the Debtor is unaware of any matters to be mediated at this time.

## III. SECTION 923 NOTICE

On or about February 12, 2016, SIHD filed the *Debtor's Motion for Entry of an Order (1) Approving Form of Notice, and (2) Setting Deadline for Filing Objections to Petition*. On or about March 15, 2016, the Court entered an order approving the motion and proposed manner in which to provide notice via publication in accordance with 11 U.S.C. §923. The Debtor timely completed all publications required under the order.

## IV. PLAN OF READJUSTMENT

On or about January 27, 2017, the Court entered the *Order Granting Ex Parte Motion to Continue Deadline to File Plan of Adjustment*. Through that order, the Court extended the deadline to file a plan for the adjustment of debts from January 31, 2017 through and including March 31, 2017.

On or about March 31, 2017, the Debtor filed the Plan for the Adjustment of Debts of Southern Inyo Healthcare District (the "Initial Plan"), the Disclosure Statement with Respect to the Plan for the Adjustment of Debts of Southern Inyo Healthcare District (the "Initial Disclosure Statement"), and other related and supporting documents.

Following the hearing on the adequacy of the Initial Disclosure Statement, the Court disapproved the Initial Disclosure Statement in order to enable the Debtor to make certain modifications thereto, including modifications relating to Optum and the Optum Claim. The Court also set the hearing on the adequacy of the amended disclosure statement for August 30, 2017, and directed the Debtor to file its amended plan and disclosure statement.

On or about July 20, 2017, the Debtor filed the First Amended Plan for the Adjustment of Debts of Southern Inyo Healthcare District (the "First Amended Plan"), the First Amended Disclosure Statement with Respect to the Plan for the Adjustment of Debts of Southern Inyo Healthcare District (the "First Amended Disclosure Statement"), and other related and supporting documents.

After filing the First Amended Plan and the First Amended Disclosure Statement, the Debtor engaged in discussions with several creditors, including Optum, regarding the First Amended Plan and the treatment of certain claims and contracts thereunder. As a result of these

discussions, the Debtor was able to resolve certain disputes pertaining to the First Amended Plan and/or the First Amended Disclosure Statement. Among these, the Debtor and Optum reached an agreement in principle through which the Debtor agreed to allow Optum to vote on the Plan despite the disputed status of the Optum Claim.

On or about January 17, 2018, the Debtor filed the Second Amended Plan (the "Second Amended Plan") and the Second Amended Disclosure Statement with Respect to the Plan for the Adjustment of Debts of Southern Inyo Healthcare District (the "Second Amended Disclosure Statement"), and other related and supporting documents. Similar to the previous iterations of the plan and disclosure statement, the Second Amended Plan and the Second Amended Disclosure Statement provided for the adjustment of the Debtor's operations and the repayment of its obligations with operational revenues. The Second Amended Disclosure Statement also included additional detail regarding the treatment of the Optum Claim in order to address the objections raised by Optum and comments expressed by the Court with respect to the previous versions of the plan and disclosure statement. On or about February 28, 2018, at the hearing to approve the adequacy of the Second Amended Disclosure Statement, the Debtor withdrew the Second Amended Disclosure Statement given, among other things, the significant change in circumstances that had occurred since the filing thereof.

As discussed at the most recent status conference, the Debtor believes that the most efficient path forward requires a resolution of the claims at issue in the HCCA Adversary, and as such, anticipates that a third amended plan and disclosure statement will be filed within thirty (30) to forty-five (45) days of the completion of the contemplated mediation.

    **A.**    **Potential Funding Sources For Third Amended Plan and Third Amended Disclosure Statement**

        1.    **Contract For Outpatient Lab Services:** Under this option, the Debtor would enter into a "Services Agreement" with an entity which would provide and implement certain administrative, software and management services in furtherance of an exclusive laboratory outreach program at the hospital. Mr. Cotter has done a significant amount of research into this option, and is confident that pursuing this alternative would generate more than sufficient

revenue to enable the Debtor to not only satisfy its obligations under the amended plan and maintain operations on a moving forward basis, but also to enable SIHD to make capital improvements to the facilities if and when such capital improvements are necessary. The Debtor continues to review proposals to provide laboratory services.

2. **Settlement With Los Angeles Department of Water and Power:** For a number of months, the Debtor and LADWP have been engaged in negotiations centered primarily on the adverse impact of potential dust pollution purportedly caused (in)directly by LADWP on the residents of Southern Inyo. With the support of a large number of LADWP employees (both individually and through their union) who reside in Southern Inyo, the Debtor has written a demand letter to LADWP requesting, among other things, that LADWP invest funds sufficient to not only satisfy the obligations of SIHD under a plan of readjustment, but also to ensure the continuation of healthcare services for SIHD and the community it serves (including countless employees of LADWP) for years to come. On May 25, 2018, the Chief Operating Officer of LADWP, Marty Adams, met with at least one member of the board of directors of SIHD to discuss potential funding options for SIHD, and such discussions have continued since that date.

3. **Accounts Receivable Financing and/or Factoring:** Prior to the termination of the HCCA Management Agreement, HCCA maintained the data and information needed to complete the Debtor's cost report(s), including the cost report that was due on November 30, 2017 for the fiscal year ending June 30, 2017 (the "November Cost Report"). Unfortunately, HCCA did not file the November Cost Report, and the Debtor was forced to recreate the information necessary to prepare it following the termination of the HCCA Management Agreement. Unfortunately, due to the delinquent filing(s) and the delinquent cost report, the Centers for Medicare and Medicaid Services ("CMS") began withholding payment at a rate of fifty percent (50%) beginning in November of 2017 (the "Holdback"). This Holdback caused significant harm to the Debtor and severely impacted the Debtor's cash flow.

The November Cost Report was filed on March 22, 2018, and accepted by CMS on March 23, 2018. In addition, the financial statement data and quarterly credit balance reports (which had previously been unavailable to the Debtor) that was due with the cost report was submitted to

CHAPTER 9 STATUS REPORT

4821-1796-7195.1

CMS on May 16, 2018. As result of the acceptance of the cost report and the submission of the financial data, the Holdback was remitted to the Debtor in the approximate amount of $225,000.00, with corresponding adjustments under the cost report(s) approximating $337,000.00. Moreover, since the termination of the HCCA Management Agreement, the Debtor has also regained control of the billing system(s), which has resulted in a *fifty percent (50%) increase* in billings for the period between January 2018 and April 2018. By way of example, in September of 2018, the Debtor billed over $1,000,000.00 and collected over $800,000.00. In stark contrast, in September of 2017, the Debtor slightly more than $900,000.00 and collected less than $350,000.00.

Given these significant improvements in the Debtor's financial situation, the Debtor believes that it will be able to obtain financing of its accounts receivable sufficient to enable it to confirm a plan of readjustment. To this end, the Debtor has submitted financial information to a number of potential financiers, including but not limited to CNH Financial, ASM Capital, Legalist, Inc., and Bay Point Advisors, and is in varying stages of discussion regarding potential "DIP" and/or exit financing options with these lenders.

**V.    CONCLUSION**

The community-at-large (a number of which are creditors of the Debtor) continues to support the efforts of the Debtor to provide quality healthcare to the surrounding population. Not only is it the only hospital in a 135 mile stretch of Highway 395, it also provides exceptional skilled nursing care for as many as 33 residents. In addition to the invaluable health and safety benefits provided by the Debtor, the Debtor also employs over ninety (90) people who would be unemployed if SIHD was forced to close its doors. The significant impact that such a closure would have on the entire community would be devastating, as it would represent a loss of almost two million dollars ($2,000,000) in annual payroll, much of which is spent in the Eastern Sierra.

Given the significant improvement in the financial condition of the Debtor that has occurred since the termination of the HCCA Management Agreement, and the myriad of options

being diligently explored, the Debtor is confident that it will not only be able to satisfy its obligations under the amended plan of readjustment to be filed, but that it will be able to continue to provide and improve the level of healthcare so desperately needed by Southern Inyo and the surrounding communities.

Dated: October 9, 2018

Respectfully submitted,

**FOLEY & LARDNER LLP**

By: /s/ Ashley M. McDow
    Ashley M. McDow
    Fahim Farivar

Attorneys for Debtor,
SOUTHERN INYO HEALTHCARE DISTRICT

- 19 -

CHAPTER 9 STATUS REPORT

4821-1796-7195.1