**406**

1   Hagop T. Bedoyan, CSB No. 131285
    **Klein, DeNatale, Goldner,**
2       **Cooper, Rosenlieb & Kimball llp**
3   5260 N. Palm Avenue, Suite 205
    Fresno, California 93704
3   Telephone: (559) 438-4374
    Facsimile:  (661) 326-0418
4   E-mail: hbedoyan@kleinlaw.com

5   Brandon N. Krueger, Esq. (SBN 221432) (ED Adm. Pending)
6   bkrueger@sallspencer.com
    Lara A.S. Callas, Esq. (SBN 174260) (ED Adm. Pending)
7   lcallas@sallspencer.com
    SALL SPENCER CALLAS & KRUEGER
8   A Law Corporation
    32351 Coast Highway
9   Laguna Beach, CA 92651
    Telephone: (949) 499-2942
10  Facsimile: (949) 499-7403

11  Attorneys for HealthCare Conglomerate Associates, LLC.
12  And Vi Healthcare Finance, Inc.

13              **UNITED STATES BANKRUPTCY COURT**

14      **EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION**

15

16  In re:                          | Case No. 16-10015-A-9

17  SOUTHERN INYO                    | Chapter   9
    HEALTHCARE DISTRICT,
18                                   | DC NO.:  KDG-4
                          Debtor.
19                                   | Date:     November 14, 2018
                                     | Time:     1:30 p.m.
20                                   | Place     United States Bankruptcy Court
                                     |           2500 Tulare Street, Fifth Floor
21                                   |           Department A, Courtroom 11
                                     |           Fresno, California
22                                   | Judge:    Honorable Fredrick E. Clement

23      **EXHIBITS IN SUPPORT OF MOTION TO DISQUALIFY ASHLEY M. MCDOW AND**
24      **FOLEY & LARDNER AS ATTORNEYS FOR THE DEBTOR**

25

| EXHIBIT | DESCRIPTION | PAGE(S) |
|---------|-------------|---------|
| "A" | Management Services Agreement between HCCA and Southern Inyo Healthcare District | 5 - 53 |
| "B" | BakerHostetler Letter dated January 2, 2016 Re: Waiver of Confict | 54 - 57 |
| "C" | BakerHostetler Letter dated January 2, 2016 Re: Engagement of Counsel | 58 - 64 |

| "D" | BakerHostetler Letter dated July 19, 2017 Re: Waiver of Conflict | 65 - 69 |
|---|---|---|
| "E" | BakerHostetler Letter dated September 29, 2017 Re: Termination of Representation | 70 - 72 |
| "F" | E-mail from Bruce Greene dated August 8, 2017 Re: TRMC Purported Board Meeting | 73 - 74 |
| "G" | Reporter's Transcript of Recorded Proceedings of Hearing on October 17, 2017 | 745- 104 |
| "H" | Transcript of Proceedings before the Honorable Fredrick E. Clement on August 29, 2018 | 105 - 130 |
| "I" | Klein DeNatale Goldner letter dated September 17, 2018 Re: Benzeevi/HCCA et al. | 131 - 136 |
| "J" | Resume of Robert L. Kehr | 137 - 145 |
| "K" | List of Materials utilized by Robert L. Kehr | 146 |
| "L" | Complaint for: (1) Avoidance of Unauthorized Post-Petition Transfers; (2) Breach of Contract; (3) Accounting; (4) Negligence; (5) Concealment; (6) Breach of Fiduciary Duty; (7) Declaratory Relief; (8) Equitable Subordination; (9) Violation of Government Code § 8314, filed on May 30, 2018 (Doc # 1) | 147 - 218 |
| "M" | Request for Judicial Notice in Support of Motion for Authorization to Reject Executory Contract of Healthcare Conglomerate Associates, LLC, filed on October 18, 2017 in the United States Bankruptcy Court Eastern District of California, Fresno Division Case of *Tulare Local Healthcare District, dba Tulare Regional Medical Center*, bearing Case Number 17-13797 ("Tulare Action") (Doc. #103) | 219 - 220 |
| "N" | Application for Ex Parte Order Authorizing FRBP 2004 Examination and Production of Documents (Bakerhostetler filed on December 5, 2017 in the Tulare Action (Doc. #256) | 221 - 223 |
| "O" | Order Granting Application for Order Authorizing FRBP 2004 Examination and Production of Documents (Bakerhostetler), filed on December 5, 2017 in the Tulare Action (Doc. #256) | 224 - 225 |
| "P" | Proof of Claim, filed on April 10, 2018 in the Tulare Action (Claim #238) | 226 - 229 |
| "Q" | Voluntary Petition for Non-Individuals Filing for Bankruptcy by Southern Inyo Healthcare District, filed on January 4, 2016 in the above-referenced case (Doc. #1) | 230 - 233 |
| "R" | Emergency Motion (1) for Authority to Immediately Terminate HCCA Management Agreement or, in the Alternative, for Authority to Modify the Terms of the HCCA Management Agreement in Order to Designate the Board as the Sole Signatory on all District Bank Accounts and (2) to Continue Hearing on Second Amended Disclosure Statement and Associated Filing Deadlines, filed on October 17, 2017 in the above-referenced case (Doc. #325) | 234 - 247 |
| "S" | Declaration of Ashley M. McDow in Support of the Emergency Motion (1) for Authority to Immediately Terminate HCCA Management Agreement or, in the Alternative, for Authority to Modify the Terms of the HCCA Management Agreement in Order to Designate the Board as the Sole Signatory on All District Bank Accounts and (2) to Continue Hearing on Second Amended Disclosure Statement and Associated Filing Deadlines, filed on October 17, 2017 in the above-referenced case (Doc. #326) | 248 - 273 |
| "T" | Order Granting Application for Order Setting Hearing on Shortened Notice Re Emergency Motion (1) For Authority to Immediately | 274 - 276 |

| | | | |
|---|---|---|---|
| | | Terminate HCCA Management Agreement or, in the Alternative, for Authority to Modify the Terms of the HCCA Management Agreement in Order to Designate the Board as the Sole Signatory on All District Bank Accounts and (2) to Continue Hearing on Second Amended Disclosure Statement and Associated Filing Deadlines, filed on October 17, 2017 in the above-referenced case (Doc. #328) | |
| | "U" | Declaration Re Provision of Notice of Hearing on Emergency Motion, filed on October 17, 2017 in the above-referenced case (Doc. #329) | 277 - 278 |
| | "V" | Declaration of Ashley M. McDow in Support of the Emergency Motion to Continue Hearing on the Status Conference and the Associated Filing Deadlines, filed on October 26, 2017 in the above-referenced case (Doc. #339) | 279 - 282 |
| | "W" | Administrative Expense Claim, filed on November 6, 2017 in the above-referenced case (Doc. #355) | 283 - 285 |
| | "X" | Proof of Claim, filed on November 6, 2017 in the above-referenced case (Claim #48-1) | 286 - 288 |
| | "Y" | Notice of Settlement Re: Emergency Motion (1) for Authority to Immediately Terminate HCCA Management Agreement or, in the Alternative, for Authority to Modify the Terms of the HCCA Management Agreement in Order to Designate the Board as the Sole Signatory on All District Bank Accounts; and (2) to Continue Hearing on Second Amended Disclosure Statement and Associated Filing Deadlines [Docket No. 325], filed on November 22, 2017 in the above-referenced case (Doc. #377) | 289 - 300 |
| | "Z" | Order Approving Stipulation Re Rejection of HCCA Management Agreement, filed on December 2, 2017 in the above-referenced case (Doc. #382) | 301 - 303 |
| | "AA" | Application for Ex Parte Order Authorizing FRBP 2004 Examination and Production of Documents (Southern Inyo Healthcare District), filed on December 8, 2017 in the above-referenced case (Doc. #388) | 304 - 306 |
| | "BB" | Order Granting Application for Order Authorizing FRBP 2004 Examination and Production of Documents (Southern Inyo Healthcare District), filed on December 12, 2017 in the above-referenced case (Doc. #392) | 307 - 308 |
| | "CC" | Second Amended Disclosure Statement with Respect to the Plan for the Adjustment of Debts of Southern Inyo Healthcare District, filed on January 17, 2018 in the above-referenced case (Doc. #397) | 309 - 375 |
| | "DD" | Request for Payme305nt of Administrative Expense Claim of Healthcare Conglomerate Associates, LLC Arising Out of Rejection of Executory Contract (11 U.S.C. §§ 503(b) and 507(a)(2)), filed on January 30, 2018 in the above-referenced case (Doc. #406) | 376 - 378 |
| | "EE' | Ex Parte Motion to Remove from the Record and Replace the Chapter 9 Status Report Filed with the Court on May 17, 2018 Due to Inadvertent Disclosure of Highly Sensitive Information; Declaration of Ashley M. McDow in Support, filed on May 17, 2018 in the above-referenced case (Doc. #436) | 379 - 402 |
| | "FF" | Request for Payment of Administrative Expense Claim of Vi Healthcare Finance, Inc. (11 U.S.C. §§ 503(b) and 507(a)(2)), filed on June 8, 2018 in the above-referenced case (Doc. #447) | 403 - 404 |
| | "GG" | Substitution of Attorney for Baker & Hostetler LLP, filed on June 14, 2018 in the above-referenced case (Doc. #450) | 405 |
| | "HH" | Order Approving Substitution of Attorney, filed on June 26, 2018 in the above-referenced case (Doc. #452) | 406 |

Dated: October __12__, 2018

KLEIN, DENATALE, GOLDNER, COOPER,
ROSENLIEB & KIMBALL LLP

By: */s/ Hagop T. Bedoyan*
HAGOP T. BEDOYAN,
Attorneys for HealthCare Conglomerate
Associates, LLC and Vi Healthcare Finance,
Inc.

# Management Services Agreement

## between

## HealthCare Conglomerate Associates, LLC

## and

## Southern Inyo Healthcare District

608081584.4

## MANAGEMENT SERVICES AGREEMENT

This Management Services Agreement ("**Agreement**") is made and entered into effective as of January 2, 2016 ("**Effective Date**"), by and between HealthCare Conglomerate Associates, LLC, a California limited liability company ("**Manager**"), and Southern Inyo Healthcare District (the "**District**").

### RECITALS:

**WHEREAS**, the District owns and operates an acute care hospital, a clinic, and a skilled nursing facility at 501 East Locust Street in Lone Pine, California (the "**Hospital**") together with the Other Facilities;

**WHEREAS**, the parties have determined that Manager's provision of services in accordance with the terms of this Agreement will further the ability of the District (1) to provide for efficient delivery of health care services; (2) serve the best interests of the communities served by the District; and (3) enhance the ability of the parties to effectively and efficiently provide health care for the communities served by the District;

**WHEREAS**, the parties intend that this arrangement will allow them to achieve a number of mutually beneficial objectives, including the following: (1) further the development of a community-based integrated health care system; (2) enhance the quality of health care services available to residents of the communities served by the District; (3) respond to the health care needs and cost concerns of community residents by allowing evaluation of existing services and addition of new services, as deemed appropriate by Manager; (4) achieve efficiencies through coordination, consolidation, or reorganization, as appropriate, of certain identified health care services; and (5) improve the capacity of the parties and their affiliates to recruit and retain physicians necessary to serve the health care needs of the community, develop linkages with other providers and payers, and expand the geographical service area of the District;

**WHEREAS**, Manager has heretofore expended considerable effort and resources, including, but not limited to, financial resources to review and analyze information regarding the Hospital provided by the District; and

**WHEREAS**, the District desires to engage Manager, and Manager desires to be engaged, to manage the Operations of the District upon the terms set forth in this Agreement.

**NOW, THEREFORE**, for and in consideration of the premises and the mutual undertakings and representations herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to become legally bound, hereby agree as follows:

### AGREEMENT

1.    **Definitions**.

All capitalized terms not defined elsewhere in this Agreement shall have the following meanings, unless a different meaning clearly appears from the context:

(a)    "**Affiliate**" means any other firm, partnership, association, corporation, joint venture or public body, directly or indirectly controlling or controlled by, or under direct or indirect common control with, the District or Manager. The term "control," when used with respect to a

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
60808 1584.4

particular Person, means the possession, directly or indirectly, of the power to direct or cause the direction of management in the policies of such Person whether through the ownership of voting stock, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

(b)    "Annual Budget" shall have the meaning set forth in Section 4(f)(i).

(d)    "Buildings" means those buildings and other structures in which the Operations, now or hereafter are conducted, together with such other buildings and structures now or hereafter owned, leased or otherwise operated by the District that Manager elects, in its sole and absolute discretion, to operate hereunder, by notice to the District from time to time.

(e)    "Chief Restructuring Officer" shall have the meaning set forth in Section 4(a)(i).

(f)    "CMS" means the Centers for Medicare and Medicaid Services.

(g)    "Collections" shall have the meaning set forth in Section 4(g)(i).

(h)    "Compliance Plan" shall have the meaning set forth in Section 5(a).

(i)    "Consultants" shall have the meaning set forth in Section 4(b)(xii).

(j)    "Controlling Person" means any Person, who acting alone or with others, has the ability to directly or indirectly influence, direct, or cause the direction of the management, expenditure of money, or policies of a Person submitting an Acquisition Proposal, including any shareholder owning, directly or indirectly, legally or beneficially, more than 5% of the equity of such Person submitting an Acquisition Proposal, a management company or similar service provider (together with a Person who is a Controlling Person of such management company or other business entity) and any other individual who, because of a relationship of any nature with the Person submitting an Acquisition Proposal or its owners, or managers, is in a position of actual control or authority with respect to the Person submitting an Acquisition Proposal, without regard to whether the individual is formally named as an owner, manager, director, officer, provider, consultant, contractor, or employee of the Person submitting an Acquisition Proposal.

(k)    "CPI" shall have the meaning set forth in Section 6(b)(i).

(l)    "CPI Increase" shall have the meaning set forth in Section 6(b)(ii)(1).

(m)    "Depository" shall have the meaning set forth in Section 4(g)(i).

(n)    "Depository Account" shall have the meaning set forth in Section 4(g)(i).

(o)    "District Default" shall have the meaning set forth in Section 10(a).

(p)    "Emergent Expenses" shall have the meaning set forth in Section 4(f)(ii).

(q)    "GAAP" means United States generally accepted accounting principles and practices as in effect from time-to-time as applied by Manager.

(r)    "Governing Body" shall have the meaning set forth in Section 3(a).

2

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
008081584.4

    (s)      "Governmental Authority" means any federal, State or local judicial, executive or legislative body or governmental municipality, department, commission board, agency or authority, including government contractors for federal health programs, and including without limitation, the State of California – Health and Human Services Agency Office of Statewide Health Planning and Development.

    (t)      "Governmental Depository Account" means a Depository Account established for the sole purpose of receiving checks, wire transfers and other forms of electronic payments governed under the Social Security Act (42 U.S.C. §§ 1395 et seq.), including payments under Medicare, Medicaid and TRICARE/CHAMPUS, and payments administered or regulated by the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services (collectively "Governmental Health Payers").

    (u)      "HIPAA" means the Health Insurance Portability and Accountability Act of 1996 and the regulations promulgated pursuant thereto.

    (v)      "Hospital" shall have the meaning set forth in the Recitals.

    (w)      "Hospital Law" means California Health and Safety Code §32000 et seq., including those provisions of the California Health and Safety Code applicable to skilled nursing facilities.

    (x)      "Ineligible Person" shall have the meaning set forth in Section 5(f).

    (y)      "Jeopardy Event" shall have the meaning set forth in Section 10(d)(ii).

    (z)      "Law" means any constitutional provision, statute, ordinance, or other law, rule, regulation, interpretation, judgment, decree, or order of any Governmental Authority or any settlement agreement or compliance agreement with any Governmental Authority, including Hospital Law, as the foregoing may be revised, replaced or amended from time to time.

    (aa)      "Manager" has the meaning set forth in the Preamble.

    (bb)      "Manager Default" shall have the meaning set forth in Section 10(c).

    (cc)      "Manager Parties" shall have the meaning set forth in Section 3(e)(i).

    (dd)      "Master Account" shall have the meaning set forth in Section 4(g)(iii).

    (ee)      "Medical Staff" shall have the meaning set forth in Section 3(e)(i).

    (ff)      "Net Adjusted Management Fee" shall have the meaning set forth in Section 6(b)(ii)(2).

    (gg)      "OIG" means the Office of Inspector General of the Department of Health and Human Services.

    (hh)      "Operating Contracts" shall have the meaning set forth in Section 4(n)(ii).

    (ii)      "Operating Period" shall have the meaning set forth in Section 2(a).

3

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
608081584 4

(jj) "Operations" means the healthcare and other operations and programs which are conducted at the Hospital and the Other Facilities, as the same may be modified by Manager from time to time during the Operating Period.

(kk) "Other Facilities" means those facilities and businesses identified on **Exhibit A** to this Agreement, together with such other facilities and clinics owned, leased or otherwise operated by the District that Manager elects, in its sole and absolute discretion, to manage hereunder, by notice to the District from time to time.

(ll) "Person" means an association, a corporation, a limited liability company, an individual, a partnership (general or limited), a trust, a hospital district organized under the Hospital Law, or any other entity or organization, including a Governmental Authority.

        (mm) "PHI" shall have the meaning set forth in Section 4(s)(iv).

        (nn) "State" means the State of California.

        (oo) "Suspended" shall have the meaning set forth in Section 9(b).

        (pp) "Termination Fee" shall have the meaning set forth in Section 10(b)(l)

2.   **Operating Period**.

        (a)   Initial Operating Period. The initial term of this Agreement shall commence on the Effective Date and end on the date five (5) years thereafter (as such initial term may be renewed pursuant to Section 2(b), the "Operating Period").

        (b)   Extension of Operating Period. Upon completion of the initial Operating Period or of any subsequent renewal Operating Period, this Agreement shall automatically renew for additional five (5) year periods unless either party shall send a written notice of intent not to renew the Agreement to the other party not less than six (6) months prior to the end of the initial Operating Period or then current renewal Operating Period, as applicable. Each renewal Operating Period shall be on the same terms and conditions set forth herein. Notwithstanding the foregoing, nothing herein is intended to permit the Operating Period to exceed beyond any time period as is permissible under applicable Law, or under any tax-exempt bond financing requirements with respect to bonds hereafter issued by the District. In the event the Operating Period exceeds any permissible time period, then the Operating Period shall be conformed to the maximum time period permitted under applicable Law.

        (c)   Irrevocability of Agreement. The District acknowledges and agrees that Manager is entering into this Agreement in reliance on the long term nature of this Agreement, and further acknowledges that the rights, duties, powers and authority of each of the parties hereto, are intended to be non-terminable throughout the Operating Period, except in accordance with the express provisions of this Agreement. The District acknowledges that neither party will achieve the benefits intended to be achieved if the District has any continuing right or power to terminate this Agreement, or the relationship hereby created, except in accordance with the express provisions of this Agreement. Accordingly, the District, as a substantial inducement to Manager to enter into this Agreement and provide its proprietary systems and knowledge, hereby irrevocably waives and relinquishes any right, power or authority existing at law or in equity to terminate this Agreement, except in strict accordance with the express provisions of this Agreement. The parties further

4

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
005081564 4

hereby acknowledge that any breach of this Section will cause irreparable and permanent damage to Manager, not compensable by money damages.

3.   **General Responsibilities of the Parties**.

(a)   Appointment. The District hereby engages and appoints Manager, and Manager hereby accepts such engagement, to exclusively provide day-to-day management services to and for the District with respect to the Hospital and the Other Facilities. Anything herein to the contrary notwithstanding, Manager's authority hereunder shall be limited as described in Section 3(b), and Manager shall otherwise perform its services hereunder in accordance with Section 5. Manager's duties shall include but are not limited to financial and operating system management, preparation of proposed annual budgets, purchasing, contracting support and relationship management, expansion of the Hospital and the Other Facilities or the services offered, preparation and implementation of staffing plans, recruitment of personnel, and supervision of the day-to-day Operations of the Hospital and the Other Facilities. Manager shall perform its services hereunder in accordance with the District Bylaws, the policies lawfully adopted by the Board of Directors of the District (the "**Governing Body**") and applicable Law. It is understood and agreed that to the extent that (i) Hospital Law is in conflict with any of the District's Bylaws, then Hospital Law shall control or (ii) the District's Bylaws or policies conflict with the terms hereof, the terms hereof shall control.

(b)   General Control of the District.

(i)   Manager expressly acknowledges and agrees that the District exercises, and at all times during the Operating Period, shall exercise the ultimate control and direction of the Operations. Subject to the provisions of Section 3(a), Manager shall operate within the reasonable parameters, policies and procedures adopted by the Governing Body and communicated to Manager by the District, (and provided that such parameters, policies and procedures do not, in Manager's reasonable judgment, jeopardize the quality of patient care provided at the Hospital and the Other Facilities, or require Manager or the District to engage in any illegal or unethical acts, or breach any express provision of this Agreement or any other agreement of the parties). Notwithstanding the ultimate control to be exercised by the Governing Body, Manager shall comply with its obligations under this Agreement, provided that the District shall not interfere with its ability to do so.

(ii)   Notwithstanding anything to the contrary herein, any change in the licensure type, payment model chosen by the Hospital, classification or operations of the Hospital other than as a Medicare participating critical access hospital (and/or as a sole community hospital, as applicable) and skilled nursing facility, shall be subject to the prior written approval of the Governing Body and Manager.

(iii)The District shall timely furnish Manager with sufficient funds to timely pay the expenses relating to the Operations, including funding of both operating expenses and non-operating expenses. Notwithstanding the foregoing, the District shall not be in default in its obligations to furnish Manager with sufficient funds to pay its

5

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
608081584.4

Filed 10/15/18
Filed 10/17/17

Case 16-10015

Case 16-10015

Doc 490

Doc 327

operating and non-operating expenses relating to the Operations if the District has insufficient revenue available for such purposes from the Operations and borrowings (and the District may, but shall not be required to, borrow funds to pay shortages in funds available to pay expenses relating to its Operations). Subject to the more expedient funding requirements set forth in <u>Section 4(b)(viii)</u>, if funds in the Master Account are insufficient, Manager shall notify the District of the need for funds by submitting Manager's fund request to the District and the District shall supply the requested funds within three (3) days of Manager's notice to the District of the need for same, provided that for unanticipated Emergent Expenses, Manager shall have the right to provide a shorter notice period. Manager shall not be obliged to fund the District expenses hereunder or provide funds to accommodate shortfalls in revenue, however, Manager may, in its sole and absolute discretion, advance funds as provided in <u>Section 4(f)(i)(1)</u>. Manager shall not be in default hereunder if Manager's failure to comply with the terms of this Agreement is due to the lack of adequate funds provided by the District.

    (iv)    The District shall assure that its funds are used to support the Hospital and the Other Facilities and to provide charitable care therein and are not diverted to other uses.

(c)    <u>Cooperation and Responsiveness</u>.

    (i)    The District and its Governing Body shall fully and timely cooperate in good faith with Manager and shall be responsive and available to Manager during the Operating Period in order that Manager can carry out its duties and obligations hereunder.

    (ii)    In any instance in which the District (or the Governing Body) has an obligation to provide input or decide an issue, or provide (or withhold) its approval or consent under the terms of this Agreement, the District (or the Governing Body) shall do so in accordance with the provisions of <u>Section 11(o)</u>. Unless a specific period of time is set forth herein for a particular act, a reasonable period of time for the District to provide input or decide an issue, or provide (or withhold) its approval or consent shall generally be within five (5) to seven (7) calendar days.

    (iii)    In addition to its obligation to provide funds, the District will timely provide Manager with the necessary equipment, information and other resources to enable Manager to fully and timely perform its services hereunder.

(d)    <u>Relationship</u>.

    (i)    Except as otherwise required by applicable Law or as specifically authorized hereunder, the District shall not interfere, directly or

6

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
600081564.4

Filed 10/15/18

Filed 10/17/17

Case 16-10015

Case 16-10015

Doc 490

Doc 327

indirectly, with Manager's decisions or the daily Operations, and shall not interfere with Manager's ability to perform its obligations hereunder. Except upon request of Manager, individual members of the District's Governing Body shall not issue directions to Manager, except following and in accordance with the formal actions of the District's Governing Body.

(ii) The District representatives' communications, formal and informal, regarding Manager and the Operations with Persons associated or affiliated with the Operations or Manager, shall be conducted exclusively with Persons designated by Manager's chief executive officer.

(iii) Neither the District nor its Governing Body, on the one hand, nor Manager or any of the other Manager Parties on the other hand, shall (nor cause or encourage others to) disclose confidential or negative information regarding, or take any action or omit to take any action that is materially detrimental to the reputation of (anything which might tend to bring a party into public disrepute, hatred, contempt, scorn, scandal, or ridicule, or which might tend to reflect unfavorably on or otherwise degrade such party), the other or make any statements, verbally, in writing or otherwise, that defame, disparage or in any way criticize the personal or business reputation, practices, or conduct of the other, to anyone other than the Manager's chief executive officer or the District's President, or as may be required under Hospital Law. Notwithstanding the foregoing, negative information may be discussed within official District Governing Body meetings and in connection with its internal operations, provided that if such information is used in a non-confidential forum, the party bringing up such information shall use reasonable efforts to verify the veracity and objectivity of such information prior to disclosing same in a non-confidential forum. However, nothing herein shall prevent the any party from testifying truthfully in a legal proceeding or governmental administrative proceeding. The parties acknowledges and agrees that this prohibition extends to statements, written or verbal, made to anyone, including but not limited to, the news media, bondholders, industry analysts, competitors, strategic partners, vendors, employees (past and present), and clients.

(iv) The parties acknowledge that: (1) this Section is a material provision of this Agreement; (2) any breach of this Section shall be a material breach of this Agreement, and (3) a breach of this Section would cause irreparable harm.

7

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
608081584 4

(e)　Medical and Professional Matters.

(i)　All medical and professional matters relating to the care and treatment of patients requiring professional medical judgment shall remain the responsibility of the District medical director(s) and medical staff of the Hospital (the "**Medical Staff**").

(ii)　Subject to Subsection 3(e)(i), Manager shall provide such oversight and support as Manager, in its sole and absolute discretion, deems appropriate for the Medical Staff's administrative affairs, including monitoring the performance of professional services by the Medical Staff and other licensed personnel.

(iii)　The District retains control and authority over all appointments to the District's Medical Staff, the granting of clinical privileges at the District to the extent required by applicable Law and applicable accreditation standards, and any actions taken with respect to Medical Staff members, including appeals of actions. Notwithstanding the foregoing, the Chief Executive Officer or his or her designee may grant an individual temporary clinical privileges for a period not to exceed the greater of (i) one hundred twenty (120) days or (ii) such period as is allowed under applicable Law, all in accordance with accreditation agency requirements and the District's Bylaws.

(f)　Standards of Performance. The District acknowledges that while Manager shall expend its commercially reasonable efforts in performing its obligations under this Agreement, Manager does not guarantee any particular results, notwithstanding projections which may be made by Manager. Manager's projections and forward looking statements are based on estimates and expectations, and reasonably available competitive, financial, economic and other data, and as a result are inherently uncertain. Actual results could differ materially from those anticipated as a result of a variety of factors. Manager shall use its commercially reasonable judgment in providing the services required under this Agreement. The parties acknowledge that implementation of the District's charitable care purposes may not permit the maximization of the District's profits. Manager shall, for and on behalf of the District, use commercially reasonable efforts to make recommendations and take actions required hereunder to assist the District to comply in all material respects with any material Law respecting the Hospital and the Other Facilities. The District covenants that it will, in good faith, consider all of Manager's recommendations regarding the Operations, and will support and implement, through policies and/or other appropriate actions of the Governing Body, the recommendations it deems reasonably appropriate. The District is a California Health Care District organized and operating under the Hospital Law with, inter alia, a charitable mission, and it has under the Hospital Law certain responsibilities and obligations, including, but not limited to, obligations to provide charity care and indigent care. At all times, Manager, in managing the District, shall follow the charity and indigent care policies and obligations of the District (provided that the Hospital and the Other Facilities' financial obligations in that regard shall not be materially changed unless such change is required by applicable Law) and shall assist the District in meeting all of the District's required obligations under Hospital Law. the District will promptly notify Manager of any changes to any policy, procedure, or the District Bylaws which may impact Manager's rights or obligations under this Agreement, including but not limited to, those affecting the Hospital and the Other Facilities' charity care obligations.

8

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
608061584.4

4.   **Duties of Manager**.

   (a)   <u>Hospital Chief Restructuring Officer</u>.

      (i)   Manager shall provide a Chief Restructuring Officer ("<u>Chief Restructuring Officer</u>") to provide the administrative and management services for the Hospital and the Other Facilities during its period of restructuring, and until such time as the Manager has determined that this position is no longer necessary because the restructuring has been completed. Such Chief Restructuring Officer shall carry out the usual and customary duties of such position within the health care industry. The Chief Restructuring Officer shall be an employee or an independent contractor of Manager.

   (b)   <u>Personnel</u>.

      (i)   District shall remain the exclusive employer / contractor of the personnel of the Hospital and the Other Facilities.

      (ii)   Without limiting the generality of the provisions in <u>Section 4(b)(i)</u>, all employees shall be employees of District for purposes of District's benefit programs or plans now existing or hereafter created, including compensation and payment and withholding of federal, state and local income, social security, unemployment, Medicare, other payroll and employment taxes, Section 125 plans, Section 403(b) annuities, workers' compensation and health insurance. District is solely responsible for the administration of employee benefits, benefit plans and programs for its employees. All wages, salaries, benefits and other expenses and charges incurred in connection with the District's employees shall be borne by the District.

      (iii)   In compliance with applicable Law, Manager shall have the sole right and obligation to hire, fire and supervise all District employees, including a chief executive officer for the Hospital, and the licensed administrator for the skilled nursing facility, and to determine their compensation. Manager shall also have the sole right and obligation to recruit, employ, train, discipline, assign and reassign District employees, as needed for the Operations, and shall provide oversight and consultation regarding performance standards, personnel policies, and employee benefits.

      (iv)   Manager shall be responsible for the development and implementation of policies and practices, in conformity with the terms of this Agreement and in accordance with applicable Law, relating to personnel management services only, including without limitation, enrolling, recruiting, interviewing, selecting, training, evaluating, replacing, supervising, disciplining, reassigning and terminating District employees, subject to Governing Body approval of such policies as may be required pursuant to 22 C.C.R. § 72521 or patient care policy committee approval as may be required pursuant to 22 C.C.R. § 72523.

9

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
608081584.4

    (v)    Manager shall confer with the District in determining the general range of the number and qualifications of employees required for the efficient and effective operation of Hospital and the Other Facilities and in establishing and revising in-service training programs, and job descriptions, all in order to accomplish the goals and objectives of Hospital and the Other Facilities. However, Manager shall have the ultimate authority to hire, fire and set the terms of employment for all such employees. To discourage nepotism and conflicts of interest, the District and its representatives agree that they shall not request or require that Manager: (i) hire or fire any specific employee or (ii) select, reject or promote an employee or contractor (or its' personnel) based on the individual's political affiliation or beliefs or as a reward for political services or as a form of political patronage, directly or indirectly. Likewise, the District shall not refer potential employees or contractors to Manager for hiring or engagement.

    (vi)    Manager may hire or retain any consultants, accountants, attorneys or other professional personnel (collectively, "**Consultants**") which Manager, in its sole and absolute discretion, determines is necessary or appropriate to assist Manager in carrying out its duties and responsibilities under this Agreement subject to the requirements of 22 C.C.R. § 72511. The expense of any Consultants so retained shall be an expense of the District, but Manager shall not retain any such Consultants without the approval of the Governing Body, if the cost of such services shall exceed $100,000 in any calendar year for such services, unless otherwise set forth in the approved Annual Budget.

    (c)    <u>Patient Safety Quality and Performance Measurement</u>. Manager shall assist in the implementation of the Hospital and the Other Facilities' patient safety, quality, and performance measurement program. Manager shall provide oversight and facilitate the Hospital and the Other Facilities' patient safety, quality, regulatory readiness, infection control/prevention, and service excellence performance metrics. Manager activities shall include:

    (i)    Coordination, data collection/analysis and recommendation/ facilitation of evidence-based practices to address the following:

    (1)    Clinical program measures, hospital-acquired conditions, and other priority patient populations;

    (2)    Patient and staff safety, including the reduction of preventable adverse events;

    (3)    Infection control and prevention services to include electronic surveillance, tracking and transmission of required data;

    (4)    Regulatory and accreditation readiness and compliance tracking;

    (5)    Evidence-based policy and procedure development; and

10

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
608081584.4

       (6)　　Patient satisfaction and loyalty.

    (ii)　　Manager will also recommend strategies to enhance the Hospital's patient safety and quality department infrastructures, assist the Hospital and the Other Facilities in implementation of evidence-based order sets, and disseminate best practices. The District shall be responsible for all expenses associated with surveys, licensure, permits, and accreditation.

    (iii)　　Manager shall use reasonable efforts, on a consultative basis, to guide or direct the District in maximizing its total performance score under the Federal government's value-based purchasing programs, including but not limited to the clinical process of core measures, the patient experience of care dimensions; and in connection with the Consumer Assessment of Health Care Providers and Systems surveys.

(d)　　Standard Forms. Manager shall recommend standard formats for all charts, invoices, and other forms used in the Operations. Manager shall make reasonable efforts to ensure that such standard forms remain current as to applicable Law, as well as industry standards.

(e)　　Revenue Cycle Management. Manager shall provide advice, direction, and reasonable assistance to the District and assist it in overseeing its revenue cycle management for the Hospital and the Other Facilities. Services provided by Manager include making recommendations regarding Hospital and the Other Facilities':

    (i)　　Charge master or similar schedule of charges;

    (ii)　　Adjustment coding;

    (iii)　　Patient / client billing and collections; and

    (iv)　　Coding and billing compliance audits.

All direct, out-of-pocket fees, expenses and charges incurred in connection with actual revenue cycle management shall be the District expenses.

(f)　　Annual Budget.

    (i)　　Manager shall be responsible for preparation, presentation, monitoring, and reporting of the annual operating and capital budgets (collectively, the "**Annual Budget**"). Each proposed Annual Budget shall set forth an estimate of operating revenues and expenses (including capital expenses) for the next fiscal year, together with an explanation of anticipated changes in utilization, charges to patients and clients, payroll rates and positions, non-wage cost increases, and all other factors differing significantly from the then-current year. Manager shall be responsible for the oversight and review of the Annual Budgets, with final recommendations presented to the Governing Body for approval. Each Annual Budget will be created

11

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
608081584.4

Filed 10/15/18

Filed 10/17/17

Case 16-10015

Case 16-10015

Doc 490

Doc 327

and implemented to coincide with the District's fiscal year. Once approved, Manager shall thereafter establish a plan necessary to implement such Annual Budget.

(ii) Subject to the limitations set forth in Section 3(f), Manager shall take commercially reasonable efforts to oversee the management of the Hospital and the Other Facilities so that the actual revenues, costs, and expenses of the operation and maintenance of the Hospital and the Other Facilities shall be consistent with the approved Annual Budget. Inclusion of any item within the Annual Budget shall constitute all necessary approval of the Governing Body for Manager to take such act to effectuate the budgeted item. Notwithstanding anything to the contrary herein, Manager shall have the right, in its sole and absolute discretion, to make any expenditures necessary on an emergent basis to avoid or mitigate damage to the Hospital and the Other Facilities, obtain equipment repairs or to avoid or mitigate injury or potential injury to Persons or property or that are necessary on an emergent basis to comply with any Law or to cure or prevent any violation of any Law, whether or not provided for or within the amounts provided for in the approved Annual Budget for the applicable year (collectively, the "**Emergent Expenses**"). Manager shall use its reasonable efforts to give the District advance notice of any such Emergent Expenses, and in any event, shall give notice as soon as reasonably practicable after such expenditures, but in no event later than fifteen (15) days.

(g)     Bank Accounts.

(i) The District shall maintain one or more bank accounts (the "**Depository Accounts**") at one or more financial institutions (a "**Depository**"), together with resident trust fund accounts as required pursuant to 22 C.C.R. § 72529. The District shall cause all amounts received by or on behalf of the District in connection with the operation, maintenance, or ownership of the Hospital and the Other Facilities (the "**Collections**") to be deposited in the Depository Accounts and resident funds to be deposited into the resident trust fund accounts. However, Collections received from Governmental Health Payers shall be deposited into a separate Governmental Depository Account. Funds in the Governmental Depository Account shall be transferred, on a daily basis to a Depository Account (other than the Governmental Depository Account.)

(1) The District shall enter into an agreement with each Depository to cause the Depository to receive such payments and deposit them into Governmental Depository Account in the name of the District, and sweep the proceeds of such account on a daily basis, into the Depository or Master Account as designated by Manager.

(2) The foregoing instructions of the District with respect to the Government Depository Account shall be revocable, at the

12

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
608081584.4

sole instruction of the District, to the extent required by applicable Law; provided, however, that, unless otherwise required by applicable Law, if the District revokes such instructions, it shall be in material default of this Agreement and Manager shall, in addition to all other rights hereunder, be entitled to seek an order or judgment from a court of proper jurisdiction for specific performance to sweep the Governmental Depository Account pursuant to this Agreement.

(ii)    Manager, acting in the District's name and as agent of the District, as provided in Section 4(h) shall make or direct to be made timely deposits, in the Depository Accounts or the Master Account of all Collections which Manager receives.

(iii)   The District shall provide disposition instructions to the Depository to transfer, at the end of each business day during the Operating Period all amounts in the Depository Account into a bank account controlled by Manager (the "Master Account"). Except for the transfers to the Master Account, the District shall not remove, disburse, transfer, use, pledge, hypothecate, grant a lien on or security interest in, or otherwise encumber any funds in the Depository Accounts or Master Account.

(iv)    The District shall execute such documents as any Depository or Manager may reasonably require, including without limitation, a limited power of attorney, to permit the Depository to receive the Collections, endorse any checks, drafts, notes, money orders, cash, insurance payments, and other instruments relating to such Collections, deposit the Collections into the Depository Account, and to transfer the Collections each day from the Depository Account into the Master Account. The District shall be responsible for all fees, costs and expenses incurred in connection with maintaining the Depository Account, including all fees, costs and expenses of a lockbox which may be deemed desirable and appropriate by Manager; provided, however if and to the extent permitted by applicable Law, at the request of Manager, the Collections or any part thereof, shall be deposited directly into the Master Account.

(v)     Manager is hereby authorized to make payment from the Master Account or other accounts of the District, including the Depository Account, to itself and its Affiliates of any amounts due to it or any of them by the District under this Agreement or otherwise, including, without limitation, the Management Fee, and the reimbursement of expenses and advances, and the District acknowledges that any amounts due to Manager or any of its Affiliates under this Agreement, including without limitation, any Management Fee, shall be senior in priority, and shall not be subordinate to the payment of, any amount due to any other creditor of Company, unless otherwise agreed to in writing by Manager and shall be paid as provided in Section 6(f).

13

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
60808 1584 4

    (vi)     Manager shall have no liability or responsibility for any loss resulting from the insolvency, malfeasance or non-feasance of any Depository with respect to the District bank accounts.

    (vii)     Manager shall have the right to make disbursements from the Master Account, the Depository Account and other the District bank accounts, on behalf of the District in such amounts and at such times as the same are required to operate the Hospital and the Other Facilities, as provided in Section 4(i) and to pay the expenses and debts incurred in connection therewith. If the District fails to timely advance funds for to pay expenses, Manager shall have the right, in its sole and absolute discretion, but not the obligation, to advance such funds, as provided in Section 4(j)(i)(1).

(h)     Charges and Collections of Accounts.

    (i)     Manager shall assist the District in billing and collecting for all fees payable with respect to all services, equipment, devices and supplies provided to patients and clients at the Hospital and the Other Facilities, including the enforcement of the rights of the Hospital and the Other Facilities and/or the District as creditor under any contract or in connection with the rendering of any service in accordance with the District's charity care policies. All out-of-pocket costs and expenses relating to the billing and collection services, including without limitation, any fees or expenses payable to collection agencies, shall be for the account of the District.

    (ii)     The District shall direct all third party payors to provide Manager with copies of all remittance advices in electronic format or in such other format as shall be agreeable to Manager.

    (iii)     The District hereby irrevocably appoints Manager during the Operating Period as its true and lawful attorney-in-fact to take the following actions for and on behalf of and in the name of the District and agrees to execute the Limited Power of Attorney, attached hereto as **Exhibit B** and any other instrument reasonably requested by Manager to evidence such appointment to:

        (1)     Bill patients and third party payors (including reimbursement or indemnification from insurance companies and plans, and other third party payors or fiscal intermediaries) in the name and provider number(s) of the District;

        (2)     Collect in the name of the District from patients, insurance companies and all other third party payors (other than from Governmental Health Payers), all charges resulting from the provision of items and services rendered to patients of the Hospital and the Other Facilities, and to collect capitated payments and all other charges, fees or salaries resulting from or related to the Operations, including but not limited to any and all incentive funds and funds from shared risk and

14

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
608081584 4

**Filed 10/15/18**

Filed 10/17/17

Case 16-10015

Case 16-10015

**Doc 490**

Doc 327

bonus pools under any risk sharing arrangements wherein the District is the provider of medical services, in whole or in part;

(3)    Take possession of and endorse in the name of the District all cash, notes, checks, money orders, insurance payments, and any other instruments received as payment of accounts receivable for deposit into the Depository Account or Master Account or other account, as applicable;

(4)    Deposit all such Collections directly into the Depository Account or the Master Account, other than with respect to Governmental Health Payer receivables;

(5)    Deposit Governmental Health Payer receivables into the Governmental Depository Account;

(6)    Make withdrawals from the Depository Account and other the Depository Accounts for such purposes as are consistent with the provisions of this Agreement;

(7)    Place accounts for collection, settle and compromise claims, and institute legal action for the recovery of accounts; and

(8)    Execute all instruments or documents necessary or appropriate in connection with the above.

(iv)    With respect to Government Health Payer patients and clients, Manager shall bill the Governmental Health Payers for same in the name of and on behalf of the District.

(v)    At the District's expense, Manager shall be entitled to obtain the assistance of one or more billing and/or collection agencies to bill and/or collect sums due to the District, in accordance with the District's charity care policies and applicable Law, including, without limitation, Section 9007 of the Patient Protection and Affordable Care Act.

(vi)    Manager, on behalf of the District, may, in its name or in the name of the District, but in any event at the expense of the District, appeal or contest any action taken by any Governmental Authority against the District and/or the Operations, including, without limitation any overpayment claims, or contest by legal proceedings the validity of any Law adverse to the District and/or the Operations; provided, however, that if Manager pursues any such appeal or contest, or asserts any such legal proceeding, the District shall adequately secure and protect Manager from all loss, cost, damage or expense by bond or other means satisfactory to Manager if any action taken by any Governmental Authority against the District and/or the Operations related to such action could result in a loss, cost, damage, or expense to Manager. Notwithstanding the foregoing, Manager shall not pursue any such appeal or contest, or assert any such legal proceeding, which involves in excess of $100,000, without first obtaining the prior approval of the Governing Body, which will not be unreasonably withheld.

15

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
608081584.4

Filed 10/15/18

Filed 10/17/17

Case 16-10015

Case 16-10015

Doc 490

Doc 327

(i)    Payment of Expenses.

(i)    Manager shall provide oversight of the District's funds in connection with the timely payment of the District's liabilities and other obligations, including wages of District employees, subject to conformance with applicable Law relating to the use of public funds. Manager shall review the payables of the District and shall cause payment thereof to be made from the Depository Account, the Master Account and / or from funds otherwise provided by the District. If the District fails to timely advance funds for such expenses, Manager shall have the right, in its sole discretion, but not the obligation, to advance such funds, as provided in Section 4(i)(i)(1).

(ii)   The District hereby grants to Manager, to the extent permitted by applicable Law, throughout the Operating Period, an exclusive special power of attorney and appoints Manager, to the extent permitted by applicable Law, the District's exclusive true and lawful agent and attorney-in-fact, and Manager hereby accepts such special power of attorney and appointment, to: (i) sign checks, drafts, bank notes or other instruments on behalf of the District, (ii) make withdrawals from the Depository Account, the Master Account or other the District accounts (other than resident trust fund accounts, which shall be held solely for the benefit of applicable residents) for payments specified in this Agreement and (iii) designate, remove, and change such signatories on such accounts as Manager deems necessary or appropriate from time to time.

(iii)  Upon request of Manager, the District shall execute and deliver to any applicable financial institution such additional documents or instruments as Manager may reasonably request to evidence or effect the special power of attorney granted to Manager by the District pursuant to this Section. The special power of attorney granted herein is coupled with an interest and shall be irrevocable except with Manager's written consent.

(iv)   It is specifically agreed and understood, however, that Manager's obligations under this Section 4 are subject to availability of the District funds to make such payments. Nothing contained herein shall obligate Manager to make any such payments from its own funds or resources or to advance any monies whatsoever to the District. If the District fails to timely advance funds, Manager shall have the right, in its sole and absolute discretion, but not the obligation, to advance such funds, as provided in Section 4(i)(i)(1). Notwithstanding the foregoing, no advance of funds hereunder shall cure the District's default resulting from a failure to timely provide funds as required hereunder, but it is understood that pursuant to Section 3(b)(iii), the District may not be in default for the failure to timely provide funds as set forth therein. Manager shall not be liable either primarily or as guarantor for debts of the Hospital or the Other Facilities, or the District under the terms of this Agreement. The District shall be responsible for payment of all legal fees and

16

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
6b8081584 4

Filed 10/15/18

Filed 10/17/17

Case 16-10015

Case 16-10015

Doc 490

Doc 327

collection fees incurred by Manager if the District fails to pay its invoices timely.

(j)     Pledge of Credit.

    (i)     Manager shall not engage in any financial lending, financing or banking actions that result in liens, mortgages, lines of credit, security interest or financial obligations in the name of the District, without the prior written consent of the Governing Body. Prior to requesting consent for approval, Manager shall provide a detailed proposal to the Governing Body describing the amount of required funding, the purpose of the financing, the strategic plan to generate sufficient revenue to repay such financing and all other alternatives evaluated to obtain sufficient funding.

        (1)     Notwithstanding anything in this Agreement to the contrary, in the event the District fails to timely advance funds as required hereunder and/or meet any of its payment obligations under this Agreement, Manager shall have the right, but not the obligation, in its sole and absolute discretion, to advance funds or agree to undertake to advance funds to any Person, as a loan to the District to meet the shortfall caused by the District's failure. As set forth in Section 4(j)(iv), such advance of funds by Manager, however, shall not cure any default, if any under Section 3(b)(iii), of the District as a result of its failure to  timely provide funds. All sums advanced by Manager pursuant to such agreements or undertakings shall be for the District's account. The District shall pay Manager interest on all advanced funds at the rate set forth in Section 6(e) and the principal upon demand by Manager. Any advance made shall be evidenced by a promissory note issued by the District in an amount equal to the amount advanced.

        (2)     To the extent permitted by applicable Law, to the extent Manager advances funds, this Agreement constitutes a security agreement pursuant to which the District provides Manager with a lien on (a) all accounts receivable of the District, and (b) any and all of the District's other assets, as specified by Manager, to the extent allowed by Law, and Manager shall have the right to file a Uniform Commercial Code financing statement with respect to such obligation without the signature of the District. In addition, Manager may request that it be provided with additional collateral for any advanced funds. District agrees that Manager's security interest in the accounts receivable and  any other assets shall be in a first priority position.

    (ii)     Except as provided in Section 4(j)(i), Manager shall not, under any circumstance, in the name of, or on behalf of, the District borrow any money or execute any promissory note, bill of exchange or other obligation, or dispose of any asset of the District not in the ordinary

17

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
608081584-4

course of business, without the consent of the Governing Body; and only to the extent allowed by all applicable Law.

(k)     Information Technology. Manager shall provide oversight of the information technology activities associated with the Hospital and the Other Facilities. Manager shall be responsible for oversight of the selection, negotiation, installation, and implementation of the information technology systems and structures at the Hospital and the Other Facilities consistent with the Annual Budget. Manager shall seek approval from the Governing Body of any new systems and/or termination of any existing agreements, which approval shall not be unreasonably withheld. The District shall be responsible for the direct expense of all hardware and software for the information technology activities of the Hospital and the Other Facilities. The District shall be responsible for the cost of maintenance and support of all such hardware and software, as well as the training of Manager and the District employees, physicians and other applicable personnel on systems and software provided, however, that Manager shall not incur any expense in excess of $100,000 unless set forth in the approved Annual Budget or otherwise approved by the Governing Body. For avoidance of doubt, Manager shall not perform the information technology maintenance for the District under the terms of this Agreement.

(l)     Internal Audit. Manager shall provide oversight of the District's routine audits of internal procedures and systems, including auditing of billing, information systems, payroll, and other areas as identified and shall perform such internal audits as Manager, in its reasonable discretion, deems necessary for the purposes of providing its services hereunder. External audits, if requested by and performed for the District, shall be the responsibility of the District. All direct, out-of-pocket fees, expenses and charges incurred in connection with such external and internal audits shall be a District expense. All internal and/or external audit expenses in excess of $10,000 shall be approved by the Governing Body, unless such expenses are set forth in the approved Annual Budget.

(m)     Managed Care Contracting. Manager shall provide recommendations regarding managed care contracts and rates, and assist the District in the negotiation and consummation of such contracts, and monitoring of contract effectiveness and compliance.

(n)     Operating Contracts.

(i)     Manager shall assist the District in negotiating and securing all third party Operating Contracts necessary or desirable for the proper and efficient management and operation of the Hospital and the Other Facilities.

(ii)    Notwithstanding Section 4(i), Manager may enter into, or modify, supplement, amend, discharge, or terminate, or grant waivers or releases of obligations under such contracts, leases, licenses, instruments, and other agreements ("Operating Contracts") in the name of and at the expense of the District, as may be deemed necessary or advisable by Manager for the furnishing of all professional, consulting, and staffing services, concessions, drugs, supplies, utilities, equipment, property maintenance, insurance and other products, goods, and services as may be necessary or appropriate from time to time for the maintenance and operation of the Hospital and the Other Facilities, or as may otherwise be necessary or appropriate to carry out Manager's obligations under

18

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
508081584.4

this Agreement. Subject to the terms hereof, Manager is hereby expressly authorized, as the District's agent, to execute and deliver any of such Operating Contracts in the name of and on behalf of the District, and presentation of a copy of this Agreement shall constitute conclusive evidence of such agency; provided, however that, Manager is also authorized to enter into and maintain in its own name any national and regional contracts in which the District may participate, as well as such other contracts for the District which, in the judgment of Manager, are advisable to be entered into in Manager's name. Upon Manager's request, the District shall execute

such agreements, contracts, leases. instruments, documents and other Agreements as Manager shall determine are desirable to facilitate the operation and management of the Hospital and the Other Facilities. With respect to all cost and expenses associated with Operating Contracts in Manager's name, the District shall reimburse Manager for all such costs and expenses and / or pay such costs and expenses directly, at Manager's discretion. Manager is expressly authorized to contract, in the name and on behalf of the District, for the provision by Manager or its Affiliates of any services to be provided with respect to the Operations.

(iii) In the event of a termination of this Agreement which results in no further relationship between the District and Manager, Manager shall cause any contracts, including Operating Contracts, it has entered into in its own name to manage and operate the Hospital and the Other Facilities pursuant to this Agreement for the benefit of the District to be assigned to the District and the District shall assume the obligations under all such agreements and shall indemnify Manager from and against any liability

(iv) All such Operating Contracts in excess of $100,000 or which are for amounts which exceed the line items set forth in any approved Annual Budget shall be subject to approval by the Governing Body, such approval not to be unreasonably delayed or denied (unless the items or services that are the subject of the Contract in excess of $100,000) have been approved previously in the Annual Budget.

(v) The expense of such third party contracts shall be a direct expense of the District. Manager shall not be obliged to pay for any the District purchases from its own funds nor shall Manager be obliged to guarantee, directly or indirectly, any debts of the Hospital or the District under the terms of any purchasing arrangement. If the District fails to timely pay amounts due under such arrangements, Manager shall have the right, in its sole discretion, but not the obligation, to advance the funds necessary to satisfy such obligations, as provided in Section 4(j)(i)(1).

(o) Insurance. Manager shall consult with the District as to the type of insurance or self-insurance, amount of coverage thereunder, deductibles and/or self-insured retentions therefor, premiums therefor, and issuers thereof to be carried with respect to the Hospital and the Other Facilities and the Operations. Approval of any change to the types or limits of insurance

19

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
008081584 4

coverage for the District shall be made by the Governing Body. The District shall, solely at its own expense, obtain and maintain in full force and effect throughout the Operating Period the following policies of insurance or self-insurance coverage:

(p)     Comprehensive general liability insurance, including personal injury and property damage liability insurance naming the District and Manager as insureds.

(q)     Property and casualty insurance, including coverage for all Buildings and their contents, including boiler insurance naming the District and Manager as insureds.

(r)     If deemed necessary by the District or Manager, comprehensive automobile liability insurance naming the District and Manager as insureds.

(s)     Worker's compensation and employer's liability insurance and other similar insurance naming the District and Manager as insureds for the District's and Manager's employees.

(t)     Professional liability insurance covering all Operations and, to the extent available, directors and officers insurance, naming the District and Manager (and Manager's executive employees) as named insureds. The professional liability insurance shall afford minimum protection (which may be effectuated through primary and/or excess coverage) of not less than $1,000,000.00 combined single limit for damage in any one occurrence and not less than $3,000,000.00 aggregate for all occurrences. The insurer must be licensed by the California Department of Insurance and have a general policyholders rating of not less than A-X or better by Best's Key Rating Guide and with a claims paying ability rating from S&P or at least AA or an equivalent rating from another rating agency acceptable to Manager. Manager may require that the District obtain from the insurer a statement as to good standing with the California Department of Insurance.

(u)     Commercial umbrella or excess liability coverage and, to the extent available, regulatory insurance coverage, covering all Operations, naming the District and Manager as named insureds. The commercial Umbrella and Excessive Liability Insurance shall afford minimum protection (which may be effectuated through primary and/or excess coverage) of not less than $1,000,000.00 combined single limit for damage in any one occurrence and not less than $3,000,000.00 aggregate for all occurrences, insuring Manager and the District and their respective employees and representatives in connection with Operations. The insurer must be licensed by the California Department of Insurance and have a general policyholders rating of not less than A-X or better by Best's Key Rating Guide and with a claims paying ability rating from S&P of at least AA or an equivalent rating from another rating agency acceptable to Manager. Manager may require that the District obtain from the insurer a statement as to good standing with the California Department of Insurance.

(v)     Insurance Specifications. The foregoing insurance shall meet the following specifications subject to the provisions of the District's joint powers agreements in BETA Healthcare Group and ALPHA Fund:

(i)     All such policies of insurance shall be in such amounts as are deemed necessary by the District and Manager (but in no event less than the amounts set forth above) and shall contain a waiver of rights of subrogation clause against Manager and the District, to the maximum extent permitted under applicable Laws. The parties and

20

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
505061584.4

Filed 10/15/18

Filed 10/17/17

Case 16-10015

Case 16-10015

Doc 490

Doc 327

their respective Affiliates shall not assert against the others, and each does hereby waive with respect to the others, any claims for any losses, damages, liabilities or expenses (including attorneys' fees) incurred or sustained by any of them on account of damage or injury to Persons or property arising out of the ownership, operation and/or maintenance of the Hospital and the Other Facilities, to the extent that the same would be covered and paid by the insurance required to be carried hereunder. The District shall present such policies of insurance to Manager for review, upon request by Manager.

(ii)    The District shall cause Manager, and any Person affiliated with Manager, that Manager so directs, to be named as additional insureds on the liability insurance coverage described above and on any fidelity bond (if any). It is the intention of the parties that the insurance and bonds (if any) maintained by the District with respect to the Operations shall protect both the District and Manager and will be primary insurance for both parties for any and all losses covered thereby.

(iii)    Certificates of insurance for the above coverages and a copy of the bond (if any) and accompanying endorsement naming Manager and/or Manager's employees (specifying his/her position), as applicable, shall be provided to Manager within thirty (30) days of the Effective Date and thereafter within thirty (30) days (i) of policy or bond (if any) renewal or replacement and (ii) of a request by Manager. All such policies shall provide that the subject policy may not be canceled, modified or reduced (including, without limitation, any amendment that would reduce the scope or limit coverage or remove any endorsement to such policy or cause the same to no longer be in full force and effect) except upon not less than thirty (30) days prior written notice to Manager. Originals of each renewal policy or certificates therefore from the insurers evidencing the existence thereof shall be provided to Manager at least thirty (30) days prior to, but not later than, the expiration or termination dates of the applicable policy. In addition, the District shall notify Manager in writing of any reduction or cancellation, increase of deductible or material modification of any term or condition of any of insurance coverage required herein within twenty-four (24) hours of receipt.

(iv)    Manager reserves the right to procure, at the District's cost, any or all of the foregoing required insurance coverage, if the District fails or refuses to do so, or if Manager in its sole discretion determines that Manager's procuring of such insurance is most efficient and/or in the financial benefit of Manager and/or the District. Manager is not required to act under this Section 4(p) and shall not be liable for its failure to effect or maintain recommended insurance upon the District's failure to do so.

(v)    Manager may obtain similar coverages for its benefit by taking out policies with such insurance companies as may be selected by Manager. Notwithstanding anything herein to the contrary, any

21

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
608081584.4

Filed 10/15/18
Filed 10/17/17

Case 16-10015
Case 16-10015

Doc 490
Doc 327

insurance obtained by Manager hereunder may, at Manager's election, cover only Manager's interest. All direct, out-of-pocket fees, expenses and charges incurred in connection with obtaining such insurance shall be the District expenses.

(vi)     If, during the Operating Period, the District is covered by general liability, professional liability, or other liability insurance on a "claims made" basis, then at least ten (10) days before the termination of this Agreement, the District shall procure and maintain, at the District's sole cost and expense, an extended reporting endorsement or "tail" insurance coverage for a period of at least four (4) years after the termination date of this Agreement, with coverage limits and deductible amounts equivalent to those required hereunder on the date immediately preceding the termination of this Agreement for such coverage for general, professional and other liability claims reported after the termination of this Agreement but concerning services provided during the Operating Period or the term of the claims made policy. The District shall provide Manager with a certificate evidencing such coverage no later than ten (10) days before the termination of this Agreement. The District shall be named as the primary insured party on each policy of tail insurance and Manager shall be named as an additional insured. This Section will survive the termination or expiration of the Agreement.

(vii)    To the extent any insurance is placed through a self-insurance program or captive insurance program, the District shall assure that such insurance shall comply with all applicable Law, if such self-insurance or captive program is domiciled outside the United States, and the District shall assure that such coverage shall be, as appropriate, reinsured by reinsurers acceptable to Manager, in Manager's sole and absolute discretion.

(w)   Purchasing.

(i)     Manager shall be responsible for the oversight and management of the District's purchasing systems and procedures for the Operations at the supervisory / management level, including but not limited to oversight of:

(1)     Capital purchasing;

(2)     Researching and negotiating equipment based on Hospital and the Other Facilities' needs, specifications, and the Annual Budget;

(3)     Reviewing oversight of inventory par levels (monthly audits); and/or

(4)     Department purchasing structures and systems.

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
608061581-1

22

**Filed 10/15/18**

Filed 10/17/17

Case 16-10015

Case 16-10015

**Doc 490**

Doc 327

(ii) The District shall be responsible for the direct expense of all purchases and for all purchasing expenses, including but not limited to utilities, concessions, drugs, equipment, supplies, furniture or furnishings, inventory items, linens, machinery, medicines, and services.

(III) In furtherance of the foregoing, all capital and other expenditures made shall be subject to the purchasing and procurement policies and procedures of the District, its Bylaws, and applicable Law.

(x) <u>Marketing and Communications</u>.

(i) Manager shall provide consultation, advice and oversight related to marketing, advertising, and promotional issues, as well as marketing strategies and policies, as it deems necessary in its sole and absolute discretion.

(ii) Manager shall:

(1) Provide direction and advice regarding the marketing program for the Hospital and the Other Facilities which shall be reasonably designed to inform and educate health care professionals and the general public served by the District of the existence of one or more of the services offered by the District.

(2) Cause, to the extent required by applicable Law, including Internal Revenue Code §501(r), a community needs health assessment to be prepared identifying the health and welfare needs of the residents who reside in the communities served by the District, and propose an implementation strategy to meet the outstanding community health needs identified in the assessment.

(3) Cause to be prepared and distributed such descriptive booklets, brochures or pamphlets as Manager determines are necessary, in its sole and absolute discretion, to inform health care professionals and members of the public of the nature and requirements of State and Federal reimbursement programs for patients and how the same relate to the services offered at the District.

(iii) All direct, out-of-pocket fees, expenses and charges incurred in connection with marketing, advertising, and promotional activities shall be at the sole cost and expense of the District.

(y) <u>Medical Records</u>.

(i) Manager shall be responsible for the oversight of the District's medical records activities at the executive levels, including development of department strategies and systems and planning.

23

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
008061584 4

(ii)    During and following the expiration of the Operating Period, all records of the District shall remain the property of the District.

(iii)    All patient medical records shall be treated as confidential so as to comply with all applicable Laws regarding the confidentiality of patient records, including, without limitation, the privacy standards promulgated under HIPAA.

(iv)    Manager shall be a "Business Associate" of the District, as that term is defined in the regulations implementing HIPAA, and Manager's use of "Protected Health Information," as that term is defined in the regulations implementing HIPAA ("PHI"). Manager shall execute and comply with the Business Associate Agreement attached hereto as **Exhibit C**.

(v)    Manager shall notify the District of any data breach that may occur at the Hospital and the Other Facilities, promptly after Manager becomes aware of same.

(z)    <u>Additional Reports</u>. Manager agrees to prepare, cause to be prepared or otherwise make available reports regarding the Operations as follows:

(i)    Within forty-five (45) days after the end of each fiscal quarter, Manager shall make available to the District the following information:

(1)    Relevant utilization statistics for the District for the prior quarter, including but not limited to patient volume and payor mix; and

(2)    Financial statements and budget analysis for the District for the prior quarter, as provided in <u>Section 7(c)</u>.

(ii)    Manager shall provide to the Governing Body, on at least thirty (30) calendar days' notice, or sooner if necessary, to implement such required action, a description of any needed or discontinued services, refinancing proposals, expansion plans or material changes in operating procedures. The proposal shall explain the reasons for the proposed activity.

(aa)    <u>Agency</u>. Subject to (i) approval of the Governing Body for acts outside of the ordinary course of the Hospital and the Other Facilities' businesses, and (ii) the terms hereof, Manager shall have the right to act as the agent of the District and/or the Hospital and the Other Facilities in the procuring of licenses, permits and other approvals, the payment and collection of accounts and in all other activities necessary or appropriate or useful to Manager in the carrying out of its duties as specified herein.

(bb)    <u>Bankruptcy Advice</u>. Manager shall provide District with consultation and advice in connection with a potential filing by District of a proceeding under Chapter 9 of the Bankruptcy Code. If such petition is filed, Manager shall generally arrange and supervise the bankruptcy proceedings. The Chief Restructuring Officer shall serve as the representative of the District in connection with any such Chapter 9 bankruptcy proceeding.

24

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
608081584.4

5.   **Legal Compliance**

(a)      **Compliance Plan**. Manager has received a copy of the District's Compliance Policies and Procedures, including the Code of Conduct and the Physician Referral, Stark Law, and Anti-Kickback policies and procedures. Manager shall abide by these policies and procedures and applicable Law. Any recommendations and/or revisions of such policies made by Manager must be approved by the Governing Body. Manager will be given prompt written notice of any changes made to the foregoing. Manager may develop and recommend changes to the District's existing Compliance Plan (the "**Compliance Plan**") for implementation during the Operating Period. Any such recommendations and/or revisions to the Compliance Plan must be approved by the Governing Body. Manager shall use its commercially reasonable efforts to support the Compliance Plan. All costs of developing, implementing and maintaining the Compliance Plan shall be borne by the District.

(b)      **Government Regulations**. On behalf of the District, Manager shall, subject to the limitations set forth herein, use its reasonable commercial efforts to help assure that: (1) the District continuously complies with all material applicable Laws, including without limitation, Hospital Law, State and Federal False Claims Act, Civil Monetary Penalty Law, State and Federal Anti-Kickback statutes, State and Federal self-referral prohibitions and applicable Medicare conditions of coverage and/or participation and (2) the District retains and maintains in good standing all necessary accreditations, licenses, permits, approvals and authorizations required for the ongoing operation of the Hospital and the Other Facilities.

(c)      **Accreditation Compliance**. Manager shall, subject to the limitations set forth herein, take all steps necessary to assist the District to continue meeting the applicable accreditation agency's accreditation standards, as they exist or may be changed from time-to-time, and as may be applicable to the Hospital and the Other Facilities' then current accreditation(s). Manager shall have the right to select and/or change the applicable accreditation agency for the Hospital, and if applicable, the Other Facilities, in its sole and absolute discretion.

(d)      **Licensure**. Manager shall not act in a manner which adversely affects the licensure of the District by the State as a Medicare participating hospital and skilled nursing facility (or any other Medicare reimbursement designation as may be agreed to by the parties). Within thirty (30) days of receipt by the District or Manager of any final report or written assessment concerning the licensure of the District by the State as a hospital or skilled nursing facility or the accreditation of the District, Manager shall furnish a copy of such report to the District.

(e)      **HIPAA Compliance**. Manager shall comply with the applicable provisions of the Administrative Simplification and Privacy Rules of the Health Insurance Portability and Accountability Act of 1996, as amended, and regulations promulgated pursuant thereto, and any related or applicable privacy Law regarding medical information and protected health information.

(f)      **Ineligible Persons - Disclosure Obligation**. Manager shall use reasonable commercial efforts to monitor that none of Manager's or the District's employees employed at the Hospital and the Other Facilities have been sanctioned, debarred or suspended or otherwise deemed ineligible to participate in Medicare, Medicaid or other Federal health care programs, and procurement, or non-procurement programs (collectively, an "**Ineligible Person**"). Manager represents to the District that Manager is not an Ineligible Person nor has any pending proceedings or received notice of any action or proceeding to exclude, debar, suspend, or otherwise declare Manager ineligible under any federally funded health program. Manager shall notify the District

25

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
608081584 4

Filed 10/15/18

Filed 10/17/17

Case 16-10015

Case 16-10015

Doc 490

Doc 327

within three (3) business days after becoming aware of any fact or circumstance that would make Manager an Ineligible Person.

(g)     Access to Records. Manager shall, in accordance with Section 1395x(v)(1) of Title 42 United States Code until the expiration of four (4) years, or longer as may be required by applicable Law, after the termination of this Agreement, make available upon written request to the Secretary of the United States Department of Health and Human Services, or, upon request, to the Comptroller General of the United States Accounting Office, or any of their duly authorized representatives, a copy of this Agreement and such books, documents and records as are necessary to verify the nature and extent of the costs of the services provided by Manager under this Agreement. Manager further agrees that in the event Manager carries out any duties under this Agreement through a subcontract with a value or cost of Ten Thousand Dollars ($10,000) or more over a twelve-month period with a related organization, such agreement shall contain a clause to the effect that until expiration of four (4) years, or longer as may be required by Law, after the furnishing of such services pursuant to such subcontract, the related organization shall make available upon written request to the Secretary of the United States Department of Health and Human Services, or, upon request, to the Comptroller General of the United States Accounting Office, or any of their duly authorized representatives, a copy of such contract and such books, documents and records of such organizations as are necessary to verify the nature and extent of such costs. This Section is included pursuant to and is governed by the requirements of federal Law. No attorney-client, accountant-client, or other legal privilege will be deemed to have been waived by the parties or any of the parties' representatives by virtue of this Agreement.

(h)     No Obligation to Refer Patients. Nothing contained in this Agreement shall require (directly or indirectly, explicitly or implicitly) either Manager or its Affiliates or the District or its Affiliates, to refer any patients to one another or to use the Hospital or the Clinics or Other Facilities as a precondition to receiving the benefits set forth herein.

6.     **Management Fee**.

(a)     Management Fee. As Manager's fee for the performance     of     the management services under this Agreement, Manager shall receive monthly (in advance on the first day of each month) a fee (the "**Management Fee**") in the amount of Sixty Five Thousand Dollars ($65,000). Effective as of each January 1st, commencing January 1, 2017, the Management Fee shall be increased as provided in Section 6(b).

26

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
6080815M4.4

    (b)     **CPI Adjustment.**

        (i)     "**CPI**" means the monthly index of the U.S. City Average Consumer Price Index for Urban Wage Earners and Clerical Workers – Medical Care Services (1982-84 equals 100) published by the United States Department of Labor, Bureau of Labor Statistics or any successor agency that shall issue such index. In the event that the CPI is discontinued for any reason, the parties shall use such other index, or comparable statistics, on the cost of medical care services in the United States, as shall be computed and published by any agency of the United States or, if no such index is published by any agency of the United States, by a responsible financial periodical of recognized authority.

        (ii)     Beginning on January 1, 2017, and every year thereafter, the Management Fee shall each be adjusted for inflation as follows:

            (1)     The then existing Management Fee shall be multiplied by the greater of (i) the CPI percentage increase using the latest published data since the last adjustment or (ii) five percent (5%) ("**CPI Increase**");

            (2)     The then existing Management Fee shall then be added to the CPI Increase ("**Net Adjusted Management Fee**"); and

            (3)     The Net Adjusted Management Fee will then be multiplied by 1.01 to determine the Management Fee for the next ensuing calendar year.

            (4)     For example, the latest published CPI in January 2017 (e.g. November 2016) will be compared to the CPI for November 2015 (assuming that was the latest available published data) and the 2016 Management Fee will be multiplied by the percentage difference. Assuming a three percent increase, the Management Fee of $65,000 would be increased by $1,950 for a new monthly Net Adjusted Management Fee of $66,950. That amount would then be multiplied by 1.01 resulting in a new monthly Management Fee of $67,619.50.

    (c)     **Expenses.** In addition to the Management Fee, Manager shall be reimbursed monthly by the District for expenses expressly made reimbursable hereunder together with (ii) other usual, customary, and commercially reasonable out-of-pocket expenses incurred on behalf of the District, in accordance with the approved Annual Budget, or with approval from the Governing Body, if such fees are in excess of the amount in the approved Annual Budget. Manager shall not be reimbursed for any indirect or overhead expenses of Manager or its Affiliates.

    (d)     **Operating Expenses.** Except as otherwise provided in this Agreement, all of the costs and expenses of maintaining and operating the Hospital and the Other Facilities shall be the sole cost and expense of the District, and shall not be expenses of Manager. Expenses shall include, without limitation:

27

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
608081584 4

    (i)     any operating or non-operating expense incurred in the provision of services to the District (unless specifically excluded hereunder); and

    (ii)     The cost of any employee or Consultant that provides services at or in connection with the Hospital or the Clinics or Other Facilities for improved clinic performance, such as management, billing and collections, business office consultation, accounting and legal services, including salaries, benefits, other compensation, travel costs, and other expenses.

(e)    **Late Payments.**    If payment of amounts due hereunder, including Management Fees, and reimbursement of other amounts, are not made on the due date, then interest shall accrue on any unpaid amounts for each day beyond the due date at the rate of ten percent (10 %) per annum (simple interest).

(f)    **Senior Indebtedness Status.**    The obligations of the District under this Agreement rank and shall rank at least senior in priority of payment to all other unsecured debt of the District. Fund transfers and other payments received by the District shall be directed, regardless of the payment purpose indicated in the payment document, according to the following priority ranking: (1) payment of the Management Fee, and other amounts due hereunder; (2) payment of any secured indebtedness; and (3) all other debts of the District.

(g)    **Setoff.**    Notwithstanding any provision of this Agreement to the contrary, Manager shall have the right from time to time to setoff any amounts owed by the District to Manager against any amounts owed by Manager to the District and/or from any funds of the District over which Manager has a power of attorney or right of disbursement, whether pursuant to this Agreement or otherwise.

## 7.    Books and Records.

(a)    **Maintenance of Books and Records.**    Manager shall supervise the maintenance of the books of account covering the operation of the District. Such books of account shall be maintained on an accrual basis in accordance with GAAP.

(b)    **Accounting.**    Manager shall be responsible for the oversight of Hospital and the Other Facilities' accounting functions.

(c)    **Reports and Financial Statements.**    Manager shall from time to time deliver to the Governing Body, from the District's data, the reports and financial statements reasonably requested by the Governing Body, as well as any other reports or financial statements required by the terms of this Agreement. Oversight shall include consultation with respect to Hospital and the Other Facilities:

    (i)     General ledger / financial accounting;

    (ii)     Accounts payable;

    (iii)     Payroll;

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
605081584 4

28

(iv)   Facilitation of Hospital and the Other Facilities annual audit; fees paid to independent accountants, however, shall be the responsibility of the District;

(v)   Cost reporting. Year-end information required for preparation of Medicare and MediCal cost reports shall be available to the District, and at the District's direction, to its accountants, prior to one hundred twenty (120) days into the year following the year for which they are prepared; and

(vi)   Monthly bank reconciliation.

(d)   Financial Statements.

(i)   Monthly financial statements, including income statements, balance sheets, statement of cash flows. Such statements shall generally be available to the District by the 20th day of the month following the applicable period.

(ii)   Quarterly financial statements including unaudited financial statements reflecting the operations of the District for such quarter. Such statements shall generally be available to the District by the 45th day following the end of each applicable quarter. Quarterly statements shall also include Manager's usual and customary statistical and performance measures.

(iii)   Annual financial statements, including an unaudited balance sheet of the District dated as of the end of the fiscal year and a related statement of income or loss for the District for such fiscal year. Year-end income statements, shall be available to the District, and at the District's direction, to its accountants, prior to ninety (90) days into the year following the year for which they are prepared.

(e)   Audit.

(i)   If the District so elects, such financial statements will be certified in the customary manner by an independent certified public accountant approved by the District. The expense of any such independent accountants shall be borne by the District.

(ii)   Manager shall respond, in writing, to any and all recommendations made by the District's independent auditors, which response shall either acknowledge that an audit proposal or recommendation has been implemented or, if not, the reasons why not.

(f)   Financial Reporting Expenses. Fees paid to independent firms and professionals in connection with the foregoing together with the direct, out-of-pocket fees, expenses and charges incurred in connection with the preparation of such shall be the District expenses.

(g)   Inspection of Records. Authorized agents of the District shall have the right at all reasonable times during usual business hours, at the District's expense, to audit, examine and

29

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
608081584 4

make copies of or extracts from the books of account of the District maintained by Manager. Such right may be exercised through any agent, independent public accountant or employee of the District designated by the District.

(h)     Confidentiality. The parties agree that: (a) neither party will disclose any secrets or confidential technology, proprietary information, or trade secrets of the other party without the prior written consent of the transmitting party, except (i) to the receiving party's agents, advisors, auditors and representatives; or (ii) as may be necessary by reason of legal, accounting or regulatory requirements beyond the reasonable control of the recipient party; and (b) should this Agreement expire or terminate, neither party will take or retain any papers, records, files, computer programs and software, other documents or copies thereof, or other confidential information of any kind belonging to the other party, except for copies of same as may be reasonably necessary to defend any anticipated litigation or respond to claims or pursuant to ordinary data backup or storage processes.

8.     **Indemnification and Liabilities.**

(a)     District Indemnity Obligation. Manager does not hereby assume any of the obligations, liabilities or debts of the District or the Hospital or the Other Facilities, except as otherwise expressly provided herein, and shall not, by virtue of its performance hereunder, assume or become liable for any of such obligations, debts or liabilities. The District hereby agrees to indemnify, defend and hold Manager harmless from and against any and all claims, actions, liabilities, losses, costs and expenses of any nature whatsoever, including reasonable attorneys' fees and other costs of investigating and defending any such claim or action, asserted against Manager on account of any of the obligations, liabilities or debts of the District or the Hospital or the Other Facilities, except for demands arising from Manager's willful misconduct. The District further hereby agrees to defend, hold harmless and indemnify Manager and Manager Parties from and against any and all claims, actions, liabilities, losses, costs and expenses of any kind imposed on account of or arising out of actions taken by Manager or Manager Parties in what Manager or any such Person reasonably believed to be within the scope of their responsibilities under this Agreement, except for acts of willful misconduct. However, in no event shall Manager or any Manager Parties be liable to the District for any loss of use, goodwill, revenues or profits, or any consequential, special, indirect or incidental loss, damage or expense, or for punitive or exemplary damages, except for punitive or exemplary damages to the extent resulting from the willful misconduct of Manager or Manager Parties. This Section shall survive the expiration or termination of this Agreement. The foregoing indemnification is an addition to and not in limitation of the indemnification provisions as they relate to agents of the District (it being agreed that Manager is an agent of the District for that purpose), as set forth in the District's Bylaws, and any other indemnification provisions set forth in this Agreement.

(b)     Manager Not Liable for District Liabilities. The District is and shall be fully liable and legally accountable at all times to all patients and Governmental Authorities for all patient care and funds and all other aspects of the operation and maintenance of the Hospital and the Other Facilities. Manager shall have absolutely no obligation or duty to act for or on behalf of the District with respect to any matter which is not directly related to Manager's obligation to provide the administrative and management services described herein to the Hospital and the Other Facilities, as and to the extent provided herein. Manager shall not be or become liable for any of the existing or future obligations, liabilities, or debts of the District, or for any of the obligations of the Hospital and the Other Facilities. This Section shall survive the expiration or termination of this Agreement.

30

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
608081584 4

(c)     Manager Not Liable for Condition of Buildings or Equipment. Notwithstanding anything contained herein to the contrary, in no event shall Manager be liable for any damages arising from, incident to, or in connection with, the physical condition (including the environmental condition) of the Buildings or other structures owned or leased by the District, or the land upon which such Buildings or other structures are situated, or any of the equipment located thereon, and any such damages as may arise shall be the sole responsibility of the District, as a the District expense, except to the extent that Manager engages in willful misconduct in carrying out its responsibilities hereunder, in which event Manager's liability shall be limited to amounts not covered by applicable insurance policies. In connection with the foregoing, the District shall, with the assistance of Manager, comply with any and all applicable fire and safety codes. This Section shall survive the expiration or termination of this Agreement.

(d)     Manager Not Liable for Acts or Omissions of the District's Agents. Manager shall not be responsible for the acts or omissions of any of the District's managers, officers, directors, Governing Body, agents, employees, contractors, subcontractors or any other Persons performing any work or rendering any services in connection with the operation, management, ownership or other use of the Hospital and the Other Facilities, or any Consultants or other Persons engaged with respect thereto. This Section shall survive the expiration or termination of this Agreement.

(e)     Manager Not Liable for Consultants' Fees and Other Financial Obligations. The District, and not Manager, shall be responsible for all fees and other compensation charged by Consultants and other Persons engaged by the District (or by Manager on behalf of the District in accordance with the terms hereof) to provide services related to the Hospital and the Other Facilities. Manager shall be responsible for reviewing such fees, and the District shall timely provide Manager with copies of all bills, invoices, and other information relating to such fees.

(f)     Release. Because of the unique services to be provided by Manager hereunder, neither Manager nor any Manager Parties shall be liable to the District for any damages or loss of any kind including, without limitation: (i) direct damages; (ii) consequential damages; (iii) loss of profits; (iv) business interruption; (v) damage to property or death or injury to Persons from any cause whatsoever including, without limitation, professional liability or malpractice, acts of vandalism, loss of trade secrets or other confidential information, or (vi) damage, loss, or injury caused by a defect in the structure of the Hospital and the Other Facilities, power failure, fire, strikes, shortage of supplies, or any cause whatsoever in or about the Hospital and the Other Facilities or any part thereof, unless such claims, losses, costs, damages or expenses are the result of the willful misconduct of Manager or Manager Parties. This Section shall survive the expiration or termination of this Agreement.

(g)     Manager Indemnity Obligation. Manager shall indemnify, defend and hold the District harmless from and against any and all claims, actions, liabilities, losses, costs and expenses of any nature whatsoever, including reasonable attorneys' fees and other costs of investigating and defending any such claim or action, imposed on the District including its officers, directors, partners, employees and agents on account of or arising out of any breach of the terms hereof by Manager, and resulting from the willful misconduct of Manager or any Manager Parties. NOTWITHSTANDING ANY PROVISION OF THIS AGREEMENT (INCLUDING ANY INDEMNIFICATION OBLIGATIONS), IN NO EVENT SHALL MANAGER BE LIABLE (WHETHER IN AN ACTION IN NEGLIGENCE, CONTRACT OR TORT OR BASED ON A WARRANTY OR OTHERWISE) FOR (I) FAILURE TO REALIZE SAVINGS OR LOSS OF PROFITS, REVENUE, OR ANY OTHER INDIRECT, INCIDENTAL, PUNITIVE, SPECIAL OR CONSEQUENTIAL DAMAGES, AND (II) DIRECT AND OTHER DAMAGES IN EXCESS OF THE AMOUNT OF MANAGEMENT

31

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
6060613564.4

FEES EARNED BY MANAGER UNDER THIS AGREEMENT DURING THE THREE (3) MONTHS PRIOR TO THE DATE OF THE APPLICABLE CLAIM FOR DAMAGES, IN EACH CASE, EVEN IF MANAGER HAS BEEN ADVISED OF POSSIBILITY OF SUCH DAMAGES.

9.      **Intentionally Omitted**.

10.      **Default**.

(a)      **District Default**.  The following occurrences shall each be deemed an event of default by the District ("**District Default**"), unless waived in writing by Manager:

(i)      Material breach of any representation, warranty, or covenant of the District contained within this Agreement, after giving written notice to the District, and the District 's subsequent failure to cure the breach (if such breach is capable of being cured) within sixty (60) days (or ten (10) days in the event of a monetary breach or thirty (30) days in the event of a breach of any provision requiring the District to: (i) provide the Manager with a consent or approval or (ii) execute an agreement or document hereunder); provided, however, that if the cure cannot reasonably be effectuated within the applicable cure period, a longer period shall be allowed not to exceed ninety (90) days, if the District has commenced to cure such breach in good faith or has otherwise provided adequate protection or security to protect Manager's interest hereunder (which security shall be sufficient in Manager's sole and absolute discretion) within the applicable cure period, and the District is proceeding with due diligence to effect a cure.

(ii)      The occurrence of any of the following: (a) the filing by the District of a voluntary petition under Chapter 9 of the Bankruptcy Code (other than any filing made within thirty (30) days after the Effective Date), or (b) the filing of a petition for the appointment of a receiver for all or any of the property of the District, or (c) the taking of any voluntary or involuntary steps to dissolve or suspend the powers of the District (unless such steps to dissolve or suspend are removed) within thirty (30) days, or (d) the consent by the District to an order for relief under the Bankruptcy Code or the failure to vacate such an order for relief within sixty (60) days from and after the date of entry thereof, or (e) the entry of any order, judgment or decree, by any court of competent jurisdiction, on the application of any creditor of the District or any other Person, adjudicating the District as a bankrupt, or to be insolvent, or approving a petition seeking reorganization or the appointment of a receiver, trustee or liquidator of all or a substantial part of the District's assets, if such order, judgment or decree shall continue unstayed and in effect for any period of sixty (60) days. In the event that the District files a petition under Chapter 9 of the Bankruptcy Code, the District agrees, to the extent permitted under applicable Law: (a) not to reject this Agreement; (b) to designate Manager as a vendor supplier that is critical to the District's business and obtain a critical vendor order that (x) waives or releases any preference liability; and (y) provides administrative priority or other

32

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
608061584.4

preferred status, acceptable to Manager, with respect to Manager's pre-petition claims (if any), and any and all funds advanced by Manager post-filing.

(b)    Liquidated damages

(i)    Each of the parties acknowledges that it would be extremely difficult and impracticable, if not impossible, for Manager to ascertain with any degree of certainty the amount of damages that would be suffered by Manager in the event of the occurrence of a District Default. In the event this Agreement is terminated as a result of any District Default, the District shall pay a fee (the "Termination Fee"), which fee is not a penalty, but rather is liquidated damages in accordance with California Civil Code Section 1671, which the parties have negotiated in good faith and have agreed is a reasonable fee under the circumstances. The Termination Fee shall be paid within five (5) days after the effective date of the termination of this Agreement.

(ii)    The Termination Fee shall be an amount equal to Thirty Two Thousand Five Hundred Dollars ($32,500) per month first increased by CPI, as provided below, and then multiplied by the remaining number of months in the Operating Period at the time of the termination, discounted to its present value using the discount rate of the Federal Reserve Bank of San Francisco at the time of termination plus one percent (1%).

(1)    "CPI" means the monthly index of the U.S. City Average Consumer Price Index for Urban Wage Earners and Clerical Workers – Medical Care Services (1982-84 equals 100) published by the United States Department of Labor, Bureau of Labor Statistics or any successor agency that shall issue such index. In the event that the CPI is discontinued for any reason, the parties shall use such other index, or comparable statistics, on the cost of medical care services in the United States, as shall be computed and published by any agency of the United States or, if no such index is published by any agency of the United States, by a responsible financial periodical of recognized authority.

(2)    Inflation Adjustment. The Termination Fee shall be adjusted for inflation by multiplying the above stated Termination Fee by the CPI percentage increase between January 1, 2016 and the date the Termination Fee is payable, using the latest published data since the last adjustment.

(iii)    If the District fails to pay the Termination Fee when due, then the Termination Fee, or any unpaid portion thereof, shall bear interest

33

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
698081564.4

from the date such payment was required to be made until the date of payment at the interest rate set forth in Section 6(e).

(iv)    If upon termination of this Agreement, the District contends that the Termination Fee is not due and owing and Manager contends that same is due and owing, the District shall be obliged to deposit, within three (3) days, the amount of the Termination Fee into an Escrow account with a national bank with not less than $50,000,000,000 in assets. The funds shall be released to the applicable party upon the sooner to occur of: (a) mutual instructions of Manager and the District; (b) final non-appealable order of a court directing the release of the funds to a party; or (c) to the District if Manager has not contested, in a judicial proceeding, that the funds are owed to it within twenty four (24) months of the termination.

(v)     This Section shall survive the expiration or termination of this Agreement.

(c)     Manager Default. The following occurrences shall each be deemed an event of default by Manager ("**Manager Default**"), unless waived in writing by the District:

(i)     Material breach of any material covenant of Manager contained within this Agreement, after giving written notice to Manager, and Manager's subsequent failure to cure the breach within sixty (60) days; provided, however, that if the cure cannot reasonably be effectuated within such sixty (60) day period, a longer period shall be allowed, if Manager has commenced to cure such breach or has otherwise provided adequate protection or security to protect the District 's interest hereunder, and Manager is proceeding to effect a cure. In determining whether a breach has occurred, the District shall exercise its reasonable discretion in good faith and shall use its best efforts to assist Manager in effectuating a cure.

(ii)    The occurrence of any of the following: (a) the filing by Manager of a voluntary petition in bankruptcy or for reorganization under the Bankruptcy Code, or (b) the filing of a petition for the appointment of a receiver for all or any substantial portion of the property of Manager, or (c) the taking of any voluntary or involuntary steps to dissolve or suspend the powers of Manager (unless such steps to dissolve or suspend are removed) within sixty (60) days, or (d) the consent by Manager to an order for relief under the Bankruptcy Code or the failure to vacate such an order for relief within sixty (60) days from and after the date of entry thereof, or (e) the entry of any order, judgment or decree, by any court of competent jurisdiction, on the application of any creditor of Manager or any other Person, adjudicating Manager as a bankrupt, or to be insolvent, or approving a petition seeking reorganization or the appointment of a receiver, trustee or liquidator of all or a substantial part of Manager's assets, if such order, judgment or decree shall continue unstayed and in effect for any period of sixty (60) days.

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
608081584.4

34

(d)    Early Termination Events.

    (i)    Notwithstanding anything herein to the contrary, Manager shall have the absolute right to terminate this Agreement, with or without "cause," upon at least thirty (30) days written notice to the District.

    (ii)    In the event either party should be determined by a Governmental Authority to be in violation of any Law, by virtue of this arrangement or this arrangement is otherwise deemed illegal by a Court of competent jurisdiction in a final non-appealable determination ("**Jeopardy Events**"), the parties shall use best efforts to negotiate an amendment to this Agreement to remove or negate the Jeopardy Event. If they are unable to do so within six (6) months, either party may terminate this Agreement by written notice to the other.

    (iii)    In the event that the District has insufficient funds to pay the expenses of Operations, and Manager fails or refuses to fund same, if the licensure of the Hospital is in imminent jeopardy of being suspended or revoked because of the failure to pay the expenses of Operations, then the District may terminate this Agreement upon not less than ten (10) days written notice to Manager (during which time period Manager may avoid termination by paying the expenses in question or otherwise making arrangements with the applicable licensing authority to avoid suspension or revocation of the Hospital's license).

    (iv)    The District may terminate this Agreement on not less than 30 days' notice to Manager in the event that Manager is excluded, debarred, or otherwise ineligible to participate in Federal healthcare programs as defined in 42 USC § 1320a-7b(f) or any state healthcare program.

(e)    Procedure.

    (i)    In the event either party to this Agreement deems the other party to be in default of its obligations hereunder, then said party shall be required to provide notice of the alleged default to the other party, which notice shall contain a detailed description of the alleged default.

    (ii)    If the claim of default is disputed by the party receiving such notice, within ten (10) business days thereafter the party receiving the notice shall give notice to the charging party that the party receiving such notice disputes that the factual matters alleged constitute a default under this Agreement. If the parties cannot resolve such dispute within ten (10) business days thereafter (commencing on the date that the charging party receives notice of the dispute) the parties shall submit such matter to binding arbitration in Los Angeles County, California, in accordance with the American Health Lawyers Association Alternative Dispute Resolution Service Rules and Procedure for Arbitration, and applying the Law of the State. Any determination by the arbitrator shall be final and binding upon the parties, and judgment thereon may be entered in any court having jurisdiction thereof. The costs of arbitration shall be borne equally by the parties. During the pendency of any such arbitration and until final judgment thereon has been entered, this Agreement shall not be terminated as a result of the alleged default which is in dispute.

(f)    Termination.

    (i)    In the event of a party's failure to cure a default within the time allowed herein for curing such default, the non-defaulting party may immediately terminate this Agreement by notice to the defaulting party and none of the parties shall have any further obligations under this Agreement, except those obligations that by their terms or nature extend beyond the date of expiration or termination, provided, that the non-defaulting party shall have all rights and remedies available hereunder and at Law as a result of the default. It is understood that

35

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
608061584 4

in the event of any monetary default by the District which is not cured within the specified ten (10) day period, Manager may immediately terminate this Agreement by written notice to the District and may cease rendering any services hereunder to the District, all without any further liability to the District (without regard to whether Manager has advanced any funds pursuant to Section 4(l)(i)(1).

(ii)     The parties may mutually agree at any time to terminate this Agreement.

(iii)    This Agreement shall automatically terminate if:

(1)     The Operating Period hereunder has expired; or

(2)     A substantial portion of the Hospital and the Other Facilities are destroyed or subject to condemnation such that the Operations are, in the sole and absolute discretion of Manager, materially impaired.

(iv)     In the event of termination of this Agreement, Manager shall remove itself as a signatory on the District's accounts and turn over to the District within ten (10) business days following the expiration or termination of this Agreement all business records of the District pertaining to the District. All medical records shall be maintained by the District and shall remain the property of the District.

11.     **Miscellaneous**.

(a)     Complete Agreement. This Agreement constitutes the entire agreement between the parties with respect to the management of the Hospital and the Other Facilities, and supersedes any and all prior agreements, either oral or written, between the parties with respect thereto.

(b)     Recordation. At the request of either party and at the expense of the requesting party, the parties shall execute a short form memorandum of this Agreement which identifies this Agreement, the parties, the Operating Period, the legal description of the real property upon which the Hospital and the Other Facilities are located, and such other matters as the parties may agree. Such memorandum shall be recorded in the Office of the County Recorder of Inyo County, California, at the expense of the requesting party.

(c)     Binding Agreement. This Agreement and the rights and obligations of the parties hereunder are binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Except as provided in this Section, neither party shall have the right to assign its rights or delegate its duties hereunder unless it first obtains the written consent of the other party hereto. Manager may, in its sole and absolute discretion, assign this Agreement, without the District's consent, to any Affiliate of Manager, or to any other Person which is owned and controlled by Manager or the Controlling Persons of Manager, or in connection with a Manager consolidation or sale by Manager to any Person of all or substantially all of Manager's assets or ownership interests. Nothing herein prevents Manager from subcontracting with third parties to perform any of the services required of Manager hereunder. Any assignment in violation of this Section shall be null and void.

36

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
608051564.4

(d)     Governing Law. This Agreement shall be deemed to be made in, and in all respects shall be interpreted, construed, and governed by and in accordance with, the Law of the State. The parties agree that the exclusive jurisdiction and venue of all actions claims, or other legal proceedings arising in any manner pursuant to this Agreement, shall be vested in the Superior Court of the County of Los Angeles in the State and in no other. Notwithstanding any other provisions contained in any other document executed simultaneously herewith, each party, for itself, and all successor, assigns, heirs, executors, or future parties at interest agree and accept the jurisdiction of these courts and waive any defense of personal jurisdiction, forum non conveniens, venue or similar defenses and irrevocably agree to be bound by any judgment rendered in the aforementioned Court; exclusive of any and all other Federal or State courts.

(e)     Headings. The section and subsection headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of the Agreement.

(f)     Notices. Except as otherwise expressly permitted herein, all notices required or permitted to be given hereunder shall be in writing (whether or not written notice is specified herein) and shall be personally delivered, or mailed by United States mail, postage prepaid, registered or certified, return receipt requested, or sent by a nationally recognized overnight delivery service, or sent by electronic transmission system. Unless such information is changed by written notice given by the affected party, any such notices shall be sent to the following addresses:

> If to Manager:
> HealthCare Conglomerate Associates
> Attention: Benny Benzeevi, M.D.
> 869 North Cherry Street
> Tulare, CA 93274
> Email: Benny@Healthcca.com
>
> With a copy to:
> Baker & Hostetler LLP
> Attention: Bruce R. Greene, Esq.
> 11601 Wilshire Blvd., Suite 1400
> Los Angeles, CA 90025
> Email: BGreene@bakerlaw.com
>
> If to the District:
> Southern Inyo Healthcare District
> Attention: Chairman of the Board
> 501 E. Locust Street
> Lone Pine, CA 93545
> Email: dickfedko@gmail.com
>
> With a copy to:
> Nave & Cortell, LLP
> Attention: Scott Nave, Esq.
> 4580 east Thousand Oaks Blvd., Suite 300
> Westlake Village, CA 91362
> Email: snave@navecortell.com

37

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
608061584.4

All notices sent by personal delivery shall be effective and deemed served upon receipt thereof. All notices sent by mail shall be effective and deemed served three (3) calendar days after being deposited in the United States mail. All notices sent by overnight delivery service shall be effective and deemed served when delivered by such overnight delivery service. All notices sent by electronic transmission system shall be effective and deemed served on the day of transmission, if on a business day and during business hours (9am until 5pm, PT) or otherwise on the next business day thereafter.

(g)     Survival of Representations. All of the representations, and warranties, and those covenants and agreements contained in this Agreement which are stated to survive termination or expiration of this Agreement, shall survive the expiration or the termination, for any reason, of this Agreement. No performance or execution of this Agreement, in whole or in part, by any party hereto, no course of dealing between the parties hereto or any delay or failure on the party of any party in exercising any rights hereunder or at Law or in equity, and no investigation by any party hereto, shall operate as a waiver of rights of such party, except to the extent expressly waived in writing by such party.

(h)     Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument. Signatures transmitted by facsimile or e-mail or other digital means shall be accepted as original signatures.

(i)     Severability.

(i)     Each and every provision of this Agreement is severable, and the invalidity of one or more of such provisions shall not, in any way, affect the validity of this Agreement or any other provisions hereof. If any clause or provision of this Agreement is illegal, invalid or unenforceable, then and in that event, it is the intention of the parties hereto that the remainder of this Agreement shall not be affected thereby, and it is also the intention of the parties to this Agreement that in lieu of each clause or provision that is illegal, invalid or unenforceable, there be added as a part of this Agreement a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

(ii)     The parties hereby have made all reasonable efforts to ensure this Agreement represents and memorializes the complete and final agreement between the parties hereto, and that it complies with all applicable Law. In the event there is a change in Law, or the interpretations thereof, whether by statute, regulation, agency or judicial decision, or otherwise, that has any material effect on any term of this Agreement, or in the event that a party's reputable counsel (being legal counsel with at least ten (10) years' experience in Hospital Law) determines that any term of this Agreement poses a material risk of violating any Law, then the applicable term(s) of this Agreement shall be subject to renegotiation and either party may request renegotiation of the affected term or terms of this Agreement, upon written notice to the other party, to remedy such condition. In the interim, the parties shall perform their obligations hereunder in full

38

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
808081584.4

compliance with applicable Law. The parties expressly recognize that upon request for renegotiation, each party has a duty and obligation to the other only to renegotiate the affected term(s) in good faith and, further, the parties expressly agree that their consent to proposals submitted by the other party during renegotiation efforts shall not be unreasonably withheld or delayed. The parties further expressly recognize that in any such renegotiation, the relative economics to each of the parties shall be preserved. Should the parties be unable to renegotiate the term or terms so affected so as to bring it/them into compliance with Law or the interpretation thereof within sixty (60) days of the date on which written notice of a desired renegotiation is given, then either party shall be entitled, after the expiration of said sixty (60) day period, to terminate this Agreement upon sixty (60) days' written notice to the other party, provided that such party has received an opinion of reputable legal counsel, which legal counsel and opinion are reasonably acceptable to the other party, that it is more likely than not that this Agreement violates applicable Law.

(j)    Cumulative Rights and Remedies. Any right, power or remedy provided under this Agreement or any party hereto shall be cumulative and in addition to any other right, power or remedy provided under this Agreement or existing in Law or in equity, including, without limitation, the remedies of injunctive relief and specific performance.

(k)    Modification and Waiver.

(i)    This Agreement may only be amended by a writing signed by both parties.

(ii)    No failure by any party to insist upon strict compliance with any term of this Agreement, to exercise any option, enforce any right, or seek any remedy upon any default of any other party shall affect, or constitute a waiver of, the first party's right to insist upon such strict compliance, exercise that option, enforce that right, or seek that remedy with respect to that default or any prior, contemporaneous, or subsequent default; nor shall any custom or practice of the parties at variance with any provision of this Agreement affect or constitute a waiver of, any party's right to demand strict compliance with all provisions of this Agreement.

(l)    Attorneys' Fees. If any action at law or in equity (or any arbitration proceeding required hereunder) is brought to enforce any of the terms of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and costs in addition to any other relief, as determined by the applicable court or arbitrator. The foregoing includes reasonable attorney's fees in connection with any bankruptcy proceeding (including relief from stay litigation), and in connection with any appeals.

(m)    Independent Contractor Status. Notwithstanding any provision contained herein to the contrary, Manager and the District each understand and agree that the parties hereto intend to act and perform as independent contractors. Therefore, the District is not an employee or partner of Manager. Nothing in this Agreement shall be construed as placing the District in a

39

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
608081584 4

relationship of employer-employee or partners with Manager. The parties shall not have the right to make any promises, warranties or representations, or to assume or create any obligations, on behalf of the other party except as otherwise expressly provided herein or as otherwise agreed. The District and Manager agree to be solely and entirely responsible for their respective acts and for the acts of any of their respective employees and agents, except as otherwise expressly provided herein.

(n)      Ambiguities and Uncertainties. This Agreement and any ambiguities or uncertainties herein, or the documents referenced herein, shall be equally and fairly interpreted and construed without reference to the identity of the party or parties preparing this Agreement or any of the documents referred to herein, on the express understanding and agreement that the parties participated equally in the negotiation of the Agreement and the documents referred to herein, or have had equal opportunity to do so. Accordingly, the parties hereby waive the benefit of California Civil Code Section 1654 and any successor or amended statute providing that in cases of uncertainty, language or a contract should be interpreted most strongly against the party who caused the uncertainty to exist.

(o)      Consents, Approvals and Discretion. Except as herein expressly provided to the contrary, whenever this Agreement requires any consent or approval to be given by any party or any party must or may exercise discretion, the parties agree that such consent or approval shall not be unreasonably withheld, conditioned or delayed and such discretion shall be reasonably exercised, except as otherwise provided herein. If no response to a consent or request from Manager to the District for approval is provided to Manager within ten (10) days from the receipt by the District of the request, then the consent or approval of the District shall be deemed to have been given.

(p)      Expiration of Time Periods. In the event that any date specified herein is, or that any period specified herein expires on, a Saturday, a Sunday, or a State or federal holiday, then such date or the expiration date of such period, as the case may be, will be extended to the next succeeding business day. A business day is a day on which banks are required to be open for business in Los Angeles, California. All references in this Agreement to "days" are to calendar days, unless business days are so indicated.

(q)      Force Majeure. Except with respect to payment obligations, neither party shall be liable nor deemed to be in default for any delay or failure in performance under this Agreement or other interruption of service deemed resulting, directly or indirectly, from acts of God, civil or military authority, acts of public enemy, war, accidents, fires, explosions, earthquakes, floods, failure of transportation, machinery or supplies, vandalism, strikes or other work interruptions beyond the reasonable control of either party. However, both parties shall make good faith efforts to perform under this Agreement in the event of any such circumstances.

(r)      No Third-Party Beneficiaries. The rights, privileges, benefits, and obligations arising under or created by this Agreement are intended to apply to and shall only apply to the parties and to no other Persons, except as otherwise set forth herein.

(s)      Consequential Damages. Except as expressly provided herein to the contrary, neither party shall be liable under this Agreement for consequential damages, incidental damages, indirect damages, or special damages or for loss of profit, loss of business opportunity or loss of income. Notwithstanding anything to the contrary contained in this Agreement, the parties hereto acknowledge and agree that the terms and provisions of this Section 11(s) shall not

40

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
608081584.4

limit, alter, modify, impair, or otherwise affect any of the remedies of Manager set forth in this Agreement.

(t)     Limitation of Liability. Notwithstanding any provision in this Agreement to the contrary, under no circumstances shall Manager or any Manager Party have any personal liability for any failure to perform any obligations arising out of or in connection with this Agreement or for any breach of the terms or conditions of this Agreement (whether written or implied). No personal judgment shall lie against Manager or any Manager Party and any judgments so rendered shall not give rise to any right of execution or levy against any of their assets. Any judgments rendered against Manager shall be satisfied solely out of the assets of Manager. The foregoing provisions are not intended to relieve Manager from the performance of any of Manager's obligations under this Agreement, but only to limit the personal liability of Manager and Manager Parties in case of recovery of a judgment against any of them.

(u)     Additional Assurances. The provisions of this Agreement shall be self-operative and shall not require further agreement by the parties except as may be herein specifically provided to the contrary; provided, however, at the request of a party, the other party or parties shall execute such additional instruments and take such additional actions as the requesting party may deem necessary to effectuate this Agreement.

[Signatures on next page]

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
608081584.4

41

Filed 10/15/18

Filed 10/17/17

Case 16-10015

Case 16-10015

Doc 490

Doc 327

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

HEALTHCARE CONGLOMERATE ASSOCIATES, LLC

By_____
Name: Yoral (Benny) Benzeevi, M.D.
Title: Manager

SOUTHERN INYO HEALTHCARE DISTRICT

By: _____
Name: Richard P. Fedchenko
Title: Chairman of Board of Directors

By: _____
Name: Jaque Hickman
Title: Member of Board of Directors

By_____
Name: Mark Lacey
Title: Member of Board of Directors

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates
608061584.4

42

Filed 10/15/18

Filed 10/17/17

Case 16-10015

Case 16-10015

Doc 490

Doc 327

## EXHIBIT A

### LIST OF FACILITIES

Acute care hospital (with 4 beds), a rural healthcare clinic, and a skilled nursing facility (with 33 beds) located at 501 East Locust Street, Lone Pine, CA 93545.

Exhibit A

608081584 4

## EXHIBIT B

### Limited Power of Attorney

**KNOW ALL MEN BY THESE PRESENTS**, that in accordance with the terms of that certain Management Services Agreement, dated of even date herewith, (the "**Agreement**"), by and among **HealthCare Conglomerate Associates, LLC** ("**Manager**") and **Southern Inyo Healthcare District** (the "**District**"), the District hereby makes, constitutes and appoints Manager as the District's true and lawful attorney-in-fact (the "**Attorney-In-Fact**") and in the District's name, place and stead to act in connection with any and all matters relating to any of the following and with all requisite authority and power and as legally permissible:

1. To bill, collect, or cause to be collected, all amounts related to the operation of the Hospital and the Other Facilities, including, but not limited to, the accounts receivable, in the District's name, and, when deemed appropriate by the Attorney-In-Fact, settle and compromise claims, and assign such other items to a collection agency, bring a legal action or take such other appropriate action against an obligee;

2. To receive, take possession of, endorse in the name of the District, and deposit into the Depository Account, the Master Account or other account, as deemed appropriate by Manager, in accordance with the terms of the Agreement, any notes, checks, money orders, payments, insurance payments, and any other instruments received in payment of services provided at the Hospital and the Other Facilities.

3. To deposit all amounts collected into the Depository Account, Master Account or other account, as deemed appropriate by Manager, in accordance with the terms of the Agreement.

4. To sign checks, drafts, bank notes or other instruments on behalf of the District, and to make withdrawals from the Depository Account, Master Account or other applicable account for payments specified in this Agreement.

5. To execute any instruments or documents or take such other or further action necessary or appropriate in connection with any of the above.

This Power of Attorney is coupled with an interest, and shall give the Attorney-In-Fact the power and authority to act in the District's name as fully as the District could do if present. The District hereby ratifies and confirms and agrees to ratify and confirm whatsoever the Attorney-In-Fact shall do or purport to do by reason of these presents.

Capitalized terms not defined herein shall have the meaning ascribed to them by the Agreement. Any provision hereof which may prove unenforceable under any Law shall not affect the validity of any other provisions hereof.

Any photocopy of this Power of Attorney shall have the same force and effect as the original.

Exhibit B

608081584 4

IN WITNESS WHEREOF, I have hereunto set my hand and seal effective as of the_____day of
_____, 20

WITNESS:

Signature:

Print Name:

Signature:

Print Name: Mark Lacey

**Southern Inyo Healthcare District**

By:

Richard P. Fedchenko
Chairman of the Board of Directors

Exhibit B

608081584.4

Filed 10/15/18
Filed 10/17/17

Case 16-10015
Case 16-10015

Doc 490
Doc 327

## EXHIBIT C

### Business Associate Agreement

This Business Associate Agreement ("Agreement) is entered into on_____, 2016 by and between, Southern Inyo Healthcare District ("Covered Entity") and HealthCare Conglomerate Associates, LLC ("Business Associate").

### 1. Definitions

#### A. Catch-all definition:

The following terms used in this Agreement shall have the same meaning as those terms in the HIPAA Rules: Breach, Data Aggregation, Designated Record Set, Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy Practices, Protected Health Information, Required by Law, Secretary, Security Incident, Subcontractor, Unsecured Protected Health Information, and Use.

#### B. Specific definitions:

(i) Business Associate. "Business Associate" shall generally have the same meaning as the term "business associate" at 45 CFR 160.103, and in reference to the party to this Agreement, shall mean HealthCare Conglomerate Associates, LLC a California limited liability company.

(ii) Covered Entity. "Covered Entity" shall generally have the same meaning as the term "covered entity" at 45 CFR 160.103, and in reference to the party to this Agreement, shall mean Southern Inyo Healthcare District.

(iii) HIPAA Rules. "HIPAA Rules" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

### 2. Obligations and Activities of Business Associate

A.    Business Associate agrees to:

(i) Not use or disclose Protected Health Information other than as permitted or required by the Agreement or as required by law;

(ii) Use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic Protected Health Information, to prevent use or disclosure of Protected Health Information other than as provided for by the Agreement;

(iii) Report to Covered Entity any use or disclosure of Protected Health Information not provided for by the Agreement of which it becomes aware, including breaches of unsecured Protected Health Information as required at 45 CFR 164.410, and any security incident of which it becomes aware;

(iv) In accordance with 45 CFR 164.502(e)(1)(ii) and 164.308(b)(2), if applicable, ensure that any subcontractors that create, receive, maintain, or transmit Protected Health Information

008081584.4                                   Exhibit C

**Filed 10/15/18**
Filed 10/17/17

**Case 16-10015**
Case 16-10015

**Doc 490**
Doc 327

on behalf of the Business Associate agree to the same restrictions, conditions, and requirements that apply to the Business Associate with respect to such information;

(v) Make available Protected Health Information in a designated record set to the Covered Entity as necessary to satisfy Covered Entity's obligations under 45 CFR 164.524;

(vi) Make any amendment(s) to Protected Health Information in a designated record set as directed or agreed to by the Covered Entity pursuant to 45 CFR 164.526, or take other measures as necessary to satisfy Covered Entity's obligations under 45 CFR 164.526;

(vii) Maintain and make available the information required to provide an accounting of disclosures to the Covered Entity as necessary to satisfy Covered Entity's obligations under 45 CFR 164.528;

(viii) To the extent the Business Associate is to carry out one or more of Covered Entity's obligation(s) under Subpart E of 45 CFR Part 164, comply with the requirements of Subpart E that apply to the Covered Entity in the performance of such obligation(s); and

(ix) Make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.

## 3. Permitted Uses and Disclosures by Business Associate

(i) Business Associate may only use or disclose Protected Health Information as necessary to perform the services set forth in its billing agreement with the Covered Entity.

(ii) Business Associate may use or disclose Protected Health Information as required by law.

(iii) Business Associate agrees to make uses and disclosures and requests for Protected Health Information consistent with Covered Entity's minimum necessary policies and procedures.

(iv) Business Associate may not use or disclose Protected Health Information in a manner that would violate Subpart E of 45 CFR Part 164 if done by Covered Entity.

## 4. Permissible Requests by Covered Entity

Covered Entity shall not request Business Associate to use or disclose Protected Health Information in any manner that would not be permissible under Subpart E of 45 CFR Part 164 if done by Covered Entity.

## 5. Term and Termination

(i) <u>Term</u>. The Term of this Agreement shall be effective as of the date first above written, and shall terminate when all of the Protected Health Information provided by the Covered Entity to the Business Associate, or created or received by the Business Associate on behalf of the Covered Entity, is destroyed or returned to the Covered Entity.

508081584 4                              Exhibit C

(ii) <u>Termination for Cause</u>. Business Associate authorizes termination of this Agreement by Covered Entity, if Covered Entity determines business associate has violated a material term of the Agreement.

(iii) <u>Obligations of Business Associate Upon Termination</u>.

Upon termination of this Agreement for any reason, Business Associate shall return to covered entity or, if agreed to by Covered Entity, destroy all Protected Health Information received from Covered Entity, or created, maintained, or received by Business Associate on behalf of Covered Entity, that the Business Associate still maintains in any form. Business Associate shall retain no copies of the Protected Health Information.

(iv) <u>Survival</u>. The obligations of Business Associate under this Section shall survive the termination of this Agreement.

**6. Miscellaneous**

(i) <u>Regulatory References</u>. A reference in this Agreement to a section in the HIPAA Rules means the section as in effect or as amended.

(ii) <u>Amendment</u>. The parties agree to take such action as is necessary to amend this Agreement from time to time as is necessary for compliance with the requirements of the HIPAA Rules and any other applicable law.

(iii) <u>Interpretation</u>. Any ambiguity in this Agreement shall be interpreted to permit compliance with the HIPAA Rules.

The parties hereby execute this Agreement as authorized representatives of their respective entities.

COVERED ENTITY                                  BUSINESS ASSOCIATE

_____                _____

Southern Inyo Healthcare District              HealthCare Conglomerate Associates, LLC

By: _____            By: _____
    Richard P. Fedchenko                            Yorai (Benny) Benzeevi, M.D.
Its: Chairman of the Board of Directors         Its: Manager

608081584 4                          Exhibit C

# BakerHostetler

Baker&Hostetler LLP

11601 Wilshire Boulevard
Suite 1400
Los Angeles, CA  90025-0509

T 310.820.8800
F 310.820.8859
www.bakerlaw.com

Bruce R. Greene
direct dial: 310.442.8834
bgreene@bakerlaw.com

January 2, 2016

Southern Inyo Healthcare District                    Yorai ("Benny") Benzeevi, M.D.
501 East Locust Street                                810 North Cherry Street
Lone Pine, CA 93545                                   Tulare, CA 93274
Attention:  Chairman of the Board

HealthCare Conglomerate Associates, LLC
810 North Cherry Street
Tulare, CA 93274
Attention:  Benny Benzeevi, Manager

Re:    *Waiver of Conflict*

Ladies and Gentlemen:

The Board of Directors of the Southern Inyo Healthcare District (the "**District**") has requested that Baker Hostetler LLP (the "**Firm**") serve as its legal counsel in connection with the potential filing of a bankruptcy case under Chapter 9 of the U.S. Bankruptcy Act by the District (the "**Chapter 9 Filing**").

The Firm currently serves as counsel for Healthcare Conglomerate Associates, LLC ("**HCCA**") which is one hundred percent (100%) owned by Dr. Benny Benzeevi, and for Dr. Benzeevi personally.  HCCA and Dr. Benzeevi are sometimes referred to collectively as the "**Benzeevi Group**."

The Firm has represented HCCA in connection with the negotiation and drafting of a management services agreement with the District.

The interests of the Benzeevi Group and the District are presently aligned with respect to the Chapter 9 Filing, and at present there are no disputes between the District and the Benzeevi Group.  However, that is not to say that things may not change in the future, and it is possible that the interests of the Benzeevi Group and the District in connection with the Chapter 9 Filing may no longer be aligned, and it is also possible that disputes may occur between the District, on one hand, and the Benzeevi Group, on the other hand.

*Atlanta      Chicago      Cincinnati      Cleveland      Columbus      Costa Mesa      Denver*
*Houston      Los Angeles      New York      Orlando      Philadelphia      Seattle      Washington, DC*
096608.000007 608081379.3
EXHIBIT B                                        54

January 2, 2016
Page 2

Assuming that HCCA and the District enter into the management services agreement, the Firm could be requested to represent HCCA to give advice in connection with its rights and obligations under such agreement, and could be requested to represent HCCA if a dispute arises between HCCA and the District in any way related to such agreement ("**Management Agreement Matters**") which Management Agreement Matters could result in litigation or other forms of dispute resolution between HCCA and the District.

The purpose of this letter is to confirm that the District and the Benzeevi Group each expressly and unconditionally waive certain conflicts of interest which may exist, or which may arise in the future, as a result of the Firm's representation of the District in the Chapter 9 Filing.

This letter confirms that:

A.      The Firm presently represents, and expects to continue to represent, the Benzeevi Group in connection with various matters unrelated to the business of the District, and also in connection with the management service agreement between the District and HCCA. The Firm may in the future represent the Benzeevi Group in connection with other matters, some of which may involve the business of the District, including but not limited to the Management Agreement Matters.

B.      The Board of Directors of the District has asked the Firm to represent the District in connection with the Chapter 9 Filing.

C.      In connection with its representation of the Benzeevi Group, the Firm has had access to confidential information of the Benzeevi Group.

D.      In connection with its representation of the District in connection with the Chapter 9 Filing, the Firm may have access to confidential information of the District.

Representation of the District in connection with the Chapter 9 Filing may place the Firm in a conflict of interest position with the Benzeevi Group under California State Bar Rules, if such conflict is not waived. The applicable Rules of Professional Conduct (the "**Rules**")[1] under which the Firm operates generally discourage representing two or more clients which may have differing or directly adverse interests. Further, the Rules discourage the representation of a client where, by reason of the representation of a former client, the firm has obtained material confidential information. However, the Rules recognize that there are instances in which a law firm may properly serve multiple clients having adverse interests in matters not involved in litigation. The Rules provide that a law firm may represent two or more clients that have differing or adverse current, past or future interests if each client consents to such representation after full disclosure of the actual and reasonably foreseeable adverse consequences with respect to the representation.

---

[1] The California Rules of Professional Conduct, specifically Rule 3-310, require that before we undertake legal representation of a client under certain circumstances, we must make certain disclosures to the client and that we obtain the client's informed written consent. These circumstances include the following:

(a)      When we have or had a relationship with another party interested in the representation; or

(b)      When we concurrently represent clients whose interests conflict; or

(c)      Where we undertake representation adverse to a client where, by reason of such representation, we obtained confidential information material to that representation.

January 2, 2016
Page 3

The Firm's representation of the District in connection with the Chapter 9 Filing may present a conflict of interest due to the Firm's prior and continuing representation of the Benzeevi Group.  The primary source of such conflict would be the fact that the Firm may have access to material confidential information of the parties which, but for the dual representation, it would be obligated to disclose to the other party.  However, the Firm hereby advises you that unless otherwise required by law, it will not disclose any material confidential information of either party to the other, nor will the Firm use material confidential information of one party to the benefit of the other party.  In addition, a conflict of interest would exist if a dispute arose between the District and HCCA with respect to the Management Agreement Matters and if HCCA requests that the Firm represent its interests in connection with such dispute.

With respect to the foregoing and the agreement to waive the conflicts of interest described herein, each of the District and the Benzeevi Group acknowledges the following:

1.      The District has engaged the Firm to represent its interests in connection with the Chapter 9 Filing.

2.      The Firm has previously represented the constituents of the Benzeevi Group in certain matters unrelated to the business of the District, and in connection with the negotiation and drafting of the Management Services Agreement, and the Firm may continue to represent the Benzeevi Group in the future, including matters in which the interests of constituents of the Benzeevi Group may be adverse to the interests of the District, including but not limited to the Management Agreement Matters.

After full disclosure of the facts and the potential adverse consequences of the dual representation as described herein, the District and the Benzeevi Group hereby waive any potential or actual conflict of interest which may now exist or which may arise in the future in connection with the Firm's accepting engagement by the District to represent the District in connection with the Chapter 9 Filing.  The District expressly acknowledges and agrees that the foregoing waiver will allow the Firm to continue to represent the interests of the Benzeevi Group in other matters, including matters which are or may be adverse to the interests of the District, including but not limited to the Management Agreement Matters (including possible litigation or other forms of dispute resolution) and that the District will not seek to disqualify the Firm or any of its attorneys from representing the Benzeevi Group in any such matters (including the Management Agreement Matters) as a result of the engagement of the Firm by the District in connection with the Chapter 9 Filing.

In the event that a material dispute and actual conflict of interest arises between the District and the constituents of the Benzeevi Group regarding the Chapter 9 Filing, or otherwise, the Firm will then assess the circumstances to determine its ethical obligations and to determine an appropriate course of action, which may include withdrawing from representation of the District in the Chapter 9 Filing.

The Firm believes that representation of the District in connection with the Chapter 9 Filing, and the continued representation of the Benzeevi Group in connection with matters both related to and not related to the business of the District, will not adversely affect the Firm's current or future representation of the other party, nor will the disclosure of other material confidential information of any party be required.  However, if the Firm determines that its continued representation of the District in the Chapter 9 Filing would require disclosure of

January 2, 2016
Page 4

material confidential information of the Benzeevi Group to the District, or vice versa, the Firm may elect to terminate its representation of the District in the Chapter 9 Filing. Moreover, if we are asked to represent either the District or the Benzeevi Group in any future matter which we determine may create an actual conflict of interest, we will then assess the circumstances to determine our ethical obligations and determine any appropriate course of action.

If, after reading this letter and having the opportunity to consult with independent counsel, you are each willing to waive the Firm's conflict of interest and consent to the Firm's representation of the District and the Benzeevi Group as described herein, we request that you each sign the enclosed copy of this letter in the spaces provided below and return the same to the undersigned as soon as possible. This letter may be executed in counterparts.

If you have any questions regarding anything contained herein, please feel free to call the undersigned.

Very truly yours,

Bruce R. Greene

READ, ACCEPTED AND AGREED:

**SOUTHERN INYO HEALTHCARE DISTRICT**

_____

By:     Richard P. Fedchenko, Chairman of the Board

**HEALTHCARE CONGLOMERATE ASSOCIATES, LLC**

_____

By:     Yorai (Benny) Benzeevi, M.D., Manager

_____

Yorai ("Benny") Benzeevi, M.D., Individually

096608.000007 608081379.3
  EXHIBIT B                                57

# BakerHostetler

**Baker&Hostetler** LLP

11601 Wilshire Boulevard
Suite 1400
Los Angeles, CA 90025-0509

T 310.820.8800
F 310.820.8859
www.bakerlaw.com

Bruce R. Greene
direct dial: 310.442.8834
bgreene@bakerlaw.com

January 2, 2016

Southern Inyo Healthcare District
501 East Locust Street
Lone Pine, CA 93545
Attn: Richard P. Fedchenko, Chairman of the Board of Directors

Re:     *Engagement of Counsel*

Dear Mr. Fedchenko:

Thank you for selecting Baker & Hostetler LLP to represent Southern Inyo Healthcare District ("You" or "Your"). We look forward to serving your needs and to establishing a mutually satisfactory relationship.

The purpose of this letter is to confirm our engagement as counsel and to provide you certain information about our fees, billing and collection policies, and other terms that will govern our relationship. We believe it is helpful to explain to our clients the nature and terms of our representation at the beginning of our relationship. Accordingly, we have attached to this letter our firm's Standard Terms of Engagement (the "Engagement Letter").

You have asked us to assist you in representing you in all aspects of the Chapter 9 bankruptcy proceeding. You have not asked us to perform any other services or functions at this time. However, in the event both parties agree, in writing, to expand the scope of the engagement set forth herein, the terms of the Engagement Letter shall govern that expanded engagement.

For the purpose of checking whether there exists any conflict of interest with respect to this engagement, we have searched our conflict of interest database under the following:

> Southern Inyo Healthcare District
> Optum Bank
> Siemens Financial Services LLC
> Siemens Diagnostics Financing Co., LLC
> Siemens Healthcare Diagnostics, Inc.

*Atlanta    Chicago    Cincinnati    Cleveland    Columbus    Costa Mesa    Denver*
*Houston    Los Angeles    New York    Orlando    Philadelphia    Seattle    Washington, DC*

608113670.2

EXHIBIT C

Southern Inyo Healthcare District
January 2, 2016
Page 2

General Electric Capital Corp.
Thermo Fisher Financial Services
Healthcare Resale Group Inc.
Craneware Inc.
Leasing Associates of Barrington, Inc.
John P. Anderson
US Foods, Inc.
[other conflict searches to be run when we receive a full list
of creditors]

We will assume that the above listing is accurate and complete unless you otherwise advise us. We also request that you notify us promptly if any additional searches are required because of any change in your circumstances.

If the terms described above and in the attached Standard Terms of Engagement are acceptable to you, please sign and return it to us.

We look forward to working with you.

Sincerely,

Bruce R. Greene
For Baker & Hostetler LLP

Attachments:
Standard Terms of Engagement

ACCEPTED AND AGREED TO:

Southern Inyo Healthcare District

By:_____
     Richard P. Fedchenko
     Chairman of the Board of Directors

Southern Inyo Healthcare District
January 2, 2016
Page 3

# STANDARD TERMS OF ENGAGEMENT

## Introduction

The purpose of this document is to explain our relationship with you, our billing practices, our obligations to you, and your obligations to us in the belief that our relationship will benefit from a mutual understanding of these matters at the beginning of our relationship. We urge you to call us anytime you have a question relating to any of these matters. We strive to have satisfied clients and your satisfaction is very important to us.

Your agreement to this engagement constitutes your acceptance of the following terms and conditions. If you find any of these terms and conditions unacceptable, please tell us now so that we can try to resolve any differences and proceed on a mutually satisfactory basis.

## Our Relationship

Our engagement and the legal services we will provide are limited to the matter described in the accompanying letter. Any change in our engagement or the legal services we are to provide to you must be mutually approved in writing. The services we provide are strictly legal services; we do not provide business, personal, financial, investment, accounting or other services. You will provide us with the factual information and materials we need to perform the legal services identified in the accompanying letter, and we will perform the necessary legal services and give you the necessary legal advice. You will make all business, personal, financial, investment, or accounting decisions that are required, including in the case of litigation, the decision whether or not to settle the case. You will not rely on us for business, personal, financial, investment, or accounting advice and will not expect us to investigate the character or credit of persons or entities with whom you are dealing, unless we have expressly agreed to do so in the accompanying letter.

## Confidentiality and Other Matters

As your attorneys, we owe you duties of confidentiality, loyalty, and competent and zealous representation. We are required to preserve your confidences and secrets. This obligation and the attorney-client communication privilege exist in order to facilitate and encourage candid communication between a client and his or her attorney. We can adequately represent you and give you sound legal advice only if you make us aware of all information and documents that might be relevant to the matter we are undertaking for you. Accordingly, we urge you to communicate with us fully and without reservation so that we can properly perform legal services for you and give you legal advice with respect to the matter on which you have engaged us.

You should understand, however, that in those matters where we are representing a corporation or other legal entity, our attorney-client relationship is with that specific corporation or legal entity and not with its individual officers, directors, executives, employees, shareholders, partners, or other persons in similar positions, or with its parent, subsidiary, or affiliated corporations or persons. In such cases, our professional

Southern Inyo Healthcare District
January 2, 2016
Page 4

duties are owed only to the corporation or legal entity that we have agreed to represent, and you will not assert a conflict of interest because we represent other persons, corporations, or entities that are adverse to any of such related persons, corporations, or other legal entities.  In some situations where there is no conflict of interest, we may represent individual officers, directors, executives, or employees, or parent, subsidiary, or affiliated corporations of a corporation or other legal entity as well as the corporation or other legal entity but such multiple representations will be clearly stated in the accompanying letter.

## **Professional Fees**

In determining the professional fee for our legal services we are generally guided primarily by the amount of time devoted to your matter and the hourly rates of the attorneys performing the services, although we offer other fee arrangements in appropriate situations.  If another fee arrangement has been mutually agreed to for your work, it will be set forth in the accompanying letter.

We may also consider other factors, as appropriate, including: the novelty and difficulty of the legal issues involved; the legal skill required to do the work; the fee customarily charged by comparable law firms for similar legal services; the importance of the work to you or the amount of money involved or at risk and the results obtained; any time constraints imposed by you or the circumstances; and the nature and length of our professional relationship with you.

The hourly rate assigned to each attorney reflects his or her ability, experience, reputation, market rates in each location for his or her area of practice, the firm's costs, and other factors deemed appropriate by the firm.  Our hourly rates are subject to review and adjustment from time to time, at least annually, based on the foregoing factors.  Any changes in hourly rates are usually applied prospectively, although they may also be applied to time that has been recorded but not yet billed.  Effective January 1, 2016, Ashley McDow's hourly rate is $550, my hourly rate is $730 and our associates' hourly rates are $380.  We will provide you with notice of any changes to our rates or expense charges, either through correspondence or invoices indicating the rates then in effect.  Our attorneys and other personnel will record time spent on your behalf in quarter-hour increments unless otherwise agreed between you and us.

We will seek to perform your work cost efficiently.  This does not mean, however, that we will necessarily assign an attorney with the lowest hourly rate.  When selecting attorneys to perform legal services required by your engagement, we generally consider the skill, ability, and experience levels required for the work, prior commitments of our attorneys, and the time demands of your matter and other matters, as well as the hourly rates of our attorneys, unless you request otherwise.  Under some circumstances, attorneys with higher hourly rates may be assigned in order to provide specialized legal skills, to complete the matter more quickly, to meet time constraints imposed by you or the circumstances, to seek to perform the work at a lower overall professional fee, or because of attorney workloads.

At times we may use temporary personnel with appropriate credentials to complete certain work under our supervision.  We will charge you for the time of these individuals

608113670.2

EXHIBIT C

Southern Inyo Healthcare District
January 2, 2016
Page 5

at rates established by us based on their experience and expertise the same as we do for our direct employees.

We generally charge for travel time during normal business hours at our applicable hourly rates. Outside normal business hours we charge one-half our applicable hourly rates unless the attorney or other person is able to work while traveling. If the attorney or other person works on your behalf while traveling, you will be charged our applicable hourly rates regardless of the time of travel. If the attorney or other person works on other clients' matters while traveling, you will not be charged for time during which the attorney or other person worked for other clients.

## Taxes

The fees for services do not include any excise, sales, use, value added or other taxes, tariffs or duties that may be applicable to our services. When we have the legal obligation to collect such taxes, tariffs or duties, the amount of such taxes, tariffs and duties will be included on our statements with other expenses and charges unless you provide us with a valid tax exemption certificate authorized by the appropriate taxing authority. Any payments by you to us will be made free and clear of, and without reduction for, any withholding taxes. Any such taxes that are otherwise imposed on payments to us will be your sole responsibility. You may be asked to provide us with official receipts issued by the appropriate taxing authority or such other evidence to establish that such taxes have been paid.

## Expenses and Other Charges

In addition to fees for our professional services, our statements will include out-of-pocket expenses we incur (e.g., filing fees, court reporter fees, expert witness fees, overnight courier fees, travel, and postage) and internal charges we make for other services we provide (e.g., copying, computerized legal research, long distance telephone, and faxes) in connection with performing legal services on your behalf. Out-of pocket expenses incurred will be billed at our cost, which in some cases may be estimated. Internal charges (which may exceed direct costs and allocated overhead expense) will be billed at amounts that reflect the value of the service or industry practice. Further detail regarding any expenses or other charges will be furnished upon request. We may request an advance expense deposit from you in matters where we expect that we will be required to incur substantial out-of-pocket costs on your behalf.

**Travel Expenses.** For automobile travel, we customarily reimburse our attorneys and other personnel and charge you the Internal Revenue Service approved mileage rate, plus parking and tolls outside the cities in which our offices are located.

Actual cost is always charged for airfare, auto rental, cab fare, meals, and lodging. Our attorneys and other personnel are required to travel coach class, lowest logical airfare, unless you request or approve other arrangements in advance, the air travel time exceeds four hours, or circumstances warrant otherwise. In the latter two cases, travel will be by business class if available or first class if it is not.

608113670.2

EXHIBIT C

Southern Inyo Healthcare District
January 2, 2016
Page 6

**Delivery and Communications Expenses.** Postage on mail in excess of two ounces per item is billed at cost.

Air express, outside local messenger services and courier services are billed at cost. Use of our own messengers for local deliveries is charged at rates generally competitive with local messenger services.

Long-distance telephone calls are charged at costs estimated using rate tables provided by our primary vendors. Local mobile phone calls to or from clients are billed at cost, exclusive of phone rental and lease costs, which are absorbed by the caller.

**Computerized Research and Database Charges.** We utilize Lexis-Nexis and Westlaw to provide primary automated research services that assist in reducing your professional fees. In addition, we have access to other internal and external databases, which help to save money and assist in improving the quality of legal research. Our charges for use of these automated research tools are at vendor invoice, which is net of all discounts provided by the vendors.

**Photocopying and Fax Charges.** Copying is charged at $.10 per page for black & white and $.50 for color. Outgoing faxes are charged at $1.00 per page within the United States and $2.50 per page internationally. There is no charge for incoming faxes or for long distance phone charges associated with fax transmission.

## Invoices and Payments

Unless otherwise mutually agreed, we generally render monthly invoices for legal services, expenses and other charges. Our invoices are due and payable upon receipt. Payment is considered overdue if not received within 21 days from the invoice date. If our invoices are not timely paid, we may withdraw from your representation and terminate our services. We may also assess an interest charge on any overdue invoices, whether or not we terminate services. Payments made on overdue invoices are applied first to the oldest outstanding invoice.

If you have any question about any invoice or any fee, expense, or other charge, we urge you to discuss it with us. We want you to be satisfied with the quality of our services and the reasonableness of our fees.

## Termination

Unless we have mutually agreed to continue our attorney-client relationship with respect to other matters, our attorney-client relationship with you will end upon the completion of services for the matter to which the accompanying letter applies or upon the earlier termination of our engagement by you or by us. In this regard, you have the right to terminate our attorney-client relationship at any time you wish with or without cause. An early termination of our relationship without cause will not, and an early termination of our relationship with cause may not, relieve you of your obligation to pay our reasonable fees, expenses, and other charges incurred before the termination. We also have the right, and sometimes the obligation, to terminate the engagement subject to the ethical standards in the Rules of Professional Conduct. We also reserve the right

Southern Inyo Healthcare District
January 2, 2016
Page 7

to suspend or terminate our representation, subject to such ethical standards, if you breach your obligations with respect to the engagement or do not pay the firm's invoices as specified.

## Ownership of Files and Records

Except as to records which belong to the firm, records or files which we receive from you and documents that are produced or created in connection with your representation, shall be your property, subject to any lien granted by law, rules of professional conduct and our right to make and retain copies. Upon the closing of our files after termination of the engagement, we will return records belonging to you unless you request otherwise, or unless special circumstances require us to retain such records. If you request that we retain your files we may ask that you bear the costs of storage. We shall require from you written authorization to transfer any property belonging to you to a third party. Under our record retention policy we normally destroy files ten years after a matter is closed. It is understood and agreed that we shall have the right, at our discretion, to dispose of files which have not been returned to you at such time that we determine that such files need no longer be retained.

# BakerHostetler

Baker&Hostetler LLP

11601 Wilshire Boulevard
Suite 1400
Los Angeles, CA 90025-0509

T 310.820.8800
F 310.820.8859
www.bakerlaw.com

Bruce R. Greene
direct dial: 310.442.8834
bgreene@bakerlaw.com

July 19, 2017

Southern Inyo Healthcare District
501 East Locust Street
Lone Pine, CA 93545
Attention: Chairman of the Board

Yorai ("Benny") Benzeevi, M.D.
810 North Cherry Street
Tulare, CA 93274

HealthCare Conglomerate Associates, LLC
810 North Cherry Street
Tulare, CA 93274
Attention: Benny Benzeevi, Manager

Vi Healthcare Finance, Inc.
4924 West Lakewood Drive
Visalia, CA 93291
Attention: Benny Benzeevi, President

*Re:      Waiver of Conflict*

The Board of Directors of the Southern Inyo Healthcare District (the **"District"**) previously engaged Baker Hostetler LLP (the **"Firm"**) to serve as its legal counsel in connection with the filing of a bankruptcy case under Chapter 9 of the U.S. Bankruptcy Act by the District (the **"Chapter 9 Filing"**).

The Firm currently serves as counsel for HealthCare Conglomerate Associates, LLC ("**HCCA**"), which is one hundred percent (100%) owned by Dr. Benny Benzeevi, for Vi Healthcare Finance, Inc. ("**Vi**") which is also 100% owned by Dr. Benny Benzeevi, and for Dr. Benzeevi personally. HCCA, Vi and Dr. Benzeevi are sometimes referred to collectively as the **"Benzeevi Group."**

---

*Atlanta     Chicago     Cincinnati     Cleveland     Columbus     Costa Mesa     Denver*
*Houston     Los Angeles     New York     Orlando     Philadelphia     Seattle     Washington, DC*
096608.000007 611073188.1

Southern Inyo Healthcare District
Yorai ("Benny") Benzeevi, M.D.
Vi Healthcare Finance, Inc.
July 19, 2017
Page 2

The Firm has represented HCCA in connection with the negotiation and drafting of a Management Services Agreement with the District.

The Firm may be representing Vi in connection with a potential loan to be made by Vi to the District (the "**Loan**").

The interests of the Benzeevi Group and the District are presently aligned with respect to the Chapter 9 Filing, and at present there are no disputes between the District and the Benzeevi Group. However, that is not to say that things may not change in the future, and it is possible that the interests of the Benzeevi Group and the District in connection with the Chapter 9 Filing may no longer be aligned, and it is also possible that disputes may occur between the District, on one hand, and the Benzeevi Group, on the other hand.

For example, the Firm could be requested to represent HCCA to give advice in connection with its rights and obligations under the Management Services Agreement, and could be requested to represent HCCA if a dispute arises between HCCA and the District in any way related to such agreement ("**Management Agreement Matters**") which Management Agreement Matters could result in litigation or other forms of dispute resolution between HCCA and the District.

As another example, assuming that Vi extends the Loan to the District, the Firm could be requested to represent Vi to give advice in connection with its rights and obligations under the loan documents and could be requested to represent Vi if a dispute arises between Vi and the District in any way related to the Loan ("**Loan Matters**"), which Loan Matters could result in litigation or other forms of dispute resolution between Vi and the District.

The purpose of this letter is to confirm that the District and the Benzeevi Group each expressly and unconditionally waive certain conflicts of interest which may exist, or which may arise in the future, as a result of the Firm's representation of the District in the Chapter 9 Filing and the Firm's prior and future representation of the Benzeevi Group.

This letter confirms that:

      A.     The Firm presently represents, and expects to continue to represent, the Benzeevi Group in connection with various matters unrelated to the business of the District, and in connection with the Management Service Agreement between the District and HCCA, and also potentially in connection with the Loan between Vi and the District. The Firm may in the future represent the Benzeevi Group in connection with other matters, some of which may involve the business of the District, including but not limited to the Management Agreement Matters and the Loan Matters.

      B.     The Board of Directors of the District has engaged the Firm to represent the District in connection with the Chapter 9 Filing.

096608.000007 611073188.1

Southern Inyo Healthcare District
Yorai ("Benny") Benzeevi, M.D.
Vi Healthcare Finance, Inc.
July 19, 2017
Page 3

     C.     In connection with its representation of the Benzeevi Group, the Firm has had access to confidential information of the Benzeevi Group.

     D.     In connection with its representation of the District in connection with the Chapter 9 Filing, the Firm may have access to confidential information of the District.

Representation of the District in connection with the Chapter 9 Filing may place the Firm in a conflict of interest position with the Benzeevi Group under California State Bar Rules, if such conflict is not waived. The applicable Rules of Professional Conduct (the "**Rules**")[1] under which the Firm operates generally discourage representing two or more clients which may have differing or directly adverse interests. Further, the Rules discourage the representation of a client where, by reason of the representation of a former client, the firm has obtained material confidential information. However, the Rules recognize that there are instances in which a law firm may properly serve multiple clients having adverse interests in matters not involved in litigation. The Rules provide that a law firm may represent two or more clients that have differing or adverse current, past or future interests if each client consents to such representation after full disclosure of the actual and reasonably foreseeable adverse consequences with respect to the representation.

The Firm's representation of the District in connection with the Chapter 9 Filing may present a conflict of interest due to the Firm's prior and continuing representation of the Benzeevi Group. The primary source of such conflict would be the fact that the Firm may have access to material confidential information of the parties which, but for the dual representation, it would be obligated to disclose to the other party. However, the Firm hereby advises you that unless otherwise required by law, it will not disclose any material confidential information of either party to the other, nor will the Firm use material confidential information of one party to the benefit of the other party. In addition, a conflict of interest would exist if a dispute arose between the District and HCCA with respect to the Management Agreement Matters or between the District and Vi with respect to the Loan Matters, and if HCCA or Vi requests that the Firm represent its interests in connection with such dispute.

With respect to the foregoing and the agreement to waive the conflicts of interest described herein, each of the District and the Benzeevi Group acknowledges the following:

---

[1] The California Rules of Professional Conduct, specifically Rule 3-310, require that before we undertake legal representation of a client under certain circumstances, we must make certain disclosures to the client and that we obtain the client's informed written consent. These circumstances include the following:

(a)     When we have or had a relationship with another party interested in the representation; or

(b)     When we concurrently represent clients whose interests conflict; or

(c)     Where we undertake representation adverse to a client where, by reason of such representation, we obtained confidential information material to that representation.

096608.000007 611073188.1

Southern Inyo Healthcare District
Yorai ("Benny") Benzeevi, M.D.
Vi Healthcare Finance, Inc.
July 19, 2017
Page 4

     1.      The District has engaged the Firm to represent its interests in connection with the Chapter 9 Filing.

     2.      The Firm has previously represented the constituents of the Benzeevi Group in certain matters unrelated to the business of the District, and potentially in connection with the negotiation and drafting of the Management Services Agreement, and in connection with the negotiation of the Loan, and the Firm may continue to represent the Benzeevi Group in the future, including matters in which the interests of constituents of the Benzeevi Group may be adverse to the interests of the District, including but not limited to the Management Agreement Matters and the Loan Matters.

After full disclosure of the facts and the potential adverse consequences of the dual representation as described herein, the District and the Benzeevi Group hereby waive any potential or actual conflict of interest which may now exist or which may arise in the future in connection with the Firm's engagement by the District to represent the District in connection with the Chapter 9 Filing. The District expressly acknowledges and agrees that the foregoing waiver will allow the Firm to continue to represent the interests of the Benzeevi Group in other matters, including matters which are or may be adverse to the interests of the District, including but not limited to the Management Agreement Matters and the Loan Matters (including possible litigation or other forms of dispute resolution) and that the District will not seek to disqualify the Firm or any of its attorneys from representing the Benzeevi Group in any such matters (including the Management Agreement Matters and the Loan Matters) as a result of the engagement of the Firm by the District in connection with the Chapter 9 Filing.

In the event that a material dispute and actual conflict of interest arises between the District and the constituents of the Benzeevi Group regarding the Chapter 9 Filing, or otherwise, the Firm will then assess the circumstances to determine its ethical obligations and to determine an appropriate course of action, which may include withdrawing from representation of the District in the Chapter 9 Filing.

The Firm believes that representation of the District in connection with the Chapter 9 Filing, and the continued representation of the Benzeevi Group in connection with matters both related to and not related to the business of the District, will not adversely affect the Firm's current or future representation of the other party, nor will the disclosure of other material confidential information of any party be required. However, if the Firm determines that its continued representation of the District in the Chapter 9 Filing would require disclosure of material confidential information of the Benzeevi Group to the District, or vice versa, the Firm may elect to terminate its representation of the District in the Chapter 9 Filing. Moreover, if we are asked to represent either the District or the Benzeevi Group in any future matter which we determine may create an actual conflict of interest, we will then assess the circumstances to determine our ethical obligations and determine any appropriate course of action.

096608.000007 611073188.1

Southern Inyo Healthcare District
Yorai ("Benny") Benzeevi, M.D.
Vi Healthcare Finance, Inc.
July 19, 2017
Page 5

If, after reading this letter and having the opportunity to consult with independent counsel, you are each willing to waive the Firm's conflict of interest and consent to the Firm's representation of the District and the Benzeevi Group as described herein, we request that you each sign the enclosed copy of this letter in the spaces provided below and return the same to the undersigned as soon as possible. This letter may be executed in counterparts.

This letter is given in addition to and not in substitution of the "waiver of conflict" letter dated January 2, 2016 between the District and the Benzeevi Group, which remains in force and effect.

If you have any questions regarding anything contained herein, please feel free to call the undersigned.

Sincerely,

Bruce R. Greene

READ, ACCEPTED AND AGREED:

SOUTHERN INYO HEALTHCARE DISTRICT

By: _____
      Richard P. Fedchenko, Chairman of the Board

HEALTHCARE CONGLOMERATE ASSOCIATES, LLC

By: _____
      Yorai (Benny) Benzeevi, M.D., Manager

Vi FINANCE, INC.

By: _____
      Yorai (Benny) Benzeevi, President

_____
Yorai (Benny) Benzeevi, M.D., individually

096608.000007 611073188.1

EXHIBIT D

# BakerHostetler

**Baker&Hostetler LLP**

11601 Wilshire Boulevard
Suite 1400
Los Angeles, CA 90025-0509

T 310.820.8800
F 310.820.8859
www.bakerlaw.com

Bruce R. Greene
direct dial: 310.442.8834
bgreene@bakerlaw.com

September 29, 2017

**VIA EMAIL (<u>BBENZEEVI@MAC.COM</u>) AND FIRST CLASS MAIL**

Benny Benzeevi, M.D.
4924 West Lakewood Drive
Visalia, CA 93291

Healthcare Conglomerate Associates, LLC
c/o Benny Benzeevi, M.D.
4924 West Lakewood Drive
Visalia, CA 93291

Re: *Termination of Representation*

Dear Benny:

This letter shall serve as notice that the Baker Hostetler firm has determined that we must commence termination of our representation of you personally as well as our representation of HCCA, and all entities affiliated with you and HCCA (collectively, "You and HCCA").

Commencing today, we will no longer undertake any new legal matters for You and HCCA. As you know, we are counsel of record for you in the *Kumar v. Betre* matter, which is now on appeal. Although there is no imminent work to be done in that case, we do need to substitute out as your counsel. Please advise which firm will substitute in our place, and we will send a substitution-of-attorney form. Until we are substituted out as your counsel, we will continue to represent your interests in that case.

We will prepare a memorandum of any pressing matters relating to our representation as soon as possible. Please advise us of any new counsel You and HCCA have retained and, upon your request, we will deliver your files to new counsel. Alternatively, we will deliver your files to you if you wish. Of course, we will cooperate with new counsel as you direct.

*Atlanta Chicago Cincinnati Cleveland Columbus Costa Mesa Denver
Houston Los Angeles New York Orlando Philadelphia Seattle Washington, DC*

096608.000007 611382803.1       70       EXHIBIT E

Benny Benzeevi, M.D.
Healthcare Conglomerate Associates, LLC
September 29, 2017
Page 2

Finally, we again request that you settle your outstanding accounts with the firm forthwith.  A
current statement is attached.

Very truly yours,

Bruce R. Greene

# BakerHostetler

STATEMENT OF ACCOUNT as of
09/29/2017

File Number 07110 / 096608
F.E.I. Number: 34-0082025

Healthcare Conglomerate Associates, LLC
4924 W. Lakewood Dr.
Visalia, CA  93291-9046

| Invoice Number | Invoice Date | Invoice Due Date | Invoice Amount | Payment Date | Payments/ Adjustments* | Balance |
|---|---|---|---|---|---|---|
| 50408487 | 08/09/17 | 09/08/17 | 10,951.50 | | | $6,962.39 |
| | | | | 09/20/17 | (2,906.11) | |
| | | | | 09/28/17 | (1,083.00) | |
| 50416431 | 09/07/17 | 10/07/17 | 53.50 | | | $53.50 |
| 50416432 | 09/07/17 | 10/07/17 | 817.00 | | | $817.00 |
| | | | | | **Balance Due** | **$7,832.89** |

| Current | 1 - 30 Days | 31 - 60 Days | 61 - 90 Days | 91 - 180 Days | Over 180 Days |
|---|---|---|---|---|---|
| 870.50 | 6,962.39 | 0.00 | 0.00 | 0.00 | 0.00 |

| PLEASE REMIT TO: | FOR WIRE REMITTANCES: | FOR QUESTIONS: |
|---|---|---|
| **Baker & Hostetler LLP**<br>P.O. Box 70189<br>Cleveland, OH 44190-0189 | **Baker & Hostetler LLP**<br>KeyBank, N.A., Cleveland, OH<br>Account No: 1001516552 / ABA 041001039<br>**SWIFT Code:  KEYBUS33** | **Bernadette O'Neill**<br>Boneill@bakerlaw.com<br>Phone: (310) 979-8470<br>Fax:    (310) 820-8859 |

| From: | Greene, Bruce R. |
|---|---|
| Sent: | Tuesday, August 8, 2017 1:21 PM PDT |
| CC: | benny@healthcca.com; Linda Wilbourn (linda.wilbourn@comcast.net); Richard Torrez (tacboxing@gmail.com) |
| To: | Kevin Northcraft (northee@aol.com); Mike Jamaica (mikejamaica@sbcglobal.net); senovia@live.com |
| CC: | benny@healthcca.com; Linda Wilbourn (linda.wilbourn@comcast.net); Richard Torrez (tacboxing@gmail.com) |
| Subject: | TRMC Purported Board Meeting |
| Attachments: | aug 9 2017 agenda final.docx |
| Importance: | High |

Mr. Northcraft and Mr. Jamaica – we have been advised that you have created the attached "agenda", calling for a Special Meeting of the Board of TRMC for tomorrow, and likely have posted or distributed the "agenda" in some manner.

As I have repeated informed you, you have no authority to call for Board meetings without three legitimate Board members doing so, and Ms. Gutierrez is still not a legitimate Board member. You can obviously meet as often as you want and with whomever you want, but none of these meetings are lawful meetings of the Board of TRMC, and no actions taken at these meetings will have any legal force or effect unless a quorum is present (which does not mean you two and Ms. Guttierez).

Moreover, any law firm that the three of you may have selected at any of these meetings will not be considered to lawfully represent the District. You are well aware of the blatant conflict of interest that the McCormick, Barstow firm has (which even they have acknowledged), and you are also aware that neither Ms. Wilbourn nor Mr. Torrez have signed a conflict waiver, nor will they do so.

This "agenda" will not be posted to the District's website.

**Bruce Greene**
Partner

**BakerHostetler**
11601 Wilshire Boulevard | Suite 1400
Los Angeles, CA 90025-0509
T +1.310.442.8834
M +1.310.308.1003

bgreene@bakerlaw.com
bakerlaw.com

 

This email is intended only for the use of the party to which it is
addressed and may contain information that is privileged,
confidential, or protected by law. If you are not the intended
recipient you are hereby notified that any dissemination, copying
or distribution of this email or its contents is strictly prohibited.
If you have received this message in error, please notify us immediately
by replying to the message and deleting it from your computer.

Any tax advice in this email is for information purposes only. The content of this email is limited to the matters specifically addressed herein and may not contain a full description of all relevant facts or a complete analysis of all relevant issues or authorities.

Internet communications are not assured to be secure or clear of inaccuracies as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. Therefore, we do not accept responsibility for any errors or omissions that are present in this email, or any attachment, that have arisen as a result of e-mail transmission.

EXHIBIT F

# CTS Reporting, Inc.

REPORTER'S TRANSCRIPT OF

RECORDED PROCEEDINGS

IN RE: SOUTHERN INYO HEALTHCARE DISTRICT

DATE: OCTOBER 17, 2017



cts-reporting.com

1              UNITED STATES BANKRUPTCY COURT

2              EASTERN DISTRICT OF CALIFORNIA

3                   FRESNO DIVISION

4                    -- o0o --          **CERTIFIED COPY**

5

6    IN RE SOUTHERN INYO
          HEALTHCARE DISTRICT,           NO. 16-10015
7
               DEBTOR.
8    _____

9

10

11

12

13        REPORTER'S TRANSCRIPT OF RECORDED PROCEEDINGS

14          BEFORE:  HON. FREDERICK E. CLEMENT
               UNITED STATES BANKRUPTCY COURT
15              2500 TULARE STREET, 5TH FLOOR
                   FRESNO, CALIFORNIA
16
               TUESDAY, OCTOBER 17, 2017
17          RECORDING TIME:  2:34 P.M. - 3:12 P.M.

18

19

20

21

22

23   TRANSCRIBED BY:
     SALLY ANNA FRITS
24   CA CSR CERTIFICATE NO. 11709
     OUR FILE NO. 2924
25

```
 1    APPEARANCES OF COUNSEL:

 2    FOR DEBTOR SOUTHERN INYO HEALTHCARE DISTRICT:

 3         (APPEARING TELEPHONICALLY)
           BAKER & HOSTETLER, LLP
 4         BY:  ASHLEY M. McDOW
                ATTORNEY AT LAW
 5         11601 WILSHIRE BOULEVARD
           SUITE NO. 1400
 6         LOS ANGELES, CALIFORNIA 90025
           (310) 820-8800
 7
      FOR CREDITOR OPTUM BANK, INC.:
 8
           (APPEARING TELEPHONICALLY)
 9         SHIPMAN & GOODWIN, LLP
           BY:  ERIC S. GOLDSTEIN
10              ATTORNEY AT LAW
           1 CONSTITUTION PLAZA
11         HARTFORD, CONNECTICUT 06103
           (860) 251-5000
12
      FOR CREDITOR GE HFS, LLC:
13
           (APPEARING TELEPHONICALLY)
14         KUTAK ROCK, LLP
           BY:  LISA M. PETERS
15              ATTORNEY AT LAW
           1650 FARNAM STREET
16         OMAHA, NEBRASKA 68102
           (402) 346-6000
17
      FOR CREDITOR BETA RISK MANAGEMENT AUTHORITY:
18
           (APPEARING TELEPHONICALLY)
19         PYLE, SIMS, DUNCAN & STEVENSON
           BY:  GERALD N. SIMS
20              ATTORNEY AT LAW
           401 B STREET
21         SUITE NO. 1500
           SAN DIEGO, CALIFORNIA 92101
22         (619) 687-5200

23    ALSO PRESENT:  ROBIN S. TUBESING

24                        -- oOo --

25
```

1          FRESNO, CALIFORNIA, TUESDAY, OCTOBER 17, 2017

2                        2:34 P.M.

3                        -- o0o --

4

5          THE COURT:  Good afternoon and be seated, please.  We

6    are on the record in the matter -- in a special setting of

7    In re Southern Inyo Healthcare.  This is 16-10015.  And

8    this is a hearing pursuant to a very short order-shortening

9    time that was filed some three hours ago.  I'm going to

10   take the appearances, starting with those in the courtroom

11   first, please.

12          Are you making an appearance, Ms. Tubesing?

13        MS. TUBESING:  Your Honor, I'm just monitoring.

14        THE COURT:  Okay.  The record to reflect that

15   Ms. Tubesing present is monitoring.  I'll take those on the

16   phone, starting with counsel for the debtor.

17        MS. McDOW:  Good afternoon, your Honor.  This is

18   Ashley McDow, Baker Hostetler, on behalf of the debtor,

19   Southern Inyo Healthcare District.

20        THE COURT:  Good afternoon.  Are there other

21   appearances on the phone?

22        MR. GOLDSTEIN:  Your Honor, this is Eric Goldstein on

23   behalf of Optum Bank.

24        THE COURT:  Good afternoon.  I believe we may have

25   some other phone appearances, either a Jed Crookston, Lisa

1  Peters, or Gerald Sims, perhaps.

2      MR. GOLDSTEIN:  Your Honor, this is Eric Goldstein.

3  Mr. Crookston is my client representative from Optum Bank.

4  He's on a listen-only line.

5      THE COURT:  Okay.

6      MR. SIMS:  Good afternoon, your Honor.  Gerald Sims on

7  behalf of BETA Healthcare.

8      THE COURT:  Good afternoon.  Is Lisa Peters present?

9      MS. PETERS:  Good afternoon, your Honor.  Lisa Peters

10  with Kutak Rock on behalf of GE HFS, LLC.

11      THE COURT:  Good afternoon.

12          Here's where we are on this:  This is an

13  emergency motion for a rejection of a purported executory

14  contract with HCCA.  I had given some orders with respect

15  to notification of the parties as to this order-shortening

16  time.  We have not yet received a certificate of service

17  from debtor's counsel.  I believe it is a Mr. Delaney has

18  spoken with my judicial assistant and tells her that she --

19  that he is attempting to upload the certificate of service,

20  but is apparently experiencing technical difficulties.  We

21  are now some almost 40 minutes late, and I do apologize to

22  the parties for that, but I do feel that I do need to see

23  that certificate of service, at least indicating that the

24  shortened notice was given.  And so far we have not yet

25  received that.

1          Ms. McDow, I'm looking for some direction from

2     you.  I'm pleased to hear this today, insofar as we're

3     able, but I do feel it is important that I at least see

4     that on a preliminary basis before we move forward.  Are

5     you able to offer any thoughts as to how long it's going to

6     take you to get that done?  I understand your office has

7     been experiencing, at least from the call, that --

8          MS. McDOW:  Your Honor, I understand that it was filed

9     about -- about five minutes ago.  It was -- and it's my

10    apologies.  My assistant, who has my log-in, is out to

11    lunch.  So it was -- it was -- and Mr. Delaney's account

12    was frozen.  So I believe my other associate, Mr. Farbar, I

13    have a ping from him four minutes ago, I guess, saying that

14    it has been filed.  So I assume it's just a temporary lag,

15    so I'm hoping that it will upload to your Honor's system

16    any second.

17         THE COURT:  Well, let me ask my deputy if she is able

18    to see.  She can see things very early when they are

19    uploaded.

20         THE CLERK:  I do not see it in the inbox yet, your

21    Honor.

22         THE COURT:  Okay.  And your system has been refreshed,

23    so were it there, you would see it?

24         THE CLERK:  I just went to another area, and it looks

25    like I --

1      THE COURT:  We may have located it.

2      THE CLERK:  Your Honor, this is not from the official

3   inbox.  This is from a different area.

4      THE COURT:  Understood.  This has not yet been filed,

5   but I am looking at a declaration from Michael T. Delaney,

6   and it does appear, at least on a preliminary basis, to

7   satisfy the terms of my order on the order-shortening time.

8           Ms. McDow, I will turn to you first.  I have read

9   the moving papers.  I am inclined to give the least

10  possible relief today that affords your client protection,

11  and that is allowing the removal of names from bank

12  accounts as suggested in the fourth paragraph, the

13  order-shortening time.  So to change the signatory

14  authorizations and such other relief as possible, but then

15  continuing this and allowing for some further -- allowing

16  HCCA to be heard.  I note that they're not here today.

17     MS. McDOW:  They are not, your Honor.  And I

18  appreciate that.  I appreciate the relief already granted,

19  and the Court's indulgence, as far as the timing and the

20  emergency motion.

21          To start, we did get an e-mail from Mr. Levinson

22  at Orrick with respect to his representation or not, and he

23  wanted me to make it clear to the Court that neither he nor

24  Mr. Bedoyan, who he copied with his e-mail -- so I assume

25  -- he did not say anything to the contrary, but

1   Mr. Levinson wanted me to convey to the Court that he does

2   not -- he nor Orrick represents HCCA in this matter and

3   neither does Mr. Bedoyan.  So -- and he wanted me to convey

4   that to the Court.  So we will -- we will serve them.

5   Again, I don't -- I don't have any understanding who their

6   counsel is in this matter, if anyone yet, but we will serve

7   them.

8        THE COURT:  Well --

9        MR. McDOW:  And, again, we appreciate the indulgence

10   with respect to the bank accounts.

11         To add a little bit of color and some more --

12        THE COURT:  Ms. McDow --

13        MS. McDOW:  Yes, your Honor.

14        THE COURT:  Before you do that, with that said, I'm

15   looking at the declaration of Mr. Delaney, and point me to

16   the portion that indicates that HCCA was given notice of

17   this hearing.  I added Mr. Levinson and Mr. Bedoyan as

18   attorneys to be served, not because I was certain they

19   represented them in this case, but because they did

20   represent them in a collateral-related Chapter 9 involving

21   the --

22        MS. McDOW:  Right.

23        THE COURT:  -- Tulare Local Healthcare District, in

24   which similar allegations are being made.  And since you

25   have now -- and I was -- and given the need for speed here,

1    I was trying to make sure that we had given the best notice

2    we were able to give in spite of circumstances.  But with

3    that said, I'm not clear from the Delaney declaration where

4    the cert -- where the notification to HCCA is then.  I --

5    help me to understand that, please.

6         MS. McDOW:  And, your Honor, the -- if you look

7    towards the end of that.  It is HCCA, the sole shareholder

8    of HCCA is Benzeevi, so that was the -- B --

9    B-E-N-Z-E-E-V-I, at HCCA, which is Healthcare Conglomerate

10   Associates, dot com.

11        THE COURT:  Where -- what line is that, please?  I'm

12   looking at --

13        MS. McDOW:  At line -- I apologize, your Honor.  Line

14   22.

15        THE COURT:  The very last e-mail address?

16        MS. McDOW:  Correct, your Honor.  Correct.

17        THE COURT:  And that is the sole shareholder of this

18   HCCA group?

19        MS. McDOW:  It is, your Honor.  And Mr. Germany, who

20   is the -- Alan Germany, whose e-mail address is immediately

21   preceding Mr. Benzeevi's, he is the -- what I'll say is the

22   face of HCCA, certainly at Inyo.  So he is the person who

23   has the most -- I'll say on the ground, you know,

24   interfacing with the District.  So in an abundance of

25   caution, we gave him notice of the same.

1      THE COURT:  This is the same Mr. Germany who's been

2   giving declarations throughout the course of your Chapter 9

3   case here before me?

4      MS. McDOW:  Correct, your Honor.

5      THE COURT:  Okay.  I'm not -- did you attempt to serve

6   the agent for service of process or give notice there?

7      MS. McDOW:  Your Honor, I don't know who -- I can

8   actually bring Michael -- and I apologize, your Honor.  I

9   had tasked him with service while I dealt with the

10  emergency that I'm going to apprise the Court of shortly.

11  So if your Honor would like, I can see whether and who the

12  agent for service is, but I don't -- I don't know, your

13  Honor, whether that was --

14     THE COURT:  Okay.  For now, let's do this.  Go ahead

15  and add -- you wanted to add some flavor or some color to

16  things -- and I have read your papers, so you don't need to

17  reiterate that.

18     MS. McDOW:  Correct, your Honor.  Thank you.

19        After that -- after we had filed the emergency

20  motion for the reasons we set forth in -- in the motion,

21  this morning, we were served and proceeded to take part in

22  a -- with a search warrant from the County of Tulare.  The

23  search warrant was served by five -- five representatives

24  of this -- the district attorney's office in Tulare and two

25  sheriff's deputies from the County of Tulare.  They had a

 1  very specific list of things they were looking for,

 2  property they think has been in their -- again, this is --

 3  I don't know.  I'm representing to the Court I don't have

 4  any experience in criminal law.  This is not what I do.  Or

 5  search warrants.  But represent to the Court that there are

 6  a number of check boxes -- checked boxes on this form, many

 7  of which are, you know, that the property was stolen or

 8  embezzled, the things were used for the means of committing

 9  a felony, and that these things are things that can be

10  seized.  And then there's a list of certain equipment

11  that -- it -- it appeared after our discussions with, you

12  know, again, those people who were conducting the search,

13  that they believe that a number of things have been

14  transferred -- equipment, you know, medications, that those

15  things have been transferred from Tulare to Inyo.

16          So for a good -- good four hours or so this

17  morning, we -- obviously, we did everything we could to

18  comply with the search, you know, had discussions.  They

19  were very interested in funds that had been transferred

20  from Tulare to the District.  The manner in which -- a lot

21  of questions about the manner in which HCCA had been

22  funding and had been, you know, providing the District with

23  funds.  So it was -- it was quite a fire drill.

24          I insured -- you know, again, was kind of, as

25  much as I could be present, that no -- despite the ability

1　and the search warrant for them to seize things, that, you

2　know, these were things that were vital to our operations,

3　that we would work with them, that we would -- you know,

4　you can take pictures.  You can identify.  We -- we

5　understand the -- the -- you know, what needs to be done.

6　But we also -- you have to understand we need these things

7　to operate.  So they didn't remove anything, except a

8　couple of thumb drives full of files.

9　　　　　　And, you know, again, we're going to be -- we are

10　really trying to get an open line of communication with

11　Tulare, because it appears we -- we suffer from the same

12　problems.  So we are trying to keep that line of

13　communication open and certainly going to follow up, you

14　know, with those who conducted the search, to try to get to

15　the bottom of it.

16　　　　　　So that is, again, you know, another reason that

17　we think the relief that we've sought, you know, in this is

18　warranted.  Again, it's -- what has been -- what has been

19　published in -- in the press and, you know, throughout --

20　throughout Tulare is really striking a chord with the

21　board, unfortunately, and it seems eerily similar to, you

22　know, again, kind of what -- what we've been experiencing.

23　　　　　　So the only plus that we have -- and, again,

24　that's a blessing and a curse is that, you know, since

25　we've been in, this board has really -- really come to

 1   understand what this hospital needs, and we have an

 2   interested party as far as CFO from -- I'm going to butcher

 3   this -- but Tehachapi, who we think as long as we can

 4   commit to two or three years, he is willing to come in --

 5   and I think the figure is 200,000 for the entire year,

 6   which as the Court knows and probable most of the creditors

 7   on the phone, is a small fraction of what the management

 8   fee was.

 9              We're also lining up, and one of our immediate

10   problems, at least it appears from what financials we do

11   have, is, you know, making sure that the operations can

12   continue to be funded.  If for some reason HCCA or V.I.,

13   you know, makes an election not to continue to fund the

14   line of credit, we have the ability now -- I was waiting

15   for confirmation from the client before the hearing but

16   have not received it.  But they were comfortable that we

17   have enough A.R. now -- again, it's sequestered now.  It

18   should be to fund payroll for the next two weeks, which is

19   a blessing.  We are getting -- and we had already started

20   to put in place a loan from --

21        THE COURT:  Ms. McDow --

22        MS. McDOW:  Yes.

23        THE COURT:  I think I understand.  Thank you.

24        MS. McDOW:  Okay.

25        THE COURT:  Let me just ask --

EXHIBIT G

1        MS. McDOW:  I apologize.

2        THE COURT:  -- a few pointed questions here.  I think

3    we're a bit far afield of where we need to be today.  So

4    let me confine --

5        MS. McDOW:  I apologize.

6        THE COURT:  -- this to the real issue here in front of

7    you.

8            So now that we have learned that neither of the

9    attorneys, which I added to your order, Mr. Levinson or

10   Mr. Bedoyan, represent that party in this action, we have

11   some questionable issues about service.

12           Do I understand you correctly that the search

13   warrant was served on Southern Inyo Healthcare?

14       MS. McDOW:  That is correct, your Honor.

15       THE COURT:  So the allegation is that there has been

16   transfers of assets or funds from the Tulare debtor before

17   Judge Lastreto to your client?

18       MS. McDOW:  Correct, your Honor.  That is correct.

19       THE COURT:  Can you give me a grocery list, summary,

20   please, of the allegations -- and I don't need you to rebut

21   them.  Just tell me what is it that they are telling you,

22   if you know, has been taken from the Tulare hospital and

23   moved into the possession of your client.

24       MS. McDOW:  Absolutely.  And I -- I can recite

25   certainly what -- what it is they're looking for, which I

1    think is one in the same for this.

2              It is large hospital equipment, such as beds,

3    gurneys, x-ray and surgical equipment, I.V. pumps, kitchen

4    or food services equipment, such as microwave ovens and

5    refrigerators.  And then the second kind of section is just

6    a search of all physical locations where hospital equipment

7    and supplies can be stored, including but not limited to,

8    general medical and office supplies and pharmaceutical

9    supplies.  And the last kind of substantive piece is the

10   search shall include but not be limited to all hard copy

11   files or electronically stored computer files for the

12   purpose of locating any and all invoices, receipts, billing

13   and payment slips, purchase orders, equipment, and supply

14   transfer and receiving slips.

15        THE COURT:  Okay.  Do you have the understanding that

16   funds may have been transferred too?

17        MS. McDOW:  I do, your Honor, from my own -- again, I

18   don't profess to be a forensic accountant, but I've spent a

19   good chunk of time over the past week looking at our -- the

20   bank statements that I've received.  And I do believe that

21   to be -- to be accurate.  I can represent to this Court

22   that there were millions transferred back and forth between

23   the two, between -- I apologize.  Between Tulare and

24   Southern Inyo.  But it not did appear to be the focus -- I

25   asked that specifically -- the focus of the D.A. -- the

1  district attorney or the sheriff's investigation today.

2      THE COURT:  And that's the Tulare County District

3  Attorney?

4      MS. McDOW:  Correct, your Honor.

5      THE COURT:  Millions back and forth between these two

6  entities?

7      MS. McDOW:  Correct.

8      THE COURT:  Very well.  And there are allegations

9  that -- and who knows which way that will net, in favor of

10  the -- in favor of the Tulare hospital or in favor of

11  Southern Inyo.  We don't know how that will shake out.

12      MS. McDOW:  Your Honor, it shows, again, that based on

13  what I can do, the best that I can do is look at the actual

14  bank statements and show, okay, there's a wire to Tulare.

15  There's a wire back.  The expense that HCCA is going to

16  claim that funds were sent to Tulare on behalf of HCCA and

17  something happened on that end.  I'm not sure.  But if you

18  just look at the net-net, there is $418,000 owed to

19  Southern Inyo by Tulare.

20      THE COURT:  All right.  Do you have any idea when you

21  will know more about all of this?

22      MS. McDOW:  Your Honor, what we hope to do is, again,

23  the board understands we immediately need -- (inaudible)

24  what happens as far as termination today or in the next few

25  weeks, a CFO.  We need somebody in there with the finances

1   so I'm hoping that's going to happen in the next ten days.

2   Like I said, they've been -- the board is very good, very

3   concerned.  They've been working like crazy to interview

4   people and get a new --

5           THE COURT:  Ms. McDow --

6           MS. McDOW:  -- CFO --

7           THE COURT:  -- I'd like you to focus on my question.

8   You're not responding to me, and I really would like you to

9   do so, please, and confine yourself to my question.

10              When will you know more about who -- which

11  direction this is going to net?  It's a time question.

12          MS. McDOW:  Your Honor, again, to confirm what I've

13  done with someone more credible, probably three weeks to a

14  month.  I'd like someone to have all of our financials and

15  really look at them.  So my guess would be 30 days to have

16  something that we can put in a declaration with any

17  definitive --

18          THE COURT:  Okay.  And Mr. Germany, I had the sense --

19  and forgive me -- it's been a couple of weeks since I've

20  looked at this -- but Mr. Germany, I believe, was employed

21  at Southern Inyo.  Was it on a contract basis to serve as

22  the chief financial officer, or was he a regular employee?

23          MS. McDOW:  Your Honor, the District's understanding

24  was that he was employed by HCCA, and that his salary was

25  to be encompassed within the $65,000-a-month management

```
 1   fee.  I did find, when I looked at the bank statements,

 2   that there were some payments made directly from Southern

 3   Inyo to Mr. Germany; however, they were few and far

 4   between.  So we do not believe -- we've never understood

 5   that he's an employee of the District, but rather of HCCA.

 6        THE COURT:  And that's how -- that is, perhaps, how

 7   these events transpired is through his -- through him?

 8        MS. McDOW:  Without a doubt, your Honor.

 9        THE COURT:  Okay.

10        MS. McDOW:  He is the one that has been -- has sole

11   control of our bank accounts, all of our finances.

12        THE COURT:  Well, here's what I'm inclined to do:

13   Other than the relief that I have granted in the

14   order-shortening time, allowing HCCA to be removed from the

15   bank accounts, unless you can articulate other relief that

16   needs to happen, I'm inclined to continue this for service

17   and a briefing schedule, in light of all of that.

18            Is there other relief you feel needs to be

19   afforded today for your motion?  It seemed to me that's

20   probably the most we can do.

21        MS. McDOW:  Your Honor, again, a couple -- twofold.

22   One, we were seeking a full -- a full cancellation of the

23   agreement, but I understand, your Honor, that that's

24   hard-pressed to do, especially with no notice.  So I

25   respect the fact that that will need --
```

1     THE COURT:  Right.

2     MS. McDOW:  -- a little more time.  And then a

3  continuance of the plan of disclosure statement, just to

4  allow us time --

5     THE COURT:  That's fine.  I'll give you time on that.

6     MS. McDOW:  Yes.  Yeah.  Yes.

7     THE COURT:  But that's the relief.  Correct?

8     MS. McDOW:  Correct.  Thank you.  Yes.  Correct, your

9  Honor.

10     THE COURT:  Okay.  Turning to the other parties on the

11  line.  Mr. Goldstein, Ms. Peters, Mr. Sims, anybody want to

12  be heard on this?

13     MR. GOLDSTEIN:  Your Honor, this is Eric Goldstein.  I

14  -- I -- I -- I don't need to be heard on it.

15     MR. SIMS:  Your Honor, Gerald Sims.  I don't have

16  anything to add.

17     THE COURT:  Okay.

18     MS. PETERS:  Your Honor, Lisa Peters, on behalf GE

19  HFS.  I don't have anything to add, but appreciate

20  counsel's update, particularly with respect to the search

21  warrant.  My client is an equipment lessor to both Southern

22  Inyo as well as Tulare.  So obviously to the extent there's

23  any allegations of equipment being swapped, that's

24  something we will want to visit with both debtor's counsel.

25  So, again, appreciate the update.

1       THE COURT:  And, Ms. Tubesing, you're monitoring but

2  not making any appearance at this juncture?

3       MS. TUBESING:  Correct, your Honor.

4       THE COURT:  Very well.  Thank you.

5          Ms. Estrada, would you remind me when the status

6  conference comes up in this case, please?

7       THE CLERK:  Yes, your Honor.  That's scheduled for

8  November 1st at 1:30, your Honor.

9       THE COURT:  Okay.  I am going to allow, and have

10  already allowed by virtue of the order I signed, the debtor

11  to remove the name and signature authority -- signatory

12  authority of HCCA from the bank accounts of the debtor.

13          I am going to continue this to November 8th in

14  Bakersfield -- and that would be at 11 o'clock,

15  Ms. Estrada?

16       THE CLERK:  Yes, your Honor.

17       THE COURT:  11 o'clock.  Opposition may be filed by

18  HCCA by Wednesday, November 1st.  Debtor will give me an

19  up -- an order granting the relief and continuing this, and

20  serve that not later than -- and I want 7004 service on

21  that, please -- not later than Monday, October 23rd.  Not

22  later than Wednesday, October 25th, I would like a brief

23  from the debtor on whether, in fact, this is an executory

24  contract, with citation to applicable portions of the

25  agreement.  My memory -- and I'm going from memory so

1  there's a good chance I'm going to get some of this wrong

2  -- but my memory is that the most commonly accepted

3  definition of executory contract is by Professor Vern

4  Countryman, who says that there must be performance due by

5  both sides and that the performance must be something other

6  than the payment of money.  So I would like a brief,

7  including citation to applicable portions of the contract,

8  specifically that shows where that -- that this is, in

9  fact, an executory contract.  You may brief such issues as

10  are appropriate.

11          It seems to me that we need to know that this is

12  an executory contract.  I will also tell you that if it is

13  not, we are, perhaps, down to post-petition transfer of

14  assets and recovery under 540, I believe, that's 9.  The

15  debtor may also brief such additional issues as they deem

16  fit, and it does seem to me that this is a question of

17  business judgment.  So I don't know that the debtor has to

18  prove nefarious deeds.  I think they can show that this is

19  a proper exercise of business judgment, and it would be

20  difficult to defeat that.

21          Any other party wishing to be heard, creditors or

22  other parties may also file opposition by Wednesday, the

23  11th.  I will ask Ms. McDow to upload the order and to

24  serve it when she serves the motion and -- serve the order

25  and the motion on HCCA.

1　　　　　　　Mr. Goldstein, Mr. Sims, Ms. Peters, did any of

2　you need to approve the form of the order?

3　　　　MR. SIMS:  This is Gerald Sims.  I don't need to see

4　it, your Honor.

5　　　　MR. GOLDSTEIN:  Eric Goldstein, your Honor.  Same

6　thing.

7　　　　MS. PETERS:  This is Lisa Peters, same.

8　　　　THE COURT:  Very well.  Ms McDow, anything further

9　from yourself?

10　　　　MS. McDOW:  Your Honor, just a -- more of a procedural

11　question.  We are --

12　　　　THE COURT:  Oh, excuse me.  One other thing.  I will

13　continue the -- I'm going to have my deputy issue a

14　separate order -- I will continue the status conference in

15　the Chapter 9 to the same date and time, and I presume

16　that's not a hardship on you, Ms. Tubesing to appear by

17　phone?

18　　　　MS. TUBESING:  That's fine, your Honor.

19　　　　THE COURT:  Okay.  That will be the other thing I

20　forgot.  Go ahead, Ms. McDow.

21　　　　THE COURT:  Just a second.  Excuse me.

22　　　　MS. TUBESING:  And I'm sorry, your Honor.  I also note

23　that the disclosure statement is set for that same date,

24　November 1st?

25　　　　THE COURT:  Correct.  And we'll continue that at the

1   same time.   We're -- I understand that we're going to have

2   to reset dates, but we'll deal with all that on the 8th.

3        Go ahead, Ms. McDow.

4    MS. McDOW:   Thank you, your Honor.   The other pieces

5   we actually are seeking in addition to rejection, authority

6   to terminate.   And my guess is -- and I don't know -- that

7   the Court would prefer and, perhaps, require that to be

8   done by way of an adversary proceeding.   Because, again,

9   part of our concern, in addition to just defining the

10   measure of damages, is making sure that we can regain all

11   of the management back.   And understand, it's kind of funny

12   thing that when you reject, in theory, those people can

13   still come do what they do.   But for a number of reasons,

14   we want it to be terminated.   So would your Honor be

15   willing to entertain that by way of motion, or would your

16   Honor require or prefer that we do that by way of an

17   adversary, again, as soon as humanly possible.

18    THE COURT:   I took your motion -- and I don't think

19   you -- and you'll forgive me.   I had about half an hour

20   with it, so I probably don't fully understand all of it.

21   But I took your motion to be a rejection under 362 --

22   excuse me -- 365(d)(2), which is incorporated by section

23   901.   I am invoking my powers under 105(a) to implement the

24   365(d)(2) rejection.   I don't think 704 or 1106 is

25   applicable here, because neither is incorporated by 901.

*www.cts-reporting.com*
*559.374.2484*
EXHIBIT G       97       *Page 22*

1   So I took that as a rejection.

2           Now, you're saying it's not that, but it's a

3   termination, and I'm not sure I'm seeing that in your

4   brief.  And I'm not entirely clear on what the difference

5   is, so I'm -- and this is at a very preliminary stage, so I

6   guess I could use a little enlightenment here.  What -- do

7   I have the basis for your relief wrong?

8       MS. McDOW:  Your Honor, it was twofold.  We had

9   actually planned to rejection -- and, again, this has all

10  kind of been, you know, a reactive, that we had still

11  planned to reject by and through the plan and --

12      THE COURT:  So this is not a rejection?

13      MS. McDOW:  This was not, your Honor.  This was a --

14  this was seeking a -- a termination of the contract.

15      THE COURT:  Well, what would be the basis under the --

16  other than 365(d)(2) for termination?  I don't -- I don't

17  understand.

18      MS. McDOW:  It's -- your Honor, it was, as -- as best

19  we could in the time we had, it was -- again, other than

20  the factual bases that were in there, it would be a 105,

21  which, again, I understand -- I understand both this

22  Court's -- I don't want to say hesitation, but conservative

23  approach to 105, which is why I think given this -- given

24  the extension of -- you know, the time that the Court is

25  willing to give, that perhaps we do it by way of adversary

1    proceeding.  I think that's probably -- I think it's on the

2    line of whether or not this sort of relief required an

3    adversary.  But given now it is the time, I think it's

4    probably the more appropriate way to do it as far as --

5          THE COURT:  Well, I'm happy to let you pitch it

6    however you'd like it.  I will tell you that my reading of

7    Law vs. Siegel is a criticism -- among other things -- is a

8    criticism of the usage of 105 and that you need to be able

9    to articulate a specific section in the Bankruptcy Code

10   that you are seeking to effectuate through 105.

11          I took your motion -- and I understand why it was

12   very loosely worded, given the speed and the -- the lack of

13   clarity, understandably, that your office still has about

14   this problem, but I took this to be a rejection under

15   362(d)(2).  If that's not it, correct me.  I think I can

16   use 105 to tell you you can take your name off the bank

17   accounts because I am effectuating that rejection.

18          If you want something else, it's going to be up

19   to you to pitch that, and I'm not sure that you can open

20   the universe with 105.  I think you need to show me

21   where -- what you're tying it to.  Whether or not that

22   should be an adversary or a motion.  I don't know.  What I

23   got from you as a motion.  Are you -- so I -- I kind of

24   feel like you're asking me to weigh in on something not in

25   front of me.  I --

 1      MS. McDOW:  Sorry, your Honor.  Sorry.  Go ahead.

 2      THE COURT:  If you can clarify it, I'm happy, but

 3  that's the way this looked to me.  Is that not it?

 4      MS. McDOW:  Your Honor, no.  You are -- you are right

 5  in part.  And I understood -- again, I'd like to think I've

 6  learned a lot of things about this Court, certainly in the

 7  past couple of years, and I understood that very likely a

 8  full termination, as opposed to the immediate relief given

 9  what we believe to be the -- the -- the irreparable damage

10  to the District, that as far as a broader termination, it

11  was -- I -- my best guess was that we were going to have to

12  do that by way of adversary proceeding.  So you were

13  correct, except that the termination that we are asking

14  for, I believe, is -- is more appropriate full termination,

15  as opposed to rejection by way of an adversary.  I think

16  your Honor --

17      THE COURT:  What is the authority?  Is it state or

18  bankruptcy law or something else, for termination, in your

19  view?  What is the authority for that?

20      MS. McDOW:  Your Honor, based on what I know now and,

21  again, it's a -- it's a big learning curve in the past ten

22  days.  It's going to be a judicial cancellation under state

23  law, as far as policy, harm to the public, and frustration

24  of purpose, a number of -- but it will be state law claims

25  for the full termination.

1        THE COURT:  Are you rescinding this for fraud?

2        MS. McDOW:  Your Honor, rescission was one of the --

3   one of the options I pursued -- although I'm not sure yet,

4   again, as we sit here now, before I can do a little bit

5   more investigation, whether or not what restoring the other

6   side to their pre-contract positions really mean for us.

7   So I'm not prepared -- I just don't feel comfortable

8   representing to the Court that that will be it.  But it

9   will be a cancellation or a rescission, again, based on

10  what I know now.  I just have to understand exactly what's

11  been given on either side, I think, before I, you know,

12  file a pleading in good faith saying this is -- or an

13  adversary saying that, your know, this is what we're --

14  what we're seeking.  But it will be -- again, very

15  comfortable it will be cancellation or rescission, as far

16  as what we do with the contract.

17       THE COURT:  So it might be rescission.  It might be

18  declaratory relief, in essence, based on breach?

19       MS. McDOW:  Correct, your Honor.

20       THE COURT:  Okay.  If it is not 365(d)(2), I start to

21  wonder about where my jurisdiction for that comes from, but

22  I'll guess we'll solve that at a later date.

23           Is the order that we have made so far today in

24  keeping with your request, or should I not be doing that?

25       MS. McDOW:  Your Honor, I think that maybe we just

1   broaden the scope of the order to be that by October --

2   maybe file a lawsuit by October 25th is a little bit -- a

3   little bit -- that being a little bit too much on --

4       THE COURT:  I'm not -- I feel like I've ruled on as

5   much of it as I can, given the motion.  So I'm not inclined

6   to broaden the scope of things.  If you're telling me you

7   don't know want the order I made, I'm glad to not give you

8   an order, but I thought you did want that.  Would you

9   correct me if I'm mistaken?

10      MS. McDOW:  No, your Honor.  I think we need to do

11  both rejection and termination, so I think that your

12  Honor's briefing, as far as rejection, is fine.  We will --

13  again, we will brief that in accordance with the order and

14  the time that the Court just gave.  And, again, I think

15  that the issue, as far as actually terminating is going to

16  have the largest impact on the timing for the plan of the

17  disclosure statement.  So we'll just endeavor to get that

18  filed as quickly as we can.

19      THE COURT:  Sure.  And I would say, take your time and

20  get it right.  And if you could articulate for me the next

21  time we visit on this status conference as to what exactly

22  you're trying to do.  Having listened to you, I'm still not

23  clear -- and it's probably me -- on what you think you're

24  going to do beyond rejection.  I suspect maybe you're

25  either going to try and rescind for fraud or get a

1   declaratory relief that your client is relieved of their

2   obligations based on a material breach by the other side.

3   I'm not sure.  We have other issues.  If you could work to

4   clarify for me what -- what you're trying to do, that would

5   be helpful because I'm -- I'm really afraid I don't

6   understand it beyond that.

7      MS. McDOW:  I absolutely will and I apologize, your

8   Honor.  I've been on a learning curve, so I apologize for

9   my -- my lack of clarity, as far as what -- what -- what

10   we're trying -- what we're trying to do and how we're going

11   to achieve it.  But I --

12      THE COURT:  It's probably --

13      MS. McDOW:  -- I will make it more clear.

14      THE COURT:  It's probably me, Ms. McDow.

15       Okay.  Anything further today?

16      MS. McDOW:  Not from me, your Honor.

17      THE COURT:  Okay.  Those will be the orders and do

18   upload your order, and we will deal with it as rapidly as

19   possible.  Thank you.

20      MS. McDOW:  Thank you, your Honor.  I thank you again

21   for the shortened time.

22      THE COURT:  We are in recess.

23

24       (End of recorded proceedings.)

25        -- o0o --

```
 1  STATE OF CALIFORNIA              )
                                     )      ss
 2  COUNTY OF FRESNO                 )

 3

 4       I, Sally A.F. Turner, CSR No. 11709, a Certified

 5  Shorthand Reporter in and for the County of Fresno, State

 6  of California, do hereby certify:

 7       That I transcribed the recorded proceedings held on

 8  October 17, 2017, in the above-listed matter, to the best

 9  of my ability, which was taken down by me in shorthand and

10  thereafter reduced to computerized transcription under my

11  direction and supervision.  I hereby certify the foregoing

12  transcript is a full, true, and correct transcript of my

13  shorthand notes so taken.

14       I make no representations as to the accuracy of the

15  speakers and/or testimony since I was not physically

16  present during the recording.

17       I further certify that I am neither counsel for nor

18  related to any party to said action nor in any way

19  interested in the outcome thereof.

20

21

22

23

24  _____
    Sally A.F. Turner
25  Certified Shorthand Reporter No. 11709
```

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA


SOUTHERN INYO HEALTHCARE          Case No. 2016-10015
DIVISION
                                  Chapter 9


_____

BEFORE THE HONORABLE FREDRICK E. CLEMENT

BANKRUPTCY JUDGE

AUGUST 29, 2018

_____

Proceedings recorded by electronic sound recording.

```
 1              A P P E A R A N C E S

 2

 3   FOLEY & LARDNER, LLP

 4   By: Ashley McDow, Esq.

 5   555 South Flower Street, Suite 3300

 6   Los Angeles, California 90071

 7   Appearing for Southern Inyo Healthcare District;

 8

 9   WALTER WILHELM LAW GROUP

10   By: Riley Walter, Esq.

11   205 East River Park Circle, Suite 410

12   Fresno, California 93720

13   Appearing for Tulare Local Healthcare District;

14

15   KLEIN DENATALE GOLDNER

16   By: Hagop Bedoyan, Esq.

17   5260 North Palm Avenue, Suite 201

18   Fresno, California 93704

19   Appearing for Healthcare Conglomerate Associates, LLC

20   VI Healthcare Finance, Inc.;

21

22   ALSO PRESENT:

23   Carmen Contreras-Martinez, by phone

24

25
```

Case 2016-10015

      THE COURT:  First matter is Southern Inyo

Healthcare District, 610015 is the status

conference.

      MS. MCDOW:  Good afternoon, Your Honor.

Ashley McDow, Foley & Lardner on behalf of the

Debtor, Southern Inyo Healthcare District, Your

Honor.

      THE COURT:  Good afternoon.

      MS. MCDOW:  Good afternoon.  Also present

in the court, Your Honor, is the CEO, Brian Cotter,

and Jaque Hickman, who is the Board president, Your

Honor.

      THE COURT:  Okay.

      MR. WALTER:  Good afternoon, Your Honor.

Riley Walter appearing on behalf of Tulare Local

Healthcare District.

      THE COURT:  Good afternoon.

      MR. BEDOYAN:  Good afternoon, Your Honor.

Hagop Bedoyan appearing on behalf of Healthcare

Conglomerate Associates, LLC and VI Healthcare

Finance, Inc.

      THE COURT:  Very well.  Any other

appearances this matter?  Hear none.

1          Ms. McDow, thank you for your very detailed

2   and thoughtful status report.

3          THE CLERK:  Excuse me, Your Honor.  I think

4   we have two appearances by phone.

5          THE COURT:  Oh, do we?  Excuse me.

6          Do we have some by phone?  Is --

7          THE OPERATOR:  Your Honor, this is the

8   operator.

9          THE COURT:  Yeah.

10          THE OPERATOR:  We have Carmen Contreras-

11   Martinez as listen only.

12          THE COURT:  Okay.

13          THE OPERATOR:  We had listed Latonya

14   Williams.  We were unable to reach her, and she has

15   not dialed in.

16          THE COURT:  Okay.  Do we have Carmen

17   Contreras-Martinez on the line, just listen only?

18          MS. CONTRERAS-MARTINEZ:  Yes, Your Honor.

19          THE COURT:  Okay.  I'm going to assume

20   you're not participating, listening only.  If that

21   changes, do speak up.

22          MS. CONTRERAS-MARTINEZ:  Thank you, Your

23   Honor.  I will.

24          THE COURT:  Okay.  I did receive your very

25   thoughtful and detailed report.  Thank you.

```
1            Is there anything you need to add to it or
2  wish to add to it?
3            MS. MCDOW:  Your Honor, the only piece we
4  would add is that the money that we had identified
5  as anticipating would be collected, about 98 percent
6  give or take -- my math is not perfect -- but a
7  very, very high number has been collected since,
8  Your Honor.
9            THE COURT:  Okay.  So that is the extent of
10 the augmentation.
11           Are there creditors who wish to be heard on
12 this?
13           MR. BEDOYAN:  Yes, Your Honor.  Hagop
14 Bedoyan on behalf of HCCA and VI Healthcare.
15           THE COURT:  Okay.
16           MR. BEDOYAN:  I just want the record clear.
17 The Debtor references on page 12, lines 12 through
18 21, discussion about mediation, claims against
19 Baker.  I just want it clear that we have discussed
20 mediation.  We've discussed mediation as to the
21 particular adversary proceedings proceeding against
22 my client as well as a global mediation effort,
23 which would include the -- what my client believes
24 are malpractice claims against Baker and Ashley
25 McDow and --
```

1          THE COURT:  I'm sorry.  Against?

2          MR. BEDOYAN:  Ashley McDow.

3          THE COURT:  Okay.  Against counsel for the

4    Debtor personally?

5          MR. BEDOYAN:  That's correct.

6          THE COURT:  Okay.

7          MR. BEDOYAN:  And her current firm, Foley &

8    Lardner.

9          Debtor -- my clients have recently hired

10   malpractice counsel in Orange County as of August

11   20th.  The files have not been turned over to my

12   client.  The idea that mediation, global or

13   otherwise, could occur by mid-September is really

14   not possible.  I've been asked to inform the Court

15   that once malpractice counsel has had a chance to

16   review the files, perhaps more realistic would be

17   mediation near the end of the year.  Again, the

18   relationship between my clients and Ms. McDow's

19   former firm, Baker Hostetler, is quite extensive and

20   lengthy.

21         So the Debtor's report doesn't specifically

22   say that the claims include negligent --

23   professional negligence, breaches of fiduciary duty,

24   but that is what I'm talking about when we talk

25   about a global mediation.

1          Again, this is a Chapter 9 case.  The Court

2     doesn't have to employ -- approve people's

3     employment approve fees, but I do want -- I do want

4     the Court to understand that the idea that somehow

5     all of these very thorny, lengthy issues, including

6     malpractice claims, can be resolved in mediation by

7     mid-September is really unrealistic.

8          THE COURT:  I see.  Anything else

9     Mr. Bedoyan?

10          MR. BEDOYAN:  Some of the statements about

11     the history of the case are -- my clients have some

12     concerns about, but the primary point that I wanted

13     to bring to the Court's attention is the -- is the

14     concept of mediation and just exactly what claims

15     are involved and who is involved.

16          THE COURT:  Okay.  Mr. Walter?

17          MR. WALTER:  Your Honor, we have had some

18     preliminary discussions with Southern Inyo about

19     participating in a mediation, if and when one is set

20     up.  I will report that we've been trying to get

21     some additional information from Southern Inyo, and

22     we have not yet had success.  But this is the first

23     time that I've met Ms. McDow, and I'm sure that I

24     can talk with her after the hearing and find a way

25     to get that information.

1          THE COURT:  Okay.  And this has to do with

2     the HCCA problem?

3          MR. WALTER:  No, Your Honor.  It has to do

4     with physical assets of my district that may have

5     gone and may still be with Southern Inyo.

6          THE COURT:  Okay.  All right.

7          Ms. McDow, I guess I'm very concerned about

8     the status of this case.  We are coming up on three

9     years, and we have not yet even come to a place

10    where plan confirmation is seriously on the table.

11    There have been a couple of preliminary attempts,

12    didn't get past the disclosure hearing.  Still don't

13    have another plan on file.

14          I guess I am losing faith that we are

15    really going anywhere here, and that is troubling to

16    me.  And at some point I'm going to have to dismiss

17    this case if it doesn't move forward.  We keep

18    wallowing around in this, and I just don't see that

19    we're getting to confirmation.

20          You report good things, and I'd like to

21    believe that, that puts us on track.  But each time

22    we get to a status conference, we still don't get

23    anything done in terms of a plan being pitched to

24    creditors.  So I guess I'm a little troubled here

25    and would like to know when we're likely to see

1   that.

2          MS. MCDOW:  Your Honor, if I could make a

3   suggestion.  What is now -- I don't want to say

4   holding up the fence certainly, but these are big

5   claims we're talking about, whoever they are,

6   whoever it is they're against.

7          Just to be clear for the record, when I

8   prepared the status report, I was not yet on notice

9   that I was being potentially sued personally or that

10  Foley & Lardner, which is why they are not in the

11  status report.  It wasn't a -- certainly a

12  misrepresentation on my part.

13         MR. ARNOLD:  I didn't take it as one.

14         MS. MCDOW:  Your Honor, what I think would

15  be helpful is for this Court to set a date by which

16  mediation would be -- would be completed or at least

17  should be attempted because it is my feeling from

18  the parties that it's a chicken and the egg.

19  They're maybe not trying to actively work towards

20  mediation in the hope that the case will just get

21  dismissed if there's no mediation.

22         So I think it would really help move the

23  case forward if the Court would set something.  I

24  understand maybe mid-September is not enough, but I

25  don't know that the malpractice lawyer needs three

1    and a half months, four months to get ready to have

2    a mediation about this.

3              THE COURT:  Given the complexity here, it

4    wouldn't surprise me if it were to take some time.

5              MR. DAVIS:  I understand, Your Honor.  I

6    don't -- again, I guess if he needs four months and

7    the Court is comfortable that, again, we won't

8    object.  But I think if Your Honor --

9              THE COURT:  It's not that I'm comfortable

10   with it.  It's that I've been uncomfortable with

11   this case for a long time because it doesn't seem to

12   be moving forward.  The question really is at what

13   point I issue an order to show cause for dismissal

14   and say, all right, now is the time, and I really

15   feel like I'm very close to that at this point.

16             So I'm not sure I'm willing to set a

17   mediation date.  I'm just telling you that at some

18   point I'm going to issue an order to show cause that

19   says you better explain to me why we shouldn't do

20   this right now and just dismiss the case.

21             MS. MCDOW:  I understand.

22             THE COURT:  So when are we likely to see a

23   plan?  Do you we know?

24             MS. MCDOW:  Your Honor, I think given the

25   number -- the amounts of the claims that are, again,

1  between these parties, and now it's a couple of

2  other parties not at the table, that, that's a big

3  -- we need to have that resolved to have the plan be

4  made.  It doesn't mean we can't present alternatives

5  in a plan, but I believe it's the most effective use

6  of the Court's resources that this -- to wait until

7  that 10 million or so, again, amongst different

8  parties, is resolved, and then the plan can be

9  presented pretty quickly after.

10          Again, the revenue is up.  There's, you

11  know, the revenue issues.  There's the claims piece

12  that I think -- I'm hopeful that at mediation, if

13  and when we can have it, will be resolved with the

14  last -- the final piece of the puzzle.  So I would

15  --

16          THE COURT:  You think that this is the only

17  issue holding up plan confirmation?

18          MS. MCDOW:  It's not the only issue, Your

19  Honor, but it is far and away the biggest issue.

20          THE COURT:  No.  I'm aware of that.  I'm

21  also looking back at your status report, and my

22  memory is that under paragraph IV(a)(3) you were

23  also trying to get a sales tax in place that is part

24  of the funding here.  And I don't profess to be an

25  expert on these things, but I have the sense that,

1    that's a somewhat long and involved process.

2         And at this point, according to the way I'm

3    reading this on page 16 at line 13, it says,

4    "Although Southern Inyo Healthcare District has not

5    yet received a formal response from the County and

6    cannot opine on the County's perspective, it intends

7    to follow up."

8         But whether they're going to and whether or

9    not -- I don't know whether this who -- can this be

10   done by the majority, the board of supervisors?  I

11   don't think it requires voter approval, but I don't

12   really know.  So --

13        MS. MCDOW:  You're correct, Your Honor.

14   Well, you're correct in the sense that it doesn't

15   require voter approval.  I'm not --

16        THE COURT:  I mean, populous --

17        MS. MCDOW:  Yes, correct.

18        THE COURT:  -- voter approval.

19        MS. MCDOW:  Correct.  Your Honor, the sales

20   tax increase is not something in our projections as

21   they currently are stated that we're depending on.

22   Again, this is -- the Board and District are always

23   trying to do different things.  They always are.

24   That's one of the reasons that I think you don't

25   have any --

1        THE COURT:  I'm sorry.  They're not moving

2  in the same direction?  When they're trying to do

3  different things, you're telling me they're working

4  at cross purposes?

5        MS. MCDOW:  No, Your Honor.  Just dual

6  tracks.  They're trying to find --

7        THE COURT:  Okay.

8        MS. MCDOW:  -- do things, and I think that

9  really shows, which is why, despite that we've been

10  here three years, you've never had a creditor in

11  here complaining.  Obviously, Optum (phonetic)

12  appears, but by and large they are working together.

13        So this is more an example for the Court of

14  an avenue we're trying to pursue, but I can

15  represent to the Court, this is not -- our plan is

16  not dependent on this piece at all.  It's too

17  speculative because we -- again, we're at the very

18  preliminary, but it's here for, you know, as a

19  disclosure of what it is that we're contemplating.

20  But the plan in no way depends on the sales tax

21  interest.

22        THE COURT:  Okay.  So we're back to the

23  question:  when do you think you're going to have a

24  plan ready to go?  I mean, Mr. Bedoyan says that

25  middle September for mediation is not realistic.  I

1    don't know anything about these claims other than

2    what little is in the status report.  You tell me

3    you're brand new to this issue.  I'm going to assume

4    this all arises out of the things that have been

5    going on for the past two and a half or more years

6    in this court and your handling of them.

7          I am going to presume that Baker Hostetler

8    carries a generous errors and omissions policy that

9    continues to cover you; I assume, although it's

10   claims made, and I don't know how that affects the

11   fact that maybe that came through after you'd

12   switched firms.  I assume Foley & Lardner has one.

13         Given the fact that we have extensive

14   dealings, my guess is it's going to take several

15   months for review of the files and just to get any

16   sort of notion about what the parties think their

17   respective exposures, if any, are, the likelihood of

18   an adverse result, as well as the potential dollars

19   attached to that.

20         So I can easily see this going three or

21   four months before -- and frankly, probably a lot

22   longer, before the parties feel comfortable sort of

23   setting forth their position.  So I'm not at all

24   surprised.

25         Short of setting a bar date, is there

1   anything that we can do to move this case forward,

2   Mr. Bedoyan?

3          MR. BEDOYAN:  Well, the idea of global

4   mediation is a subject that was raised by the

5   District's special counsel, Jeff Schinbrock

6   (phonetic), who is the attorney of record in the

7   adversary proceeding against my clients, and it was

8   in response to a concern, you know.  If there were

9   breaches of fiduciary duties, those duties wouldn't

10  necessarily be limited to those that are owed to my

11  clients, VI Healthcare and HCCA.  There would also

12  be breaches of fiduciary duties owed to the District

13  because, obviously, the Baker Hostetler firm has

14  been involved with this case for two and a half

15  years and has generated a great deal of fees.

16  Again, I don't know if those fees have been paid or

17  not.  It's not relevant, but Mr. Schinbrock felt

18  that, that's why the global settlement idea would

19  make sense.

20          If the global settlement approach isn't

21  necessarily required, the adversary proceeding

22  issues would probably be resolved one way or the

23  other much faster than early next year I'm guessing.

24  But ----

25          THE COURT:  And some of the -- there are

1   actions filed outside of those in this court?

2        MR. BEDOYAN:  No actions at this point.

3   There are tolling agreements that have been signed

4   and continue to be signed.  Again, this malpractice

5   counsel was just engaged on August 20th and has

6   asked me to represent that to the Court.

7        Your question, if I may, Your Honor,

8   Ms. McDow talks about the claims having to be

9   resolved, and that's really the problem.  You know,

10  I'm relatively new to this case.  I just went back

11  and read the District's last status conference

12  report that was filed on May 17th, Docket Number

13  431.  The same issues that the Debtor talks about as

14  being somehow the panacea or the source of funds -

15  the LA Department of Water and Power case, the

16  outpatient lamp services.  LA department of Water

17  and Power are supposed to have a meeting on May 25th

18  if you read the last status report, and in the

19  current status report there's no discussion on what

20  happened on May 25th.

21       The sales tax increase, as the Court points

22  out -- again, I'm not a municipal law attorney, but

23  just in a very simplistic sense, I would think the

24  voters would have a say on sales tax increases.

25       The bond measure that the District was

1   hoping to pass in April didn't pass, and I think in

2   one of our earlier status conference hearings, there

3   was some reference to revisiting the tax increase in

4   a November election.  Interestingly, in the current

5   status report, there's no discussion on whether that

6   measure is even going to be on the ballot.  So the

7   revenue side is just as critical as the claims side.

8           And finally on page -- and again, I'm

9   sorry, Your Honor.  I didn't raise this to begin

10  with, but the point about revenue not being an

11  issue.  A great deal is made in the Debtor's report

12  on page 18, paragraph 5 about Medicare

13  reimbursements having been increased with regard to

14  acute beds and swing beds.

15          But what the report doesn't point out is

16  that this is primarily a skilled nursing facility.

17  It has two -- it has two acute beds.  It doesn't

18  have -- again, and perhaps things have changed, but

19  to my knowledge, it doesn't have an operating room

20  or an operating room that has surgeries.  So the

21  fact that there may have been an increase in the

22  Medi-Cal, Medicare reimbursement, it may be a non-

23  issue if there are only two acute beds, and very

24  rarely is more than one every used.  So a 300

25  percent increase of zero is not much.

1     So these are just examples of the same

2  explanations as to sources of revenue that we have

3  heard before that the Debtor now, two and a half

4  years into this case, hasn't really made any

5  progress.

6     Mr. Cotter himself, that the District takes

7  a great deal of pride in hiring on page 8,

8  Mr. Cotter was brought to the District by HCCA.  It

9  wasn't some superman that was brought in to solve

10  their problems.

11     So the point is, for two and a half years

12  the District has had a great deal of time to talk

13  about how they're going to find a way out of this.

14  The truth is the disputes with my client don't

15  require a Chapter 9 case to resolve.  If there are

16  no other creditors to worry about, this case can be

17  dismissed, and those disputes can be handled outside

18  of this courtroom, whether it's the malpractice

19  claims or the claims that are serving the basis of

20  the adversary, some of which are not even, I would

21  argue, within the jurisdiction of this Court to

22  resolve.  And I believe there's been a jury trial

23  request.

24     So the Chapter 9 isn't integral to

25  resolving the claims going back and forth between

1    the District, between the law firms, and among the

2    law firms and my clients, but we continue to just

3    keep coming back; and I venture to say fees continue

4    to rise.

5              THE COURT:  Is there anything -- I'm going

6    to bring you back to the point.  Is there anything

7    that can be done short of setting a bar date?

8              MR. BEDOYAN:  A bar date for what, Your

9    Honor?

10             THE COURT:  Is there anything short of

11   setting a bar date to file a plan that this Court

12   can do?  Would some sort of a court-ordered

13   mediator, in your view, have a better shot than a

14   private mediator?  Is there some -- I'm trying to

15   figure out, is there any way that we can move this

16   case forward with these resources to the Court?

17             MR. BEDOYAN:  At this time, until the files

18   are reviewed by malpractice counsel, I don't think

19   setting a bar date for mediation for a case that

20   hasn't even been filed and may never be filed --

21             THE COURT:  I agree.

22             MR. BEDOYAN:  -- makes sense.

23             THE COURT:  But is there anything else we

24   can do?

25             MR. BEDOYAN:  I can't think of anything

1   else.  I mean, you've been quite generous in your

2   multiple extensions of time for the Debtor to file a

3   plan.

4          THE COURT:  Okay.

5          Mr. Walter?

6          MR. WALTER:  I don't have anything to add,

7   Your Honor.

8          THE COURT:  Ms. McDow?

9          MS. MCDOW:  Your Honor, just a couple of

10   points in response, and I'm going to limit it and be

11   general for fear that my poor dead mother, God rest

12   her soul, is going to be sued after this hearing.

13          But the irony of this discussion that it is

14   now -- the District was playing catch-up and for all

15   the reasons that special counsel has put in a

16   complaint that Mr. Walter has filed similar lawsuits

17   in his Chapter 9.  Those allegations are not mine.

18   Those are third-party counsel.  And now for HCCA to

19   sit here and tell the Court that this case should be

20   dismissed, when the District is playing catch-up

21   because of the allegations, allegedly, that are in

22   those complaints, is so disturbing I can barely -- I

23   can barely stomach it, Your Honor.

24          And of course, HCCA would love to have the

25   case dismissed because they have -- they're the only

creditor who would benefit.  They have an assignment

right now of partial tax revenues, that if the case

gets dismissed they will get until the end of time,

until their 20 percent interest rate notes for $2

million is paid off in full, which means the

hospital will shut down.  It's not a maybe.  It is a

certainty.

And that would be great for them.  They

could get our tax revenues, even if the hospital was

closed.  That's how it would look, okay.  So of

course they want dismissal, Your Honor.

Rather than trying to come to the table and

really push for mediation, push for a global

resolution, they're, again, in my opinion, going to

make this difficult, put it on us so that Your Honor

will dismiss the case.  It's clear.  It's what's

happened today, Your Honor.

It's -- again, I've not been dealing with

it, but my impression is that, that has been the

response from HCCA, which is I think the case is

going to be dismissed, so we don't need to -- we

don't need to actively and in good faith engage in

mediation.  And now it's because there's a

malpractice lawyer.

I can tell you that Foley & Lardner, who

1   has never represented an HCCA entity, is not going

2   to (indiscernible).  So I don't know if that's going

3   to bring it to a close sooner, but I think that's

4   going -- the response that HCCA gets from that I

5   anticipate is not going to be well received in the

6   sense that they thought it would, considering that

7   they've never represented HCCA in any related

8   entity, any of the entities that Baker represented.

9   And it's actually fairly offensive that it's -- how

10  it's been conducted, but that's neither here nor

11  there.

12          Your Honor, I -- again, I understand where

13  we are, but I can tell the Court without too much

14  detail that I would ask you to look at, again, the

15  allegations in the complaint, the allegations,

16  Mr. Walter's complaints, the news.  This is -- this

17  is not a problem of the District's making, and we

18  are now playing catch-up.  We've done a very good

19  job, but it's been a struggle, no doubt about it.

20          We are finally, in the past six months,

21  eight months, really starting to turn around

22  financially.  That's what the numbers suggest.  We

23  have now come off with 50 percent Medicare withhold

24  because hospital reports weren't submitted for a

25  year and a half, almost two years.  They just

1   weren't submitted, so that we could get our AR.

2       It was HCCA's responsibility to submit

3   them, and none of them were submitted.  So we are

4   now playing catch-up.  We are -- you know, have a

5   million dollars in the bank, close to a million

6   dollars.  We are operating really well financially,

7   but it has been a struggle; and it has been a catch-

8   up that, again, is -- the irony of what I just had

9   to listen to, and I'm sure that the Board had to

10  listen to.  The CEO is baffled.

11      So, Your Honor, again, I would -- I would

12  ask the Court to set a bar date for mediation.  I

13  understand that, that's not something that you --

14  you know, that you're excited about doing.  But I

15  really think, given all the dynamics, it would

16  really help push this case forward.  And if we set

17  it in December -- I don't want to be unfair to

18  counsel, the malpractice counsel, but I also don't

19  want it to be a repeat of we come back here and

20  we're trying to do everything.  We're turning

21  everything around financially and trying to resolve

22  the big claims and getting pushback and have that

23  looked badly upon us again, Your Honor.

24      So I'm not sure where that leaves us, but I

25  would ask, again, that perhaps a court-ordered

1   mediation, court-ordered mediator -- I don't know.

2   Unfortunately, I'm unfamiliar with the panel here.

3   We have a good panel in the Central District.  I'm

4   there's equally good mediators on this Board's

5   panel, in this District's panel, and I think it

6   would really move the case forward.

7           And I'm not sure how long Mr. Walters would

8   need for his clients to get ready.  I would imagine

9   before December we could talk about it.  I would

10  imagine that would be sufficient time.  I don't mean

11  to speak for him, but that we could -- that we could

12  get the parties together.

13          I did speak to Baker Hostetler, and she, at

14  least the head of the group there, was ready to

15  participate in mediation early September.  So they

16  are, again, in a place where they're prepared to

17  come to the proverbial table, maybe the literal

18  table there, Your Honor.  So --

19          THE COURT:  Okay.

20          MS. MCDOW:  Thank you, Your Honor.

21          THE COURT:  I think I'm going to set an

22  interim monitoring date.  I'm not going to set a bar

23  date for mediation.  I'm not sure that's feasibly

24  realistic at this time, given the newness of these

25  claims that I'm hearing about.  But I am going to

1   set a monitoring date, and we'll speak about it

2   again when the parties are a little further down the

3   road.  I'm thinking mid-October, and we'll come back

4   and see where it goes.

5         What is our mid-October date?  I think I

6   have a dark week there sometime that I'm not

7   available.  So mid to late October?

8         THE CLERK:  October 16th, Your Honor, or

9   the 31st.

10        THE COURT:  I'm going to put this on for

11  further status on October 16th at 1:30.  I would

12  like a status report a week ahead from the Debtor,

13  also from Mr. Walter and Mr. Bedoyan with particular

14  discussion of the adversaries and the litigation

15  involving professional negligence, if any, and the

16  status and the status of the mediation with the hope

17  that we can be a little closer.

18        MS. MCDOW:  Your Honor, just so I

19  understand, a joint status report from all three or

20  --

21        THE COURT:  No.  Three are fine.  But --

22        MR. BEDOYAN:  Thank you.

23        MS. MCDOW:  Thank you, Your Honor.

24        MR. WALTER:  Thank you.

25        (HEARING CONCLUDED)

1              * * * * * * * * * * * *

2

3         I, Court approved transcriber, certify that

4    the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings

6    in the above-entitled matter.

7

8

9

10   _____

11   Julie Thompson, CET 1036

12

13

14

15

16

17

18

19

20

21

22

23

24

25



5260 N. Palm Ave., Suite 205, Fresno, CA 93704
p. 559-438-4374  f. 661-326-0418  www.kleinlaw.com

September 17, 2018

Via E-mail & U.S. Mail

Matthew J. Price, Esq.
Foley & Lardner, LLP,
777 East Wisconsin Avenue
Milwaukee, WI 53202-5306
mprice@foley.com

Jeffery R. Atkin, Esq., Managing Partner
Ashley M. McDow, Esq.
Foley & Lardner LLP
555 S. Flower St., Suite 3500,
Los Angeles, CA 90071
jatkin@foley.com
amcdow@foley.com

Re:     Benzeevi / HCCA et al.

Dear Mr. Price, Mr. Atkin and Ms. McDow

This letter addresses a related but separate issue to the Tolling Agreement raised in recent correspondence from the Sall Spencer firm regarding the situation with the Benzeevi Parties (HCCA, Dr. Benzeevi, Vi Healthcare and Tulare Asset Management) and Southern Inyo Healthcare District ("Inyo").  Based on the facts as set forth below, the Benzeevi Parties hereby request that Foley & Lardner and Ms. McDow withdraw from representing Inyo in the matter entitled, In re Southern Inyo Healthcare District, U. S. Bktcy Ct., E.D. Cal., Fresno Div. Case No. 2016-10015.  Absent a voluntary withdrawal, HCCA will be moving to disqualify your firm and Ms. McDow from any further participation in the case.

The facts regarding the conflicts of interest that prohibit Ms. McDow and Foley from continuing as attorneys for Inyo in this case are set forth below.  Prior to joining Foley, Ms. McDow was a partner for Baker Hostetler and integrally involved with representing the Benzeevi Parties and ultimately Inyo.  Baker's relationship with the Benzeevi Parties spanned several years and covered multiple matters, in no way was this a limited representation by Baker on a discrete matter.  As direct counsel for the Benzeevi Parties, Ms. McDow is presumptively in possession of all of the collective knowledge of Baker attorneys concerning the Benzeevi Parties.  Most importantly, Ms. McDow was involved in drafting and negotiating the Management Services Agreement (the "MSA") between HCCA and Inyo, and then going on to lead the bankruptcy team for Inyo, while she and her firm continued to represent the Benzeevi Parties.

Klein • DeNatale • Goldner

Matthew J. Price, Esq.
September 17, 2018
Page 2

The MSA has been one of the central topics of Inyo's bankruptcy proceedings.   In the course of her representation of the Benzeevi Parties, Ms. McDow obtained substantial confidential client information from HCCA and the other Benzeevi Parties, in addition to any knowledge she is constructively in possession of due to her previous employment with Baker.

While Baker did obtain conflict waivers from certain of the Benzeevi Parties, these conflict waivers were not only deficient in failing to make the required Rule of Professional Conduct 3-310 disclosures, but actually recognized several key facts and make statements that further strengthens the case for disqualification.  The letter from Baker to Inyo, HCCA and Dr. Benzeevi dated January 2, 2016 makes the following statements:

•       "The Firm has represented HCCA in connection with the negotiation and drafting of a management service agreement with the District."

•       "In connection with its representation of the Benzeevi Group, the Firm has had access to confidential information of the Benzeevi Group."

•       "the Rules discourage the representation of a client where, by reason of the representation of the former client, the firm has obtained material confidential information."

•       "However, the firm hereby advises you that unless otherwise required by law, it will not disclose any material confidential information of either party to the other, nor will the Firm use material confidential information of one party to the benefit of the other party."

•       "a conflict of interest would exist if a dispute arose between the District and HCCA with respect to the Management Agreement Matters and if HCCA requests that the Firm represent its interests in connection with such dispute."

•       "The District expressly acknowledges and agrees that the foregoing waiver will allow the Firm to continue to represent the interests of the Benzeevi Group in other matters, including but not limited to the Management Agreement Matters (including possible litigation or other forms of dispute resolution) and that the District will not seek to disqualify the Firm or any of its attorneys from representing the Benzeevi Group in any such matters (including the Management Agreement Matters) as a result of the Engagement of the Firm by the District in connection with the Chapter 9 Filing."

•       "if the Firm determined that its continued representation of the District in the Chapter 9 Filing would require disclosure of material confidential information of the Benzeevi Group to the District, or vice versa, the Firm may elect to terminate its representation of the District in the Chapter 9 Filing."

EXHIBIT I

Klein • DeNatale • Goldner

Matthew J. Price, Esq.
September 17, 2018
Page 3

These statements were substantially duplicated in a later conflict waiver letter dated July 19, 2017 concerning Baker's representation of Vi Healthcare (a Benzeevi entity) in a loan transaction with Inyo.

These letters fail to comply with Rule 3-310 in that, amongst other things, they misstate the applicable rules and law concerning conflicts of interest and fail to describe the reasonably foreseeable adverse consequences of a potential conflict such as, that if a conflict developed that Baker could decide to abandon the Benzeevi Parties who would then have to retain new independent counsel as would Inyo. Moreover, even if these letters were valid, Baker violated the stated terms of these agreements. The waivers stated that none of the Benzeevi Parties' confidential information would be used adverse to the Benzeevi Parties and also strongly implied that if a conflict arose, Baker would continue to represent the Benzeevi Parties and withdraw from its representation of Inyo. Instead, when a conflict arose, Ms. McDow and Baker, abandoned the Benzeevi Parties, used confidential information adverse to the Benzeevi Parties, and acted directly adverse to the Benzeevi Parties in assisting Inyo in attempts to terminate the MSA, going so far as to criticize the MSA that Baker drafted as one-sided in favor of HCCA. Then, when Ms. McDow left Baker and joined Foley, she continued her representation of Inyo as general insolvency counsel, now on behalf of Foley who substituted in to replace Baker, in the very bankruptcy proceedings that continued to challenge the Benzeevi Parties' actions and role regarding Inyo, and in which HCCA is a creditor. As recently as August 29, 2018, Ms. McDow appeared at a Bankruptcy Court status conference where she continued to entrench her position adverse to HCCA by making allegations and statements adverse to HCCA. In this hearing, while admitting that it was in HCCA's interest that the Bankruptcy be dismissed, she resisted dismissal because it is in Inyo's interest that the proceedings continue. She also accused HCCA of delaying mediation in bad faith and that the problems that Inyo has had with submitting a feasible, confirmable plan are the fault of HCCA. While it is my understanding that you have taken the position that the retention of independent counsel somehow cleanses Ms. McDow of the conflict, this is not so. As you admit, because Ms. McDow has a duty to keep the Court informed of the bankruptcy matters she must continue to communicate with independent counsel as general insolvency counsel. Thus, this retention of separate counsel for certain aspects of the bankruptcy does not in any way operate as an ethical shield.

Ms. McDow's conflict has thus now become Foley's conflict since her fiduciary duties to the Benzeevi Parties survived termination of that relationship and are imputed to Foley. Ms. McDow is advocating for a global mediation, which she contends could be a significant funding source for the debtor. In that same mediation, McDow will participate as general insolvency counsel for Inyo, while she and her former firm will be parties with potential liability to both Inyo and the Benzeevi Parties. If that's not enough, McDow is also a material witness to the events that led to the dispute between the Benzeevi Parties and Inyo. These facts reveal the depth of the conflict facing Foley and Ms. McDow. On the one hand, Ms. McDow will attempt to minimize her own liability and that of Baker in these negotiations adverse to the Benzeevi Parties, but then on the other hand, she must try to maximize Inyo's recovery in these

Klein · DeNatale · Goldner

Matthew J. Price, Esq.
September 17, 2018
Page 4

negotiations. While not a concern for the Benzeevi Parties, how would Inyo know that Ms. McDow didn't settle with the Benzeevi Parties at Inyo's expense in order avoid or reduce her own professional liability and the liability of the Foley and Baker firms. This is a direct and irreconcilable conflict of interest which was never described to the Benzeevi Parties or waived. The fact that Mr. Shinbrot was brought in to represent Inyo in the adversary action does not change the fact that as bankruptcy counsel, Ms. McDow is still taking positions adverse to her former client in acting as the architect of Inyo's chapter 9 plan that relies heavily on extinguishing multi-million dollar claims asserted by HCCA and Vi Healthcare and recovering additional millions from those very same two entities, Mc Dow is presumptively if not actually using confidential information in advancing the objectives of Inyo.

Rule 3-310(E) of the CRPC (Avoiding the Representation of Adverse Interests) articulates the well-established ethical prohibition against accepting representation of parties with adverse interest when confidential information is in the possession of the attorney:

> A member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client, where by reason of the representation of the client or former client, the member has obtained confidential information material to the employment.

Please also note that new Rule of Professional Conduct 1.9, which will become effective November 1, 2018, closely mirrors the model Rules of Professional Conduct, and prohibits representation adverse to a former client. The comments note that "a lawyer could not properly seek to rescind on behalf of a new client a contract drafted on behalf of the former client." New Rule 1.9. This new rule also incorporates the concept stated in New Rule 1.7 that certain conflicts are un-waivable, such as when an attorney represents a client asserting claims in direct adversity to a former client. See New Rule 1.7(d).

An attorney's fiduciary duties to a former client continues after termination of employment, at least to the extent that the attorney must maintain the confidentiality of all client information and must not act adversely to the former client in matters involving the former representation. *Oasis West Realty, LLC v. Goldman* (2011) 51 Cal. 4th 811, 821 ("'an attorney is forbidden to do either of two things after severing [the] relationship with a former client. [The attorney] may not do anything which will injuriously affect [the] former client in any matter in which [the attorney] formerly represented [the client] nor may [the attorney] at any time use against [the] former client knowledge or information acquired by virtue of the previous relationship.'"); *Styles v. Mumbert* (2008) 164 Cal. App. 4th 1163, 1167 ("So fundamental is this precept that an attorney continues to owe a former client a fiduciary duty even after the termination of the relationship. For example, an attorney is forever forbidden from using, against the former client, any information acquired during such relationship, or from acting in a way which will injure the former client in matters involving such former representation.")

      EXHIBIT I

Klein · DeNatale · Goldner

Matthew J. Price, Esq.
September 17, 2018
Page 5

An attorney cannot escape this continuing duty by switching firms. When the attorney switches firms, that duty is then imputed to the firm, as a whole. *City and County of San Francisco v. Cobra Solutions, Inc.* (2006) 38 Cal.4th 839, 847–848 ("an attorney's conflict is imputed to the law firm as a whole on the rationale 'that attorneys, working together and practicing law in a professional association, share each other's, and their clients', confidential information.'"); *People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1146 ("a presumption that an attorney has access to privileged and confidential matters relevant to a subsequent representation extends the attorney's disqualification vicariously to the attorney's entire firm.") New Rule of Professional Conduct 1.10 incorporates this rule of imputation.

In cases of successive adverse representation, where a lawyer personally provided legal services to a former client, "the only question is whether there is a substantial relationship between the subject of the prior representation and the subject of the current representation." *Fiduciary Trust Int'l of Cal. v. Superior Court* (2013) 218 Cal.App.4th 465, 479. When there is a substantial relationship, "access to confidential information by the attorney, in the course of the first representation (relevant, by definition, to the second representation) is ***presumed*** and disqualification of the attorney's representation of the second client is mandatory; indeed, the disqualification extends vicariously to the entire firm." *Flatt v. Superior Court* (1994) 9 Cal.4th 275, 283 (emphasis in original); *Jessen v. Hartford Cas. Ins. Co.* (2003) 111 Cal.App.4th 698, 706. Because here, the representation of the Benzeevi Parties, with regard to the MSA and the structuring of the loan transactions with Vi Healthcare and the bankruptcy proceedings, are substantially related, access to relevant confidential information by Foley is presumed.

While some cases (and New Rule 1.10) have recognized that imputation will not be presumed, and disqualification of a successive firm may not be warranted under certain circumstances, if the conflicted attorney was not substantially participating in a related matter and is screened from representation of an adverse client, here that potential exception does not apply. As to Inyo, Ms. McDow substantially participated in the MSA and the Vi Healthcare formation and its loan transactions with Inyo, and Foley not only did not establish ethical screening to shield Foley from Ms. McDow's conflict, it affirmatively supported Ms. McDow in continuing to represent Inyo in violation of her duties to the Benzeevi Parties. See, e.g., *Kirk v. First American Title Ins. Co.* (2010) 183 Cal.App.4th 776, 801 "(we should presume knowledge is imputed to all members of a tainted attorney's law firm. However, we conclude that, in the proper circumstances, the presumption is a rebuttable one, which can be refuted by evidence that ethical screening will effectively prevent the sharing of confidences in a particular case.")

Under these facts and the applicable case law, Foley and Ms. McDow are prohibited from continuing to represent Inyo and must withdraw. While we anticipate that you may claim that the timing of this request six months after Foley substituted into this case operates as a waiver of the Benzeevi Parties' rights to disqualify Foley and Ms. McDow, absent both inexcusable and unjustifiable delay and extreme prejudice, a client is not barred by laches from seeking

Klein · DeNatale · Goldner

Matthew J. Price, Esq.
September 17, 2018
Page 6

disqualification. *Western Continental Operating Co. v. Natural Gas Corp.* (1989) 212
Cal.App.3d 752, 763–764. Ms. McDow was put on notice almost immediately after she
withdrew from representing the Benzeevi Parties that the Benzeevi Parties objected to her
representation of Inyo. If you have any facts or cases supporting that a six-month delay, when
the attorney was put on notice months earlier of the client's objections, is inexcusable and that
Inyo would suffer extreme prejudice please provide that information.

The Benzeevi Parties hereby request that Foley & Lardner withdraw from representation
of Inyo in the bankruptcy case as well as to any matter involving the relationship or transactions
between the Benzeevi Parties and Inyo. If you agree to this withdrawal we can discuss a
reasonable time for Inyo to retain another firm. Otherwise the Benzeevi Parties will promptly be
moving to disqualify Foley and Ms. McDow. We will give you until September 29, 2018 to
respond to this letter. Otherwise, we will assume we will need to proceed with the
disqualification motion.

Sincerely,

Hagop T. Bedoyan

HTB:tb

cc: Jeffrey S. Shinbrot, Esq.
    Brandon N. Krueger, Esq.
    Lara Callas, Esq.

EXHIBIT I

EXHIBIT "J"

## RESUME OF ROBERT L. KEHR

ROBERT L. KEHR - Cornell University (B.A., 1966); Columbia University (J.D., 1969); Member: California State Bar Commission for the Revision of the Rules of Professional Conduct (2005-2017); California State Bar Standing Committee on Professional Responsibility and Conduct (Member: 1996-2001, Chair, 1999-2000 and Special Advisor: 2000-01); Professional Responsibility and Ethics Committee of the Los Angeles County Bar Association (Member: 1981-Present and Chair: 1986-87); Evaluation of Professional Standards Committee of the Los Angeles County Bar Association (Member: 1988 - merged into PREC); Member: American Law Institute; Member: Association of Professional Responsibility Lawyers; Adjunct Professor - Loyola Law School; Author: "The Lawyer as Director" to be published in the April 2018 Los Angeles County Bar Updates; "The Lawyer as Escrow Holder" published in the March 2018 Los Angeles County Bar Updates; "Lawyer Ethics in Real Estate Transactions" - ABA Probate & Property, Vol. 26, No. 2 (Mar/Apr 2012) (with Prof. Roger Bernhardt); "The Lawyer as Scrivener" - Los Angeles Lawyer (2011), Vol. 34, No. 6, p. 20; "Midcourse Corrections: Being Professionally Responsible in Property Transactions" 34 CEB Real Property Law Reporter 123 (July 2011) (with Prof. Roger Bernhardt); "When a Lawyer-Mediator Prepares the Settlement Agreement" - ABA/BNA Lawyers' Manual on Professional Conduct (2011), Vol. 27, No. 12; "Principles or Rules: What is the Best Approach to Regulation?" Los Angeles Daily Journal, August 12 and August 13, 2010; "Lawyer Error: Malpractice, Fiduciary Breach, or Disciplinable Offense?" 29 W.St.U.L.Rev. 235 (2002); "Update on Conflicts of Interest" - Los Angeles Lawyer (2000), Vol. 23, No. 4 p. 33; "Ruling on the Rules" - Los Angeles Lawyer (1998), Vol. 21 No. 4 p. 37; Peck & Kehr, "Ruling on the Rules" - Vol. 21 No. 4, p. 37 Los Angeles Lawyer (1998); "The Changing Law of Lease Assignments" - Real Estate Review, Vol. 11 No. 2 p. 54, (1981); "Lease Assignments: The Landlord's Consent" - 55 California State Bar Journal 108 (1980); "The Application of Green v. Superior Court to Non-Residential Realty" - 1 Los Angeles Lawyer 30 (1979). Arbitrator: Los Angeles County Bar Attorneys Fee Arbitration Committee, (1980-Present).

Currently practice limited to transactional matters and consultation and expert testimony concerning legal ethics and standard of care issues. Frequent lecturer on lawyer responsibilities.

Robert L. Kehr was a speaker or one of the panelists at the following programs:

1.     "Disclosure Pitfalls for Lawyers: Partners, Brokers, and Other Fiduciaries in Real Estate Transactions." This program was given under the auspices of the Real Estate Committee of the Los Angeles County Bar Association on May 18, 1995.

2.     "Breaking Up is Hard to Do: Ethical Issues in Lateral Transfers and Law Firm Dissolutions." This program was given under the auspices of the Los Angeles County Bar Association Committee on Professional Responsibility and Ethics on June 22, 1995.

3.      "Engagement, Disengagement, and Non-Engagement Letters."  This program was given under the auspices of the Business Law Section of the State Bar of California as part of the annual spring program on June 23, 1995.

4.      "Managing Civil Conflicts of Interest In and Out of Court."  This program was given under the auspices of the Los Angeles County Bar Association on October 21, 1995.

5.      "Conflicts of Interest."  This program was sponsored by the California Continuing Education for the Bar on January 23, 1997.

6.      "The Application of Advertising & Solicitation Rules to the Internet".  This program was sponsored by the Law Firm of Jackson & Lewis on March 18, 1997.

7.      "Recognizing and Avoiding Conflicts of Interest."  This program was presented to the Los Angeles Consumer Lawyers Association on July 10, 1997.

8.      "Recent Developments in Legal Ethics."  This program was presented to the California State Bar at its September 13, 1997 annual meeting.

9.      "Ethics Issues in Buying and Selling Businesses."  This program was presented by CLE International as part of a 2-day program on December 4, 1997.

10.      "Conflicts:  Traps and Consequences for Lawyer and Insurers."  This program was presented by the Assoc. of So. Cal. Defense Counsel on February 5, 1998

11.      "Legal Ethics in Land Use Matters".  This program was presented by CLE International on April 30, 1998.

12.      "Recent Developments in Professional Responsibility."  This program was presented to the California State Bar at its October 1-4, 1998 annual meeting.

13.      "What Every Lawyer Needs to Know About Conflicts of Interest."  This program was presented to the California State Bar at its October 1-4, 1998 annual meeting.

14.      "Ethics Issues in Buying and Selling Businesses."  This program was presented by CLE International as part of a 2-day program on February 26, 1999.

15.      "Methods for Identifying and Avoiding Conflicts."  This program was presented to the California State Bar at its October 2, 1999 annual meeting.

16.      "Conflicts of Interest."  This program was presented to the Sonoma County Bar Association on November 30, 1999.

17.      "Ethics Issues in Cutting Edge Fee Arrangements."  This program was presented at the Beverly Hills Bar Association on April 29, 2000.

18. "The Ethics of Taking Stock for Services." This program was presented at the Annual Statewide Ethics Symposium on June 17, 2000, at Western States University School of Law.

19. "Methods for Identifying and Avoiding Conflicts." This program was presented to the California State Bar at its September 2000 annual meeting.

20. "Conflicts of Interest: An In-Depth Analysis for Corporate and Private Counsel." This program was presented by PLI on December 14, 2000 (Los Angeles) and January 12, 2001 (San Francisco).

21. "Navigating the Ethical Maze of Elder Law, Estate Planning and Fiduciary Conflicts: Practical Strategies both to Serve our Clients and Avoid Malpractice" which was presented to the Beverly Hills Bar Association on May 30, 2001.

22. "Non-Consensual Ethics Screening for Private Lawyers" which was presented at the Annual Statewide Ethics Symposium on June 16, 2001, at Western States University School of Law.

23. "A Review of Fees, Fee Agreements, Fee Collections, Unconscionability, and Non-Standard Fee Arrangements" which was presented to the State Bar of California at its September 8, 2001 annual meeting.

24. "The Going Rate: Entertainment Economics by the Numbers" [legal ethics aspects] which was presented at the USC/Beverly Hills Bar Association 47th Annual Entertainment Law Institute on September 15, 2001.

25. "Recognizing and Avoiding Conflicts of Interest" which was presented by CEB on November 7 (San Diego), November 17 (Costa Mesa), and December 8, 2001 (Los Angeles).

26. "Conflicts of Interest: An In-Depth Analysis for Corporate and Private Counsel" which was presented by PLI on December 14, 2001 (San Francisco) and January 11, 2002 (Los Angeles).

27. "Legal Ethics 2002-2003 - Current Developments" which was presented by PLI (Los Angeles) on January 10, 2003.

28. "The Role and Responsibility of Lawyers" which was presented at Pepperdine Law School, MDR program on January 21, 2003.

29. "Ethics" which was presented at the 15th Annual Educational Conference of the California Alliance of Paralegal Association program on June 21, 2003.

30. "Advanced Problems in Conflicts of Interest" which was presented at the Annual Statewide Ethics Symposium on June 28, 2003, at Whittier Law School, Costa Mesa.

31.     "Buying & Selling a Business" which was presented by Sterling Education Services on November 14, 2003 in Pasadena.

32.     "Legal Ethics - Current Developments" which was presented by PLI on January 9, 2004, in Los Angeles.

33.     "The Essentials of Legal Ethics:  The Lawyers' Responsibilities and Conflicts of Interest" which was presented by CLE International in Los Angeles on January 23, 2004.

34.     "The Role and Responsibility of Lawyers" which was presented at Pepperdine Law School, MDR program on February 2, 2004.

35.     "An Attorney's Duties to the Court and Opposing Counsel" which was presented by Consumer Attorneys of Los Angeles Annual Las Vegas Convention on August 29, 2004.

36.     "Legal Ethics - Current Developments" which was  presented by PLI on January 14, 2005, in Los Angeles.

37.     "The Ethics of Referral Fees" which was presented by the Southern California Council of Elder Law Attorneys on February 9, 2005.

38.     "The Role and Responsibility of Lawyers" which was presented at Pepperdine Law School, MDR program on March 2, 2005.

39.     "Relationship Agreements" which was presented by The Seminar Group on March 4, 2005, in Los Angeles.

40.     "Ethics and Conflict of Interest" which was presented at The Family Law Study Group on May 10, 2005, in Los Angeles.

41.     "Legal Ethics for Real Estate Attorneys" which was presented by the Los Angeles County Bar Association and the American Bar Association on December 7, 2005, in Los Angeles.

42.     "The Work of the Commission for the Revision of the Rules of Professional Conduct" which was presented at the Annual Statewide Ethics Symposium on May 6, 2006, at Santa Clara Law School.

43.     "Legal Ethics in ADR" which was presented at the ADR conference at Pepperdine Law School on May 20, 2006.

44.     "Legal Ethics Issues of the California Environmental Quality Act" which was presented by CLE International on August 14, 2006, in Los Angeles.

45.     "Legal Ethics" which was presented by CEB on November 18, 2006, in Anaheim and December 9, 2006, in Los Angeles.

46.     "Ethical Issues for Business Lawyers" which was presented by the California Bankers Association's Bank Counsel Seminar on March 30, 2007, in Dana Point, California.

47.     "Ethics Update: The Latest Recent Developments and Proposed New Rules from the California Rules Revision Commission" which was presented by CEB on November 16 and December 8, 2007 in Anaheim and Los Angeles.

48.     "Potpourri of Ethics: Conflicts and Updates on Important Developments" which was presented by the Beverly Hills Bar on November 30, 2007, in Beverly Hills.

49.     "Residential Landlord-Tenant Law" (legal ethics aspects) which was presented by Sterling Education Services on March 27, 2008, in Santa Monica.

50.     "Nuts and Bolts of Ethics" which was presented by The California Political Attorneys Association on September 6, 2008, in Universal City.

51.     "What Every Lawyer Needs to Know About the Upcoming Changes to the Rules of Professional Conduct" which was jointly sponsored by the Rules Revision Commission and the Inns of Court and was presented at the State Bar Convention on September 25, 2008, in Monterey, California.

52.     "Ethics Update: The Latest Recent Developments and Proposed New Rules from the California Rules Revision Commission" which was presented by CEB on December 5, 2008, in Los Angeles.

53.     "Re-Forming the California Rules of Professional Conduct" which was presented at the State Bar 13th Annual Ethics Symposium on May 2, 2009, in San Diego.

54.     "Ethics Update 2010:  Recent Developments and Proposed New Rules from the California Rules Revision Commission" which was presented by CEB on January 15, 2010 in Orange County and on January 29, 2010, in Los Angeles.

55.     "Criminal Defense and the New Rules of Professional Conduct" which was presented by the Los Angeles County Bar Association on January 16, 2010, in Los Angeles.

56.     "The ABCs of Conflicts of Interest" which was presented in Temecula, California on January 30, 2010.

57.     "Landlord-Tenant Law Update" which was presented by Sterling Education Services in Pasadena on June 17, 2010.

58.     "Attorney Fee Agreements & Fee Disputes:  Basics and Recent Developments" which was presented by CEB in Los Angeles on August 20, 2010.

59.     "The Proposed New California Rules of Professional Conduct" which was presented by BNA on November 11, 2010 as a webinar.

60.     "Ethics Update 2011:  Recent Developments and Proposed New Rules from the California Rules Revision Commission" which was presented by CEB on January 21, 2011 in Orange County and on January 28, 2011, in Los Angeles.

61.     "Foreshadowing:  California's New Proposed Rules of Professional Conduct" which was presented by California Society for Healthcare Attorneys on April 10, 1011 in Los Angeles.

62.     "The Proposed New California Rules of Professional Conduct" which was presented by BNA on October 19, 2011 as a webinar.

63.     "A Selected Introduction to Contingency Fees, Non-Refundable Fees, and Lawyer-Client Business Transactions" which was presented on November 30, 2011 as an in-house seminar at King, Holmes, Paterno & Berliner, LLP in Los Angeles.

64.     "Advance Consents to Conflicts of Interest" which was presented on December 3, 2011 by the Los Angeles County Bar Association in Los Angeles.

65.     "Ethics Update 2012:  Recent Developments and Proposed New Rules from the California Rules Revision Commission" which was presented by CEB on January 20, 2012 in Orange County and on January 27, 2012, in Los Angeles.

66.     "Transactional Conflicts of Interest" which was presented to USC Law School LLM students on February 6, 2012.

67.     "Navigating Common Ethical Dilemmas," which was presented on May 17, 2012 by the Los Angeles Paralegal Association at Abraham Lincoln University School of Law in Los Angeles.

68.     "The No-Contact Rule:  Up Close and Personal," which was presented on May 19, 2012 at the State Bar's Statewide Ethics Symposium to be held at Hastings School of Law.

69.     "Attorney-Client Privilege" which was presented on June 13, 2012 by the Kern County Bar Association at the Petroleum Club in Bakersfield, California.

70.     "Ethics for Criminal Defense Lawyers" which was presented on August 30, 2012 as a firmwide teleconference for the Kavinoky Law Firm.

71.     "Ethics Update 2013: Recent Developments and Proposed New Rules from the California Rules Revision Commission" which was presented by CEB on January 18, 2013 in Los Angeles and on January 25, 2013 in Orange County.

72.     "Ethical Rules for Healthcare Lawyers: What You Don't Know Can Harm You (And Your Clients)" which was presented by the California Society of Health Attorneys on April 13, 2013 in Newport Beach, California.

73.     "Legal Ethics, Recent Developments & Emerging Rules" which was presented by the Association of Business Trial Lawyers on May 7, 2013 in Los Angeles.

74.     "Avoiding Conflicts in Representing a Closely-Held Business" which was presented by CEB as a webinar on September 24, 2013.

75.     "Selected Issues in Attorneys Fees" which was presented on December 7, 2013 by the Los Angeles County Bar Association in Los Angeles.

76.     "OCBA Ethics Update 2013" which was presented by the Orange County Bar Association on December 14, 2013 in Newport Beach.

77.     "Legal Ethics in Probate and Trust Matters" which was presented on May 14, 2014 by the Kern County Bar Association in Bakersfield, California.

78.     "An Introduction to Conflicts of Interest" which was videotaped on June 19, 2014 for AttorneyCredits.com.

79.     "Legal Fees, Fee Agreements, and Fee Collectibility" which was presented by Concord Law School on June 21, 2014 in Pasadena.

80.     "Recent Developments in California Legal Ethics" which was videotaped for CEB on July 19, 2014.

81.     "Ethical Issues in Law Office Marketing" which was presented by the Beverly Hills Bar Association on November 5, 2014.

82.     "Conflicts of Interest" which was presented by the Los Angeles County Bar Assoc. Prof. Responsibility and Ethics Comm. on December 6, 2014 in Los Angeles.

83.     "OCBA Ethics Update 2014" which was presented by the Orange County Bar Association on December10, 2014 in Irvine.

84.     "Conflicts of Interest and Disqualification Arising from Prior Client Representations: What Are the Rules?" which was presented by COPLI as a webinar on January 13, 2015.

85. "Selected Issues in Legal Ethics for Health Lawyer" which was presented by the Los Angeles County Bar Section on Health Law on January 15, 2015.

86. "Probate Symposium" which was presented by the San Bernardino County Bar Association on May 27, 2015.

87. "Selected Issues in Legal Ethics" which was presented by the California Association of Realtors on August 6, 2015.

88. "The Past Year in Review: Recent Developments in the Law of Lawyering" which was presented by the State Bar's Committee on Professional Liability Insurance at the State Bar Annual Meeting in Anaheim on October 10, 2015.

89. "Recent Developments in California Legal Ethics" which was videotaped for CEB on December 1, 2015.

90. "OCBA Ethics Update 2015" which was presented to the Orange County Bar Association on December 5, 2015.

91. "Ethical Keys: Client Identity, Conflicts, and More", which was presented to the Group Legal Services meeting of the California Teachers' Association in Costa Mesa on February 6, 2016.

92. "Doing Business with Your Client: The Problems, Pitfalls and Issues in Lawyer-Client Transactions", which was presented to the Southern California Business Litigation Inn of Court on March 3, 2016.

93. "Common Mistakes Made in Drafting Contingency Fee Agreements and How to Avoid Them", presented by COPLI as a webinar on April 19, 2016.

94. "The Formation, Scope, and Termination of a Lawyer-Client Relationship", presented by COPLI on September 29, 2016 at the State Bar annual meeting.

95. "OCBA Ethics Update 2016" presented to the Orange County Bar Association on December 3, 2016.

96. "What you don't know, but should, about the New California Rules of Professional Conduct" presented at the Annual Statewide Ethics Symposium on April 21, 2017 at Loyola Law School, Los Angeles.

97. "OCBA Ethics Update 2017" presented to the Orange County Bar Association on September 28, 2017.

98. "Conflicts Analysis in the Representation of Governmental Entities and Agencies", presented in-house to Meyers Nave on May 22, 2018.

99.     "Brave New World:  What Business Lawyers Need to Know about the Sea Change to new Rules of Professional Conduct", presented to the Beverly Hills Bar Association on July 12, 2018.

100.     "The New Rules of Professional Conduct", presented to the Los Angeles County Bar Association on August 21, 2018.

101.     "California's New Rules of Professional Conduct: BE PREPARED!" to be presented to the Orange County Bar Association on October 17, 2018.

102.     "An Introduction to California's New Rules of Professional Conduct" to be presented in-house to Klein DeNatale Goldner on October 27, 2018 at Bakersfield.

EXHIBIT "K"

## LIST OF MATERIALS

1.      Baker Hostetler conflict letter dated January 2, 2016

2.      Baker Hostetler conflict letter dated July 19, 2017

3.      Declaration of Ashley M. McDow in Support of the Emergency Motion (1) for Authority to Immediately Terminate HCCA Management Agreement, etc. filed 10/17/17

4.      Management Services Agreement between HealthCare Conglomerate Associates, LLC and Southern Inyo Healthcare District dated January 2, 2016

5.      Baker Hostetler engagement letter to Southern Inyo Healthcare District dated January 2, 2016

6.      Reporter's transcript of October 17, 2017 hearing in this matter

7.      Draft of disqualification motion

8.      Draft of Declaration of Yorai Benzeevi, M.d. in Support of Motion to Disqualify Ashley M. McDow and Foley & Lardner as Attorneys for Debtor