1  Ashley M. McDow (245114)
   Michael T. Delaney (261714)
2  **BAKER & HOSTETLER LLP**
   11601 Wilshire Boulevard, Suite 1400
3  Los Angeles, CA  90025-0509
   Telephone:    310.820.8800
4  Facsimile:    310.820.8859
   Email:        amcdow@bakerlaw.com
5                mdelaney@bakerlaw.com

6  Attorneys for Debtor,
   SOUTHERN INYO HEALTHCARE DISTRICT

7

8                **UNITED STATES BANKRUPTCY COURT**

9                **EASTERN DISTRICT OF CALIFORNIA**

10                      **FRESNO DIVISION**

11

| In re | Case No.: 2016-10015 FEC |
|---|---|
| SOUTHERN INYO HEALTHCARE DISTRICT, | Chapter 9 |
| Debtor. | Doc. No. BH-20 |
| | **SECOND AMENDED DISCLOSURE STATEMENT WITH RESPECT TO THE PLAN FOR THE ADJUSTMENT OF DEBTS OF SOUTHERN INYO HEALTHCARE DISTRICT** |
| | Hearing:<br>Date:    February 28, 2018<br>Time:    1:30 p.m.<br>Place:   Dept A, Ctrm 11<br>         U.S. Bankruptcy Court<br>         2500 Tulare Street<br>         Fresno, CA 93721 |

**BAKER & HOSTETLER LLP**
ATTORNEYS AT LAW
LOS ANGELES

1    <u>**CAVEAT**</u>**: The Bankruptcy Court has not yet approved the within disclosure statement**

2    **pursuant to section 1125(b) of the Bankruptcy Code for use in the solicitation of vote with**

3    **respect to the plan of adjustment of debts for Southern Inyo Healthcare District described**

4    **herein. Accordingly, the filing and distribution of the within disclosure statement is not**

5    **intended and should not be construed as a solicitation of acceptance or rejection of the plan**

6    **of adjustment of debts described herein.**

7             [This caveat shall be removed prior to solicitation]

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT CC  310
611923772.1

SECOND AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS

# TABLE OF CONTENTS

**Page**

I.  SUMMARY .................................................................................... 1

II.  INTRODUCTION ........................................................................ 7

   A.  Purpose of the Disclosure Statement ........................................ 7

   B.  Summary of Entities Entitled to Vote to Accept or Reject the Plan and Certain Prerequisites to Confirming the Plan ........................................ 8

   C.  Summary of Voting Procedures, Balloting Deadline, Confirmation Hearing, and Other Dates, Deadlines, and Procedures ........................ 9

      1.  Voting Procedures and Deadlines ........................................ 9

      2.  Date of Confirmation Hearing and Deadline for Objecting to Confirmation of the Plan ........................................ 9

   D.  General Notices and Disclaimers ........................................ 10

   E.  Additional Information ........................................ 11

III.  BACKGROUND INFORMATION ........................................ 11

   A.  The District ........................................ 11

   B.  Events Precipitating Bankruptcy ........................................ 12

      1.  Historical Financial Issues ........................................ 12

      2.  Breakdown of Operations Due to Cash Shortage ........................................ 13

      3.  Appointment and Actions of New Board of Directors ........................................ 14

IV.  COMMENCEMENT AND ADMINISTRATION OF CHAPTER 9 CASE ........................................ 16

   A.  Commencement of the Chapter 9 Case ........................................ 16

   B.  Immediate Actions to Stabilize Operations and Revenue Deficits ........................................ 16

   C.  Eligibility Litigation ........................................ 17

   D.  Appointment of Patient Care Ombudsman ........................................ 17

   E.  Disputes Pertaining to Claims Against the District ........................................ 18

   F.  Pending Litigation ........................................ 19

   G.  Post-Petition Financing ........................................ 20

V.  THE DISTRICT'S LIABILITIES AND ASSETS ........................................ 21

   A.  Liabilities ........................................ 21

      1.  Summary of Scheduled Claims ........................................ 21

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

- i -

**TABLE OF CONTENTS CONTINUED**

|  |  |  | | Page |
|---|---|---|---|---|
| | 2. | Proofs of Claim | | 21 |
| | 3. | Alterations to Liability under the Plan | | 22 |
| | | a. | Alteration of Claims | 22 |
| | | b. | Disputed Claims | 23 |
| | 4. | Summary of Current Liabilities | | 26 |
| | 5. | Statement Regarding Liabilities | | 26 |
| B. | Assets | | | 27 |
| | 1. | Additional Medical Services and Treatment | | 27 |
| | 2. | Parcel Tax Increase | | 28 |
| | 3. | Transient Occupancy Tax | | 29 |
| | 4. | Claims and Causes of Action Against Third Parties | | 29 |
| | | a. | Potential Claims and Causes of Action | 30 |
| VI. | SUMMARY OF THE PLAN OF ADJUSTMENT | | | 31 |
| A. | Classification and Treatment of Claims | | | 32 |
| | 1. | Unclassified Claims | | 32 |
| | | a. | Administrative Expense Claims | 32 |
| | | b. | Professional Claims | 32 |
| | | c. | Deadline for the Filing and Assertion of Postpetition Claims, Administrative Claims, and Professional Claims | 33 |
| | 2. | Class 1 – Secured Claims | | 34 |
| | | a. | Class 1A – Action Capital Corporation | 34 |
| | | b. | Class 1B – Bank of the West/Thermo Fisher Financial Services, Inc. | 34 |
| | | c. | Class 1C – Canon Financial Services, Inc. | 35 |
| | | d. | Class 1D – Cardinal Health 110, LLC | 35 |
| | | e. | Class 1E – Healthcare Resource Group | 36 |
| | | f. | Class 1F – Optum Bank, Inc. | 37 |
| | | g. | Class 1G – Vi Healthcare Finance, Inc. | 38 |
| | 3. | Class 2 – Post-Petition Claims | | 38 |

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

- ii -

EXHIBIT CC  312
611923772.1

SECOND AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS

|  |  | a. | Impairment and Voting | 38 |
|  |  | b. | Treatment | 39 |
|  | 4. | Class 3 – General Unsecured Claims | | 39 |
|  |  | a. | Impairment and Voting | 39 |
|  |  | b. | Treatment | 39 |
|  |  | c. | Class 4 Election | 39 |
|  | 5. | Class 4 – Convenience Claims | | 40 |
|  |  | a. | Impairment and Voting | 40 |
|  |  | b. | Treatment | 40 |
| B. | Treatment of Executory Contracts and Unexpired Leases | | | 40 |
|  | 1. | Generally | | 40 |
|  | 2. | Assumption of Executory Contracts and Unexpired Leases | | 40 |
|  |  | a. | Cure Payments | 41 |
|  |  | b. | Adequate Assurance of Prompt Cure and Future Performance | 41 |
|  | 3. | Rejection of Executory Contracts and Unexpired Leases | | 42 |
|  |  | a. | Claims Arising from Rejection | 43 |
| C. | Means for Execution and Implementation of Plan | | | 44 |
| D. | Distributions | | | 45 |
|  | 1. | Disbursing Agent | | 45 |
|  | 2. | Delivery of Distributions | | 45 |
|  | 3. | Undeliverable Distributions | | 46 |
|  | 4. | Distribution of Cash | | 46 |
|  | 5. | Timeliness of Payments | | 46 |
|  | 6. | Default and Cure | | 46 |
|  | 7. | Compliance with Tax Requirements | | 47 |
|  | 8. | Time Bar to Cash Payments | | 47 |
|  | 9. | No De Minimis Distributions | | 48 |
|  | 10. | No Distributions on Account of Disputed Claims | | 48 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

- iii -

**Page**

| | | | |
|---|---|---|---|
| | | 11. | No Post-Petition Date Accrual ................................................ 48 |
| | E. | | Disputed Claims; Objections to Claims; Prosecution of Objections to Disputed Claims ................................................................................................ 49 |
| | | 1. | Claim Objection Deadline; Prosecution of Objections ............................ 49 |
| | | 2. | Reserves, Payments, and Distributions with Respect to Disputed Claims ................................................................................................ 49 |
| | F. | | Continuing Jurisdiction of the Bankruptcy Court ................................................. 49 |
| VII. | | | CONFIRMATION AND EFFECTIVE DATE OF THE PLAN ....................................... 49 |
| | A. | | Voting and Right to be Heard at Confirmation ...................................................... 50 |
| | | 1. | Who May Support or Object to Confirmation of the Plan? ..................... 50 |
| | | 2. | Who May Vote to Accept or Reject the Plan? ......................................... 50 |
| | | 3. | Votes Required to Confirm Plan ............................................................. 51 |
| | B. | | The "Best Interests" Test ..................................................................................... 51 |
| | C. | | Feasibility ............................................................................................................. 52 |
| | D. | | "Cramdown" ........................................................................................................ 53 |
| | E. | | Conditions Precedent ............................................................................................ 53 |
| | | 1. | Condition Precedent to Confirmation ...................................................... 53 |
| | | 2. | Conditions Precedent to Effective Date .................................................. 53 |
| | | 3. | Non-Occurrence of Effective Date .......................................................... 54 |
| | | 4. | Waiver of Conditions Precedent to Effective Date .................................. 54 |
| | F. | | Effect of Confirmation .......................................................................................... 54 |
| | | 1. | Dissolution of the Committee .................................................................. 54 |
| | | 2. | Discharge of the District ......................................................................... 55 |
| | | 3. | Injunction ................................................................................................. 55 |
| | | 4. | Term of Existing Injunctions and Stays .................................................. 55 |
| | | 5. | Exculpation .............................................................................................. 56 |
| | | 6. | Good Faith Compromise .......................................................................... 56 |
| VIII. | | | RESERVATION OF RIGHTS OF ACTION ............................................................. 57 |
| IX. | | | RISK FACTORS ................................................................................................... 57 |

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

- iv -

# TABLE OF CONTENTS CONTINUED

|  |  | **Page** |
|---|---|---|
| X. | FEDERAL INCOME TAX CONSEQUENCES ............................................................. | 59 |
| XI. | RECOMMENDATION AND CONCLUSION .............................................................. | 60 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

EXHIBIT CC  315
611923772.1

# I.      SUMMARY

The following section summarizes certain important aspects of the Second Amended Plan for the Adjustment of Debts for Southern Inyo Healthcare District (the "Plan").  These matters are discussed further elsewhere in the within Second Amended Disclosure Statement with Respect to the Plan for the Adjustment of Debts for Southern Inyo Healthcare District (the "Disclosure Statement").  Capitalized terms are defined in the text of this Disclosure Statement as well as the Plan, and any capitalized term used but not defined in the Disclosure Statement shall have the meaning ascribed to such term in the Plan.  Unless otherwise noted, all references to "section _____ " refer to the specified section of the Bankruptcy Code.

Please be aware that the Disclosure Statement contains information that may be important to certain creditors or classes of creditors that is not set forth in this Summary and that such information may influence your decision regarding whether to accept or reject the Plan.  Accordingly, please review the Disclosure Statement and Plan as well as the supporting documents in their entirety.

\* \* \* \*

The Southern Inyo Healthcare District is a California Healthcare District.  The District operates a hospital, skilled nursing facility, and medical clinic in Inyo County, California.  The District filed a petition for relief under chapter 9 of the Bankruptcy Code on January 4, 2016, which was designated Case Number 2016-10015.  The United States Bankruptcy Court for the Eastern District of California, Fresno Division, the Honorable Fredrick E. Clement presiding, entered an order for relief in the Chapter 9 Case on July 12, 2016, as docket entry 195.  The Chapter 9 Case currently is pending before the Bankruptcy Court.

The *Second Amended Plan for the Adjustment of Debts for Southern Inyo Healthcare District* proposed by the District involves the adjustment of the District's operations and the repayment of its obligations under the Plan with operational revenues as well as additional revenues derived from expanded operations, potential litigation recoveries, and increases to parcel

Baker & Hostetler llp
Attorneys at Law
Los Angeles

EXHIBIT CC  316
611923772.1

and transient occupancy taxes.  With the additional funds and revenues, the District will be able to maintain operations and repay its obligations pursuant to the Plan by December 2025.  While approval of the tax measure is required, and the District has yet to obtain such approval, the District has commenced the process for obtaining the necessary approvals and believes these measures will be approved prior to the Effective Date.  The District anticipates that measures will be voted upon in April 2018, which will result in an Effective Date for the Plan in or about January 2019.

In the event the District is unable to adjust its debts pursuant to the Plan, or any amended or revised version thereof, the District will likely be unable to maintain operations and, as a result, will be forced to close the hospital, medical clinic, and skilled nursing facility, which would not only render the District unable to pay its obligations, it would leave the community without necessary medical services.

The following chart summarizes key information, including the proposed treatment of the various classes of claims:

| | |
|---|---|
| **Debtor** | Southern Inyo Healthcare District, a California Local Health Care District |
| **Bankruptcy Court** | United States Bankruptcy Court for the Eastern District of California, Fresno Division |
| | The Honorable Fredrick E. Clement presiding |
| **Plan** | Second Amended Plan for the Adjustment of Debts of Southern Inyo Healthcare District |
| **Purpose of Disclosure Statement** | To provide information of a kind, and in sufficient detail, that would enable a typical holder of Claims in a class Impaired under the Plan to make an informed judgment with respect to voting on the Plan. |
| **Balloting Information** | Ballots have been provided with this Disclosure Statement to creditors known to have Claims that are Impaired under the Plan.  *See* Exhibit 1.[1] |
| | Ballots must be <u>received by</u> the Ballot Tabulator no later than ____ a.m./p.m., Pacific Time, on _____ , |

---

[1] All exhibits referenced herein are attached to the contemporaneously-filed Exhibits to Second Amended Plan for the Adjustment of Debts of Southern Inyo Healthcare District, Disclosure Statement Relating Thereto, and the Declaration of Brian Weiss in Support Thereof (the "**Plan Exhibits**").  Unless otherwise stated, "Exhibit __ " refers to the specified exhibit appended to the Plan Exhibits.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

EXHIBIT CC  317
611923772.1

SECOND AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS

2018.[2]

| | |
|---|---|
| **Ballot Tabulator** | Karla Hernandez, Baker & Hostetler LLP, 11601 Wilshire Blvd., Ste. 1400, Los Angeles, California 90025 (facsimile 310.820.8859; email khernandez@bakerlaw.com) |
| **Confirmation Hearing** | The Court shall hold a hearing regarding the confirmation of the Plan on _____ , 2018, commencing at _____ a.m./p.m. Pacific Time. |
| **Confirmation Objections** | Any objections to confirmation of the Plan must be set forth in writing and filed and served no later than _____ , 2018. |
| **Treatment of Claims** | If the Court confirms the Plan and the Plan becomes effective, Claims will be treated as follows: |
| Administrative Claims | Administrative Claims shall receive Cash on the Effective Date, or as soon thereafter as practicable, in an amount equal to their approved Administrative Claim. |
| Professional Claims | Holders of Professional Claims shall be treated as follows: (i) Baker & Hostetler LLP shall receive payment on account of the portion of its Allowed Professional Claim relating to attorneys' fees in monthly installments over a term of 36 months commencing on the Effective Date; and (ii) Nave Cortell LLP and Province as well as the portion of the Allowed Professional Claim of Baker & Hostetler LLP relating to costs incurred in the course of the Chapter 9 Case shall receive Cash on the Effective Date, or as soon thereafter as practicable, in an amount equal to their respective Allowed Professional Claims. |
| | Payment of Professional Claims is subject to a finding of the Bankruptcy Court that the amounts of the Professional Claims are reasonable. |
| Class 1 Secured Claims | Claims in Class 1 are separated in to subclasses, which, in each instance, are treated as separate classes under the Plan. |
| Class 1A Action Capital Corporation | **Impaired.** Action Capital Corporation shall receive an allowed General Unsecured Claim in the amount of $185,600.35. |
| Class 1B Bank of the West/Thermo Fisher Financial Services, Inc. | **Impaired.** The District shall surrender to Bank of the West or Thermo Fisher Financial Services, Inc. the collateral for the underlying agreement. |

_____

[2] The District shall fill-in all missing information and incorporate all bracketed language contained herein prior to circulation of the final disclosure statement for solicitation.

- 3 -

EXHIBIT CC 318
611923772.1
SECOND AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

| | | |
|---|---|---|
| **Class 1C**<br>Canon Financial Services, Inc. | **Impaired.** The District shall surrender to Canon Financial Services, Inc. the collateral for the underlying agreement. |
| **Class 1D**<br>Cardinal Health 110, LLC | **Unimpaired.** Cardinal Health 110, LLC shall be entitled to retain the funds presently in its possession, which total $838.28. The remainder of this Claim shall be allowed as a General Unsecured Claim. |
| **Class 1E**<br>Healthcare Resource Group | **Impaired.** Class 1E is comprised of the Disputed Claim of HRG. Class 1E shall not receive any distributions under the Plan unless and until a court of competent jurisdiction enters a Final Order allowing the HRG Claim or HRG returns any and all avoidable transfers. If the HRG Claim is adjudged valid, enforceable and secured in whole or in part and/or HRG returns any and all avoidable transfers, the District shall make periodic payments to HRG until the Class 1E Claim is paid in full with interest. Under the Plan, the payments on account of the Class 1E Claim shall begin in the first full month following the allowance of the HRG Claim and/or the return of any and all avoidable transfers. If deemed an Allowed Claim, HRG shall receive monthly payments in the approximate amount of $2,020.00 per month over the life of the Plan, which equates to the full amount of the Claim plus interest at a rate of 3.25% *per annum*. |
| **Class 1F**<br>Optum Bank, Inc. | **Impaired.** Class 1F is comprised of the Disputed Claim of Optum. Class 1F shall not receive any distributions under the Plan unless and until a court of competent jurisdiction enters a Final Order allowing the Optum Claim. If the Optum Claim is adjudged valid, enforceable and secured in whole or in part, the District shall pay Optum Cash in an amount equal to the portion of the Optum Claim allowed as a Secured Claim, which may include interest and costs and expenses incurred by Optum in association with the underlying loan, to the extent permitted under the Optum loan agreement and allowed by the Court, no later than one hundred and twenty (120) days following the entry of a Final Order allowing the Optum Claim. If the Optum Claim is adjudged valid and enforceable but not wholly secured, the portion of the Optum Claim adjudged to be a Secured Claim, which may include interest and costs and expenses incurred by Optum in association with the underlying loan, to the extent permitted under the Optum loan agreement and allowed by the Court, shall be treated pursuant to the preceding sentence and any order(s) entered in the Optum Adversary and the remaining Allowed Claim shall be treated as a General Unsecured Claim in Class 3. If the Optum Claim is adjudged invalid and unenforceable, Class 1F shall not receive any distributions under the Plan. |

BAKER & HOSTETLER LLP<br>ATTORNEYS AT LAW<br>LOS ANGELES

- 4 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

| | |
|---|---|
| Class 1G<br>Vi Healthcare Finance Inc. | **Impaired.** The treatment of Class 1G shall depend on the outcome of the ViHF Adversary. If the District succeeds in disallowing the ViHF Claim in its entirety, Class 1G shall not receive any distributions under the Plan. If the Bankruptcy Court allows the ViHF Claim as a subordinated claim and transfers any security interest(s) associated therewith to the District, the ViHF Claim shall be treated in a separate class of subordinated Claims—Class 5. Class 5 shall receive a distribution equal to three percent (3%) of the total claims in the Class, which shall be paid in a lump sum within one hundred and twenty (120) days after entry of an order subordinating the ViHF Claim. If the Bankruptcy Court allows the ViHF Claim as a Class 1G Claim, the District shall pay the Allowed Secured Claim of ViHF in full within one hundred and twenty (120) days after entry of an order allowing the Class 1G Claim |
| Class 2<br>Post-Petition Claims | **Impaired.** Holders of Class 2 Claims shall receive Cash on the Effective Date, or as soon thereafter as practicable, in an amount equal to the amount listed for each respective claimant in Exhibit 6. |
| Class 3<br>General Unsecured Claims | **Impaired.** Holders of Class 3 Claims shall receive a *pro rata* portion of $100,000.00, which shall be paid as follows: (a) $25,000.00 on December 31, 2019, or as soon thereafter as practicable; (b) $25,000.00 on April 30, 2020; (c) $25,000 on December 31, 2020, or as soon thereafter as practicable; and (d) $25,000 on April 30, 2021, or as soon thereafter as practicable. In addition to the foregoing distributions, holders of Class 3 Claims shall receive a *pro rata* portion of 25% of any recovery, net of fees, costs, and other administrative expenses associated therewith, from the proposed litigation against HCCA, which shall be paid no later than 120 calendar days following recovery thereof.<br><br>Holders of Class 3 Claims shall have the ability to waive their entitlement to Class 3 treatment and, instead, elect to have their Claims treated as Class 4 Claims. *See* Section VI.A.5.c. |
| Class 4<br>Convenience Class Claims | **Impaired.** Holders of Class 4 Claims shall receive Cash on the Effective Date, or as soon thereafter as practicable, in an amount equal to the lesser of (a) the amount of their Allowed Class 4 Claims or (b) $100.00. |
| **Background Information** | See pages 16 to 25 |
| **Questions** | Please contact the District's counsel, Ashley M. McDow, Baker & Hostetler LLP, 11601 Wilshire Blvd., Ste. 1400, Los Angeles, California 90025<br>(telephone 310.820.8800; facsimile 310.820.8859) |

- 5 -

**PLEASE NOTE**: To the extent there is any inconsistency between the Plan (including the Exhibits and any supplements to the Plan) and the description of the Plan in the Disclosure Statement, the terms of the Plan (including the Exhibits and any supplements to the Plan) will govern.

SECOND AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS

EXHIBIT CC  321
611923772.1

## II. INTRODUCTION

The District filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of California—thereby commencing the above-captioned bankruptcy case. On or about July 12, 2016, the Court entered an Order for Relief under chapter 9 of the Bankruptcy Code.

The District is the proponent of the Plan. During a hearing held on _____ , 2018, the Court found that the Disclosure Statement contains "adequate information" within the meaning of section 1125 of the Bankruptcy Code and authorized the District to transmit the Disclosure Statement and Plan to holders of Impaired claims in connection with the solicitation of votes on the Plan.

As discussed below, the District believes that adjusting its obligations pursuant to the Plan provides the best result for creditors and that any alternative would result in delay and/or reduced distributions to creditors, if any at all. Accordingly, the District encourages creditors to vote to accept the Plan.

### A. Purpose of the Disclosure Statement

The Bankruptcy Code generally requires that the proponent of a plan of adjustment prepare and file with the Bankruptcy Court a "disclosure statement" that provides information of a kind and in sufficient detail that would enable a typical holder of claims in a Class Impaired under the proposed plan to make an informed decision regarding whether to accept or reject the plan. In accordance with this requirement, the within Disclosure Statement provides information regarding the Plan and the treatment of Claims thereunder. ***Parties in interest should read the Plan and Disclosure Statement as well as all associated documents carefully and in their entirety in order to (a) determine how the Plan will affect their Claims against the District, (b) understand their rights (if any) as they pertain to voting on the Plan, (c) understand their rights (if any) as they pertain to objecting to confirmation of the Plan, and (d) determine how and when creditors may vote to accept or reject the Plan.***

The Disclosure Statement cannot and, therefore, does not provide creditors with advice or inform creditors regarding all aspects of their rights. Holders of any Claims against the District

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

are advised to consult with independent counsel and/or a financial advisor to obtain advice regarding how the Plan will affect them and their Claims against the District and the best course of action to take with respect to the Plan.

This Disclosure Statement has been prepared in good faith and in compliance with applicable provisions of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure. Based upon currently available information, the District believes that the information contained in this Disclosure Statement is true and correct as of the date of its filing. The Disclosure Statement cannot and does not reflect events that may occur after January 17, 2018.

**B.    Summary of Entities Entitled to Vote to Accept or Reject the Plan and Certain Prerequisites to Confirming the Plan**

Each holder of an Allowed Claim classified into Classes 1A, 1B, 1C, 1F, 2, 3, and 4 of the Plan (collectively, the "**Voting Classes**") shall be entitled to vote each such Claim to accept or reject the Plan.[3]

The Bankruptcy Court may only confirm the Plan if at least one Class of Impaired Claims has voted to accept the Plan (without counting the votes of any Insiders[4] whose Claims are classified within that Class) and if certain statutory requirements are met as to both non-consenting members within a consenting Class and as to any dissenting Classes. A Class of Claims shall be deemed to have accepted the Plan if at least one-half in number and at least two-thirds in amount of the Allowed Claims actually voting in that Class vote in favor of the Plan.

In the event of a rejection of the Plan by any of the Voting Classes, the District will request that the Bankruptcy Court confirm the Plan in accordance with those portions of section 1129(b) applicable to cases filed under chapter 9 of the Bankruptcy Code, which provisions permit confirmation of the Plan notwithstanding the rejection thereof by an Impaired Class through a process commonly known as "cramdown". In order to confirm the Plan through

---

[3] While Class 1F is comprised of the Disputed Optum Claim and, as such, Class 1F would not be entitled to vote on the Plan ordinarily, the District and Optum entered into a stipulation to permit Optum to vote its Class 1F Claim notwithstanding the pending dispute and without affecting the parties' respective rights. *See* D.E. 316.

[4] As used in this Disclosure Statement, "**Insider**" shall have the meaning ascribed to such term in section 101(31)(D), as applicable to municipalities.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

"cramdown", the Court must find, among other things, that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each rejecting Class.

### C. Summary of Voting Procedures, Balloting Deadline, Confirmation Hearing, and Other Dates, Deadlines, and Procedures

#### 1. Voting Procedures and Deadlines

The District has provided copies of this Disclosure Statement, the Plan, and the Ballot to all known holders of Impaired Claims in the Voting Classes.  Holders of an Allowed Claim in one or more of the Voting Classes may vote to accept or reject the Plan by completing, executing, and returning the Ballot by the Balloting Deadline (defined below) to the Ballot Tabulator—Karla Hernandez, Baker & Hostetler LLP, 11601 Wilshire Blvd., Ste. 1400, Los Angeles, California 90025 (facsimile 310.820.8859; email sgaeta@bakerlaw.com).

*All Ballots, including Ballots transmitted by facsimile or email, must be completed, signed, returned to, and **actually received** by the Ballot Tabulator by not later than _____ , ____, at 4:00 p.m. Pacific Time (the "**Balloting Deadline**").  Unless expressly waived by the District in its sole and absolute discretion, Ballots received after the Balloting Deadline, Ballots submitted directly to the Bankruptcy Court, and incomplete or illegible Ballots shall not be counted in connection with the confirmation of the Plan.*

#### 2. Date of Confirmation Hearing and Deadline for Objecting to Confirmation of the Plan

The Bankruptcy Court shall hold a hearing to determine whether to confirm the Plan on _____ , ____, at __:__ a.m./p.m. Pacific Time, in Department A, Courtroom 11 of the United States Bankruptcy Court located at 2500 Tulare Street, Fresno, CA 93721, the Honorable Fredrick E. Clement presiding.  The Confirmation Hearing may be continued from time to time by pronouncement or order of the Bankruptcy Court with or without further notice.

Any objections to confirmation of the Plan along with copies of any and all supporting documents must be filed with the Bankruptcy Court and served on the following entities or their counsel of record no later than _____ , ____: (a) the Bankruptcy Court, 2500 Tulare Street, Suite 2501, Fresno, California 93721; (b) the Office of the United States Trustee, 2500

EXHIBIT CC 324
611923772.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

Tulare Street, Suite 1401, Fresno, California 93721; and (c) Baker & Hostetler LLP, 11601 Wilshire Boulevard, Suite 1400, Los Angeles, California 90025, Attention: Ashley M. McDow, Esq.  Please be aware that the Bankruptcy Court may not consider any objections that are not timely filed and served.

### D. General Notices and Disclaimers

The historical financial data relied upon in preparing the Plan and this Disclosure Statement is based upon the District's books and records.  Although certain professional advisors of the District assisted in the preparation of this Disclosure Statement and the documents filed in support thereof, in doing so such professionals relied upon factual information and assumptions regarding financial, business, and accounting data provided by the District and third parties, much of which has not been audited.  The District's most recent audited financial statements, which cover the fiscal years ending June 30, 2013, June 30, 2014, and June 30, 2015, are included in the Plan Exhibits as Exhibits 2, 3, and 4, respectively, and incorporated herein by reference.

*The District's professional advisors have not independently verified all financial information provided in this Disclosure Statement, and, accordingly, make no representations or warranties as to its accuracy.*  Moreover, although reasonable efforts have been made to provide accurate information, the District does not warrant or represent that the information in this Disclosure Statement, including any and all financial information and projections, is without inaccuracy or omissions, or that actual values or distributions will comport with the estimates and projections contained herein or submitted in support of the Plan and Disclosure Statement.

*No individual or entity may rely upon the Plan or Disclosure Statement or any of the supporting documentation for any purpose other than to determine whether to vote to accept or reject the Plan*.  Nothing contained in such documents constitutes an admission of any fact or liability by any party, nor shall such information or documentation be admissible in any proceeding involving the District or any other party, nor will this Disclosure Statement be deemed evidence of the tax or other legal effects of the Plan on holders of Claims in the Chapter 9 Case. This Disclosure Statement is not intended to be a disclosure communication to the public capital markets and should not be relied upon by investors.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

Certain information included in this Disclosure Statement and its exhibits contains forward-looking statements. The words "believe," "expect," "anticipate," and similar expressions identify such forward-looking statements. The forward-looking statements were based upon information and documentation available when such statements were made and are subject to risks and uncertainties that could cause actual results to differ materially from those expressed in the statements. A number of those risks and uncertainties are described below. Therefore, readers are cautioned not to place undue reliance on the forward-looking statements in this Disclosure Statement. The District undertakes no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events, or otherwise.

No regulatory agency has approved or disapproved this Disclosure Statement, nor has any such agency determined whether this Disclosure Statement is accurate, truthful, or complete.

### E.    Additional Information

If you have any questions about the procedures for voting on the Plan, desire an additional copy of the Ballot, or seek further information about the dates and deadlines applicable to the confirmation of the Plan, please contact counsel for the District via email at the following addresses: Ashley M. McDow at amcdow@bakerlaw.com, Michael T. Delaney at mdelaney@bakerlaw.com, and Karla Hernandez at khernandez@bakerlaw.com. Any party represented by counsel is directed to submit any questions through counsel. Counsel for the District cannot and will not communicate directly with any individual or entity represented by counsel in relation to the Chapter 9 Case. Please note that counsel for the District cannot and will not provide creditors with any legal advice, including, without limitation, advice regarding how to vote on the Plan or the effect that confirmation of the Plan will have upon any Claims that may exist against the District.

### III.    BACKGROUND INFORMATION

### A.    The District

The District is a special district formed under the California Local Healthcare District Law, Cal. Health and Safety Code § 32000, *et seq*., located in Lone Pine, California. As of the commencement of the Chapter 9 Case, the District owned and operated three facilities—namely,

an emergency and acute care facility with four (4) beds (the "**Hospital**"), a skilled nursing facility with thirty-three (33) beds (the "**SNF**"), and an out-patient medical clinic (the "**Clinic**").

### B.    Events Precipitating Bankruptcy

#### 1.    Historical Financial Issues

As a rural healthcare district, the District has historically operated on a narrow margin; however, beginning in 2008, the District started experiencing substantial financial difficulties as patient demands and revenues declined while operational expenses remained high due to the cost of new hospital equipment and increasing salaries resulting from the limited availability of qualified doctors and medical personnel.  Indeed, between 2008 and 2015, the District only earned net revenues in two years—namely, 2013 and 2014.

In or about 2012, the financial condition of the District began to worsen.  The cause of the financial downturn is attributable to numerous sources, including a decrease in patient volume.  More precisely, in or about 2012, the patient services and hospital occupancy rates began to rapidly decline—falling from an occupancy rate of 87.08% in 2012 to 67.20% in 2015.  In addition to unforeseen decreases in patient volume, increases in the discounts applied by governmental healthcare programs, such as Medicare and Medi-Cal, and insurance providers further diminished revenues.  As a result of the increased discounts, the District received less in reimbursements from these providers—exacerbating the effects caused by the reduction in patient volume and patient revenues.

Unfortunately, the declining financial condition of the District was further exacerbated by the failure of its former management to respond to the reduction in patient demands with corresponding decreases in staffing and other related overhead expenses.  Indeed, between 2013 and 2015, full time equivalents ("**FTEs**")[5] for staff members increased from 85.48 in 2013 to 103.23 in 2015—an increase of more than 20% at a time when occupancy was sharply declining.

---

[5] A full time equivalent is a unit of measurement essentially equal to a single full time employee.  The use of FTEs ensures consistency in financial reporting by providing a basis for calculating working hours or labor expenses of a business regardless of the number of employees providing the services—such as in the case of a business that employs full time and part time employees.

EXHIBIT CC  327
611923772.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1   Essentially, the District was employing more staff to serve fewer patients.  As a result, operating

2   expenses increased from $8,376,655 in 2012 to $9,075,609 in 2015.

3        The District experienced its greatest financial decline during fiscal year 2015.  As with

4   2013 and 2014, occupancy rates in 2015 continued to decline to 67.20%, which was the lowest

5   point in the preceding decade.  As a result, operating income dropped to $6,105,816—a decrease

6   of approximately $1,800,000 from the 2014 fiscal year operating income.  Notwithstanding the

7   reduced demand for services, the District continued to increase staffing, which resulted in an

8   increase in total operating expenses.  As a result of the increased expenditures and decreased

9   revenues, the District experienced net losses in 2015 totaling $2,242,722.  The substantial losses

10  in 2015 also resulted in a year-end cash balance of negative $626,583.

### 2.      Breakdown of Operations Due to Cash Shortage

12       The District continued to experience losses during the 2016 fiscal year, which resulted in

13  an inability to pay ordinary operating expenses, including payroll and vendor obligations.  Indeed,

14  by October 2015, the District was unable to continue paying for employee health insurance—

15  ultimately resulting in the termination of this benefit—and, by November 2015, the District was

16  three to five weeks behind in its payroll obligations despite applying nearly all revenues to payroll

17  in an effort to keep the hospital running.  Due to the inability to consistently meet its payroll

18  obligations, employees started to resign, which further reduced services at the hospital.

19       In an effort to keep the hospital and its related facilities open, the District was forced to

20  turn to the community for donations and loans to pay for essential items, including insurance,

21  licensing fees and payroll.  While the District was able to obtain approximately $75,000 in

22  donations and an $80,000 loan from members of the community, the funds were quickly depleted

23  and, by the end of November 2015, the District lacked sufficient funds to pay payroll as well as

24  the amounts owing under the contracts with the emergency room doctors.  As a result, the board

25  was forced to decide between paying hospital staff and paying the doctors.  Ultimately, the board

26  voted to pay staff payroll—a decision that resulted in the District defaulting under the

27  employment agreements with the emergency room doctors and the loss of their services.

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

EXHIBIT CC  328
611923772.1

SECOND AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1    In addition to the inability to continue paying hospital staff, the severe economic

2    conditions prevented the District from paying obligations owing to its vendors.  As a result, the

3    District's accounts payable continued to grow—ultimately reaching a balance of approximately

4    $2,550,000 in December 2016.  Despite large arrears and the District's inability to pay, vendors

5    continued to work with the District in an effort to preserve the hospital for the community.

6    Regrettably, the concerted efforts of the community and the District ultimately proved too

7    little as the staggering budget deficit and inability to generate sufficient operational revenues to

8    meet its obligations stifled the District.  With the loss of the doctors, the District was forced to

9    begin winding down operations.  Accordingly, on or about November 30, 2015, the board voted

10   to issue 60- and 90-day notices that the District intended to terminate services at the Hospital and

11   SNF.  Thereafter, the District closed the Hospital and emergency room and began making

12   arrangements to transfer SNF patients to surrounding medical facilities.  Without patients, the

13   District was unable to generate new revenues and earnings completely stagnated.  Thereafter, on

14   or about December 14, 2015, Lee Barron, the former Chief Executive Officer and Chief Financial

15   Officer for the District, tendered her resignation.  Three days later, the former board members

16   resigned.  As a result, the District was left without any management or governing body, and, thus,

17   was unable to effectively operate or redress any of the financial issues facing the Hospital and its

18   associated operations.

19   ### 3.    Appointment and Actions of New Board of Directors

20   The community, however, took efforts to save the District and prevent the closure of its

21   facilities, which are vital to the remote area they serve.  More precisely, following the resignation

22   of the prior board of directors, on or about December 29, 2015, the Inyo County Board of

23   Supervisors appointed three new board members for the District.  Immediately following its

24   appointment, the new board of directors started making strides toward reopening the facility and

25   restructuring its obligations.

26   On or about December 30, 2015, the board held a meeting to evaluate the financial

27   condition of the District and other issues affecting operations.  The principal issue facing the

28   District was insufficient cash to continue to finance operations; indeed, by the end of December

- 14 -

2015, the District had virtually no cash on hand to fund operations. Additionally, the board learned that by the end of December 2015, the District's debt had grown to approximately $4,500,000, which was comprised in part of more than $2,550,000 in debt obligations to vendors and service providers previously utilized by the District in the course of its operations. The District, however, had few (if any) sources to generate new revenues due to the closure of the Hospital, the SNF, and the Clinic and only approximately $1,600,000 in accounts receivable, which included bad debt carried on the District's books. Furthermore, as the District lacked the ability to pay staff, the District was unable to effectively collect any accounts receivable presently owing.

Due to the dire financial condition of the District, the board immediately consulted with Healthcare Conglomerate Associates (HCCA), a restructuring and advisory firm focused on the reorganization and operation of medical practices and hospitals, and insolvency counsel to explore and evaluate potential reorganizational strategies to preserve District's operations, including bankruptcy and potential partnerships with nearby hospitals or hospital associations. After evaluating potential partnership options, the board concluded that the options were no longer viable as Northern Inyo Hospital and Ridgecrest Hospital withdrew from discussions after learning of the District's financial condition. The board also concluded that obtaining a loan as a means of consolidating and adjusting its current obligations was not a viable option as the District had insufficient funds to cover its existing obligations, let alone service new debt. As the District could not debt finance its operations or enter into a partnership to help defray operating expenses, the board determined that bankruptcy provided the best option for the District, its patients and creditors, and the community at large.

Following a December 30, 2015 meeting of the District's board, the board noticed a public meeting for January 2, 2016, to elicit comments on the financial state of the District and potential options for the readjustment of its obligations as well as the retention of HCCA as chief restructuring officer. Approximately 80 members of the community attended the meeting, including individuals that had donated and loaned money to the District in an effort to support the Hospital's operations in late 2015. During the meeting, the board discussed the proposed

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

- 15 -

employment of HCCA as chief restructuring officer and the commencement of a voluntary chapter 9 bankruptcy case as a means to restructure the operations and adjust the District's present obligations. The majority of the community members in attendance supported the employment of HCCA and the commencement of the bankruptcy case.

With the support of the community, the board voted to approve the employment of HCCA, to declare a fiscal emergency, and to authorize the commencement of the Chapter 9 Case. The board of directors declared a fiscal emergency for numerous reasons, including, primarily, the District's inability to operate due to the lack of sufficient funds, generate any revenues due to the closing of the Hospital and related facilities, and pay the obligations then due and owing. The board also found that the inability to operate the Hospital and, thereby, provide medical services to the community constituted a threat to the health and welfare of the residents of Southern Inyo County. On or about January 3, 2016, the board adopted Resolution No. 16-01, which effected the board's prior decision.

## IV. COMMENCEMENT AND ADMINISTRATION OF CHAPTER 9 CASE

### A. Commencement of the Chapter 9 Case

Due to the District's dire financial condition and the inability to remedy the same outside of bankruptcy, the District proceeded with filing a voluntary petition for relief under chapter 9 of the Bankruptcy Code on January 4, 2016.

### B. Immediate Actions to Stabilize Operations and Revenue Deficits

Following the Petition Date, the District and HCCA took action to establish a foundation for the Plan. The primary concerns immediately following the commencement of the Chapter 9 Case were the preservation of the Hospital, the SNF, and the Clinic operations and the implementation of practices designed to decrease expenditures and, thereby, increase revenues. For example, the District immediately began reevaluating the billing practices in an effort to reduce the number of insurer discounts, thereby increasing net revenues. The District also began utilizing governmental programs that provide revenues to hospital and nursing facilities that maintain high levels of service, including the California Quality Assurance Fee program. In additional to taking advantage of available programs and streamlining the overall operations, the

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

District also began exploring opportunities for additional governmental subsidies to increase non-operational revenues and permit the District to repay its obligations more quickly without affecting its operational capabilities.

### C.    Eligibility Litigation

On or about March 31, 2016, the District filed its brief regarding the District's qualification as a debtor under chapter 9 of the Bankruptcy Code (the "**Eligibility Motion**").  The Eligibility Motion came on for hearing on or about June 29, 2016.  On or about June 29, 2016, the Bankruptcy Court issued a minute order finding that the District qualified as a debtor under chapter 9 of the Bankruptcy Code.  Thereafter, on or about July 12, 2016, the Bankruptcy Court entered an order for relief in the Chapter 9 Case.

### D.    Appointment of Patient Care Ombudsman

On or about January 6, 2016, the Court issued the *Order to Appear and Show Cause Why a Patient Care Ombudsman Should Not Be Appointed*.  On or about January 25, 2016, the District filed the *Debtor's Motion to Excuse the Appointment of a Patient Care Ombudsman*.  On or about February 3, 2016, the Debtor filed the *Declaration of Colleen Wilson, Chief Nursing Officer, in Support of the Motion to Excuse the Appointment of a Patient Care Ombudsman*.  A hearing to consider the appointment of a patient care ombudsman was held on February 10, 2016.  On or about February 16, 2016, the Court entered an order denying the *Debtor's Motion to Excuse the Appointment of a Patient Care Ombudsman* and, on or about February 17, 2016, entered an order directing the appointment of a patient care ombudsman.  On or about March 4, 2016, the Office of the United States Trustee filed a notice regarding the appointment of Joseph Rodrigues (the "**Ombudsman**") as patient care ombudsman.

Since his appointment, the Ombudsman has filed numerous reports pertaining to the operation of the District's facilities.  The reports are not attached hereto; however, copies of the reports are available on the Chapter 9 Case docket or may be obtained from the District by submitting a written request via email addressed to mdelaney@bakerlaw.com and sgaeta@bakerlaw.com.  Since his appointment, the Ombudsman's reports have noted a few minor issues; however, in each instance, these issues were promptly resolved to the Ombudsman's

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

satisfaction.  In his reports, the Ombudsman also noted that the District's facilities are clean and fully operational, and the District's patients are well cared-for by the staff.  In short, the Ombudsman reports demonstrate that the District has corrected the operational issues it faced in the past.

### E.    Disputes Pertaining to Claims Against the District

Following the Petition Date, the District continued evaluating its existing obligations and the Claims asserted against the District.  Notwithstanding the ongoing nature of this inquiry, the District identified several disputed and/or objectionable Claims (whether in whole or in part)— namely, the Claims asserted by the following claimants: (i) Action Capital Corporation (also known as Coast to Coast Healthcare); (ii) Covidien; (iii) Dean Vander Wall; (iv) the California Employment Development Department; (v) GE HFS LLC; (vi) Lee Barron; and (vii) MJL & Associates.

Accordingly, on or about January 26, 2017, the District filed two omnibus objections to proofs of Claim.  The first omnibus objection sought to characterize Claims asserted by the California Employment Development Department, Lee Barron, and MJL & Associates, each of which asserted an entitlement to priority treatment of all or part of their respective Claims under the Bankruptcy Code, as General Unsecured Claims (the "**Priority Claim Objection**").  The second omnibus objection sought to disallow Claims asserted by Action Capital Corporation, Covidien, Dean Vander Wall, and GE HFS LLC based on the claimants' failure to adequately substantiate the Claim through the submission of competent evidence (the "**Adequacy Claim Objection**").

Prior to the hearing on the Adequacy Claim Objection, the District resolved the Adequacy Claim Objection as it pertained to Dean Vander Wall and GE HFS LLC and, at the hearing, withdrew the objection as it pertained to Covidien.  During the hearing on the Adequacy Claim Objection, the Court denied without prejudice the objection as it pertained to Action Capital Corporation.  On or about March 30, 2017, the Court entered an order adopting its rulings during the hearing on the Adequacy Claim Objection.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

During the hearing on the Priority Claim Objection, the Bankruptcy Court sustained the objection and ordered that the affected Claims be reclassified as General Unsecured Claims. Accordingly, under the Plan, these Claims are treated as General Unsecured Claims in Class 3.

**F.  Pending Litigation**

As of the commencement of the Chapter 9 Case, the District was party to certain pending lawsuits, including the following: *Perez v. Kibler, et al.*, case no. SICV CV 1457395, pending in the California Superior Court for the County of Inyo (the "**Perez Litigation**"); *Anderson v. Southern Inyo Healthcare District*, case no. 30-2015-00817277-CL-CL-CJC (the "**Anderson Litigation**"); *Craneware, Inc. v. Southern Inyo Healthcare District*, 15CV04309, pending in the District Court of Johnson County, Kansas (the "**Craneware Litigation**"); and *J.MH, IL et al. v. Marilyn S Devries, MD., et al.*, Case Number: SI- CV-1659008; Superior Court of the State of California, County of Inyo (the "**Huerta Litigation**").

On or about February 1, 2016, the Anderson Litigation was dismissed.

On or about March 30, 2016, the District removed the Craneware Litigation to this Court and, on or about August 29, 2016, the Court dismissed the Craneware Litigation for failure to prosecute.  On or about January 27, 2017, the underlying state court action was dismissed without prejudice.

On or about April 15, 2016, the Bankruptcy Court approved a stipulation by and between the District and the plaintiff in the Huerta Litigation.  Pursuant to the stipulation, the District agreed to allow the plaintiff to prosecute the Huerta Litigation; *provided, however,* that he only seek to recover from any applicable insurance policies.  The Huerta Litigation is currently pending.

Based on the nature of the Perez Litigation, the District did not remove the action.

In addition to the actions pending on the Petition Date, on or about January 13, 2016, the District filed a complaint against the California Department of Public Health ("**CDPH**")—thereby commencing the adversary proceeding styled *Southern Inyo Healthcare District v. California Department of Public Health, et al.*, adv. no. 2016-01008 (the "**CDPH Adversary**").  By and through the CDPH Adversary, the District sought a determination that the suspension or

1    revocation of the District's hospital licensure violated the automatic stay.  Following the

2    reinstatement of the District's licenses, the District and the defendants in the CDPH Adversary

3    reached an agreement to dismiss the CDPH Adversary without prejudice.  On or about March 9,

4    2016, the District filed a stipulation to dismiss the CDPH Adversary without prejudice, which the

5    Court approved by order entered on or about March 10, 2016.

6         **G.      Post-Petition Financing**

7         During the pendency of the Chapter 9 Case, the District utilized a line of credit extended

8    by HCCA (the HCCA Loan) to cover temporary cash shortfalls arising in the course of

9    operations.  HCCA was no longer willing and/or able to extend a line of credit to the District.  As

10   the District required funding to continue to operate pending both confirmation of the Plan and the

11   Effective Date, and finance certain pre-confirmation activities, the District explored various

12   financing options.  Unable to procure financing from an institutional lender, on or about July 19,

13   2017, the District entered into an agreement with Vi Healthcare Finance Inc. ("**ViHF**") for the

14   provision of a line of credit in the amount of Two Million Dollars ($2,000,000) (the "**ViHF**

15   **LOC**"), which is secured by the District's current tax revenues, to the extent permitted under

16   California law.  The District has drawn funds on the ViHF LOC to repay the outstanding balance

17   of the HCCA Loan (the "**HCCA Draw**").

18        Under the ViHF LOC, the HCCA Draw shall accrue interest at a rate of ten percent (10%)

19   until repaid.  Any additional draws on the ViHF LOC shall accrue simple interest at a rate of

20   twenty percent (20%) until the amount is repaid in full.  To ensure payment of the ViHF LOC, the

21   District agreed to assign certain tax revenues permitted to be pledged under applicable law to

22   ViHF.  The assigned tax revenues shall be applied to the balance owing under the ViHF LOC

23   until paid in full.  Any tax revenues received by ViHF that are not necessary to pay any

24   outstanding balance under the ViHF LOC shall be returned to the District within one (1) business

25   day of receipt.[6]

26

27

28

---

[6] The District intends to file an action to disallow and/or subordinate the ViHF Claim and transfer any security interest related thereto to the District pursuant to section 510(c).  If the ViHF Claim is disallowed or the related security interest transferred to the District, ViHF will no long be entitled to any tax revenues payable to the District.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

EXHIBIT CC  335
611923772.1                    SECOND AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS

# V.    THE DISTRICT'S LIABILITIES AND ASSETS

The schedules filed in the Chapter 9 Case, as amended (collectively, the "**Schedules**"), provide a detailed list of the assets and liabilities of the District as of the Petition Date.[7]  The audited financial statements provide detailed information regarding the performance of the District in the three (3) fiscal years immediately preceding the Petition Date.  *See* Exhibits 2, 3, 4.  The following is a summary of the liabilities and assets that are relevant to the Plan.

## A.    Liabilities

### 1.    Summary of Scheduled Claims

The District filed its Schedules on or about January 19, 2016.  In sum, the Schedules identified the following obligations: (a) 11 Secured Claims totaling $1,998,535.65; and (b) 254 General Unsecured Claims totaling $2,503,239.60.  With the exception of the Administrative Claims and Professional Claims, the District does not have any unsecured Claims entitled to priority treatment under the Bankruptcy Code.  Accordingly, the District did not list any creditors in Schedule E.

### 2.    Proofs of Claim

The Bankruptcy Court established September 30, 2016, as the deadline for the filing of non-administrative proofs of Claim against the District.  Forty-eight (48) proofs of Claim were filed against the District prior to the Claims Bar Date.  These Claims represent a total debt of $6,371,984.78.  Of this amount, approximately eight (8) Claims, totaling $2,339,011.21, asserted security interests in certain assets of the District.  The majority of the proofs of Claim filed overlap with the Claims scheduled by the District.  Unless otherwise provided in the Plan, if a purported creditor filed a proof of Claim relating to a Claim listed in the Schedules, the Claim shall be Allowed in the amount stated in the proof of Claim and the amount listed for the Claim in the Schedules shall be disregarded for the purposes of calculating the total indebtedness provided for under the Plan or determining the treatment of the related creditor under the Plan.

---

[7] Copies of the Schedules are available on the Chapter 9 Case docket or may be obtained from the District by submitting a written request via email addressed to mdelaney@bakerlaw.com and sgaeta@bakerlaw.com.

EXHIBIT CC  336
611923772.1

SECOND AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

As previously noted, the District filed objections to eight (8) proofs of Claim. The Bankruptcy Court sustained the objections to the proofs of Claim filed by Employment Development Department, Lee Barron, and MJL & Associates. The District resolved or withdrew the objections to the proofs of Claim filed by Covidien, Dean Vander Wall, and GE HFS, LLC. The Bankruptcy Court overruled the objection to the proof of Claim filed by Action Capital Corporation. In total, the objections to the proofs of Claim resulted in the reclassification of $224,151.22 in purported priority unsecured Claims as General Unsecured Claims.

### 3.    Alterations to Liability under the Plan

#### a.    Alteration of Claims

Under the Plan, the District intends to alter the treatment or classification set forth in the Schedules for the following Claims:

- General Electric Capital Corporation ("**GE**"). In the Schedules, the District listed GE as holding two Secured Claims totaling $65,129.11. Following the Petition Date, GE filed three (3) proofs of Claim (nos. 5, 29, and 33) asserting three unsecured Claims relating to the same obligations. Accordingly, under the Plan, GE shall be treated as holding three (3) General Unsecured Claims in the amounts stated in the GE proofs of Claim.

- HCCA. In the Schedules, the District listed HCCA as holding a Secured Claim in an unknown amount relating to the HCCA Loan. As the HCCA Loan will be paid on the Effective Date, the Plan does not provide any treatment for the HCCA Loan in Class 1. Any other amounts owing to HCCA shall be treated as a General Unsecured Claim in Class 3.

- Leasing Associates of Barrington, Inc. ("**LAB**"). In the Schedules, the District listed LAB as holding a Secured Claim in an unknown amount. LAB did not file a proof of Claim in the Chapter 9 Case. Accordingly, under the Plan, the Claim listed in the Schedules for LAB shall be treated as a Disallowed Claim.

- Marlin Leasing Corporation ("**MLC**"). In the Schedules, the District listed MLC as holding a Secured Claim the in the amount of $0.00. MLC did not file a proof

- 22 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1   of Claim in the Chapter 9 Case.  Accordingly, under the Plan, the Claim listed in

2   the Schedules for MLC shall be treated as a Disallowed Claim.

3   • <u>Siemens Healthcare Diagnostic, Inc. (aka Siemens Financial Services, Inc.)</u>

4   (“**Siemens**”).  In the Schedules, the District listed two Secured Claims held by

5   Siemens—one in the amount of $0.00 and the other in an unknown amount.

6   Following the Petition Date, Siemens filed a proof of Claim (no. 36) asserting a

7   General Unsecured Claim against the District relating to the same obligation.

8   Accordingly, under the Plan, Siemens shall be treated as holding a General

9   Unsecured Claim in the amount stated in proof of Claim no. 36.

10  • <u>U.S. Foods (“**US Foods**”)</u>.  In the Schedules, the District listed a purported

11  Secured Claim held by US Foods in the amount of $35,539.19.  Following the

12  Petition Date, US Foods filed a proof of Claim (no. 44) asserting a General

13  Unsecured Claim against the District relating to the same obligation(s).

14  Accordingly, under the Plan, US Foods shall be treated as holding a General

15  Unsecured Claim in the amount stated in proof of Claim no. 44.

16  In addition to the foregoing, pursuant to the terms of the Plan, any Claim qualifying as a

17  Disallowed Claim shall not receive any distributions under the Plan, regardless of whether and in

18  what manner the District listed such Claim in the Schedules.

19  **b.      Disputed Claims**

20  The District disputes the validity and/or enforceability of several claims, including,

21  without limitation, the Claims discussed below.  The omission of any Claim from the discussion

22  in this section shall not constitute a waiver or otherwise affect the rights of the District to object

23  or otherwise exercise any and all with respect to any Claim against the District.

24  **i.      Optum Claim**

25  By and through proof of Claim no. 25 (the Optum Claim), Optum Bank has asserted a

26  Secured Claim in the amount of $1,717,320.24 relating to a loan extended to the District in or

27  about February 2015, which it contends is secured by the real property in which the SNF and the

28  Hospital are located (the “**Property**”), as well as various personal property assets in which the

- 23 -

District has an ownership interest.  The District disputes the enforceability of the Secured Claim

asserted by Optum Bank, especially with respect to the Property, and the validity of the

underlying loan (i.e., the Optum Loan).

As a California healthcare district, the District's ability to borrow funds is strictly

regulated.  One of the many restrictions placed on the District's ability to borrow funding is set

forth at Cal. Health & Safety Code § 32130, which provides:

> A district may borrow money and incur indebtedness in an amount not to exceed
> 85 percent of all estimated income and revenue for the current fiscal year,
> including, but not limited to, tax revenues, operating income, and any other
> miscellaneous income received by the district, from whatever source derived. *The
> money borrowed and indebtedness incurred under this section shall be repaid
> within the same fiscal year.*

(emphasis added).  Additionally, Cal. Health & Safety Code § 32130.2(b) limits the issuance of

negotiable promissory notes to finance a "capital outlay"—in other words, the initial acquisition

of property, equipment and supplies utilized by a healthcare district—and to a term of no more

than ten (10) years.  "Restrictions on the borrowing of public entities are common in California

and other states. ... They are intended to prohibit the accumulation of public debt without the

consent of the taxpayers, and require governmental agencies to carry on their operations on a cash

basis."  *In re S. Humboldt Cmty. Healthcare Dist.*, 254 B.R. 758, 760 (Bankr. N.D. Cal. 2000).

Claims made on account of loans extended in violation of such limitations are unenforceable.

*Ibid*.

Based on its review of the salient documents and applicable law, the District believes that

the Optum Loan violates, among other provisions, Cal. Health & Safety Code §§ 32130 and

32130.2.  More precisely, the Optum Loan does not require repayment within the same fiscal year

nor was such repayment possible at the time the Optum Loan was extended.[8]  Additionally, the

Optum Loan provided for a repayment term in excess of ten (10) years and was not related to a

"capital outlay;" rather, the Optum Loan related to the refinancing of an existing debt.

Accordingly, the Optum Loan violates the restrictions on lending to healthcare districts under Cal.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

---

[8] It also appears that the Optum Loan violates Cal. Health & Safety Code § 32130.2 by virtue of the fact that it
matures more than ten (10) years after its issuance.

- 24 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1 Health & Safety Code §§ 32130 and 32130.2 and, thus, the Optum Claim is unenforceable. As

2 such, the District is left with no choice but to treat the Optum Claim as a Disputed Claim under

3 the Plan. *See In re S. Humboldt Cmty. Healthcare Dist.*, 254 B.R. at 760-761.

4          Furthermore, under California law, creditors are not able to encumber or assert security

5 interests in municipal property unless expressly authorized by statute. *See Mayrhofer v. Board of*

6 *Education of the City of San Diego, et al.*, 89 Cal. 110 (Cal. 1891). As relevant here, the Cal.

7 Health & Safety Code contains no authorization for creditors to encumber the real property assets

8 of a California health care district, such as the District. As Optum was not authorized to

9 encumber the Property, the security interest asserted by Optum in the Property is void and

10 unenforceable.

11          Based on the foregoing, the District has commenced the Optum Adversary, though which

12 the District seeks to invalidate the Optum Loan and associated security interest, in whole or in

13 part, and disallow the Optum Claim. Thus, under the Plan, the Optum Claim is treated as a

14 Disputed Claim and shall not receive any distributions unless and until a court of competent

15 jurisdiction enters a Final Order allowing the Optum Claim, and then, only to the extent allowed.

16                    **ii.    ViHF Claim**

17          ViHF asserts an entitlement to a Secured Claim in an amount equal to any draw on the

18 ViHF LOC. The District contends that the ViHF Claim is not enforceable and/or may be

19 subordinated to all other Claims under section 510(c) and/or the Bankruptcy Court's general

20 equitable authority due to certain misconduct and improper actions taken by ViHF and/or its

21 affiliates. The District intends to retain special litigation counsel to commence an adversary

22 proceeding against ViHF ("**ViHF Adversary**") prior to the Confirmation Hearing. By and

23 through the ViHF Adversary, the District intends to seek an order disallowing or subordinating

24 the ViHF Claim and transferring any securing interest associated with the ViHF LOC to the

25 District.[9]

26

27

28

---

[9] Due to allegations of conflicts of interest between HCCA and its affiliates, including ViHF, and general insolvency counsel for the District, the District shall provide further detail regarding the bases for the ViHF Adversary by and through the forthcoming complaint.

### 4.    Summary of Current Liabilities

On the Effective Date, the District estimates that it will have the following liabilities:

- Administrative Claims totaling approximately $34,321.00;

- Professional Claims totaling approximately $1,094,910.97;

- Secured Claims totaling approximately $3,281,362.61;[10]

- Priority Unsecured Claims totaling $0.00;

- Post-Petition Unsecured Claims totaling $460,880.00; and

- General Unsecured Claims totaling approximately $7,153,051.98.[11]

### 5.    Statement Regarding Liabilities

As previously noted, the District disputes a number of Claims that have been asserted against it, and the District's review and analysis of Claims is ongoing.  Given that fact, as well as the inherent uncertainties in any litigation regarding Claims, no assurances can be given regarding the successful outcome of any litigation that has or may be initiated in objecting to such Claims or regarding the ultimate amount of Claims that will be Allowed against the District.

As described below, the Plan enables the District to file objections to Claims at any time within one hundred and eighty (180) days after the Effective Date.  The Plan also provides for the District to retain any and all defenses, offset and recoupment rights, and counterclaims that may exist with respect to any Disputed Claim, whether under section 502, 552, or 558 of the Bankruptcy Code or other applicable law.  The District reserves all rights with respect to the allowance and disallowance of any and all Claims.  **In voting on the Plan, creditors may not rely on the absence of a reference in this Disclosure Statement or the Plan or the absence of an objection to their proofs of Claim as any indication that the District ultimately will not object to the amount, priority, nature, or allowance of their Claim(s).**

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

---

[10] This amount does not account for Secured Claims satisfied under the Plan through the surrender of collateral.  This amount includes the Disputed Claims of Optum and ViHF.

[11] This amount is comprised of all General Unsecured Claims, including those classified in Class 4 under the Plan, the Unsecured portion of the Secured Claim asserted by Action Capital Corporation, and the projected cure payments due and owing in relation to the assumption of executory contracts and unexpired leases.  The inclusion of any Claim in this calculation shall not alter the proposed treatment of such Claim under the Plan.

**B.     Assets**

The District's assets include, among other things, the real property on which the Hospital and the SFN are located, medical equipment and supplies, accounts receivables, healthcare receivables, potential claims and causes of action, and other various personal property assets. The District's assets are more fully described in the Schedules and associated statement of financial affairs. Under the Plan, the District estimates that it will supplement its current revenue through offering additional medical services and treatments, potential proceeds from litigation, and an increase in parcel and transient occupancy taxes. Each potential revenue source is discussed below:

**1.     Additional Medical Services and Treatment**

The District intends to partially fund the Plan with anticipated revenues to be generated from expanding certain services. More precisely, the District intends to expand its services by offering medical infusion services.

The District has designated a room in its hospital facility for conversion into a treatment center for individuals requiring regular infusions of intravenous medications, including, without limitation, medications for the treatment of cancer, arthritis, and other chronic and severe illnesses and conditions. The designated space is sufficient to house four (4) infusion chairs and related equipment—thereby permitting the District to treat up to four (4) patients at any one time. Establishing the treatment facility will cost approximately $6,350.00, which expense shall be a one-time cost. The District estimates that the annual operating cost would be approximately $240,000 or $60,000 per chair, including the additional staffing required to operate the facility and to administer the treatments. The District estimates that the infusion services will result in additional net revenues of approximately $200,000 in 2018. The District anticipates that demand for this service will increase between 2018 and 2025—thereby increasing revenues derived from this service. The District believes it will be able to establish and begin providing infusion services prior to the Effective Date.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

### 2. Parcel Tax Increase

The District intends to fund the Plan (in part) with revenues from an increased parcel tax. A parcel tax is a tax assessed against the owner of real property. At present, the parcel tax in Southern Inyo is approximately $150.00 per parcel, which generates an average of $350,000 per year in revenues for the District. The District proposes increasing the parcel tax from $150.00 to $365.00 per parcel, per year, which will increase receipts from the parcel tax from approximately $350,000 to $950,000 per year.

The District has taken certain actions to gauge whether the community is likely to support an increase to parcel taxes in order to preserve the Hospital, the SNF, and the Clinic. Based thereon, the District believes that voters will support the increase in parcel taxes in order to ensure the continued operations of the District and availability of the essential services the District provides to the community.

Voter Approval Required. Increasing the parcel tax will require approval by two-thirds of the voters in Inyo County, California, who vote on the tax measure.

Timing for Approval. The District intends to seek approval of the parcel tax initiative as part of the general election in April 2018. If the requisite number of votes is received, the election results will thereafter be certified. If approved, the District anticipates that its will begin receiving the additional revenues on account of the parcel tax increase in December 2018. The parcel tax revenues will be paid bi-annually—with the first payment in April of each year and the second payment in December of each year.

Certificates of Participation. In the event the District is required to make any lump-sum payments to Optum or ViHF, or otherwise remedy a cash shortfall, the District may issue certificates of participation ("**COP**") in association with the increased parcel tax revenues (to extent necessary to fund such payment(s)). The COP issuance will essentially securitize all or a portion of the future revenues from the increased parcel taxes and result in a lump-sum payment to the District. Thereafter, the District shall utilize the revenues from the parcel tax initiative to repay the COP obligations. Based on the District's calculations, the COP repayment obligations will be less than the revenues from the increased parcel taxes and, as the COP revenues will repay

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

a substantial portion of the District's obligations, will not affect the District's ability to perform under the Plan.

### 3.    Transient Occupancy Tax

The District intends to partially fund the Plan with additional tax revenues from the Transient Occupancy Tax (the "**TOT**") for the County of Inyo, California.  The TOT is a tax levied against consumers of tourist related goods and services, principally through taxes on hotel and motel rooms.  The District intends to propose an allocation of one percent (1%) of the TOT to the District.  The District has conferred with authorities from the County of Inyo and obtained historical collection data relating to the TOT.  Based on its discussions with county officials and historical data, the District estimates that the allocation of additional revenues generated by the one percent (1%) allocation would result in approximately $34,600 per year in additional revenues for the District.  The District would receive the TOT revenues as a single payment at the end of each calendar year.

Voter Approval **Not** Required.  Voter approval of the TOT increase is not required; rather, any increase to the TOT requires approval from the County Board of Supervisors, which ordinarily makes its decision in concert with the merchants affected by the assessment.  The District believes that the TOT increase will be approved and allocated to the District.

Timing for Approval.  As voter approval is not required, the timeline for approval is slightly more flexible.  Regardless, the District expects the TOT increase to be approved before the projected Effective Date.

### 4.    Claims and Causes of Action Against Third Parties

The District may have claims and causes of action against certain individuals or entities, and is continuing its investigation of any and all potential claims and causes of action that may exist.  By and through the Plan, the District retains the right to commence and prosecute any action(s) based upon any claim or cause of action possessed by the District prior to the Effective Date.  Any recovery by the District arising from a claim or cause of action commenced on or after the Effective Date shall be treated as additional revenues and used by the District to fund operations and/or plan payments.  **Parties in interest may not rely on the absence of a**

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

**reference in this Disclosure Statement or the Plan as any indication that the District ultimately will not pursue any and all available claims and causes of action against them.**

### a.    Potential Claims and Causes of Action

The District is presently aware of the claims and causes of action discussed *infra*. The following discussion of claims and causes of action does not in any way limit or affect the reservation of rights set forth in the preceding paragraph, nor the District's right to assert any and all claims and causes of action following the Effective Date.

### i.    HCCA Claim

The principal claim(s) of which the District is aware pertain to HCCA. More precisely, HCCA was retained as chief restructuring officers for the District. In this role, HCCA was responsible for, among other things, the management of the District's operations. Among other things, HCCA failed to collect approximately $4,000,000 in accounts receivable. To ameliorate this cash shortage (to the extent possible), the District was required to expend additional funds, including, without limitation, incurring additional debt from an HCCA affiliate at an interest rate of 20% and retaining additional professionals and service providers to fulfill HCCA's responsibilities. In sum, the District estimates that HCCA's failure to carry-out its duties resulted in more than $6,000,000 in damages to the District. The District intends to file an adversary proceeding against HCCA to recover damages arising from or relating to the foregoing.

### ii.    ViHF Adversary

As discussed *supra*, the District intends to commence an adversary proceeding challenging the validity and enforceability and/or seeking to subordinate the Claim asserted by ViHF and transferring any security interest associated with the ViHF Claim to the District.[12]

### iii.    Avoidance Actions

The District also intends to pursue claims to recover fraudulent and/or preferential transfers to or for the benefit of certain creditors, including, without limitation, HRG, under the

---

[12] Due to allegations of conflicts of interest between HCCA and its affiliates, including ViHF, and general insolvency counsel for the District, the District shall provide further detail regarding the bases for the ViHF Adversary by and through the forthcoming complaint.

- 30 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

Bankruptcy Code and applicable California law. The District intends to commence these avoidance actions prior to the Effective Date of the Plan, but in no event later than July 11, 2018.

## VI.    SUMMARY OF THE PLAN OF ADJUSTMENT

**The discussion of the Plan set forth herein is qualified in its entirety by reference to the more detailed provisions set forth in the Plan and its exhibits, the terms of which are controlling. Holders of Claims and other interested parties are urged to read the Plan and its exhibits, copies of which are served herewith, in their entirety so that they may make an informed decision regarding the Plan.**

The Plan proposes paying the Allowed Claims against the District over a term of several years. The Allowed Claims are separated into four (4) Classes—namely, Secured Claims (Class 1), Post-Petition Claims (Class 2), General Unsecured Claims (Class 3), and Convenience Class Claims (Class 4).

As set forth in the financial projections (Exhibit 5 to the Plan Exhibits), the Allowed Claims will be paid over a term of years depending on their specific classification and treatment relating thereto. Administrative Claims and Professional Claims are not classified and shall receive payment in full on the Effective Date, unless the holders of such claims agree to alternate treatment. Secured Claims are separately categorized into subclasses (Classes 1A-1G) based upon the collateral purportedly securing each of the Claims. Post-Petition Claims (Class 2) consist of certain general unsecured Claims held by creditors that provide goods or services to the District essential to the operation of the District and its facilities. General Unsecured Claims (Class 3) consist of general unsecured Claims in excess of $250.00 held by claimants not classified as Post-Petition Claims. Convenience Class Claims (Class 4) consist of general unsecured Claims in an amount less than or equal to $250.00 held by claimants not classified as Post-Petition Claims, which are separately classified from General Unsecured Claims in order to avoid the administrative burden and expense associated with remitting payments on account of Claims of this size over a term of years, and Claims classified in Class 3 that opt to be treated as Class 4 Claims. The District shall make the payments provided for in the Plan over a term of approximately seven (7) years (the Effective Date through and including December 2025).

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

- 31 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

**A.      Classification and Treatment of Claims**

      **1.      Unclassified Claims**

Section II of the Plan governs the treatment of certain Claims that are not classified into Classes under the Plan.

      **a.      Administrative Expense Claims**

Except to the extent that the holder of an Allowed Administrative Claim agrees to a different treatment, the District or its agent shall pay to each holder of an Allowed Administrative Claim, in full satisfaction, release, and discharge of such Allowed Administrative Claim, Cash in an amount equal to such Allowed Administrative Claim on the later of (i) the Effective Date or (ii) the date on which such Claim becomes an Allowed Administrative Claim, or as soon thereafter as is practicable.  Under the Plan, the Allowed Administrative Claims consist of the following: SourceMedia, Inc. ($34,321.00) and Up-to-Date ($0.00).[13]

      **b.      Professional Claims**

Pursuant to section 943(b)(3), all amounts paid or to be paid following the Effective Date for services or expenses in the Chapter 9 Case or incident to the Plan must be disclosed to the Bankruptcy Court and must be reasonable.  There shall be paid to each holder of a Professional Claim, in full satisfaction, release and discharge of the Professional Claims existing on the Effective Date, Cash in an amount equal to that portion of such Claim that the District consents to pay and the Bankruptcy Court deems reasonable.[14]

The portion of the Allowed Professional Claim of Baker & Hostetler LLP ("**Baker**") relating to attorneys' fees shall be paid in equal monthly payments over a term of thirty-six (36) months following the Effective Date.  The District estimates that the attorneys' fees incurred by Baker for services rendered to the District prior to the Effective Date shall total approximately $850,000.  The Allowed Professional Claims of Nave Cortell LLP and Province as well as the

---

[13] The amounts listed herein are estimates of amount owing on account of the Allowed Administrative Claims as of the anticipated Effective Date.

[14] The treatment of Professional Claims provided herein shall not in any way limit the rights of any professional employed by the District seeking compensation for services provided following the Effective Date.  The amounts listed in this Section are estimates of the Professional Claims and shall not in any way be interpreted as a limitation on the amount of the Professional Claims.

1  portion of the Allowed Professional Claim of Baker & Hostetler LLP relating to costs incurred in

2  the course of the Chapter 9 Case shall be paid in full upon, or as soon as reasonably practicable

3  following, the Effective Date.  The District estimates that Nave Cortell LLP and Province shall

4  have Professional Claims in the amount of approximately $24,149.22 and $20,761.75,

5  respectively, as of the Effective Date.  The District estimates that the portion of the Allowed

6  Professional Claim of Baker & Hostetler LLP relating to costs incurred in the course of the

7  Chapter 9 Case shall total approximately $200,000 as of the Effective Date.[15]

8       The District does not consent to the Bankruptcy Court adjudicating whether any other

9  individual or entity constitutes a Professional or may assert a Professional Claim.  The District

10  solely consents to the Bankruptcy Court adjudicating the reasonableness of the services rendered

11  and costs incurred by the Professionals for which compensation and/or reimbursement is sought.

12       The District, in the ordinary course of its business, and without the requirement for

13  Bankruptcy Court approval, may pay for professional services rendered and costs incurred

14  following the Effective Date.

15              **c.    Deadline for the Filing and Assertion of Postpetition Claims,**

16                   **Administrative Claims, and Professional Claims**

17       **All proofs of Claim for Claims arising on or after the Petition Date, and requests for**

18  **payment or any other means of preserving and obtaining payment of Administrative Claims**

19  **that have not been paid, released, or otherwise settled, and all requests for a determination**

20  **regarding the reasonableness of Professional Claims, must be filed with the Bankruptcy**

21  **Court and served upon the District no later than thirty (30) days <u>before</u> the date set for the**

22  **Confirmation Hearing.**  Any proof of Claim for Claims arising on or after the Petition Date, or

23  request for payment of an Administrative Claim or a Professional Claim that is not timely filed

24  will be forever barred and holders of such Claims shall be barred from asserting such Claims in

25  any manner against the District.

26

27

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

---

[15] This figure includes projected costs for Force 10 Partners, the financial advisory firm retained by Baker & Hostetler LLP to assist with the preparation of the Plan and associated documents.

2.    **Class 1 – Secured Claims**

a.    **Class 1A – Action Capital Corporation**

Class 1A consists of the Claim asserted by Action Capital Corporation (also known as Coast to Coast Healthcare) ("**ACC**") in the amount of $185,600.35, which is purportedly secured by all accounts receivable of the District arising on or before January 31, 2015.

i.    **Impairment and Voting**

Class 1A is Impaired by the Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of ACC. Accordingly, this Class is entitled to vote to accept or reject the Plan in accordance with the Plan Solicitation Order.

ii.    **Treatment**

ACC's Class 1A Claim is purportedly secured solely by accounts receivable generated on or before January 31, 2015, which the District estimates to be worth $0.00. Accordingly, in full satisfaction, release and discharge of the Class 1A Claim, ACC shall receive an allowed General Unsecured Claim in the amount of $185,600.35, which shall be included in and treated in accordance with the treatment provided for Class 3 Claims.

b.    **Class 1B – Bank of the West/Thermo Fisher Financial Services, Inc.**

Class 1B consists of the Claims asserted by Bank of the West ("**BOW**") in the amount of $7,189.61 and Thermo Fisher Financial Services, Inc. ("**Thermo**") in the amount of $12,443.46,[16] which are purportedly secured by an Abbott iSTAT 1 Upgrade from 200 Series and the related equipment and documentation.

i.    **Impairment and Voting**

Class 1B is Impaired by the Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of BOW and/or Thermo. Accordingly, this Class is entitled to vote to accept or reject the Plan in accordance with the Plan Solicitation Order.

---

[16] Bank of the West and Thermo Fisher Financial Services, Inc. each filed proofs of Claim asserting Secured Claims in the subject collateral. Per the documentation provided in support of the proofs of Claim, it appears that Thermo Fisher Financial Services, Inc. assigned its rights under the agreement with the District to Bank of the West in or about June 2013. Accordingly, under the Plan, the Claims asserted by Bank of the West and Thermo Fisher Financial Services, Inc. are treated as the same Claim.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

EXHIBIT CC  349
611923772.1

SECOND AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS

**ii.    Treatment**

In full satisfaction, release and discharge of the Class 1B Claims, the District shall surrender to BOW or Thermo the collateral for the underlying agreements—namely, one Abbott iSTAT 1 Upgrade from 200 Series and the related equipment and documentation. The District shall surrender the subject equipment and documentation on or as soon as practicable following the Effective Date.

**c.    Class 1C – Canon Financial Services, Inc.**

Class 1C consists of the Claim asserted by Canon Financial Services, Inc. ("**Canon**") in the amount of $84,275.90, which is purportedly secured by certain office equipment subject to the agreements by and between the District and Canon or its affiliates.

**i.    Impairment and Voting**

Class 1C is Impaired by the Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of Canon. Accordingly, this Class is entitled to vote to accept or reject the Plan in accordance with the Plan Solicitation Order.

**ii.    Treatment**

In full satisfaction, release and discharge of the Class 1C Claim, the District shall surrender to Canon the collateral for the underlying agreement. The District shall surrender the subject equipment and documentation on or as soon as practicable following the Effective Date.

**d.    Class 1D – Cardinal Health 110, LLC**

Class 1D consists of the Claim asserted by Cardinal Health 110, LLC ("**Cardinal**") in the amount of $838.28, which is purportedly secured by certain funds presently held by Cardinal.

**i.    Impairment and Voting**

Class 1D is Unimpaired by the Plan since the treatment of this Class will not affect the legal, equitable, or contractual rights of Cardinal. Accordingly, this Class is **not** entitled to vote to accept or reject the Plan in accordance with the Plan Solicitation Order.[17]

**ii.    Treatment**

---

[17] The Unimpaired status of the Class 1D Claim held by Cardinal shall not affect the right of Cardinal, if any, to cast a vote for or against the Plan on account of the portion of its Claim categorized as a General Unsecured Claim in Class 3.

EXHIBIT CC  350
611923772.1

SECOND AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1    In full satisfaction, release and discharge of the Class 1D Claim, Cardinal shall be entitled

2    to retain the funds presently in its possession, which total $838.28.  The remainder of the Claim

3    asserted by Cardinal shall be allowed as a General Unsecured Claim in Class 3 in accordance

4    with the proof of Claim filed by Cardinal.

5    **e.        Class 1E – Healthcare Resource Group**

6    Class 1E consists of the Disputed Claim asserted by Healthcare Resource Group ("**HRG**")

7    in the amount of $151,562.73, which is purportedly secured by various personal property and

8    general intangible assets of the District or in which the District has an ownership interest.  Based

9    on the District's books and records, HRG received preferential and/or fraudulent transfers

10   avoidable under the Bankruptcy Code and/or California law and, as such, the HRG Claim is

11   unenforceable under section 502(d).

12   **i.        Impairment and Voting**

13   Class 1E is Impaired by the Plan since the treatment of this Class will affect the legal,

14   equitable, or contractual rights of HRG; however, as comprised of a Disputed Claim, this Class is

15   **not** entitled to vote to accept or reject the Plan in accordance with the Plan Solicitation Order.

16   **ii.        Treatment**

17   As a Disputed Claim, the HRG Claim shall not receive any distributions under the Plan

18   unless and until a court of competent jurisdiction enters a Final Order allowing the HRG Claim or

19   HRG returns any and all avoidable transfers.  If the HRG Claim is adjudged valid, enforceable

20   and secured in whole or in part and/or HRG returns any and all avoidable transfers, the District

21   shall make periodic payments to HRG until the Class 1E Claim is paid in full with interest.

22   Under the Plan, the payments on account of the Class 1E Claim shall begin in the first full month

23   following the allowance of the HRG Claim and/or the return of any and all avoidable transfers. If

24   deemed an Allowed Claim, HRG shall receive monthly payments in the approximate amount of

25   $2,020.00 per month over the life of the Plan, which equates to the full amount of the Claim plus

26   interest at a rate of 3.25% *per annum*.

27

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

EXHIBIT CC  351
611923772.1

#### f.    Class 1F – Optum Bank, Inc.

Class 1F is comprised of the Disputed Claim asserted by Optum in the amount of $1,717,320.24, which is purportedly secured by the District's real property as well as personal property and general intangible assets.  The validity and enforceability of the Optum Claim is the subject of the Optum Adversary.

##### i.    Impairment and Voting

Class 1F is Impaired by this Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of Optum.  As Class 1F is comprised solely of the Disputed Claim of Optum, Class 1F is not entitled to vote on the Plan; however, the District and Optum entered into a stipulation permitting Optum to vote in Class 1F.  As such, Class 1F is entitled to vote to accept or reject the Plan in accordance with the Plan Solicitation Order.

##### ii.    Treatment

As a Disputed Claim, the Optum Claim shall not receive any distributions under the Plan unless and until a court of competent jurisdiction enters a Final Order allowing the Optum Claim. If the Optum Claim is adjudged valid, enforceable and secured in whole or in part, the District shall pay Optum Cash in an amount equal to the portion of the Optum Claim allowed as a Secured Claim, which may include interest and costs and expenses incurred by Optum in association with the underlying loan, to the extent permitted under the Optum loan agreement and allowed by the Court, no later than one hundred and twenty (120) days following the entry of a Final Order allowing the Optum Claim.  If the Optum Claim is adjudged valid and enforceable but not wholly secured, the portion of the Optum Claim adjudged to be a Secured Claim, which may include interest and costs and expenses incurred by Optum in association with the underlying loan, to the extent permitted under the Optum loan agreement and allowed by the Court, shall be treated pursuant to the preceding sentence and any order(s) entered in the Optum Adversary and the remaining Allowed Claim shall be treated as a General Unsecured Claim in Class 3.  If the Optum Claim is adjudged invalid and unenforceable, Class 1F shall not receive any distributions under the Plan.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

### g.    Class 1G – Vi Healthcare Finance, Inc.

Class 1G is comprised of any and all funds advanced to the District by ViHF pursuant to the ViHF LOC.  The anticipated balance of the ViHF LOC on the Effective Date is $1,314,922. The Class 1G Claim is purportedly secured in accordance with the terms of the ViHF LOC to the extent permitted under California law.  The Class 1G Claim constitutes a Disputed Claim under the Plan.

#### i.    Impairment and Voting

Class 1G is Impaired by the Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of ViHF; however, as comprised of a Disputed Claim, this Class is **not** entitled to vote to accept or reject the Plan in accordance with the Plan Solicitation Order.

#### ii.    Treatment

The treatment of Class 1G shall depend on the outcome of the ViHF Adversary.  If the District succeeds in disallowing the ViHF Claim in its entirety, Class 1G shall not receive any distributions under the Plan.  If the Bankruptcy Court allows the ViHF Claim as a subordinated claim and transfers any security interest(s) associated therewith to the District, the ViHF Claim shall be treated in a separate class of subordinated Claims—Class 5.  Class 5 shall receive a distribution equal to three percent (3%) of the total claims in the Class, which shall be paid in a lump sum within one hundred and twenty (120) days after entry of an order subordinating the ViHF Claim.  If the Bankruptcy Court allows the ViHF Claim as a Class 1G Claim, the District shall pay the Allowed Secured Claim of ViHF in full within one hundred and twenty (120) days after entry of an order allowing the Class 1G Claim.

### 3.    Class 2 – Post-Petition Claims

Class 2 consists of the Claims listed in Exhibit 6 of the Plan Exhibits.

#### a.    Impairment and Voting

Class 2 is Impaired by the Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of the holders of Class 2 Claims.  Accordingly, this Class is entitled to vote to accept or reject the Plan in accordance with the Plan Solicitation Order.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

- 38 -

### b. Treatment

In full satisfaction, release and discharge of the Class 2 Claims, holders of Class 2 Claims shall receive Cash on the Effective Date, or as soon thereafter as practicable, in an amount equal to the amount listed for each respective claimant in Exhibit 6 of the Plan Exhibits.

### 4. Class 3 – General Unsecured Claims

Class 3 consists of the Claims listed in Exhibit 7 of the Plan Exhibits.[18]

### a. Impairment and Voting

Class 3 is Impaired by the Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of the holders of Class 3 Claims.  Accordingly, this Class is entitled to vote to accept or reject the Plan in accordance with the Plan Solicitation Order.

### b. Treatment

In full satisfaction, release and discharge of the Class 3 Claims, holders of Class 3 Claims shall receive a *pro rata* portion of $100,000.00, which shall be paid as follows: (a) $25,000.00 on December 31, 2019, or as soon thereafter as practicable; (b) $25,000.00 on April 30, 2020; (c) $25,000 on December 31, 2020, or as soon thereafter as practicable; and (d) $25,000 on April 30, 2021, or as soon thereafter as practicable.  In addition to the foregoing distributions, holders of Class 3 Claims shall receive a *pro rata* portion of 25% of any recovery, net of fees, costs, and other administrative expenses associated therewith, from the proposed litigation against HCCA, which shall be paid no later than 120 calendar days following recovery thereof.

### c. Class 4 Election

Holders of General Unsecured Claims in Class 3 may elect to have their Claim(s) treated as Class 4 Claim(s) by so noting on the Ballot.  Any Class 3 Claim electing treatment under Class 4 shall irrevocably forfeit its status as a Class 3 General Unsecured Claim and the holder of such Claim shall be deemed to have accepted payment as a holder of a Claim in Class 4 in full satisfaction, release and discharge of their Claim.

---

[18] Exhibit 7 does not include any estimate(s) on account of the potential General Unsecured Claim of Optum, if any. If the Bankruptcy Court rules that Optum is entitled to an allowed General Unsecured Claim, such Claim shall be entitled to a *pro rata* portion of any distributions to Class 3.

- 39 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

5.    **Class 4 – Convenience Claims**

Class 4 consists of the Claims in an amount of $250.00 or less. A list of all Class 4 Claims is set forth in Exhibit 8 of the Plan Exhibits.

a.    **Impairment and Voting**

Class 4 is Impaired by the Plan since the treatment of this Class will affect the legal, equitable, or contractual rights of the holders of Class 4 Claims. Accordingly, this Class is entitled to vote to accept or reject the Plan in accordance with the Plan Solicitation Order.

b.    **Treatment**

In full satisfaction, release and discharge of the Class 4 Claims, holders of Class 4 Claims shall receive Cash on the Effective Date, or as soon thereafter as practicable, in an amount equal to the lesser of (a) the amount of their Allowed Class 4 Claims or (b) $100.00.

B.    **Treatment of Executory Contracts and Unexpired Leases**

1.    **Generally**

The Bankruptcy Code grants debtors, subject to court approval, the power to assume or reject executory contracts and unexpired leases. An "executory contract" generally means a contract under which the obligations of both the District and the other party thereto are so far unperformed that the failure of either party to complete performance would constitute a material breach of the subject agreement, thereby excusing the performance of the other party.

If a debtor rejects an executory contract or unexpired lease, the rejection operates as a prepetition breach of the subject agreement. If an executory contract or unexpired lease is assumed by the debtor, the assumption obligates the debtor to perform under the agreement, and damages arising from any subsequent breach of the agreement are treated as administrative expenses.

2.    **Assumption of Executory Contracts and Unexpired Leases**

Without the need to file any further motions, the District intends to assume and will assume as of the Effective Date all executory contracts and unexpired leases to which it is a party and which was entered into prior to the Petition Date, except (i) for those unexpired leases and

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

EXHIBIT CC   355
611923772.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1    executory contracts specifically identified in subsection 3 below or (ii) as otherwise provided in

2    the Plan.

3                          **a.      Cure Payments**

4              To cure any purported default or arrears under the executory contracts and unexpired

5    leases the District plans to assume through the Plan, the District shall make the cure payments

6    identified on Exhibit 9 to the Plan Exhibits.[19]   The Bankruptcy Court shall resolve all disputes

7    regarding: (i) the amount of any cure payment to be made in connection with the assumption of

8    any contract or lease; (ii) the ability of the District to provide "adequate assurance of future

9    performance" within the meaning of section 365 under the contract or lease to be assumed; and

10   (iii) any other matter pertaining to such assumption and assignment.  If any party to an executory

11   contract or unexpired lease that is to be assumed by the District asserts that the proposed cure

12   payment is insufficient or some other performance is required to assume the subject contract or

13   lease, such party shall file with the Bankruptcy Court and serve upon the District a written

14   statement and accompanying declaration in support thereof specifying the basis for its position

15   and accounting for the purported amount owing under the subject contract or lease not later than

16   thirty (30) days **before** the Confirmation Hearing.  The failure to timely file and serve such a

17   statement shall be deemed to be a waiver of any and all objections to the proposed assumption,

18   including, without limitation, any objection pertaining to the adequacy of the proposed cure

19   payment or the adequate of the assurance of prompt cure and/or of future performance.

20                          **b.      Adequate Assurance of Prompt Cure and Future Performance**

21             What constitutes "adequate assurance" is a factual question to be determined on a case-by-

22   case basis with due regard to the nature and identify of the parties, their past dealings, and present

23   commercial realities.  The District need only show that performance is likely (i.e. more probable

24   than not) in order to assume an executory contract or unexpired lease pursuant to section 365.  As

25   reflected in Section VI.C. herein, the District submits that the means for implementation of the

26

---

27   [19] If an executory contract or unexpired lease is not identified on Exhibit 9, the District shall not make any cure
     payment to any party or parties to such agreement as the District does not have any record of any outstanding amount

28   owing under the subject agreement.  The omission of the subject contract or lease, however, shall not in any way
     affect the assumption of the subject agreement by and through the Plan.

Plan constitute adequate assurance of both its ability to "promptly" cure the payments set forth in Exhibit 9, and for future performance. Moreover, as the total amount of the cure payments is only $99,899.18, which the District intends to pay over a period of eighteen (18) months following the Effective Date, even if one or more of the anticipated sources that will be used to fund the Plan does not materialize, the District will be able to meet the cure obligations set forth in Exhibit 9.

### 3. Rejection of Executory Contracts and Unexpired Leases[20]

Without the need to file any further motions, the District elects to reject and shall be deemed to have rejected as of the Effective Date the following executory contracts and unexpired leases:[21]

- Master Lease Agreement dated as of November 13, 2012 between the District, as lessee, and General Electric Capital Corporation, as lessor, and all other leases based thereon, pertaining to, among other things, a Proteus X Ray XR/a 65W Radiographic System;

- Lease dated March 7, 2013 between the District, as lessee, and Thermo Fisher Financial Services, Inc., as lessor, and/or Bank of the West, as assignee of Thermo Fisher Financial Services, Inc., pertaining to an Abbott iSTAT 1 Upgrade from 200 Series and related equipment and documentation;

- Agreement dated October 9, 2014, between the District and Thermo Fisher Financial Services, Inc., pertaining to a VITROS 350 Chemistry System;

- Lease between the District, as lessee, and Healthland, Inc., as lessor, pertaining to certain medical billing hardware and software;

- Lease No. x005 between the District, as lessee, and Canon Financial Services, as lessor, pertaining to Canon ImageRunner 1730iF (serial number x4453);

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

---

[20] The Management Services Agreement ("**MSA**") by and between the District and HCCA was rejected via stipulation prior to the preparation and submission of the Plan. *See* D.E. 377. As such, the MSA is not listed in this section. The exclusion of the MSA shall not in any way alter the prior rejection of the MSA or the agreement(s) of the District and HCCA relation to such rejection.

[21] Any reference contained herein to an agreement as a "lease" shall not constitute an admission regarding whether the subject agreement constitutes "true lease" under applicable law.

- Lease No. x006 between the District, as lessee, and Canon Financial Services, as lessor, pertaining to Canon ImageRunner Advance 6255 (serial number x1950);

- Lease No. x007 between the District, as lessee, and Canon Financial Services, as lessor, pertaining to Canon ImageRunner 1730iF (serial number x4451);

- Lease No. x008 between the District, as lessee, and Canon Financial Services, as lessor, pertaining to IRA 4235 (serial number x1785), IRA 1025iF (serial number x5469), IRA 400iF (serial number x2533), IRA 400iF (serial number x1857), IRA 400iF (serial number x1862), and IR 1730iF (service only) (serial number x5155);

- Agreement between the District and Celleration Inc.;

- Employment Agreement between the District, as employer, and Dr. Kenneth L. Saeger, as employee;

- Employment Agreement between the District, as employer, and Dr. Milton R. Jones, as employee;

- Employment Agreement between the District, as employer, and Dr. Steve Chong Luo, as employee;

- Service Agreement between the District and Laboratory Specialists International, as service provider;

- Lease between the District, as lessee, and Marlin Leasing Corporation, as lessor, pertaining to certain medical equipment, including a Horiba Medial Pentra 60 C+, two Unimac Natural Gas Dryers, and one Ultrascan table;

- Agreement between the District and T System, Inc.; and

- Agreement between the District and Tosoh Bioscience, Inc.

### a. Claims Arising from Rejection

Unless otherwise agreed by the District and the counterparty or counterparties to the subject contract or lease, proofs of Claim arising from the rejection of executory contracts or unexpired leases must be filed with the Bankruptcy Court and served on the District no later than thirty (30) days after the Effective Date. The failure to properly and timely assert a rejection damages Claim shall result in such Claim being forever barred and rendered unenforceable

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

against the District or its assets, properties, or interests in property. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be classified into Class 3 (General Unsecured Claims) and treated accordingly.

**C.    Means for Execution and Implementation of Plan**

Under the Plan, the District shall be required to make Cash disbursements totaling approximately $1,33,071 to the holders of Allowed Claims over a term of approximately seven (7) years while paying an estimated $9,476,530 per year for the costs and expenses associated with maintaining the operations of the District's facilities and services, including, without limitation, costs associated with staffing, supplies and equipment, and capital expenditures for the acquisition of new property and maintenance of current property, which total.

The Plan will be funded utilizing primarily the following sources:

- <u>Cash on Hand</u>. The District estimates that it will have approximately $311,131 in cash on hand on the Effective Date.

- <u>Operations</u>. The District estimates that it will generate approximately $9,754,532 per year from the operations.[22]

- <u>Tax Revenues</u>. The District anticipates receiving approximately $900,000 per year on account on approved tax assessments.

- <u>Parcel Tax Revenues</u>. As set forth in greater detail, *supra*, at Section V.B.2., the District anticipates receiving additional parcel tax revenues of $602,000 per year beginning in December 2018.

- <u>Transient Occupancy Tax</u>. As set forth in greater detail, *supra*, at Section V.B.2., the District anticipates receiving revenues from the Transient Occupancy Tax (TOT) of $34,600 per year.

- <u>Inyo County Treasury Loan</u>. In accordance with its prior practices, the District intends to borrow funds from Inyo County to the extent necessary to cover any cash shortage during the term of the Plan. The District would repay any such loan(s) with interest upon receipt of funds from the Intergovernmental Transfer

---

[22] The estimated operational revenues includes the estimated revenues from the facility for medical infusion services.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

program (described in Exhibit 5 as "Supplemental Funds") or upon the availability of funds. Interest on such loans accrues at the rate of the current Local Agency Investment Fund at the time of financing plus 100 basis points.

- <u>Litigation Proceeds</u>. As discussed *supra*, the District intends to commence litigation against certain individuals and entities. If successfully, the District may obtain damages in excess of $6,000,000 and avoid certain fraudulent and/or preferential payments to creditors. Such funds will be available for the payment of Claims under the Plan and the maintenance of the District's operations.

In sum, the District anticipates having approximately $311,131 in cash on hand on the Effective Date and approximately $10,391,150 in revenues per year. As a result, and as the financial projections (Exhibit 5) reflect, the District is confident it will be able to maintain its operations so that it can continue providing desperately needed medical treatment to the community at large while making the payments required under the Plan.

**D.    Distributions**

**1.    Disbursing Agent**

On and after the Effective Date, the District shall serve as disbursing agent for payments to be made under the Plan and in accordance with section 944. However, the District may elect to retain one or more agents to perform or assist it in making distributions pursuant to the Plan and may provide reasonable compensation to any such agent(s) without further notice or Bankruptcy Court approval.

**2.    Delivery of Distributions**

All distributions to any holder of an Allowed Claim shall be made at the address of such holder as set forth in the books and records of the District or its agents unless (i) the holder has designated an alternate address for payment in a proof of Claim filed with the Bankruptcy Court or (ii) specifies an alternate address on its Ballot. Any and all notifications of address changes should be addressed to Karla Hernandez at Baker & Hostetler LLP, 11601 Wilshire Boulevard, Suite 1400, Los Angeles, California 90024, or khernandez@bakerlaw.com.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

- 45 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

### 3.     Undeliverable Distributions

*Holding of Undeliverable Distributions*. If any distribution to a holder of an Allowed Claim is returned to the District or its agent as undeliverable, no further distributions shall be made to such holder unless and until the District is notified in writing of such holder's correct address. Unless and until the District is so notified, such distribution shall be deemed to be "Unclaimed Property" and shall be set aside and held in a segregated account.

*Notification and Forfeiture of Unclaimed Property.* On the first anniversary of the Effective Date, the District will file with the Bankruptcy Court a list of Unclaimed Property, together with a schedule that identifies the name and last-known address of the individuals and entities entitled to the Unclaimed Property. The District shall not otherwise be required to attempt to locate any such individual or entity. On the second anniversary of the Effective Date, all remaining Unclaimed Property and accrued interest or dividends earned thereon will be remitted to and vest in the District. Additionally, such individuals and entities shall be deemed to have waived and forfeited their right to any future payments under the Plan and such funds shall be retained by the District. Notwithstanding the non-payment of any forfeited Claims, such Claims shall be deemed satisfied and discharged as if paid pursuant to the terms of the Plan.

### 4.     Distribution of Cash

Any payment of Cash to be made by the District or its agent pursuant to the Plan shall be made by check drawn on a domestic bank or by wire transfer, at the sole option of the District.

### 5.     Timeliness of Payments

Any payments or distributions to be made pursuant to the Plan shall be deemed to be timely made if made within fourteen (14) Business Days after the date(s) specified in the Plan. Whenever any distribution to be made under the Plan is due on a day that is not a Business Day, such distribution instead shall be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due.

### 6.     Default and Cure

In the event the District fails to make any payment required under the Plan in a timely manner, the affected creditor(s) shall serve the District with a notice of default not later than thirty

- 46 -

(30) days after the purported default along with any documentation supporting the alleged default. Not later than sixty (60) days after receipt of the notice of the purported default, the District shall either (i) cure the default or (ii) serve the affected creditor(s) with a statement and supporting documentation contesting the allegation of default. In the event the District contests an alleged default, not later than five (5) Business Days after serving a response to a purported default, the District shall file a motion with the Bankruptcy Court requesting a resolution of the dispute relating to the alleged default and set the motion for hearing on the first available hearing date not sooner than fourteen (14) days after filing the motion. If the Bankruptcy Court rules that the non-payment constitutes an event of default under the Plan, the District shall cure the purported default not later than five (5) Business Days following the entry of a Final Order of the Bankruptcy Court adopting the finding with respect to the purported default.

### 7.    Compliance with Tax Requirements

Any and all distributions pursuant to the Plan shall be subject to any applicable tax withholding and reporting requirements imposed on it by any governmental unit. In connection with each distribution which requires the filing of an information return (such as Internal Revenue Service Form 1099 or 1042) or withholding, the District shall file such information return with the Internal Revenue Service and provide any required statements in connection therewith to the recipients of such distribution, or effect any such withholding and deposit all moneys so withheld to the extent required by law. With respect to any entity from whom a tax identification number, certified tax identification number, or other tax information is required by law to avoid withholding has not been received by the District at the time the district is to be made, the District, at its sole option, may withhold the amount required and distribute the balance to such entity or the District may decline to make such distribution(s) until the information is received.

### 8.    Time Bar to Cash Payments

Checks issued by the District on account of Allowed Claims will be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof. Requests for reissuance of any check shall be submitted in writing to Karla Hernandez via first-class mail addressed to Karla Hernandez, Baker & Hostetler LLP, 11601 Wilshire Boulevard, Suite 1400,

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

- 47 -

Los Angeles, California 90024, or via email addressed to khernandez@bakerlaw.com. Any request for reissuance of an expired check must be not later than 180 calendar days following the initial issuance of the subject check. After such date, the amounts stated in the voided check(s) shall be deemed forfeited and the District shall retain such funds. Any amounts forfeited pursuant to the preceding sentence shall be deemed paid to and received by the subject claimant for purposes of calculating the amounts owing to such creditor under the Plan.

### 9. No *De Minimis* Distributions

With the exception of Class 4 Claims (Convenience Class Claims), no payment of less than ten dollars (US$10.00) will be made by the District on account of any Allowed Claim.

### 10. No Distributions on Account of Disputed Claims

Notwithstanding anything to the contrary in the Plan, no distributions shall be made on account of any part of any Disputed Claim or Disallowed Claim unless and until such Claim becomes an Allowed Claim and only to the extent such Claim constitutes an Allowed Claim. Distributions made after the Effective Date with respect to Claims that were not Allowed Claims as of the Effective Date, but are later determined to be Allowed Claims, shall be deemed to have been made on time and in accordance with the terms of the Plan.

If any distributions are made prior to the resolution of a dispute pertaining to a Claim, the portion that would be payable on account of such Claim if such Claim was an Allowed Claim, shall be held in a segregated bank account. If the Claim is subsequently adjudicated to be an Allowed Claim, the segregated funds shall be distributed to the holder of such Claim. Any interest accrued on account of the segregated funds shall be paid to and retained by the District.

### 11. No Post-Petition Date Accrual

Unless otherwise specifically provided in the Plan, specifically agreed to by the District in writing, or allowed by Final Order of the Bankruptcy Court, the District will not be required to pay to any holder of a Claim any interest, penalty or late charge accruing with respect to such Claim on or after the Petition Date.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

EXHIBIT CC  363
611923772.1

SECOND AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS

**E.    Disputed Claims; Objections to Claims; Prosecution of Objections to Disputed Claims**

      **1.    Claim Objection Deadline; Prosecution of Objections**

The District shall have the right to object to the allowance of Claims with respect to which liability or allowance is disputed in whole or in part. Unless otherwise ordered by the Bankruptcy Court, the District shall file and serve any such objections to Claims (whether by motion or commencement of an adversary proceeding) by not later than one hundred and eighty (180) days after the Effective Date or, in the case of Claims properly filed after the Effective Date, by not later than one hundred and eighty (180) days after the date of filing of such Claims.

      **2.    Reserves, Payments, and Distributions with Respect to Disputed Claims**

At such time as a Disputed Claim becomes an Allowed Claim, in whole or in part, the District or its agent shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan in the manner set forth in the Plan. Such distributions, if any, shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Claim becomes a Final Order, but in no event more than sixty (60) days thereafter, unless otherwise provided in the Plan, order of the Bankruptcy Court, or agreement between the District and the subject Claim holder. Unless otherwise specifically provided in the Plan or allowed by Final Order of the Bankruptcy Court, no interest will be paid on Disputed Claims that later become Allowed Claims.

**F.    Continuing Jurisdiction of the Bankruptcy Court**

The Plan provides for the Bankruptcy Court to retain jurisdiction over various matters relating to the Chapter 9 Case, the Plan, and other related items. Readers are encouraged to review the Plan carefully to ascertain the nature of the Bankruptcy Court's continuing jurisdiction following the Effective Date.

**VII.    CONFIRMATION AND EFFECTIVE DATE OF THE PLAN**

Because the law with respect to confirmation of a plan of adjustment is complex, creditors concerned with issues regarding confirmation of the Plan should consult with

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

**independent counsel and/or a financial advisor.** The following discussion is intended solely for the purpose of providing basic information concerning certain confirmation issues. The District cannot and does not represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Bankruptcy Court can confirm the Plan. Some of the requirements discussed in this Disclosure Statement include acceptance of the Plan by the requisite number of creditors and whether the Plan is in the "best interests" of creditors. These requirements, however, are not the only requirements for confirmation and the Bankruptcy Court will not confirm the Plan unless and until it determines that the Plan satisfies all applicable requirements, including requirements which may not be discussed or referenced in this Disclosure Statement

### A.    Voting and Right to be Heard at Confirmation

#### 1.    Who May Support or Object to Confirmation of the Plan?

Any party in interest may support or object to the confirmation of the Plan. Even parties in interest that may not have a right to vote on the Plan (e.g., individuals and entities in Unimpaired Classes) may still have a right to support or object to confirmation of the Plan by filing pleadings supporting or objecting to confirmation of the Plan.

#### 2.    Who May Vote to Accept or Reject the Plan?

A creditor generally has the right to vote for or against the Plan if its Claim is both (i) an Allowed Claim for purposes of voting and (ii) classified in an Impaired Class. Generally, a Claim is deemed allowed if a proof of Claim was timely filed or the Claim is scheduled as undisputed, non-contingent and liquidated; *provided, however*, that if an objection to the Claim has been filed or raised in the Plan or otherwise, or a Claim is otherwise disputed or contested, the claimant cannot vote unless and until the Bankruptcy Court, after notice and a hearing, either overrules the objection or allows the Claim for voting purposes.

The holders of the following types of Claims <u>are not</u> entitled to vote on the Plan: (a) Disallowed Claims; (b) Claims that are subject to a pending objection (whether by way of the Plan or independent motion or adversary proceeding) and that have not been allowed for voting

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

purposes; (c) Claims that are not Impaired under the Plan; (d) Administrative Claims, since such Claims are not placed in Classes and are required to receive specific treatment; and (e) Professional Claims, since such Claims are not placed in Classes.

Each holder of an Allowed Claim classified into one or more of the Voting Classes shall be entitled to vote each such Claim to accept or reject the Plan.

### 3.    Votes Required to Confirm Plan

The Bankruptcy Court cannot confirm the Plan unless, among other things, (a) at least one Impaired Class has accepted the Plan without counting the votes of any Insiders within that Class and (b) either all Impaired Classes have voted to accept the Plan, or the Plan can be "crammed-down" with respect to each and every dissenting Impaired Class.

A Class of Claims is considered to have accepted the Plan when more than one-half in number **and** at least two-thirds in dollar amount of the Claims that actually voted in that Class have voted in favor of the Plan.

### B.    The "Best Interests" Test

The Bankruptcy Court also must determine pursuant to section 943(b)(7) that the Plan is in the "best interests of creditors", which in the chapter 9 context means that the treatment of Claims under the Plan must be better than the only meaningful alternative available, which is dismissal of the Chapter 9 Case.  The District submits that the Plan is in the best interests of all creditors because significant payments will be made to all Impaired Classes, and holders of Allowed Claims in all Impaired Classes will receive greater distributions under the Plan than those creditors would receive were the Chapter 9 Case dismissed.  *See* Exhibit 5 to Plan Exhibits.

In contrast, in the absence of the Plan, the District's creditors would be left to "fend for themselves."  Individual creditor collection actions would likely aggregate, through suits and attachments, to make continued operation of the District's facilities untenable (if not impossible), thus eliminating the ability to pay the obligations of the District.  More precisely, but for the adjustment to its obligations proposed through the Plan, the District will not be unable to alter the treatment of certain Claims, including General Unsecured Claims.  The District will also lose the benefits afforded to debtors under the Bankruptcy Code, which, in essence, would result in

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

substantial interference in the operations of the Hospital, the SNF, and/or the Clinic as creditors sought to recover collateral and levy against the District's assets to satisfy their Claims, which would prevent the District from utilizing those assets to maintain operations and pay its obligations in an orderly and equitable fashion over a term of years. Furthermore, the District would likely be unable to resolve disputes regarding certain purported Claims (including, without limitation, the Claim asserted by Optum Bank) without the need for costly and protracted litigation—expenses that would further diminish, if not decimate, operational capabilities. As a result of the foregoing, the proposed ballot initiatives underpinning the Plan would likely fail as the District would be unable to maintain its operations or establish a long-term work-out plan for the payment of its obligations in the face of operational difficulties causes by the debt collection efforts of its creditors and the costs of litigation. In short, the District cannot afford to pay its creditors absent the debt relief afforded by the Plan, and dismissal of the Chapter 9 Case would likely result in chaos, the closure of the District's facilities and cessation of its services, and, thus, an inability to not only pay most (if not all) of its creditors, but an inability to continue providing essential services to the community at large.

## C. Feasibility

To satisfy the requirement set forth in section 943(b)(7) that the Plan be feasible, the District must demonstrate the ability to make the payments required under the Plan while maintaining its operations at the level necessary to the continued viability of the health care district. Based on the District's analysis of operational revenues, anticipated bond revenues, and supplemental tax revenues, as well as the projected Plan distributions, the District is confident it possesses the financial ability to maintain its current operations, which is necessary to continue providing services to the community, while simultaneously meeting its obligations under the Plan. Indeed, based on the financial projections (*see* Exhibit 5), the District will be able to maintain a positive cash position while servicing operational and Plan debts and simultaneously maintaining a reserve for future expenditures, including capital expenditures. Accordingly, the District submits that the Plan is feasible.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

- 52 -

EXHIBIT CC  367
611923772.1

SECOND AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS

### D. "Cramdown"

The Bankruptcy Code provides that the Bankruptcy Court may confirm a plan of adjustment that is not accepted by all Impaired Classes if at least one Impaired Class of Claims accepts the Plan and the so-called "cramdown" provisions set forth in sections 1129(b)(1), (b)(2)(A) and (b)(2)(B) are satisfied. The Plan may be confirmed under the cramdown provisions if, in addition to satisfying the other requirements of section 943(b), it (a) is "fair and equitable," and (b) does not discriminate unfairly with respect to each Class of Claims that is Impaired under and has not accepted the Plan. The District believes that the Plan satisfies the foregoing requirements and, as such, may be confirmed over the objection of any dissenting Class of Claims.

**As noted above, the District has reserved the right to request that the Bankruptcy Court confirm the Plan by "cramdown" in accordance with sections 1129(b)(1), (b)(2)(A) and (b)(2)(B).**

### E. Conditions Precedent

#### 1. Condition Precedent to Confirmation

The Plan shall not be confirmed unless and until the following conditions precedent have been satisfied or waived: (1) the Plan satisfies the requirements of section 943(b) of the Bankruptcy Code, as applicable; (2) the District has received any and all authorizations, consents, regulatory approvals, rulings, no-action letters, opinions, and documents that are necessary to implement the Plan and that are required by law, regulation or order, including, but not limited to, those required under section 943(b)(6) of the Bankruptcy Code; and (3) the Bankruptcy Court enters a Confirmation Order in a form and substance satisfactory to the District.

#### 2. Conditions Precedent to Effective Date

The Plan will not become effective and operative unless and until the Effective Date occurs. Section XIII of the Plan sets forth certain conditions to the occurrence of the Effective Date. The Effective Date will occur on the first Business Day after which the conditions set forth in Section XIII.B. of the Plan are satisfied or waived. Based on currently available information, the District anticipates that the Effective Date will occur in or about March 2018.

- 53 -

EXHIBIT CC  368
611923772.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

### 3.    Non-Occurrence of Effective Date

The Plan provides that, if the Bankruptcy Court confirms the Plan but the conditions precedent to the Effective Date thereof are not satisfied, upon notification submitted by the District to the Bankruptcy Court: (i) the Confirmation Order shall be vacated, (ii) no distributions under the Plan shall be made, (iii) the District and all holders of Claims shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iv) all of the District's obligations with respect to the Claims shall remain unchanged and nothing contained herein or in the Plan shall be deemed to constitute a waiver or release of any Claims by or against the District or any other entity or to prejudice in any manner the rights, remedies, or claims of the District or any entity in any further proceeding involving the District.

### 4.    Waiver of Conditions Precedent to Effective Date

Under the Plan, the District may waive in whole or in part any condition to the Effective Date of the Plan or the payment of any Effective Date Payments. Any such waiver of a condition may be effected at any time, without notice or leave or order of the Bankruptcy Court and without any formal action, other than the filing of a notice of such waiver with the Bankruptcy Court.

### F.    Effect of Confirmation

Confirmation of the Plan and the occurrence of the Effective Date will have a number of important and binding effects, some of which are summarized below. Readers are encouraged to review Section XI of the Plan carefully and in its entirety to assess the various consequences of confirmation of the Plan.

### 1.    Dissolution of the Committee

On the Effective Date, the Committee shall be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to and arising from and in connection with the Chapter 9 Case and the Committee shall be deemed dissolved and its appointment terminated. Any professionals retained by the Committee and/or the members thereof shall not be entitled to compensation or reimbursement of expenses for any services rendered or expenses incurred.

- 54 -

### 2.    Discharge of the District

Pursuant to section 944, upon completion of all payments required under the Plan, the District shall be discharged from all debts (as defined in the Bankruptcy Code) of the District and Claims against the District other than (i) any debt specifically and expressly excepted from discharge by the Plan or the Confirmation Order and (ii) any debt owed to an entity that, before the confirmation of the Plan, had neither notice nor actual knowledge of the Chapter 9 Case.

The rights afforded in the Plan and the treatment of all holders of Claims, whether Impaired or Unimpaired, shall be in exchange for and in complete satisfaction, discharge and release of all Claims of any nature whatsoever arising on or before the Effective Date, known or unknown, including any interest accrued or expenses incurred thereon from and after the Petition Date, whether against the District or any of its properties, assets or interests in property.

### 3.    Injunction

Except as otherwise expressly provided in the Plan, all entities who have held, hold or may hold Pre-Confirmation Date Claims shall be permanently enjoined from and after the Confirmation Date from: (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Pre-Confirmation Date Claims against the District or its property; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree or order against the District or its property with respect to such Pre-Confirmation Date Claims; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against the District or its property; and (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due to the District with respect to any such Pre-Confirmation Date Claims.

### 4.    Term of Existing Injunctions and Stays

Unless otherwise provided in the Plan, all injunctions or stays provided for in the Chapter 9 Case pursuant to sections 105, 362, or 922, or otherwise, and in existence immediately prior to the Confirmation Date, shall remain in full force and effect unless and until the District receives a discharge in accordance with Section XI.A. of the Plan.

**5.  Exculpation**

Except with respect to obligations specifically arising pursuant to or preserved in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Claim, obligation, cause of action or liability for any Claim in connection with or arising prior to or on the Effective Date for any act taken in connection with, or related to, (i) the administration of the Chapter 9 Case, (ii) the negotiations, pursuit, confirmation, solicitation of votes for, consummation or implementation of the Plan, (iii) the administration of the Plan or property to be distributed under the Plan, (iv) the Cal. Gov't Code § 53760 process or compliance therewith, (v) any document, release, contract, or other instrument entered into in connection with, or related to, the Plan, and/or (vi) any other transaction contemplated by or entered into in connection with the Plan or entered into during the administration of the Chapter 9 Case; *provided*, *however*, that nothing shall be deemed to release or exculpate any Exculpated Party for its willful misconduct or gross negligence. In all respects, each Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities pursuant to the Plan.

**6.  Good Faith Compromise**

In consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan, including, without limitation, the exculpation provisions, constitute a good faith compromise and settlement of all Claims, causes of action and/or controversies relating to any and all rights that a holder of a Claim may have against the District, any distributions to be made pursuant to the Plan on account of any such Claim, and any and all Claims and causes of action of any party. The entry of the Confirmation Order constitutes the Bankruptcy Court's approval, effective as of the Effective Date, of the compromise or settlement of all such Claims and/or controversies and the Bankruptcy Court's finding that all such compromises or settlements are in the best interests of the District and the holders of Claims, and are fair, equitable, and reasonable.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

EXHIBIT CC  371
611923772.1

SECOND AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS

## VIII.    RESERVATION OF RIGHTS OF ACTION

Any and all claims, causes of action, rights of recovery, rights of offset, rights of recoupment, rights to refunds, and similar rights held by the District shall be retained by the District, including, without limitation, the claims and causes of action alleged in the Optum Adversary.  The failure to identify any potential or existing Right of Action retained by the District is not intended to and shall not limit the rights of the District to pursue any such action(s).  Unless a Right of Action is expressly waived, relinquished, released, compromised, or settled (in the Plan or otherwise), the District expressly reserves all Rights of Action for later adjudication and, as a result, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Rights of Action upon or after the Confirmation Date.  In addition, the District expressly reserves the right to pursue or adopt against any other entity any claims alleged in any lawsuit in which the District is a defendant or an interested party.

## IX.    RISK FACTORS

Holders of Claims against the District should read and consider carefully the factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered with this Disclosure Statement and/or incorporated by reference, prior to voting to accept or reject the Plan.  These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.

As discussed herein, the Plan is premised on revenues from four principal sources—namely, (i) operational revenues, (ii) revenues derived from the increased parcel tax, and (iii) revenues derived from the TOT.

1.    With respect to the provision of medical infusion treatments, the District has yet to establish the facility or provide the services; accordingly, there is a risk that the costs of acquiring the necessary equipment and establishing the treatment facility may exceed the cost estimates, that the facility may take longer than nine (9) months to establish, that the operational expenses may exceed the estimated costs,

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

- 57 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1    and/or that the demand for such services may be less than the projected demand—

2    thereby reducing the anticipated revenues.

3    2.    With respect to the parcel tax revenues, the District requires voter approval for the

4    parcel tax initiative; accordingly, there is a risk that voters will not approve the

5    parcel tax increase.  Notwithstanding, as the Effective Date is expressly

6    conditioned upon the approval of the parcel tax initiative, such approval is not a

7    risk factor in considering the District's ability to perform under the Plan; however,

8    the approval of the parcel tax initiative is a risk factor in considering whether the

9    Effective Date will occur.

10   3.    With respect to the TOT revenues, the District requires approval from the Inyo

11   County Board of Supervisors to receive a portion of the TOT; accordingly, there is

12   a risk that Board will not approve the TOT increase.  Notwithstanding, as the

13   Effective Date is expressly conditioned upon the approval of the TOT initiative,

14   such approval is not a risk factor in considering the District's ability to perform

15   under the Plan; however, the approval of the TOT initiative is a risk factor in

16   considering whether the Effective Date will occur.

17   4.    With respect to potential litigation revenues, the District may not prevail in the

18   potential litigation described herein.  If the District is unsuccessful, the District

19   may not receive the potential damages awards or may be required to pay certain

20   sums to creditors, including, without limitation, Optum and ViHF.  The District,

21   however, does not require the potential damages awards to perform under the Plan

22   and, moreover, has provided for the contingency that the Claims of Optum and/or

23   ViHF are adjudged to be Allowed Secured Claims.

24   5.    The Plan also relies upon operational revenues from the Hospital, the SNF, and the

25   Clinic to fund operations and pay Allowed Claims under the Plan.  As such, there

26   are several risks related to the District's operations that may affect the Plan,

27   including the following:

28

a. The demand for medical services in Inyo County may decline and, thus, decrease revenues;

b. Reimbursement from insurance companies and governmental programs (e.g., Medicare and MediCal) may decrease and, thus, decrease revenues; and

c. Costs associated with operating the business (e.g., payroll, medicine, equipment, medical supplies, utilities, etc.) may increase and, thereby, decrease net revenues.

There is also a risk that the amount of the Allowed Claims may be greater than currently estimated, in which case distributions to creditors may be reduced.

## X.    FEDERAL INCOME TAX CONSEQUENCES

The implementation of the Plan may have federal, state, local and foreign tax consequences to the District and its creditors. No tax opinion has been sought or will be obtained with respect to any tax consequences of the Plan. This Disclosure Statement does not constitute and is not intended to constitute either a tax opinion or tax advice to any person, and the summary contained herein is provided for informational purposes only. However, because the District is a municipality and, thus, is treated as a political subdivision of the State of California for federal income tax purposes, the District believes that it will not be subject to any federal income tax liability from the implementation of the Plan.

As individual circumstances may differ, and the income tax consequences of a chapter 9 case are complex and uncertain, this summary does not address the federal income tax consequences that may be relevant to the creditors of the District as a result of the Plan. Accordingly, creditors should consult with their own tax advisors regarding the potential income tax consequences of the Plan as it pertains to them.

**To ensure compliance with requirements imposed by the Internal Revenue Service, you are hereby notified that any discussion of tax matters contained herein (including any attachments) is not intended or written to be used by any taxpayer, and cannot be used by any taxpayer, for the purpose of avoiding tax-related penalties that otherwise may be**

EXHIBIT CC  374
611923772.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

imposed under the Internal Revenue Code on the taxpayer.  Such discussion of tax matters was written in connection with the solicitation of votes in favor of the Plan.  The District and its creditors should seek tax advice regarding the tax consequences to them of the Plan based on their particular circumstances from an independent tax advisor.

## XI.    RECOMMENDATION AND CONCLUSION

The District believes that confirmation and implementation of the Plan represents the best option for the District and its creditors.  Accordingly, **the District urges holders of Impaired Claims to vote to accept the Plan by so indicating on their Ballots and returning them as specified in this Disclosure Statement and on their Ballots.**

Dated:    January 17, 2018         SOUTHERN INYO HEALTHCARE DISTRICT

By:    /s/ Mark Lacey [signature to follow]
Mark Lacey

Vice President of the Board of Directors for Southern Inyo Healthcare District

Submitted by:

**BAKER & HOSTETLER LLP**

By:    /s/ Michael T. Delaney
Ashley M. McDow
Michael T. Delaney

Attorneys for Debtor,
SOUTHERN INYO HEALTHCARE DISTRICT

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

EXHIBIT CC  375
611923772.1                    SECOND AMENDED DISCLOSURE STATEMENT FOR PLAN OF ADJUSTMENT OF DEBTS

# 3

1  MARC A. LEVINSON, CSB NO. 57613
2  CYNTHIA J. LARSEN, CSB NO. 123994
   **ORRICK, HERRINGTON & SUTCLIFFE LLP**
3  400 Capitol Mall, Suite 3000
   Sacramento, California 95814-4497
4  Telephone: (916) 329-4910
   Email: malevinson@orrick.com
5         clarsen@orrick.com

6  HAGOP T. BEDOYAN, CSB NO. 131285
7  LISA HOLDER, CSB NO. 217752
   **Klein, DeNatale, Goldner,**
8    **Cooper, Rosenlieb & Kimball LLP**
   5260 N. Palm Avenue, Suite 201
9  Fresno, California 93704
   Telephone: (559) 438-4374
10 Facsimile:  (661) 326-0418
11 E-mail: hbedoyan@kleinlaw.com
           lholder@kleinlaw.com

12
13 Attorneys for Healthcare Conglomerate Associates, LLC

14                **UNITED STATES BANKRUPTCY COURT**

15        **EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION**

16

17 In re:                              Case No.: 16-10015-A-9

18 SOUTHERN INYO HEALTHCARE           Chapter 9
   DISTRICT,
19                                     Doc. No. KDG-1
20             Debtor.

21

22                                     Date:  To Be Scheduled
                                       Time:  To Be Scheduled
23                                     Place: Dept. A, Courtroom 11
                                              U.S. Bankruptcy Court
24                                            2500 Tulare St.
                                              Fresno, CA 93721
25

26

27

28 ///

1
2

**REQUEST FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM OF HEALTHCARE CONGLOMERATE ASSOCIATES, LLC ARISING OUT OF REJECTION OF EXECUTORY CONTRACT (11 U.S.C. §§ 503(b) AND 507(a)(2))**

3      NOTICE IS HEREBY GIVEN that HEALTHCARE CONGLOMERATE ASSOCIATES,

4 LLC ("HCCA") hereby asserts an Administrative Expense Claim (the "Claim") in the total

5 amount of $2,524,054.00, pursuant to 11 U.S.C. §§ 503(b) and 507(a) (2), and represents the

6 following:

7      1.    This claim arises out of the rejection of that certain Management Services

8 Agreement ("MSA") dated sometime in January of 2016, between HCCA and Southern Inyo

9 Healthcare District (the "Debtor"). A copy of the MSA is attached hereto as Exhibit "A" and

10 incorporated herein by reference.

11      2.    On December 2, 2017, the Court made its *Order Approving Stipulation Re*

12 *Rejection of HCCA Management Agreement* [Dkt. No. 382] (the "Rejection Order"). The

13 Rejection Order approved that certain *Stipulation Re Rejection of HCCA Management Agreement*

14 [Dkt. No. 377], which specifically preserved HCCA's right to contest allegations made in the

15 *Debtor's Emergency Motion (1) for Authority to Immediately Terminate HCCA Management*

16 *Agreement* [Dkt. No. 325], including the Debtor's allegations that the MSA is a prepetition

17 contract.

18      3.    The Rejection Order further provided that, Pursuant to Rule 3002(c)(4) of the

19 Federal Rules of Bankruptcy Procedure, HCCA shall file any claim arising from this rejection,

20 including, but not limited to any claim or demand seeking administrative expense payments, no

21 later than **January 31, 2018**." (Rejection Order, Par. D).

22      4.    The Claim is based upon the following items:

23

| | |
|---|---|
| Unpaid Management Fees (See, Exh. B) | $1,184,730.00 |
| Unpaid Travel Expenses (See, Exh. C) | $137,850.00 |
| MSA Term. Fee Before Interest (See, Exh. D) | $1,201,474.00 |
| TOTAL | $2,524,054.00 |

28   ///

1       5.      Claimant reserves the right to amend this Claim and will set the matter for hearing

2   at a future date.

3

4   Dated: January  __30__ , 2018                    KLEIN, DENATALE, GOLDNER, COOPER,
                                                     ROSENLIEB & KIMBALL LLP AND ORRICK,
5                                                    HERRINGTON & SUTCLIFFE LLP

6

7                                                    By: _____

8                                                         HAGOP T. BEDOYAN
                                                     Attorneys for Healthcare Conglomerate
9                                                            Associates, LLC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  Ashley M. McDow (245114)
   Fahim Farivar (252153)
2  **FOLEY & LARDNER LLP**
   555 S. Flower St. #3500
3  Los Angeles, CA  90071
   Telephone:    213.972.4615
4  Facsimile:    213.486.0065
   Email:        amcdow@foley.com
5                ffarivar@foley.com

6  Attorneys for Debtor,
   SOUTHERN INYO HEALTHCARE DISTRICT
7

8            **UNITED STATES BANKRUPTCY COURT**

9            **EASTERN DISTRICT OF CALIFORNIA**

10                   **FRESNO DIVISION**

11
   In re                              Case No.: 2016-10015
12
   SOUTHERN INYO HEALTHCARE           Chapter 9
13 DISTRICT,
                                      FL-2
14          Debtor.
                                      ***EX PARTE* MOTION TO REMOVE**
15                                    **FROM THE RECORD AND REPLACE**
                                      **THE CHAPTER 9 STATUS REPORT**
16                                    **FILED WITH THE COURT ON MAY 17,**
                                      **2018 DUE TO INADVERTENT**
17                                    **DISCLOSURE OF HIGHLY SENSITIVE**
                                      **INFORMATION; DECLARATION OF**
18                                    **ASHLEY M. MCDOW IN SUPPORT**

19                                    [Pursuant to Local Bankruptcy Rules 9018-1
                                       and/or 9037-1]
20

21

22

23

24

25

26

27

28

1    SOUTHERN INYO HEALTHCARE DISTRICT ("SIHD" or the "Debtor"), the debtor in

2    the above-captioned bankruptcy case (the "Bankruptcy Case"), respectfully submits the within *Ex*

3    *Parte* Motion to Remove from the Record and Replace the Chapter 9 Status Report filed with the

4    Court on May 17, 2018 due to inadvertent disclosure of highly sensitive information, pursuant to

5    Local Bankruptcy Rules 9018-1 and/or 9037-1 (the "*Ex Parte* Motion").

6    Unfortunately, a subsection of the Initial SR regarding the settlement discussions with the

7    Los Angeles Department of Water and Power (the "DWP") inadvertently disclosed certain highly

8    sensitive information.  After further review of the Initial SR by the member of the Debtor's Board

9    of Directors who is most familiar with this matter, it was determined that the disclosure of the

10   referenced information would unnecessarily jeopardize the settlement discussions with the DWP.

11   Based on the foregoing, the Debtor respectfully request that the Court remove the Initial SR from

12   the record and replace it with the revised version of the Chapter 9 Status Report (the "Revised

13   SR"), which has removed any reference to sensitive information.  A true and correct copy of the

14   Revised SR is attached as **Exhibit A** to the Declaration of Ashley M. McDow, and has also been

15   filed separately concurrently herewith**.**

16

17    Dated:    May 17, 2018                    Respectfully submitted,

18

19                                             **FOLEY & LARDNER LLP**

20                                             By:    /s/ Ashley M. McDow

21                                                    Ashley M. McDow
                                                      Fahim Farivar
22
                                               Attorneys for Debtor,
23                                             SOUTHERN INYO HEALTHCARE DISTRICT

24

25

26

27

28

Exhibit E - 380

1

## **DECLARATION OF ASHLEY M. MCDOW**

2      I, Ashley M. McDow, hereby declare:

3      1.      I am an attorney duly admitted to practice before this court. I am a partner with

4 the law firm of Foley & Lardner LLP ("<u>Foley</u>"), general insolvency counsel for the Southern Inyo

5 Healthcare District in the above-captioned bankruptcy case (the "<u>Debtor</u>" or the "<u>District</u>"). I

6 submit this declaration in support of the *Ex Parte* Motion to Redact from the Record and Replace

7 the Chapter 9 Status Report filed with the Court on May 17, 2018 due to inadvertent disclosure of

8 highly sensitive information, pursuant to Local Bankruptcy Rules 9018-1 and/or 9037-1 (the "*Ex*

9 *Parte* Motion").

10      2.      On May 17, 2018, at approximately 2:30 a.m., I caused to be filed the Chapter 9

11 Status Report (the "Initial SR") utilizing eCalWebfiling.

12      3.      Unfortunately, a subsection of the Initial SR regarding the settlement discussions

13 with the Los Angeles Department of Water and Power (the "DWP") inadvertently disclosed

14 certain highly sensitive information. After further review of the Initial SR by the member of the

15 Debtor's Board of Directors who is most familiar with this matter, it was determined that the

16 disclosure of the referenced information would unnecessarily jeopardize the settlement

17 discussions with the DWP. Based on the foregoing, the Debtor respectfully requests that the

18 Court remove the Initial SR from the record and replace it with the revised version of the Chapter

19 9 Status Report (the "Revised SR"), which has removed any reference to sensitive information. A

20 true and correct copy of the Revised SR is attached hereto as **Exhibit A**, and has also been filed

21 separately concurrently herewith**.**

22

23      I declare under penalty of perjury that the foregoing is true and correct. Executed this

24 17th day of May 2018, at Calabasas, California.

25

26                              /s/ Ashley M. McDow
                                  Ashley M. McDow

27

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

EX PARTE MOTION TO REMOVE FROM THE RECORD AND REPLACE THE CHAPTER 9 STATUS REPORT FILED WITH THE
COURT ON MAY 17, 2018 DUE TO INADVERTENT DISCLOSURE OF HIGHLY SENSITIVE INFORMATION

Exhibit E 38

# EXHIBIT A

1    Ashley M. McDow (245114)
     Fahim Farivar (252153)
2    **FOLEY & LARDNER LLP**
     555 S. Flower St. #3500
3    Los Angeles, CA 90071
     Telephone:    213.972.4500
4    Facsimile:    213.486.0065
     Email:    amcdow@foley.com
5            ffarivar@foley.com

6    Attorneys for Debtor,
     SOUTHERN INYO HEALTHCARE DISTRICT

7

8                **UNITED STATES BANKRUPTCY COURT**

9                **EASTERN DISTRICT OF CALIFORNIA**

10                        **FRESNO DIVISION**

11
     In re                              | Case No.: 2016-10015
12
     SOUTHERN INYO HEALTHCARE           | Chapter 9
13   DISTRICT,
                                         | FL-2
14            Debtor.
                                         | **CHAPTER 9 STATUS REPORT**
15
                                         | Status Conference:
16                                       | Date:    May 30, 2018
                                         | Time:    1:30 p.m.
17                                       | Place:   Dept. A, Ctrm 11
                                         |          U.S. Bankruptcy Court
18                                       |          2500 Tulare Street
                                         |          Fresno, CA 93721
19

20

21

22

23

24

25

26

27

28

4821-1796-7195.1

| | | | |
|---|---|---|---|
| I. | | BANKRUPTCY CASE ................................................................. | 2 |
| | A. | Petition and Schedules ........................................................... | 2 |
| | B. | Appointment of Patient Care Ombudsman ............................. | 2 |
| | C. | Adequate Assurance Stipulations And Orders Thereon .......... | 5 |
| | D. | Executory Contracts/Unexpired Leases .................................. | 6 |
| | | 1.    BETA Risk Management Authority ............................... | 6 |
| | | 2.    Everbank Commercial Finance, Inc. ............................ | 6 |
| | | 3.    Healthcare Conglomerate Associates, LLC ................. | 6 |
| | E. | Relief from Stay ..................................................................... | 7 |
| | F. | Case Administration ............................................................... | 8 |
| | | 1.    Licensure ..................................................................... | 8 |
| | | 2.    Termination of HCCA/Imposition of New Management ...... | 8 |
| | | 3.    Financial Advisory Firm .............................................. | 9 |
| | G. | Claims Administration ............................................................ | 9 |
| | | 1.    Tulare Regional Medical Center ................................... | 9 |
| | | 2.    Healthcare Conglomerate Associates, LLC ................. | 9 |
| | H. | Pending and Prior Litigation ................................................. | 10 |
| | | 1.    The Anderson, Craneware and Perez Litigation ......... | 10 |
| | | 2.    The California Department of Public Health Litigation ...... | 11 |
| | | 3.    The Optum Bank Litigation ......................................... | 11 |
| | | 4.    The HCCA/VI Healthcare Litigation ............................ | 12 |
| II. | | MEDIATION ............................................................................... | 12 |
| III. | | SECTION 923 NOTICE ............................................................... | 12 |
| IV. | | PLAN OF READJUSTMENT ...................................................... | 12 |
| | A. | Potential Funding Sources For Third Amended Plan and Third Amended Disclosure Statement ................................................ | 14 |
| | | 1.    Measure J ................................................................... | 14 |
| | | 2.    Contract For Outpatient Lab Services. ....................... | 15 |

- i -

3.   Settlement With Los Angeles Department of Water and Power: ............ 15

4.   Citizens' Initiative .................................................................. 15

5.   Real And Personal Property Assessment Pursuant to California Health
      and Safety Code 32200 ........................................................ 16

6.   Sales Tax Increase. ................................................................. 16

7.   Accounts Receivable Financing and/or Factoring .................................. 16

V.   CONCLUSION ........................................................................... 17

4821-1796-7195.1

EXHIBIT EE  385

CHAPTER 9 STATUS REPORT

SOUTHERN INYO HEALTHCARE DISTRICT ("SIHD" or the "Debtor"), the debtor in the above-captioned bankruptcy case (the "Bankruptcy Case"), respectfully submits the within *Chapter 9 Status Report*.

## I.    BANKRUPTCY CASE

### A.    Petition and Schedules

On January 4, 2016, SIHD commenced the instant Bankruptcy Case by filing a voluntary petition for relief (the "Petition") under chapter 9 of title 11 of the United States Code (the "Bankruptcy Code").

On or about January 19, 2016, the Debtor filed its schedules and statement of financial affairs.  On or about February 5, 2016, the Debtor filed an amended summary of schedules as well amended versions of Schedule D, Schedule E and Schedule F.  On or about February 9, 2016, the Debtor filed an amended version of Schedule G.  On or about March 3, 2016, the Debtor filed a second amended version of Schedule G.

On or about July 12, 2016, the Court entered an *Order for Relief under Chapter 9* in the Bankruptcy Case.

### B.    Appointment of Patient Care Ombudsman

On or about January 6, 2016, the Court issued the *Order to Appear and Show Cause Why a Patient Care Ombudsman Should Not Be Appointed*.  On or about January 25, 2016, SIHD filed the *Debtor's Motion to Excuse the Appointment of a Patient Care Ombudsman*.  On or about February 3, 2016, the Debtor filed the *Declaration of Colleen Wilson, Chief Nursing Officer, in Support of the Motion to Excuse the Appointment of a Patient Care Ombudsman*.  A hearing to consider the appointment of a patient care ombudsman was held on February 10, 2016, at 1:30 p.m.  On or about February 16, 2016, the Court entered an order denying the *Debtor's Motion to Excuse the Appointment of a Patient Care Ombudsman*.  On or about February 17, 2016, the Court entered an order directing the appointment of a patient care ombudsman.  On or about March 4, 2016, the Office of the United States Trustee filed a notice regarding the appointment of Joseph Rodriquez as patient care ombudsman (the "Ombudsman").

- 2 -

On or about April 8, 2016, the Ombudsman filed the *First Report of the Patient Care Ombudsman*, which indicated, among other things, that no complaints had been made regarding the services provided by the Debtor.  Accordingly, the Ombudsman had no recommendations for the Court.

On or about June 7, 2016, the Ombudsman filed the *Second Report of the Patient Care Ombudsman*, which indicated, among other things, that patients were comfortable and receiving adequate care.  Accordingly, the Ombudsman had no recommendations for the Court.

On or about August 5, 2016, the Ombudsman filed the *Third Report of the Patient Care Ombudsman*, which indicated, among other things, that patients were comfortable and presented no complaints regarding the facility or the treatment they were receiving.  Accordingly, the Ombudsman had no recommendations for the Court.

On or about October 4, 2016, the Ombudsman filed the *Fourth Report of the Patient Care Ombudsman*, which indicated, among other things, that patients were comfortable and presented no complaints regarding the facility or the treatment they were receiving.  Additionally, the Ombudsman did not note any issues with the operations of the facility and, thus, had no recommendations for the Court.

On or about December 2, 2016, the Ombudsman filed the *Fifth Report of the Patient Care Ombudsman*, which indicated, among other things, that the patients were comfortable and that SIHD expeditiously addressed the few minor issues that had arisen.  Accordingly, the Ombudsman had no recommendations for the Court.

On or about January 31, 2017, the Ombudsman filed the *Sixth Report of the Patient Care Ombudsman*, which indicated, among other things, that the facility appeared to be clean, patients were comfortable and that SIHD had expeditiously addressed and/or was working to resolve the few minor issues that had arisen.  Accordingly, the Ombudsman had no recommendations for the Court.

On or about March 28, 2017, the Ombudsman filed the *Seventh Report of the Patient Care Ombudsman*, which indicated, among other things, that the patients were comfortable and satisfied with the services, the facility staff assisted residents routinely with daily activities, and

4821-1796-7195.1

1   that SIHD had expeditiously addressed a minor complaint that had arisen.  Accordingly, the

2   Ombudsman had no recommendations for the Court.

3         On or about May 19, 2017, the Ombudsman filed the *Eighth Report of the Patient Care*

4   *Ombudsman*, which indicated, among other things, that the facility appeared to be clean, patients

5   were comfortable and that SIHD had expeditiously addressed and/or was working to resolve the

6   minor issues that had arisen.  Accordingly, the Ombudsman had no recommendations for the

7   Court.

8         On or about July 12, 2017, the Ombudsman filed the *Ninth Report of the Patient Care*

9   *Ombudsman*, which indicated, among other things, that the facility appeared to be clean, and

10  patients were comfortable.  The report also noted that SIHD had expeditiously addressed the

11  minor issues that had arisen.  Accordingly, the Ombudsman had no recommendations for the

12  Court.

13        On or about September 8, 2017, the Ombudsman filed the *Tenth Report of the Patient*

14  *Care Ombudsman*, which indicated, among other things, that the facility appeared to be clean,

15  residents appeared clean and were appropriately dressed for the time of year and day, and menus

16  were posted and residents reported being satisfied with their choices.  The Ombudsman had no

17  recommendations for the Court.

18        On or about November 3, 2017, the Ombudsman filed the *Eleventh Report of the Patient*

19  *Care Ombudsman*, which indicated, among other things, that the local ombudsman program had

20  not received any concerns involving vendors, utilities, or external support factors that might

21  impact resident care. With respect to the one minor complaint that was received during the

22  relevant period, the Ombudsman noted that the resident reported that the matter had been resolved

23  when he met with him.  The Ombudsman had no recommendations for the Court.

24        On or about January 2, 2018, the Ombudsman filed the *Twelfth Report of the Patient Care*

25  *Ombudsman*, which indicated, among other things, that the local ombudsman program had not

26  received any concerns involving vendors, utilities, or external support factors that might impact

27  resident care and several of the residents had indicated that they were comfortable and had no

28

EXHIBIT EE  388

1  complaints.  The report also noted that the minor issues that had arisen during the relevant period

2  had been addressed.  Accordingly, the Ombudsman had no recommendations for the Court.

3          On or about March 2, 2018, the Ombudsman filed the *Thirteenth Report of the Patient*

4  *Care Ombudsman*, which indicated, among other things, that the local ombudsman program had

5  not received any concerns involving vendors, utilities, or external support factors that might

6  impact resident care. the facility appeared to be clean, and patients were comfortable.  The report

7  also noted that SIHD had addressed the issues that had arisen, and with respect to the one matter

8  that the Ombudsman had reported to the California Department of Public Health ("CDPH"), the

9  CDPH notified the Ombudsman that the allegations were unsubstantiated.  Accordingly, the

10  Ombudsman had no recommendations for the Court.

11          On or about May 1, 2018, the Ombudsman filed the *Fourteenth Report of the Patient Care*

12  *Ombudsman*, which indicated, among other things, that the local ombudsman program had not

13  received any concerns involving vendors, utilities, or external support factors that might impact

14  resident care, and the Ombudsman noted that the facility appeared to be clean, residents appeared

15  clean and were appropriately dressed for the time of year and day, and menus were posted and

16  residents reported being satisfied with their choices  The report also noted that SIHD had

17  addressed the two issues that had arisen, and that the parent of one of the residents who had

18  lodged a complaint with SIHD advised that she was comfortable with the steps the facility had

19  taken to ensure the safety of her parent.

20          **C.**          **Adequate Assurance Stipulations And Orders Thereon**

21          SIHD negotiated stipulations regarding the provision of adequate assurances pursuant to

22  11 U.S.C. §366 with the following utility providers: (a) the Los Angeles Department of Water

23  and Power ("LADWP"); (b) Preferred Septic and Disposal; (c) Eastern Sierra Propane; (d)

24  Thomas Petroleum; (e) California Broadband; (f) ATI Medical Waste Management; (g) the

25  County of Inyo Town and Water Systems; and (h) Bishop Welding.  The Court subsequently

26  entered orders approving the foregoing stipulations.

27

28

4821-1796-7195.1

D.     **Executory Contracts/Unexpired Leases**

    1.     **BETA Risk Management Authority**

On or about March 17, 2016, SIHD and BETA Risk Management Authority ("BETA") entered into a stipulation to assume certain insurance agreements by and between SIHD and BETA.  On or about March 22, 2016, the Court entered an order approving the stipulation between SIHD and BETA and the assumption of the subject agreements.

    2.     **Everbank Commercial Finance, Inc.**

SIHD rejected an unexpired lease/executory contract with Everbank Commercial Finance, Inc. ("Everbank") for certain medical equipment (the "Everbank Agreement"). Following the rejection of the Everbank Agreement, SIHD agreed to purchase the equipment subject thereto.  On or about March 7, 2017, SIHD filed a motion seeking approval of the settlement and mutual release agreement (the "Settlement Agreement") by and between SIHD and Everbank pursuant to Rule 9019 of Federal Rule of Bankruptcy Procedure, which the Court approved by entry of an order on or about March 22, 2017.  In sum, SIHD agreed to pay Everbank the sum of One Hundred Fifty Thousand Dollars ($150,000.00) in exchange for the withdrawal of proof of claim no. 43-1 filed by Everbank in the Bankruptcy Case (the "Everbank POC"), and a release and/or transfer, as applicable, from Everbank to SIHD of any and all right(s), title and interest in various medical equipment that was the subject of the Everbank Agreement.  The Settlement Agreement also provided for mutual and general releases by and between SIHD and Everbank.  SIHD has paid the amounts due under the Settlement Agreement, and title to the medical equipment has been transferred to SIHD.  In addition, on or about June 14, 2017, Everbank withdrew the Everbank POC.

    3.     **Healthcare Conglomerate Associates, LLC**

On or about January 2, 2016, SIHD entered into a management agreement with Healthcare Conglomerate Associates, LLC ("HCCA") (the "HCCA Management Agreement"). On or about October 17, 2017, SIHD filed an *Emergency Motion (1) For Authority to Immediately Terminate the HCCA Management Agreement Or, In The Alternative, For Authority*

- 6 -

4821-1796-7195.1

1   *To Modify The Terms Of The HCCA Management Agreement In Order To Designate The Board*

2   *As The Sole Signatory On All District Bank Accounts And (2) To Continue Hearing On Second*

3   *Amended Disclosure Statement And Associated Filing Deadlines* (the "HCCA Termination

4   Motion"). On or about October 23, 2017, the Court entered an order granting the HCCA

5   Termination Motion in part (the "HCCA Termination Order"). More specifically, the HCCA

6   Termination Order authorized SIHD to remove HCCA as the signatory from any and all bank

7   accounts containing SIHD funds, and instructed SIHD to file a supplemental brief addressing,

8   among other issues, whether the HCCA Management Agreement constituted an executory

9   contract within the meaning of 11 U.S.C. §365. On or about November 15, 2017, SIHD filed[1] a

10   supplemental brief in support of the HCCA Termination Motion. On or about November 22,

11   2017, SIHD filed a Notice of Settlement resolving the issues raised by and through the HCCA

12   Termination Motion ("HCCA Termination Settlement"). Among other things, the HCCA

13   Termination Settlement provided for the rejection of the HCCA Management Agreement, and set

14   the deadline for HCCA to file a claim as January 31, 2018 (the "HCCA Bar Date").

15      **E.**     **Relief from Stay**

16      On or about March 29, 2016, J.M.H., II, a minor, moved for relief from stay to proceed

17   with pending litigation relating to alleged medical malpractice and recover any judgment

18   resulting from such litigation from any insurance coverage. Thereafter, SIHD entered into a

19   stipulation to grant J.M.H., II, relief from the automatic stay to proceed with the pending

20   litigation and seek to recover any judgment from any insurance coverage. The Court entered an

21   order approving the stipulation on or about April 15, 2016.

22      On or about June 7, 2016, Everbank filed a motion for relief from the automatic stay in

23   order to record a UCC-3 financing statement indicating the assignment of a security interest in

24   certain medical equipment utilized by the hospital. The motion also requested that the Court set a

25   deadline by which SIHD had to either assume or reject the Everbank Agreement. SIHD opposed

26   the motion and, more specifically, the characterization of the agreement as an unexpired lease or

---

[1] In response to allegations of purported conflict of interest asserted by HCCA against Baker Hostetler, SIHD has retained Dentons LLP as special counsel to handle, amongst other things, the HCCA Termination Motion.

executory contract. The Court ultimately granted in part and denied in part Everbank's motion and set a deadline for SIHD to assume or reject the Everbank Agreement. As noted above, the Debtor rejected the Everbank Agreement and, thereafter, Everbank and the Debtor entered into the Settlement Agreement.

### F.     Case Administration

#### 1.     Licensure

On or about March 1, 2016, the California Department of Public Health (the "CDPH") reinstated SIHD's license to operate the hospital. Following the reinstatement of the license, SIHD commenced operations at the hospital and the associated clinic and skilled nursing facility.

#### 2.     Termination of HCCA/Imposition of New Management

Immediately prior to the filing of the Petition, SIHD entered into the HCCA Management Agreement pursuant to which HCCA, among other things, was charged with managing the operations of the Debtor. Following the termination of the HCCA Management Agreement (*as further detailed below*), the Debtor hired Jerrel Tucker ("Mr. Tucker") as the new Chief Financial Officer and Brian Cotter ("Mr. Cotter") as the new Chief Executive Officer. In addition to having significant experience with hospitals of similar size and type as SIHD, including Big Bear, Mr. Tucker was a member of J.W.T. & Associates, LLP, which prepared the most recent audited financials for SIHD. Mr. Cotter has been noted as a transformational executive leader that has led multiple seven figure hospital turn-arounds and excelled in quality metrics and operational efficiencies by implementing LEAN tactics, strategic planning & execution, and leadership accountability. Mr. Cotter has also led operational teams in successful CMS, CDPH surveys that include DNV, Medication Error Reduction Plan (MERP), Life Safety, Sub-Acute, SNF, Dietary, Psych, Paramedic Receiving, and Out Patient Services, and has extensive experience with, among other things, both general acute care and critical access hospitals.

3.      **Financial Advisory Firm**

The Debtor has also engaged a financial advisory firm, Force10 Partners, LLC, which has assisted and continues to assist with the analysis of the data and creation of financial projections in furtherance of the plan(s) and disclosure statement(s) which have been filed and are to be filed.

G.      **Claims Administration**

Pursuant to the *Order Granting Motion to Set Claims Bar Date Pursuant to Fed. R. Bankr. P. 3003(c)(3)* entered by the Court on or about August 16, 2016, the Court set September 30, 2016 as the deadline by which to file claims.

The Debtor continues to negotiate with several individuals and entities to whom and to which avoidance action demand letters were sent.  To the extent the Debtor is unable to reach agreement(s) with the recipients of what the Debtor believes to be avoidable transfers, the Debtor will timely commence avoidance actions as necessary and appropriate.

1.      **Tulare Regional Medical Center**

On or about November 6, 2017, Tulare Regional Medical Center ("TRMC") filed an *Administrative Expense Claim* in which it asserted it was entitled to an administrative claim in an amount exceeding $2,500,000 (the "TRMC Claim") (the "TRMC Claim Request"). On or about April 2, 2018, SIHD (through special counsel[2]) filed an opposition to the TRMC Claim Request.  Since that time, SIHD and Tulare have been negotiating the issues underlying the TRMC Claim Request, and have agreed in principle to treat the entirety of the TRMC Claim as a general unsecured claim, with the amount subject to negotiation between the parties and, if that fails, mediation.  The parties are working diligently towards finalizing and filing a stipulation reflecting the treatment of the TRMC Claim prior to the date of the status conference.

2.      **Healthcare Conglomerate Associates, LLC**

On or about January 30, 2018, HCCA filed a *Request For Payment Of Administrative Expense Claim of Healthcare Conglomerate Associates, LLC Arising Out Of*

---

[2] In an abundance of caution, special counsel for SIHD is also handling issues relating to the TRMC Claim.

*Rejection Of Executory Contract (11 U.S.C. §§503(b) and 507(a)(2))* (the "HCCA Administrative

Claim Request"), in which HCCA asserted a claim with purported administrative priority in the

amount of $2,524,054.00 for damages arising from the rejection of the HCCA Management

Agreement (the "HCCA Claim"). On or about February 23, 2018, SIHD filed an opposition to the

HCCA Administrative Claim Request.  On or about February 26, 2018, the Court issued a

memorandum informing HCCA that it would not take any action with respect to the HCCA

Administrative Claim Request unless and until HCCA complied with the notice and hearing

requirement set forth in 11 USC §503(b).  To date, HCCA has not yet complied with 11 USC

§503(b), and has made no effort otherwise to have the matter brought for hearing before the

Court, and thus the matter remains unresolved. As there is no mechanism (of which the Debtor is

aware) to compel a hearing on the HCCA Administrative Claim Request, the Debtor respectfully

requests that the Court set a hearing thereon in order to advance this matter towards resolution.

> **H.    Pending and Prior Litigation**

>> 1.    **The Anderson, Craneware and Perez Litigation**

As of the commencement of the Bankruptcy Case, the Debtor was party to certain

lawsuits, including the following: *Perez v. Kibler, et al*., case no. SICV CV 1457395, pending in

the California Superior Court for the County of Inyo (the "Perez Litigation"); *Anderson v.

Southern Inyo Healthcare District*, case no. 30-2015-00817277-CL-CL-CJC (the "Anderson

Litigation"); and *Craneware, Inc. v. Southern Inyo Healthcare District*, 15CV04309, pending in

the District Court of Johnson County, Kansas (the "Craneware Litigation").

On or about February 1, 2016, the Anderson Litigation was dismissed.

On or about March 30, 2016, the Debtor removed the Craneware Litigation to this Court.

On or about August 29, 2016, the Court dismissed the Craneware Litigation for failure to

prosecute.  On or about January 27, 2017, the underlying state court action was dismissed without

prejudice.

Based on the nature of the Perez Litigation, the Debtor did not remove that action.

EXHIBIT EE  394                                   CHAPTER 9 STATUS REPORT

4821-1796-7195.1

1      **2.      The California Department of Public Health Litigation**

2              In addition to the actions pending on the petition date, on or about January 13,

3      2016, the Debtor filed a complaint against the CDPH and Karen Smith—thereby commencing the

4      adversary proceeding styled *Southern Inyo Healthcare District v. California Department of*

5      *Public Health, et al.*, adv. no. 2016-01008 (the "CDPH Adversary").  By and through the CDPH

6      Adversary, the Debtor sought a determination that the suspension or revocation of the Debtor's

7      hospital licensure violated the automatic stay.  Following the reinstatement of SIHD's licenses,

8      the Debtor and the defendants in the CDPH Adversary reached an agreement to dismiss the

9      CDPH Adversary without prejudice.  On or about March 9, 2016, SIHD filed a stipulation to

10     dismiss the CDPH Adversary without prejudice, which the Court approved by order entered on or

11     about March 10, 2016.

12     **3.      The Optum Bank Litigation**

13             On or about August 15, 2017, the Debtor filed a complaint seeking to disallow the

14     purported secured claim (the "Optum Claim") asserted by Optum Bank, Inc. ("Optum") and

15     invalidate any and all security interest(s) and set aside any and all liens associated therewith (the

16     "Optum Complaint").  The resulting adversary proceeding is styled *Southern Inyo Healthcare*

17     *District v. Optum Bank, Inc.*, adv. no. 2017-01077 FEC (the "Optum Adversary").

18             On or about October 27, 2017, Optum filed an answer and counterclaim to the Optum

19     Complaint (the "Counterclaim").  On or about March 20, 2018, the Debtor filed an answer to the

20     Counterclaim (the "Optum Answer"). On or about April 5, 2018, the Court entered an order

21     setting various dates and deadlines related to the Optum Adversary.

22             On or about April 10, 2018, Optum filed the *Motion to Strike Southern Inyo Healthcare*

23     *District's Affirmative Defenses to Optum Bank's Counterclaim* (the "Motion to Strike").  The

24     Motion to Strike sought to dismiss certain of the Debtor's certain affirmative defenses raised in

25     the Optum Answer (the "Optum Affirmative Defenses").

26             On or about May 8, 2018, the Motion to Strike came on for hearing (the "Motion to Strike

27     Hearing") before the Court and was granted with fourteen (14) days leave to amend.  The Debtor

28

1  is proceeding to prepare and file an amended answer to the Counterclaim, which will address the

2  concerns raised by the Court during the Motion to Strike Hearing.

3                    4.      **The HCCA/VI Healthcare Litigation**

4          SIHD has recently retained Jeffrey S. Shinbrot, APLC in connection with the

5  preparation and filing of an complaint against HCCA and related entities.  Mr. Shinbrot has

6  reviewed evidence, conducted witness interviews and drafted a complaint containing numerous

7  claims for relief against HCCA and related entities, including but not limited to VI Healthcare.

8  The claims for relief include, but are not limited to, those relating to violations of California's

9  False Claims Act, violation of California's Government Code, Breach of Fiduciary Duty and

10  other business torts.  Mr. Shinbrot is also investigating claims for violation of the automatic stay

11  by HCCA and related parties.  Mr. Shinbrot is confident that he will have the foregoing complaint

12  filed prior to the status conference, and has committed to working expeditiously to bring the

13  resulting adversary proceeding to trial in this Court thereafter.

14  **II.     MEDIATION**

15         The Debtor believes that mediation may be beneficial in helping to resolve the issues

16  underlying the HCCA Administrative Claim Request. Additionally, the Debtor and Optum may

17  elect to mediate the issues underlying the Optum Adversary once the parties have engaged in

18  substantive settlement discussions (which they intend to do shortly), if the Debtor believes

19  mediation will meaningfully assist in a resolution of the dispute.

20  **III.    SECTION 923 NOTICE**

21         On or about February 12, 2016, SIHD filed the *Debtor's Motion for Entry of an Order (1)*

22  *Approving Form of Notice, and (2) Setting Deadline for Filing Objections to Petition*.  On or

23  about March 15, 2016, the Court entered an order approving the motion and proposed manner in

24  which to provide notice via publication in accordance with 11 U.S.C. §923.  The Debtor timely

25  completed all publications required under the order.

26  **IV.    PLAN OF READJUSTMENT**

27         On or about January 27, 2017, the Court entered the *Order Granting Ex Parte Motion to*

28  *Continue Deadline to File Plan of Adjustment*.  Through that order, the Court extended the

- 12 -

1   deadline to file a plan for the adjustment of debts from January 31, 2017 through and including

2   March 31, 2017.

3       On or about March 31, 2017, the Debtor filed the Plan for the Adjustment of Debts of

4   Southern Inyo Healthcare District (the "Initial Plan"), the Disclosure Statement with Respect to

5   the Plan for the Adjustment of Debts of Southern Inyo Healthcare District (the "Initial Disclosure

6   Statement"), and other related and supporting documents.

7       Following the hearing on the adequacy of the Initial Disclosure Statement, the Court

8   disapproved the Initial Disclosure Statement in order to enable the Debtor to make certain

9   modifications thereto, including modifications relating to Optum and the Optum Claim. The

10   Court also set the hearing on the adequacy of the amended disclosure statement for August 30,

11   2017, and directed the Debtor to file its amended plan and disclosure statement.

12       On or about July 20, 2017, the Debtor filed the First Amended Plan for the Adjustment of

13   Debts of Southern Inyo Healthcare District (the "First Amended Plan"), the First Amended

14   Disclosure Statement with Respect to the Plan for the Adjustment of Debts of Southern Inyo

15   Healthcare District (the "First Amended Disclosure Statement"), and other related and supporting

16   documents.

17       After filing the First Amended Plan and the First Amended Disclosure Statement, the

18   Debtor engaged in discussions with several creditors, including Optum, regarding the First

19   Amended Plan and the treatment of certain claims and contracts thereunder. As a result of these

20   discussions, the Debtor was able to resolve certain disputes pertaining to the First Amended Plan

21   and/or the First Amended Disclosure Statement. Among these, the Debtor and Optum reached an

22   agreement in principle through which the Debtor agreed to allow Optum to vote on the Plan

23   despite the disputed status of the Optum Claim.

24       On or about January 17, 2018, the Debtor filed the Second Amended Plan (the "Second

25   Amended Plan") and the Second Amended Disclosure Statement with Respect to the Plan for the

26   Adjustment of Debts of Southern Inyo Healthcare District (the "Second Amended Disclosure

27   Statement"), and other related and supporting documents. Similar to the previous iterations of the

28   plan and disclosure statement, the Second Amended Plan and the Second Amended

          EXHIBIT EE   397           CHAPTER 9 STATUS REPORT

Disclosure Statement provided for the adjustment of the Debtor's operations and the repayment of its obligations with operational revenues. The Second Amended Disclosure Statement also included additional detail regarding the treatment of the Optum Claim in order to address the objections raised by Optum and comments expressed by the Court with respect to the previous versions of the plan and disclosure statement. On or about February 28, 2018, at the hearing to approve the adequacy of the Second Amended Disclosure Statement, the Debtor withdrew the Second Amended Disclosure Statement given, among other things, the significant change in circumstances that had occurred since the filing thereof.

The Debtor anticipates that it will be in a position to file a third amended plan and disclosure statement in the next sixty (60) to ninety (90) days.

A.      **Potential Funding Sources For Third Amended Plan and Third Amended Disclosure Statement**

1.      **Measure J:** In or about the end of February 2018 and/or the beginning of March 2018, the Debtor held a special mail election in which it asked voters to approve a parcel tax in the amount of $215 per parcel per year for a period of fifteen (15) years. The parcel tax was estimated to generate approximately $602,000 per year, for a total of $9,030,000 over the term of the tax. The proceeds from the tax were to be paid to SIHD as part of its biannual tax disbursement. On or about April 10, 2018, the ballots were tabulated, and of the 976 voters who cast a ballot, fifty-seven percent (57%) voted in favor of Measure J and forty-three percent (43%) voted against Measure J. Unfortunately, Measure J needed 2/3 voter approval to pass, and thus did not pass. Immediately upon learning that Measure J did not pass, both SIHD and the community-at-large began working diligently together to try to identify viable alternatives for the future of the Debtor, focusing primarily on sources of alternative funding for not only the plan of readjustment, but the operations of the Debtor on a moving forward basis. To this end, SIHD has held a number of board meetings - the majority of which have been well attended by the public. At one of the most recent board meetings, the board of directors took a poll to assess the options the community was most interested in having SIHD pursue, many of which are included below:

1    2.    **Contract For Outpatient Lab Services:** Under this option, the Debtor

2    would enter into a "Services Agreement" with an entity which would provide and implement

3    certain administrative, software and management services in furtherance of an exclusive

4    laboratory outreach program at the hospital. The CEO of SIHD has done a significant amount of

5    research into this option, and is confident that pursuing this alternative would generate more than

6    sufficient revenue to enable the Debtor to not only satisfy its obligations under the amended plan

7    and maintain operations on a moving forward basis, but also to enable SIHD to make capital

8    improvements to the facilities if and when such capital improvements are necessary. To this end,

9    SIHD is in the process of negotiating an agreement with CuroMD for the provision of such

10    services. However, given the fact that this is a relatively new concept, both the board of directors

11    and counsel are conducting further research to confirm the propriety and legality of the proposed

12    arrangement before moving forward in this regard.

13    3.    **Settlement With Los Angeles Department of Water and Power:** With

14    the support of a large number of LADWP employees (both individually and through their union)

15    who reside in Southern Inyo, the Debtor has written a demand letter to LADWP requesting,

16    among other things, that LADWP contribute funds sufficient to not only satisfy the obligations of

17    SIHD under a plan of readjustment, but also to ensure the continuation of healthcare services for

18    SIHD and the community it serves (including countless employees of LADWP) for years to

19    come.[3]  In response thereto, LADWP has agreed to meet with the board of directors on May 25,

20    2018 at 9:00 a.m., and the board of directors is very optimistic about what will transpire there at.

21    **4.    Citizens' Initiative:** Pursuant to the recent decision of the California

22    Supreme Court in *California Cannabis vs. Upland*,[4] any tax initiative which is introduced by the

23    citizens only requires a majority of voter approval to pass (as opposed to 2/3 voter approval

24    which is required if the board includes proposes such an initiative – i.e. Measure J – on the

25

26    ---
[3] To the extent that it would be more palatable for LADWP to remit funds as a "donation" to SIHD rather than as a "payment" to SIHD, the Debtor is exploring the possibility of setting up a non-profit healthcare

27    foundation in order to facilitate any such agreement.
[4] *California Cannabis Coalition, et. al. v. City of Upland, et. al.*, 3 Cal. 5th 924, 401 P.3d 49 (2017), <u>as</u>

28    <u>modified on denial of reh'g</u> (Nov. 1, 2017).

EXHIBIT EE  399                                    CHAPTER 9 STATUS REPORT

4821-1796-7195.1

ballot). Although the *Upland* decision is controversial, it is currently good law, and a significant number of citizens have expressed an intention to ensure that Measure J (or a measure substantially similar if not identical to Measure J) is put (back) on the ballot in November of this year. Based upon the results of the Measure J election, if a similar initiative is included on the ballot for the upcoming election by the citizens, it will likely garner the requisite number of votes to pass.

**5.     Real And Personal Property Assessment Pursuant to California Health and Safety Code 32200:** SIHD is exploring whether and the extent to which Measure J can be rewritten and reintroduced on the ballot as an assessment based on value rather than a flat per parcel tax. While there is definitely support from the community for this option, counsel for the Debtor is exploring the potential limitations of such an assessment, including but not limited to potential limitations imposed by Proposition 13, before moving forward in this regard.

**6.     Sales Tax Increase:** The Debtor has asked the Inyo County Board of Supervisors to increase the sales tax in Inyo County by one percent (1%), with the proceeds thereof to be reserved solely and expressly for SIHD. Although SIHD has not yet received a formal response from the County, and cannot independently opine on the legality of such an arrangement from the County's perspective, it intends to follow-up with the County regularly as this option was also of significant interest to the community.

**7.     Accounts Receivable Financing and/or Factoring:** Prior to the termination of the HCCA Management Agreement, HCCA maintained the data and information needed to complete the Debtor's cost report(s), including the cost report that was due on November 30, 2017 for the fiscal year ending June 30, 2017 (the "November Cost Report"). Unfortunately, HCCA did not file the November Cost Report, and the Debtor was forced to recreate the information necessary to prepare it following the termination of the HCCA Management Agreement. Unfortunately, due to the delinquent filing(s) and the delinquent cost report, the Centers for Medicare and Medicaid Services ("CMS") began withholding payment at a rate of fifty percent (50%) beginning in November of 2017 (the "Holdback"). This Holdback has caused significant harm to the Debtor and severely impacted the Debtor's cash flow.

1        The November Cost Report was filed on March 22, 2018, and accepted by CMS on March

2  23, 2018.  In addition, the financial statement data and quarterly credit balance reports (which had

3  previously been unavailable to the Debtor) that was due with the cost report was submitted to

4  CMS on May 16, 2018.  As result of the acceptance of the cost report and the submission of the

5  financial data, the Debtor anticipates that the Holdback will be remitted to the Debtor in an

6  estimated amount of $225,000.00, and that the corresponding adjustments under the cost report(s)

7  will be approximately $337,000.00.  Moreover, since the termination of the HCCA Management

8  Agreement, the Debtor has also regained control of the billing system(s), which has resulted in a

9  fifty percent (50%) increase in billings for the period between January 2018 and April 2018.

10  Given these significant improvements in the Debtor's financial situation, the Debtor believes that

11  it will be able to obtain financing of its accounts receivable sufficient to enable it to confirm a

12  plan of readjustment. To this end, the Debtor has submitted financial information to a number of

13  potential financiers, including but not limited to CNH Financial, ASM Capital, Legalist, Inc., and

14  Bay Point Advisors, and is in varying stages of discussion regarding potential "DIP" and/or exit

15  financing options with these lenders.  In addition, the Debtor has provided Optum with certain

16  financial information relevant to the Debtor's finances in furtherance of not only the potential for

17  financing but for a global resolution of any and all claims between the parties, including but not

18  limited to the Optum Claim and the Optum Adversary.  The Debtor intends to continue these

19  discussions, and anticipates that it will have a meaningful and substantive update regarding this

20  option at the upcoming status conference.

21  **V.    CONCLUSION**

22        Despite the fact that Measure J did not pass, it is clear that the community-at-large (a

23  number of which are creditors of the Debtor) believes that the healthcare services currently

24  provided by the Debtor are vital and must continue uninterrupted in some form or another.  Not

25  only is it the only hospital in a 135 mile stretch of Highway 395, it also provides exceptional

26  skilled nursing care for as many as 33 residents.  There are many residents who can testify to the

27  care that they or a loved one have received at SIHD that, in many cases, has saved lives.  In

28  addition to the invaluable health and safety benefits provided by the Debtor, the Debtor also

EXHIBIT EE  401        CHAPTER 9 STATUS REPORT

4821-1796-7195.1

1   employs over ninety (90) people who would be unemployed if SIHD was forced to close its

2   doors.  The significant impact that such a closure would have on the entire community would be

3   devastating, as it would represent a loss of almost two million dollars ($2,000,000) in annual

4   payroll, much of which is spent in the Eastern Sierra.

5       Given the significant improvement in the financial condition of the Debtor that has

6   occurred since the termination of the HCCA Management Agreement, and the myriad of options

7   being diligently explored, the Debtor is confident that it will not only be able to satisfy its

8   obligations under the second amended plan of readjustment to be filed, but that it will be able to

9   continue to provide and improve the level of healthcare so desperately needed by Southern Inyo

10   and the surrounding communities.

11

12   Dated: May 17, 2018           Respectfully submitted,

13

14                        **FOLEY & LARDNER LLP**

15                    By:   /s/ Ashley M. McDow

16                        Ashley M. McDow
                             Fahim Farivar

17                    Attorneys for Debtor,

18                    SOUTHERN INYO HEALTHCARE DISTRICT

19

20

21

22

23

24

25

26

27

28

- 18 -

CHAPTER 9 STATUS REPORT

4821-1796-7195.1

**2**

1   HAGOP T. BEDOYAN, CSB No. 131285
   **KLEIN, DeNATALE, GOLDNER,**
2     **COOPER, ROSENLIEB & KIMBALL LLP**
   5260 N. Palm Avenue, Suite 205
3   Fresno, California 93704
   Telephone: (559) 438-4374
4   Facsimile: (661) 326-0418
   E-mail: hbedoyan@kleinlaw.com

5

6

7   Attorneys for VI Healthcare Finance, Inc.

8           **UNITED STATES BANKRUPTCY COURT**

9      **EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION**

10

11   In re:                Case No. 16-10015-A-9

12   SOUTHERN INYO       Chapter   9

13   HEALTHCARE DISTRICT,    DC NO.: KDG-2

14         Debtor.      Date:     TO BE SCHEDULED
                     Time:     TO BE SCHEDULED
15                      Place     United States Bankruptcy Court
                                2500 Tulare Street, Fifth Floor
16                                 Department A, Courtroom 11
                                Fresno, California
17                      Judge:    Honorable Fredrick E. Clement

18

19      **REQUEST FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM OF**
       **VI HEATHCARE FINANCE, INC. (11 U.S.C. §§ 503(b) AND 507(a)(2))**
20

21         NOTICE IS HEREBY GIVEN that VI HEALTHCARE, INC. ("Vi

22   Healthcare) hereby asserts an Administrative Expense Claim (the "Claim"), secured by tax

23   revenues, in the total amount of $1,423,418.72, as of May 31, 2018 (the "Claim"), pursuant to 11

24   U.S.C. §§ 503(b) and 507(a) (2), and represents the following:

25         1.      This claim is based upon various advances made to SOUTHERN INYO

26   HELATHCARE DISTRICT (the "Debtor") during the administration of the Debtor's case in

27   accordance with the terms of a REVOLVING LINE OF CREDIT NOTE (SECURED) dated July

28   19, 2017 (the "Note"). A copy of the Note is attached as Exhibit "A".

2.     The Claim arises out of four separate advances made to the Debtor by Vi Healthcare as set forth below:

| Loan Number | Principal Bal. | Request Date | Funding/Payment Date | Interest Rate |
|---|---|---|---|---|
| H1 | $1,038,789.56 | 7/25/17 | 7/25/17 | 10% |
| V1 | $350,000.00 | 8/1/17 | 8/10/17 | 20% |
| V2 | $100,000.00 | 9/7/17 | 9/8/17 | 20% |
| V3 | $250,000.00 | 9/18/17 | 9/17/17 | 20% |

Copies of the requests for funding are attached as Exhibit "B".

3.     The Note is secured by an Assignment, Security Agreement and Pledge Agreement which are attached as Exhibit "C" (the "Security Agreement").

4.     In accordance with the terms of the Security Agreement, Vi Healthcare is also the direct assignee of anticipated tax revenues from Inyo County, which is more specifically described in the Notice of Anticipated Tax Revenues attached as Exhibit "D".

5.     The Claim includes interest from January 1, 2018 through May 31, 2018 in the amount of $93,263.51 and reflects two payments received by Vi Healthcare from Inyo County in the respective amounts of $253,628.45 and $261,463.8, on January 8, 2018 and May 4, 2018.

6.     Claimant reserves the right to amend this Claim and will set the matter for hearing at a future date.

Dated:    6/7/18

KLEIN, DENATALE, GOLDNER, COOPER, ROSENLIEB & KIMBALL LLP

By: _____
      HAGOP T. BEDOYAN,
      Attorneys for VI Healthcare Finance, Inc.

2

REQUEST FOR PAYMENT OF ADMIN. EXPENSE CLAIM

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF CALIFORNIA

In re:        ) Bankruptcy Case No.  2016-10015 FEC

          )
SOUTHERN INYO HEALTHCARE )
DISTRICT,       )
          ) DCN  2
       Debtor(s) )

## SUBSTITUTION OF ATTORNEY FOR
## BAKER & HOSTETLER LLP

Debtor(s)   herein, hereby substitute(s):

    Ashley M. McDow, Esq.
    Fahim Farivar, Esq.
    FOLEY & LARDNER LLP
    555 South Flower Street, Suite 3500, Los Angeles, CA  90071-2411
    Telephone: 213.972.4615

in place and stead of the present attorney:

    BAKER & HOSTETLER LLP
    11601 Wilshire Boulevard, Suite 1400, Los Angeles, CA  90025-0509
    Telephone: 310.820.8800

I consent to the above substitution.

Dated June 12, 2018

             Jaque Hickman
             Party

Dated

             Party

Dated June 12, 2018

             Teresa C. Chow
             Present Attorney for Party

I am duly admitted to practice in this district, and I accept the above substitution.

Dated June 12, 2018

             Ashley M. McDow

             Proposed Attorney for Party

EDC 3-506 Revised 9/25/14

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF CALIFORNIA

In re:                                    ) Bankruptcy Case No.        2016-10015 FEC
SOUTHERN INYO HEALTHCARE                  )
DISTRICT,                                 )
                                          )
                                          ) DCN  2
                      Debtor(s)           )
_____ )

## ORDER APPROVING SUBSTITUTION OF ATTORNEY

It is ORDERED that  Ashley M. McDow, Esq. / Fahim Farivar, Esq.
                    FOLEY & LARDNER LLP
                    555 S. Flower Street, Suite 3500, Los Angeles, CA
                    90071-2411 / Telephone: 213.972.4615
is hereby substituted as Attorney of Record, in place and stead of

Baker & Hostetler LLP                .

**Dated:** Jun 26, 2018

_____
Fredrick E. Clement
United States Bankruptcy Judge

RECEIVED
June 25, 2018
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0006307485

. 1/11/17          EXHIBIT HH  406