Ashley M. McDow (245114)
**FOLEY & LARDNER LLP**
555 S. Flower St., Suite 3300
Los Angeles, CA  90071
Telephone:      213.972.4500
Facsimile:      213.486.0065
Email:          amcdow@foley.com

Attorneys for Debtor,
SOUTHERN INYO HEALTHCARE DISTRICT

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

## FRESNO DIVISION

| | |
|---|---|
| In re | Case No.: 2016-10015 |
| SOUTHERN INYO HEALTHCARE DISTRICT, | Chapter 9 |
| | FL-003 |
| Debtor. | **DEBTOR'S OPPOSITION TO MOTION TO DISQUALIFY ASHLEY M. MCDOW AND FOLEY & LARDNER AS COUNSEL FOR DEBTOR** |
| | Date:      March 21, 2019 |
| | Time:      1:30 p.m. |
| | Place:     Dept. A, Ctrm 11 |
| | U.S. Bankruptcy Court |
| | 2500 Tulare Street |
| | Fresno, CA 93721 |

SOUTHERN INYO HEALTHCARE DISTRICT, the debtor (the "District" or the "Debtor") in the above-captioned bankruptcy case (the "Bankruptcy Case"), respectfully submits the within Opposition to the Motion to Disqualify Ashley M. McDow and Foley & Lardner as Counsel for Debtor (the "Motion").

/ / /

/ / /

/ / /

4817-8802-6504.3

1

**Table of Contents**

2   I.      INTRODUCTION ................................................................................................... 1

3   II.     FACTUAL BACKGROUND ................................................................................... 4

4           A.      The Filing of the Chapter 9 Petition and the Debtor's Retention of HCCA. ......... 4
            B.      Ms. McDow's Relationship with HCCA While at Baker Was Limited. ............... 5
5           C.      HCCA Waived Adversity by Ms. McDow and Baker in the Debtor's
                    Chapter 9 Case. ......................................................................................... 6
6           D.      The Motion to Terminate the MSA Was Filed on an Emergency Basis and
                    Was Prosecuted by Independent Counsel. ......................................................... 8
7           E.      Independent Counsel Will Represent the Debtor in Any Matter Adverse to
                    HCCA Going Forward. ............................................................................... 10
8           F.      The Motion is Being Used as a Litigation Tactic to Benefit HCCA to the
                    Detriment of the Debtor and Its Creditors. ..................................................... 11
9
    III.    LEGAL ARGUMENT ........................................................................................... 11
10
            A.      California Law Imposes a Significant Burden on Parties Who Seek to
11                  Disqualify a Former Attorney. ..................................................................... 11
            B.      Disqualification of Ms. McDow and Foley Is Not Required or Appropriate. ...... 12
12                  i.      Rule 3-310 and the Substantial Relationship Test Under California
                            Law. ........................................................................................... 12
13                  ii.     The Evolution of the Substantial Relationship Test under California
                            Law. ........................................................................................... 14
14                  iii.    Ms. McDow and Foley Should Not Be Disqualified Under the
                            Substantial Relationship Test or the Modified Substantial Relationship
15                          Test. ........................................................................................... 16
            C.      The Hot Potato Rule Does Not Serve as a Basis for Disqualification of Ms.
16                  McDow or Foley. ....................................................................................... 20
            D.      Even if There is a Substantial Relationship, the Movants Have Waived Any
17                  Right to Seek Disqualification of Ms. McDow and Foley. ................................ 21
                    i.      The Right to Seek Disqualification of a Former Attorney Can Be
18                          Waived. ....................................................................................... 21
                    ii.     The Movants Waived Their Right to Seek Disqualification of Ms.
19                          McDow and, Therefore, Foley by, Among Other Things, Waiting
                            More Than One Year to Bring the Disqualification Motion. ................... 23
20
    IV.     CONCLUSION ...................................................................................................... 25
21

22

23

24

25

26

27

28

1

<h1 style="text-align:center">Table of Authorities</h1>

2  **Cases**

3  *Adams v. Aerojet-General Corp.*,
4    86 Cal. App. 4th 1324 (2001) ................................................................ 16

*Comden v. Superior Court*,
5    20 Cal. 3d 906 (1978) ........................................................................... 24

6  *Concat LP v. Unilever, PLC*,
7    350 F. Supp.2d 794 (N.D. Ca. 2004) .................................................... 12

*Elliott v. McFarland Unified School District*,
8    165 Cal. App.3d 562 (1985) .................................................................. 20

9  *Gross Belsky Alonso LLP v. Henry Edelson*,
    2009 WL1505284 (N.D. Cal. 2009) ...................................................... 13
10
*H.F. Ahmanson & Co. v. Salomon Brothers, Inc.*,
11    229 Cal. App.3d 1445 (1991) ........................................................... 14, 15

12  *In re County of Los Angeles*,
    223 F.3d 990 (9th Cir. 2000) ................................................................. 11
13
*In re Marvel*,
14    251 B.R. 869 (Bankr. N.D. Cal. 2000) .................................................. 12

15  *Lennar Mare Island, LLC v. Steadfast Ins. Co.*,
    105 F. Supp.3d 1100 (E.D. Cal. 2015) .................................................. 14
16
*Liberty Nat'l Enterprises, L.P. v. Chicago Title Ins. Co.*,
17    194 Cal. App.4th 839 (2011) ................................................... 3, 13, 23, 24

18  *Med-Trans Corp., Inv. V. City of California City*,
    156 Ca. App.4th 655 (2007) .................................................................. 17
19
*Radcliffe v. Hernandez*,
20    818 F.3d 537 (9th Cir. 2016) ................................................................. 11

21  *River West Inc. v. Nickel*,
    188 Cal. App. 3d 1297 (1987) ..................................................... 23, 24, 25
22
*Shurance v. Planning Control Intern., Inc.*,
23    839 F.2d 1347 (9th Cir. 1988) ............................................................... 12

24  *Silver Chrysler Plymouth, Inc. v. Chrysler Mot. Corp.*,
    (2nd Cir. 1975) ................................................................................. 15, 16
25
*Sirisup v. It's Thai, L.L.C.*,
26    2015 WL 404096 (C.D. Cal.) ................................................................ 23

27  *Trust Corp. of Montana v. Piper Aircraft Corp.*,
    701 F.2d 85 (9th Cir. 1983) ....................................................... 12, 13, 23
28

4817-8802-6504.3

*Visa U.S.A., Inc. v. First Data Corp.,*
  241 F. Supp.2d 1100 (N.D. Cal. 2003) ................................................................. 12

*Western Sugar Coop v. Archer Daniels-Midland Co.,*
  98 F. Supp.3d 1074 (C.D. Cal. 2015) ................................................................. 22

*White v. Superior Court,*
  98 Cal App. 3d 51 (1979) ................................................................................. 23

**Rules**

California Rules of Professional Conduct, Rule 3-310 ............................... 13, 15, 16, 18

California Rules of Professional Conduct, Rule 3-310(E) ...................... 1, 12, 13, 16, 18

**Other Authorities**

*Cal. Prac. Guide Prof. Resp.*, §4.189(1) ................................................................. 17

*Cal. Prac. Guide Prof. Resp.*, §4.189.1 ................................................................. 17

4817-8802-6504.3

## I.     INTRODUCTION

In their initial Memorandum of Points and Authorities in Support of the Motion (the "IMPA") and the Supplemental Memorandum of Points and Authorities in Support of the Motion (the "SMPA" and collectively with the IMPA, the "MPA"), HealthCare Conglomerate Associates, LLC ("HCCA") and Vi Healthcare Finance, Inc. ("Vi" and collectively with HCCA, the "Movants") spend nearly forty (40) pages attempting to convince this Court that the services previously rendered to the Movants by Baker & Hostetler LLP ("Baker") and Ms. McDow while at Baker were so related to the work currently being done by Ms. McDow and Foley & Lardner LLP ("Foley") that disqualification of Ms. McDow and Foley from the representation of the Debtor in the Bankruptcy Case is mandatory.  To this end, the Movants contend that the invoices produced by Baker (the "Baker Invoices") somehow substantiate this conclusion.   However, even if we temporarily set aside the fact that the Movants executed a written waiver consenting to any conflict of interest related to the dual representation of the Movants and the Debtor by Baker (and thus Ms. McDow), the Baker Invoices actually prove the opposite point: that Ms. McDow's work for the Movants was limited in nature and scope and perhaps more importantly, wholly unrelated to any services rendered or to be rendered to the Debtor by Ms. McDow and Foley for the remainder of the Bankruptcy Case – a reality that is factually and legally fatal to the ability of the Movants to obtain the relief sought by and through the Motion.

Moreover, and contrary to the impression given by the MPA, which attempts to muddy clear water, the Motion actually presents two fairly straight-forward questions for this Court. *First*, under Rule 3-310(E) and the case law interpreting it, is there a substantial relationship between the previous representation of the Movants by Baker and Ms. McDow (the "Previous Representation"), on the one hand, and the current representation of the Debtor by Foley and Ms. McDow (the "Current Representation"), on the other hand?  *Second*, and regardless of the answer to the first question, have the Movants waived their right to seek disqualification of Ms. McDow and Foley? The answer to the first question is "no."  The answer to the second question is "yes" because, among other reasons, the Movants waited more than a year to file the Motion in a patent attempt to derail litigation currently being prosecuted by the Debtor by and through independent counsel.

OPPOSITION TO MOTION TO DISQUALIFY ASHLEY M. MCDOW AND FOLEY & LARDNER AS COUNSEL FOR DEBTOR

4817-8802-6504.3

The Motion and the MPA go to great lengths to exaggerate the nature and scope of the Previous Representation, and then attempt to use that exaggerated involvement as a basis to disqualify Ms. McDow and Foley from the Current Representation. To this end, the Movants contend that the proper standard to be applied in determining whether disqualification is mandatory is the "substantial relationship" test – a contention that completely disregards relevant California decisions that have refused to strictly apply this test. Using what appears to be an inverse belt and suspenders approach, the Movants simply assume that there is a substantial relationship between the Former Representation and the Current Representation and then rely on this purported substantial relationship to impute confidential information to Ms. McDow and Foley that could hypothetically be used to potentially harm the Movants' amorphous interests in this case. However, even if this Court were to apply the stricter approach advocated by the Movants to determine whether disqualification of Ms. McDow and Foley is warranted in the instant case, there is simply no substantial relationship between the Previous Representation and the Current Representation. First and foremost, the Management Services Agreement between HCCA and the Debtor (the "MSA"), which the Movants contend is the basis for the purported substantial relationship, no longer exists, as it was terminated by the Debtor – ***by and through independent counsel*** - long ago. (Indeed, if the Movants had wished to disqualify Baker and Ms. McDow, shortly after the filing of the termination of the MSA would have been the time to do so.) Moreover, the only remaining task to be completed by the Debtor is the finalizing and prosecution of the plan of adjustment, which may or may not involve a mediation; however, in no event would Ms. McDow or Foley participate in any such mediation (despite Movants repeated unsubstantiated contentions to the contrary). Moreover, despite the Movant's blatant misrepresentations to the contrary, the Debtor has never even suggested that any recoveries from the pending lawsuit against the Movants would serve as the (primary) funding source for the plan of adjustment. In fact, the current version of the plan of adjustment does not even contemplate the use of such funds. Accordingly, and despite the Movants unrelenting attempts to convince this Court to the contrary, the Current Representation is not related – let alone substantially related – to the Previous Representation.

*Second*, and out of an abundance of caution, to the extent that any matter involves or will involve adversity between the Debtor and the Movants, such matter has been and will continue to be handled by independent counsel.  This, coupled with the termination of the MSA, by independent counsel, prior to Ms. McDow joining Foley demonstrates that ***the <u>current</u> scope of Ms. McDow and Foley's representation of the Debtor does not include any work adverse to the Movants, including any work related to the MSA.  Thus, no form of the substantial relationship test is satisfied.***

Even *assuming arguendo* that the substantial relationship test *had* been satisfied (which the Debtor contends is not the case), the Movants have waived their right to seek disqualification of Ms. McDow and Foley.  In recognizing that clients can waive the ability to seek to disqualify their former lawyers, California courts consider, among other things, the length of time that elapses between the complained of conduct and the time when a disqualification motion is filed.  In a patent attempt to avoid a finding of waiver, the Movants preemptively argue that they only waited four (4) months to file the Motion,  apparently arbitrarily starting the proverbial clock ticking when Ms. McDow joined Foley.  However, the action they now so vociferously complain of and which serves as the entire basis for the disqualification motion – Baker's filing of a motion to terminate the MSA and Ms. McDow's declaration in support of that motion - took place *more than a year* before the filing of the Motion.  Such a significant delay not only warrants a finding of waiver, but also, as at least one court has recognized, *see Liberty Nat'l Enterprises, L.P. v. Chicago Title Ins. Co.,* 194 Cal. App.4th 839, 847 (2011), is an indication that the Movants never seriously believed that Ms. McDow had confidential information that could meaningfully be used against them.  Indeed, in nearly forty (40) pages of briefing, Movants do not even attempt to describe what confidential information Ms. McDow and now Foley have that has or could be used against them moving forward.

Since the filing of the motion to terminate the MSA over a year ago, the Movants have apparently laid in wait for the most opportune time to file the Motion.  Not coincidentally, that time came shortly after they were sued by the Debtor (using independent counsel) for damages, treble damages, breach of fiduciary duty and equitable subordination, among many other things.  The

4817-8802-6504.3

1  Motion is nothing more than a litigation tactic - a transparent attempt to run the Bankruptcy Case

2  off the proverbial rails which, in turn, would likely result in not only a dismissal of the Bankruptcy

3  Case (which was almost assuredly force the closure of the hospital), but the adversary proceeding

4  against them, yet Vi would continue to receive the property tax revenues on account of the very

5  loan that is the subject of the litigation currently pending against Vi *even if the bankruptcy case*

6  *were dismissed and the hospital were to shut its doors*.

7       For all of these reasons, the Court should deny the Motion.

8  **II.     FACTUAL BACKGROUND**

9       **A.     The Filing of the Chapter 9 Petition and the Debtor's Retention of HCCA.**

10      The Debtor filed a voluntary chapter 9 bankruptcy petition in this Court on or about

11  January 4, 2016.  Declaration of Ashley M. McDow, filed concurrently herewith (the "McDow

12  Decl."), ¶ 3.  On or about July 12, 2016, this Court entered an order for relief.  McDow Decl., ¶ 3.

13  On or about January 2, 2016, just prior to the filing of the chapter 9 petition, the Debtor retained

14  HCCA to serve as the management company in accordance with the terms of the MSA.  McDow

15  Decl., ¶ 4. Under the MSA, HCCA was, among other things, vested with the authority and the

16  obligation to manage the operational and financial aspects of the District.  McDow Decl., ¶ 4.  At

17  the time the MSA was executed, both the Debtor and HCCA were represented by Baker. McDow

18  Decl., ¶ 4.  As detailed further below, at all relevant times, the Movants were well aware of Baker's

19  dual representation and expressly waived, in writing, any conflict arising from such dual

20  representation.  The Movants are both controlled by Dr. Yorai Benzeevi ("Dr. Benzeevi").  *See*

21  Declaration of Yorai Benzeevi, M.D. in Support of Motion to Disqualify Ashley M. McDow and

22  Foley & Lardner as Attorneys for Debtor, at ¶ 4.

23      Baker represented the Movants until approximately September 29, 2017.  McDow Decl., ¶

24  5.  Baker represented the Debtor until approximately May 1, 2018, following the departure of Ms.

25  McDow from Baker on or about April 30, 2018.  McDow Decl., ¶ 5.  The Debtor subsequently

26  retained Foley to represent it in the Bankruptcy Case.

27

28

4817-8802-6504.3

**B.      Ms. McDow's Relationship with HCCA While at Baker Was Limited.**

As the Movant's have no choice but to concede, the majority of Baker's involvement with the MSA was handled by Bruce Greene, a partner at Baker (and the long standing relationship partner of the Movants), and not by Ms. McDow. McDow Decl., ¶ 6. Indeed, contrary to the allegations contained in the Motion, which portray the relationship between Ms. McDow and the Movants as an extensive one, Ms. McDow's relationship with the Movants was extremely limited. McDow Decl., ¶ 6.

While the Debtors do not contest the fact that Baker may have had a lengthy relationship with one or more of the Movants, Ms. McDow's involvement with the Movants, as evidenced in the Baker Invoices, was limited to (i) 37.2 hours in December 2015 and January 2016 advising HCCA on the MSA and potential chapter 9 bankruptcy filing by the Debtor[1] and (ii) 11.6 hours in 2014 advising HCCA on various matters completely unrelated to the Debtor.[2] McDow Decl., ¶ 7. However, beyond these limited categories, Ms. McDow had no relationship with HCCA and would not, in the normal course, have had access to HCCA's confidential information, including any strategies of HCCA in this chapter 9 case. McDow Decl., ¶ 8. Ms. McDow had no administrative or managerial duties with respect to Baker's relationship with HCCA or any of its affiliates. McDow Decl., ¶ 8. Furthermore, the Baker Invoices show that Ms. McDow *did not* communicate with Dr. Benzeevi "multiple times per day" during the December 2015- January 2016 time period in which the MSA was being negotiated, despite the contention of Dr. Benzeevi – under oath – to the contrary. *See* Benzeevi Decl., ¶ 6. In fact, the invoices reflect, at most, a total of four

---

[1] This time consisted of five time entries: (i) December 28, 2015 @ 5.8 hours; (ii) December 29, 2015 @ 5.7 hours; (iii) December 30, 2015 @ 15.3 hours (which included travel time to a board meeting of the Debtor); (iv) December 31, 2015 @ 5.6 hours; and (v) January 1, 2016 @ 4.8 hours. As the Movants noted in the SMPA, the December 28, 2015 and December 29, 2015 time entries also appear in another invoice and appear to be duplicative of the entries in that invoice. *See* SMPA, at p. 8, n.5. In addition, Mr. Farivar billed 1.4 hours to HCCA on December 30, 2015. Mr. Farivar is no longer associated with Foley.

[2] The Movants argue – without providing a scintilla of factual or legal support - that Ms. McDow spent 9.6 hours on services rendered to HCCA in matters pertaining to Tulare Regional Medical Center ("Tulare") and that, because that matter was purportedly similar to the services rendered to HCCA in matters pertaining to the Debtor, those 9.6 hours have more significance than they actually do. *See* SMPA, at p 8. However, the Current Representation is wholly unrelated to any services rendered by Ms. McDow on the Tulare matter, a fact which should be self-evident given, among other things, the period of time between the rendering of services for Tulare as opposed to the District.

4817-8802-6504.3

1   conversations with Dr. Benzeevi in which Ms. McDow participated in the December 2015 –

2   January 2016 timeframe.[3]  McDow Decl., ¶ 8.   In 2014, the invoices reflect at most two

3   conversations or meetings between Ms. McDow and Dr. Benzeevi.[4]  McDow Decl., ¶ 8.  Moreover,

4   as demonstrated by the Baker Invoices, Ms. McDow did not render any services to either of the

5   Movants once the Bankruptcy Case had been commenced.  Further, it is clear from the Baker

6   Invoices that Ms. McDow was hardly involved – let alone intimately - in the legal representation

7   of HCCA while at Baker.  McDow Decl., ¶ 9.  In fact, in the Baker Invoices, between May 2013

8   and October 2017, the hours billed by Ms. McDow to any matter related to HCCA were

9   approximately 2.8% of the total hours billed by Baker to HCCA.  McDow Decl., ¶ 9.

10          **C.      HCCA Waived Adversity by Ms. McDow and Baker in the Debtor's**

11                    **Chapter 9 Case.**

12          While the Movants first expressed some doubt as to whether HCCA ever executed the

13  January 2, 2016 conflict waiver letter (the "January 2016 Waiver),[5] the Movants attached a fully

14  executed version of that waiver letter to their Supplemental Declaration of Hagop T Bedoyan in

15  Support of Motion to Disqualify Ashley M. McDow and Foley & Lardner as Attorneys for the

16  Debtor.  Among other things, the January 2016 Waiver:

17          (i) discloses that Baker represents the Debtor as counsel in the Bankruptcy Case;

18          (ii) discloses that Baker represents HCCA in connection with the negotiation and drafting

19  of the MSA;

20          (iii) states that the interests of the Debtor and HCCA were presently aligned but that it was

21  possible that the interests of HCCA and the Debtor in connection with the Bankruptcy Case may,

22  in the future, no longer be aligned and, further, that disputes may occur between HCCA and the

23  Debtor;

24  _____

25  [3] These are the time entries on (i) December 28, 2015; (ii) December 29, 2015; (iii) December 31, 2015; and (iv)
    January 1, 2016 (the January 1, 2016 time entry indicates that Ms. McDow participated on a conference call, but does

26  not indicate with whom).

27  [4] These are the time entries on (i) May 30, 2014 and (ii) potentially April 24, 2014 (which time entry reflects a meeting
    with the "client").

28
    [5] See IMPA, at p. 9 (referring to the January 2016 Waiver as a "purported conflict waiver").

4817-8802-6504.3

(iv) discloses that the California State Bar Rules provide that a law firm may represent two or more clients that have differing or adverse, past or future interests if each client consents to such representation after full disclosure of the actual and reasonably foreseeable adverse consequences with respect to the representation;

(v) discloses that Baker's representation of the Debtor in connection with the Bankruptcy Case may present a conflict of interest due to Baker's prior and continuing representation of HCCA;

(vi) discloses that the primary source of such a conflict would be the fact that Baker may have access to material confidential information of the parties which, but for the dual representation, it would be obligated to disclose to the other party;

(vii) provides that HCCA and the Debtor "hereby waive any potential or actual conflict of interest which may now exist or which may arise in the future in connection with [Baker] accepting engagement by the [Debtor] to represent the [Debtor] in the connection with the Chapter 9 Filing";

(viii) states that if "a material dispute and actual conflict of interest arises between the [Debtor] and [HCCA] regarding the Chapter 9 Filing, or otherwise, [Baker] will the assess the circumstances to determine its ethical obligations and to determine an appropriate course of action, which may include withdrawing from representation of the District in the Chapter 9 Filing."

McDow Decl., ¶ 10.

Thus, there is no doubt – and the Movants do not dispute - that HCCA was aware of Baker's dual representation of HCCA and the Debtor, and further was aware that its confidential information would be shared with Baker. Nor is there any doubt that HCCA did not object to – and in fact consented to - this dual representation.

Furthermore, it is also undisputed that on or about July 19, 2017 both Movants executed a conflict waiver letter (the "July 2017 Waiver," and together with the January 2016 Waiver, the "Waivers").  After making disclosures and statements similar to those set forth above in the January 2016 Wavier, the July 2017 Waiver again waived any conflict that resulted from Baker's dual representation of the Movants and the Debtor:

> After full disclosure of the facts and the potential adverse consequences of the dual representation as described herein, the [Debtor] and the [Movants and Dr. Benzeevi] hereby waive any potential or actual conflict of interest which may now exist or

which may arise in the future in connection with the Firm's engagement by the District to represent the District in connection with the Chapter 9 Filing.

July 2017 Waiver, at p. 4.

McDow Decl., ¶ 12.

The broad scope of the Waivers, which explicitly waived "any potential or actual conflict of interest", arguably extended to Baker's filing of the Emergency Motion to Terminate, as defined below, two (2) months later.[6] However, at no point did the Movants ever object to the dual representation (even after the filing of the Termination Motion") or seek to disqualify Baker from representing the Debtor in the Bankruptcy Case, a fact which should not be overlooked and cannot be overstated.

However, even if this were not the case, it has absolutely no bearing on whether Ms. McDow and Foley should be disqualified from their representation of the Debtor in the Bankruptcy Case. Rather, the only relevant considerations in this determination are (i) whether there is a substantial relationship between Ms. McDow's former representation of HCCA and her and Foley's current representation of the Debtor and (ii) whether the Movants waived any right to seek disqualification of Ms. McDow and Foley.

**D.      The Motion to Terminate the MSA Was Filed on an Emergency Basis and Was Prosecuted by Independent Counsel.**

Notwithstanding the existence of the Waivers, the first and only action that either Ms. McDow or Baker took that was even arguably adverse to HCCA was the filing of the "Emergency Motion (1) for Authority to Immediately Terminate HCCA Management Agreement or, in the Alternative, for Authority to Modify Terms of the HCCA Management Agreement in Order to Designate the Board as the Sole Signatory on all District Accounts, and (2) to Continue Hearing on Second Amended Disclosure Statement and Associated Filing Deadlines" (the "Emergency Motion to Terminate"). McDow Decl., ¶ 13. The Emergency Motion to Terminate was filed on October 17,

---

[6] It is true that the Waivers further state that "[i]n the event that a material dispute and actual conflict of interest arises between the District and the constituents of the Benzeevi Group regarding the Chapter 9 filing, or otherwise, the Firm will then asses the circumstances to determine its ethical obligations and to determine an appropriate course of action, which may include withdrawing from representation of the District in the Chapter 9 Filing." *Id.*

4817-8802-6504.3

2017. McDow Decl., ¶ 14. Importantly, more than two weeks before the filing of the Emergency

Motion to Terminate, Baker terminated its representation of Dr. Benzeevi, HCCA and all HCCA

affiliated entities. Benzeevi Decl., ¶ 11. Thus, at the time of the filing of the Emergency Motion

to Terminate, HCCA was not a client of Baker. McDow Decl., ¶ 14.

The Emergency Motion to Terminate was filed on an emergency basis because the Debtor

believed that HCCA had mismanaged the Debtor and, worse, engaged in what appeared to be

numerous unauthorized transactions involving funds of the Debtor. McDow Decl., ¶ 15.

Furthermore, HCCA appeared to have made numerous misrepresentations and misstatements in the

financial reports it had prepared for and on behalf of the Debtor. McDow Decl., ¶ 15. On or about

October 11, 2017, the board of the District convened and determined that HCCA's misconduct

warranted the immediate termination and rejection of the MSA. McDow Decl., ¶ 16. Given the

board's belief that HCCA was siphoning funds from the Debtor, it authorized the immediate filing

of the Emergency Motion to Terminate in an effort to ensure that the operations of the District –

namely the provision of healthcare services to the community-at-large - would not be adversely

impacted. McDow Decl., ¶ 16. Moreover, given the emergency nature of the situation and their

awareness of the Waivers, the Debtors asked Baker to file the Emergency Motion to Terminate.

McDow Decl., ¶ 16.

At the initial hearing on the Emergency Motion to Terminate on October 17, 2017, the Court

granted limited relief to the Debtor. McDow Decl., ¶ 17. That relief consisted of removing HCCA

as a signatory on the Debtor's bank accounts. McDow Decl., ¶ 17. After that, prosecution of the

balance of the Emergency Motion to Terminate was handled by independent counsel at Dentons,

and the matter was eventually settled. McDow Decl., ¶ 17. Other than the filing of the Emergency

Motion to Terminate, which was unavoidable given the exigencies presented, neither Baker nor

Ms. McDow took any other actions which the Movants have even alleged to be adverse to their

interests, with respect to the Emergency Motion to Terminate or otherwise. McDow Decl., ¶ 17.

The Court approved the rejection and termination of the MSA on December 2, 2017, which

was well before Ms. McDow joined Foley. McDow Decl., ¶ 18. As the MSA has been terminated,

it has little to no remaining relevance in the Bankruptcy Case, other than serving as a basis for the

1  Adversary Complaint (as defined below) that is being prosecuted by independent counsel and any

2  claim that HCCA believes it may have against the Debtor, a contested matter that will also be

3  handled by independent counsel if and when it is properly before the Court. McDow Decl., ¶ 18.

4      **E.**    **Independent Counsel Will Represent the Debtor in Any Matter Adverse to**

5          **HCCA Going Forward.**

6      The Debtor has retained independent counsel – Jeffrey S. Shinbrot, APLC – to represent it

7  in any matter adverse to one or both of the Movants. McDow Decl., ¶ 19. In particular, Mr.

8  Shinbrot of Jeffrey S. Shinbrot, APLC is representing the Debtor in the adversary proceeding

9  commenced by the Debtor's filing of a complaint against the Movants (the "Adversary Complaint")

10  on or about May 30, 2018 (the "Adversary Proceeding"). McDow Decl., ¶ 19. The Adversary

11  Complaint seeks to avoid unauthorized post-petition transfers and alleges breach of contract,

12  negligence, concealment, breach of fiduciary duty and equitable subordination, among other things.

13  McDow Decl., ¶ 19. In addition to representing the Debtor in the Adversary Proceeding, Mr.

14  Shinbrot, along with Scott Nave of Nave & Cortell LLP, who has represented the District since

15  well before its bankruptcy filing, will represent the Debtor in any mediation that takes place in this

16  case, and neither Ms. McDow nor anybody else from Foley will not attend or participate in any

17  way in such mediation. McDow Decl., ¶ 20. Thus, contrary to the baseless allegations contained

18  in the Motion, neither Ms. McDow nor Foley will be "hopelessly conflicted" in any such mediation.

19  McDow Decl., ¶ 21. Further, contrary to the baseless and unsubstantiated allegation in the SMPA,

20  *see* SMPA at p. 17, n.8 ("there is no evidence that Ms. McDow has no involvement in [the

21  Adversary Complaint], and is not exercising supervisory control of that action as lead insolvency

22  counsel."), Ms. McDow has not and will not have any involvement in any portion of the Adversary

23  Proceeding and is not exercising supervisory authority with respect to any portion of the Adversary

24  Proceeding. McDow Decl., ¶ 21. The unsubstantiated allegation that Ms. McDow would

25  surreptitiously breach her ethical obligations is offensive at best and

26  libelous/slanderous/defamatory at worst, particularly when it is set forth in a pleading that is

27  publicly accessible.

28

4817-8802-6504.3

**F.      The Motion is Being Used as a Litigation Tactic to Benefit HCCA to the Detriment of the Debtor and Its Creditors.**

As noted above, the Adversary Complaint was filed relatively recently, and seeks not only compensatory damages, but punitive and treble damages, from the Movants.  McDow Decl., ¶ 22. And despite the fact that the Adversary Proceeding is being prosecuted by independent counsel for the Debtor, it is beyond dispute that disqualification of Ms. McDow and Foley would have positive implications for the Movants (likely by and through the Dismissal of not only the Bankruptcy Case, but the Adversary Proceeding), yet would be catastrophic to not only the Debtor, but the residents of the skilled nursing facility, and the community-at-large who utilizes the services of the District. McDow Decl., ¶ 22.  First and foremost, disqualification of lead counsel to the Debtor, after more than three years into the Bankruptcy Case, would substantially delay, if not completely impede, the ability of the Debtor to successfully exit chapter 9 while continuing to provide vital healthcare services to the community-at-large.  McDow Decl., ¶ 23.  Moreover, the Debtor does not likely have the funds available that would be required to retain reputable replacement counsel and allow such counsel to get "up to speed" on the vast array of issues that Ms. McDow (and Baker/Foley) have been handling since the beginning of 2016.  Unfortunately, the Bankruptcy Case is not a simple case, and the Debtor cannot afford, and should not be forced, to completely start over with counsel that is unfamiliar with the nuances of this case (assuming that the Debtor would even be able to retain experienced chapter 9 counsel given their financial situation).  McDow Decl., ¶ 23.

## III.      LEGAL ARGUMENT

**A.      California Law Imposes a Significant Burden on Parties Who Seek to Disqualify a Former Attorney.**

State law is controlling in determining motions to disqualify counsel.  *In re County of Los Angeles*, 223 F.3d 990, 995 (9th Cir. 2000); *Radcliffe v. Hernandez*, 818 F.3d 537, 543 (9th Cir. 2016).  Under California law, "[b]ecause disqualification is a drastic measure, it is generally disfavored and should only be imposed when absolutely necessary." *Concat LP v. Unilever, PLC*, 350 F. Supp.2d 794, 814 (N.D. Ca. 2004).  Furthermore, because of their potential for abuse, motions for disqualification should be subjected to particularly strict judicial scrutiny.  *Shurance v.*

4817-8802-6504.3

*Planning Control Intern., Inc.*, 839 F.2d 1347, 1349 (9th Cir. 1988). The right to disqualify counsel is within the discretion of the trial court as an exercise of its inherent powers." *Visa U.S.A., Inc. v. First Data Corp.*, 241 F. Supp.2d 1100, 1103-04 (N.D. Cal. 2003) (citing *United States v. Wunsch,* 84 F.3d 1110, 1114 (9th Cir. 1996)). But "[m]otions to disqualify counsel are strongly disfavored." *Id.* at 1104. "A motion for disqualification of counsel is a drastic measure which courts should hesitate to impose except when of absolute necessity." *In re Marvel,* 251 B.R. 869, 871 (Bankr. N.D. Cal. 2000)(citing *Schiessle v. Stephens,* 717 F.2d 417 (7th Cir. 1983)). "They are often tactically motivated[,]" and "tend to derail the efficient progress of litigation." *Id.* (citing *Evans v. Artek Systems Corp.,* 715 F.2d 788, 791 (2nd Cir. 1983)). "The moving party, therefore carries a heavy burden and must satisfy a high standard of proof." *Id.* "Because of the potential for abuse, disqualification motions should be subjected to particularly strict judicial scrutiny." *Id.*

The Ninth Circuit has held that a "district court has the responsibility for controlling the conduct of attorneys practicing before it." *Trust Corp. of Montana v. Piper Aircraft Corp.*, 701 F.2d 85, 87 (9th Cir. 1983). Furthermore, an order on a motion seeking to disqualify an attorney "will not be disturbed if the record reveals any sound basis for the district court's action." *Id.* (citations omitted). Similarly, in the California state courts, a trial court's decision on a disqualification motion is normally reviewed for abuse of discretion. *Liberty National Enterprises, L.P. v. Chicago Title Ins. Co.*, 194 Cal. App. 4th 839, 847 (2011). Thus, under either federal or California state law, substantial discretion is accorded the trial court's ruling on a disqualification motion.

**B.    Disqualification of Ms. McDow and Foley Is Not Required or Appropriate.**

**i.    Rule 3-310 and the Substantial Relationship Test Under California Law.**

Rule 3-310(E) of the California Rules of Professional Conduct, which was in effect until October 31, 2018, and which the Debtor submits applies here, provides:

> A member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment.

1 　　　Thus, as applicable here, Rule 3-310(E) states that a lawyer cannot represent a client adverse

2 to a former client where, by the representation of the former client, the lawyer has actually obtained

3 confidential information material to the employment by the current client. What's more, the

4 informed written consent of the client can do away with this prohibition.

5 　　　At the outset, the Debtor notes that this case is about the duty of confidentiality and the

6 substantial relationship test. The Movants try, however, to argue that Ms. McDow's duty of loyalty

7 to HCCA continues. *See* MPA at p. 16. And they even argue that Foley, which has never

8 represented the Movants, has a duty of loyalty to the Movants. *Id*. But the duty of loyalty

9 "precludes an attorney from *concurrently* representing parties with adverse interests. . . Once the

10 representation ceases, however, the duty of loyalty becomes inapposite." *Gross Belsky Alonso LLP*

11 *v. Henry Edelson*, 2009 WL1505284 at *3 (N.D. Cal. 2009) (emphasis in original). *See also Lennar*

12 *Mare Island, LLC v. Steadfast Ins. Co.*, 105 F. Supp.3d 1100, 1108 (E.D. Cal. 2015) ("If the conflict

13 is successive, the "chief fiduciary value jeopardized is that of client confidentiality.") (emphasis in

14 original) (citation omitted). Here, the representation is successive, in that the Movants complain

15 that Ms. McDow and Baker took an adverse action against them after they had ceased to be clients

16 of Baker.

17 　　　A leading case on the interpretation and application of Rule 3-310(E), not cited by Movants,

18 is *H.F. Ahmanson & Co. v. Salomon Brothers, Inc.*, 229 Cal. App.3d 1445 (1991). There, the court

19 discussed in detail the "substantial relationship" test developed by the courts to implement Rule 3-

20 310, and modifications that have been made to that test in recognition of some of its earlier

21 infirmities. The court began by noting that a party seeking to disqualify its former lawyer from an

22 adverse representation under the original form of the substantial relationship test did not need not

23 to prove that the lawyer possesses confidential information. *Id*. at 1453. Rather, the party only had

24 to show a substantial relationship between the "former and current representations" in order to have

25 the former attorney disqualified. *Id*.

26 　　　But the *Ahmanson* court noted that there are several drawbacks to an approach that presumes

27 that the former attorney possesses confidential information adverse to the former client. *Id*. For

28 example, among other things, such a rigid rule is overinclusive and may impose a significant

4817-8802-6504.3

1   hardship on the attorney's current client. *Id.* "Another problem inherent in the 'substantial

2   relationship' approach is just what meaning to give to those two words. The word 'substantial',

3   like other nonquantifiable denominators of measurement, is subject to a variety of interpretations.

4   Use of the word 'relationship' implies a connection, but offers no guidance as to what is being

5   connected: subject matters, facts, or issues." *Id.* (citations omitted). Finally, the court recognized

6   that disqualification motions are "commonly used for purely strategic purposes to delay litigation,

7   harass the opposing party or pressure for a more favorable settlement." *Id*. at 1454. Thus, the low

8   bar for disqualification set by the traditional substantial relationship test could encourage its use as

9   a litigation tactic.

10            **ii.  The Evolution of the Substantial Relationship Test under California Law.**

11           As a result of some of the inherent problems with the substantial relationship test, it has

12   been modified since it was first introduced. Now, "the rule followed in California is that the

13   attorney's possession of confidential information will be presumed <u>only</u> when 'a substantial

14   relationship has been shown to exist between the former representation and the <u>current</u>

15   representation, and when it appears by virtue of the nature of the former representation or the

16   relationship of the attorney to his former client confidential information material to the <u>current</u>

17   dispute would normally have been imparted to the attorney. . . '" *Id.* (emphasis supplied) (citations

18   omitted). Thus, the *Ahmanson* court established a two-part test for attorney disqualification: the

19   moving party must establish (i) a substantial relationship between the former and current

20   representations and (ii) that by virtue of the nature of the former representation, confidential

21   information material to the <u>current</u> dispute would normally have been imparted to the attorney. The

22   Court described this as a "pragmatic" approach to disqualification motions. *Id*. at 1455.

23           In furtherance of this "pragmatic" approach, the *Ahmanson* court adopted an analysis of the

24   "substantial relationship" test that was espoused by Judge Adams in his concurrence in *Silver*

25   *Chrysler Plymouth, Inc. v. Chrysler Mot. Corp.* (2nd Cir. 1975). *Ahmanson*, 229 Cal. App. 3d. at

26   1455. In *Silver Chrysler*, Judge Adams suggested that the court should "focus on the similarities

27   between the two factual situations, the legal questions posed, and the nature and extent of the

28   attorney's involvement with the cases. As part of its review, the court should examine the time

spent by the attorney on the earlier cases, the type of work performed, and the attorney's possible exposure to formulations of policy or strategy." *Silver Chrysler*, 519 F. 2d at 760 (Adams, J., conc.).

California courts have continued to refine the substantial relationship test. For example, in *Adams v. Aerojet-General Corp.*, 86 Cal. App. 4th 1324 (2001), a case that was cited by Movants, the Court engaged in an extensive review of Rule 3-310, the substantial relationship test and prior decisions, including *Ahmanson* which, the *Adams* court noted, gave the substantial relationship test "refinement and specificity." *Adams*, 86 Cal. App. 4th at 1332. The *Adams* court noted that *Ahmanson's* focus is on the "practical consequences of the attorney's representation of the former client. The courts ask whether confidential information relevant to the current dispute would normally have been imparted to the attorney by virtue of the nature of the former representation." *Id.* (citation omitted). The *Adams* court further held that "even prior direct contact between an attorney and the former client does not necessarily result in disqualification when the attorney subsequently represents an adverse party, as long as the contact was not substantially likely to have compromised client confidences." *Id.* at 1335. The Court held, "disqualification should not be ordered where there is no reasonable probability the firm-switching attorney had access to confidential information at his or her former firm that is related to the <u>current</u> dispute." *Id.* at 1340 (emphasis supplied).

The primary difference between the "substantial relationship" test – which the Movants strenuously argue applies in the instant case - and the "modified substantial relationship" test concerns whether an attorney's involvement in the previous matter was "direct and personal" rather than "peripheral and attenuated." *Med-Trans Corp., Inv. V. City of California City*, 156 Ca. App.4th 655, 665 (2007). If the former, it is presumed that the attorney had access to confidential information in the first representation (the substantial relationship test). *Id.* If the latter, the moving party must make a showing that the attorney was in a position vis-a-vis the client to likely have acquired confidential information material to the current representation (the modified substantial relationship test). *Id.* But in either case, there must be a showing of a substantial relationship between the former and current representations. *Id.* (noting that, under the substantial relationship

test, "where a former client seeks to have a previous attorney disqualified from serving as counsel to a successive client in litigation adverse to the interests of the first client, the governing test requires that the client demonstrate a '*substantial relationship*' between the subjects of the antecedent and current representations") (citation omitted).  Indeed, even the Movants seem to agree on the scope of the Court's analysis here, stating that, "all that is left for this court to do is determine whether the former matter for HCCA and the current matter for the Debtor are substantially related or, in fact, the same matter."  *SMPA*, at p. 6.  Unfortunately for the Movants, however, as detailed *infra*, the Former Representation and the Current Representation are not substantially related (and are certainly not the same matter).

### iii.  Ms. McDow and Foley Should Not Be Disqualified Under the Substantial Relationship Test or the Modified Substantial Relationship Test.

Disqualification of Ms. McDow and Foley is not warranted under Rule 3-310 for a myriad of reasons.  *First*, there is no "substantial relationship" between the Former Representation and the Current Representation, and thus, disqualification of Ms. McDow and Foley would be inappropriate regardless of which  the Court elects to apply.  *Second*, Ms. McDow is not, and never was, in possession of any confidential information of the Movants that bears on any current or future dispute with the Movants and the Movants cannot and have not proven to the contrary. *Third*, as recognized by Rule 3-310(E), a client may give its informed consent to an attorney's, or former attorney's, representation adverse to a client or former client, *even when the lawyer has obtained confidential information of the client*.  Accordingly, even if Ms. McDow and Foley did obtain confidential information of the Movants (which they did not), the Waivers constituted informed (written) consent to the dual representation that the Movants now complain of.  *Fourth*, any disputes between the Movants and the Debtor (other than the filing of the Emergency Motion to Terminate) have been handled and will continue to be handled by independent counsel  for the Debtor in order to ensure that there is no realistic possibility that confidential information could be used against the Movants in any current or future dispute with the Debtor.

Neither the Substantial Relationship Test Nor the Modified Substantial Relationship Test Are Satisfied.  Here, it is of no import whether the substantial relationship test or the modified

1    substantial relationship test applies.  Under both tests, disqualification of Ms. McDow and Foley is

2    unwarranted and would be inappropriate. As noted above, both the substantial relationship test and

3    the modified substantial relationship test require a showing of a substantial relationship between

4    the former and current matters. The tests then diverge, depending on whether the attorney's

5    involvement in the prior matter was "direct and personal" or "peripheral and attenuated." However,

6    in either case, if there is not a substantial relationship between the former and current matters, the

7    inquiry ends there.  The nature of the attorney's involvement in the first matter, and whether

8    confidential information is presumed to have been imparted to the lawyer or must be affirmatively

9    shown to have been acquired, is irrelevant.

10        The three-part test formulated by Judge Adams in his concurrence in *Silver Chrsyler*, and

11   adopted by the court in *Ahmanson*, is instructive in the instant case.  Under this formulation of the

12   substantial relationship test, the court should focus its inquiry on (i) the similarities between the

13   two factual situations, (ii) the legal questions posed, and (iii) the nature and extent of the attorney's

14   involvement with the cases.  As part of its review, the court should also focus on the time spent by

15   the attorney on the earlier case, the type of work involved and the attorney's possible exposure to

16   formulation of policy or strategy. *See also Cal. Prac. Guide Prof. Resp.*, §4.189(1) (same). Further,

17   "the legal services performed by the attorney in the prior representation do not determine whether

18   disqualification is required. Rather, the focus is on the 'similarities between the legal problem

19   involved in the former representation and the legal problem involved in the current representation.'"

20   *Cal. Prac. Guide Prof. Resp.*, §4.189.1 (*quoting Farris v. Firemen's Fund Ins. Co.,* 119 Cal. App.

21   4th 671, 681 (2004)).

22        With respect to the factual situations, it is true that both the Former Representation and the

23   Current Representation relate to the Debtor and the Bankruptcy Case. But that is where the

24   similarities end.  As detailed above, the MSA was terminated long before Ms. McDow joined Foley

25   and has absolutely no relevance to the representation currently being provided to the Debtor by Ms.

26   McDow or Foley. Furthermore, the scope of Ms. McDow's former representation of the Movants

27   was limited to fewer than eleven (11) hours advising HCCA on the MSA, and fewer than twelve

28

- 17 -

1   (12) hours rendering services completely unrelated to the Bankruptcy Case or the Debtor in early

2   2014 (some 18-20 months before the Bankruptcy Case was even commenced).

3       Furthermore, there are no similarities between the legal questions posed in the Former

4   Representation and the legal questions posed in the Current Representation.  Again, the MSA was

5   terminated well before Ms. McDow joined Foley and the only involvement of the Movants in the

6   Bankruptcy Case is as a defendant in an Adversary Proceeding being handled by independent

7   counsel and a (potential) claimant in a (potential) contested matter to be handled by independent

8   counsel if and when the matter is properly before the Court.  The legal questions that were at issue

9   in the Former Representation related almost exclusively to the treatment of the MSA in a

10  Bankruptcy Case – a legal issue that became a legal nullity once the MSA was terminated.  There

11  are no legal questions in the Current Representation that even tangentially relate to this issue, and

12  the Movants do not even attempt to assert as much.

13      With respect to the nature and extent of Ms. McDow's involvement in the Prior

14  Representation and the Current Representation, there is no dispute that Ms. McDow, as lead counsel

15  to the Debtor in the Bankruptcy Case while at both Baker and Foley, is and has been heavily

16  involved in that representation.  However, as detailed above, Ms. McDow's involvement in the

17  Prior Representation was limited to the now-terminated MSA and to matters unrelated to the

18  Bankruptcy Case or the Debtor, and the Debtor has engaged independent counsel with respect to

19  any matters which are or may be adverse to the Movants; thus this factor is, at best, a wash.

20      <u>Ms. McDow Possesses No Confidential Information of the Movants</u>. Because there is no

21  substantial relationship between the Prior Representation and the Current Representation, the

22  Movants must demonstrate that Ms. McDow is actually in possession of their confidential

23  information in order to disqualify Ms. McDow and Foley.  *Elliott v. McFarland Unified School*

24  *District*, 165 Cal. App.3d 562 (1985) is instructive here.  In interpreting the predecessor to Rule 3-

25  310(E), the court held that, where there was (as here) no substantial relationship between the former

26  and current representations, "conclusory statements" regarding confidential information shared

27  with the attorney by the party moving for disqualification are insufficient.  *Id*. at 572.  Rather, there

28

- 18 -

1   is a requirement that "there be some showing of the nature of the communications or a statement

2   of how they relate to the current representation without disclosing what was actually communicated

3   . . ." *Id.*

4
5       Unfortunately for the Movants, they have not done that. Rather, they rely solely on

6   conclusory statements about how Ms. McDow obtained confidential information without (a)

7   providing any detail whatsoever as to what type of confidential information was purportedly shared

8   or (b) attempting to demonstrate any relationship between this purported confidential information

9   and the Current Representation.  For example, in an attempt to demonstrate that confidential

10  information was imparted to Ms. McDow in the course of the Prior Representation, the Movants

11  rely solely on the self-serving conclusory attestation of Dr. Benzeevi that he "spoke multiple times

12  per day during this period with both Mr. Greene and Ms. McDow concerning the Inyo MSA and

13  shared substantial confidential information with them concerning HCCA's strategies and goals with

14  respect to the Inyo MSA."  Benzeevi Decl., at ¶ 6.  However, there are no facts proffered to support

15  this conclusory statement (even in a way that would avoid disclosure of any actual confidential

16  information that might exist), no evidence such as emails or other correspondence to demonstrate

17  (or even suggest) that confidential information was shared, and not even a paltry attempt to

18  demonstrate how any purportedly confidential information imparted to Ms. McDow could benefit

19  the Debtor and/or be harmful to the Movants in the Current Representation.  Thus, contrary to the

20  assertions in the IMPA and of Dr. Benzeevi in his declaration, Ms. McDow's representation of the

21  Movants while at Baker was extremely limited both in nature and scope.  Moreover, in the course

22  of that limited representation, Ms. McDow did not gain access to any confidential information of

23  the Movants that could bear on any current or future dispute with either of the Movants.

24
25      <u>The Movants Gave Informed, Written Consent to Baker's Representation of the Debtor.</u>  As

26  discussed above, HCCA twice consented to Baker's dual representation of HCCA and the Debtor.

27
28

- 19 -

4817-8802-6504.3

The first waiver was executed on the eve of the commencement of the Bankruptcy Case, and the second waiver was executed a ***full eighteen (18) months later.*** So, not only did HCCA execute a waiver authorizing Baker's dual representation of HCCA and the Debtor when it was negotiating the MSA with the Debtor, it executed another waiver authorizing Baker's dual representation of HCCA and the Debtor after the Debtor had been in bankruptcy for eighteen (18) months – eighteen (18) months during which the dual representation was ongoing and during which no objection was raised. Accordingly, it is patently obvious that Movant's recent attempt to disqualify Ms. McDow and Foley is not based upon a genuine concern that confidential information obtained by Ms. McDow has been or will be used to harm the interests of the Movants, but rather is simply a tactical maneuver designed to deprive the Debtor of not only its right to counsel but of any meaningful ability to successfully exit the Bankruptcy Case. Even if the Movants have a legitimate concern regarding the timing of and/or motivation behind Baker's termination of its representation of the Movants in the Prior Representation (which the Debtor takes no position on), this has nothing to do with Ms. McDow or the Debtor, which is entitled to its choice of counsel absent extreme circumstances that are not present here.

Independent Counsel Will Handle Any Adversity to HCCA. As noted above, the Debtor retained independent counsel to represent the Debtor with respect to any issues adverse to HCCA. Thus, as a practical matter, to the extent there ever existed a risk that confidential information of HCCA could be used against it in litigation as a result of Ms. McDow's previous representation of HCCA – which the Debtor submit there was not - that risk no longer exists.

**C.      The Hot Potato Rule Does Not Serve as a Basis for Disqualification of Ms. McDow or Foley.**

In the SMPA, the Movants argue that the "hot potato" rule applies here, and mandates the disqualification of Ms. McDow and Foley from representing the Debtor in this case. *See* SMPA,

4817-8802-6504.3

at pp. 18-19. "The 'hot potato rule' bars an attorney and law firm from curing the dual representation of clients by expediently severing the relationship with the preexisting client." *Western Sugar Coop v. Archer Daniels-Midland Co.*, 98 F. Supp.3d 1074, 1084 (C.D. Cal. 2015). Further, the effect of the rule is to prohibit a lawyer or law firm to avoid the automatic disqualification rule that would apply as a result of concurrent, adverse representations by simply dropping one of the clients. *Id.* But there is at least one problem with the Movant's argument. If the hot potato rule does apply, it was Baker, not Foley, who disengaged from HCCA and arguably violated the rule. Indeed, neither Ms. McDow nor Foley had any involvement in the decision to disengage from HCCA. So, HCCA's complaint is with Baker, not Ms. McDow or Foley. Thus, the hot potato rule is not especially germane to the Motion, which seeks to disqualify Ms. McDow and Foley.

Furthermore, the hot potato rule typically comes into play when a firm represents two clients who are adverse to each other without any sort of conflict waiver or consent to the dual representation in place. *See, e.g., Western Sugar Coop.*, 98 F. Supp.3d at 1084 (noting that one of the clients had refused to sign a conflict waiver). Here, of course, as discussed above, both clients consented to the dual representation and acknowledged that in the event of an actual conflict between the parties, Baker would consider the situation and take an appropriate course of action. Here, Baker apparently determined that the appropriate course of action was to disengage from the Movants.

### D.     Even if There is a Substantial Relationship, the Movants Have Waived Any Right to Seek Disqualification of Ms. McDow and Foley.

#### i.     The Right to Seek Disqualification of a Former Attorney Can Be Waived.

While some jurisdictions hold that the right to seek to disqualify counsel cannot be waived, it has been well established for decades under California state and federal law that a client can waive its right to disqualify its former counsel. *See, e.g., Trust Corp. of Montana v. Piper Aircraft*

1  *Corp.*, 701 F.2d 85, 87 (9th Cir. 1983); *Liberty National Enterprises, L.P. v. Chicago Title Ins. Co.*,

2  194 Cal. App. 4th 839, 844 (2011); *White v. Superior Court*, 98 Cal App. 3d 51, 55-56 (1979). *See*

3  *also Sirisup v. It's Thai*, L.L.C., 2015 WL 404096 (C.D. Cal.) (holding that a court's authority to

4  disqualify an attorney derives from the court's equitable powers, and equitable considerations like

5  waiver and estoppel apply).

6          Put another way, "it is not in the interests of justice to make the 'substantial relationship'

7  rule so unyielding as to permit the former client to inexcusably postpone objections without

8  penalty." *River West Inc. v. Nickel*, 188 Cal. App. 3d 1297, 1309 (1987). In such cases, "a narrow

9  exception should apply if the present client, by way of opposition, offers *prima facie* evidence of

10  any unreasonable delay by the former client in making the motion and resulting prejudice to the

11  current client." *Id.* As the Ninth Circuit has succinctly stated, a waiver occurs when the moving

12  party "knowingly refrains from asserting [a conflict of interest] <u>promptly</u>." *Trust Corp. of*

13  *Montana*, 701 F.2d at 87 (emphasis supplied). *See also White,* 98 Cal. App. at 55-56 ("where the

14  circumstances do not require a different result, a party who seeks to challenge the qualification of

15  counsel to represent an adversary party must . . . proceed at the <u>first reasonable opportunity by</u>

16  <u>proper motion</u> . . . and that failing to do so, it is an abuse of the trial court's discretion to thereafter

17  entertain favorably a request for such relief") (emphasis supplied). Delay in bringing a

18  disqualification motion "is also an indication that the alleged breach of confidentiality was not seen

19  as serious or substantial by the moving party." *Liberty*, 194 Cal. App. 4th at 847.

20          The *River West* court held that where there has been an unreasonable delay in filing a

21  disqualification motion, the burden shifts back to the party seeking disqualification to justify the

22  delay. That party should address: (i) how long it has known about the potential conflict; (ii) whether

23  it has been represented by counsel since it has known about the potential conflict; (iii) whether

24  anyone prevented the moving party from making the motion earlier and, if so, under what

25  circumstances; and (iv) whether an earlier motion would have been inappropriate or futile, and

26  why. *River West*, 188 Cal. App. 3d at 1309.

27          But considerations other than the moving party's failure to "promptly" file a disqualification

28  motion also come into play. As the California Supreme Court has stated, it would be "naïve not to

recognize the motion to disqualify counsel is frequently a tactical devise to delay litigation." *Comden v. Superior Court*, 20 Cal. 3d 906, 915 (1978). Further, the greater the delay in bringing a disqualification motion, the more difficult it is to replace counsel, which also factors into the waiver analysis. *Liberty National*, 194 Cal. App. 4th at 847. Finally, "among all the factors to be taken into account, the interest and right of the nonmoving client to the lawyer of its choice is certainly one." *Id*. at 848.

> **ii. The Movants Waived Their Right to Seek Disqualification of Ms. McDow and, Therefore, Foley by, Among Other Things, Waiting More Than One Year to Bring the Disqualification Motion.**

In the Motion, the Movants admit that they have delayed in fling the Motion ("Here, the delay has been only four months. . . "). *Motion*, at p. 27. Having admitted delay, however, they attempt to argue that their delay was only four months, apparently starting the clock ticking at the time that Ms. McDow joined Foley on April 30, 2018 (although even using that date, the delay was 4½ months). But this is disingenuous, at best. The Movants do not take issue with Ms. McDow moving from Baker to Foley. Indeed, the Debtor submits that the Movants would have filed the Motion even if Ms. McDow were still at Baker. Rather, the actions that the Movants complain of – Ms. McDow's representation of HCCA and subsequent adversity to HCCA through the filing of the Emergency Motion to Terminate – date back at least until October 17, 2017, when Baker filed the Emergency Motion to Terminate. That was nearly a full year before the Movants filed the Motion. And, that occurred well prior to Foley's engagement in this case. If the Movants took issue with Ms. McDow purportedly representing an interest adverse to theirs, they should have filed the Motion promptly after Baker filed the Emergency Motion to Terminate, and their failure to do so speaks volumes.

Having failed to promptly file a disqualification motion, the burden shifts to the Movants to justify the delay. *River West*, 188 Cal. App.3d at 1309. Applying the four *River West* factors, they cannot. *First*, the Movants have known about the potential conflict since at least October 17, 2017, when the Motion to Terminate was filed. As noted above, that is almost one year prior to the Motion being filed. *Second*, HCCA has been represented in this matter since at least November

4817-8802-6504.3

17, 2017, shortly after the filing of the Motion to Terminate. *See* Notice of Appearance and Request for Special Notice and Amendment to Mailing List filed by Klein, DeNatale, Goldner, Cooper, Rosenlieb & Kimball, LLP on behalf of HealthCare Conglomerate Associates, LLC, at Dkt. No. 359. *Third*, the Movants were always free to file the Motion, and were in no way prevented from doing so. *Fourth*, no facts or circumstances changed in the year between the filing of the Motion to Terminate and the filing of the Motion that make the Motion any more "inappropriate or futile", *River West*, 188 Cal. App.3d at 1309, than it currently is, for all the reasons stated in this Opposition.

Furthermore, the Motion was filed a mere 4-1/2 months after the Adversary Complaint and appears to be nothing more than a transparent attempt to derail the Adversary Proceeding (and the entire Bankruptcy Case). As noted above, the Adversary Complaint seeks to avoid unauthorized post-petition transfers and alleges breach of contract, negligence, concealment, breach of fiduciary duty and equitable subordination, among other things. If the Movants were successful in disqualifying Ms. McDow, the Bankruptcy Case would be put on pause while new counsel was retained and became familiar with the case. Given the severity of the claims being prosecuted against the Movants, such a delay would only serve to benefit the Movants at the expense of the Debtor and the community it serves.

1    IV.    **CONCLUSION**

2          For the reasons set forth above, the Debtor respectfully requests that the Court deny the

3    Motion.

          Dated: February 20, 2019                    Respectfully submitted,

4

5                                                      **FOLEY & LARDNER LLP**

6

7                                              By:         */s/ Ashely M. McDow*_____

8                                                         Ashley M. McDow

9
                                                         Attorneys for Debtor, SOUTHERN
10                                                        INYO HEALTHCARE DISTRICT

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4817-8802-6504.3