**24**

1   HAGOP T. BEDOYAN, CSB No. 131285
    **KLEIN, DENATALE, GOLDNER,**
2     **COOPER, ROSENLIEB & KIMBALL LLP**
    5260 N. Palm Avenue, Suite 205
3   Fresno, California 93704
    Telephone: (559) 438-4374
4   Facsimile: (661) 326-0418
    E-mail: hbedoyan@kleinlaw.com

5
    Brandon N. Krueger, Esq. (SBN 221432)
6   *bkrueger@sallspencer.com*
    Lara A.S. Callas, Esq. (SBN 174260)
7   *lcallas@sallspencer.com*
    SALL SPENCER CALLAS & KRUEGER
8   A Law Corporation
    32351 Coast Highway
9   Laguna Beach, CA 92651
    Telephone: (949) 499-2942
10  Facsimile: (949) 499-7403

11
    Attorneys for HealthCare Conglomerate Associates, LLC, and
12  Vi Healthcare Finance, Inc.

13

14              **UNITED STATES BANKRUPTCY COURT**

15        **EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION**

16  In re:                          Case No. 16-10015-A-9

17                                  Chapter   9
    SOUTHERN INYO
18  HEALTHCARE DISTRICT,            DC NO.: KDG-4

19              Debtor.             Date:     March 21, 2019
                                    Time:     1:30 p.m.
20                                  Place     United States Bankruptcy Court
                                              2500 Tulare Street, Fifth Floor
21                                            Department A, Courtroom 11
                                              Fresno, California
22                                  Judge:    Honorable Fredrick E. Clement

23

24

25  **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF REPLY TO**
    **OPPOSITION TO MOTION TO DISQUALIFY FOLEY & LARDNER**
26  **AND ASHLEY MCDOW AS COUNSEL FOR DEBTOR**

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ II

I.     INTRODUCTION............................................................................................... 1

II.    SUMMARY OF CRITICAL FACTS AND MS. MCDOW'S ADMISSIONS ........... 5

III.   LEGAL ARGUMENT...................................................................................... 9

     A.     The Hot Potato Rule Requires Automatic Disqualification............................. 9

     B.     Debtor Misrepresents or Ignores Key Facts and Law Requiring
           Disqualification ..................................................................................... 10

     C.     Baker Never Obtained Benzeevi's Advance Consent to the Conflict............. 14

     D.     There Can be No Implied Consent to a Conflict Requiring Automatic
           Disqualification ..................................................................................... 16

     E.     Moving Parties Did Not Impliedly Consent to Foley's or Ms. McDow's
           Disqualifying Conflict ........................................................................... 16

IV.   CONCLUSION ................................................................................................ 20

# TABLE OF AUTHORITIES

**Federal Cases**

*Beltran v. Avon Products, Inc.*
   867 F.Supp.2d 1068 (C.D. Cal. 2012) .................................................14

*Blecher & Collins, P.C. v. Northwest Airlines, Inc.,*
   858 F.Supp.2d 1442 (C.D. Cal. 1994) ...............................................16

*In re Jaeger,*
   213 B.R. 578 (Bankr. C.D. Cal. 1997)...........................................13, 15

*In re Muscle Improvement, Inc.,*
   437 B.R. 389 (Bankr. C.D. Cal. 2010)...............................................12

*Lennar Mare v. Steadfast Ins. Co.,*
   105 F.Supp.3d 1100 (E. D. Cal. 2015)..........................................14, 17

*Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*
   2007 WL 3203056 (N.D. Cal., Oct. 29, 2007)....................................17

*Trust Corp. of Montana v. Piper Aircraft Corp.,*
   701 F.2d 85 (9th Cir. 1983) .............................................................18

*Western Sugar Coop.,*
   98 F.Supp.3d 1074 (C.D. Cal. 2015) ..................................................9

**California Cases**

*A.I. Credit Corp., Inc. v. Aguilar & Sebastinelli*
   113 Cal.App.4th 1072 (2003) ...........................................................20

*Blue Water Sunset, LLC v. Markowitz,*
   192 Cal.App. 477 (2011) .................................................................16

*City and County of San Francisco v. Cobra Solutions, Inc.,*
   38 Cal.4th 839 (2006) ................................................................10, 14

*Faughn v. Perez,*
   145 Cal.App.4th 592 (2006) ..........................................................2, 11

*Fiduciary Trust Internat. of California v. Superior Court,*
   218 Cal.App.4th 465 (2013) .............................................................12

*Flatt v. Superior Court,*
   9 Cal.4th 275 (1994) .........................................................................9

*Frazier v. Superior Court,*
   97 Cal.App.4th 23 (2002) .................................................................11

*In re Complex Asbestos Litigation,*
   232 Cal.App.3d 572 (1991) ...........................................................5, 17

*Liberty National Enterprises, L.P. v. Chicago Title Ins. Co.*
   194 Cal.App.4th 839 (2011) ................................................................18

*Oasis West Realty, LLC v. Goldman,*
   51 Cal. 4th 811 (2011) .....................................................................11

*Ontiveros v. Constable,*
   245 Cal.App.4th 686 (2016) ..........................................................16, 17

*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.*
   20 Cal.4th 1135 (1999) ...........................................................1, 9, 10, 14

*River West, Inc. v. Nickel,*
   188 Cal.App.3d 1297 (1987) ............................................................18

*State Farm Mut. Auto. Ins. Co. v. Federal Ins. Co.,*
   72 Cal.App.4th 1422 (1999) .............................................................16

*Western Continental Operating Co. v. Natural Gas Corp. of Calif.*
   212 Cal.App.3d 752 (1989) .............................................................17

*White v. Superior Court*
   98 Cal.App.3d 51 (1979) ................................................................18

*Wutchumna Water Co. v. Bailey,*
   216 Cal. 564 (1932) ......................................................................11

*Zador Corp. v. Kwan,*
   31 Cal. App. 4th 1285 (1995) ............................................................13

**Other Authorities**

California Rules of Professional Conduct, Rule 1.7 ...............................................9, 15

California Rules of Professional Conduct, Rule 1.9 ...............................................2, 11

California Rules of Professional Conduct, Rule 1.10 .............................................3, 10

Tuft, Peck, et al., Cal. Practice Guide: Professional Responsibility, (The Rutter
   Group 2019) .........................................................................5, 9, 20

iii

# I.    INTRODUCTION

Moving Parties Healthcare Conglomerate Associates, LLC ("HCCA") and Vi Healthcare Finance, Inc. ("Vi") have established that Ms. McDow deliberately and publicly breached her duty of loyalty to HCCA and that she both actually and presumptively possesses HCCA's material confidential information which she can use, and already has used, to Moving Parties' prejudice in breach of her duty of confidentiality. The ethical considerations that serve as the bedrock of the judicial system, embodied in the Rules of Professional Conduct and recognized in long-standing California law, require that Ms. McDow and Foley & Lardner ("Foley") be disqualified from further representation of Debtor in this case. "The important right to counsel of one's choice must yield to ethical considerations that affect the fundamental principles of our judicial process." *People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* 20 Cal.4th 1135, 1145 (1999).

**Hot Potato Rule**: As the Court recognized at the December 19, 2018 hearing, this case can be considered under the hot potato rule. Baker Hostetler ("Baker") and Ms. McDow abruptly terminated their representation of HCCA only two weeks before Ms. McDow ambushed HCCA seeking to reject the very contract she advised HCCA about, and drafted and negotiated on HCCA's behalf. In textbook violation of the "hot potato" rule, Baker and Ms. McDow's representations of HCCA and Inyo are and were in direct adversity and thus, should be deemed a concurrent adverse representation, requiring automatic disqualification of Ms. McDow and Foley.

Ms. McDow cannot avoid her automatic disqualification by shuffling Inyo to a new firm, Foley, where she continues to have the lead role in representing Inyo in these proceedings. Debtor provides no authority for the proposition that the "hot potato" rule does not apply when the automatically disqualified attorney takes the client to a different firm.

**McDow's Actual and Presumptive Possession of Material Confidential Information Requires Disqualification.** Alternatively, the law governing attorneys' duties to *former* clients requires disqualification because Ms. McDow actually received, and is also conclusively presumed to have received, HCCA's confidential information. Accordingly, even if this case is decided under the standards applicable to an attorney's responsibility to former, as opposed to

1

1   concurrent clients, Ms. McDow and Foley must be disqualified.

2      "In successive representation cases, a party may obtain the disqualification of an attorney

3      by establishing that the targeted attorney (1) has actual knowledge of material confidential

4      information *or* (2) is presumed to have acquired confidential information because of the

5      relationship between the prior representation and the current representation."

6   *Faughn v. Perez*, 145 Cal.App.4th 592, 603 (2006) (emphasis added); Rule Prof. Conduct 1.9.

7      Here, Mrs. McDow's admissions in her declaration, coupled with the Baker invoices and

8   Dr. Benzeevi's declaration, establish that: (1) Ms. McDow personally participated in numerous

9   lengthy client conferences during the negotiation and drafting of the Inyo MSA to discuss

10   HCCA's strategies and goals with regard to the Inyo MSA and the implications of the

11   contemplated Chapter 9 proceedings; *and* (2) that Mrs. McDow personally and directly advised

12   HCCA and Dr. Benzeevi *on the same matter* in which it now represents Inyo against HCCA,

13   these Chapter 9 proceedings, and *the substantially related matter* of the Inyo MSA.  These

14   uncontroverted facts satisfy both of the independent bases to disqualify Foley and Ms. McDow

15   under a successive representation analysis.  Moreover, even *after* this Chapter 9 proceeding was

16   filed, Ms. McDow continued to communicate directly and personally with and advise Dr.

17   Benzeevi and HCCA concerning these very proceedings, including discussions about the plan of

18   adjustment, treatment of creditors, and strategies to approach the Inyo Board. [Benzeevi Decl., ¶

19   7; Callas Decl., ¶ 14, Ex. PP].   Even if the Court were to credit Debtor's implausible contention

20   that Ms. McDow somehow did not receive HCCA's material confidential information in her

21   many hours of conferences with Dr. Benzeevi about these Chapter 9 proceedings and during

22   negotiations of the Inyo MSA,[1] Ms. McDow's representation of HCCA in the same matter

23   (Chapter 9), and a substantially related matter (Inyo MSA), establishes a conclusive presumption

24   that she did.

25      Because the Opposition admits that Ms McDow advised HCCA regarding this Chapter 9

26

27   [1] As noted in the Moving Papers, the very conflict waivers that Debtor and Ms. McDow want to
rely on to defeat this motion expressly acknowledged that Baker was in fact in possession of the

28   Benzeevi Group's confidential information.  [Benzeevi Decl., Ex. D; Supp. Bedoyan Decl., Ex.
RR, 2, ¶ C].

1 proceeding, the same matter in which she represents Inyo now, it is unnecessary to show that the

2 Inyo MSA is substantially related to this proceeding.  Nevertheless, there can be no doubt that

3 there is a "rational link" [2] between the Inyo MSA and these proceedings: the Inyo MSA

4 established and governed the relationship between HCCA and Inyo, addressed the imminent

5 filing of the Chapter 9 proceeding, and bestowed upon HCCA supervisory and decision-making

6 authority for Inyo in these Chapter 9 proceedings for Inyo. Debtor's reliance on the termination of

7 the Inyo MSA to try to break this link boils down to the cynical argument that Ms. McDow

8 should not be disqualified because she has *already* subjected her client to the maximum possible

9 harm she could concerning the former representation – termination of the very contract she

10 drafted and negotiated.

11        While the adversary proceedings and administrative claims between Inyo and HCCA are

12 now being handled by special counsel and Ms. McDow has promised not to involve herself or

13 appear in these proceedings, this ad hoc attempt at screening is far too little and far too late, and

14 from a practical perspective, impossible to implement.[3]  Permanent damage has already been

15 suffered by HCCA due to Ms. McDow's decision to breach her duties and her further

16 involvement only continues to contaminate the entire situation.  Whether or not Ms. McDow

17 attends or involves herself in the mediation and adversary proceedings directly, lead bankruptcy

18 counsel will need to consult and coordinate with special counsel to integrate these proceedings

19 into the overall bankruptcy and any settlement into the plan of adjustment.

20        **Ms. McDow cannot save herself by selectively cherry-picking integral parts of this**

21 **proceeding that she will now abandon**.  Ms. McDow's new attempts to extricate herself from

22 involvement in the mediation that she previously begged the Court to expedite, highlights the

23 problems inherent in her continued involvement in this case.  The proposed mediation is meant to

24 address not only the adversary claims between HCCA and Inyo but also the claims of other

25 creditors such as Tulare Local Healthcare District, and to address whether or not Baker and Ms.

26

27 [2] A substantial relationship will be found based on a rational link between the former and current representations.  Tuft, Peck, , et al., Cal. Practice Guide: Professional Responsibility, (The Rutter Group 2019) § 4:189.

28 [3] Screening does not prevent disqualification when the screened attorney substantially participated in the same or substantially related matter.  Rule Prof. Conduct 1.10;

(KDG-4) REPLY MEMORANDUM
OF P's and A's MOTION TO DQ

1. McDow bear malpractice responsibility for the Inyo MSA and the Vi Healthcare Finance

2. transaction, and thus may be willing to contribute to any settlement that is being discussed.

3. [Bedoyan Decl., ¶7]. Debtor's attempt to now minimize the importance of this mediation and

4. impact of the claims between HCCA and Inyo on the plan of adjustment flies in the face of

5. representations previously made by Ms. McDow to this Court that these claims are "far and away

6. the biggest issue" holding up plan confirmation. [Bedoyan Decl., Ex. H, 11:18-19]. The fact that

7. lead insolvency counsel cannot, because of her admitted conflicts with her former client, attend a

8. mediation and advise her current client regarding claims that are necessary to resolve a plan of

9. adjustment, clearly underscores the necessity to disqualify Ms. McDow and Foley and for Inyo to

10. retain new counsel unfettered by conflicts and the need to carve itself out of critical parts of the

11. Chapter 9 proceedings.

12.      **The Benzeevi Group did not expressly consent to Baker's and McDow's betrayal.**

13. Debtor simply ignores the plain language of the purported conflict waiver letters establishing that

14. Dr. Benzeevi never consented to allow Baker and Ms. McDow to represent Inyo if an actual

15. conflict developed. Baker represented to Dr. Benzeevi that Baker "***presently represents and***

16. ***expects to continue to represent***, the Benzeevi Group . . . in connection with the management

17. service agreement between the District and HCCA." [Supp. Bedoyan Decl., Ex. RR, p. 2, ¶ A;

18. Benzeevi Decl., Ex. D, p. 2] (emphasis added). This language is entirely consistent with Dr.

19. Benzeevi's reasonable expectation of continuing representation, given that Baker had for years

20. and was at the time effectively functioning as outside general counsel for HCCA and all the

21. Benzeevi entities, whereas Inyo was a new client. [Benzeevi Decl., ¶ 11]. The purported conflict

22. waivers have no bearing on the required automatic and mandatory disqualification of Ms.

23. McDow and Foley. Debtor offers no expert opinion in response to, and the Opposition

24. completely ignores, Mr. Kehr's expert conclusion that these defective, incomplete and misleading

25. conflict waivers could not operate as an effective advance consent.

26.      **Implied consent cannot defeat automatic disqualification**. "[W]here disqualification is

27. *mandatory* (e.g., *concurrent* representation of adverse interests), delay in filing a disqualification

28. motion does *not* constitute implied consent to conflicted representation." Tuft, Peck, , et al., Cal.

(KDG-4) REPLY MEMORANDUM
OF P's and A's MOTION TO DO

Practice Guide: Professional Responsibility, (The Rutter Group 2019) § 4:327.1.

**However, even if delay were relevant, Debtor has fallen far short of establishing that Moving Parties' consent should be implied through the timing of this motion.** Here, Ms. McDow, Baker and Debtor were put on notice within days of the Emergency Motion to terminate the Inyo MSA that HCCA objected to Baker and Ms. McDow's continuing representation of Inyo adverse to HCCA. [2nd Supp. Bedoyan Decl., ¶ 2, Ex. TT]. Given the obvious and serious conflict presented, the only proper course was for Baker and Ms. McDow to voluntarily withdraw. Instead, Debtor, Baker, Ms. McDow and now Foley proceeded in reckless disregard of these obvious and expressly noted conflicts of interest and ethical violations.

Moreover, Debtor would have to show that there has been unreasonable delay *which has caused Debtor extreme prejudice*. Debtor cannot make this showing. Only four months passed between Foley's involvement in this case and the disqualification motion. Even if the Court looks as far back as October 2017, when Moving Parties first became aware of Baker's and Ms. McDow's betrayal, as this Court has repeatedly noted, very little progress has been made in this case in the intervening year. Further, the loss of existing counsel and the cost of replacement counsel does not result in any way from any alleged <u>delay</u> – it is present in every disqualification motion, no matter when filed. [4] There is no foundation for Ms. McDow's alarmist claims that the Debtor cannot afford new counsel and the hospital will shut down if this motion is granted. Indeed, if the hospital does eventually shut down it will be a result of the Debtor's unprecedented delay in filing a plan of adjustment under Ms. McDow's leadership.

## II. SUMMARY OF CRITICAL FACTS AND MS. MCDOW'S ADMISSIONS

The voluminous briefing and evidence can be distilled into several key facts which make disqualification mandatory.

- Baker Hostetler had a "long standing" attorney-client relationship with Healthcare Conglomerate Associates ("HCCA"), and other Benzeevi entities, including Vi Healthcare Finance ("Vi"), spanning from 2009-2017; [McDow Decl., ¶ 6; Benzeevi Decl., ¶ 5];

---

[4] Loss of knowledgeable counsel and cost of retaining new counsel is endemic in every disqualification motion and is not the type of prejudice which will establish implied waiver by delay. *In re Complex Asbestos Litigation*, 232 Cal.App.3d 572, 599–600 (1991).

1      -    In late 2015 and early 2016, Ms. McDow personally performed 37.2 hours of services

2          "advising HCCA on the MSA **and potential chapter 9 bankruptcy filing by Debtor**."

3          [McDow Decl., ¶ 7; Callas Decl., ¶¶ 4-5, 7-8, Exs. II, JJ, LL](emphasis added);[5]

4      - Ms. McDow directly and personally participated in privileged attorney-client

5          communications with Dr. Benzeevi, including advising "concerning how the contemplated

6          Chapter 9 proceedings, to be initiated by Inyo, would affect HCCA's rights under the Inyo

7          MSA" and discussion of "HCCA's strategies and goals with respect to the Inyo MSA."

8          [McDow Decl., ¶¶ 7- 8; Benzeevi Decl., ¶ 6; Callas Decl., ¶¶ 4-5, 7-8, Exs. II, JJ, LL];[6]

9      - Ms. McDow provided 11.6 hours of services on other matters for HCCA, including

10     additional direct communications with Dr. Benzeevi relating to the Tulare MSA and the

11     bankruptcy implications in that earlier similar transaction. [McDow Decl., ¶ 8; Callas

12     Decl., ¶ 9, Ex. MM];

13     - The Inyo MSA, drafted and negotiated by Ms. McDow and Baker, created and defined the

14     relationship, rights and duties of HCCA and Inyo, and expressly contemplated the filing of

15     these Chapter 9 proceedings, including vesting HCCA with supervisory responsibility

16     over these Chapter 9 proceedings. [Benzeevi Decl., Ex. A, ¶ 3(bb)].

17     - After the Chapter 9 proceedings were filed, Ms. McDow, Mr. Greene, and other Baker

18     attorneys continued to work together as a team advising HCCA regarding its duties and

19     responsibilities under the Inyo MSA, including bankruptcy-related issues. [Benzeevi

20     Decl., ¶ 8; Callas Decl., ¶¶ 12-13, Ex. PP].

21     - After the Chapter 9 proceedings were filed, Ms. McDow personally continued to have

22     direct and private communications with Dr. Benzeevi about many subjects relating to both

23     the Inyo MSA and the Chapter 9 proceedings, including the plan of adjustment.

24     [Benzeevi Decl., ¶ 8; Callas Decl., ¶ 14, Ex. PP].

25

26    [5] At page 17, line 27, the Opposition states that only 11 hours of services were performed by Ms.
McDow on the Inyo MSA.  This statement is directly contradicted by not only the Baker invoice

27    but by Ms. McDow herself.  [McDow Decl., ¶ 7].

28    [6] It is telling that Ms. McDow in her declaration does not controvert Dr. Benzeevi's statements
concerning the subject matters discussed during the December 2015-January 2016 time frame but
rather merely quibbles with the frequency of her discussions.

- Two weeks before taking action directly adverse to HCCA to terminate the very contract that Ms. McDow had personally and substantially participated in drafting and negotiating, Baker abruptly terminated its relationship with HCCA and all Benzeevi related entities; [McDow Decl., ¶¶ 7, 9];

- Baker and Ms. McDow represented Inyo in direct adversity to HCCA by secretly preparing and filing the Emergency Motion to Terminate the Inyo MSA without any advance notice to the Benzeevi Group.  [McDow Decl., ¶ 10; Benzeevi Decl., ¶ 12];[7]

- Dr. Benzeevi, HCCA and Vi never consented to allow Baker to represent Inyo adverse to the Benzeevi Group, instead the purported conflict waivers represented to the Benzeevi Group that: Baker "*presently represents and expects to continue to represent*, the Benzeevi Group in connection with various matters unrelated to the business of the District, and also in connection with the management service agreement between the District and HCCA."  [Supp. Bedoyan Decl., Ex. RR, p. 2, ¶ A][8]  (emphasis added).

- Those same conflict waiver letters actually provided that Baker could represent the Benzeevi Group adverse to Inyo, but not vice versa: Inyo "expressly acknowledges and agrees that the foregoing waiver will allow the Firm to continue to represent the interests of the Benzeevi Group in other matters, including matters which are or may be adverse to the interests of the District, including but not limited to the Management Agreement Matters (including possible litigation or other forms of dispute resolution) and that the District will not seek to disqualify the Firm or any of its attorneys from representing the Benzeevi Group in any such matters (including the Management Agreement Matters) as a result of the engagement of the Firm by the District in connection with the Chapter 9 Filing." [Supp. Bedoyan Decl., Ex. RR, p. 3].

- HCCA's counsel objected on the record at a November 1, 2017 hearing to Baker's and

---

[7] Ms. McDow takes offense at the suggestion that she would "surreptitiously breach her ethical obligations," (Opp. Brief, p. 10:25-26), yet this is exactly what she did when Baker terminated the representation of the Benzeevi Group and then Ms. McDow secretly prepared and then filed the Emergency Motion seeking to terminate the very contract she drafted and negotiated for HCCA.

[8] The later letter relating to the Vi transaction contained similar language. [Benzeevi Decl., Ex. D, p.4].

Ms. McDow's representation of Inyo and stated that it would seek disqualification. [2nd Supp. Bedoyan Decl., ¶ 2]. Ms. McDow's papers prior to that hearing acknowledged HCCA had raised conflict of interest issues. [RJN, Ex. UU]. A follow up e-mail to Baker re-iterated the facts establishing the conflict and requesting that Baker and Ms. McDow voluntarily withdraw. [2nd Supp. Bedoyan Decl., Ex. TT].

- There is no imminent development in this case that will be affected by replacing Ms. McDow. Indeed, the Court has been disturbed by Ms. McDow's failure to achieve progress in these Chapter 9 proceedings. [Bedoyan Decl., Ex. H, 8:7-9:1 ("Ms. McDow, I guess I'm very concerned about the status of the case. We are coming up on three years, and we have not yet even come to a place where plan confirmation is seriously on the table."), 10:9-12 ("It's that I've been uncomfortable with this case for a long time because it doesn't seem to be moving forward.")];

- Ms. McDow represented to the Court that the claims to be resolved at mediation are "far and away the biggest issue" holding up plan confirmation and involved claims of "$10 million or so." [Bedoyan Decl., Ex. H, 10:24-11:10][9]

These critical admissions establish that: Baker dropped the Benzeevi Group like a hot potato immediately before taking directly adverse action against HCCA; Ms. McDow personally received confidential client information from HCCA directly relevant to these proceedings; Ms. McDow personally provided services to HCCA in this exact same subject matter, this Chapter 9 proceeding; Ms. McDow also personally provided services to HCCA in the substantially related matter of the Inyo MSA; and that Baker and Ms. McDow breached their duty of loyalty and confidentiality to HCCA in these proceedings. These facts also establish that there has been no express or implied consent to Baker, Ms. McDow's or Foley's continuing conflicted participation in these proceedings. Thus, disqualification of Foley and Ms. McDow is required.

---

[9] The Opposition states "[d]espite the Movant's blatant misrepresentations to the contrary, the Debtor had *never even suggested that any recoveries from the pending lawsuit against the Movants would serve as the (primary) funding source for the plan of adjustment."* [ Opp. Brief, 2:22-24] (emphasis added). The record stands for itself as to who is making "blatant misrepresentations" to this Court.

(KDG-4) REPLY MEMORANDUM
OF P's and A's MOTION TO DQ

# III.  LEGAL ARGUMENT

## A.  The Hot Potato Rule Requires Automatic Disqualification

The facts necessary to trigger the "hot potato" rule requiring automatic disqualification of Ms. McDow and Foley are undisputed. Baker dropped the Benzeevi Group on September 29, 2017 in the midst of a dispute between the Inyo Board and HCCA concerning Inyo's financial situation and HCCA's management of Inyo. [Benzeevi Decl., ¶¶ 10-11; McDow Decl., ¶ 11]. Less than two weeks later, on October 11, 2017, Ms. McDow was secretly discussing termination of the Inyo MSA with the Debtor, and by October 17, 2017 Ms. McDow had filed the Emergency Motion to terminate the Inyo MSA. [McDow Decl., ¶¶ 11, 13]. Baker and Ms. McDow thus attempted to cure their direct conflict – Baker seeking to terminate on behalf of Inyo the very contract that Baker had drafted and negotiated on behalf of HCCA – by dropping the Benzeevi Group in favor of Inyo. As this Court noted, a classic "hot potato" situation.

Where an attorney attempts to cure a conflict of interest by "expediently severing" the relationship with one of the clients, the "hot potato" rule applies which then treats the representation as concurrent, triggering the automatic disqualification rule applicable to concurrent representations. *Western Sugar Coop.*, 98 F.Supp.3d 1074, 1084 (C.D. Cal. 2015); *Flatt v. Superior Court*, 9 Cal.4th 275, 288 (1994); Rutter Prof. Resp., § 4:41. When there is concurrent representation, "With few exceptions, disqualification follows automatically, regardless of whether the simultaneous representations have anything in common or present any risk that confidences obtained in one matter would be used in the other." *People ex rel. Dept. of Corps. v. SpeeDee Oil Change Sys., Inc., supra,* 20 Cal. 4th 1135, 1147; Rule Prof. Conduct 1.7 (a); Former Rule Prof. Conduct 3-310(C).

Debtor argues that the hot potato rule does not apply because Ms. McDow didn't personally terminate the relationship with the Benzeevi Group, and then she left to go to Foley. First, there is no statement in Ms. McDow's declaration that she was not involved in the decision to drop the Benzeevi Group.[10] Moreover, whether she personally sent the termination letter is not

---

[10] It would be surprising, to say the least, when a dispute arose between HCCA and Inyo in the Summer of 2017, that Ms. McDow was not involved in discussions within her firm about how to handle the evolving dispute between Baker's two clients.

9

1 important because Ms. McDow personally provided substantial services to HCCA in the drafting

2 and negotiation of the Inyo MSA and then two weeks after her firm terminated the Benzeevi

3 Group, she personally breached her duty to HCCA by filing the Emergency Motion supported by

4 her own declaration directly adverse to her deemed current client HCCA.

5      The court may also summarily disregard Ms. McDow's argument that the alleged

6 "emergency nature of the situation" somehow relieved her of her duties not to harm her

7 client/former client with respect to the very subject matter of her former representation, or that

8 her breaches of duty were "unavoidable." [Opp. Brief, p. 9:23]. Whether there was even a true

9 emergency was questionable at best, but regardless, no such "emergency exception" exists in law

10 or logic which permits an attorney to harm her former or current client in this way. Debtor

11 understandably provides no authority for this notion, because none exists.

12      There can be no doubt that this automatically disqualifying conflict must be imputed to

13 her new firm Foley. As with every other conflict that an individual attorney has by virtue of a

14 direct and personal relationship with a client, that conflict is imputed to any firm that attorney

15 later joins. *City and County of San Francisco v. Cobra Solutions, Inc.,* 38 Cal.4th 839, 847–848

16 (2006); *People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.*, *supra*, 20

17 Cal.4th 1135, 1146; Rule Prof. Cond. 1.10.

18      An attorney cannot skewer a former client by attacking the contract she drafted for that

19 client just two weeks after her firm drops the client, and then cure that conflict by switching

20 firms. Any other conclusion would encourage unethical gamesmanship inimical to the honesty,

21 integrity and loyalty embodied in the fiduciary duties of attorneys stated in the Rules of

22 Professional Conduct and California law. This Court should apply the hot potato rule to

23 disqualify both Ms. McDow and Foley.

24     **B.**     **Debtor Misrepresents or Ignores Key Facts and Law Requiring**

25               **Disqualification**

26      Debtor's opposition not only ignores the significance of the dispositive evidence such as

27 the actual language of the purported conflict waivers and the Chapter 9 Invoice, as well as the

28 declaration of well-respected ethics expert Robert Kehr, it engages in troubling distortion of the

1 　relevant case law and Moving Parties' arguments concerning conflicts of interest.

2 　　　　In the first place, the Opposition incorrectly claims, based on an unpublished District

3 　Court decision (Opp. Brief, p. 13:5-11) that an attorney's duty of loyalty ends at the termination

4 　of the attorney-client relationship.  This false notion ignores decades of Supreme Court precedent

5 　uniformly followed in all of the California courts and the Rules of Professional Conduct. The

6 　duty of loyalty survives termination of the attorney-client relationship which prevents an attorney

7 　from doing "anything that will injuriously affect the former client in any matter in which the

8 　lawyer represented the former client." *Oasis West Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821

9 　(2011); *Wutchumna Water Co. v. Bailey*, 216 Cal. 564, 573-74 (1932); Rule 1.9, Comment [1];

10 　Kehr Decl., ¶ 3.  The comments to Rule 1.9 expressly states that is not proper for a lawyer to

11 　"seek to rescind on behalf of a new client a contract drafted on behalf of a former client," which

12 　is exactly what Ms. McDow did here.  Thus, the conflicts which require Ms. McDow's

13 　disqualification here generally implicate both the duty of confidentiality and the duty of loyalty.

14 　　　　Then, while admitting that Ms. McDow's involvement was direct and personal, the

15 　Opposition tries to muddy the waters by discussing the modified substantial relationship test.  As

16 　was discussed at length in the Moving Parties' Supplemental Brief, in cases of direct involvement

17 　by the firm-switching attorney, the substantial relationship test applies, not the modified

18 　substantial relationship and there is no rebutting the presumption of receipt of confidential

19 　information; *Frazier v. Superior Court*, 97 Cal.App.4th 23 (2002); *Faughn v. Perez, supra*, 145

20 　Cal. App. 4th 592.

21 　　　　The Opposition also simply ignores one of the most significant factors supporting

22 　disqualification, that Ms. McDow personally provided services to HCCA *in this very same*

23 　*matter*, these Chapter 9 proceedings.  According to her own declaration, the subject matter of Ms.

24 　McDow's 37.2 hours of service to HCCA in December 2015 and January 2016 included the

25 　"potential Chapter 9 bankruptcy filing by the Debtor." [McDow Decl. ¶ 7].  Dr. Benzeevi's

26 　declaration confirmed that Ms. McDow's services had "particular emphasis on advising HCCA

27 　concerning how the contemplated Chapter 9 proceedings, to be initiated by Inyo, would affect

28 　HCCA's rights under the Inyo MSA." [Benzeevi Decl., ¶ 6].  Then, after the Chapter 9

1 │ proceedings began, Ms. McDow continued to advise HCCA in relation to the Chapter 9

2 │ proceedings, including the plan of adjustment and issues with creditors such as Optum Bank.

3 │ [Benzeevi Decl., ¶ 8; Callas Decl., ¶¶ 12-14, Ex. PP].  Essentially, while the Inyo MSA was in

4 │ place, HCCA was the "client" directing the Chapter 9 proceedings in consultation with Ms.

5 │ McDow as bankruptcy counsel.  All of the strategies, goals and objectives communicated to Ms.

6 │ McDow were HCCA's confidential client communications which are undeniably still material to

7 │ these Chapter 9 proceedings, especially with respect to the plan of adjustment.   These facts not

8 │ only satisfy the substantial relationship test, they show that Ms. McDow in fact obtained HCCA's

9 │ material confidential client information about this proceeding.

10 │         When the former and current representations involve the ***same*** subject matter, the law is

11 │ clear that the possession of material confidential information is conclusively presumed as a matter

12 │ of law, and disqualification is mandatory. *See, e.g.,  Fiduciary Trust Internat. of California v.*

13 │ *Superior Court*, 218 Cal.App.4th 465, 480 (2013) (substantial relationship test met when

14 │ representations involve same subject matter).   A recent bankruptcy case is instructive: there, an

15 │ attorney had consulted with debtors, then ended up representing a principal creditor in the

16 │ bankruptcy proceeding involving the debtors. *In re Muscle Improvement, Inc.*, 437 B.R. 389, 396

17 │ (Bankr. C.D. Cal. 2010).  The court concluded "the substantial relationship test is clearly met . . .

18 │ the subject matter is essentially the same as the case before the court, and thus is substantially

19 │ related." *In re Muscle Improvement, Inc.*, 437 B.R. 389, 396.

20 │         This case presents the unique circumstance of a concurrent representation of two clients

21 │ on the same subject matter where Baker expressly severed the "jointness" of that relationship by

22 │ claiming (incredibly) that confidential client information would not be shared between the clients.

23 │ [Benzeevi Decl., Ex. D., p.3; Supp. Bedoyan Decl., Ex. RR, p. 3] ("the Firm hereby advises you

24 │ that unless required by law, it will not disclose any material confidential information of either

25 │ party to the other, nor will the Firm use material confidential information of one party to the

26 │ benefit of the other party.")].  In the analogous context of joint clients where "the subsequent

27 │ action relates to the same matter, the substantial relationship test adds nothing to the

28 │ disqualification analysis.  This is because a substantial relationship between the former

representation and the subsequent action is *inherent* in such situations." *Zador Corp. v. Kwan,* 31 Cal. App. 4th 1285, 1294 (1995); *See also, In re Jaeger,* 213 B.R. 578, 589 (Bankr. C.D. Cal. 1997). Thus, the substantial relationship test has been met and Ms. McDow and Foley must be disqualified from representing Inyo in the same subject matter that Ms. McDow formerly represented HCCA.

Here, the substantial relationship test is also satisfied by Ms. McDow's services regarding the Inyo MSA. These Chapter 9 proceedings and the Inyo MSA, and HCCA's participation and involvement in these two matters, are inextricably intertwined and cannot be severed by the argument that the Inyo MSA has been terminated. Among other things, the Inyo MSA provided: "Manager shall provide District with consultation and advice in connection with a potential filing by District of a proceeding under Chapter 9 of the Bankruptcy Code. If such petition is filed, Manager shall arrange and supervise the bankruptcy proceedings." [Benzeevi Decl., Ex. A, p. 24, ¶ 4 (bb)]. The Inyo MSA, the Chapter 9 proceedings, and Baker's retention were all discussed and approved at the same Inyo Board meeting on January 2, 2016. [Supp. Bedoyan Decl., Ex. QQ]. HCCA's independent contractor Alan Germany was the Chief Restructuring Officer and integrally involved in the Chapter 9 filings. [Benzeevi Decl., ¶ 8; Callas Decl., Ex. PP].

When the dispute erupted between Inyo and HCCA in the summer of 2017, Inyo, with Ms. McDow's counsel, chose to seek to terminate the Inyo MSA in the Chapter 9 proceedings. And now, both the adversary proceeding and HCCA's administrative expense claim focus squarely on the Inyo MSA. Ms. McDow has admitted that the resolution of these claims is necessary to proceed forward with the plan of adjustment. [Bedoyan Decl., Ex. H, 10:24-11:10]. The mediation that Ms. McDow and Mr. Shinbrot have so strongly pushed for will involve these claims, but also claims of other creditors such as Tulare Local Healthcare District, as well as malpractice claims relating to the Inyo MSA, and may also include Tulare's malpractice claims against Baker as well.

For Debtor's lead bankruptcy counsel to purport to withdraw from participation in a mediation that is a substantial potential source of recovery to fund the plan of adjustment, where her own services to HCCA will be a focus, is not a reasonable or workable solution and does not

1    cure the conflict. These facts firmly establish the substantial relationship between the Inyo MSA

2    and these Chapter 9 proceedings.

3         The strong and unbreakable connections between the subject matter of Baker and Ms.

4    McDow's former representation of HCCA in both the Inyo MSA and these Chapter 9 proceedings

5    and Ms. McDow's and Foley's current representation of Inyo in these proceedings creates a

6    conclusive presumption that material confidential client information was exchanged between Ms.

7    McDow and HCCA. *Beltran v. Avon Products, Inc.* 867 F.Supp.2d 1068, 1077(C.D. Cal. 2012);

8    *SpeeDee Oil*, *supra*, 20 Cal. 4th 1135, 1146; *Lennar Mare v. Steadfast Ins. Co.*, 105 F.Supp.3d

9    1100, 1109 (E. D. Cal. 2015). Ms. McDow's disqualifying conflict must necessarily then be

10   imputed to Foley because she was directly and personally involved in the prior representation

11   creating the conflict. *City and County of San Francisco v. Cobra Solutions, Inc., supra,* 38 Cal.

12   4th 839, 847–848  *People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.*,

13   *supra,*  20 Cal.4th 1135, 1146.

14        As distinguished ethics expert Robert Kehr recognized, Ms. McDow's conduct amounts to

15   "an unusually clear example of a violation of the lawyer's duties of undivided loyalty and

16   confidentiality . . ." [Kehr Decl., ¶ 5]. Moving Parties have established under Rule of Prof.

17   Conduct 3-310(E), Rule of Prof Conduct 1.9, the "hot potato" rule, and the substantial

18   relationship test that Ms. McDow and Foley must be disqualified from further representation of

19   Debtor in this case.

20        **C.    Baker Never Obtained Benzeevi's Advance Consent to the Conflict**

21        Debtor's argument that the Benzeevi Group consented to allow Baker and Ms. McDow to

22   represent Debtor adverse to HCCA and VI in this proceeding blatantly ignores the actual

23   language of the purported conflict waivers. These purported waivers represent to the Benzeevi

24   Group that Baker "***presently represents and expects to continue to represent***, the Benzeevi

25   Group" in connection with the Inyo MSA and other matters. [Supp. Bedoyan Decl., Ex. RR, p. 2,

26   ¶ A; Benzeevi Decl., Ex. D, p. 2] (emphasis added). This language confirmed Dr. Benzeevi's

27   reasonable expectation, given his long-standing relationship with Baker as his outside general

28   counsel, that Baker would continue to represent the Benzeevi Group if adversity developed.

[Benzeevi Decl., ¶ 8]. Baker's representation to its long-standing clients that it expected to continue to represent them directly contradicts Ms. McDow's present contention that Baker somehow obtained the Benzeevi Group's informed written consent to precipitously terminate its representation of the Benzeevi Group and act in direct adversity in the exact matter it formerly represented them

In contrast, in these same purported conflict waivers, Inyo expressly acknowledged Baker's prior representation of the Benzeevi Group and gave express consent to allow Baker to continue to represent *the Benzeevi Group* even if an actual conflict arose as to the Inyo MSA. [Supp. Bedoyan Decl., Ex. RR, p. 3]. The absence of reciprocal language for the Benzeevi Group cements the conclusion that there was no advance informed consent from the Benzeevi Group to allow Baker to continue to represent Inyo if a conflict developed in relation to the Inyo MSA.

Debtor's deliberate omission in the Opposition of any reference to this directly relevant language in the purported conflict waiver is telling --The actual language of the purported waivers is fatal to the argument that the Benzeevi Group gave advance consent to allow Baker and Ms. McDow to drop them like a hot potato and seek to terminate the very contract they negotiated and drafted for HCCA. The Opposition also completely ignores Mr. Kehr's expert opinion that the purported conflict letters did **not** operate to obtain Moving Parties' informed written consent to allow Baker to represent Inyo adverse to the Benzeevi Group. [Kehr Decl., ¶¶ 4 – 4.3].

Further, even if these purported conflict waivers somehow contained the proper language of advance consent, the law and the Rules of Professional Conduct require that an additional consent to continued representation be obtained after adversity actually later develops.[11] *In re Jaeger, supra* 213 B.R. 578, 585. Baker did not seek this additional consent from the Benzeevi Group and Dr. Benzeevi never would have given consent had it been sought. [Benzeevi Decl., ¶

---

[11] Like former Rule 3-310, the comment to new Rule 1.7 also confirms: "If a lawyer initially represents multiple clients with the informed written consent* as required under paragraph (b), and circumstances later develop indicating that direct adversity exists between the clients, the lawyer must obtain further informed written consent* of the clients under paragraph (a)." RPC Rule 1.7, comment [2].

(KDG-4) REPLY MEMORANDUM
OF P's and A's MOTION TO DO

11]. Baker's conflict letters actually state the exact opposite of what Ms. McDow and Foley now claim, and neither Ms. McDow nor Foley can rely on them to avoid their disqualification under the law.

### D. There Can be No Implied Consent to a Conflict Requiring Automatic Disqualification

Debtor's argument that the Moving Parties impliedly consented to Ms. McDow's and Foley's continuing representation of Inyo by waiting to file its motion until October 2018 has no merit. In cases of automatic disqualification based on a concurrent conflict, there can be no waiver by implied consent through any claimed delay. California cases recognize that in cases of automatic disqualification, delay is not a factor to be considered. *Blue Water Sunset, LLC v. Markowitz*, 192 Cal.App. 477, 490 (2011). In cases of concurrent representation there can be no implied consent to conflicted representation. *State Farm Mut. Auto. Ins. Co. v. Federal Ins. Co.*, 72 Cal. App. 4th 1422, 1434-35 (1999); *Blecher & Collins, P.C. v. Northwest Airlines, Inc.*, 858 F.Supp.2d 1442, 1455 (C.D. Cal. 1994).[12] Thus, this Court should not consider the argument that the mere passage of a few months indicates the Moving Parties impliedly consented to Foley and Ms. McDow's conflicted representation of Inyo.

### E. Moving Parties Did Not Impliedly Consent to Foley's or Ms. McDow's Disqualifying Conflict

Moreover, even if it were relevant to this Court's determination, there has been no implied consent to Baker, Ms. McDow's or Foley's representation of Debtor. To find such an implied consent the delay and prejudice *resulting from the delay* must be extreme. *Ontiveros v. Constable*, 245 Cal. App. 4th 686, 701 (2016). Debtor has not established unreasonable delay nor that the timing of the motion has resulted in extreme prejudice.

Within days of the Emergency Motion, Baker, Ms. McDow and Debtor were put on notice that the Benzeevi Group objected to their representation of Debtor and would move for disqualification unless Baker and Ms. McDow voluntarily stepped aside. Had Baker and Ms.

---

[12] Moving parties recognize that the California appellate courts are in conflict on this issue but submit that the weight of authority supports that there can be no implied consent in cases of automatic disqualification. *Ontiveros v. Constable*, 245 Cal. App. 4th 686, fn.9 (noting conflict)

16

1  McDow simply abided by their ethical duties when first requested to do so, none of this would

2  have been necessary.  Instead, Ms. McDow stubbornly disregarded her ethical duties and the

3  Rules of Professional Conduct, fully aware of the risk that HCCA would seek disqualification.

4  There can be no implied consent found here.

5         Both delay and the resulting prejudice must be extreme to find implied consent to a

6  disqualifying conflict.  *Ontiveros v. Constable, supra,* 245 Cal. App. 4th 686, 701;  *Western*

7  *Continental Operating Co. v. Natural Gas Corp. of Calif.*, 212 Cal.App.3d 752, 763-764 (1989).

8  Numerous cases have found that delays of a year or longer are not *per se* unreasonable.  *Western*

9  *Continental Operating Co. v. Natural Gas Corp., supra, 212* Cal. App. 3d 752, 764, recognized

10  that a delay of thirteen months from when the party seeking disqualification was put on notice of

11  the conflict was not extreme.  In *Ontiveros, supra, 245* Cal. App. 4th 686, 701, the court found

12  that a 16-month delay after discovery of the conflict was not unreasonable and did not warrant

13  waiver of the right to disqualify.  The court noted it is not the "age" of the proceeding that is

14  important, but rather the "stage" which must be considered.  *Ontiveros* at 701-02.  Because the

15  case was in its pleading stages, discovery ongoing, and the trial not set, the delay was not

16  considered unreasonable.  *Id.* at 702.  Similarly here, this bankruptcy proceeding is nowhere near

17  resolution, and no plan of adjustment is even on the table.  The adversary proceedings are also in

18  their beginning stages.  *See also, Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 2007

19  WL 3203056, at *4–5 (N.D. Cal., Oct. 29, 2007) (18-month delay from notice of conflict did not

20  justify waiver).

21         Further, the prejudice that must be found must be that which results from extreme delay

22  and not merely the fact that disqualification will be granted.  The loss of knowledgeable counsel

23  of choice and need to retain new counsel does not constitute the type of extreme prejudice

24  required to find an implied waiver by delay.  *In re Complex Asbestos Litigation*, 232 Cal.App.3d

25  572, 599–600 (1991). The prejudice must be "extreme and reach beyond 'those client interests

26  implicated by any disqualification motion.'"  *Lennar Mare Island, LLC v. Steadfast Ins. Co.,*

27  *supra*, 105 F. Supp. 3d 1100, 1120.

28         The cases cited by Debtor to justify a finding of implied consent by delay are entirely

17

(KDG-4) REPLY MEMORANDUM
OF P's and A's MOTION TO DO

1    inapposite. In *Liberty,* defendant did not notify plaintiff of any intent to disqualify their counsel

2    until filing a motion for disqualification two years into litigation, after the target attorney had

3    already won phase one of the trial. *Liberty National Enterprises, L.P. v. Chicago Title Ins.*

4    *Co.* 194 Cal.App.4th 839, 843-44 (2011). In *Trust Corp.*, counsel sat on their objections for two

5    and a half years, then sought disqualification a month before trial was to start. *Trust Corp. of*

6    *Montana v. Piper Aircraft Corp.*, 701 F.2d 85, 86-88 (9th Cir. 1983). The court found that the

7    "failure to object within a reasonable time" combined with the two and half year delay operated

8    as a "*de facto* consent "to the continued representation and a waiver of the right to object. *Id.* at

9    88.

10         The *River West* decision which also recognized that "the delay must be extreme in terms

11    of time and consequence" found that a delay of nearly 4 years while the target attorneys spent

12    over 3,000 hours in litigation efforts satisfied this standard. *River West, Inc. v. Nickel*, 188

13    Cal.App.3d 1297, 1311-12 (1987). The *White* case has no bearing here because it involved

14    discussion only of a conflict arising from an attorney serving as both advocate and witness and

15    contained no discussion of potential breaches of loyalty or confidentiality. *White v. Superior*

16    *Court*, 98 Cal. App. 3d 51, (1979).

17         The Opposition blurs this argument by using the inception of Baker's representation of

18    Inyo in January of 2016 as a starting point for the consideration of prejudice. However, the

19    prejudice issue relates only to the period when a conflict has arisen and potential grounds exist for

20    disqualification. Moving Parties filed this motion approximately 4 months after Foley substituted

21    into this case on June 12, 2018. Prior to June 2018, since Foley was not involved in this action, it

22    could not be disqualified. On its face, four months is not unreasonable delay and there is not

23    even any claim that the filing motion in October of 2018 versus June of 2018 caused any -

24    much less extreme - prejudice to Inyo. Virtually nothing happened in this case between June of

25    2018 and October 2018. [Bedoyan Decl., ¶ 6].

26         To the extent that Debtor argues that the relevant time period is when Moving Parties first

27    became aware of Baker's conflict of interest, that occurred when Baker ambushed HCCA with

28    the Emergency Motion on or about October 17, 2017. [Benzeevi Decl., ¶ 12; RJN, Ex. R, Docket

(KDG-4) REPLY MEMORANDUM
OF P's and A's MOTION TO DQ

No. 325].  By October 28, 2017, HCCA had put Baker and Ms. McDow on notice that it objected to Baker's representation of Inyo based on conflicts of interest, and Ms. McDow sought a continuance of the hearing on the Emergency Motion to address the conflict issue.  [Supp RJN, Docket No. 338].  At the hearing on that Motion to Continue, HCCA objected to Baker's representation of Inyo and stated its intent to file a motion to disqualify Baker.  [2nd Supp. Bedoyan Decl., ¶ 2].  Baker and Ms. McDow chose to continue that representation in violation of their ethical duties with full knowledge of the risk of disqualification.

HCCA's counsel was in the process of preparing the motion for disqualification when Ms. McDow left Baker and joined Foley.  [2nd Supp. Bedoyan Decl., ¶ 4].  After the Emergency Motion was resolved, and before Foley was substituted in, there was little activity by Baker in the case other than a Second Amended Disclosure Statement in January 2018 and status conferences.  [2nd Supp. Bedoyan Decl., ¶ 5].  This Court has repeatedly recognized the lack of any meaningful progress made in this case, and has considered dismissal for Ms. McDow's failure to move this case towards plan approval.  [Bedoyan Decl., Ex. H]

In the meantime, there were a plethora of significant issues facing HCCA outside of the Chapter 9 proceedings – issues caused or triggered by McDow's hot potato breaches.  Ms. McDow's declaration was used by Tulare to challenge the MSA between Tulare and HCCA and also spawned a criminal investigation that resulted in searches and seizures of funds and property from Dr. Benzeevi.  [2nd Supp. Bedoyan Decl., ¶ 4].  Dr. Benzeevi was forced to devote substantial time and resources between October 2017 and October 2018 responding to and addressing these other significant matters, all at a time when his two primary sources of revenue, the Inyo MSA and the Tulare MSA had both been cut off.  [2nd Supp. Bedoyan Decl., ¶ 4].  The delay in filing the motion for disqualification was not for any tactical reasons but rather due to the direction of attention and resources to these substantial legal issues.

Ms. McDow's speculation that Inyo will suffer prejudice by not being able to afford new counsel, the case will be dismissed, and the hospital closed are not supported by any evidence or logic.  Dismissal is in this Court's discretion and it can hardly be expected that this Court would be so unfair as to dismiss the case while Inyo retains new counsel.  Loss of knowledgeable

(KDG-4) REPLY MEMORANDUM
OF P's and A's MOTION TO DQ

1  counsel and additional cost are not the type of prejudice to be considered because that is the result

2  any time a disqualification motion is granted, no matter when or how promptly it was filed.

3      There is no basis to conclude that Inyo cannot afford new counsel, especially where Inyo's

4  counsel Scott Nave and Mr. Shinbrot can assist new counsel. Ms. McDow offers no evidence to

5  support her unfounded conclusion that Debtor cannot afford new counsel. If Debtor truly needs

6  funds to hire replacement counsel, Debtor can seek disgorgement of Baker and Foley fees for

7  services performed under this disqualifying conflict. *A.I. Credit Corp., Inc. v. Aguilar &*

8  *Sebastinelli*, 113 Cal.App.4th 1072, 1079 (2003); Tuft, Peck, et al., Cal. Practice Guide:

9  Professional Responsibility, (The Rutter Group 2019) § 5:1026.2 ("An attorney violating conflict

10  of interest rules may also be forced to *disgorge* fees already paid by the client.").

11      New efficient counsel unhampered by conflicts and the need to remove itself from

12  substantial aspects of these proceedings may very well benefit, rather than prejudice Debtor.

13  Debtor has not established that any extreme prejudice would be suffered by reason of a four-

14  month or even one year delay in the filing of this motion, and Moving Parties' implied consent to

15  Foley's and Ms. McDow's disqualifying conflict has not been established by Debtor.

### IV.     CONCLUSION

17      Based on the foregoing, and the facts and arguments presented in the moving papers, as

18  well as Moving Parties' Supplemental Brief, and to preserve the integrity of these proceedings

19  and attorney ethical and public confidence in attorneys herein, the motion to disqualify Foley and

20  Ms. McDow must be granted.

21  Dated: March 6, 2019                KLEIN, DENATALE, GOLDNER, COOPER,
                                        ROSENLIEB & KIMBALL LLP

By: */s/ Hagop T. Bedoyan*
    HAGOP T. BEDOYAN,
    Attorneys for HealthCare Conglomerate
    Associates, LLC, Tulare Asset Management,
    LLC, Medflow, PC and Vi Healthcare
    Finance, Inc.

(KDG-4) REPLY MEMORANDUM
OF P's and A's MOTION TO DQ